**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| 24 HOUR FITNESS WORLDWIDE, INC., *et al.*, | ) | Case No.: 20-11558 (KBO) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) |  |
| _____ | ) |  |
|  | ) |  |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| CONTINENTAL CASUALTY COMPANY; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY; STARR SURPLUS LINES INSURANCE COMPANY; ALLIANZ GLOBAL RISKS US INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; BEAZLEY-LLOYD'S SYNDICATES 2623/623; ALLIED WORLD NATIONAL ASSURANCE COMPANY; QBE SPECIALTY INSURANCE COMPANY; and GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, | ) | Adv. Proc. No._____ |
|  | ) |  |
| Defendants. | ) |  |
| _____ | ) |  |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs 24 Hour Fitness Worldwide, Inc. ("Plaintiff" or "24 Hour Fitness") complains against Defendants as follows:

### I.    NATURE OF THE ACTION

1.    The Defendants in this action issued insurance to 24 Hour Fitness that provides coverage to 24 Hour Fitness for business losses, including its losses associated with the COVID-19 outbreak.  Such losses arise from direct physical loss or damage to 24 Hour Fitness business locations, civil authority orders prohibiting access to 24 Hour Fitness business locations, the inability to access 24 Hour Fitness business locations and the presence of Communicable Disease

at 24 Hour Fitness business locations and throughout the communities where such business locations are maintained. 24 Hour Fitness submitted claims for business interruption and other covered losses arising in connection with the COVID-19 outbreak, but the Defendant insurers denied coverage or have refused to acknowledge coverage under their policies.

2.      24 Hour Fitness seeks a judgment declaring the scope of the Defendants' obligation to pay the losses incurred by 24 Hour Fitness under the insurance policies they sold to 24 Hour Fitness as described below.

## II.      PARTIES

3.      24 Hour Fitness is a Delaware Corporation with its principal place of business in San Ramon, California. For more than 30 years 24 Hour Fitness has been a leading fitness industry pioneer.

4.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant Continental Casualty Company ("Continental") is an Illinois corporation, with its principal place of business in Chicago, Illinois.

5.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant Endurance American Specialty Insurance Company ("Endurance") is a Delaware Corporation, with its principal place of business in Wilmington, Delaware.

6.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant Starr Surplus Lines Insurance Company ("Starr") is an Illinois Corporation, with its principal place of business in New York, New York.

7.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant Allianz Global Risks US Insurance Company ("Allianz") is an Illinois Corporation, with its principal place of business in Chicago, Illinois.

8.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual") is a Wisconsin Corporation, with its principal place of business in Boston, Massachusetts.

9.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant Beazley-Lloyd's Syndicates 2623/623 ("Beazley") are insurance underwriting syndicates in the Lloyd's of London insurance market with a principal place of business in London, England.

10.      24 Hour Fitness is informed and believes, and based thereon alleges that Defendant Allied World National Assurance Company ("Allied World") is a New Hampshire Corporation, with its principal place of business in Concord, New Hampshire.

11.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant QBE Specialty Insurance Company ("QBE") is a North Dakota Corporation, with its principal place of business in Sun Prairie, Wisconsin.

12.      24 Hour Fitness is informed and believes, and based thereon alleges, that Defendant General Security Indemnity of Arizona ("General Security") is an Arizona Corporation, with its principal place of business in Scottsdale, Arizona.

### III.    JURISDICTION AND VENUE

13.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, and an action for declaratory judgment pursuant 28 U.S.C. § 2201.

14.      This court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 because this case arises in or is related to the above referenced Chapter 11 case.  The insurance policies at issue in this case are assets of the bankruptcy estate and the losses Plaintiff suffered due to the COVID-19 outbreak for which it seeks coverage in this case led to Plaintiff's bankruptcy filing.

15.      This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. §157(b)(2)(0), because the losses for which Plaintiff seeks coverage have continued post-petition and the dispute with Defendants regarding coverage under the Policies arose post-petition.

16.      Venue is proper for this proceeding pursuant to 28 U.S.C. § 1409.  In addition, policies issued by each of the Defendants contain the following provision whereby the insurers agree to the insured's choice of jurisdiction and venue:

> "[T]he Company(ies), at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all of the requirements necessary to give such court jurisdiction and all matters hereunder shall be determined in accordance with the law and practice of such court, not including the court's law regarding choice of law.   The Company(ies) shall not transfer, change venue, or remove, or seek to transfer, change venue, or remove any lawsuit filed by the Insured in any such court.

Mater Policy, ¶33.

## IV.   FACTUAL BACKGROUND

### A.   24 Hour Fitness' Business Operations

15.   24 Hour Fitness is one of the nation's leading operators of health and fitness clubs. Prior to the COVID-19 outbreak, 24 Hour Fitness operated in fourteen (14) states and the District of Columbia, with 445 clubs serving approximately 3.4 million members.  The vast majority of its clubs are operated under the *24 Hour Fitness* brand.  In addition to providing members with access to cardio and weightlifting equipment, the company's fitness clubs feature a range of additional amenities and services, including personal training, services, group exercise classes, and "Kids' Club" services.  Given the large size of 24 Hour Fitness's clubs, which average approximately 36,000 square feet, certain clubs feature, among other amenities, full-size basketball courts, lap pools, and "Turf Zones" for high-intensity interval training.

16.   24 Hour Fitness primarily generates revenue from the collection of membership dues and fees.  Each member is a party to a membership agreement, pursuant to which membership dues generally are billed on a monthly or annual basis.  Plaintiff also generates revenue from the sale of a variety of products and services, including, among other things, personal training sessions, services, and retail merchandise.

17.   Prior to the COVID-19 outbreak, 24 Hour Fitness employed approximately 19,200 individuals, but due to the closure of its fitness clubs as a result of COVID-19, 24 Hour Fitness furloughed approximately 17,800 individuals and reduced its workforce by approximately 700 individuals.

18.     As part of its prudent business and risk-management practices, 24 Hour Fitness maintains insurance coverage.  24 Hour Fitness specifically maintains "all risks" coverage provided by the Defendants, which covers all risks of loss unless specifically excluded, including risks associated with communicable diseases like COVID-19.  In addition to its "all risk" coverage, 24 Hour Fitness also purchased a "Pollution" policy from Defendant Allied World, which also covers business interruption losses from the COVID-19 outbreak.

### B.     COVID-19 Is A Fortuitous And Highly Contagious Communicable Disease

19.     During the relevant policy period, a communicable disease ("COVID-19") was first discovered in China, and spread to and throughout the United States.  The first known COVID-19 case in the United States was diagnosed in January 2020.  The public health infrastructure in the United States was not prepared for or equipped to prevent the spread of the disease in the United States.

20.     COVID-19 is a highly contagious, deadly and infectious disease that is transmitted from person to person.

21.     By January 2020, the COVID-19 disease reached the United States and then spread across the country.  The public health infrastructure was not ready to prevent the spread of the disease.  For example, the public health system was not prepared with an appropriate testing regimen and did not have procedures in place for contacting tracing and isolating infected individuals.  It was only later that public health officials became aware that wearing masks was an effective means to control the spread of the disease.  Even then, government and public health officials sent mixed messages regarding the efficacy and need for wearing masks, and no uniform mandates were issued throughout the country.

22.     On March 11, 2020, the World Health Organization ("WHO") declared COVID-19 a global outbreak.  The WHO stated: "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks."

23.     On March 16, 2020, the federal government issued public guidance titled "30 Days

to Slow the Spread" of COVID-19.  The guidance called for extreme social distancing measures, such as working from home, avoiding gatherings of more than 10 people, and staying away from bars and restaurants.

24.     On March 19, 2020, California Governor Gavin Newsom ordered all Californians to stay inside their homes indefinitely, only allowing them to leave to perform activities that were necessary to maintain the "federal critical infrastructure."  During a televised speech, the Governor stated that he issued the Stay at Home Order because state officials had changed their prior assessment of the disease and believed 56 percent of Californians—nearly 25 million people— might be infected with the virus between mid-March and June.  The Governor predicted that 20 percent of those infected might need to be hospitalized, creating an unprecedented surge on California's health care system as tens of thousands of people sought medical treatment during a short period of time.

25.     At around this time, various "stay at home" or "shelter in place" orders were issued in locations where 24 Hour Fitness conducts operations.

26.     On March 16, 2020, San Francisco, California issued its "Stay Safe At Home Order" requiring most people to remain in their homes subject to certain exceptions.  In a subsequent order on March 27, 2020, the Mayor of San Francisco confirmed that the orders issued as a result of the COVID-19 emergency were issued "because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time."

27.     On March 16, 2020, Alameda County, California issued its shelter in place "Order of the Health Officer of the County of Alameda."  The Order prohibited all "non-essential gatherings of any number of individuals."  The Order also required all businesses in Alameda County, with exceptions for essential businesses, to "cease all activities at facilities located within the County."  The order recognized that there was a lack of widespread COVID-19 testing available to the public.

28.     On March 31, 2020, Alameda County issued a revised shelter-in-place order to

strengthen and extend a prior order, including to "mitigate the impact on delivery of critical healthcare services to those in need."  Again, the revised order prohibited "[a]ll public and private gatherings of any number of people occurring outside a single household or living unit."  The order noted that the public health emergency had "substantially worsened since the County issued the Prior Shelter in Place Order on March 16, 2020, with a significant escalation in the number of positive cases, hospitalizations, and deaths, and increasing strain on health care resources."  An order issued by the County of Alameda on June 18, 2020 continued to prohibit gatherings of individuals.

29.    On March 16, 2020, the City of New York issued an Emergency Executive Order which ordered the closure of all "commercial gyms."  The New York City order cited "the propensity of the virus to spread person to person and also because the virus physically is causing property loss and damage."

30.    Also on March 16, 2020, the City of Dallas, Texas ordered closed any "gym or health studio" pursuant to Texas Government Code Section 418.80 which authorizes the Mayor to "order the evacuation of all or part of the population from a stricken or threatened area under the jurisdiction and authority of the Mayor if the Mayor considers the action necessary for the preservation of life or other disaster mitigation, response, or recovery; and authorizes the Mayor to control ingress to and egress from a disaster area under the jurisdiction and authority of the Mayor and control the movement of persons and the occupancy of premises in that area."

31.    On March 23, 2020, the State of Washington issued a "Stay Home – Stay Healthy" order in which it shuttered all non-essential businesses.  The order described the outbreak and its progression in Washington State as a "public disaster affecting the life, health, property or the public peace."

32.    On March 24, 2020 Harris County, Texas issued its "Stay Home, Work Safe" order, which ordered the closure of all fitness centers.  The order referenced the "substantial risks posed by the COVID-19 virus to Harris County residents and their property."

33.    Additional orders like these were entered in the areas where 24 Hour Fitness

conducted business and are all publicly available.

34.     As more information was obtained regarding the disease and measures could be implemented to allow for the easing of restrictions, the restrictions imposed by these orders were relaxed such that gym operations could be conducted under various restrictions and conditions. However, certain governments changed course as time progressed and reinstated their restrictive provisions.  For example, on July 13, 2020, California's Governor issued a statewide order mandating the indefinite closure of all *indoor* activities such as restaurants, movie theaters, wineries, zoos, museums, cardrooms and entertainment venues and mandated the closure of gyms in most California counties.  On November 15, 2020, the Governor of Washington State issued a Proclamation rolling back the phased reopening, which included closing all indoor operations at fitness facilities and gyms.  The Proclamation noted that the COVID-19 was a "public disaster affecting life, health, property or the public peace."  Similarly, on November 17, 2020, the Governor of Oregon issued an Executive Order instituting a "temporary freeze" imposing various restrictions including the prohibition of "gyms and fitness organizations" from operating.  On November 16, 2020, the Governor of California announced that the state was "pulling an emergency brake" on its reopening, and that 94.1 percent of California's population would be in the "most restrictive tier."  Additional orders have since been entered throughout California.

**C.     The Public Health System Could Not Contain The Spread Of COVID-19**

35.     What distinguishes COVID-19 from other diseases is its propensity to spread via persons who show no symptoms of the disease.  Asymptomatic carriers of the disease are seemingly healthy people, yet can unknowingly transmit the disease by spreading infectious droplets through speaking, breathing, and touching objects.  According to the CDC, "everyone is at risk for getting COVID-19."  A person may become infected by: (1) coming into close contact (about 6 feet) with a person who has COVID-19; (2) coming into contact with respiratory droplets when an infected person talks, sneezes, or coughs; and/or (3) touching surfaces or objects contaminated with COVID-19.

36.     In the months following the first known COVID-19 case in the United States in January 2020, the spread of the disease in the United States was rampant as public health authorities and medical professionals sought to understand the disease.  The state of the public health system in the United States, both before and after the start of the crisis, was unable to stop the unrestrained spread of COVID-19, which led to the presence of COVID-19 throughout the communities where Plaintiff operated its fitness clubs, and in the immediate areas surrounding its club locations.  Members and employees at Plaintiff's clubs were also infected with COVID-19.  Given the limited knowledge of the disease in these early stages, including the limited knowledge regarding the transmission of the disease from asymptomatic individuals, Plaintiffs were unaware of the extent of the disease in the community.   All of this caused Plaintiff's fitness clubs to be rendered unsafe and dangerous until the disease became better understood and steps could be taken to modify Plaintiff's premises and operations such that they could be operated safely.  Before COVID-19 was allowed to spread, Plaintiff's fitness clubs were in a satisfactory condition, but because COVID-19 was permitted to spread and remain throughout the community, Plaintiff's fitness clubs became unsafe until steps could be taken to make them safe again to operate.

37.     Even before COVID-19 was detected in China and made known throughout the world, the public health system in the United States was not prepared to handle a massive national healthcare emergency that would ultimately require:  stockpiles of medical supplies, adequate hospital and first responder staffing, and sufficient hospital facilities to handle the influx of new patients, in addition to the already existing level of patients being treated under normal circumstances.  The United States' public health system was also unequipped to handle the spread of COVID-19 due to a lack of critical infrastructure for testing, contact tracing, and quarantining for those found exposed to the disease, or those who came into contact with someone confirmed to carry COVID-19.  An article on Vox.com dated March 16, 2020, entitled "Coronavirus is exposing all of the weaknesses in the US health system," explained that "America was less prepared for a pandemic than countries with universal health systems."  "Before the crisis even began, the United States had fewer doctors and fewer hospital beds per capita than most other

developed countries.  The rollout of COVID-19 testing has been patchy, reliant on a mix of government and private labs to scale up the capacity to perform the tens of thousands of tests that will be necessary."  Similarly, an article in the New Yorker from March 17, 2020, titled "The Coronavirus and the Gutting of America's Public-Health System", discusses various reports finding that with the eroding infrastructure of America's public health system "comes a diminished capacity to predict, detect, and respond to an emerging infectious disease."

38.    As a result of the above conditions, COVID-19 spread largely undetected into an unsuspecting United States population, and individuals infected with the COVID-19 roamed undetected throughout the community, including in and throughout business locations like Plaintiff's fitness club locations.  Given the dearth of knowledge regarding the disease and how it spread, there was little guidance from government or public health officials regarding the safe operation of fitness clubs and similar businesses, including repairs and other modifications to facilities that could be implemented to allow for their safe operation.

39.    In March 2020, Plaintiff became aware of several incidents of individuals with actual or suspected cases of COVID-19 being present in Plaintiff's fitness club locations. Given the widespread presence of the disease within the community, including the areas where Plaintiff's clubs are and were located, Plaintiff believes that individuals with COVID-19 were present at most, if not all, of Plaintiff's clubs from January 2020 to March 16, 2020.

40.    Due to all of the conditions set forth above, on March 16, 2020, Plaintiff had no choice but to close all of its club locations while it (and the government and medical professionals) worked to develop safe protocols for reopening, and was required to keep its club locations closed due to various governmental orders.  Over time, as the disease became better understood and safety protocols, including necessary physical changes to Plaintiff's clubs, could be implemented, Plaintiff gradually and intermittently was permitted to reopen with restricted operations or heightened public health practices.  In some cases, however, Plaintiff was subject to the rolling back of its ability to reopen in certain states, including in California, its largest market, which implemented orders causing the prohibition of operations at nearly all of its clubs in California on

July 15, 2020.

41.     The presence of individuals who contracted or suffered from COVID-19, coupled with the prevalence of the disease in the community, caused physical loss of or damage to Plaintiff's business locations.

42.     Due to this physical loss or damage, Plaintiff's operations were suspended and Plaintiff suffered and continues to suffer, significant losses.   As noted above, in certain jurisdictions, including California, Plaintiff is still prohibited from operating, as the government has determined that fitness clubs should be closed due to perceived risks associated with such businesses.   While Plaintiff believes that the modifications it has put in place now allow it to operate safely, it is required to comply with these government directives.

43.     Although Plaintiff purchased insurance to cover the business interruption losses it has suffered, Defendants have abandoned Plaintiff in its time of need.   Plaintiff's business losses from the closure of its clubs due to the COVID-19 outbreak, which have not been paid by the Defendants, led to Plaintiff's chapter 11 filing.

        D.      **The "All Risks" Insurance Policies Issued by Defendants**

44.     As part of its comprehensive insurance program, 24 Hour Fitness purchased "all risks" property insurance from the Defendants.  24 Hour Fitness purchased this insurance to protect against losses to its business from a covered event.   Such insurance provides broad coverage for "all risks" of physical loss or damage to covered property unless specifically excluded, including business interruption losses arising from such physical loss or damage.  In addition, the insurance protects against business interruption losses when, due to an insured peril, there is an order of a civil authority that prohibits access to insured locations, or an insured peril prevents ingress/egress to or from an insured location.  In addition, these policies contain specific coverage for business losses due to civil orders related to the presence of a communicable disease at insured locations. All of these coverages are implicated by the COVID-19 outbreak.

45.     Plaintiff's "all risks" property insurance program is comprised of a primary layer of insurance with limits of coverage in the amount of $20 million per occurrence, and an excess

layer of insurance with a limit of $30 million per occurrence, for a total of $50 million per occurrence.  Defendants Continental Casualty, Endurance, Starr, Allianz, Liberty Mutual, Beazley and Allied World each provide a percentage of the $20 million per occurrence primary coverage layer.  Defendants QBE, General Security, Starr and Allianz each provide a percentage of the excess layer of coverage.  The insurance policies that comprise the primary and excess layers of coverage are subject to a common master policy form, and were issued for the period June 30, 2019 to June 30, 2020 (the "Property Policies").  So long as the losses commenced during the policy period, coverage applies even if the losses continue after the end of the policy period.

46.     The Property Policies contain sub-limits for certain types of losses, such as $10 million per occurrence for extra expenses, but other losses are simply subject to the full $50 million per occurrence policy limit.  For example, the Property Policies have no sublimit for business interruption, meaning the full $50 million of coverage per occurrence is available.

47.     The Property Policies cover Plaintiffs "any and all subsidiary or affiliated companies, corporations, firms, organizations, partnerships or joint ventures and/or any owned, whether wholly or partially, or controlled company(ies) where the Insured maintains and interest, or as now or hereafter constituted or acquired . . . ."  Master Policy, ¶1.

48.     Pursuant to the Policies, Defendants promised 24 Hour Fitness to insure against the following "Perils":

> All risk of direct physical loss or damage to property described herein including general average, salvage and all other charges on shipments covered hereunder, except as hereinafter excluded.
>
> Master Policy, ¶9.

49.     "Loss" and "damage" are not defined in the Property Policies.  Moreover, "loss" is necessarily different than "damage" to property.  A property can suffer a "loss" without there being any physical alteration to the structure of the property.  That being said, the COVID-19 disease is transmitted through physical matter that attaches to physical surfaces, and is emitted into the air and into ventilation systems, such that when Plaintiff's property was exposed to the disease, it

physically altered the property and rendered the property dangerous and unsafe, at least until the disease became better understood and steps could be taken to modify Plaintiff's premises and operations such that they could be operated safely. Even after that occurred, the enforcement of certain government directives prohibiting or severely restricting the operations of Plaintiff's business locations resulted in continuing losses.

50.     Coverage under the Property Policies extends to the "interest of the Insured in all real and personal property including but not limited to property owned, used, leased or intended for use by the Insured. . . ."  Master Policy, ¶7.A.

51.     The Property Policies provide coverage for "Business Interruption" defined as "Loss resulting from necessary interruption of business conducted by the Insured whether total or partial, and caused by loss, damage, or destruction covered herein during the term of this policy to real and personal property as described in Clause 7.A."  Master Policy, ¶7.B.

52.     The Property Policies contain a provision entitled "Demolition and Increased Cost of Construction" which provides, in part, that if there is "loss or damage under this policy that causes the enforcement of any law, ordinance, governmental directive or standard regulating . . . use, or occupancy of property" the Defendants "shall be liable for," among other things, "any increase in the business interruption, extra expense, rental value or royalties loss arising out of the additional time required to comply with said law or ordinance."  Master Policy, ¶8.

53.     The Property Policies contain a coverage extension for "Interruption by Civil or Military Authority," which provides:

> This policy is extended to cover the loss sustained during the period of time when access to real or personal property is prohibited by order or action of civil or military authority issued in connection with or following a peril insured against within (5) statute miles of the insured premises and for a period not to exceed (30) days.

> Master Policy, ¶7.F(2).

54.      The 30-day period was extended to 45 days per occurrence. A separate 45-day per occurrence period applies under the primary Property Policies followed by a separate 45-day

period per occurrence period under the excess Property Policies once the 45 days of coverage provided for in the primary Property Policies is exhausted for a particular occurrence. The Property Policies specifically provide that upon exhaustion of a primary limit, the excess Property Policies "shall step down and be liable for loss in the excess of the amount attributed to such policy as respects loss or damage insured thereunder subject to the excess policy(ies) limits." Master Policy, ¶16.

55.    In contrast to the other applicable coverage grants, the Civil or Military Authority provision does not require physical loss or damage to any property to trigger coverage. Rather, all that is required is an order or action of a civil or military authority issued in connection with or following "a peril insured against" within five miles of an insured premises, which results in a business interruption loss. The perils insured against are "all risks" of loss or damage. The failures to contain the spread of COVID-19 in each of the locations where 24 Hour Fitness conducted operations, which led to the various civil authority orders that prevented customers from accessing the 24 Hour Fitness business locations, constitute insured perils. The insured perils occurred within five miles of Plaintiff's locations. Moreover, many of the civil orders make clear that they were issued because COVID-19 was causing property damage in the subject jurisdictions.

56.    The Property Policies also contain a coverage extension for "Ingress/Egress," which provides:

> This policy is extended to cover the loss sustained during the period of time when, in connection with or following a peril insured against, access to or egress from real or personal property is prevented within five (5) statute miles of the insured premises and for a period not to exceed thirty (30) days.

> Master Policy, ¶7F.(3).

57.    The 30-day period was extended to 45 days per occurrence. A separate 45-day per occurrence period applies under the primary Property Policies followed by a separate 45-day period per occurrence period under the excess Property Policies once the 45 days of coverage provided for in the primary Property Policies is exhausted for a particular occurrence. The Property

Policies specifically provide that upon exhaustion of a primary limit, the excess Property Policies "shall step down and be liable for loss in the excess of the amount attributed to such policy as respects loss or damage insured thereunder subject to the excess policy(ies) limits." Master Policy, ¶16.

58.     In contrast to the other applicable coverage grants, the Ingress/Egress provision does not require physical loss or damage to any property to trigger coverage.  Rather, all that is required is "a peril insured against" and access to or egress from property being prevented in connection with or following the insured peril within five miles of an insured premises and a resulting business interruption loss.  The failures to contain the spread of COVID-19 in each of the locations where 24 Hour Fitness conducted operations, which led to the various civil authority orders that prevented customers from accessing the 24 Hour Fitness business locations, constitute insured perils.  The insured perils occurred within five miles of Plaintiff's locations.

59.     By endorsement, the Property Policies contain a provision entitled "Interruption by Communicable Disease" which provides specific coverage for the losses from the presence and spread of a "communicable disease" which is defined as:

> [A] disease that:
>
> A. May be transmitted directly or indirectly by one person or other
>
> life form to another and:
>
> B. Is due to:
>
> > 1. An infectious agent; or
> >
> > 2. A toxic product produced by such infectious agent.
>
> Master Policy, Endt. #2.

60.     The "Communicable Disease" endorsement specifically covers reasonable and necessary expenses to a) clean up, remove and dispose of communicable disease from insured property and b) to restore the premises "[i]n a manner to satisfy the minimum requirements of any law or ordinance regulating communicable diseases."  The endorsement also specifies that the Property Policies cover business interruption losses resulting from the need to clean up and restore

insured premises, provided that access to an insured location is prohibited "a) Due to the actual presence of and spread of communicable diseases at the that described location; and b) as a direct result of a declaration by a civil authority enforcing any law or ordinance regulating communicable diseases."   The endorsement further states that "the presence of and spread of communicable diseases will be considered direct physical damage and the expenses listed in items a) and b) above will be considered expenses to repair such damage."  *Id*.

61.    There can be no question that COVID-19 constitutes a "communicable disease" as defined in the Property Policies.   The presence and spread of COVID-19 throughout the community, including at Plaintiff's fitness club locations, led to the closure orders discussed above.  This resulted in Plaintiff suffering substantial business interruption losses, all of which are covered under the Property Policies.

62.    One of the Defendant insurers, Endurance, has taken the position in correspondence that its Policy does not afford coverage under the Communicable Disease Endorsement, even though the Communicable Disease Endorsement is attached to its Policy.  Endurance asserts that a "General Change Endorsement," which is focused on deductibles, takes away the coverage provided by the Communicable Disease Endorsement.   This position is unreasonable and inconsistent with the explicit coverage provided by the Communicable Disease Endorsement.

63.    Endurance also has taken the position in correspondence that another endorsement in its Policy precludes all of Plaintiff's losses, not only those that would be covered under the Communicable Disease Endorsement.  *See* Endurance Policy, Endorsement #4.  This exclusion is not enforceable as it cannot be reconciled with the specific Communicable Disease Endorsement or the Plaintiff's reasonable expectations of coverage.

64.    The Property Policies also cover "such expenses incurred for the purpose of reducing any loss under this policy, even though such expenses may exceed the amount by which the loss under this policy is thereby reduced."  Master Policy, ¶7.G.(3).  Expenses incurred by 24 Hour Fitness in connection with the closure of its properties, in addition to being done to address ongoing physical loss or damage, were also for the purpose of reducing loss under the Property

Policies that would have occurred had those locations remained open.

65.     Similarly, the Property Policies contain a "Sue and Labor" provision which provides as follows:

> In case of actual or imminent loss or damage covered by this policy except imminent loss or damage as respects an "accident", it shall, without prejudice to this insurance, be lawful and necessary for the Insured, their factors, servants, or assigns to sue, labor and travel for, in and about the defense, the safeguard, and the recovery of property or any part of the property insured hereunder; nor in the event of loss or damage, shall the acts of the Insured or of the Company(ies) in recovering, saving, and preserving the insured property be considered a waiver or an acceptance of abandonment. The Company(ies) shall pay the expenses so incurred.

> Master Policy, ¶30.

The expenses incurred by 24 Hour Fitness in connection with the closure of its properties, in addition to being done to address ongoing physical loss or damage, were also for the purpose of preserving the property from further loss, and such expenses are covered under the Property Policies.

66.     In summary, Plaintiff's losses are covered in whole or in part under the business interruption, civil authority, ingress/egress and communicable disease coverage provisions of the Property Policies and there are no exclusions that apply.  Certain expenses also are covered as expenses to reduce loss and sue and labor expenses.

67.     The Defendants dispute their obligations to provide coverage under the Property Policies.

**E.     The Allied World Pollution Policy**

68.     As part of its comprehensive insurance program, 24 Hour Fitness purchased a Pollution Policy from Defendant Allied World, Policy Number 0309-1873 (the "Pollution Policy"), for the policy period September 3, 2017 to September 3, 2020.  The Pollution Policy contains limits of $25 million for each incident and in the aggregate.

69.     The Pollution Policy provides coverage for "business interruption costs resulting

from business interruption caused solely and directly by a pollution incident on, at or under a scheduled location." The term "pollution incident" includes the presence of a virus on, at or within buildings or structures." "Business interruption" means "the necessary suspension" of the insured's operations, and "business interruption costs" mean "actual loss of business income and extra expense" the insured incurs during the period of business interruption.

70.     The Pollution Policy covers some or all of Plaintiff's business interruption losses from the COVID-19 outbreak. The Pollution Policy states that if there is other insurance that also affords coverage for a loss covered under the Pollution Policy, the Pollution Policy "is primary." Thus, to the extent coverage exists under both the Property Policies and the Pollution Policy for any aspect of Plaintiff's losses, then the Pollution Policy provides primary coverage for those specific losses.

71.     Allied World disputes its obligation to provide coverage under the Pollution Policy.

### V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(Declaratory Relief)

72.     Plaintiff incorporates the above Paragraphs, by reference.

73.     An actual controversy exists between the parties within the meaning of California Code of Civil Procedure Section 1060.

74.     As such, this Court has the authority to issue a declaratory judgment concerning the respective rights and duties of 24 Hour Fitness and the Insurers under the Property Policies and the Pollution Policy.

75.     24 Hour Fitness is entitled to declaratory relief establishing that the losses it has suffered are covered by the Property Policies and the Pollution Policy.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, 24 Hour Fitness prays for judgment as follows:

1.    On the First Cause of Action for Declaratory Relief:

a.    that this Court declare the rights, obligations and liabilities of the parties herein and specifically declare, as 24 Hour Fitness contends, that the events and losses incurred as described in this complaint are covered by the Property Policies and the Pollution Policy.

b.    for costs of suit incurred herein; and

c.    for such other relief as the Court may deem just and proper.


Dated: December 21, 2020                          Respectfully submitted,
            Wilmington, Delaware

                                                          **REED SMITH LLP**

                                                          By: */s/ Mark W. Eckard*
                                                                Mark W. Eckard (No. 4542)
                                                                1201 North Market Street, Suite 1500
                                                                Wilmington, DE 19801
                                                                Telephone:  (302) 778-7500
                                                                Facsimile:  (302) 778-7575
                                                                Email:  meckard@reedsmith.com

                                                                David E. Weiss (*pro hac vice pending*)
                                                                101 Second Street
                                                                Suite 1800
                                                                San Francisco, CA  94105-3659
                                                                Telephone: (415) 543-8700
                                                                Facsimile: (415) 391-8269
                                                                Email:  dweiss@reedsmith.com

                                                                Counsel for 24 HOUR FITNESS
                                                                WORLDWIDE, INC.