## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (TMH) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (TMH) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## PROPERTY INSURER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................... iii

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................... 1

II.     SUMMARY OF ARGUMENT ................................................................................... 2

III.    STATEMENT OF FACTS ......................................................................................... 3

        Closure of the 24 Hour Facilities ..................................................................... 3

        COVID-19 – The Virus and its Spread ............................................................. 3

        The Property Policies .......................................................................................... 4

        The Evidentiary Record ....................................................................................... 7

IV.     ARGUMENT ........................................................................................................... 10

        A.      Standard of Review ............................................................................... 10

        B.      Applicable Law ..................................................................................... 11

        C.      24 Hour Offers No Evidence of "Physical Loss or Damage" Required for
                Business Interruption and Other Time Element Coverage ..................... 11

                1.      "Direct Physical Loss or Damage" Requires Physical Harm or Alteration to
                        Property ..................................................................................... 12

                2.      Neither the Mere Presence of the COVID-19 Virus Nor Closure by
                        Government Orders  Constitute Physical Loss or Damage. ............ 15

        D.      24 Hour Fails to Meet The Requirements for Coverage Under the ICD
                Endorsement  ......................................................................................... 20

                1.      24 Hour Has Offered No Evidence of the "Actual Presence and Spread"
                        of COVID-19 at Any of Its Facilities ............................................ 21

                2.      24 Hour Fitness Has Not Demonstrated That Access To Any Of Its
                        Properties Was Prohibited............................................................... 25

                3.      24 Hour Offers No Evidence That It Incurred COVID-19 Related Cleaning
                        Costs During the Time of its Closure after March 16, 2020.............. 27

                4.      24 Hour Is Not Entitled to Business Interruption Coverage under the ICD
                        Endorsement ................................................................................. 29

        CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*,
    21 F.4th 216 (2d Cir. 2021) ...................................................................14

*10012 Holdings, Inc. v. Sentinel Ins. Co.*,
    No. 21-80-cv, 2021 U.S. App. LEXIS 38270 (2d Cir. Dec. 27, 2021)....................................13

*AIKG, LLC v. Cincinnati Ins. Co.*,
    No. 21-13506, 2022 U.S. App. LEXIS 17282 (11th Cir. June 23, 2022)................................13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................10, 11

*Another Planet Entertainment v. Vigilant Insurance Company*,
    Case: 21-16093, Order Certifying Question to the California Supreme Court
    (9th Cir. Dec. 28, 2022) ...................................................................16

*Apple Annie, LLC v. Oregon Mutual Ins. Co.*,
    82 Cal.App.5th 919, 298 Cal.Rptr.3d 886 (Cal. App. 2022) ...................................17

*Aspen Lodging Grp., LLC v. Affiliated FM Ins. Co.*,
    No. 21-35472, 2023 U.S. App. LEXIS 12336 (9th Cir. May 19, 2023)................................13

*AU Health System, Inc. v. Affiliated FM Ins. Co.*,
    593 F. Supp. 3d 1344 (S.D. Ga. 2022)...........................................................24, 25

*Aydin Corp. v. First State Ins. Co.*,
    959 Cal. Rptr. 1213 ...................................................................28

*BA Lax, LLC v. Hartford Fire Ins. Co.*,
    No. 21-55109, 2022 U.S. App. LEXIS 29383 (9th Cir. Oct. 21, 2022) ................................13

*Body Xchange Sports Club, LLC v. Zurich Am. Ins. Co.*,
    648 F.Supp.3d 1205, 1214 (E.D. Cal. 2022)...........................................................12

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ...................................................................10

*Brunswick Panini's, LLC v. Zurich Am. Ins. Co.*,
    No. 21-3222, 2022 U.S. App. LEXIS 35544 (6th Cir. Dec. 21, 2022)................................13

*Buffalo Xerographix, Inc. v. Sentinel Ins. Co., Ltd., et al.*,
    No. 21-1502, 2022 U.S. App. LEXIS 25857 (2d Cir. Sept. 15, 2022) ................................13

*Caballero v. Massachusetts Bay Ins. Co.*,
  No. 21-35510, 2022 U.S. App. LEXIS 28678 (9th Cir. Oct. 17, 2022) ..................................13

*Cajun Conti LLC v. Certain Underwriters at Lloyd's*,
  359 So.3d 922 (La. 2023) ........................................................................................................16

*Ceres Enters., LLC v. Travelers Indem. Co. of Am.*,
  No. 21-3232, 2022 U.S. App. LEXIS 35542 (6th Cir. Dec. 21, 2022)..................................13

*Circle Block Partners, LLC v. Fireman's Fund Ins. Co.*,
  44 F.4th 1014 (7th Cir. 2022) .................................................................................................13

*Cleveland v. Policy Mgmt. Sys. Corp.*,
  526 U.S. 795 (1999)................................................................................................................10

*Coast Restaurant Group, Inc. v. Amguard Ins. Co.*,
  90 Cal.App.5th 332, 307 Cal.Rptr.3d 133 (Cal. App. 2023) ..................................................17

*Coleman E. Adler & Sons, LLC v. Axis Surplus Ins. Co.*,
  49 F.4th 894 (5th Cir. 2022) ...................................................................................................13

*Creative Artists Agency, LLC v. Affiliated FM Ins. Co.*
  (C.D. Cal. Jul. 27, 2022, No. 2:21-CV-08314-AB (GJS)) 2022 WL 3097371 .....................15

*Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*,
  20 F.4th 303 (7th Cir. 2021) ...................................................................................................13

*Danville Regional Medical Center, LLC v. American Guarantee and Liability
  Insurance Company*,
  2022 WL 16914516 (W.D. Va., 2022) ....................................................................................26

*DDS v. Aspen Am. Ins. Co.*,
  No. 21-35477, 2022 U.S. App. LEXIS 29189 (9th Cir. Oct. 20, 2022) ..................................13

*Dickie Brennan & Co., LLC v. Zurich Am. Ins. Co.*,
  No. 21-30776, 2022 U.S. App. LEXIS 21185 (5th Cir. Aug. 1, 2022) ...................................13

*Endeavor Operating Co. v. HDI Global Ins. Co.*,
  95 Cal.App.5th 839, 313 Cal.Rptr.3d 746 (Cal. App. 2023) ........................................13, 16, 17

*Equity Planning Corp. v. Westfield Ins. Co.*,
  No. 21-3229, 2022 U.S. App. LEXIS 35493 (6th Cir. Dec. 21, 2022)..................................13

*Estes v. Cincinnati Ins. Co.*,
  No. 21-5587, 2022 U.S. App. LEXIS 926 (6th Cir. Jan. 12, 2022)........................................13

*Exceptional Dental of La., LLC v. Bankers Ins. Co.*,
  No. 22-30705, 2023 U.S. App. LEXIS 8647 (5th Cir. Apr. 11, 2023)....................................13

*Family Tacos, LLC v. Auto-Owners Ins. Co.*,
No. 21-3224, 2022 U.S. App. LEXIS 35543 (6th Cir. Dec. 21, 2022)...................................13

*First and Stewart Hotel Owner LLC v. Fireman's Fund Ins. Co.*,
No. 21-35637, 2023 U.S. App. LEXIS 12328 (9th Cir. May 19, 2023)................................13

*First Realty LLC v. Aspen Am. Ins. Co.*,
No. 22-2220, 2023 U.S. App. LEXIS 9407 (2d Cir. Apr. 20, 2023) .....................................13

*Golden Corral Corp. v. Illinois Union Ins. Co.*,
559 F. Supp. 3d 476 (E.D.N.C. 2021), *aff'd*, 2022 WL 3278938 (4th Cir. Aug.
11, 2022) ..............................................................................................................................14

*Henderson Rd. Rest. Sys. v. Zurich Am. Ins. Co.*,
No. 21-4148, 2022 U.S. App. LEXIS 16374 (6th Cir. June 13, 2022)..................................13

*Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*,
35 F.4th 1318 (11th Cir. 2022) ...........................................................................................13

*Hot Yoga, Inc. v. Philadelphia Indem. Ins. Co.*,
No. 21-35806, 2022 U.S. App. LEXIS 28674 (9th Cir. Oct. 17, 2022) ...............................13

*Hotel Mgmt. of New Orleans, LLC v. Gen. Star Indem. Co.*,
No. 22-30354, 2023 U.S. App. LEXIS 11145 (5th Cir. May 5, 2023)..................................13

*HT-Seattle Owner, LLC v. Am. Guar. & Liab. Ins. Co.*,
No. 21-35916, 2023 U.S. App. LEXIS 12327 (9th Cir. May 19, 2023)................................13

*Huntington Ingalls Indus., Inc. v. Ace Am. Ins.*,
287 A.3d 515 (Vt. 2022) .....................................................................................................16

*Inns-by-the-Sea v. California Mut. Ins. Co.*,
71 Cal. App. 5th 688 (Cal. App. 2021)......................................................................13, 18, 26

*Inspira Health Network v. American Guarantee and Liability Insurance
Company*,
2022 WL 16552780 (D.N.J. 2022) (holding that the COVID-19 Executive
Order restricted certain activities on the insured location but did not prohibit
access to the insured location as is required to trigger coverage under the ICD
provision) ............................................................................................................................26

*ITT Inc. v. Factory Mut. Ins. Co.*,
No. 22-1245, 2023 U.S. App. LEXIS 2409 (2d Cir. Jan. 31, 2023).....................................13

*Jackson v. Danberg*,
594 F.3d 210 (3d Cir.2010)..................................................................................................21

*Legal Sea Foods, LLC v. Strathmore Ins. Co.*,
   36 F.4th 29 (1st Cir. 2022) ................................................................. 13

*Marina Pacific Hotels and Suites, LLC v. Fireman's Fund Ins. Co.*,
   81 Cal.App.5th 96, 296 Cal.Rptr.3d 777 (Cal. App. 2022) ..................... 17

*In re Mariner Health Grp.*,
   2003 WL 22299672 (Bankr. D. Del. Sept. 24, 2003) ............................. 11

*McCulloch v. Valley Forge Ins. Co.*,
   No. 21-35520, 2022 U.S. App. LEXIS 28680 (9th Cir. Oct. 17, 2022) ............... 13

*Med. Ctr. v. Cont'l Cas. Co.*,
   No. 22-322, 2023 U.S. App. LEXIS 9057 (2d Cir. Apr. 17, 2023) ................. 13

*Michael's Inc. v. Westfield Ins. Co. (In re MIKMAR, Inc.)*,
   No. 21-3230, 2022 U.S. App. LEXIS 35497 (6th Cir. Dec. 21, 2022) ............... 13

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
   15 F. 4th 885 (9th Cir. 2021) ................................................ 13, 14, 18

*Musso & Frank Grill Co. v. Mitsui Sumitomo Ins. USA Inc.*,
   77 Cal. App. 5th 753, 293 Cal.Rptr.3d 1 (2022) ................................. 14

*Neuro-Communication Svcs., Inc. v. Cincinnati Ins. Co.*,
   --N.E.3d--, 2022 WL 17573883 (Ohio 2022) ........................................ 16

*Northwell Health, Inc. v. Lexington Ins. Co.*,
   550 F. Supp. 3d 108 (S.D.N.Y. 2021*), following order without opinion*, 2021
   WL 3163273 (July 07, 2021) .......................................................... 26

*O'Brien Sales and Marketing, Inc. v. Transportation Ins. Co.*,
   512 F. Supp. 3d 1019 (N.D. Cal. 2021) ........................................ 13, 14

*Olmsted Med. Ctr. v. Cont'l Cas. Co.*,
   No. 22-1256, 2023 U.S. App. LEXIS 10128 (8th Cir. Apr. 26, 2023) ............... 13

*Oral Surgeons, P.C. v. Cincinnati Ins. Co.*,
   2 F. 4th 1141 (8th Cir. July 2, 2021) .............................................. 13

*PHI Grp., Inc. v. Zurich Am. Ins. Co.*,
   No. 22-30142, 2023 U.S. App. LEXIS 2367 (5th Cir. Jan. 30, 2023) ............... 13

*Protégé Rest. Partners LLC v. Sentinel Ins. Co.*,
   No. 21-16814, 2022 U.S. App. LEXIS 29925 (9th Cir. Oct. 25, 2022) ............... 13

*PS Bus. Mgmt., LLC v. Fireman's Fund Ins. Co.*,
   No. 21-30723, 2022 U.S. App. LEXIS 18688 (5th Cir. July 6, 2022) ............... 13

*Q Clothier New Orleans, LLC v. Twin City Fire Ins. Co.*,
  29 F.4th 252 (5th Cir. 2022) ................................................................13

*Riverside Dental of Rockford, Ltd. v. Cincinnati Ins. Co.*,
  No. 20 CV 50284, 2021 WL 2660774 (N.D. Ill. June 29, 2021)............................................26

*Rock Dental Ark. PLLC v. Cincinnati Ins. Co.*,
  40 F.4th 868 (8th Cir. 2022) ................................................................13

*S. Orthopaedic Specialists, LLC v. State Farm Fire*,
  No. 22-30340, 2023 U.S. App. LEXIS 8027 (5th Cir. Apr. 3, 2023)......................................13

*Sagome, Inc. v. Cincinnati Ins. Co.*,
  56 F.4th 931 (10th Cir. 2023) ........................................................13, 17

*Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*,
  20 F.4th 327 (7th Cir. 2021) ................................................................15

*Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*,
  No. 21-1186/No. 21-1559/No. 21-1203, 2021 U.S. App. LEXIS 36399 (7th
  Cir. Dec. 9, 2021)................................................................13

*Santo's Italian Café LLC v. Acuity Ins. Co.*,
  15 F. 4th 398 (6th Cir. 2021) ................................................................13

*Satispie, LLC v. Travelers Prop. & Cas. Co. of Am.*,
  448 F. Supp. 3d 287 (W.D.N.Y. 2020) ................................................................14

*Spirit Realty Capital, Inc. v. Westport Insurance Corporation*,
  568 F. Supp. 3d 470 (S.D.N.Y. 2021)................................................................26

*St. Tammany Par. Hosp. Serv. Dist. No. 2 v Zurich Am. Ins. Co.*,
  593 F. Supp 3d 399 (E.D. La. 2022)................................................................26

*Starlight Cinemas, Inc. v. Mass. Bay Ins. Co.*,
  91 Cal.App.5th, 308 Cal.Rptr.3d 31 (Cal. App. 2023) ................................................................17

*Sukkah Miami Beach Acquisitions, LLC v. Zurich American Ins. Co.*,
  No. 2020-017923-CA-44, 2021 WL 3841784 (Fla. Cir. Ct. June 18, 2021),
  *aff'd* 2023 WL 219102 (Fl. Dist. Ct. App. Jan. 18, 2023)................................................................14

*Tao Grp. Holdings, LLC v. Emps. Ins. Co. of Wausau*,
  No. 22-15506, 2022 U.S. App. LEXIS 32202 (9th Cir. Nov. 22, 2022) ................................................................13

*Tapestry Inc. v. Factory Mutual Insurance Co.*,
  286 A.3d 1044 (Md. 2022) ................................................................17

*Tarrar Enterprises, Inc. v. Associated Indemnity Corp.*
    83 Cal.App.5th 685, 299 Cal.Rptr.3d 698 (2022)...................................................17

*Uncork & Create LLC v. Cincinnati Ins. Co.*,
    27 F.4th 926 (4th Cir. 2022) ....................................................................................13

*United Talent Agency v. Vigilant Ins. Co.*,
    77 Cal. App. 5th 821 293 Cal. Rptr. 3d 65 (Cal. App. 2022) ....................................15, 16, 18

*Verveine Corp. v. Strathmore Ins. Co.*,
    184 N.E.3d 1266 (Mass. 2022) ................................................................................16

*Wild Eggs Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.*,
    48 F.4th 645 (6th Cir. 2022) ....................................................................................13

*Wilson v. USI Ins. Serv. LLC*,
    57 F.4th 131, 2023 U.S. App. LEXIS 303 (3d Cir. Jan. 6, 2023)...........................................13

*Zurich Am. Ins. Co. v. Tavistock Restaurants Grp., LLC*,
    No. 21-14215, 2022 U.S. App. LEXIS 31791 (11th Cir. Nov. 17, 2022) .............................13

**Statutes**

28 U.S.C. § 157(b) ...........................................................................................................1

**Other Authorities**

Federal Rules of Bankruptcy Procedure Rule 7056........................................................1

Federal Rules of Civil Procedure Rule 56 ..............................................................1, 10

Defendants Continental Casualty Company ("Continental"), Starr Surplus Lines Insurance Company ("Starr"), Allianz Global Risks US Insurance Company ("Allianz"), Liberty Mutual Insurance Company ("Liberty Mutual"), Certain Underwriters at Lloyd's ("Underwriters"), Allied World National Assurance Company ("Allied World"), QBE Specialty Insurance Company ("QBE") and General Security Indemnity Company of Arizona ("GSINDA") (collectively, the "Property Insurers") hereby move the Court to enter summary judgment in their favor, pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and Rule 56 of the Federal Rules of Civil Procedure, showing the Court as follows:

## I.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING[1]

This case arises from an insurance claim (the "Claim") submitted to the Property Insurers by Plaintiff 24 Hour Fitness Worldwide, Inc. ("24 Hour") for alleged losses related to the COVID-19 pandemic. 24 Hour submitted the Claim under commercial property insurance policies (the "Property Policies") issued to 24 Hour for the policy period June 30, 2019 - June 30, 2020. (*See* Exhs. A1-A7 at A.0001-0454) (The Property Policies).

On March 21, 2020, 24 Hour provided notice of the Claim under the Property Policies for economic losses it allegedly experienced as a result of the closure of its clubs. During the course of the adjustment of 24 Hour's Claim, the Property Insurers requested information needed to evaluate whether coverage existed under the Property Policies. 24 Hour did not fully respond to the requests for information. Instead, on December 21, 2020, 24 Hour filed an adversary proceeding

---

[1] This Adversary Proceeding is a non-core proceeding within the meaning of 28 U.S.C. § 157(b). (*See* Adv. DE 68). The Property Insurers have not consented to this Court's entry of final judgments in this Adversary Proceeding. (*See* Adv. DE 37 ¶ 15, 40 ¶ 15, 43 ¶ 15, 49 ¶ 15, 53 ¶ 15, 56 ¶ 15). The Property Insurers have preserved their right to seek withdrawal of the reference of this Adversary Proceeding. (*See* Adv. DE 231-1 ¶ 2). The Property Insurers, including the Excess Insurers, do not, by filing this motion, consent to entry of final judgments by the Court in this Adversary Proceeding or otherwise waive any rights with respect to withdrawal of the reference, all of which rights are reserved.

in this Court[2] against the Property Insurers and their pollution coverage insurer. (*See* Adv. DE 1).[3] In the adversary proceeding, 24 Hour seeks a declaration that it is entitled to recovery under the Property Policies for the economic losses it purportedly incurred as the result of the closure of its 445 fitness clubs (the "facilities") (*See* Adv. DE 1).

## II.    SUMMARY OF ARGUMENT

In this Motion, the Property Insurers maintain that:

1.    Coverage under the Property Policies' business interruption and other "time element" provisions requires proof of "direct physical loss or damage" to property.

2.    24 Hour has offered no evidence of direct physical loss of or damage to property and is therefore not entitled to recover for purported business interruption or other time element losses.

3.    The Property Policies' Interruption by Communicable Disease Endorsement (the "ICD Endorsement") provides coverage only for certain specified cleaning costs and the time required to undertake the cleaning and is subject to certain required preconditions of coverage, specifically that all loss must "directly result[] from access being prohibited to a described location or any portion thereof" (a) due to the actual presence of and the spread of communicable diseases at that described location; and (b) as a direct result of a declaration by a civil authority enforcing any law or ordinance regulating communicable diseases.

4.    24 Hour has not offered evidence sufficient to demonstrate that it has met these prerequisites to coverage.

---

[2] On June 15, 2020, 24 Hour filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware.

[3] "Adv. DE" refers herein to a docket entry in the Adversary Proceeding.

5.     Even assuming 24 Hour had offered evidence to support coverage under the ICD Endorsement, it has offered no evidence that any purported losses thereunder exceed the Property Policies' $250,000 deductible for Interruption by Communicable Disease.

## III.   STATEMENT OF FACTS

### Closure of the 24 Hour Facilities

In March 2020, 24 Hour operated 445 fitness clubs (the "facilities") in fourteen states. (*See* Adv. DE 1 at ¶ 15).

On March 11, 2020, the World Health Organization declared COVID-19 to be a "global outbreak." (*See* Exh. A-8 at A.0462) (Declaration of Dr. Allison Stock ("Dr. Stock Dec.") at Exh. A, p.4, ¶ 11). Starting on March 15, 2020, certain state governors across the U.S. began to issue "safer at home" orders to limit the spread of COVID-19. (*See* Exh. A-8 at A.0462) (Dr. Stock Dec. at Exh. A, p. 4, ¶ 11).

On March 16, 2020, 24 Hour issued a corporate-wide order to close all of its facilities effective at midnight. (*See* Adv. DE 1 at ¶ 40). The 24 Hour facilities remained closed until 24 Hour was permitted to re-open the facilities by government authorities. (*See* Adv. DE 1 at ¶ 40). Following their re-openings, a small number of 24 Hour facilities were temporarily re-closed due to orders of local governments requiring the closure of non-essential businesses due to further outbreaks of COVID-19. (*See* Adv. DE 1 at ¶ 34). The few facilities that were forced to re-close temporarily due to local governmental orders were again re-opened when the orders were lifted unless otherwise unable to re-open (*See* Exh. A-9 at A.0491) (Rule 30(b)(6) Deposition of Dan Larson ("Larson Rule 30(b)(6) Dep.") at 92:4-23).

### COVID-19 – The Virus and its Spread

COVID-19 is a contagious disease that is caused by the virus known as severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). (*See* Exh. A-8 at A.0462) (Dr. Stock Dec. at

Exh. A, p. 4, ¶ 11). For ease of reference, the disease will be referred to herein as "COVID-19" and the virus as "COVID virus."

According to the CDC, "SARS-CoV-2, the virus that causes COVID-19, is an enveloped virus, meaning that its genetic material is packed inside an outer layer (envelope) of proteins and lipids." (*See* Exh. A-8 at A.0466) (Dr. Stock Dec. at Exh. A, p. 8, ¶ 22). "The envelope contains structures (spike proteins) for attaching to human cells during infection." (*See* Exh. A-8 at A.0466) (Dr. Stock Dec. at Exh. A, p. 8, ¶ 22). In contrast to other diseases that have community-based transmission such as tuberculosis and norovirus, the envelope for SARS-CoV-2, as with other enveloped respiratory viruses, is labile or easily broken down, and can degrade quickly upon contact with surfactants contained in cleaning agents and EPA disinfectants. (*See* Exh. A-8 at A.0466)(Dr. Stock Dec. at Exh. A, p. 8, ¶ 22); (*see also* Exh. A-10 at A.0528) (Declaration of Dr. Alexis Sauer-Budge ("Dr. Sauer-Budge Dec.") at Exh. A, p.26, ¶ 4.22). 24 Hour used such disinfectants when conducting regular cleaning of its properties as of March 2020. (*See* Exh. A-11 at A.0597-0598) (March 12, 2020 Email); (*see also* Exh. A-12 at A.0600-0601) (May 5, 2020 Email from Matt Piro). Appropriately disinfected surfaces do not transmit the COVID virus. (*See* Exh. A-10 at A.0541-0542) (Dr. Sauer-Budge Dec. at Exh. A, pp. 39-40, ¶ 4.43). The COVID virus does not physically alter the air or surfaces with which it comes into contact. (*See* Exh. A-10 at A. 0541-0542) (Dr. Sauer-Budge Dec. at Exh. A, pp. 39-40, ¶ 4.36).

## The Property Policies[4]

The Property Policies cover only "Perils Insured Against," which is defined to mean "[a]ll risk of direct physical loss or damage to property described herein including general average,

---

[4] For ease of reference, all specific policy citations herein will be to the Continental Policy (*See* Exh. A-4 at A.0187-0236) (Continental Policy), of which the terms cited to herein, are identical to all other property policies issued by the Property Insurers (*See* Exh. A-1 at A.0001-0065) (Allianz Policy); (*See* Exh. A-2 at A.0066-0118) (Allied World Policy); (*See* Exh. A-3 at A.0119-0186) (Underwriters Policy); (*See* Exh. A-5 at A.237-320) (GSINDA & QBE

salvage and all other charges on shipments covered hereunder, except as hereinafter excluded."

(*See* Exh. A-4 at A.0212) (Continental Policy, p. 18 at "9. PERILS INSURED AGAINST").

Where these requirements of the insuring agreement are met, the Property Policies provide Business Interruption coverage for "[l]oss resulting from necessary interruption of business conducted by the Insured, whether total or partial, and caused by loss, damage, or destruction covered herein during the term of this policy to real and personal property as described in Clause 7.A," *i.e.*, when there is caused by a "Peril Insured Against." (*See* Exh. A-4 at A.0203) (Continental Policy, p. 9 at 7.B.(1). Business Interruption). The Property Policies also include certain "Time Element Extensions," which extend Time Element coverages, including Business Interruption in limited circumstances when there is physical loss or damage to property of third parties, including:

> (2) Interruption by Civil or Military Authority: This policy is extended to cover the loss sustained during the period of time when access to real or personal property is prohibited by order or action of civil or military authority issued in connection with or following a peril insured against within five (5) statute miles of the insured premises and for a period not to exceed thirty (30) days.
>
> (3) Ingress/Egress: This policy is extended to cover the loss sustained during the period of time when, in connection with or following a peril insured against, access to or egress from real or personal property is prevented within five (5) statute miles of the insured premises and for a period not to exceed thirty (30) days.

(*See* Exh. A-4 at A.0205) (Continental Policy, p. 11 at 7.F.(2)-(3). Time Element Extensions). In addition, the Property Policies reinforce that *physical* loss or damage is required for there to be Time Element coverage, stating, in pertinent part, that the Period of Recovery for Time Element coverages, including Business Interruption, is measured as:

1) Period of Recovery: The length of time for which loss may be claimed:

(a) shall not exceed such length of time as would be required:

> (i.) with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property as has been destroyed or damaged;

---

Policy); (*See* Exh. A-6 at A.321-385) (Liberty Mutual Policy); and (*See* Exh. A-7 at A.0386-454) (Starr Policy).

(ii.) to restore the interrupted services to the premises and the premises made ready for normal operations when such interruption is caused by an accidental occurrence;

***

(*See* Exh. A-4 at A.0206) (Continental Policy, p.12 at G.(1). Period of Recovery).

The Property Policies also expressly extend limited coverage for communicable diseases in Endorsement 2, which states:

**Interruption by Communicable Disease:**

This policy is extended to cover the reasonable and necessary expenses incurred by the Insured to:

a) Clean up, remove, and dispose of communicable diseases from insured property at a described location; and
b) Restore the premises;

In a manner to satisfy the minimum requirements of any law or ordinance regulating communicable diseases. This policy is also extended to cover business interruption (if provided) loss directly resulting from items a) and b) above.

All coverage above must be directly resulting from access being prohibited to a described location or any portion thereof:

a) Due to the actual presence of and the spread of communicable diseases at that described location; and
b) As a direct result of a declaration by a civil authority enforcing any law or ordinance regulating communicable diseases.

For the purpose of this extension, the presence of and the spread of communicable diseases will be considered direct physical damage and the expenses listed in items a) and b) above will be considered expenses to repair such damage. There will be no coverage to comply with any law or ordinance with which the Insured was required to comply had the direct physical damage not occurred.

Communicable disease means a disease that:

A. May be transmitted directly or indirectly by one person or other life form to another and;
B. Is due to:
   1. An infectious agent; or
   2. A toxic product produced by such infectious agent.

(*See* Exh. A-4 at A.0227) (Continental Policy, p. 33 at Endorsement 2).

**The Evidentiary Record**

To support its position that it is entitled to coverage, 24 Hour has made the conclusory allegations that the presence of individuals who contracted or suffered from COVID-19, coupled with prevalence of the disease in the community, caused physical loss of or damage to 24 Hour's business location and, as a result, its operations were suspended. (*See* Adv. DE at ¶¶ 41-42). Similarly, it has alleged that the presence and spread of COVID-19 throughout the community, including at 24 Hour Fitness, led to the closure orders prohibiting access to its facilities. (*See* Adv. DE at ¶ 61). For Civil or Military Authority and Ingress/Egress coverage, 24 Hour has erroneously contended that physical loss or damage is not necessary and it is entitled to coverage because of "[t]he failures to contain the spread of COVID-19 in each of the locations where 24 Hour Fitness conducted operations." (*See* Adv. DE at ¶¶ 55, 58). Yet, after an extensive discovery process, 24 Hour has offered no evidence to support these allegations.

Specifically, 24 Hour has offered no evidence of a confirmed case of COVID-19 at any 24 Hour facility prior to their closing on March 16, 2020. On March 13, 2020, three days before their nationwide closure, Dan Larson, 24 Hour's environmental health and safety manager, wrote an e-mail to Jeremy Gottlieb, 24 Hour's Vice President, audit and compliance, entitled "COVID-19 (Unconfirmed allegation)" stating "So far the handful of alleged COVID-19 cases that were reported by members to the clubs have not been substantiated." (*See* Exh. A-13 at A.0603) (March 13, 2020 Email from Dan Larson). According to an internal March 24, 2020 summary of incident reports prepared by 24 Hour for all of the facilities, there were a total of 27 incident reports merely referencing COVID-19 as of this date. (*See* Exh. A-14 at A.0607) (Deposition of Jeremy Gottlieb ("Gottlieb Dep.") at 29:6-29:15); (*see also* Exh. A-15 at A.0611) (24 Hour Claim Report).

24 Hour has no evidence of positive COVID-19 tests for any employee, guest or other visitor while on the premises of any 24 Hour facility prior to or throughout the closure period.

Moreover, 24 Hour has no evidence of any employee or member with a confirmed COVID-19 infection being present at any 24 Hour location. Nor did 24 Hour conduct any "contact tracing" in response to the few reports they received of possible or suspected exposure of employees or guests to COVID-19. Dr. Mercedes Carnethon testified on behalf of 24 Hour that she has not done any work related to the presence of COVID-19 virus in any location. (*See* Exh. A-16 at A.0614-0615) (Deposition of Dr. Mercedes Carnethon ("Dr. Carnethon Dep.") at 11:20-12:1). Indeed, Dr. Carnethon relies on little more than the aforementioned unsubstantiated "incidents" reported by 24 Hour and in support of her opinion that it was "reasonable" for 24 Hour to "assume" that COVID-19 virus was present in their facilities. (*See* Exh. A-16 at A.0619-0620) (Dr. Carnethon Dep. at 62:24-63:6) (*see also* Exh. A-17 at A.0616) (Dr. Carnethon Report at pp. 17-19). When pressed on whether she has any opinion regarding whether or not COVID-19 was present at any 24 Hour location, Dr. Carnethon testified "No, I do not have an opinion." (*See* Exh. A-16 at A.617; A.619-620) (Dr. Carnethon Dep. at 24:9-13; 63:7-12;). Dr. Carnethon also had no opinion as to whether COVID-19 was spreading at any 24 Hour location. (*See* Exh. A-16 at A.0617; A.0620) (Dr. Carnethon Dep. at 24:14-19; 63:13-18).

No governmental authority confirmed the presence of the COVID virus at any 24 Hour facility or issued any orders directly to 24 Hour regarding the operation of its facilities as a result of the COVID outbreak. (*See* Exh. A-18 at A.0718; A.0721) (Deposition of Matthew Piro ("Piro Dep.") at 60:15-20; 92:4-21).

24 Hour has offered no evidence of any direct physical loss of or damage to property at any of the facilities and, in fact, its witnesses have conceded that the COVID-19 virus did not cause any physical damage to any of its property. (*See* Exh. A-18 at A.0722-0723) (Piro Dep. at 142:23-143:21) (*see also* Exh. A-19 at A.0730) (Depostion of Dan Larson ("Larson Dep.") at 94:3-19).

Nor has 24 Hour offered expert testimony to rebut that of Dr. Alexis-Sauer Budge, an expert in the interaction between biology (*e.g.*, viruses) and materials, that the COVID virus does not damage the air or surfaces with which it comes into contact. (*See* Exh. A-10 at A.0541-0542) (Dr. Sauer-Budge Dec. at Exh. A, pp. 39-40, ¶ 4.36). Indeed, Dr. Carnethon testified on behalf of 24 Hour that she was not asked by 24 Hour to opine on whether COVID-19 caused any physical loss of or damage to property at any 24 Hour location. (*See* Exh. A-16 at A.0618) (Carnethon Dep. at 33:11-16).

24 Hour also has offered no evidence that it incurred any cost to "clean up, remove, and dispose of" COVID-19 from any of its locations. Indeed, on March 16, 2020, the date of 24 Hour's nationwide closure, Matthew Piro, 24 Hour's national director of club operations, wrote to representatives of KBS, 24 Hour's corporate janitorial service at the time, and stated as follows:

> KBS Team:
> Please be advised that due to all of the gym closures required by the government related to the COVID-19 virus outbreak, all of our clubs will close at midnight tonight until further notice. We may solicit help from you with some cleaning during the closure, but all regular cleaning will end effective tonight at midnight until we are allowed to re-open—and we will reach out to you about any specific cleaning requests.

(*See* Exh. A-9 at A.0489-0490) (Larson Rule 30(b)(6) Dep. at 76:25-77:7); (*see also* Exh. A-20 at A.0733) (March 16, 2020 Email from Matt Piro).

24 Hour has offered no evidence of any kind to demonstrate that it undertook any cleaning at any facility to dispose of and/or remove virus from its premises from the time that it closed its facilities on March 16, 2020 until it reopened its facilities beginning in May of 2020. A checklist prepared by 24 Hour to provide guidance for the re-opening of facilities closed on March 16, 2020 does not include any indication that efforts were to be made to clean or remove virus from the premises. (*See* Exh. A-19 at A.0727-0728; 0729) (Larson Dep. at 73:7-74:2; 75:11-24); (*see also* Exh. A-25 at A.0793-0797) (April 9, 2020 Email from Adam VanderYacht). 24 Hour undertook

no effort to clean or remove virus from its facilities after the national closure on March 16, 2020. (*See* Exh. A-21 at A.0736) (Deposition of Jason Carter ("Carter Dep.") at 50:5-10).

24 Hour has not produced evidence indicating that any cleaning costs or economic losses during the period necessary to clean or remove the COVID virus from its locations, if any, exceeded $250,000 at any one location during the closure period. (*See* Exh. A-4 at A.200) (Continental Policy, p. 6 at 4. PRIMARY DEDUCTIBLES).

## IV.   ARGUMENT

### A.   Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to her case, and on which she will bear the burden at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (alterations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

If the evidence offered by the nonmoving party is merely colorable or is not significantly probative, summary judgment is proper. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48 (emphasis original). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Id.* at 248. The applicable substantive law will determine which facts are "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

**B.      Applicable Law**

The Property Insurers assert that California law applies here. The choice-of-law rule of the forum state dictates the substantive law that applies. *In re Mariner Health Grp.*, 2003 WL 22299672 (Bankr. D. Del. Sept. 24, 2003). Delaware's choice-of-law rule is the Restatement's "most significant relationship test." *Id*. Under that test, the law of the state where the parties understood the insured risk to be principally located will generally apply. *See id*. The Property Insurers submit that here, the state where the parties understood the insured risk to be principally located in California. 24 Hour's principal place of business is in California, and the Property Policies were delivered to 24 Hour in California. (*See* Exh. A-4 at A.0188) (Continental Policy, "NAMED INSURED AND ADDRESS"). That said, where instructive, the Property Insurers will reference additional case law from other jurisdictions, the overwhelming weight of which—in California and elsewhere—supports the Property Insurers' positions.

**C.      24 Hour Offers No Evidence of "Physical Loss or Damage" Required for Business Interruption and Other Time Element Coverage**

The Property Policies' "Perils Insured Against" provision states that the Property Policies insure only against "direct physical loss or damage to property." (Exh. A-4 at A.0212) (Continental Policy, p. 18 at "9. PERILS INSURED AGAINST").

Each of the Time Element provisions under which 24 Hour seeks recovery also are premised upon the "direct physical loss or damage to property" requirement set forth in the Property Policies' "Perils Insured Against" provision, with the exception of the specific ICD Endorsement, which is addressed below. Specifically, the Property Policies' business interruption

provision limits recovery to "[l]oss resulting from necessary interruption of business conducted by the Insured, whether total or partial, and caused by loss, damage, or destruction *covered herein* during the term of this policy to real and personal property as described in Clause 7.A.". (*See* Exh. A-4 at A.0203) (Continental Policy, p. 9 at 7.B.(1). Business Interruption). (emphasis added). The Interruption by Civil Authority provision likewise provides coverage only upon proof of "a *peril insured against* within five (5) statute miles of the insured premises." (*See* Exh. A-4 at A.0205) (Continental Policy, p. 11 at 7.F.(2). Time Element Extensions). emphasis added). Similarly, Ingress/Egress coverage requires proof that access was prevented within five miles of an insured location due to a "peril insured against." Again, the Property Policies provide that a "peril insured against" is the "risk of direct physical loss or damage" to insured property. (*See* Exh. A-4 at A.0205) (Continental Policy, p. 11 at 7.F.(3). Time Element Extensions).

    1. <u>"Direct Physical Loss or Damage" Requires Physical Harm or Alteration to Property</u>

    24 Hour has offered no evidence that it experienced any physical loss or damage to its property. (*See* Exh. A-18 at A.0722-0723. (Piro Dep. at 142:23-143:21); (*see also* Exh. A-19 at A.0730) (Larson Dep. 94:3-19). Likewise, it has offered no evidence of physical loss or damage to property of others. Rather, 24 Hour seeks recovery of purely economic losses under the Property Policies' Business Interruption and other Time Element coverages, which 24 Hour alleges was caused by the Orders issued by various governmental entities during the pandemic. As confirmed by federal and state courts applying California law in COVID-19 coverage actions, the Property Policies, however, do not provide coverage for economic losses arising from loss of use, as 24 Hour contends. *Body Xchange Sports Club, LLC v. Zurich Am. Ins. Co.*, 648 F.Supp.3d 1205, 1214 (E.D. Cal. 2022) (collecting cases) ("'direct physical loss of or damage to' requires a physical alteration to the property"); *O'Brien Sales and*

*Marketing, Inc. v. Transportation Ins. Co.*, 512 F. Supp. 3d 1019, 1023 (N.D. Cal. 2021); *Inns-by-the-Sea v. California Mut. Ins. Co.*, 71 Cal. App. 5th 688, 705 (Cal. App. 2021).[5]

Numerous courts in California and nationwide have concluded that the peril insured against language in the COVID-19 context or otherwise requires physical loss or damage. *See, e.g., Endeavor*

---

[5] Courts nationwide have reached the same result, with *every* federal appellate court, including the Ninth Circuit, rejecting 24 Hour's contention that the presence of the COVID-19 virus or closure by government order constitutes physical loss or damage. *See, e.g.,* [5] *See, e.g., HT-Seattle Owner, LLC v. Am. Guar. & Liab. Ins. Co.*, No. 21-35916, 2023 U.S. App. LEXIS 12327 (9th Cir. May 19, 2023); *First and Stewart Hotel Owner LLC v. Fireman's Fund Ins. Co.*, No. 21-35637, 2023 U.S. App. LEXIS 12328 (9th Cir. May 19, 2023); *Aspen Lodging Grp., LLC v. Affiliated FM Ins. Co.*, No. 21-35472, 2023 U.S. App. LEXIS 12336 (9th Cir. May 19, 2023); *Hotel Mgmt. of New Orleans, LLC v. Gen. Star Indem. Co.*, No. 22-30354, 2023 U.S. App. LEXIS 11145 (5th Cir. May 5, 2023); *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, No. 22-1256, 2023 U.S. App. LEXIS 10128 (8th Cir. Apr. 26, 2023); *First Realty LLC v. Aspen Am. Ins. Co.*, No. 22-2220, 2023 U.S. App. LEXIS 9407 (2d Cir. Apr. 20, 2023); *Connecticut Child.'s Med. Ctr. v. Cont'l Cas. Co.*, No. 22-322, 2023 U.S. App. LEXIS 9057 (2d Cir. Apr. 17, 2023); *Exceptional Dental of La., LLC v. Bankers Ins. Co.*, No. 22-30705, 2023 U.S. App. LEXIS 8647 (5th Cir. Apr. 11, 2023); *S. Orthopaedic Specialists, LLC v. State Farm Fire*, No. 22-30340, 2023 U.S. App. LEXIS 8027 (5th Cir. Apr. 3, 2023); *ITT Inc. v. Factory Mut. Ins. Co.*, No. 22-1245, 2023 U.S. App. LEXIS 2409 (2d Cir. Jan. 31, 2023); *PHI Grp., Inc. v. Zurich Am. Ins. Co.*, No. 22-30142, 2023 U.S. App. LEXIS 2367 (5th Cir. Jan. 30, 2023); *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 2023 U.S. App. LEXIS 303 (3d Cir. Jan. 6, 2023); *Sagome, Inc. v. Cincinnati Ins. Co.*, 56 F.4th 931 (10th Cir. 2023); *Michael's Inc. v. Westfield Ins. Co. (In re MIKMAR, Inc.)*, No. 21-3230, 2022 U.S. App. LEXIS 35497 (6th Cir. Dec. 21, 2022); *Family Tacos, LLC v. Auto-Owners Ins. Co.*, No. 21-3224, 2022 U.S. App. LEXIS 35543 (6th Cir. Dec. 21, 2022); *Equity Planning Corp. v. Westfield Ins. Co.*, No. 21-3229, 2022 U.S. App. LEXIS 35493 (6th Cir. Dec. 21, 2022); *Ceres Enters., LLC v. Travelers Indem. Co. of Am.*, No. 21-3232, 2022 U.S. App. LEXIS 35542 (6th Cir. Dec. 21, 2022); *Brunswick Panini's, LLC v. Zurich Am. Ins. Co.*, No. 21-3222, 2022 U.S. App. LEXIS 35544 (6th Cir. Dec. 21, 2022); *Tao Grp. Holdings, LLC v. Emps. Ins. Co. of Wausau*, No. 22-15506, 2022 U.S. App. LEXIS 32202 (9th Cir. Nov. 22, 2022); *Zurich Am. Ins. Co. v. Tavistock Restaurants Grp., LLC*, No. 21-14215, 2022 U.S. App. LEXIS 31791 (11th Cir. Nov. 17, 2022); *Protégé Rest. Partners LLC v. Sentinel Ins. Co.*, No. 21-16814, 2022 U.S. App. LEXIS 29925 (9th Cir. Oct. 25, 2022); *BA Lax, LLC v. Hartford Fire Ins. Co.*, No. 21-55109, 2022 U.S. App. LEXIS 29383 (9th Cir. Oct. 21, 2022); *DDS v. Aspen Am. Ins. Co.*, No. 21-35477, 2022 U.S. App. LEXIS 29189 (9th Cir. Oct. 20, 2022); *McCulloch v. Valley Forge Ins. Co.*, No. 21-35520, 2022 U.S. App. LEXIS 28680 (9th Cir. Oct. 17, 2022); *Hot Yoga, Inc. v. Philadelphia Indem. Ins. Co.*, No. 21-35806, 2022 U.S. App. LEXIS 28674 (9th Cir. Oct. 17, 2022); *Caballero v. Massachusetts Bay Ins. Co.*, No. 21-35510, 2022 U.S. App. LEXIS 28678 (9th Cir. Oct. 17, 2022); *Coleman E. Adler & Sons, LLC v. Axis Surplus Ins. Co.*, 49 F.4th 894 (5th Cir. 2022); *Buffalo Xerographix, Inc. v. Sentinel Ins. Co., Ltd., et al.*, No. 21-1502, 2022 U.S. App. LEXIS 25857 (2d Cir. Sept. 15, 2022); *Wild Eggs Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 48 F.4th 645 (6th Cir. 2022); *Circle Block Partners, LLC v. Fireman's Fund Ins. Co.*, 44 F.4th 1014 (7th Cir. 2022); *Dickie Brennan & Co., LLC v. Zurich Am. Ins. Co.*, No. 21-30776, 2022 U.S. App. LEXIS 21185 (5th Cir. Aug. 1, 2022); *Rock Dental Ark. PLLC v. Cincinnati Ins. Co.*, 40 F.4th 868 (8th Cir. 2022); *PS Bus. Mgmt., LLC v. Fireman's Fund Ins. Co.*, No. 21-30723, 2022 U.S. App. LEXIS 18688 (5th Cir. July 6, 2022); *AIKG, LLC v. Cincinnati Ins. Co.*, No. 21-13506, 2022 U.S. App. LEXIS 17282 (11th Cir. June 23, 2022); *Henderson Rd. Rest. Sys. v. Zurich Am. Ins. Co.*, No. 21-4148, 2022 U.S. App. LEXIS 16374 (6th Cir. June 13, 2022); *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29 (1st Cir. 2022); *Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, 35 F.4th 1318 (11th Cir. 2022); *Q Clothier New Orleans, LLC v. Twin City Fire Ins. Co.*, 29 F.4th 252 (5th Cir. 2022); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926 (4th Cir. 2022); *Estes v. Cincinnati Ins. Co.*, No. 21-5587, 2022 U.S. App. LEXIS 926 (6th Cir. Jan. 12, 2022); *10012 Holdings, Inc. v. Sentinel Ins. Co.*, No. 21-80-cv, 2021 U.S. App. LEXIS 38270 (2d Cir. Dec. 27, 2021); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, No. 21-1186/No. 21-1559/No. 21-1203, 2021 U.S. App. LEXIS 36399 (7th Cir. Dec. 9, 2021); *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303 (7th Cir. 2021); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F. 4th 885 (9th Cir. 2021); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F. 4th 398 (6th Cir. 2021); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F. 4th 1141 (8th Cir. July 2, 2021).

*Operating Co. v. HDI Global Ins. Co.*, 95 Cal.App.5th 839, 313 Cal.Rptr.3d 746, 761-762 (Cal. App. 2023); *Golden Corral Corp. v. Illinois Union Ins. Co.,* 559 F. Supp. 3d 476, 490 (E.D.N.C. 2021), *aff'd*, 2022 WL 3278938 (4th Cir. Aug. 11, 2022) (no civil authority coverage for COVID-19 loss because the COVID-19 virus is not "a type of risk that would create direct physical loss, damage, or destruction"); *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 223 (2d Cir. 2021) (no civil authority coverage because COVID-19 executive orders "were the result of the COVID-19 pandemic and the harm it posed to human beings, not, as 'risk of direct physical loss' entails, risk of physical damage to property"); *Sukkah Miami Beach Acquisitions, LLC v. Zurich American Ins. Co.*, No. 2020-017923-CA-44, 2021 WL 3841784, at *1 (Fla. Cir. Ct. June 18, 2021), *aff'd* 2023 WL 219102 (Fl. Dist. Ct. App. Jan. 18, 2023) (where civil authority coverage required insured peril and insured peril was defined as a "risk of direct physical loss of or damage to property," court found no civil authority coverage "[a]bsent such direct physical loss of or damage to property"); *Satispie, LLC v. Travelers Prop. & Cas. Co. of Am.,* 448 F. Supp. 3d 287, 293 (W.D.N.Y. 2020) ("Under New York law, the phrase 'risks of direct physical loss' has been interpreted to mean 'some form of actual, physical damage' to the insured property.") (citation omitted).

As the "Perils Insured Against" provision here clearly states—and as virtually every state and federal appellate court to address the issue has found—coverage for loss under a commercial property policy is provided only if there is evidence that the insured's loss was incurred as the result of demonstrable, *physical* damage to or *physical* loss of (*e.g.,* total and permanent deprivation) insured property. *O'Brien, 512 F. Supp. 3d at 1023; Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 891–92 (9th Cir. 2021) ("California courts would construe the phrase 'physical loss of or damage to' as requiring an insured to allege physical alteration of its property"); *Musso & Frank Grill Co. v. Mitsui Sumitomo Ins. USA Inc*., 77 Cal. App. 5th 753, 758-59, 293 Cal.Rptr.3d 1 (2022), *citing MRI*

*Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.,* 187 Cal. App. 4th 766, 115 Cal. Rptr. 3d 27 (Cal. 2010) ("direct physical loss or damage requires a 'distinct, demonstrable, physical alteration of the property.'")

24 Hour Fitness has offered no such evidence here, but rather instead relies upon unsubstantiated allegations that it experienced physical loss or damage because of the actual presence of COVID-19 and the virus causing it at 24 Hour's property and in the vicinity, because of government orders that prevented 24 Hour's use of its properties, and because of a need to institute social distancing and undertake other efforts to mitigate the effects of COVID-19. (*See* Exh. A-22 at A.0749-0750) (24 Hour's Responses to Defendants' First Set of Interrogatories at Response No. 7).  None of these allegations demonstrate physical loss or damage to its property or to property of others.

  2.  <u>Neither the Mere Presence of the COVID-19 Virus Nor Closure by Government Orders Constitute Physical Loss or Damage</u>

Numerous courts in California and elsewhere have concluded that the mere presence of the COVID-19 virus on an insured's premises does not constitute "physical loss or damage" that would trigger coverage under a commercial insurance policy. *See Creative Artists Agency, LLC v. Affiliated FM Ins. Co.* (C.D. Cal. Jul. 27, 2022, No. 2:21-CV-08314-AB (GJS)) 2022 WL 3097371, at *5-6 (finding *Inns by the Sea* "instructive" in finding that plaintiff's "conclusory and speculative allegations" were insufficient to allege that the presence of COVID-19 constituted "physical loss or damage"); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 335 (7th Cir. 2021); *United Talent Agency v. Vigilant Ins. Co.*, 77 Cal. App. 5th 821, 834-35 293 Cal. Rptr. 3d 65, 76 (Cal. App. 2022). In *United Talent Agency v. Vigilant Ins. Co.*, the Second District held that, under *Inns by the Sea*, an insured "must establish *either* 'direct physical ... damage to' property at the premises, *or* 'direct physical loss of' property at the premises caused by its suspension of operations." 77 Cal. App. 5th 821, 830 (emphasis in original). *United Talent Agency* "agree[d] with the majority of the cases finding that

the presence or potential presence of the virus does not constitute direct physical damage or loss."

(*Id.* at 838.) Indeed, "no state supreme court that has addressed this issue has finally decided the

presence of COVID-19 constitutes a physical loss or damage to property." *Cajun Conti LLC v.*

*Certain Underwriters at Lloyd's*, 359 So.3d 922, 929 (La. 2023).[6]

The Property Insurers acknowledge that, on March 1, 2023, the California Supreme Court

accepted certification from the Ninth Circuit of the following question:

> Can the actual or potential presence of the COVID-19 virus on an insured's
> premises constitute "direct physical loss or damage to property" for purposes of
> coverage under a commercial property insurance policy?

*Another Planet Entertainment v. Vigilant Insurance Company,* Case: 21-16093, Order Certifying

Question to the California Supreme Court (9th Cir. Dec. 28, 2022). Supreme Court of California

(March 1, 2022).

The Property Insurers are confident that the California Supreme Court will follow the

example of the overwhelming weight of case law on this issue—including the decisions of other

state supreme courts to address the issue—and find that the mere presence of the COVID virus

cannot constitute "direct physical loss of or damage to property." *See*, *e.g.*, *Endeavor,* 313

Cal.Rptr.3d at 762; *Neuro-Communication Svcs., Inc. v. Cincinnati Ins. Co.*, --N.E.3d--, 2022 WL

17573883 at *6 (Ohio 2022) ("direct physical loss" or "damage to property" that triggers coverage

under a commercial policy does not arise from: (1) general presence of COVID-19 in community,

(2) presence of COVID-19 on surfaces at a premises, or (3) presence on a premises of a person

infected with COVID-19.); *Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1276 (Mass.

2022) ("Even accepting the plaintiffs' premise that the suspension of their business was caused by

---

[6] The Vermont Supreme Court considered the state's pleading standard, but did not conclude that COVID-19 is physical loss or damage. *See Huntington Ingalls Indus., Inc. v. Ace Am. Ins.,* 287 A.3d 515 (Vt. 2022).

the 'presence' of the virus on surfaces and in the air at the restaurants (as opposed to the danger that the virus would be introduced to the restaurants or spread directly from person to person if indoor dining were allowed), mere 'presence' does not amount to loss or damage to the property"); *Tapestry Inc. v. Factory Mutual Insurance Co.,* 286 A.3d 1044, 1066 (Md. 2022) *accord*, *Sagome, Inc. v. Cincinnati Ins. Co.*, 56 F.4th 931, 937 (10th Cir. 2023).[7]

Likewise, numerous courts in California and elsewhere have held that governmental orders requiring businesses to close due to COVID-19 do not satisfy the physical loss or damage requirement in the Property Policies. *See*, *e.g.*, *Starlight Cinemas, Inc. v. Mass. Bay Ins. Co.*, 91 Cal.App.5th, 308 Cal.Rptr.3d 31, 38-39 (Cal. App. 2023); *Apple Annie, LLC v. Oregon Mutual Ins. Co.*, 82 Cal.App.5th 919, 298 Cal.Rptr.3d 886 (Cal. App. 2022); *Tarrar Enterprises, Inc. v. Associated Indemnity Corp.* 83 Cal.App.5th 685, 687, 299 Cal.Rptr.3d 698 (2022).[8]

Indeed, allowing 24 Hour to recover for a mere loss of use of its facilities because of government orders would render portions of the Property Policies meaningless. As noted, the "Period of Recovery" for Time Element coverages states that the period of time for which losses under those provisions can be recovered shall not exceed the "length of time as would be required…with the exercise of due diligence and dispatch to *rebuild, repair, or replace* such part of the property as has been *destroyed or damaged*.

---

[7] Property Insurers acknowledge that a small minority of courts have found that the mere presence of COVID virus at an insured's premises may constitute physical loss or damage for purposes of business interruption cover. *See*, *e.g.*, *Marina Pacific Hotels and Suites, LLC v. Fireman's Fund Ins. Co.*, 81 Cal.App.5th 96, 296 Cal.Rptr.3d 777 (Cal. App. 2022). As an example of this minority view, however, *Marina Pacific* has been roundly criticized by other courts on this point, including by other California appellate courts. *See*, *e.g.*, *Endeavor*, 313 Cal.Rptr.3d at 763.

[8] Property Insurers acknowledge that, in an outlier opinion, one California state appellate court has found that a temporary deprivation of use of an insured's property as the result of a government order may constitute "physical loss" of property for purposes of business interruption coverage. *Coast Restaurant Group, Inc. v. Amguard Ins. Co.*, 90 Cal.App.5th 332, 307 Cal.Rptr.3d 133, (Cal. App. 2023). The *Coast* decision, however, represents a significant departure from the mainstream and has been rejected by other California appellate courts. *See*, *e.g.*, *Starlight*, 91 Cal.App.5th at 39 ("We disagree with our colleagues in *Coast* that a temporary deprivation of an insured's right to use covered property constitutes a covered loss under policy language covering a 'direct physical loss of or damage to property.'")

This language plainly contemplates sufficiently demonstrable physical alteration or harm such that the property must be repaired, rebuilt, or replaced. Courts have consistently held that this type of language reinforces that mere loss of use or presence of a virus does not constitute physical loss or damage. *See, e.g., Inns-by-the-Sea,* 71 Cal. App. 5th at 592 (period of recovery provision's "focus on repairing, rebuilding or replacing property (or moving entirely to a new location) is significant because it implies the 'loss' or 'damage' that gives rise to Business Income coverage has a *physical* nature that can be *physically* fixed" or moved to a new location) (emphasis in original); *Mudpie,* 15 F.4[th] at 892 ("interpreting the phrase 'direct physical loss or damage to' property as requiring physical alteration of property is consistent with other provisions of [insured's] policy," including the period of restoration provision); *United Talent Agency,* 77 Cal.App.5[th] at 833-834 (the "'period of restoration' language in the policies demonstrates that coverage requires a physical loss requiring repair or replacement, not simply loss of use.")

A result consistent with the overwhelming authority rejecting arguments similar to those made by 24 Hour is warranted here, because 24 Hour has not proven and cannot prove that there has been any direct physical loss or direct physical damage to property as a matter of law. Not only does the weight of current California law hold that the presence of COVID-19 and loss of use cannot constitute physical loss or damage, 24 Hour itself has failed to demonstrate that the presence of the COVID virus here somehow caused "direct physical loss of or damage" to property required for coverage under the Business Interruption or other Time Element provisions. In fact, the 24 Hour witnesses identified by 24 Hour as having knowledge of "any direct physical loss or damage to Your Property due to COVID-19" have testified that COVID virus did **not** damage 24 Hour's property. (*See* Exh. A-18 at A.0722-0723) (Piro Dep. at 142:23-143:21; (*see also* Exh. A-19 at A.0730)

(Larson Dep. at 94:3-19; (*see also* Exh. A-22 at A.0752-0753) (24 Hour Responses to Defendants' First Set of Interrogatories at Response No. 13.)

Nor has 24 Hour offered any evidence to show any physical alteration to its property. The Property Insurers' expert witness, Dr. Alexis Sauer-Budge, a biomedical engineer whose professional focus is on the interaction of biology and materials, opined in her expert report that "SARS-CoV-2 does not physically alter, change, or damage the air that surrounds respiratory droplets that contain infectious virus or the surface on which these droplets settle, thereby allowing for easy disinfection of the surface." (*See* Exh. A-10 at A.0541-0542) (Dr. Sauer-Budge Dec. at Exh A, pp. 39-40, ¶ 4.36). In contrast, 24 Hour's only designated expert witness—Dr. Carnethon, gives no opinion on whether the COVID virus damages property, and, in her deposition, stated that she did not disagree with anything in Dr. Sauer-Budge's report. Instead, she testified that she "learned a lot" from Dr. Sauer-Budge's report and found it "very interesting." (*See* Exh. A-16 at A.0623) (Dr. Carnethon Dep. at 84: 3-14). Dr. Carnethon conceded that Dr. Sauer-Budge's report was "completely" outside of her area of expertise. (*See* Exh. A-16 at A.0623) (Dr. Carnethon Dep. at 84: 15-16).

For the same reasons discussed above, 24 Hour has not offered evidence that would trigger coverage under the "Civil or Military Authority" or Ingress/Egress provisions. Coverage under the Civil Authority provision is triggered only for "a peril insured against" that occurs "within five (5) statute miles of the insured premises and for a period not to exceed thirty (30) days." Relatedly, Ingress/Egress coverage is triggered only when, following, a "peril insured against" "access to or egress from real or personal property is prevented within five (5) statute miles of the insured premises and for a period not to exceed thirty (30) days." Because 24 Hour cannot demonstrate a "peril insured against," within the prescribed vicinities of its locations, neither coverage is triggered.

In sum, under the plain terms of the Property Policies, 24 Hour cannot recover for business interruption or other time element coverages without demonstrating that it has incurred "physical loss or damage to property."

### D.     24 Hour Fails to Meet The Requirements for Coverage Under the ICD Endorsement

Unlike many property insurance policies, the Property Policies' expressly contemplate the potential for coverage for disease, the requirements for which have not been met in this case. The Property Policies' ICD Endorsement provides limited coverage for costs incurred to clean up, remove and dispose of communicable disease from insured property and to restore the premises as well as business interruption losses during such clean up, removal, disposal and restoration. Coverage under the ICD Endorsement is provided solely with respect to "reasonable and necessary" expenses to "clean up, remove, and dispose of [COVID virus] from insured property" and to "restore the premises" that were incurred "in a manner to satisfy the minimum requirements of any law or ordinance regulating communicable diseases." Coverage extends to any business interruption losses directly resulted from the clean up, removal and disposal of COVID virus from the facilities and the restoration of the premises.

ICD coverage is, however, subject to a number of independent prerequisites, each of which must be satisfied to trigger coverage. Specifically, the reasonable and necessary expenses to clean up and restore the premises "must be directly resulting from access being prohibited" to a 24 Hour facility:

  a)  "due to the **actual presence and the spread** of" COVID-19 at that facility; and

  b)  "as a direct result of a declaration by a civil authority enforcing any law or ordinance regulating communicable disease."

(*See* Exh. A-4 at A.0227) (Continental Policy, p. 33 at Endorsement 2).

20

24 Hour has not offered evidence sufficient to meet any, much less each, of these independent requirements for ICD coverage.

1.    <u>24 Hour Has Offered No Evidence of the "Actual Presence and Spread" of COVID-19 at Any of Its Facilities</u>

24 Hour has offered no evidence with respect to the actual presence and spread of COVID-19 at any of its facilities, a prerequisite to coverage under the ICD Endorsement. 24 Hour offers the purely speculative view that, based upon its belief that the COVID virus was "widespread" in all communities in March 2020, it was reasonable for 24 Hour to "assume" that COVID-19 was present in each of its facilities. Speculation and conjecture, however, cannot defeat summary judgment. *Jackson v. Danberg,* 594 F.3d 210, 227 (3d Cir.2010).

It is undisputed that 24 Hour offers no evidence of "confirmed" cases of COVID-19 at any of its facilities. Rather, 24 Hour offers little more than Dr. Carnethon's reliance on anecdotal reports that it gathered intermittently prior to and following March 16, 2020 from individuals who, for example, may have come into contact with someone suspected of possibly having COVID-19. Dr. Carnethon's report cites to materials that reflect 24 Hour's "assumption" that COVID-19 was present in its facilities in support of her statement "24HF reported that it had learned of several instances in which team members and/or 24HF patrons with actual or suspected cases of COVID-19 entered its facilities.")   (*See* Exh. A-17 at A.0650) (Dr. Carnethon Report at fn. 43). For example, Dr. Carnethon's cited sources include:

- Tony Ueber's Deposition Testimony

    Q.   In terms of my question, did you -- did you assume that COVID-19 was present in -- in each and every one of the clubs?

    A.   I think we had to assume that it certainly could have been present in all of the clubs at that point.

    Q.   Did you assume that it, in fact, was present?

A.   Well, we assumed that it was because we took these actions to be able to mitigate any spread if it was present in the clubs.

(*See* Exh. A-23 at A.0775-0776) (Ueber Dep. at pp. 71:20-72:4).

- Claim Information Submitted by 24 Hour to the Property Insurers.

2.   Please specify whether you are claiming any direct physical loss or damage to the real property, personal property, stock, supplies and/or merchandise?

We believe that the inability to use our clubs and all of the property therein for their intended purpose due to the COVID-19 disease and hazards associated with groups of people gathering in locations such as our clubs, plus the fact that it should be presumed that individuals infected with COVID-19 were present at all of our locations, constitutes "direct physical loss or damage."

If there has been physical loss or damage, please explain the nature of the damage.

3.   Has there been any confirmed cases of Covid-19 at any of the properties? If so, please provide the details of the incidents and when the person was on the property.

There have been confirmed cases of individuals with COVID-19, including members and employees, at certain locations. Information regarding the identities of these individuals is private information, and we are not sure if we can disclose that information. We will provide general information regarding these "incidents" shortly, but please keep in mind that our claim is not dependent on any identified case of COVID-19 on our premises. Given the nature of the disease and its presence within the community, we believe it must be presumed that all of our locations were impacted by the presence of individuals with COVID-19.

(*See* Exh. A-24 at A.0788 (24 Hour's Responses to Property Insurers' Requests for Information at

p. 3).

- 24 Hour's Interrogatory Responses

INTERROGATORY NO. 7: Set forth the factual basis for the allegation in paragraph 41 of the Complaint that Your Property experienced direct physical loss or damage due to COVID-19.

RESPONSE [in pertinent part]: . . . Plaintiff contends that each of its fitness clubs sustained direct physical loss or damage due to the actual presence of COVID-19 and SARSCoV-2 at and in the immediate vicinity of Plaintiff's properties, which constituted physical loss or damage to Plaintiff's property including by rendering such property unfit or unsafe for its intended purpose and/or normal human occupancy. . . . The statistical probability/certainty of the

presence of thousands to millions of virions in the air and on the surfaces of Plaintiff's properties rendered such properties unsafe for use in the same way that asbestos particles, ammonia, or radiation would have, causing physical loss or damage to such properties. Moreover, Plaintiff identifies that all its covered locations—which are or were accessible to the public or to employees and subject to regular foot traffic—were physically altered as a result of COVID-19 and SARS-CoV-2 virions. . . Plaintiff further identifies the following examples of the type of physical loss or damage to its properties: (1) at least several hundred of Plaintiff's employees or members were confirmed or suspected of contracting COVID-19, demonstrating both the certain or virtually certain presence of COVID-19 and/or SARS-CoV-2 in Plaintiff's locations, in the air, and on its surfaces; . . .

(*See* Exh. A-22 at A.0749-0750) (24 Hour's Responses to Defendants' First Set of Interrogatories at Response No. 7). None of the documents or testimony Dr. Carnethon relied upon, however, established that any employee or member confirmed with COVID-19 visited the premises.

As noted, Dr. Carnethon testified on behalf of 24 Hour that she has not done any work related to the presence of COVID-19 virus in any location. (*See* Exh. A-16 at A.0616) (Carnethon Dep. at 17:4-11) and that she has "no opinion" on whether COVID-19 was, in fact, actually present at any 24 Hour location. (*See* Exh. A-16 at A.0620) (Carnethon Dep. at 63:7-12). This is all the more notable since, in response to Property Insurers' Interrogatory Number 5, which requested information regarding the actual presence of COVID-19 at 24 Hour facilities, 24 Hour objected on the basis that the question called "for the production of expert testimony." (*See* Exh. A-22 at A.0744-0755) (24 Hour Responses to Defendants' First Set of Interrogatories at Response No. 5).

It is undisputed that 24 Hour made no effort to conduct even minimal "contact tracing" when it received such reports in order to determine if (1) any individual with a COVID-19 infection was actually at a 24 Hour location, or (2) even if that were the case, where such an individual may have been in the building or with whom they may have made contact while there. Information such

as this would have been readily available to 24 Hour at the time and was regularly gathered by other businesses. (*See* Exh. A-8 at A.0461) (Dr. Stock Dec. at Exh. A, p. 3).

Rather than provide any evidence of the actual presence and spread of COVID-19 at its facilities, 24 Hour executives repeatedly testified that the company's management "assumed" COVID-19 was present at the facilities because it was "everywhere" in March 2020. When asked for specific evidence of the presence and spread of COVID-19 at one of its facilities, Dan Larson, 24 Hour's health and safety manager, testified as follows:

> You know, there was COVID within the – all the communities that we operated within. Being deemed a world pandemic by the World Health Organization, or WHO, we reasonably assumed that COVID was in the club.

(*See* Exh. A-9 at A.0488) (Larson Rule 30(b)(6) Dep. at 48:5-13).

Matthew Piro, 24 Hour's national head of club operations similarly testified that, "based upon the information that was in the public domain, we assumed the virus was likely in the majority of our clubs." (*See* Exh. A-18 at A.0717) (Piro Depo. at 47:9-21). Tony Ueber, 24 Hour's Chief Executive Officer also testified that, when 24 Hour issued the order to close its facilities on March 16, 2020, it assumed that COVID-19 was present in its facilities. (*See* Exh. A-23 at A.0776) (Ueber Dep. at 72:1-4).

These conclusory assertions are patently insufficient to support the "actual presence and spread" of COVID-19 at any single facility, let alone all of them. The same issue was faced by the court in *AU Health System, Inc. v. Affiliated FM Ins. Co.*, 593 F. Supp. 3d 1344 (S.D. Ga. 2022). The policy in *AU Health* included an endorsement under which coverage might be provided for certain losses arising as the result of the "presence of communicable disease." *Id.* at 1349. The insured in *AU Health* owned over 30 healthcare facilities, some of which treated individuals who were positive for COVID-19. *Id.* at 1353. The insured moved for partial summary judgment and asked the court to find that "COVID-19 was 'actually present' at their 'described locations.'" The court rejected the insured's

speculative assertion that COVID-19 was "actually present" at all of its locations finding that "the Court, and AFM, are unwilling to blindly accept Plaintiffs' contention that all of the Insured Locations had COVID-19 'actually present.'" *Id*. at 1352.

Here, too, the Court should decline 24 Hour's request that it blindly accept 24 Hour's conclusory and speculative allegations that COVID-19 *must* have been in all of its locations in March 2020 because the virus was "everywhere."

Notwithstanding 24 Hour's failure to demonstrate the "actual presence" of COVID-19 at a specific club, there is additionally no evidence of "spread" of COVID-19 at any location. Under the terms of the ICD Endorsement, 24 Hour must provide sufficient evidence of the actual presence ***and*** spread of COVID-19 at its locations. (*See* Exh. A-4 at A.0227) (Continental Policy, p. 33 at Endorsement 2). In this context, "presence" and "spread" are independent requirements for coverage. As noted, however, 24 Hour did not undertake even rudimentary contact tracing that might allow it to at least infer the potential spread of disease associated with some location(s), and, instead, appears again to rely upon its assumption that COVID-19 must have been present at its locations to make the further assumption that, therefore, it must have spread at those locations. It's only designated expert, Dr. Carnethon, admitted that she was not asked to offer an opinion as to whether COVID-19 was "actually" spreading at 24 Hour's facilities nor does she have an opinion as to whether COVID-19 was spreading at 24 Hour's facilities. (*See* Exh. A-16 at A.0617; 0620)(Dr. Carnethon Dep. at 24:14-19; 63:13-18).

2.   <u>24 Hour Fitness Has Not Demonstrated That Access To Any Of Its Properties Was Prohibited</u>

Finally, not only does 24 Hour have to demonstrate the actual presence of and the spread of" COVID-19 at a particular location, but it must also demonstrate that access to that location must have been prohibited by a government order **due to** that presence and spread. 24 Hour has

not produced or identified any such order. The orders issued by state and local authorities in 2020 were either broad closure or "stay at home" orders, none of which were in any way related to a specific condition at an insured location. *See Inns-by-the-Sea v. California Mut. Ins. Co.*, 71 Cal. App. 5th 688, 711-712;  (Cal. App. 2021); *Spirit Realty Capital, Inc. v. Westport Insurance Corporation,* 568 F. Supp. 3d 470, 475 (S.D.N.Y. 2021) (insured's business was closed due to orders because it was one of many "non-essential" businesses and not because of the actual presence of virus at its locations). Nor has 24 Hour identified any orders that  prohibited access to any of 24 Hour's locations. *See, e.g., Riverside Dental of Rockford, Ltd. v. Cincinnati Ins. Co.*, No. 20 CV 50284, 2021 WL 2660774 (N.D. Ill. June 29, 2021), *following prior dismissal w/o prejudice*, 2021 WL 346423 (Jan. 19, 2021) (no prohibition of access where there was a prohibition on certain services being performed (which could have been as much as 90% of services ordinarily provided) where the premises could still be accessed for essential services); *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108 (S.D.N.Y. 2021*), following order without opinion*, 2021 WL 3163273 (July 07, 2021) ("While the Orders certainly restrict access to hospitals [by requiring the temporary suspension of elective procedures], they fall short of "prohibiting" access."); *St. Tammany Par. Hosp. Serv. Dist. No. 2 v Zurich Am. Ins. Co.*, 593 F. Supp 3d 399 (E.D. La. 2022) (holding that government orders did not prohibit access to insured's hospital as required for coverage under interruption by communicable disease provision); *Danville Regional Medical Center, LLC v. American Guarantee and Liability Insurance Company*, 2022 WL 16914516 (W.D. Va., 2022)*; Inspira Health Network v. American Guarantee and Liability Insurance Company*, 2022 WL 16552780 (D.N.J. 2022) (holding that the COVID-19 Executive Order restricted certain activities on the insured location but did not prohibit access to the insured location as is required to trigger coverage under the ICD provision).

Although 24 Hour refers in its Complaint to orders of various local and state governments requiring non-essential businesses such as 24 Hour's to close, 24 Hour has provided no evidence that it was directly ordered by any governmental body to undertake any specific action concerning COVID-19 with respect to any 24 Hour facility. Dr. Carnethon testified on behalf of 24 Hour that it was her understanding that the government orders required closure of gym facilities such as 24 Hour's regardless of whether or not COVID-19 was present on the premises. (*See* Exh. A-16 at A.0621-0622) (Dr. Carnethon Dep. at 73:17-74:4). Dr. Carnethon further testified that she was unaware of any health department or state or local government contacting 24 Hour directly regarding concerns about the potential presence of COVID-19 at any 24 Hour facility. (See Exh. A-16 at A.0622) (Dr. Carnethon Dep. at 74:12-17). And 24 Hour's own Rule 30(b)(6) witness, Matthew Piro, affirmatively asserted that 24 Hour closed its clubs not because they were ordered to do so by government authorities, but, rather, because "public orders indicated that COVID-19" was a significant health risk and 24 Hour therefore closed its facilities out of concern for the health and safety of its employees and guests. (*See*. Exh. A-18 at A.0719-0720) (Piro Dep. at 88:10-89:2). Again, evidence of the "actual presence and spread" of COVID-19 and resulting prohibition of access by a governmental order at 24 Hour's facilities is an independent precondition to coverage under the ICD Endorsement.

3.      <u>24 Hour Offers No Evidence That It Incurred COVID-19 Related Cleaning Costs During the Time of its Closure after March 16, 2020</u>

To date, 24 Hour has provided no verifiable evidence that it incurred any expenses to "clean up, remove, and dispose of" the COVID virus from its facilities or "restore the premises" after it closed its facilities on March 16, 2020 and until it began reopening facilities in May of 2020. The information submitted by 24 Hour in support of its purported loss during the claim adjustment and

27

during the discovery period in this litigation does not indicate that any funds were expended to undertake such cleaning, removal, disposal or restoration.

Indeed, on March 16, 2020—the date on which 24 Hour closed its clubs nationwide, Matthew Piro, 24 Hour's national director of club operations, wrote to representatives of KBS, 24 Hour's corporate janitorial service at the time and stated as follows (emphasis added):

> KBS Team:
> Please be advised that due to all of the gym closures required by the government related to the COVID-19 virus outbreak, all of our clubs will close at midnight tonight until further notice. We may solicit help from you with some cleaning during the closure, but *all regular cleaning will end effective tonight at midnight until we are allowed to re-open*—and we will reach out to you about any specific cleaning requests.

(*See* Exh. A-9 at A.0489-0490)(Larson Rule 30(b)(6) Deposition, 76:25-77:7); (*see also* Exh. A-20 at A.0733)(March 16, 2020 Email from Matt Piro).

In line with this directive, 24 Hour has offered no evidence that KBS or any other vendor did any cleaning or other work at the facilities during the period that they were closed or upon re-opening.[9]

Even if 24 Hour had produced any evidence of cleaning, removal, disposal or restoration costs that it incurred, it has made no effort to demonstrate that it incurred any such costs "in a manner to satisfy the minimum requirements of any law or ordinance regulating communicable diseases." Indeed, 24 Hour has not directed the Property Insurers to any law or ordinance regulating COVID-19 that sets forth the minimum requirements that 24 Hour would have been required to

---

[9]The Property Insurers requested such information in discovery, but none was provided by 24 Hour. Under the clear language of the ICD Endorsement, however, evidence that 24 Hour has incurred "reasonable and necessary" cleaning costs to "clean up, remove, and dispose of [COVID virus] from insured property" and "restore the premises" is a precondition to coverage. 24 Hour bears the burden to demonstrate, in the first instance, the existence of coverage under the Property Policies. *Aydin Corp. v. First State Ins. Co.*, 959 Cal. Rptr. 1213, 1215; 77 Cal. Rptr. 2d 537, 539 (Cal. 1998) (burden is on an insured to establish its claim is within the basic scope of insurance coverage). By failing to produce any evidence of such costs, 24 Hour has failed to meet this burden.

follow had it ever undertaken efforts to "clean up, remove, and dispose of " COVID-19 from their locations or restore the premises.

The Property Insurers anticipate that 24 Hour will argue that "cleaning" is ineffective against COVID-19 and that, as a result, they had no choice but to close their locations for the duration of the government orders in order to eradicate the COVID virus from their premises. The closure of the facilities, however, does not plausibly equate with cleaning, removal, disposal or restoration. Moreover, Dr. Alison Stock, an epidemiologist who specializes in the characteristics and spread of infectious diseases, testified that the Centers for Disease Control confirms that cleaning with appropriate disinfectants is effective against the COVID virus. (*See* Exh. A-8 at A.0466) (Dr. Stock Dec. at Exh. A, p. 8, ¶ 22). Dr. Stock further noted that 24 Hour's normal cleaning operations in March 2020 included the type of disinfectants found to be effective against the COVID virus. (*See* Exh. A-8 at A.0466) (Dr. Stock Dec. at Exh. A, p. 8, ¶ 22). 24 Hour has offered no expert testimony on this issue or evidence to contradict this undisputed point.

Insofar as ICD coverage is afforded only for costs to "'clean up, remove, and dispose of' COVID-19 from their locations" and "restore the premises" and for the time required to undertake such operations, 24 Hour's failure to offer any evidence of covered loss under the ICD endorsement warrants summary judgment in favor of the Property Insurers as to 24 Hour's Claim under the ICD Endorsement.

4. <u>24 Hour Is Not Entitled to Business Interruption Coverage under the ICD Endorsement</u>

24 Hour seeks to recover economic losses due to the closure of the facilities under the ICD Endorsement. The business interruption coverage under this endorsement, however, is limited. Where all other requirements for coverage under the ICD Endorsement are met, *see supra* at IV.D.1 - IV.D.3, the endorsement covers business interruption loss "directly resulting from" the

clean up, removal and disposal of the communicable disease and the restoration of the premises. Thus, the ICD Endorsement does not provide coverage for business interruption for the entire time period that the facilities were dormant due to the governmental closure orders. Such coverage is provided by the civil authority provision in the Property Policies and is subject to the terms and conditions of that provision. *See supra* at IV.C. The ICD Endorsement only covers business interruption losses for the period of time that 24 Hour was actually cleaning, removing and disposing of the COVID virus and restoring the premises. As noted above, 24 Hour undertook no clean up, removal, disposal or restoration during the period of time that the facilities were closed, and 24 Hour has offered no evidence of any clean up, removal, disposal or restoration that it undertook when the facilities re-opened.

As there are no covered cleaning and restoration expenses here, it follows there are no "directly resulting" business interruption losses. Even if 24 Hour were able to show such cleaning costs, the potential business interruption coverage would be only for the short period of time during which the cleaning occurred, not the months-long period that the clubs were closed. Accordingly, 24 Hour's failure to demonstrate it incurred any expense that is covered under the ICD Endorsement precludes any potential for coverage of business interruption costs under the ICD Endorsement.[10]

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Property Insurers respectfully request that the Court grant their Motion for Summary Judgment.

---

[10] The Property Insurers also note that, even if 24 Hour were able to demonstrate coverage under the ICD Endorsement, which it has not and cannot do, the Property Policies provide a policy sublimit of $2,500,000 per occurrence and a $250,000 per occurrence deductible for ICD coverage. Accordingly, for each occurrence asserted by 24 Hour, it would additionally have to demonstrate that the cleaning and restoration costs as well as the directly resulting business interruption losses exceeded $250,000.

Dated: November 10, 2023

Respectfully submitted,

**HOGAN McDANIEL**

*/s/ Garvan F. McDaniel*
Garvan F. McDaniel (No. 4167)
1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7596
(302) 656-7599 (Fax)
gfmcdaniel@dkhogan.com

Benjamin W. Loveland (admitted *pro hac vice*)
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
(617) 526-6641
benjamin.loveland@wilmerhale.com

Lauren R. Lifland (admitted *pro hac vice*)
**WILMER CUTLER PICKERING HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
lauren.lifland@wilmerhale.com

*Counsel to Continental Casualty Company; Starr Surplus Lines Insurance Company; Allianz Global Risks US Insurance Company; Certain Underwriters at Lloyd's of London subscribing to Policy No. W27C0A190101; incorrectly sued as "Beazley-Lloyd's Syndicates 2623/623"; QBE Specialty Insurance Company and General Security Indemnity Company of Arizona*

31

Matthew S. Sarna (Bar No. 6578)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
302.468.5700
302.394.2341 (Fax)
Email: matthew.sarna@us.dlapiper.com

Brett Ingerman (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
The Marbury building
6225 Smith Avenue
Baltimore, MD 21209-3600
410.580.3000
410.580.3001 (Fax)
Email: brett.ingerman@us.dlapiper.com

*Attorneys for Continental Casualty
Company*

**GELLERT SCALI BUSENKELL &
BROWN, LLC**

*/s/ Michael Busenkell*
Michael Busenkell (DE No. 3933)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
(302) 425-5812
mbusenkell@gsbblaw.com

Richard G. Haddad (admitted *pro hac vice*)
**OTTERBOURG, P.C.**
230 Park Avenue
New York, NY 10169-0075
(212) 661-9100
rhaddad@otterbourg.com

Deanna M. Manzo (admitted *pro hac vice*)
**MOUND COTTON WOLLAN &
GREENGRASS, LLP**
One New York Plaza
New York, NY 10004
Telephone: (212) 804-4200
dmanzo@moundcotton.com

*Counsel to Allied World National Assurance Company*

Marlie McDonnell (admitted *pro hac vice*)
**CLYDE & CO US LLP**
271 17th Street NW, Suite 1720
Atlanta, GA 30363
(404) 410-3150
marlie.mcdonnell@clydeco.us

*Counsel to Allianz Global Risks US Insurance Company*

Courtney E. Murphy (admitted *pro hac vice*)
Kyle M. Medley (admitted *pro hac vice*)
Adam S. Cohen (admitted *pro hac vice*)
**HINSHAW & CULBERTSON LLP**
800 Third Avenue, 13th Floor
New York, NY 10022
(212) 471-6200
cmurphy@hinshawlaw.com

*Counsel to Starr Surplus Lines Insurance Company and Certain Underwriters at Lloyd's of London subscribing to Policy No. W27C0A190101, incorrectly sued as "Beazley-Lloyd's Syndicates 2623/623"*

Matthew M. Burke (admitted *pro hac vice)*
**ROBINSON & COLE LLP**
One Boston Place, 25th Floor
Boston, MA 02108
(617) 557-5996
mburke@rc.com

Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA 02110
(617) 248-5000

33

dgooding@choate.com
jmarshall@choate.com

*Counsel to Liberty Mutual Fire Insurance Company*

Elizabeth Kniffen (admitted *pro hac vice*)
Dennis Anderson (admitted *pro hac vice*)
**ZELLE LLP**
500 Washington Avenue South, Suite 4000
Minneapolis, MN 55415
(612) 359-4261
ekniffen@zellelaw.com
danderson@zellelaw.com

*Counsel to QBE Specialty Insurance Company and General Security Indemnity Company of Arizona*