IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (KBO) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (KBO) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>PROPERTY INSURER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW</u>**

# EXHIBIT A-16

*Excerpts from the Deposition of Mercedes Carnethon
(8/16/2023)*

```
                                                              Page 1

 1            IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE
 2

 3     IN RE:                           ) Chapter 11
                                        )
 4     RS FIT NW LLC,                   ) Case No. 20-11568 (TMH)
                 Debtor.                )
 5     -------------------------------)
       24 HOUR FITNESS WORLDWIDE,       )
 6     INC.,                            )
                         Plaintiff,     )
 7                                      )
                  -VS-                  ) Adv Pro. No. 20-51051(TMH)
 8                                      )
       CONTINENTAL CASUALTY COMPANY;    )
 9     ENDURANCE AMERICAN SPECIALTY     )
       INSURANCE COMPANY; STARR         )
10     SURPLUS LINES INSURANCE          )
       COMPANY, ALLIANZ GLOBAL RISKS    )
11     US INSURANCE COMPANY; LIBERTY    )
       MUTUAL INSURANCE COMPANY;        )
12     BEAZLEY-LLOYD'S SYNDICATES       )
       2623/623; ALLIED WORLD           )
13     NATIONAL ASSURANCE COMPANY;      )
       QBE SPECIALTY INSURANCE          )
14     COMPANY; and GENERAL SECURITY    )
       INDEMNITY COMPANY OF ARIZONA,    )
15                       Defendants.    )

16

17           Videotaped deposition of MERCEDES CARTHENON,
18    PH.D. taken before CAROL CONNOLLY, CSR, CRR, and Notary
19    Public, pursuant to the Federal Rules of Civil Procedure
20    for the United States District Courts pertaining to the
21    taking of depositions, at 10 S. Wacker Drive, Chicago,
22    Illinois, commencing at 10:02 a.m. on the 16th day of
23    August, A.D., 2023.
24    Job No. CS6059198
```

Page 11

1   A   None that I can think of off the top of my
2   head, and certainly none that are relevant to my
3   testimony.
4   Q   Okay.  All right.  Are you presently doing any
5   work with respect to the COVID-19 virus?
6   MR. CARROLL:  Objection to form.
7   THE WITNESS:  I am currently collaborating on a
8   scientific team that is evaluating stress among
9   healthcare workers who served during the COVID-19
10  pandemic, and we are preparing scientific manuscripts
11  around providing opportunities for individuals to improve
12  their -- healthcare providers to address their mental and
13  physical health from the stressors.
14  MR. INGERMAN:  Q  Okay.  Any other current work with
15  respect to the COVID-19 virus?
16  A   No, I have no current work with respect to the
17  COVID-19 virus.
18  Q   Have you ever done any work related to
19  determining whether COVID-19 is -- Let me start over.
20      Other than this case, have you ever done any
21  work in determining whether or not COVID-19 is present at
22  any particular location?
23  MR. CARROLL:  Object to the form.
24  THE WITNESS:  No, I have not done any work related

1    to the presence of COVID-19.
2         MR. INGERMAN:  Q  Okay.  Have you done any work
3    related to tracking the spread of the COVID-19 virus?
4         A    I have volunteered on behalf of my children's
5    school to help them set up appropriate contact tracing
6    for the spread of the COVID-19 virus within the school
7    setting.
8         Q    Other than the work for your child's school,
9    have you done any other work related to tracking the
10   spread of the COVID-19 virus?
11        A    I have not done any work related to that.
12        Q    And when was the volunteer work that you did at
13   your child's school?
14        A    We began that work in September of 2020 when
15   they returned, and that work continued until the spring
16   of 2022.  I would say approximately May or June of 2022
17   is when we ended that tracing work.
18        Q    Okay.  Let me ask you a couple additional
19   questions about your qualifications.  Are you a member of
20   the Council of State and Territorial Epidemiologists?
21        A    No, I'm not.
22        Q    Are you familiar with that council?
23        A    I have heard of that council, yes.
24        Q    Okay.  Have you ever considered joining that

1        MR. CARROLL:  Objection to form.

2        MR. INGERMAN:  Q  In a particular location.

3        A    Would you mind restating the question?

4        Q    Sure.  Have you ever participated in an

5   epidemiological study of COVID-19 and whether it exists

6   in particular locations, not in people, but in

7   physical --

8        A    A research study is what you mean?

9        MR. CARROLL:  Same objection.

10            You can go ahead.

11       THE WITNESS:  No.

12       MR. INGERMAN:  Q  Have you ever done an outbreak

13  investigation?

14       MR. CARROLL:  Objection to form.

15       MR. INGERMAN:  Q  Do you know what an outbreak

16  investigation is?

17       A    I have never done an outbreak investigation

18  that relied on the particular criteria for carrying one

19  out as stated by the CDC.  We have within the school

20  setting tracked the number of cases.  We -- I advised on

21  the protocols needed on who needed to be contacted to ask

22  questions about known sources of the illness.  This was

23  not an investigation that was carried out I think in a

24  formal manner as I would define it.

Page 24

1   epidemiologist to comment on the course of the pandemic,
2   what we knew when, and a bit about how the virus itself
3   was spread in the population.  And I was told that I
4   would be asked questions about -- that would rely on my
5   expertise as an epidemiologist.
6       Q   And you've never served as an expert witness
7   before, right?
8       A   No, I have never served as an expert witness.
9       Q   Were you asked as part of your assignment to
10  determine whether COVID-19 was actually present at any
11  particular 24 Hour Fitness location?
12      A   No, I was not ever asked to determine whether
13  COVID-19 was actually present.
14      Q   Were you ever asked to determine as part of
15  your assignment whether or not COVID was actually
16  spreading at any particular 24 Hour Fitness location?
17      MR. CARROLL:  Objection to form.
18      THE WITNESS:  I was not asked to assess whether or
19  not COVID-19 was actually spreading.
20      MR. INGERMAN:  Q   Okay.  Let's mark this as No. 3.
21          (Exhibit 3 marked as requested)
22      Q   All right.  Dr. Carthenon, we've handed what we
23  marked as Carthenon Deposition 3.  This is a letter from
24  David Weiss at Reed Smith to you dated August 18th, 2021.

Page 33

1  Q   And tell me your best recollection of what you
2  learned during that conversation?
3  A   I don't believe I can recall with any
4  precision.  What they described -- I asked them questions
5  about the number of people who visited their clubs on
6  average.  I don't remember very much of that discussion.
7  I apologize.
8  Q   That's okay.  All right.
9      Going back to your assignment in this case --
10 A   Correct.
11 Q   -- from the lawyers.  Were you asked to
12 determine whether or not COVID-19 caused any physical
13 loss or damage to property at any of the 24 Hour Fitness
14 locations?
15      MR. CARROLL:  Objection to form.
16      THE WITNESS:  No, I was not.
17      MR. INGERMAN:  Q   Are you familiar with the
18 International Health Racquet and Sports Club Association
19 Guidance for fitness clubs dealing with COVID-19?
20 A   I am not, no.
21 Q   Did you do any determination of the
22 effectiveness of the disease mitigation strategies that
23 were implemented at any of the 24 Hour Fitness clubs?
24      MR. CARROLL:  Objection to form.

1  populated gatherings where people are speaking and
2  talking and interacting with one another, that the
3  assumption would be that that would be a route of
4  transmission.
5          Biological plausibility was one of them.
6  Biological plausibility is based on what we know of the
7  biology of how the respiratory illnesses tend to spread
8  through respiratory droplets and aerosols.  That would be
9  the assumption that a particular virus would be spreading
10 similarly.
11         And then coherence, I think that the -- I think
12 the coherence, I think comes -- Sorry.
13         Coherence is another way of looking at the
14 prior literature and thinking about how things were
15 determined to be present, whether or not it was again
16 somewhat biologically plausible for these situations to
17 convey risk.  And so it was really based on those in
18 particular.
19    Q    And you utilized these four criteria to reach
20 your conclusion that you presume that the virus was
21 present at all 400-plus locations for 24 Hour Fitness, is
22 that correct?
23         MR. CARROLL:  Objection to form.
24         THE WITNESS:  I took the evidence that 24 Hour

1    Fitness shared with me, and what I did was I used these
2    criteria to make an indeterminate determination about
3    whether or not I thought their assumption of the presence
4    was reasonable.  And the reason that I think their
5    assumption that it was present is reasonable is -- based
6    on consistency, analogy, and biological plausibility.
7         MR. INGERMAN:  Q  Okay.  Let me make sure I
8    understand this.  Do you have an opinion one way or the
9    other as to whether COVID-19 was present at any location
10   -- at any 24 Hour Fitness location?
11        MR. CARROLL:  Objection to form.
12        THE WITNESS:  No, I do not have an opinion.
13        MR. INGERMAN:  Q  Do you have an opinion one way or
14   the other whether COVID-19 was spreading at any 24 Hour
15   Fitness location?
16        MR. CARROLL:  Objection to form.
17        THE WITNESS:  I do not have an opinion about whether
18   it was spreading.
19        MR. INGERMAN:  Q  Okay.  All right.  Are you aware
20   of any other epidemiological study that used the Bradford
21   Hill criteria to determine the presence of SARS Co-V 2 at
22   any particular location?
23        A    I -- I am not aware.  Quite frequently when we
24   publish in the scientific literature, part of the paper

1    were also not described in March of 2020 as disease
2    mitigation strategies.  The primary disease mitigation
3    strategies for businesses were shutdowns and quarantines.
4        MR. INGERMAN:  Q  Now, you understand that 24 Hour
5    Fitness made the decision to close all of its clubs
6    across the country as of 12:01 a.m. March 16th, 2020,
7    correct?
8        A    Yes.
9        Q    And do you understand that, for instance, in
10   California there was a statewide order issued three days
11   later on March 19th, 2020 closing all nonessential
12   businesses, including gyms?
13       A    I didn't realize the timeline.  But, yes.
14       Q    Okay.  And that's -- are you familiar generally
15   with those statewide stay-at-home orders?
16       A    I am, yes.
17       Q    All right.  You understood that the government
18   orders that required the closure of 24 Hour Fitness's
19   locations was whether or not there was COVID on the
20   premises, right?  In other words, whether there was COVID
21   on the premises or not, if you were a gym subject to that
22   government order, you had to close, is that your
23   understanding?
24       MR. CARROLL:  Objection to form.

1        THE WITNESS:  Yes, I believe so.  The government
2   orders which were not restricted to statewide level, they
3   were often localities, cities could vary, those were not
4   based on confirming the presence of COVID-19.
5        MR. INGERMAN:  Q  After 24 Hour Fitness closed its
6   facilities on March 16th, 2020, to the extent there was
7   COVID on the premises, how long did it take for it to
8   disappear once the gyms were closed?
9        MR. CARROLL:  Objection to form.
10       THE WITNESS:  As I stated, that falls outside my
11  area of expertise to know about a decay rate.
12       MR. INGERMAN:  Q  Are you aware of any health
13  department in any state or local government contacting
14  24 Hour Fitness about an outbreak or spread of COVID-19
15  at any of its locations?
16       A    They did not share any information with me
17  about that.
18       Q    Bear with me one second.
19       A    No problem.
20            (Exhibit 6 marked as requested)
21       Q    Dr. Carthenon, the court reporter has handed
22  you what we marked as Carthenon Deposition Exhibit 6.
23  This is a document dated May 15th, 2020, from McLarens.
24  The Bates label at the very bottom right-hand corner is

1      A    It's a struggle.

2           (Exhibit 8 marked as requested)

3      Q    Dr. Carthenon, the court reporter has handed
4  you what we marked as Carthenon Exhibit No. 8.  This is
5  the expert report of Dr. Alexis Sauer-Budge that I think
6  you told me you reviewed most recently on Sunday.

7      A    Correct.

8      Q    My guess is that a lot of this is outside your
9  area of expertise, but let me ask you generally, do you
10 recall reading anything in Dr. Sauer-Budge's report with
11 which you disagree?  Please take your time and review it.

12     A    No.  Just as I look through the summary of the
13 executive summary, I recall thinking that I learned a lot
14 from her report.  It was very interesting.

15     Q    But outside of your area of expertise?

16     A    Completely.  Sounds very reasonable.

17     Q    Okay.  Going back to your report which we
18 marked as Carthenon Exhibit 1.  At page 16 of your
19 report, just under the Figure 3 --

20     A    Yes.

21     Q    Okay.  There's a sentence in there that says,
22 quote, 24 Hour Fitness' clubs are predominantly located
23 in urban and suburban high-density settings which are
24 areas that 24 Hour Fitness understood experienced high

1   STATE OF ILLINOIS  )
                       )  SS:
2   COUNTY OF C O O K  )

3

4           The within and foregoing deposition of the
5   aforementioned witness was taken before CAROL CONNOLLY,
6   CSR, CRR and Notary Public, at the place, date and time
7   aforementioned.
8           There were present during the taking of the
9   deposition the previously named counsel.
10          The said witness was first duly sworn and was
11  then examined upon oral interrogatories; the questions
12  and answers were taken down in shorthand by the
13  undersigned, acting as stenographer and Notary Public;
14  and the within and foregoing is a true, accurate and
15  complete record of all of the questions asked of and
16  answers made by the forementioned witness, at the time
17  and place hereinabove referred to.
18
19
20
21
22
23
24

1        The signature of the witness was not waived,
2    and the deposition was submitted, Pursuant to Rule 30 (e)
3    and 32 (d) 4 of the Rules of Civil Procedure for the
4    United States District Courts, to the deponent per copy
5    of the attached letter.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 94

1       The undersigned is not interested in the within
2   case, nor of kin or counsel to any of the parties.
3       Witness my official signature and seal as
4   Notary Public in and for Cook County, Illinois on this
5   30th day of August, A.D.
6   2023.

7
8   *Carol Connolly*
9       CAROL CONNOLLY, CSR, CRR
        CSR No. 084-003113
10      Notary Public