IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (KBO) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (KBO) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PROPERTY INSURER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

# EXHIBIT A-18

*Excerpts from the Deposition of Matthew Piro
(4/27/2022)*

```
UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------x
In re:                     Chapter 11
                           Case No. 20-11558
                           (KBO)

24 HOUR FITNESS WORLDWIDE,
INC., et al.,

              Debtors.
-------------------------------------x
24 HOUR FITNESS WORLDWIDE, INC.,

              Plaintiff,

     v.              Adv. Pro. No.
                     20-51051 (KBO)

CONTINENTAL CASUALTY COMPANY;
ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY; STARR SURPLUS
LINES INSURANCE COMPANY; ALLIANZ
GLOBAL RISKS US INSURANCE COMPANY;
LIBERTY MUTUAL INSURANCE COMPANY;
BEAZLEY-LLOYD'S SYNDICATES 2623/623;
ALLIED WORLD NATIONAL ASSURANCE
COMPANY; QBE SPECIALTY INSURANCE
COMPANY and GENERAL SECURITY
INDEMNITY COMPANY OF ARIZONA,

              Defendants.
-------------------------------------x
          DATE:  April 27, 2022

          TIME:  11:32 a.m.


     Video-recorded Deposition of MATTHEW

PIRO, on behalf of 24 Hour Fitness

Worldwide, Inc., taken by counsel for

defendant, held via Zoom videoconference,

before Roberta Caiola, a Notary Public of

the State of New York.
```

```
 1                  Matthew Piro
 2   it was at the time and I do not know that
 3   many public health experts really did
 4   either.  It didn't seem like prior to
 5   March 16th that there was a clear
 6   understanding of how dangerous it was or
 7   how contagious it was, so I think that's
 8   all I can say on the matter.
 9        Q.    Well the company -- let me
10   rephrase my question because I'll just ask
11   with respect to you, you can only answer
12   for yourself.
13              You certainly wouldn't have
14   wanted either employees or customers to
15   come into a 24 Hour Fitness facility where
16   you believed that the virus was present;
17   would you?
18        A.    Frankly, based on the
19   information that was in the public domain,
20   we assumed the virus was likely in the
21   majority of our clubs.
22        Q.    And notwithstanding that, you
23   were comfortable with having employees and
24   customers enter all those clubs?
25              MR. O'CARROLL:  Objection to
```

```
 1                  Matthew Piro
 2            MR. O'CARROLL:  Objection to
 3       form.
 4       A.    I can't speak for how
 5  impossible it was to detect.  In my mind,
 6  clearly the fact that it was detected by
 7  public health experts at the time, it was
 8  not impossible to detect.  It was not
 9  possible for us to detect without any tools
10  or resources in our clubs, but I don't know
11  how else public health experts would be
12  indicating that it was dangerous and highly
13  transmissible if it was impossible to
14  detect, as you just said.
15       Q.    Just to be clear, you never
16  received any notice from any public health
17  agency or official that they had been in
18  one of your clubs and detected COVID-19;
19  correct?
20       A.    Not to my recollection.
21       Q.    You mentioned earlier that in
22  response to people who had been in one of
23  the clubs later indicating that they had
24  tested positive for COVID, that the company
25  had closed individual clubs.  Did I hear
```

1        Matthew Piro

2    dangerous place needed to not operate any

3    longer, but it was I would say because we

4    were being instructed by public health

5    experts that COVID-19 in those specific

6    areas was at a great risk of

7    transmissibility, and so for the health and

8    safety of our members and team members we

9    needed to close our clubs.

10        Q.   Well you had to close them

11   because you were ordered by the government

12   to close them; correct?

13            MR. O'CARROLL:  Objection to

14       form.

15        A.   We closed them because the

16   public orders indicated that COVID-19 in

17   those specific areas was at a higher rate

18   of transmissibility or risk, and it was

19   dangerous to operate gyms.

20            So because we were instructed

21   by experts in the public domain -- not in

22   the public domain, in the public health

23   field that gyms were dangerous and needed

24   to close to keep people safe from COVID-19,

25   that we needed to close them for the health

1          Matthew Piro
2   and safety of our team members and members.
3        Q.   For those clubs that were
4   listed as in question on this chart, what
5   did in question mean?
6        A.   Which column does it indicate
7   in question?
8        Q.   If you look at the chart
9   there's a column that's titled "Status,"
10  and there are some that are labeled
11  "Closed," some that are labeled "To Close,"
12  and some that are labeled "In Question."
13            My question to you was on this
14  chart what does in question mean?
15       A.   That means in that area which
16  is labeled as CLA, Central LA, there
17  were -- I don't want to say tea leaves --
18  the public health officer in those areas
19  had indicated that that area was also at
20  great risk, but they had not yet made any
21  advisory statements.
22            They had not indicated that the
23  public health was at such great a risk that
24  it was no longer safe to operate certain
25  facilities, including gyms.

```
 1                    Matthew Piro
 2          at 10:37 a.m.
 3   BY MR. DENN:
 4          Q.    Mr. Piro, in response to a
 5   couple of questions before we took a break
 6   you made some reference to communications
 7   from public health officials.  Do you
 8   recall that?
 9          A.    Yes, I recall that.
10          Q.    Am I correct that all of the
11   communications you're aware of from public
12   health officials were in the form of
13   government orders?  In other words, you
14   didn't receive any individualized
15   communication from any public health
16   official about any of your clubs?
17          A.    We did not receive individual
18   communication about any of our clubs, to my
19   knowledge, but you're not correct in
20   assuming that it was just related just to
21   government orders.  We were very much like
22   the rest of the country, watching the news,
23   looking at Facebook, Twitter posts from
24   public health officials and a lot of --
25   actually the best, most timely information
```

1         Matthew Piro

2    midnight on the 16th, and so what likely

3    would have occurred is that our chief

4    communications officer at the time would

5    have been dealing with drafting this with

6    our CEO.  It's possible that they asked me

7    details about 24GO, or something like that,

8    but I don't believe that I was involved in

9    the drafting of this.

10        Q.    And you didn't see any earlier

11   drafts of it?

12        A.    Not to my recollection.

13        Q.    So at midnight on March 16,

14   2020, when all of the clubs were supposed

15   to close, had anyone at the company asked

16   you whether any of the company's properties

17   had been altered or damaged by COVID-19?

18             MR. O'CARROLL:  Objection to

19       form.

20        A.    I don't remember a specific

21   question in regards to was the property

22   physically damaged by COVID-19, no.

23        Q.    Had anyone reported to you that

24   any 24 Hour Fitness property had been

25   either lost or damaged by COVID-19 as of

1                    Matthew Piro
2    midnight on March 16th?
3             MR. O'CARROLL:  Objection to
4        form.
5        A.     I do recall specific examples
6    of some of our equipment being damaged as a
7    result of our team members' best efforts to
8    disinfect them.  Some of our equipment, as
9    you may be aware, has electronic
10   components, screens or digital readouts
11   that show how fast you're going or how hard
12   you're working or what your heart rate may
13   be, and there were some instances of team
14   members spraying disinfectant too heavily
15   and leaving it too long on those pieces of
16   equipment, in their best efforts to prevent
17   other members or team members from getting
18   COVID-19, but that is the extent at which
19   I'm aware of any physical property damage
20   that was reported to me in relation to the
21   COVID-19 virus.
22        Q.    And that's damage that was
23   caused by someone attempting to clean
24   equipment?
25             MR. O'CARROLL:  Objection to

1        Matthew Piro

2         C E R T I F I C A T E

3

4  STATE OF NEW YORK  )

5             : ss

6  COUNTY OF BRONX    )

7

8       I, ROBERTA CAIOLA, a Certified

9  Shorthand Reporter, do hereby certify:

10       That MATTHEW PIRO, the witness whose

11  deposition is hereinbefore set forth, was

12  duly sworn by me and that such deposition

13  is a true record of the testimony given by

14  the witness.

15       I further certify that I am not

16  related to any of the parties to this

17  action by blood or marriage, and that I am

18  in no way interested in the outcome of this

19  matter.

20       IN WITNESS WHEREOF, I have hereunto

21  set my hand on May 5, 2022

22

23       *Roberta Caiola* (signature)

24            ROBERTA CAIOLA

25