## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (TMH) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (TMH) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANT ALLIED WORLD NATIONAL ASSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW REGARDING THE POLLUTION POLICY

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................... 1

II.     SUMMARY OF ARGUMENT ............................................................................ 2

III.    STATEMENT OF FACTS .................................................................................. 3

    1.    Allied World's Issuance of the Pollution Policy to 24 Hour, with
        its Principal Place of Business in California .......................................... 3

    2.    Closure of the 24 Hour Facilities ...................................................... 3

    3.    The Evidentiary Record ................................................................... 5

    4.    The Relevant Policy Language ......................................................... 9

    5.    The Ruling on Allied World's Motion for Judgment on the Pleadings ........... 12

IV.     ARGUMENT .................................................................................................. 13

    1.    Standard of Review ....................................................................... 13

    2.    California Law Governs these Issues of Contract Interpretation ............. 14

    3.    24 Hour Does Not Have Evidence That It Suffered Business Interruption Costs
        from Business Interruption Caused Solely and Directly By the Presence of the
        COVID Virus on, at or under a Scheduled Location ............................. 17

        a.   24 Hour Bears the Burden of Proof that it Suffered a Covered Loss Under
            the Plain Language of the Pollution Policy ..................................... 17

        b.   There is No Evidence that the COVID Virus was on, at or Under any
            Scheduled Location ................................................................. 18

        c.   The Alleged Business Interruption Was Not Caused "Solely and Directly"
            by a "Pollution Incident" on, at or under a Scheduled Location ........... 22

V.      CONCLUSION ............................................................................................... 26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AIU Ins. Co. v. Superior Ct.*,
  51 Cal. 3d 807 (1990)................................................................................18

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................. 13

*Another Planet Ent., LLC v. Vigilant Ins. Co.*,
  No. 3:20-cv-07476, 2021 WL 774141 (N.D. Cal. Feb. 25, 2021) .......................................... 21

*Baker v. Oregon Mutual Ins. Co.*,
  (N.D.Cal., Mar. 25, 2021, No. 20-cv-05467-LB) 2021 WL 1145882, at p. ............................ 25

*Bank of the West v. Superior Court*,
  2 Cal. 4th 1254 (1992)................................................................................17

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
  5 Cal. 4th 854 (1993)................................................................................18

*Catlin Specialty Ins. Co. v. CBL & Assocs. Properties, Inc.*,
  2017 WL 4784432 (Del. Super. Ct. Sept. 20, 2017) ................................................ 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................... 13, 14

*Certain Underwriters at Lloyds v. Chemtura Corp.*,
  160 A.3d 457 (Del. 2017)................................................................. 14, 15, 16

*Cong. Talcott Corp. v. Gruber*,
  993 F.2d 315 (3d Cir. 1993)................................................................. 14

*Dove v. Prudential Ins. Co. of Am.*,
  2009 WL 1379574 (D. Kan. May 18, 2009) .......................................................... 23

*DZ Jewelry, LLC v. Certain Underwriters at Lloyds London*,
  525 F. Supp. 3d 793 (S.D. Tex. 2021) ............................................................. 20

*Entm't Am. Inc. v. Am. Home Assurance Co.*,
  532 F.3d 1007 (9th Cir. 2008)................................................................. 18

ii

*Foster-Gardner, Inc. v. National Union Fire Ins. Co.,*
18 Cal. 4th 857 (1998) ............................................................................................... 17

*Greenwood Racing Inc. v. Am. Guarantee & Liab. Ins. Co.,*
569 F. Supp. 3d 243 (E.D. Pa. 2021) ...................................................................... 20

*Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.,*
539 F. Supp. 3d 409 (E.D. Pa. 2021) ...................................................................... 25

*In re Abeinsa Holding Inc.,*
2021 WL 3909984 (3d Cir. Sept. 1, 2021) ............................................................. 14

*In re Gaston & Snow,*
243 F.3d 599 (2d Cir. 2001) ..................................................................................... 14

*In re Lindsay,*
59 F.3d 942 (9th Cir. 1995) ...................................................................................... 14

*In re Merritt Dredging Co.,*
839 F.2d 203 (4th Cir. 1988) .................................................................................... 14

*In re Payless Cashways,*
203 F.3d 1081 (8th Cir. 2000) .................................................................................. 14

*In re PHP Healthcare Corp.,*
128 F. App'x 839 (3d Cir. 2005) .............................................................................. 14

*Island Hotel Props., Inc. v. Fireman's Fund Ins. Co.,*
512 F. Supp. 3d 1323 (S.D. Fla. 2021) .................................................................... 21

*Jackson v. Danberg,*
594 F.3d 210 (3d Cir. 2010) ..................................................................................... 22

*James v. Getty Oil Co. (E. Operations),*
472 A.2d 33 (Del. Super. Ct. 1983) ......................................................................... 23

*Johnson v. Hartford Fin. Servs. Grp., Inc.,*
510 F.Supp.3d 1326 (N.D. Ga. 2021) ...................................................................... 21

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
313 U.S. 487, (1941) ................................................................................................. 14

*Lamont v. New Jersey,*
637 F.3d 177 (3d Cir. 2011) ..................................................................................... 13

*Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.,*
166 Ill. 2d 520, 655 N.E.2d 842 (1995), *as modified on denial of reh'g* ................ 17

iii

*MacKinnon v. Truck Ins. Exch.*,
    31 Cal.4th 635 (2003)........................................................................................... 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................ 13

*Minkler v. Safeco Ins. Co. of America*,
    49 Cal.4th 315 (2010).......................................................................................... 17

*Mortar and Pestle Corp. v. Atain Specialty Ins. Co.*,
    508 F.Supp.3d 575 (N.D. Cal. 2020) .................................................................. 24

*Mudpie, Inc. v. Travelers Casualty Ins. Co. of America*,
    487 F.Supp.3d 834 (N.D. Cal. 2020) .................................................................. 24

*Muriel's New Orleans, LLC v. State Farm Fire and Casualty Co.*,
    535 F.Supp.3d 556 (E.D. La. 2021) .................................................................... 25

*Palmer v. Truck Ins. Exch.*,
    21 Cal. 4th 1109 (1999)....................................................................................... 17

*Paradigm Care & Enrichment Ctr., LLC v. W. Bend Mut. Ins. Co.*,
    529 F. Supp. 3d 927 (E.D. Wis. 2021) ............................................................... 20

*Pittston Co. v. Allianz Ins. Co.*,
    795 F. Supp. 678 (D.N.J. 1992) .......................................................................... 14

*Plaza De Mesilla Inc. v. Cont'l Cas. Co.*,
    519 F. Supp. 3d 1006 (D.N.M. 2021) ................................................................. 21

*Podobnik v. U.S. Postal Serv.*,
    409 F.3d 584 (3d Cir. 2005) ......................................................................... 13, 22

*Promotional Headwear Int'l v. Cincinnati Ins. Co.*,
    504 F. Supp. 3d 1191 (D. Kan. 2020) ................................................................ 22

*Safeco Ins. Co. v. Gilstrap*,
    141 Cal. App. 3d 524 (1983)............................................................................... 18

*Shea v. Bonutti Rsch., Inc.*,
    2011 WL 53473 (S.D. Ohio Jan. 7, 2011)......................................................... 23

*Simon Mktg., Inc. v. Gulf Ins. Co.*,
    149 Cal. App. 4th 616 (2007).............................................................................. 24

*Travelers Indem. Co. v. CNH Indus. Am., LLC*,
    191 A.3d 288 (Del. 2018).................................................................................... 15

iv

*Uncork & Create LLC v. Cincinnati Ins. Co.,*
  498 F. Supp. 3d 878 (S.D.W. Va. 2020) .................................................................. 21

*Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.,*
  929 F.3d 1143 (9th Cir. 2019) ........................................................................... 18, 22

*ViacomCBS Inc. v. Great Divide Ins. Co.,*
  640 F. Supp. 3d 931 ................................................................................................. 22

*Vons Cos., Inc. v. Fed. Ins. Co.,*
  212 F.3d 489 (9th Cir. 2000) ................................................................................... 24

*Waller v. Truck Ins. Exch., Inc.,*
  11 Cal. 4th 1 (1995) ........................................................................................... 17, 18

**Statutes**

28 U.S.C. § 157(b) ........................................................................................................ 2

28 U.S.C. § 1334 ......................................................................................................... 14

Cal. Civ. Code § 1638 ................................................................................................. 17

Cal. Civ. Code § 1641 ................................................................................................. 18

**Rules**

Fed. R. Civ. P. 56 ............................................................................................. 11, 13, 14

Rule 7056 of the Federal Rules of Bankruptcy Procedure ........................................... 1

v

Defendant Allied World National Assurance Company ("Allied World") hereby moves the Court to enter summary judgment in its favor, pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and Rule 56 of the Federal Rules of Civil Procedure, on the claim asserted by plaintiff 24 Hour Fitness Worldwide, Inc. ("24 Hour") against Allied World in this adversary proceeding under the Pollution Policy (as defined below).  In support of this motion (the "Motion for Summary Judgment"), Allied World states as follows:

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This case arises from an insurance claim (the "Claim") submitted to Allied World by 24 Hour for alleged losses related to the COVID-19 pandemic. 24 Hour submitted the Claim under Scheduled Location Pollution Liability Policy No. 0309-1873, effective September 3, 2017, through September 3, 2020, issued by Allied World to 24 Hour's parent company, 24 Hour Holdings I Corp. ("24 Hour Holdings") covering 24 Hour Holdings and its subsidiaries, including 24 Hour (the "Pollution Policy"). (Allied World's Supplemental Appendix, Adv. DE 236 ("Supp. Appendix") at AW0014-0074, AW0076-0177).

24 Hour failed to provide information to prove that it suffered a covered loss under the Pollution Policy. As such, Allied World advised 24 Hour that no coverage would be afforded under the Pollution Policy unless it could provide evidence of a covered loss.  On December 21, 2020, 24 Hour filed an adversary proceeding in this Court[1] (i) against Allied World under the Pollution Policy and (ii) against Allied World and certain other insurers based on policies affording a different type of coverage. (*See* Complaint for Declaratory Relief (the "Complaint"), Adv. DE[2] 1).

---

[1] On June 15, 2020, 24 Hour filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware.

[2] "Adv. DE" refers herein to a docket entry in the Adversary Proceeding.

In the adversary proceeding, 24 Hour seeks a declaration that it is entitled to recovery under the Pollution Policy for the economic losses it purportedly incurred as the result of the closure of its fitness clubs (the "facilities"). (Complaint ¶ 17 & p. 19 ¶ 1.a).[3]  Discovery is complete.

## II.    <u>SUMMARY OF ARGUMENT</u>

In this Motion, Allied World maintains that:

1.    24 Hour bears the burden of proof of showing that it suffered a covered loss under the Pollution Policy. That burden requires 24 Hour to prove that it incurred "business interruption costs resulting from business interruption caused solely and directly by a pollution incident on, at or under a scheduled location."

2.    24 Hour cannot meet its burden of proof because it has no evidence to establish the presence of the COVID virus on, at or under a scheduled location (its facilities).

3.    Even if 24 Hour could prove the presence of the COVID virus on, at or under a scheduled location (which it cannot), 24 Hour cannot establish that its facilities were closed "solely and directly" due to the presence of the COVID-19 virus on, at or under a scheduled location.  To the contrary, 24 Hour admits in its Complaint that the closures were due primary (if not entirely) due to governmental shut-down orders.

Accordingly, Allied World requests that summary judgment be granted in its favor.

---

[3] This Adversary Proceeding is a non-core proceeding within the meaning of 28 U.S.C. § 157(b).  (Adv. DE 68). Allied World has not consented to this Court's entry of final judgments in this Adversary Proceeding.  (*See* Adv. DE 56 ¶ 15).  Allied World has preserved its right to seek withdrawal of the reference of this Adversary Proceeding.  (See Adv. DE 231-1 ¶ 2).  Allied World does not, by filing this motion, consent to entry of final judgments by the Court in this Adversary Proceeding or otherwise waive any rights with respect to withdrawal of the reference, all of which rights are reserved.

2

### III.    STATEMENT OF FACTS

### 1.    Allied World's Issuance of the Pollution Policy to 24 Hour, with its Principal Place of Business in California

24 Hour is a Delaware corporation with its principal place of business in San Ramon, California.  (Complaint ¶ 3).  In March 2020, 24 Hour operated 445 fitness clubs (the "facilities") in fourteen states. (Complaint ¶ 15). Although 24 Hour operates in multiple states, California is 24 Hour's "largest market." (Complaint ¶ 40).  Allied World issued and sent the Pollution Policy to 24 Hour Holdings' corporate headquarters located in San Ramon, California.  (Pollution Policy at AW0014).

### 2.    Closure of the 24 Hour Facilities

COVID-19 is a contagious disease that is caused by the virus known as severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). (Appendix, Exh. A-8 at A.0462) (Declaration of Dr. Allison Stock ("Dr. Stock Dec.") at Exh. A, p. 4, ¶ 11).  For ease of reference, the disease will be referred to herein as "COVID-19" and the virus as the "COVID virus."

On March 11, 2020 the World Health Organization declared COVID-19 to be a "global outbreak." (Appendix, Exh. A-8 at A.0462) (Dr. Stock Dec.) at Exh. A, p.4, ¶ 11) (Report of Dr. Alison Stock, p. 4); (Complaint ¶ 22). Starting on March 15, 2020, certain state and local authorities across the U.S. began to issue "safer at home" orders to limit the spread of COVID-19. (Appendix, Exh. A-8 at A.0462) (Dr. Stock Dec. at Exh. A, p. 4, ¶ 11); (Complaint ¶¶ 24-33).

On March 16, 2020, 24 Hour issued a corporate-wide order to close all of its facilities effective at midnight. (Complaint ¶ 40). The 24 Hour facilities remained closed until 24 Hour was permitted to re-open the facilities by government authorities. (Complaint ¶ 40). Dan Larson ("Larson"), 24 Hour's 30(b)(6) witness at its 30(b)(6) deposition on issues relating to 24 Hour's

3

Claim under the Pollution Policy, admitted that "[g]overnment-related requirements were part of the decision-making process" in closing all of its then open fitness centers by midnight on March 16, 2020 (Supp. Appendix at AW0187-88) (Transcript of 30(b)(6) Deposition of Dan Larson ("Larson 30(b)(6) Dep."), 77:18-78:14), and that a "component … of the decision-making process" in 24 Hour's decision that it would be "temporarily closing all 24 Hour Fitness clubs, no later than midnight tonight, March 16," was "to comply with federal, state, and local government ordinances." (Supp. Appendix at AW0186) (Larson 30(b)(6) Dep. at 65:4-65:25).

Following their re-openings, certain 24 Hour facilities were temporarily re-closed due to orders of local governments requiring the closure of non-essential businesses due to further outbreaks of COVID-19. (Complaint ¶ 34). The facilities that were forced to re-close temporarily due to local governmental orders were again re-opened when the orders were lifted, unless otherwise prohibited to re-open due to "lease rejection." (Supp. Appendix at AW0190) (Larson 30(b)(6) Dep. 92:4-23).

According to the CDC, "SARS-CoV-2, the virus that causes COVID-19, is an enveloped virus, meaning that its genetic material is packed inside an outer layer (envelope) of proteins and lipids." (Appendix[4], Exh. A-8 at A.0466) (Dr. Stock Dec. at Exh. A, p. 8, ¶ 22). "The envelope contains structures (spike proteins) for attaching to human cells during infection." (Appendix, Exh. A-8 at A.0466) (Dr. Stock Dec. at Exh. A, p. 8, ¶ 22). In contrast to other diseases that have community-based transmission, such as tuberculosis and norovirus, the envelope for SARS-CoV-2, as with other enveloped respiratory viruses, is labile or easily broken down, and can degrade quickly upon contact with surfactants contained in cleaning agents and EPA disinfectants.

---

[4] "Appendix" refers to the 803-page Appendix that includes Exhibits A-1 to A-27 and was filed at Adv DE 233.

(Appendix, Exh. A-8 at A.0466)(Dr. Stock Dec. at Exh. A, p. 8, ¶ 22); (Appendix, Exh. A-10 at A.0528) (Declaration of Dr. Alexis Sauer-Budge ("Dr. Sauer-Budge Dec.") at Exh. A, p. 26, ¶ 4.22).  24 Hour used such disinfectants when conducting regular cleaning of its properties as of March 2020. (Appendix, Exh. A-11 at A.0597-0598) (March 12, 2020 Email); (Appendix, Exh. A-12 at A.0600-0601) (May 5, 2020 Email from Matt Piro). Appropriately disinfected surfaces do not transmit the COVID virus. (Appendix, Exh. A-10 at A.0541-0542) (Dr. Sauer-Budge Dec. at Exh. A, pp. 39-40, ¶ 4.43). The COVID virus does not physically alter the air or surfaces with which it comes into contact. (Appendix, Exh. A-10 at A.0541-0542) (Dr. Sauer-Budge Dec. Exh. A, pp. 39-40, ¶ 4.36).

### 3.  **The Evidentiary Record**

To support its position that it is entitled to coverage, 24 Hour has made conclusory allegations that the presence of individuals who contracted or suffered from COVID-19, coupled with prevalence of the disease in the community, caused physical loss of or damage to 24 Hour's business location and, as a result, its operations were suspended.  (Complaint ¶¶ 41-42).  24 Hour has also alleged, in conclusory fashion, that "[t]he presence and spread of COVID-19 throughout the community, including at Plaintiff's fitness club locations, led to the closure orders discussed above," thereby prohibiting access to its facilities. (Complaint ¶ 61). 24 Hour has further alleged that "[t]he Pollution Policy covers some or all of Plaintiff's business interruption losses from the COVID-19 Outbreak." (Complaint ¶ 70).

Yet, after an extensive discovery process, 24 Hour has offered no evidence to support these allegations.  24 Hour has offered no evidence of a confirmed case of the COVID virus at any 24 Hour facility prior to their closing on March 16, 2020. On March 13, 2020, three days before 24 Hour's nationwide closure, Larson, 24 Hour's environmental health and safety manager, stated in

5

an e-mail he sent to Jeremy Gottlieb, 24 Hour's Vice President, audit and compliance, entitled "COVID-19 (Unconfirmed allegation)" that "So far the handful of alleged COVID-19 cases that were reported by members to the clubs have not been substantiated." (Appendix, Exh. A-13 at A.0603) (March 13, 2020 Email from Larson).  According to an internal March 24, 2020 summary of incident reports prepared by 24 Hour for all of the facilities, a total of merely 27 incident reports referred to COVID-19 as of that date. (Appendix, Exh. A-14 at A.0607) (Deposition of Jeremy Gottlieb ("Gottlieb Dep.") at 29:6-29:15); (Appendix, Exh. A-15 at A.0611) (24 Hour Claim Report).

However, 24 Hour has no evidence of positive COVID-19 tests for any employee, guest or other visitor while on the premises of any 24 Hour facility prior to or throughout the closure period. Moreover, 24 Hour has no evidence of any employee or member with a confirmed COVID-19 infection being present at any 24 Hour location. Nor did 24 Hour conduct any "contact tracing" in response to the few reports they received of possible or suspected exposure of employees or guests to COVID-19.  (Appendix, Exh. A-8 at A.0461) (Dr. Stock Dec. at Exh. A, p. 3).

Larson, 24 Hour's 30(b)(6) witness with respect to the Pollution Policy, confirmed at his 30(b)(6) deposition that 24 Hour has no evidence that the COVID virus was present at any particular facility at the time of its closure.  Specifically, he testified as follows concerning 24 Hour's purported evidence establishing the presence of the COVID virus at its fitness clubs at the time 24 Hour closed them on March 16, 2020:

> Q       And -- and what specific evidence, if any, do you have to substantiate the presence of COVID-19 on or at each of your clubs as of March 16, 2020, at 10:50 p.m.?
>
> MR. O'CARROLL: Objection to form.
>
> THE WITNESS:  Based on WHO, World Health Organization, declaring it an

international pandemic, COVID-19 cases within the communities we operate in, and the basis of our business where people breathe heavily, are in areas for an hour-plus, potentially, we had reason to believe COVID-19 was within our clubs at all times.

(Supp. Appendix at AW0188-89) (Larson 30(b)(6) Dep., 78:20-79:6).

Dr. Mercedes R. Carnethon, the sole expert retained by 24 Hour in this case, testified on behalf of 24 Hour that she has not done any work related to the presence of the COVID virus in any location. (Appendix, Exh. A-16 at A.0614-0615) (Transcript of Deposition of Dr. Mercedes Carnethon ("Dr. Carnethon Dep.") at 11:20-12:1). Dr. Carnethon relied on little more than the aforementioned unsubstantiated "incidents" reported by 24 Hour and in support of her opinion that it was "reasonable" for 24 Hour to "assume" that the COVID virus was present in their facilities. (Appendix, Exh. A-16 at A.0619-0620) (Dr. Carnethon Dep. at 62:24-63:6); (Appendix, Exh. A-17 at A.0650-62) (Dr. Carnethon Report at pp. 17-19).

Dr. Carnethon specifically testified that she was never asked by 24 Hour to determine whether the COVID virus was present at *any* of 24 Hour's facilities. She further testified that she had *no opinion* as to whether the COVID virus was actually present at any of 24 Hour's facilities. She testified:

> Q.    Were you asked as part of your assignment to determine whether COVID-19 was actually present at any particular 24 Hour Fitness location?
>
> A.    No. I was not ever asked to determine whether COVID-19 was actually present.
>
> Q.    Were you ever asked to determine as part of your assignment whether or not COVID was actually spreading at any particular 24 Hour Fitness location?
>
> Mr. Carroll:    Objection to form.
>
> The Witness:  I was not asked to assess whether or not COVID-19 was actually spreading.

7

* * *

Mr. Ingerman: Q. Okay.  Let me make sure I understand this. Do you have an opinion one way or the other as to whether COVID-19 was present at any location – at any 24 Hour Fitness location?

Mr. Carroll:  Objection as to form.

The Witness:  No, I do not have an opinion.

Mr. Ingerman: Q.  Do you have an opinion one way or the other whether COVID-19 was spreading at any 24 Hour Fitness location?

Mr. Carroll:  Objection to form.

The Witness:  I do not have an opinion about whether it was spreading.

(Supp. Appendix at AW197-98) (Carnethon Dep., 24:12-19; 63:7-18).

No governmental authority has confirmed the presence of COVID-19 at any 24 Hour facility or issued any orders directly to 24 Hour regarding the operation of its facilities as a result of the COVID outbreak. (Appendix, Exh. A-18 at A.0718; A.0721) (Transcript of Deposition of Matthew Piro ("Piro Dep."), 60:15-20; 92:4-18).

24 Hour also has offered no evidence that it incurred any cost to clean up, remove, and dispose of COVID-19 from any of its locations. Indeed, on March 16, 2020, the date of 24 Hour's nationwide closure, Matthew Piro, 24 Hour's national director of club operations, wrote to representatives of KBS, 24 Hour's corporate janitorial service at the time, and stated as follows:

> KBS Team,
> Please be advised that due to all of the gym closures required by the government related to the COVID-19 virus outbreak, all of our clubs will close at midnight tonight until further notice. We may solicit help from you with some cleaning during the closure, but all regular cleaning will end effective tonight at midnight until we are allowed to re-open—and we will reach out to you about any specific cleaning requests.

8

(Appendix, Exh. A-9 at A.0489-0490) (Larson 30(b)(6) Dep. at 76:25-77:7); (Appendix, Exh. A-20 at A.0733) (March 16, 2020 Email from Matt Piro).

24 Hour has offered no evidence to demonstrate that it undertook any cleaning at any facility to dispose of and/or remove virus from its premises from the time that it closed its facilities on March 16, 2020 until it reopened its facilities beginning in May of 2020. A checklist prepared by 24 Hour to provide guidance for the re-opening of facilities closed on March 16, 2020 does not include any indication that efforts were to be made to clean or remove virus from the premises. (Appendix, Exh. A-19 at A.0727-0728; 0729) (Larson Dep. at 73:7-74:2; 75:11-24); (Appendix, Exh. A-25 at A.0793-0797) (April 9, 2020 Email from Adam VanderYacht). 24 Hour undertook no effort to clean or remove virus from its facilities after the national closure on March 16, 2020. (Appendix, Exh. A-21 at A.0736) (Transcript of Deposition of Jason Carter) at 50:5-10).

24 Hour has not produced evidence indicating that any cleaning costs or economic losses during the period necessary to clean or remove the COVID virus from its locations, if any, exceeded $250,000 at any one location during the closure period. (Supp. Appendix at AW0034) (Pollution Policy pg. AWPLL000168).

## 4.  **The Relevant Policy Language**

The Pollution Policy provides the following "Insuring Agreement" for "Business Interruption Coverage," subject to a 72-hour retention and certain other limitations:  "We will pay business interruption costs resulting from business interruption caused solely and directly by a pollution incident on, at or under a scheduled location."  (Supp. Appendix AW0060) (Pollution Policy pg. AWPLL000194).  The Pollution Policy reflects that 24 Hour Holdings I Corp.'s "Address" is in San Ramon, California. (Supp. Appendix AW0014) (Pollution Policy pg. AWPLL000148).

9

The Pollution Policy defines a "pollution incident" as:

a.   The discharge, emission, seepage, migration, dispersal, release or escape of any pollutant into or upon land, or any structure on land, the atmosphere (including indoor air) or any watercourse or body of water (including groundwater), provided such conditions are not naturally present in the environment in the concentration or amounts discovered;

b.   The presence of microbial matter on, at or within buildings or structures; or

c.   The presence of pollutants, whether contained or uncontained, that have been illegally disposed of or abandoned at a scheduled location by parties other than an insured, provided that no insured had knowledge of such disposal or abandonment.

(Supp. Appendix AW0073) (Pollution Policy pg. AWPLL000207).

The Pollution Policy defines a "Pollutant" as follows:

Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low-level radioactive material and waste, medical or infectious or pathological waste, waste materials, electromagnetic fields, Legionella pneumophilia, and microbial matter.

(Supp. Appendix AW0014) (Pollution Policy pg. AWPLL000148).

Endorsement No. 9 to the Pollution Policy, entitled "Microbial Matter Definition Amendment," amends the definition of "microbial matter" to read as follows:

Microbial matter means fungi, mold, bacteria or viruses which reproduce through the splitting of cells, the release of spores or by any other means, whether or not such microbial matter is living.

(Supp. Appendix AW0039) (Pollution Policy pg. AWPLL000173).

Thus, under the above language, the Pollution Policy only covers "business interruption costs resulting from business interruption caused solely and directly by" the "presence" of COVID-19 "on, at or within buildings or structures" "on, at or under a scheduled location."

The Pollution Policy defines "business interruption" and "business interruption costs" as follows:

10

3.     Business interruption means the necessary suspension of your operations, at a scheduled location, but only if such suspension of your operations first commenced during the policy period.

4.     Business interruption costs mean actual loss of business income and extra expense you incur during the business interruption period. Business interruption costs will be reduced to the extent that the insured can resume operations, in whole or in part, at the scheduled location, or by making use of other locations.

(Supp. Appendix AW0071) (Pollution Policy pg. AWPLL000205).  The Pollution Policy defines

"business interruption period" as follows:

Business interruption period means the period of time that begins the number of hours shown as the "Business Interruption Waiting Period" in Item 3. of the Declarations after the time and date that the business interruption first commenced, and ends on the time and date that is the earlier of:

a.     The time and date that the insured resumes normal business operations at the scheduled location or at another location;

b.     The time and date that the insured, acting reasonably and with due diligence, should have resumed normal business operations at the scheduled location or at another location; and

c.     The time and date that is three hundred sixty five (365) days after the time and date that the business interruption first commenced.

(Supp. Appendix AW0071) (Pollution Policy pg. AWPLL000205).

The Pollution Policy defines a "scheduled location" as "the location(s) entered in Item 5 of

the Declarations." (Pollution Policy pg. AWPLL000208).  The "scheduled locations" are shown

in Item 5 of the Declarations and Endorsement to the Pollution Policy, as well as numerous other

endorsements.   (Supp. Appendix AW0014-AW0022, AW0054-55, AW0075-134) (Pollution

Policy pgs. AWPLL000148 to AWPLL000156, AWPLL000188 to AWPLL000189, and

AWPLL000033 to AWPLL000134).

11

**5.  The Ruling on Allied World's Motion for Judgment on the Pleadings**

On May 13, 2021, Allied World filed a Motion for Judgment on the Pleadings, on the grounds that 24 Hour's Complaint failed to plead facts indicating that 24 Hour sustained "business interruption caused solely and directly by a pollution incident on, at or under a scheduled location," as required by the Pollution Policy. (Adv. DE 75-76). The Court denied the Motion.  The Court explained that "Allied argues, and 24 Hour Fitness agrees, that 24 Hour Fitness must allege that its operations were closed solely and directly because of the presence of COVID-19 on, at, or under a scheduled location," but concluded that dismissal of 24 Hour's claim under the Pollution Policy on a pre-discovery motion for judgment on the pleadings – on which "the trial court is required to view the facts presented in the pleadings, and the inferences to be drawn therefrom, in the light most favorable to the nonmoving party" – would be premature and it was not "appropriate to close, today, the courthouse doors on the plaintiff's claim arising from the pollution policy." (Supp. Appendix AW-0239, AW0244) (Adv. DE 108, Transcript of Hearing on Allied World's Motion for Judgment on the Pleadings on September 7, 2021, filed September 9, 2021 ("Motion Transcript"), at 36:17-20; 41:10-13).

Importantly, the Court clarified, and 24 Hour agreed, that to establish a claim for business interruption under the Pollution Policy, 24 Hour must prove the presence of COVID-19 on, at or under a scheduled location:  "THE COURT: … [C]an we agree that it has to be—the virus has to be in—sorry, the virus has to be on, at, or under a scheduled location, a club?  MR. WEISS:  Yes, I agree." (*See* Supp. Appendix AW0228-229) (Adv. DE 108, Motion Transcript, at pp. 25-26).  In other words, 24 Hour could not rely on its theory that COVID-19 is everywhere so that it must be present at all of its clubs.  The Court also noted that "[w]hether or not COVID-19 was physically present at one or more of the clubs will be an issue for discovery" and "whether or not discovery

12

will prove these allegations correct is a matter for another day." (Supp. Appendix AW0242) (Adv. DE 108, Motion Transcript, at 39:16-18, 23-24).

Although discovery is now complete, 24 Hour still has no evidence that COVID-19 was physically present at any of its clubs. Accordingly, for that reason and the other reasons set forth herein, Allied World's Motion for Summary Judgment should be granted.

## IV.   **ARGUMENT**

### 1.   **Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). There is a "genuine dispute" "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).

The mere existence of some evidence in support of the nonmoving party is not sufficient for denial of a summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it. *Id.* Specifically, the party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Thus, a nonmoving party asserting that a material fact is in dispute

13

must support this assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, ... admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." *See* Fed. R. Civ. P. 56(c)(1). If the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### 2.  <u>California Law Governs these Issues of Contract Interpretation</u>

California law governs the instant coverage dispute between Allied World and 24 Hour. Where, as here, federal jurisdiction exists over an action under 28 U.S.C. § 1334 on the grounds that it arises in or is related to a case under title 11 of the Bankruptcy Code, courts apply (i) either the forum state's (here Delaware's) choice-of-law rules or (ii) "federal-choice-of-law" rules. *In re Abeinsa Holding Inc.*, 2021 WL 3909984, at *3 (3d Cir. Sept. 1, 2021) (citing *In re Payless Cashways*, 203 F.3d 1081, 1084 (8th Cir. 2000); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, (1941); *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995); *In re PHP Healthcare Corp.*, 128 F. App'x 839, 843 (3d Cir. 2005) (per curiam); *In re Gaston & Snow*, 243 F.3d 599, 606–07 (2d Cir. 2001); *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988)). In either case, courts apply the substantive law of the state with the "most significant relationship" to the parties and the underlying transaction, including as set forth in Sections 188 and 193 of the Restatement (Second) of Contracts. *Abeinsa Holding Inc.*, 2021 WL 3909984, at *3; *Cong. Talcott Corp. v. Gruber*, 993 F.2d 315, 319 n.4 (3d Cir. 1993); *Certain Underwriters at Lloyds v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017); *Pittston Co. v. Allianz Ins. Co.*, 795 F. Supp. 678, 690 (D.N.J. 1992); Restatement (Second) of Conflicts (the "<u>Second Restatement</u>") §§ 188, 193.

14

In determining which state has the "most significant relationship to the transaction and the parties," Section 188 requires Delaware courts to consider:  "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  Restatement (Second) of Conflict of Laws § 188(2).  Those factors favor application of California law here because:  (i) 24 Hour's headquarters was and is located in San Ramon, California; (ii) the Pollution Policy was negotiated, at least in part, from 24 Hour's headquarters in California; (iii) the Pollution Policy lists and was sent to 24 Hour's corporate office in California; and (iv) the subject matter of the Pollution Policy is in California, which is 24 Hour's "largest market." (Complaint ¶ 40).

Moreover, where, as here, a corporation purchases a "comprehensive, nationwide insurance scheme that would invariably involve underlying claims from multiple states," Delaware courts generally apply the law of the state of the insured's corporate headquarters listed on the insurance policy, rather than the location of each loss as to that loss, to contract interpretation issues under the policy.  *E.g., Chemtura Corp.*, 160 A.3d at 466 (under Section 193, applying New York law, rather than the laws of the two states where the losses occurred, to contract interpretation issues where, "when viewed from the beginning of this insurance program, Uniroyal was a New York-based business seeking nationwide coverage, the contracts were obtained through a New York broker, and Uniroyal's New York headquarters was listed on the policies"); *Travelers Indem. Co. v. CNH Indus. Am., LLC*, 191 A.3d 288 (Del. 2018) ("*Chemtura* addressed how the Second Restatement should be applied to coverage disputes involving insurance programs that cover risks across a corporation's operations.  Instead of looking to § 193, which is typically applied to one-off policies for site-specific risks, the court should instead apply the § 188 factors, focusing on the

15

insurance program itself and where the parties negotiated and managed the program."); *Catlin Specialty Ins. Co. v. CBL & Assocs. Properties, Inc.*, 2017 WL 4784432, at *5 (Del. Super. Ct. Sept. 20, 2017) ("In complex insurance cases with risks in multiple states such as this one, Delaware courts have generally held that the most significant factor for the conflict-of-laws analysis is the principal place of business of the insured because it is 'the situs which link[s] all the parties together.'").

Here:  (i) 24 Hour's claims arise out of a single multi-state program of insurance purchased by 24 Hour covering all of its 447 fitness clubs located in 14 states around the country; (ii) all of 24 Hour's losses arise out of a single pandemic; (iii) 24 Hour's headquarters was and is located in San Ramon, California; (iv) the Pollution Policy lists 24 Hour's address as its headquarters address in San Ramon, California and the Pollution Policy was delivered to that address; (v) the Pollution Policy was negotiated at least in part in California; (vi) California was 24 Hour's "largest market"; and (vii) because the Pollution Policy does not include different statutory forms for coverage in different states, applying the law of the state of the place of the loss would result in 14 different states' laws governing the same policy language.  Consequently, California law should govern all contractual interpretation issues with respect to all locations under the Pollution Policy.  The uniform application of California law to the contract interpretation issues under the Pollution Policy will also avoid the possibility that 14 different states' laws could govern the issues of contract interpretation under a single insurance claim by a single insured against a single insurer arising out of a single pandemic.  *See Chemtura Corp.*, 160 A.3d at 467 ("[I]n analyzing the contacts relevant to determining the most significant relationship, we focus on the reality that this is a contract dispute and that the important purpose of fulfilling the justified expectations of the parties in contract disputes is best served by providing terms in the contract with a meaning that

16

does not vary based on the happenstance of the locations of a particular claim"); *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 166 Ill. 2d 520, 527, 655 N.E.2d 842, 845 (1995), *as modified on denial of reh'g* (Oct. 2, 1995) (where policy covered property in six different states, declining to apply law of state where property was located, in order "to obtain a consistent interpretation of the policy").

### 3.  24 Hour Does Not Have Evidence That It Suffered Business Interruption Costs from Business Interruption Caused Solely and Directly By the Presence of the COVID Virus on, at or under a Scheduled Location

#### a.  *24 Hour Bears the Burden of Proof that it Suffered a Covered Loss Under the Plain Language of the Pollution Policy*

Under California law, the interpretation of an insurance policy is a question of law. *Waller v. Truck Ins. Exch., Inc.,* 11 Cal. 4th 1, 18 (1995).  "[T]he ordinary rules of contractual interpretation apply," and the policy's terms must be given their "ordinary and popular sense," and if the policy language is "clear and explicit, it governs."  *Palmer v. Truck Ins. Exch*., 21 Cal. 4th 1109, 1115 (1999) (quote marks omitted).  *See also* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

California law follows the plain meaning rule for contract interpretation.  *See Foster-Gardner, Inc. v. National Union Fire Ins. Co.* 18 Cal. 4th 857, 868 (1998); *Minkler v. Safeco Ins. Co. of America* 49 Cal.4th 315 (2010).  "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992). "If contractual language is clear and explicit, it governs."  *Id*.  In addition, "[t]he terms in an insurance policy must be read in context and in reference to the policy as a whole, with each clause helping to interpret the other."  *Sony Comput.*

17

*Entm't Am. Inc. v. Am. Home Assurance Co*., 532 F.3d 1007, 1012 (9th Cir. 2008) (citing Cal. Civ. Code § 1641); *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co*., 5 Cal. 4th 854, 867 (1993). Courts may look to the dictionary definition for the "ordinary and popular" meaning of a term. *AIU Ins. Co. v. Superior Ct.,* 51 Cal. 3d 807, 827 (1990).

"A court must first examine the coverage provisions to determine whether a claim falls within the policy terms." *Waller v. Truck Ins. Exchange*, 11 Cal. 4th 1 at 16. "The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded." *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co*., 929 F.3d 1143, 1151 (9th Cir. 2019) *quoting MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 648 (2003) (emphasis added). Courts "may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid." *Safeco Ins. Co. v. Gilstrap*, 141 Cal. App. 3d 524, 533 (1983).

As demonstrated below, the undisputed evidence shows that 24 Hour cannot meet its burden of establishing that its claim is within the basic scope of coverage under the Pollution Policy.

### b. *There is No Evidence that the COVID Virus was on, at or Under any Scheduled Location*

24 Hour has admitted, and this Court has already ruled, that 24 Hour must prove that the COVID virus was on, at or under its facilities to trigger coverage under the Pollution Policy. (Supp. Appendix AW0228-229, AW0242) (Adv. DE 108, Motion Transcript, at 25-26 & 39:16-18, 23-24). In denying Allied World's motion for judgment on the pleadings, the Court reasoned that discovery may lead to admissible evidence that may allow 24 Hour to prove that the COVID virus

18

was allegedly on, at or under 24 Hour's facilities.  (Supp. Appendix AW0239, AW0244) (Adv. DE 108, Motion Transcript, at 36:17-20; 41:10-13).

Discovery is now complete and has yielded no evidence that the COVID virus was on, at or under *any* particular "scheduled location" or facility operated by 24 Hour.  In particular, discovery has not yielded any evidence of a confirmed case of COVID-19 at any 24 Hour facility prior to its closing on March 16, 2020.  Importantly, as noted above:

- 24 Hour has no evidence of positive COVID-19 tests for any employee, guest or other visitor while on the premises of any 24 Hour facility prior to or throughout the closure period.

- 24 Hour did not conduct even minimal "contact tracing" in response to the few reports they received of possible or suspected exposure of employees or guests to COVID-19.  (Appendix, Exh. A-8 at A.0461) (Dr. Stock Dec. at Exh. A, p. 3).

- Larson, 24 Hour's 30(b)(6) witness with respect to the Pollution Policy, admitted at his 30(b)(6) deposition that 24 Hour has no evidence that the COVID virus was present at any particular facility at the time of its closure.  (Supp. Appendix at AW0188-89) (Larson 30(b)(6) Dep., 78:20-79:6).

- 24 Hour's sole expert witness, Dr. Mercedes R. Carnethon, testified that she was never even asked to determine whether the COVID virus was present at any of 24 Hour's facilities, and that she has no opinion, one way or the other, as to whether the COVID virus was in fact actually present at any of 24 Hour's facilities.  (Supp. Appendix at AW197-98) (Carnethon Dep., 24:12-19; 63:7-18).

- No governmental authority has confirmed the presence of the COVID virus at any 24 Hour facility or issued any order(s) directly to 24 Hour regarding the operation

19

of its facilities as a result of the COVID outbreak. (Appendix, Exh. A-18 at A.0718;

A.0721)) (Piro Dep., 60:15-20; 92:4-18).

Lacking any admissible evidence, 24 Hour can be expected to retreat to the position that it

reasonably believed that the COVID virus must have been on, at or under its facilities, and this is

sufficient to trigger coverage under the Pollution Policy.  (*See* Complaint ¶ 39-40, 70).  It is not.

24 Hour's apparent assumption that the COVID virus is present at a location cannot satisfy the

burden of proving that the COVID virus was actually present.  The Court in *Greenwood Racing*

*Inc. v. Am. Guarantee & Liab. Ins. Co.,* 569 F. Supp. 3d 243, 250 (E.D. Pa. 2021), explained:

> Nor is the mere risk that coronavirus might be present at a covered location a
> pollution event. The policy's definition of "pollution event" requires the actual
> presence of a contaminant or pollutant. "Pollution event" is defined as the
> "discharge, dispersal, release, or escape" of a contaminant or pollutant, not the risk
> or potential that those things might happen. (Amendatory Endorsement § III.FF, at
> 456.) These words would have no meaning if a pollution event could occur without
> anything actually being discharged, dispersed, released, or escaping into or from a
> covered location.

Courts throughout the country have consistently found that speculative allegations about

the presence of the COVID virus are wholly insufficient to sustain a claim for business-interruption

losses under standard commercial property policies, which provide broader coverage than the

specialized more narrowly tailored policy at issue here. *See, e.g., Paradigm Care & Enrichment*

*Ctr., LLC v. W. Bend Mut. Ins. Co*., 529 F. Supp. 3d 927, 936 (E.D. Wis. 2021), *aff'd*, 33 F.4th

417 (7th Cir. 2022) (finding allegation that if the plaintiff were "to conduct business as usual, the

disease and the virus would show up and children would get sick" to be "both speculative and

conclusory" and finding further that the plaintiff failed to establish that there was a COVID-19

outbreak at its premises by alleging one enrollee at its childcare center tested positive shortly after

the center closed); *DZ Jewelry, LLC v. Certain Underwriters at Lloyds London*, 525 F. Supp. 3d

793, 799 (S.D. Tex. 2021) (finding the plaintiffs' allegation that "COVID-19 was potentially present" in its store and that several employees tested positive for COVID-19 "would not plausibly allege that the store property was actually contaminated by COVID-19"); *Another Planet Ent., LLC v. Vigilant Ins. Co.*, No. 3:20-cv-07476, 2021 WL 774141, *1 (N.D. Cal. Feb. 25, 2021) (finding it "difficult to understand how [the plaintiff] can allege with a straight face that the virus was actually present on its facilities' surfaces at the time of the shutdown" and calling such information "unknowable"); *Island Hotel Props., Inc. v. Fireman's Fund Ins. Co.*, 512 F. Supp. 3d 1323, 1328 (S.D. Fla. 2021) (rejecting as conclusory the plaintiff's allegation that the COVID virus was present on its premises without alleging "whether a person infected with COVID-19 had entered the Properties, which of the Properties were 'infected,' or whether COVID-19 was present on any particular surfaces of the Properties").

Courts have also rejected the argument that it is reasonable to assume the presence of the COVID virus at an insured location because the disease was widespread. *Café Plaza De Mesilla Inc. v. Cont'l Cas. Co.*, 519 F. Supp. 3d 1006, 1014 (D.N.M. 2021) ("The Court additionally rejects Plaintiff's conclusory argument that the widespread existence of the virus locally necessarily makes it 'reasonable' to infer that the virus was present on the premises…"); *Johnson v. Hartford Fin. Servs. Grp., Inc.*, 510 F.Supp.3d 1326, 1334-35 (N.D. Ga. 2021) (rejecting the plaintiff's conjecture and speculation that "due to the exceedingly high number of COVID-19 cases in Georgia and ease of person-to-person transmission during the relevant time period, COVID-19 must have somehow found its way into the offices"); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 883 (S.D.W. Va. 2020), *aff'd*, 27 F.4th 926 (4th Cir. 2022) (rejecting argument that virus likely was present on surfaces at the plaintiff's facility because "[t]here is a similar risk of exposure to the virus in any public setting, regardless of artful pleading as to the

21

likelihood of the presence of the virus"); *Promotional Headwear Int'l v. Cincinnati Ins. Co*., 504 F. Supp. 3d 1191, 1203 (D. Kan. 2020) ("The fact that the virus travels through the air and was present in the United States sooner than first suspected, does not support the assertion that it 'likely' exists on the surfaces of Plaintiff's property.").

Instead, under California law, the "burden is on the  insured to establish that the claim is within the basic scope of coverage…" *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co*., 929 F.3d 1143, 1151 (9th Cir. 2019). Here, 24 Hour cannot meet its burden of showing that its alleged business interruption losses are covered under the Pollution Policy because there is simply no *evidence* that the COVID virus was actually present on, at or under *any particular scheduled location*.   24 Hour's belief and speculation are insufficient to survive summary judgment. *Podobnik*, 409 F.3d at 594; *Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010).

### c.   The Alleged Business Interruption Was Not Caused "Solely and Directly" by a "Pollution Incident" on, at or under a Scheduled Location

Even assuming, *arguendo*, that 24 Hour had evidence that the COVID virus was on, at or under a scheduled location, 24 Hour still cannot establish that it suffered a covered loss because the business interruptions were not caused "solely and directly" by the presence of COVID-19 on, at or under a scheduled location.  To the contrary, 24 Hour admits in its Complaint that the closures were primarily (if not entirely) due to governmental shut-down orders.  (Complaint ¶¶ 22-34, 40, 42).

The phrase "solely and directly," as used in an insurance policy, is not ambiguous. The Court in *ViacomCBS Inc. v. Great Divide Ins. Co.,* 640 F. Supp. 3d 931, 945 and 947 (C.D. Cal. 2022) explained:

> As the Policy does not define "solely" or "directly," (*see* Policy GD0089), resort to dictionary definitions is appropriate [Citation]. "Solely" means "to the exclusion of

all else," and "directly" means "in a straightforward manner."  Solely, Merriam-Webster, https://www.merriam-webster.com/dictionary/solely (accessed Nov. 4, 2022); Directly, Black's Law Dictionary (11th ed. 2019); *see also* Directly, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary /english/directly (accessed Nov. 4, 2022) (defining "directly" as "without anything else being involved or in between").  Here, ViacomCBS did not incur the 2020 KCAs pre-production costs exclusively or straightforwardly by reason of the abandonment…. ViacomCBS does not explain, in its argument or the proffered declarations, how its asserted industry custom and practice can effectively negate the clear and unambiguous terms, "solely and directly."

Numerous other decisions have adopted similar definitions of the phrases "sole" or "solely."  For example, in *James v. Getty Oil Co. (E. Operations)*, 472 A.2d 33, 39 (Del. Super. Ct. 1983), the Court explained:

> The common dictionary meaning of the word "sole" is clear and unambiguous. It is defined as "having no sharer," "being the only one," "functioning independently and without assistance or interference," and "belonging exclusively or otherwise limited to one usually specified individual, unit, or group." "Solely" is defined as "without another," "singly," and "to the exclusion of all else." Webster's New Collegiate Dictionary.  Giving to the contract language "solely" its clear, common meaning, it follows that it refers to the exclusive negligence of Getty, *i.e.*, instances where Getty is independently negligent, without the assistance or interference of another. Such a reading neither defies logic nor offends the principles of indemnity. The language of the contract is crystal clear and unequivocal.  It is, therefore, valid and enforceable, the meaning of "solely negligent" being "exclusively negligent."

*See also Shea v. Bonutti Rsch., Inc.*, 2011 WL 53473, at *4 (S.D. Ohio Jan. 7, 2011) ("There is nothing ambiguous about the word 'sole,' as a Delaware Superior Court has explained:  The common dictionary meaning of the word "sole" is clear and unambiguous.  It is defined as 'having no sharer,' 'being the only one,' 'functioning independently and without assistance or interference,' and 'belonging exclusively or otherwise limited to one usually specified individual, unit, or group.' 'Solely 'is defined as 'without another,' 'singly,' and 'to the exclusion of all else.' Webster's New Collegiate Dictionary."); *Dove v. Prudential Ins. Co. of Am.*, 2009 WL 1379574, at *7 (D. Kan. May 18, 2009), *rev'd and remanded*, 364 F. App'x 461 (10th Cir. 2010) ("The Plan's language is unambiguous when it defines 'accidental bodily injury' as an injury resulting

23

"solely and directly from a covered accident.'"").  Likewise, in *Vons Cos., Inc. v. Fed. Ins. Co.,* 212

*F.*3d 489, 492–93 (9th Cir. 2000), the Ninth Circuit, applying California law, held that "'direct'

means 'direct'" and an indemnity policy did not provide coverage for an indirect loss.  *See also,*

*Simon Mktg., Inc. v. Gulf Ins. Co.,* 149 Cal. App. 4th 616, 623 (2007).

Here, the Pollution Policy provides that Allied World will "pay business interruption costs

resulting from business interruption caused solely and directly by a pollution incident [*i.e.*, the

presence of the COVID virus] on, at or under a scheduled location."  24 Hour's alleged business

interruptions were not caused "solely and directly" due to the presence of the COVID virus on, at

or under a scheduled location.  Rather, as 24 Hour readily admits in its Complaint, and as its

30(b)(6) witness, Larson, admitted during his 30(b)(6) deposition, 24 Hour closed its facilities in

whole or in part in order to comply with orders of the federal, state, county or municipal

governments.  (Complaint ¶¶ 22-34, 40, 42) (Supp. Appendix AW0186-0188) (Larson 30(b)(6)

Dep. 65:4-65:25, 77:18-78:14).  Moreover, 24 Hour only re-opened facilities when federal, state,

county or municipal governments allowed its facilities to reopen.  (Larson 30(b)(6) Dep. 92:4-23).

The governmental orders were not issued to 24 Hour due to the discovery or presence of

the COVID virus on, at or under its facilities.  Instead, the governmental orders that led to the

closures of 24 Hour's facilities and all non-essential businesses were issued primarily to prevent

community transmission of the COVID virus and to "flatten the curve." *Mudpie, Inc. v. Travelers*

*Casualty Ins. Co. of America,* 487 F.Supp.3d 834, 844 (N.D. Cal. 2020) ("[T]he government

closure orders were intended to prevent the spread of COVID-19" rather than based on presence

of COVID-19 at plaintiff's property); *Mortar and Pestle Corp. v. Atain Specialty Ins. Co.,* 508

F.Supp.3d 575, 582 (N.D. Cal. 2020) ("[I]t is apparent from the plain language of the cited civil

authority orders that such directives were issued to stop the spread of COVID-19 and not as a result

of any physical loss of or damage to property"); *Baker v. Oregon Mutual Ins. Co.* (N.D.Cal., Mar. 25, 2021, No. 20-cv-05467-LB) 2021 WL 1145882, at p. *5 ("[T]he shutdown orders were issued to stop the spread of COVID-19 and were not about loss of or damage to property"); *Muriel's New Orleans, LLC v. State Farm Fire and Casualty Co.* 535 F.Supp.3d 556, 573 (E.D. La. 2021) (coverage under the Civil Authority provision was not invoked because "the Closure Orders were intended to prevent the spread of COVID-19" and therefore "were preventative and lack[ed] the requisite nexus with prior property damage"); *Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.*, 539 F. Supp. 3d 409, 422 (E.D. Pa. 2021) ("[T]he relevant Closure Orders were not issued in response to 'dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss.'  Rather, the Closure Orders were issued to *prevent* the spread of the COVID-19 virus to any of these properties.  That fact brings this claim outside the coverage…").

Accordingly, even assuming, contrary to fact, that 24 Hour could adduce admissible evidence that the COVID virus was on, at or under a scheduled location, 24 Hour's business interruptions nevertheless were caused not "solely and directly" due to the alleged presence of the COVID virus on, at or under a scheduled location but primarily (if not exclusively) due to compliance with the governmental orders to prevent the spread of COVID-19.  Quite simply, 24 Hour has not established, and cannot establish, that its alleged business interruption losses were caused "solely and directly" due to the presence of the COVID virus at its facilities because they were not.  As such, summary judgment should be granted in Allied World's favor.

25

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Allied World respectfully requests that the Court grant this Motion for Summary Judgment, and dismiss the Complaint in its entirety with prejudice to the extent it seeks relief from Allied World with respect to the Pollution Policy.

Wilmington, Delaware
November 10, 2023

GELLERT, SCALI, BUSENKELL & BROWN, LLC
By:  _/s/ Michael Busenkell_
Michael Busenkell (DE 3933)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
Tel:  (302) 425-5812
Email:  mbusenkell@gsbblaw.com

OTTERBOURG P.C.
Richard G. Haddad (admitted *pro hac vice*)
Andrew S. Halpern (admitted *pro hac vice*)
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Email:  rhaddad@otterbourg.com
           ahalpern@otterbourg.com

SELMAN LEICHENGER EDSON HSU NEWMAN MOORE LLP
Elizabeth M. Brockman (admitted *pro hac vice*)
Calvin S. Whang (admitted *pro hac vice*)
10880 Wilshire Boulevard, Suite 1200
Los Angeles, California 90024
Tel.: (310) 445-0800
ebrockman@selmanlaw.com
cwhang@selmanlaw.com

*Counsel for Defendant Allied World National Assurance Company*

26