# EXHIBIT 46

## Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
In re                    )
                         ) Chapter 11
RS FIT NH LLC,           ) Case No.: 20-11558 (KBO)
                         )
       Debtor.           ) (Jointly Administered)
~~~~~~~~~~~~~~~~~~~~~~~~~
                         )
24 HOUR FITNESS WORLDWIDE, INC., )
                         )
       Plaintiff,        )
                         )
    vs                   ) Adv. Proc. No.:
                         ) 20-51051 (KBO)
CONTINENTAL CASUALTY COMPANY;    )
ENDURANCE AMERICAN SPECIALTY     )
INSURANCE COMPANY; et al.,       )
                         )
       Defendants.       )
~~~~~~~~~~~~~~~~~~~~~~~~~
```

VIDEOTAPED EXPERT DEPOSITION OF
DR. ALEXIS SAUER-BUDGE

August 25, 2023
9:11 a.m.

DLA Piper
33 Arch Street, No. 26
Boston, Massachusetts

Deborah J. Bateman, Court Reporter

## Page 2

1  APPEARANCES OF COUNSEL
2
3  On Behalf of the Plaintiff 24 Hour Fitness Worldwide,
   Inc.:
4      DAVID E. WEISS, ESQ.
       ELIZABETH BOWMAN, ESQ.
5      REED SMITH LLP
       101 Second Street, Suite 1800
6      San Francisco, California 94105
       415.659.5966
7      Dweiss@reedsmith.com
8
   On Behalf of the Defendant Allied World National
9  Assurance Company:
10     DEANNA M. MANZO, ESQ.
       MOUND COTTON WOLLAN & GREENGRASS LLP
11     One New York Plaza, 44th Floor
       New York, New York 10004
12     212.804.4587
       Dmanzo@moundcotton.com
13
14 On Behalf of the Defendant Liberty Mutual Insurance
   Company:
15
       JOEL L. MCNABNEY, ESQ.
16     ROBINSON + COLE
       777 Brickell Avenue, Suite 680
17     Miami, Florida 33131
       786.725.4119
18     Jmcnabney@rc.com
19
   On Behalf of the Defendants QBE Specialty Insurance
20 Company and General Security Indemnity Company of
   Arizona:
21
       DENNIS C. ANDERSON, ESQ. (via Zoom)
22     ZELLE LLP
       500 Washington Avenue South, Suite 4000
23     Minneapolis, Minnesota 55415
       612.336.9179
24     Danderson@zellelaw.com

## Page 3

1       APPEARANCES OF COUNSEL
2
3  On Behalf of the Defendant Allianz Global Risks U.S.
   Insurance Company:
4
       MARLIE MCDONNELL, ESQ. (via Zoom)
5      CLYDE & CO.
       271 17th Street NW, Suite 1720
6      Atlanta, Georgia 30363
       404.410.3184
7      Marlie.mcdonnell@clydeco.us
8
   On behalf of the Defendant Allied World National
9  Assurance Company:
10     CALVIN S. WHANG, ESQ. (via Zoom)
       SELMAN LEICHENGER EDSON HSU NEWMAN & MOORE LLP
11     11766 Wilshire Boulevard, Sixth Floor
       Los Angeles, California 90025
12     310.689.7042
       cwhang@selmanlaw.com
13
14 Also Present:
15
   Ferdusi Z. Chowdhury, Esq.
16 Jacqueline Matyszczyk, Esq.
17 Couirey Eckmayer, Videographer

## Page 4

1       INDEX OF EXAMINATION
2
3  WITNESS: DR. ALEXIS SAUER-BUDGE          Page
4  EXAMINATION
5    By Mr. Weiss                            7
6
7       INDEX TO EXHIBITS
8
9  PLAINTIFF'S    Description              Page
10 Exhibit 1    Sauer-Budge Case File Materials    17
11 Exhibit 2    Sauer-Budge Testimony List         18
12 Exhibit 3    Sauer-Budge Updated Curriculum Vitae   19
13 Exhibit 4    Invoice dated 12/15/22             37
14 Exhibit 5    Invoice dated 02/14/23             37
15 Exhibit 6    Riddell Article                    47
16 Exhibit 7    Tharayil Article                   55
17 Exhibit 8    Sauer-Budge Expert Report dated    68
18             11/23/02
19 Exhibit 9    Krishan Article                    75
20 Exhibit 10   Jayaweera Article                  81
21 Exhibit 11   Marzoli Article                    99
22 Exhibit 12   Lendacki Article                  102
23 Exhibit 13   Bae Article                       105
24 Exhibit 14   Anderson Article                  108

1 (Pages 1 to 4)

Page 5

1    INDEX TO EXHIBITS
2
3    PLAINTIFF'S   Description                      Page
4    Exhibit 15   Jang Article                      108
5    Exhibit 16   Suhs Article                      111
6    Exhibit 17   Liu Article                       112
7    Exhibit 18   Article from CDC COVID-19 Response 120
8                 Team
9    Exhibit 19   Transcript of Trial Proceedings re 121
10                Marina Pacific v Fireman's Fund
11                dated 04/19/23
12   Exhibit 20   Sauer-Budge Expert Declaration    133
13   Exhibit 21   Joonaki Article                   173
14   Exhibit 22   Letter Report                     177

Page 6

1    VIDEOTAPED EXPERT DEPOSITION OF DR. ALEXIS SAUER-BUDGE
2                       August 25, 2023
3
4         THE VIDEOGRAPHER:  This is tape number one to
5    the videotaped deposition of Dr. Alexis Sauer-Budge in
6    the matter of 24 Hour Fitness Worldwide versus
7    Continental Casualty Company, et al., being heard before
8    the U.S. Bankruptcy Court, District of Delaware, Case
9    Number 20-11568 (KBO).
10        This deposition is being held at DLA Piper in
11   Boston, Massachusetts, on Friday, the 25th of August 2023
12   at 9:11 a.m.  My name is Couirey Eckmayer, and I'm the
13   videographer.  The court reporter is Deborah Bateman.
14        Counsel, will you please introduce yourselves
15   and affiliations.  And the witness will be sworn in.
16        MR. WEISS:  Good morning.  David Weiss from
17   Reed Smith on behalf of the plaintiff.  And with me is
18   Elizabeth Bowman, also from Reed Smith.
19        MS. MANZO:  Deanna Manzo with Mound Cotton
20   Wollan & Greengrass on behalf of Allied World Assurance
21   Company.
22        MR. MCNABNEY:  Joel McNabney on behalf of
23   Defendant Liberty Mutual Insurance Company.
24        MR. ANDERSON:  Dennis Anderson on behalf of

Page 7

1    QBE Specialty Insurance Company and General Security
2    Indemnity Company of Arizona.
3         MS. MCDONNELL:  Marlie McDonnell of Clyde &
4    Co. on behalf of Defendant Allianz.
5         MR. WHANG:  Calvin Whang for -- with Selman
6    Leichenger with -- on behalf of Allied World.
7
8         DR. ALEXIS SAUER-BUDGE, having been first
9    satisfactorily identified and duly sworn, testified as
10   follows:
11
12                  EXAMINATION
13   BY MR. WEISS:
14       Q.  Good morning, Doctor.  My name is David Weiss
15   from Reed Smith.  I represent the plaintiff in this
16   action.  Have you given a deposition before?
17       A.  I have.
18       Q.  On approximately how many occasions?
19       A.  Seven, I think.
20       Q.  Have you testified in court before?
21       A.  I have.
22       Q.  On approximately how many occasions?
23       A.  One.
24       Q.  Were the -- all the prior depositions that

Page 8

1    you've given in the context of you being an expert
2    witness?
3        A.  Yes.
4        Q.  And the same for your court testimony?
5        A.  Yes.
6        Q.  Okay.  I'll go through some deposition ground
7    rules just so that we're on the same page.
8             First of all, do you understand that you're
9    under oath?
10       A.  I do.
11       Q.  Do you understand the oath that you've taken
12   has the same effect as if you were testifying in court?
13       A.  Yes.
14       Q.  The court reporter will be taking down the
15   testimony today, and there'll be -- besides you and me,
16   there may be other people in the room talking.  Counsel
17   might raise objections.  So it's important that we not
18   talk over one another.  Are you okay with that?
19       A.  Of course.
20       Q.  Yeah.  So if you'll just wait for me to finish
21   my question before you answer, and I'll try to wait for
22   you to finish your answer before you -- before I ask my
23   next question, and we be mindful of counsel, everybody in
24   the room would have a better day, and -- including the

2 (Pages 5 to 8)

Exhibit 46 to Plaintiff's Appendix of Evidence                          Page 840 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

Page 105

1  greater than or equal to six feet apart.  In addition,
2  facilities should provide engineering and administrative
3  controls including improving ventilation, enforcing
4  physical distancing, increasing opportunities for hand
5  hygiene, and reminding all employees and patrons to (1)
6  isolate when experiencing COVID-like systems or after
7  receiving a positive SARS-CoV-2 test; and (2) quarantine
8  after a potential exposure to SARS-CoV-2 and while
9  awaiting test results.  Conducting exercise activities
10  entirely outdoors or virtually could further reduce
11  SARS-CoV-2 transmission risk."  Do you see all of that?
12      A.   I do.
13      Q.   Would you consider those statements to be
14  outside of the -- outside of your opinions in this case?
15      A.   Yes.
16          MR. WEISS:  Okay.  Let's go to 10.
17          (Exhibit No. 13, Bae Article marked for
18          identification)
19      Q.   So Exhibit 13 is an article titled
20  "Epidemiological Characteristics of COVID-19 Outbreak at
21  Fitness Centers in Cheonan, Korea."  And it was accepted
22  July 31, 2020.  Is this another article that's listed in
23  your Appendix C?
24      A.   Yes, it is.

Page 106

1      Q.   This was one of the articles that you found in
2  your review of articles about incidents of fitness clubs?
3      A.   Yes, that's correct.
4      Q.   On page 2 of 9, in the third paragraph towards
5  the middle, it says, "However, considering that COVID-19
6  is transmitted by droplet and fomites, high-impact group
7  exercise in a confined indoor spaces, such as a Zumba
8  class, could provide an environment prone to easy
9  transmission of SARS-CoV-2 infection as the droplets
10  produced by exhalation or cough of a patient during the
11  exercise have higher chance of reaching the nose, mouth,
12  or eye of other class participants directly, as well as
13  remaining on the surface of the exercise equipment and
14  later transmitted by contact."  Do you see that?
15      A.   Yes.
16      Q.   Do you agree that exercise -- high-impact
17  group exercise in a confined indoor space could provide
18  an environment prone to the easy transmission of
19  SARS-CoV-2?
20          MS. MANZO:  Objection to form.
21      A.   Opinions regarding transmission are outside of
22  my scope of assignment in this case.
23      Q.   Do you have any opinions as -- well, strike
24  that.

Page 107

1  There's a statement in here that droplets
2  produced by exhalation or a cough of a patient could
3  remain on the surface of the exercise equipment and later
4  be transmitted by contact.  Do you see that?
5      A.   Yes.  I'm not sure if it's -- "patient" is the
6  correct word, but somebody infected, yes.
7      Q.   Okay.  And do you have an opinion as to
8  whether droplets exhaled by an infected person could
9  remain on surface of exercise equipment and later be
10  transmitted to someone else?
11      A.   So only in regards to the -- what happens to
12  the SARS-CoV-2 virus on the surface and how long it may
13  be there.  Not necessarily the part, which was the second
14  part of your question, transmission to a person.
15      Q.   Okay.  So you have an opinion -- your opinions
16  relate to what happens when the virus reaches the surface
17  and how it interacts with the surface; correct?
18      A.   That's correct, yes.
19      Q.   And you have opinions regarding how long the
20  virus might stay infectious on the surface; is that
21  correct?
22      A.   Yes, that's correct.
23      Q.   During the time that the virus remains
24  infectious on the surface, do you have an opinion as to

Page 108

1  whether that infectious virus could be transmitted to
2  another person?
3      A.   No.
4          MR. WEISS:  Let's mark -- do 11.
5          (Exhibit No. 14, Anderson Article marked for
6          identification)
7      Q.   Exhibit 14 is another article titled "An
8  Outbreak of COVID-19 Associated With a Fitness Centre in
9  Saskatchewan:  Lessons for Prevention."  And it looks
10  like this was published in November of 2021.  Is this
11  another article that's listed in your Appendix C?
12      A.   Yes, it is.
13      Q.   And is this, again, one of the articles that
14  you located regarding fitness clubs?
15      A.   Yes.  During that search, exactly.
16          MR. WEISS:  All right.  Let's go to the next
17  one.
18          (Exhibit No. 15, Jang Article marked for
19          identification)
20      Q.   Exhibit 15 is titled "Cluster of Coronavirus
21  Disease Associated with Fitness Dance Classes, South
22  Korea."  And it looks like it was published in August of
23  2020.  Dr. Sauer-Budge, is this another article that was
24  listed on your Appendix C?

27 (Pages 105 to 108)

Exhibit 46 to Plaintiff's Appendix of Evidence            Page 841 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

Page 109

1    A.   Yes, that's correct.
2    Q.   And, again, this was an article that you
3  located when you were looking for articles about fitness
4  clubs?
5    A.   That is correct.
6    Q.   Okay.  On page 1919, in the bottom of the
7  first column, it says, "Characteristics that might have
8  led to transmission from the instructors in Cheonan
9  include large class sizes, small spaces, and intensity of
10 the workouts.  The moist warm atmosphere in a sports
11 facility coupled with turbulent airflow generated by
12 intense physical exercise can cause more dense
13 transmission of isolated droplets."  Do you see that?
14   A.   I do.
15   Q.   Okay.  Is it your view that that's outside of
16 your expertise?
17   A.   With regard to the transmission of COVID, yes.
18 With regards to the -- what happens to the virus in the
19 air under different environmental conditions, then that
20 is part of my opinion.
21   Q.   Okay.  And how -- what is your opinion with
22 respect to how turbulent airflow within a fitness club
23 might affect how the virus is transmitted?
24   A.   So my opinion isn't necessarily with regards

Page 110

1  to the airflow, but instead with regards to the, it says
2  early in that sentence, "moist and warm atmosphere."  So
3  with regards to those.
4    Q.   Okay.  And what -- what is your opinion with
5  respect to moist and warm atmosphere and how that impacts
6  the movement of the virus or the virus in general, if
7  you --
8         MS. MANZO:  Objection to the form.
9    A.   Yeah, I don't have an opinion on how it
10 impacts the movement of the virus.  That's related to the
11 air flow.  But the -- so the data investigating the
12 different factors that inactivate SARS-CoV-2 in droplets,
13 partially in the air and -- since we're talking about
14 air, I'll talk about that as well as -- but on surfaces
15 has to do with the rate of evaporation of those droplets
16 in the air.  And the -- so the more humid the
17 environment, that impacts the rate of evaporation; and
18 the temperature also impacts the rate of evaporation.
19       Separately, the temperature has been studied
20 in -- particularly in laboratory environments as to the
21 impact of -- on the persistence of SARS-CoV-2.  And in
22 those studies, higher temperature is correlated with a
23 more rapid inactivation of the virus.
24   Q.   How is humidity correlated with inactivation

Page 111

1  of the virus?
2    A.   So most of these studies are done on surfaces.
3  And it -- at -- so it's not a linear relationship.  It is
4  more of a U-shaped relationship.  So in the middle zone,
5  say 40 to 60 percent relative humidity, is where the
6  highest rates of inactivation.  So that inactivates
7  faster.  And then the more humid or the less humid
8  outside of those result in slower rates.  But that is if
9  you keep all of the other factors constant.
10   Q.   Okay.  And the other factors could include
11 temperature?
12   A.   Correct.
13       (Exhibit No. 16, Suhs Article marked for
14        identification)
15   Q.   Exhibit 16 looks like an article or a
16 manuscript titled "COVID-19 Outbreak Associated with a
17 Fitness Center in Minnesota, September to November of
18 2020."  It looks like it's published in -- this says, at
19 the bottom, "The Author(s) 2021.  Published by Oxford
20 University Press."  Is this another article that's cited
21 in your Appendix C?
22   A.   Yes, it is.  The journal is the "Clinical
23 Infectious Diseases."
24   Q.   And did you locate this in your -- as part of

Page 112

1  your search for information regarding fitness clubs?
2    A.   Yes.
3        (Exhibit No. 17, Liu Article marked for
4         identification)
5    Q.   Exhibit 17 is titled "Investigating SARS-CoV-2
6  Persistent Contamination in Different Indoor
7  Environments."  It states that it was available online on
8  July 28, 2021.  Is this an article that's identified in
9  your Appendix C?
10   A.   Yes.
11   Q.   Okay.  Do you recall what your purpose was for
12 listing this article in your Appendix C?
13   A.   Let me review the abstract briefly.
14       Yes.  So I included this article because it
15 investigates the persistence of SARS-CoV-2 in a number of
16 environments.  Particularly, it looks at collection of
17 samples that from, in this case, I believe it said a
18 department store that had been closed for unknown period
19 of time and looked for the presence of viral RNA and the
20 presence of infectious virus.  They tested for both.
21   Q.   And did it also look at an apartment as well?
22   A.   Yes, that's correct.
23   Q.   All right.  And when you -- when you use the
24 term "persistence," what do you mean by that?

28 (Pages 109 to 112)

Page 117

1  they are doing it with controls to try to rule out that
2  there was something in the sample that inhibited or
3  created a false positive.  So, generally, when you're
4  saying -- when researchers say that no virus was -- no
5  viable virus or no infectious virus was found, they mean
6  that it -- there were no signs of infection of those
7  cells in the laboratory.
8      Q.  If you look at page 12 of this article which
9  is Exhibit 17.
10     A.  Okay.
11     Q.  In the conclusion, it says, "SARS-CoV-2 RNA
12 can be detected by RT-PCR 57 days after the last exposure
13 in room-temperature environments, much longer than
14 previous reports.  Doorknobs and toilets, bathrooms, in
15 paren, were important positions in COVID-19 control.
16 Infectious SARS-CoV-2 can exist for at least 60 days on
17 the surface of cold-chain food packages under minus 18
18 degrees Celsius.  High risk populations of
19 cold-chain-related logistic operations such as porters
20 require strict prevention and high-level personal
21 protection.  Even after disinfection, SARS-CoV-2 RNA can
22 still be partially detected in the environment.  Cleaning
23 with water and detergent is an effective way to eliminate
24 the persistent existence of RNA fragments on

Page 118

1  environmental surfaces."  Do you see all that?
2      A.  I do.
3      Q.  Okay.  Does that -- does it look like they
4  then did some culturing on the samples that they got from
5  the -- from the food packages?  Because they say that
6  infectious SARS-CoV-2 can exist for at least 60 days.
7      A.  I am not remembering.
8      Q.  Because I didn't see that either.
9      A.  I don't see it.  I think that they are
10 referring to another study.
11         On page 10, it says, "In low temperature
12 environments under minus 18 degrees C" -- are you with
13 me?
14     Q.  Yeah.
15     A.  Okay.
16         -- "the infectious virus particle could
17 survive longer than an in-room temperature environments."
18 And then they reference various articles.  So I think
19 that they are referring to those.
20     Q.  Okay.  And then when they say, "Cleaning with
21 water and detergents is an effective way to eliminate the
22 persistent existence of RNA fragments on environmental
23 surfaces," I guess my question is why would you even care
24 about RNA fragments on environmental surfaces enough to

Page 119

1  even bother cleaning them?
2      A.  I find this statement to not make a lot of
3  sense because I have no idea why you would care if there
4  were RNA fragments on the surface.  In real-world
5  environments, we are constantly -- humans are constantly
6  shedding all sorts of biological material that ends up on
7  the surfaces around us.  That biological material has RNA
8  in it.  Also, various viruses have RNA in it which may be
9  emitted, not just SARS-CoV-2, but other viruses that are
10 RNA-based viruses.  Microbes such as bacteria and fungi
11 also have RNA in them.  And all of these things are
12 normally on the surfaces around us.  And so it's not
13 unusual in any way to find RNA on surfaces.  And it's not
14 harmful in any way.  So I just -- I really don't
15 understand the purpose of that statement.
16     Q.  Okay.
17     A.  Perhaps -- actually, I'm just thinking now.
18 Perhaps what they were implying is that RNA -- we -- we
19 know from other studies that SARS-CoV-2 viral RNA can
20 persist on surfaces much longer.  So if you're doing a --
21 much longer, sorry, than infectious virus.  So if you
22 were doing a study based on viral RNA only, you may
23 overestimate -- or likely you will overestimate the
24 persistence of infectious virus on those surfaces or

Page 120

1  under those conditions.  So perhaps they're saying --
2  they're trying to warn against that.  But I can't say for
3  sure.
4      MR. WEISS:  Let's do 15.
5      (Exhibit No. 18, Article from CDC COVID-19
6      Response Team marked for identification)
7      Q.  Exhibit 18 is an article titled "Geographic
8  Differences in COVID-19 Cases, Deaths, and Incidence --
9  United States, February 12 to April 7, 2020."  And it was
10 published April 17, 2020, by the CDC and the U.S.
11 Department of Health and Human Services.  Is this an
12 article that's referenced in your Appendix C?
13     A.  Yes, it is.
14     Q.  And do you recall why you referenced this
15 article?
16     A.  I do not recall specifically.  It may have
17 been -- it may have been in regards to reading
18 Dr. Carnethon's report.  And she had mentioned in her
19 report certain geographical differences, and so I -- I
20 may have reviewed this article in conjunction with
21 reviewing her report.
22     Q.  Okay.  Do any of your opinions have to do
23 with the geographic prevalence -- the prevalence of
24 SARS-CoV-2 or COVID-19 in different geographic areas in

30 (Pages 117 to 120)

Exhibit 46 to Plaintiff's Appendix of Evidence           Page 843 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

Page 129

1   laboratory studies on those types of materials or
2   real-world studies that may be similar context.
3       Q.   If you go to page 164 of your deposition -- of
4   your trial transcript testimony.  So it should say page
5   161 to 164 at the bottom.
6       A.   Okay.  On page 164, you said?
7       Q.   Yeah.
8       A.   Okay.
9       Q.   And then on line -- beginning on line 18 and
10  going to line 20, you say, "Viruses and biological
11  material are everywhere.  It's coating all of the
12  surfaces around us."  Do you see that?
13      A.   I do.
14      Q.   Okay.  And that's still your belief today;
15  correct?
16      A.   Let me just -- it is my belief, but let me
17  clarify what I meant by that.
18          I didn't mean that every single surface that
19  you touch will have a specific -- that you investigate
20  will have a specific virus or a specific biological
21  material.  But rather, as I was describing before, humans
22  are constantly emitting respiratory droplets or we're --
23  we're shedding skin cells.  We're -- when we touch
24  things, we leave behind skin oils.  There are different

Page 130

1   types of microbes all around us.  And so, just generally,
2   when I say "everywhere," I mean around in the
3   environment.
4       Q.   In your average fitness club where people are
5   working out throughout the day and breathing heavily,
6   would you be surprised not to find viruses of some sort
7   or another on surfaces within a gym at any given time?
8       A.   Viruses in particular?  Many -- many
9   respiratory viruses, which I think is what you're
10  referring to when you're saying "breathing," those may
11  degrade fairly rapidly, and so we may not find infectious
12  virus.  But I would be very surprised if we didn't find
13  some sort of genetic material from viruses.
14      Q.   Does the fact that you find genetic material
15  for viruses on a surface mean that at some point in time
16  those -- that viral material was infectious when it was
17  on the surface?
18      A.   No, it doesn't mean that.
19      Q.   Why not?
20      A.   Because just as a simple example -- there's
21  complex reasons.  Let's see.  So to start with, when you
22  breathe out, the respiratory droplets start to evaporate
23  and rapidly inactivate many viruses.  We already talked
24  about in this context.  So by the time that it lands on

Page 131

1   the surface, it may not be infectious.
2       Q.   Would it have been infectious at some point
3   between the time it was exhaled from the individual to
4   the time it hit the surface?
5       A.   Also not necessarily.
6       Q.   Okay.  Why not?
7       A.   Because not all of the genetic material from
8   the virus that is inside of your body or inside of your
9   mouth is associated with infectious virus.  It can be
10  understood, at least in part, because your immune system
11  is working against those viruses, and so they are working
12  to degrade those viruses.  And so you'll have -- you will
13  still have potentially viral RNA in a sample that -- or,
14  like, in your body that isn't associated with an
15  infectious virus anymore.
16      Q.   If you go to page 161 of your testimony.  So
17  that would be the -- I guess the top left block.
18      A.   Yes.
19      Q.   At the -- beginning at line 28, you say, "So
20  if a new virus had the ability to somehow change the
21  underlying surface to eat into it or to dissolve it, that
22  would be a new type of virus and perhaps not even a new
23  virus.  It would be something that was brand new in
24  biology that's unknown.  Certainly, if this was the case,

Page 132

1   it would have been reported in the scientific
2   literature."
3           What were you intending to convey by that
4   statement?
5           MS. MANZO:  Objection to form.
6       A.   So, in part, this was in response to a line of
7   questioning that was focused on whether because viruses
8   interacting with surfaces hadn't -- in a way that damaged
9   the underlying surface hadn't been reported, does that
10  mean that it just hasn't been reported?  So it was, in
11  part, in line with questions -- or to discuss and respond
12  to questions along those lines.
13          And what I was trying to convey is that it has
14  been understood for a long time how viruses interact with
15  inanimate surfaces in terms of the general types of
16  forces that are involved; and, also, that viruses are
17  understood, as part of the definition of a virus, that
18  they are not able to infect inanimate objects.  They can
19  only infect host cells.  And so the -- and then outside
20  of the host cell, they are inert in that they don't
21  change the environment around them outside of a host
22  cell.
23      Q.   Okay.  And when you say "they don't change the
24  environment around them," what do you mean by that?

33 (Pages 129 to 132)

Page 133

1    A.  Well, so I gave some examples in here such as
2    dissolving a surface or emitting different types of toxic
3    gases or somehow burrowing into a surface would be some
4    examples of things viruses don't do.
5    Q.  Okay.
6        MS. MANZO:  When we get to a good breaking
7    point.
8        MR. WEISS:  We can take a break now.  That's
9    fine.
10       THE VIDEOGRAPHER:  We are going off the record
11   at 1:59 p.m.
12       (Recess)
13       THE VIDEOGRAPHER:  Back on the record at
14   2:14 p.m.
15       (Exhibit No. 20, Sauer-Budge Expert
16       Declaration marked for identification)
17   Q.  I've marked as Exhibit 20 "Expert Declaration
18   of Dr. Alexis Sauer-Budge in Support of Defendant
19   Lexington Insurance Company's Opposition to Plaintiff's
20   Motion for Summary Adjudication, and Notice of Motion and
21   Memorandum in Support of Lexington's Cross-Motion for
22   Summary Judgment" in the Santa Ynez Band of Chumash
23   Mission Indians versus Lexington Insurance Company.  Do
24   you recognize Exhibit 20 as a declaration that you

Page 134

1    submitted in the Santa Ynez case?
2    A.  Yes.
3    Q.  And is that one of the cases that you also
4    gave deposition testimony in?
5    A.  Yes.
6    Q.  Okay.  I don't have any other questions about
7    that one.
8        So part of your opinions in this case involve
9    your view that viruses like SARS-CoV-2 adhere to
10   surfaces; correct?
11   A.  By "adhere," you mean -- if you mean they
12   interact with weak intermolecular forces such as van der
13   Waal's electrostatic -- electrostatic interactions and
14   hydrophobic interactions, then -- if that's -- if that's
15   what you mean, then --
16   Q.  It is.
17   A.  -- yes, they interact that way.
18   Q.  And another term used is "adsorb"; correct?
19   As opposed to "absorb" with a b, "adsorb" with a d.
20   A.  That is correct.  Viruses adsorb, with a d, to
21   inanimate surfaces.
22   Q.  And if you were to try to explain what
23   adsorption means to a layperson, how would you explain
24   it?

Page 135

1    A.  Adsorption, with a d, is the process of
2    organic material settling onto a surface, as opposed to
3    absorption, with a b, where it -- the -- the object that
4    we're talking about sinks into or goes into the material.
5    Q.  Okay.  Does the process of adsorption, with a
6    d, involve a level of the substance, you know, sticking
7    to the surface at all, or is there any aspect of that in
8    the concept of adsorption?
9    A.  So "sticking" is -- is not a scientific term.
10   The -- the way that it involves -- I'm trying to answer
11   your question.
12   Q.  Yeah, let me ask it differently.
13       When a virus or other biologic material lands
14   on a surface, is there some process by which it is able
15   to stay on the surface and not just, you know, fall off
16   the surface?
17   A.  Yes.
18   Q.  Okay.
19   A.  So when materials interact -- and, in this
20   case, we're talking about a biological material,
21   SARS-CoV-2 -- with an inanimate surface, when they --
22   materials come close together, whether it's the ones I
23   was talking about or just in general, they come together,
24   weak intermolecular forces start to come into play.  So

Page 136

1    as they touch each other, you will have the same types of
2    interactions which are a combination of attractive and
3    repulsive forces.  And if a force acts upon it, it's
4    reversible, and you can take them apart.  So -- just like
5    I took my two fingers apart here.
6    Q.  Okay.  And with regard to the SARS-CoV-2
7    virus, you do agree that there is at least some period of
8    time where the SARS-CoV-2 virus can be infectious and be
9    on a surface; correct?
10   A.  ==So whether the virus is infectious on the==
11   ==surface is a function of the environment that it's in.==
12   ==It is possible that it can be.==
13   Q.  Okay.  And do you agree that the primary way
14   by which SARS-CoV-2 virus reaches a surface is through
15   the air?
16       MS. MANZO:  Objection to form.
17   A.  The way you phrase this is a little bit hard,
18   but if you mean the primary way is through respiratory
19   droplets emitted by a person sick with COVID-19, and then
20   those, at some point, coming in contact with surfaces,
21   that's -- that's the primary way.  I agree with that.
22   Q.  All right.  And to get from the infected
23   person to the surface, they at least have to be in the
24   air for some period of time?

34 (Pages 133 to 136)

Page 137

1   A.  Yes, they have to be in -- well, I suppose
2   unless they're really close to the surface and licking it
3   or something.  I could think of options where that's not
4   the case.
5   Q.  Okay.
6   A.  But, generally, yes, those respiratory
7   droplets need to travel at least some distance through
8   the air.
9   Q.  And do you agree that even if you're able to
10  clean a virus like SARS-CoV-2 from a surface, as hosts
11  come in and out of a location, the virus might be
12  reintroduced onto surfaces; correct?
13       MS. MANZO:  Objection to form.
14  A.  So I think you're asking if one person comes
15  in, is sick with COVID, emits virus, and the conditions
16  are -- allow that virus to be infectious on the surface,
17  then somebody comes by and disinfects the surface -- the
18  virus may have already degraded on its own, but somebody
19  comes by, disinfects the surface, then somebody else
20  comes in to the exact same spot who is sick with COVID
21  and, again, breathes onto the surface, there is a
22  possibility that infectious virus from that second person
23  can be introduced to that same surface.
24  Q.  The studies that have been done of how long --

Page 138

1   well, let me ask this.  Are you aware of any studies that
2   have been done in a real-life operating business where
3   people are coming in and out on a daily basis to test
4   whether live virus is present as the business is
5   operating on a daily basis as opposed to just looking at
6   virus on the surface and looking at it again a number of
7   days later to see if it's still live but without this
8   ongoing daily interaction of people coming in and out?
9   If you get -- if you understand what I'm saying.
10  A.  I'm not fully sure, but let me try.
11  Q.  Uh-huh.
12  A.  The -- I think you're asking about frequency
13  of sampling?  Is that correct?
14  Q.  Right.  So let's take a fitness club like 24
15  Hour Fitness.
16  A.  Yes.
17  Q.  And it's operating -- it might be operating 24
18  hours a day, seven days a week with people coming in and
19  out.  Are you aware of any tests that attempted to
20  identify on a -- like, a daily basis the level of virus
21  that might be present in an operating facility like that
22  where people are coming in and out all the time?
23  A.  Let's see.  To be -- there are some studies
24  which measure or sample from the same general locations

Page 139

1   in subsequent periods of time.  I'm not aware of any that
2   do it on -- at a high frequency such as daily or minute
3   by minute.
4   Q.  Okay.  So a study that would, you know,
5   evaluate how long SARS-CoV-2 might persist on a piece of
6   metal over, you know, some period of time, let's say 20
7   days, is not really that useful to a business like a gym
8   where people are coming in and out every hour or half an
9   hour and some -- and some may be sick and some may have
10  viruses, and, you know, it might -- how -- you know, for
11  an operating business, how useful do you think a study is
12  of the persistence of a virus on a given piece of
13  material over a period of time?
14       MS. MANZO:  Objection to form.
15  A.  So, in general, there are two types of studies
16  which can provide some information that I think has
17  utility to businesses who are considering operational
18  choices.  The ones where we can measure the persistence
19  time of a virus, SARS-CoV-2, in -- over time and measure
20  at -- at, you know, different frequencies -- it could be
21  hours.  It could be minutes.  It could be days.  Those
22  are primarily conducted in a laboratory environment
23  because you can control the various factors that would
24  impact the persistence time.

Page 140

1        So as we already discussed, I believe, a
2   variety of factors can change those times.  And so if you
3   want to look at persistence time, you need to control
4   these other factors.  And that can primarily be and
5   possibly only be done in a laboratory.
6        Laboratory studies have limitations into --
7   with regards to how -- how much you can take that data
8   and interpret that data and then infer information about
9   what happens in the real world.
10       So on the other side, you have real-world
11  studies where you may have people who are sick with
12  COVID-19 emitting potentially infectious virus.  In those
13  cases, you cannot control when it's emitted, how much it
14  is emitted, whether it's actually infectious by the time
15  it gets to a surface.  So you can't control those things.
16  But on the other hand, you can understand if I take
17  measurements at different places or at a certain time
18  when a person who is sick in -- in the room is present,
19  then you can take that information, but you have to
20  really understand the limitations and the strengths of
21  both types of studies.  I think both have utility in
22  understanding what happens, but they are different sorts
23  of experiment s.
24       Part of the reason why you can't do a -- the

35 (Pages 137 to 140)

Exhibit 46 to Plaintiff's Appendix of Evidence     Page 846 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

Page 141

1  type of study that you're asking about is because the --
2  you cannot control the amount of virus that is
3  introduced.  So it would be -- clearly, it would be
4  unethical to take infectious SARS-CoV-2 and spray it in
5  an operating business.  So we can't do that.
6      Q.   Or bring people that you know are infected
7  into the business?
8      A.   For the same reason.  It would be unethical to
9  carry out a -- some sort of study like that.
10     Q.   So the one that we looked at earlier where --
11 in the department store where they knew that the
12 department store was closed for 57 days, and they went in
13 and they found at least viral RNA in -- does that type of
14 study have -- in your opinion, have any utility for a
15 business like a 24 Hour Fitness who's trying to figure
16 out how to operate every day?  Because, presumably, they
17 would actually be open and operating during those 57 days
18 with people coming in and out all the time.
19         MS. MANZO:  Objection to form.
20     A.   ==So I think any utility is -- I think there's==
21 ==some utility.  I don't know that it provides a==
22 ==significant amount of information to inform==
23 ==operational -- daily operational choices, that particular==
24 ==study.==

Page 142

1      Q.   Are you aware of any studies regarding the
2  persistence of COVID-19 or the SARS-CoV-2 virus on
3  surfaces that would be -- that would provide a
4  significant amount of information to inform operational
5  or daily operational choices, as you said?
6      A.   So I think this -- the sum of the laboratory
7  data and the real-world studies do provide potentially
8  actionable information.
9      Q.   Okay.  And, in your opinion, what actual
10 information do they provide?
11     A.   So I believe that they provide information as
12 to the general conditions under which SARS-CoV-2 is more
13 likely to remain infectious in an environment; particular
14 information about the effectiveness of different
15 disinfection chemistries; the -- and then some
16 information with regards to distance that you may find --
17 you may be able to collect infectious virus or detect
18 infectious virus away from somebody who is sick.  So
19 those, to me, would provide information that would be
20 useful.  I'm not involved in developing mitigation
21 protocols, but I think that that information is useful.
22     Q.   Okay.  Let's go back to Exhibit 8 which is
23 your report.  Let's see.  If you go to page 2, the
24 qualifications section.

Page 143

1      A.   Okay.  I'm there.
2      Q.   In paragraph -- in paragraph 2.2, you say,
3  "Broadly speaking, my expertise is at the interface of
4  biology and materials."  Can you explain what you mean by
5  that?
6      A.   Yes.  So, generally, I describe it as the
7  interface between biology and materials because I'm
8  thinking biology, or what I'm trying to explain by
9  biology, means living or organic material and how those
10 interact with inanimate materials.  So that's the
11 materials aspect.  So the organic or biological materials
12 and how those interact with inanimate materials.
13     Q.   And then if you go to page 4 of your report,
14 paragraph 3.2, we're now on the executive summary.
15     A.   Yes.
16     Q.   You say, "For reasons explained further below,
17 it is my opinion that there is no scientific basis for
18 the assertion that SARS-CoV-2 adversely affects the
19 surfaces or surrounding air it contacts or that this
20 coronavirus remains infections" -- "infectious after
21 either general degradation or disinfection by one of a
22 wide range of effective means."  Do you see that?
23     A.   I do.
24     Q.   Okay.  And how do you define what it means for

Page 144

1  something to "adversely affect" a surface?
2      A.   So there are a number of different mechanisms
3  that potentially could fall under that description.  One
4  of them would be if there was some sort of chemical
5  reaction that changed the underlying material.  One could
6  be more of a physical mechanism such as creating holes in
7  the material that would damage its mechanical stability.
8  There could be a material that interacts with it such
9  that -- not -- not necessarily that there's a chemical
10 reaction, but such that the material is changed in a way
11 that -- that makes it no longer useful for the particular
12 context, I guess.  So I'm thinking of, for example,
13 staining.  If a dye were -- or bleach were put on a
14 material, then there could be a significant stain.  And
15 if that material was used, I don't know, as clothing, for
16 example, you probably wouldn't want to use it anymore.
17     Q.   Okay.  And then when you talk about adversely
18 affecting surrounding air, can you explain what you mean
19 by that?
20     A.   Yes.  So the -- so air is -- when I refer to
21 air, I'm referring to the gaseous material which is
22 primarily nitrogen with -- well, 78 percent nitrogen, 21
23 percent oxygen, and then 1 percent of everything else.
24 That "everything else" includes other gases but also

36 (Pages 141 to 144)

Exhibit 46 to Plaintiff's Appendix of Evidence         Page 847 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

```
                                                        Page 181
 1             COMMONWEALTH OF MASSACHUSETTS
 2                    ESSEX COUNTY
 3
 4       I, DEBORAH J. BATEMAN, Court Reporter and Notary
 5   Public in and for the Commonwealth of Massachusetts, do
 6   hereby certify that the witness whose deposition is
 7   hereinbefore set forth, was duly sworn and that such
 8   deposition is a true record of the testimony given by the
 9   witness.
10       I further certify that I am neither related to or
11   employed by any of the parties in or counsel to this
12   action, nor am I financially interested in the outcome of
13   this action.
14       I witness whereof, I have set my hand and seal
15   this 1st day of September 2023.
16
17
18
19
20       _____
21       Deborah J. Bateman, Notary Public in and
22       for The Commonwealth of Massachusetts
23       My Commission Expires: November 2, 2023
24
```

```
                                                        Page 182
 1                  DEPOSITION ERRATA SHEET
 2
 3   Our Assignment No. J10132740
 4   Case Caption:  24 HOUR FITNESS WORLDWIDE, INC. vs
 5   CONTINENTAL CASUALTY COMPANY
 6
 7
 8          DECLARATION UNDER PENALTY OF PERJURY
 9       I declare under penalty of perjury that I have
10   read the entire transcript of my Deposition taken in the
11   captioned matter or the same has been read to me, and the
12   same is true and accurate, save and  except for changes
13   and/or corrections, if any, as indicated by me on the
14   DEPOSITION ERRATA SHEET hereof, with the understanding
15   that I offer these changes as if still under oath.
16       Signed on the _____ day of
17   _____, 2023.
18
19       _____
20   DR. ALEXIS SAUER-BUDGE
21
22
23
24
```

```
                                                        Page 183
 1             DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24       DR. ALEXIS SAUER-BUDGE
```

```
                                                        Page 184
 1             DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24       DR. ALEXIS SAUER-BUDGE
```

46 (Pages 181 to 184)

Exhibit 46 to Plaintiff's Appendix of Evidence    Page 848 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment