# EXHIBIT 52

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                           *
                                 *
RS FIT NW LLC,                   *   Chapter 11
        Debtors.                 *
_____  *   Case No.: 20-11558 (KBO)
24 HOUR FITNESS                  *
WORLDWIDE, INC.,                 *   (Jointly Administered)
        Plaintiff,               *
                                 *
VS.                              *
                                 *   Adv. Proc. No. 20-51051 (KBO)
CONTINENTAL CASUALTY             *
COMPANY, ET AL.,                 *
        Defendants.              *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF

BEAZLEY-LLOYD'S SYNDICATES 2623/623

THROUGH ANDREA MATOTT

VOLUME 1

OCTOBER 11, 2022

(Reported Remotely)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NMA COMPRESSED TRANSCRIPT

Page 2

1  ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION of
2  BEAZLEY-LLOYD'S SYNDICATES 2623/623 through ANDREA
3  MATOTT, produced as a witness at the instance of the
4  Plaintiff, and remotely duly sworn, was taken in the
5  above-styled and numbered cause on October 11, 2022,
6  from 11:04 a.m. to 4:08 p.m., before Carol Jenkins, CSR,
7  RPR, CRR, in and for the State of Texas, reported by
8  machine shorthand, with the Witness in New Hampshire,
9  pursuant to the Federal Rules of Civil Procedure, the
10 Emergency Order Regarding the COVID-19 State of
11 Disaster, and the provisions stated on the record or
12 attached hereto.

Page 3

REMOTE APPEARANCES:

FOR THE PLAINTIFF:
Ms. Nat Ochoa
Reed Smith LLP
101 Second Street, Suite 1800
San Francisco, California 94105
415.543.8700
nochoa@reedsmith.com

FOR THE DEFENDANT, CONTINENTAL CASUALTY COMPANY:
Mr. Matthew S. Sarna
DLA Piper LLP
6225 Smith Avenue
Baltimore, Maryland 21209
410.580.3000
matt.sarna@us.dlapiper.com

FOR THE STARR SURPLUS DEFENDANT:
Ms. Courtney Murphy
Hinshaw & Culbertson
800 Third Avenue, Suite 1300
New York, New York 10022
212.471.6200
cmurphy@hinshawlaw.com

FOR THE ALLIED WORLD DEFENDANT:
Mr. Austin Westergom
Mound Cotton
3 Greenway Plaza, Suite 1300
Houston, Texas 77056
281.572.8350
bwestergom@moundcotton.com

FOR THE ALLIANZ DEFENDANT:
Ms. Marlie McDonnell
Clyde & Co
271 17th Street NW, Suite 1720
Atlanta, Georgia 30363
404.410.3150
marlie.mcdonnell@clydeco.us

Page 4

FOR THE LIBERTY MUTUAL FIRE DEFENDANT:
Mr. Joel L. McNabney
Robinson & Cole LLP
777 Brickell Avenue, Suite 680
Miami, Florida 33131
786.725.4119
jmcnabney@rc.com

ALSO PRESENT:
The Videographer, Ms. Jessica Rawls

Page 5

INDEX

|  | PAGE |
|---|---|
| Appearances | 02 |
| Stipulations | 01 |
| ANDREA MATOTT | |
| Examination by Ms. Ochoa | 07 |
| Signature and Jurat | 222 |
| Reporter's Certificate | 223 |

EXHIBITS

| NO. DESCRIPTION | PAGE |
|---|---|
| Exhibit A | 14 |
| Plaintiff's Amended Notice of 30(b)(6) Deposition to Beazley-Lloyd's Syndicates 2623/623 | |
| Exhibit B | 37 |
| Ms. Matott's New Claim Acknowledgment Letter | |
| Exhibit C | 53 |
| McLarens First Coronavirus Claim Report | |
| Exhibit D | 60 |
| Email String Bates LYDSCLM 521-23 | |
| Exhibit E | 75 |
| Email Bates LYDSCLM 477 | |
| Exhibit F | 79 |
| Screenshot Bates LYDSCLM 77 | |
| Exhibit G | 84 |
| Screenshot Bates LYDSCLM 359 | |
| Exhibit H | 85 |
| Screenshot Bates LYDSCLM 365 | |

2 (Pages 2 to 5)

Page 6

```
 1   Exhibit I                              89
     Screenshot Bates LYDSCLM 366
 2
     Exhibit J                              95
 3   Screenshot Bates LYDSCLM 246
 4   Exhibit K                              97
     Screenshot Bates LYDSCLM 247
 5
     Exhibit L                             106
 6   Beazley's Insurance Policy for 24 Hour Fitness
 7   Exhibit M                             141
     COVID-19 Changing Claims Patterns AGCS Article
 8
     Exhibit N                             146
 9   Mr. Allen's Draft Letter to Mr. Gottlieb
10   Exhibit O                             149
     McLarens Second Coronavirus Claim Report
11
     Exhibit P                             164
12   McLarens Third COVID-19 Pandemic Report
13   Exhibit Q                             187
     McLarens Fourth COVID-19 Pandemic Report
14
     Exhibit R                             202
15   McLarens Fifth COVID-19 Pandemic Report
16   Exhibit S                             205
     McLarens Sixth Reply Requested Document
17
     Exhibit T                             207
18   McLarens Seventh COVID-19 Pandemic Report
19   Exhibit U                             210
     Email String Bates AGRUS 1005-11
20
     Exhibit V                             217
21   McLarens Eighth COVID-19 Pandemic Report
22
23
24
25
```

Page 7

```
 1        THE VIDEOGRAPHER:  Good morning.  Today is
 2   Tuesday, October 11th, 2022.  The time is 11:04 a.m.,
 3   and we are now on the record.
 4        THE REPORTER:  Good morning.  My name is
 5   Carol Jenkins reporting this remotely from Chambers
 6   County, Texas, and the witness is in New Hampshire.
 7        ANDREA MATOTT,
 8   having been first remotely duly sworn, testified as
 9   follows:
10            EXAMINATION
11   BY MS. OCHOA:
12        Q.  Good morning, Ms. Matott.  My name's Natalie
13   Ochoa, and I'm an attorney representing 24 Hour Fitness
14   in this case.
15            How are you?
16        A.  Good morning.  Good.
17            How are you?
18        Q.  Good.  Doing well.
19            Can you please spell and state your name
20   for the record, your full name?
21        A.  Sure.  It's Andrea Smith, S-m-i-t-h.  I go by
22   Andrea Matott for work.
23        Q.  Great.  Is it okay if I call you Ms. Smith for
24   purposes of this deposition?
25        A.  Sure.
```

Page 8

```
 1        Q.  Are you in your home office today, or are you
 2   in your physical office?
 3        A.  A home office.
 4        Q.  Great.  And did your office shut down at all
 5   during the pandemic?
 6        A.  Yes.  Well, the offices closed, but business
 7   continued as usual.
 8        Q.  When did it physically close, if you recall?
 9        A.  I -- I don't recall.  I've been working remote
10   for years, so...
11        Q.  Okay.  So would you guess the physical office
12   closed sometime when COVID started around March 2020?
13            MS. MURPHY:  Objection.
14            THE WITNESS:  I'm sorry.
15            MS. MURPHY:  Go ahead.
16        A.  I guess that would be a good guess.
17        Q.  (By Ms. Ochoa) Great.  And do you know when it
18   reopened?
19        A.  I don't specifically recall when they reopened.
20   But we have offices throughout the United States, so
21   they might have been staggered openings.
22        Q.  Okay.  So I'd like to go over just a couple of
23   ground rules before we start the deposition relating to
24   the fact that the deposition is remote.
25            Can you please confirm that you'll not use
```

Page 9

```
 1   any text messages, chats, emails or any other form of
 2   communications as we go throughout the day?
 3        A.  Yes.
 4        Q.  And can you affirm that you won't review any
 5   notes or documentation other than what I pull up on the
 6   screen and ask you to open?
 7        A.  Yes.
 8        Q.  Did you bring any notes with you today?
 9        A.  No.
10        Q.  Is anyone in the room with you at all?
11        A.  No.
12        Q.  If someone ever throughout the deposition joins
13   you in the room or you get a knock on the door, your
14   counsel just affirmly should disclose their presence and
15   identify them on the record and then we can move
16   forward.
17            Does that sound fair?
18        A.  Sure.
19        Q.  Have you ever given any testimony before?
20        A.  Yes.
21        Q.  And was that at a trial or a deposition?
22        A.  Both.
23        Q.  How many times would you say you've given
24   testimony in a deposition?
25        A.  Oh.  Over the course of 30 years, ten plus.
```

3 (Pages 6 to 9)

Exhibit 52 to Plaintiff's Appendix of Evidence    Page 895 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

Page 118

```
 1  provide access and use to customers?
 2  A.  I think it --
 3       MS. MURPHY:  Objection.
 4  A.  I think it --
 5       MS. MURPHY:  Go ahead.
 6  A.  -- frustrated many businesses.
 7  Q.  (By Ms. Ochoa)  Right.  Like 20 -- it
 8  frustrated 24 Hour's business in that report?
 9  A.  Right.  And I don't -- I don't think that
10  there's an issue with regards to the closing.  The
11  problem is is, you know, did they have COVID on the
12  premises and were they actually closed because they were
13  prohibited by a civil authority.  That's what we were
14  trying to confirm.
15  Q.  Right.  And prohibited by a civil authority
16  with regard to the public could mean that the government
17  order said that the public can't enter the building.
18  That would qualify as prohibited access?
19       MS. MURPHY:  Objection.
20  A.  No, well, I think the government orders were
21  more closing orders just, in general, issued for all
22  businesses to stop the spread of COVID.  What we needed
23  here for this claim was specific closure orders for
24  the -- for the locations that were involved.
25  Q.  (By Ms. Ochoa)  Let me ask it this way.
```

Page 119

```
 1  Doesn't a customer being unable to access a gym because
 2  a government order says that the public cannot access
 3  the gym, doesn't a customer being unable to do that
 4  frustrate the intended purpose of 24 Hour Fitness
 5  catering to its customers?
 6       MS. MURPHY:  Objection.
 7       Go ahead.
 8  A.  Well, I would assume that would be frustrating.
 9  But again, what we had in regards to the claim and the
10  policy, we needed actual verification that there was
11  COVID on the presence -- present on the premises and
12  that the actual location was closed and prohibited
13  because of that.  And we didn't have any of that
14  information.
15  Q.  (By Ms. Ochoa)  Let's go to sub (a) here.  It
16  says:  All coverage involved must be directly resulting
17  from access being prohibited to a described location or
18  any portion thereof (a) due to the actual presence of
19  and the spread of communicable diseases at the described
20  location.
21       Do you see that?
22  A.  Yes.
23  Q.  Do you agree that if someone infected with
24  COVID-19 entered a 24 Hour location, that COVID-19 would
25  be present at that location?
```

Page 120

```
 1  A.  If somebody tested positive and were, you know,
 2  within reason on the premises, I would say yes, I could
 3  agree that the potential for COVID would be at the
 4  premises.
 5       But again, in order for the coverage to
 6  apply, the closure must have been as the result of being
 7  on the premises and prohibited by a civil authority.
 8  Q.  I want to just focus on this specific
 9  subdivision.  I understand what you're saying about the
10  closure, and we went over that.
11       But with regard to this --
12  A.  Okay.
13  Q.  -- specific subdivision here, that due to the
14  actual presence and spread of the communicable disease,
15  would you agree that if someone tested positive for
16  COVID-19 and walked into a 24 Hour Fitness gym, that
17  COVID-19 would be present at the gym at that time?
18  A.  Well, the person --
19       MS. MURPHY:  Objection.  Well, hold on.
20       THE WITNESS:  Yeah.
21       MS. MURPHY:  Objection, asked and -- asked
22  and answered.
23       Go ahead.
24  A.  Yeah.  I was going to say the person would have
25  the COVID.  But would they -- you know, were they
```

Page 121

```
 1  wearing a mask?  You know, could you tell that it was
 2  spread to anybody else reporting issues?  Were there
 3  incident reports?  Again, you know, in order to turn
 4  around and confirm, you know, what was covered, we'd
 5  have to turn around and get that information.
 6       I don't necessarily need names, but, you
 7  know, something in location so that I could confirm the
 8  presence and then have the order, the civil authority
 9  order, documented that that described location was
10  closed because of that exposure.
11  Q.  (By Ms. Ochoa)  Sure.  And if 24 Hour Fitness
12  showed you that a person was in the gym with COVID-19,
13  are you saying that that would not mean that COVID was
14  present on the premises?
15  A.  No.  I think I said if the person had COVID-19
16  and we could document that they had the COVID-19 and
17  walked into that gym, I would agree that there was COVID
18  present in the person.
19  Q.  COVID present when?
20  A.  With the person who had COVID-19.
21  Q.  Okay.
22  A.  Present in the gym with the person who had
23  COVID-19, right.
24       MS. MURPHY:  Objection.  Let's not
25  rephrase her answer, but go ahead.
```

31 (Pages 118 to 121)

Page 134

1  had communicable disease endorsements?
2     A.  There might have been some, but no specific
3  recollection.
4     Q.  Okay.  So then you can't confirm or deny
5  whether the ones that did have a communicable disease
6  endorsement resulted in coverage?
7     A.  Right.
8     Q.  Okay.  You touched on this a bit earlier, but
9  around the time that you were putting in -- you were
10 considering the communicable disease endorsement, did
11 you consider whether any other coverage provisions in
12 the policy might apply to this claim?
13    A.  I would have looked at the rest of the policy,
14 yes.  You know, that there's another civil -- civil
15 authority provision, an ingress/egress as far as how
16 that would -- and I look at the -- I'd like to think I
17 look at the totality of the policy, so...
18    Q.  Did you ever attempt to evaluate whether there
19 might be coverage under the civil authority provision?
20    A.  I would have, yes, but I would have still
21 needed some of the same information that we had
22 requested to confirm what damage there may be.
23    Q.  Is it fair to say that you never made a
24 determination about whether there could be coverage
25 under that provision?

Page 135

1     A.  I don't think we made a determination on
2  anything based on the information that had been
3  provided.  It wasn't enough.
4     Q.  And did you discuss that with anybody at
5  Beazley?
6     A.  No.
7     Q.  Did you review the general business
8  interruption coverage section of the policy?
9     A.  I would have, yes.
10    Q.  And did you ever make determinations about
11 whether there could be coverage under that provision?
12    A.  We didn't have enough information to confirm if
13 there was any damage and what was -- what the claim was.
14    Q.  And did you ever discuss that with anyone?
15    A.  No.
16    Q.  Around the time that you were assigned to work
17 on the 24 Hour Fitness claim in March of 2020, were you
18 aware of any measures that were available to test for
19 the presence of COVID-19 inside of a business location?
20    A.  At the time it was submitted, no.  I still
21 don't know if there are any.  But a good indicator would
22 be if somebody was on the premises, you know, I would
23 have probably considered that to, you know, again,
24 within that time frame, you know, to potentially
25 satisfy, assuming we had a closure prohibiting access

Page 136

1  and all that other good stuff, I might have considered
2  that sufficient under that endorsement.
3     Q.  Okay.  So --
4     A.  As long -- as long as the conditions were met.
5     Q.  Okay.  So have you ever -- you kind of just
6  touched upon this, but I just want to clarify.  Have you
7  ever been made aware of any measures that are available
8  to test for the presence of COVID-19 in a business
9  location at any time outside of the presumption that
10 COVID might be there if all those other things we talked
11 about were met?
12    A.  I haven't done any research on that, no.
13    Q.  Okay.  So you're not aware one way or the
14 other?
15    A.  No.
16    Q.  To your knowledge, did Beazley do any testing
17 of an insured business location for the presence of
18 COVID?
19    A.  No.  We would not do that.
20    Q.  And why is -- why would you not do that?
21    A.  We're not set up or anything equipped to turn
22 around and go out and test somebody else's property.  I
23 wouldn't do that anyway.  Neither was --
24    Q.  Because you're not in the business of doing
25 that?

Page 137

1     A.  No, I would just say --
2         MS. MURPHY:  Objection.
3         Go ahead.
4         THE WITNESS:  Sorry.
5         MS. MURPHY:  That's okay.
6     A.  I would say that, you know, say there, you
7  know, was -- there was damage and a collapse.  I might
8  send an engineer out to turn around and review the
9  property.  Here we had no evidence of damage.  So there
10 was nothing for -- for us to go out and have Beazley
11 test for, so...
12    Q.  (By Ms. Ochoa)  So in the case of sending an
13 engineer to go out and assess damage, you didn't --
14 would it have not been possible for you to have directed
15 a different, I don't know, an equivalent to an engineer,
16 but in this case to go out and test for the presence of
17 COVID-19 at the insured location?
18    A.  No.  Based --
19        MS. MURPHY:  Objection.
20        Go ahead.
21        THE WITNESS:  I'm sorry, Courtney.
22        MS. MURPHY:  That's okay.
23    A.  Based on the -- based on the information that
24 was provided, you know, there wasn't sufficient
25 information for us, especially if you, you know, read

Page 138

1  what was sent in. You know, within 72 hours, time takes
2  it -- you know, by the time we're getting this
3  information, you know, it would have been too late
4  anyway for us to try and even consider sending somebody
5  out.
6         But, you know, at this point, there was no
7  damage, you know, for us to investigate. So, no, we
8  didn't consider sending anybody out.
9    Q.  (By Ms. Ochoa) But wasn't 24 Hour Fitness
10 providing you with certain examples of when a person
11 tested positive for COVID-19?
12   A.  Without information supporting when they were
13 there within that time frame, and they themselves
14 acknowledged that in time all this would not be there,
15 so no.
16   Q.  Outside of the person, do you not think it was
17 possible for you to have sent somebody to test the
18 building, like whether the physical building had
19 COVID-19?
20   A.  Well, I would -- I would turn around and say
21 what -- what was the damage? You know, I mean, if
22 there's damage and we were -- we felt an expert was
23 warranted, we would have sent somebody out. Here, we
24 didn't have anything demonstrating damage. So we did
25 not feel it was warranted to send anybody out.

Page 139

1    Q.  Okay. Have you ever seen any guidance that
2  Beazley published for its policyholders to give advice
3  as to how to test for the presence of COVID-19 at a
4  location?
5    A.  No.
6    Q.  Have you ever read any literature that
7  discussed the testing of an insured business location
8  for the presence of COVID?
9    A.  No.
10   Q.  As part of the investigation of the 24 Hour
11 Fitness claim that McLarens did, to your knowledge, did
12 anyone from McLarens ever visit a 24 Hour Fitness
13 location?
14   A.  I don't believe -- I don't believe they did.
15   Q.  On any claims that you have worked on, have you
16 ever had a market adjuster go and visit a location where
17 a loss took place?
18   A.  Well, what do you mean by loss?
19   Q.  Where an alleged loss occurred. Have you ever
20 had an adjuster go out and assess potential damage or
21 loss at a location that's being claimed?
22   A.  As a result of COVID-19? Or, I mean, what --
23       MS. MURPHY: Yeah.
24   A.  I'm a little confused right now.
25   Q.  (By Ms. Ochoa) So as a result of COVID --

Page 140

1  well, let's go as a result of COVID-19, have you ever
2  had a market adjuster go and visit a location where --
3    A.  Okay.
4    Q.  -- the alleged loss took place?
5    A.  I think I had one that went out in California.
6  He went out and took some pictures. Maybe in Florida,
7  but I don't remember specifically offhand. Not many.
8    Q.  Do you know why that was a decision to go out
9  at that point and not in this case?
10   A.  He might have had the time. He might have been
11 in the area. It might have been in discussion with an
12 insured. I don't remember the specifics with regards to
13 those.
14   Q.  What about generally outside of the COVID
15 context? You mentioned one or two instances where a
16 market adjuster went out with regard to a COVID case,
17 but what about outside of the COVID context? Have you
18 ever had an adjuster go out and visit a location where
19 an alleged loss took place?
20   A.  Usually, you know, we're dealing with property
21 damage claims. So anything that comes in would have
22 some component of damage, which you'd probably want to
23 inspect. So I would say in that context, yes, we send
24 out adjusters to inspect.
25   Q.  Would you say it's common to do that?

Page 141

1    A.  To confirm damages being claimed? Yes.
2    Q.  Okay. Let's mark Exhibit M.
3        (Exhibit M marked.)
4    Q.  (By Ms. Ochoa) And I will share my screen.
5    A.  Okay.
6    Q.  Okay. Do you see this?
7    A.  Yes.
8    Q.  So I'll just give you -- I'll start slowly
9  skimming down just so you can kind of see what this is,
10 and then I'll direct your attention to a specific page
11 that we can discuss.
12       So this -- I'll represent that this is a
13 publication by another market insurer, Allianz; and it's
14 titled COVID-19 Changing Claims Patterns.
15       MS. MURPHY: Okay. Before we just kick
16 off on this, I just want to make sure that the record is
17 clear that obviously that this is a 30(b)(6) for
18 Beazley. And to the extent that you're asking questions
19 of this witness of an AGCS publication that she's not
20 seen before, I will object to that.
21       But having said that, you can proceed.
22 But I'm going to stay tight to the 30(b)(6) notice that
23 you guys crafted. And there was nothing in that
24 30(b)(6) notice where we would be asked to speak about
25 articles such as this drafted by other insurers. And so

36 (Pages 138 to 141)

Page 190

1    Jeremy replies: The following incidents
2    regarding COVID-19 at our locations had been identified
3    to us at around the time of closing of our facilities on
4    March 16th, 2020. Of course, we assume that there were
5    many other incidents that were not reported,
6    particularly incidents related to members or other
7    visitors to our clubs.
8         At present we have nothing to report with
9    respect to any decontamination/cleanup costs.
10        First, do you remember any discussions
11   with the market about going back and asking Mr. Allen
12   follow-up questions?
13   A. Nothing specific. I mean, Mike -- as I said,
14   Mike's a qualified adjuster. So this may have been some
15   additional follow-up that he was looking for as well
16   because he knew that he'd be asked. So I don't remember
17   anything specific, so...
18   Q. Do you recall seeing this information that 24
19   Hour Fitness provided, right, the incidents that are
20   laid out here?
21   A. Yes, as part of the report.
22   Q. Do you recall any discussions with anyone about
23   the information that 24 Hour Fitness provided?
24   A. Nothing specific.
25   Q. Was an investigation done with Beazley to

Page 191

1    follow up on any of the specific instances that were
2    identified by Mr. Glieb? Gottlieb, excuse me.
3    A. Yeah, I think it was something later on when we
4    sent the -- the additional reservation of rights wherein
5    we followed up for additional information.
6         So, for example, you know, they had an
7    individual on March 8th who tested positive on March
8    11th, it says, was in our Whippany.
9         So on this one here, we would have asked
10   for the cleanup costs and stuff like that. But up
11   above, he says that he doesn't have any.
12        So the additional question would have
13   been, you know, did you have an actual closure for that
14   particular location pursuant to the -- the endorsement
15   for communicable diseases. And the same would have --
16   would have been done for the remaining to confirm, you
17   know, again, that time frame that we were talking --
18   Q. Uh-huh.
19   A. -- about earlier, you know, that some people
20   were exposed, but we're not sure if they ever tested.
21   So we don't know if they actually had COVID so that we
22   could confirm that there was COVID on the premises. You
23   know, present on the premises and all that other stuff.
24        So it would have been, you know, part of
25   that, all these questions here looking for that

Page 192

1    documentation to include the civil authority orders for
2    the locations.
3    Q. Taking out the civil authority question that we
4    talked about, let's take for example this first bullet.
5    A. Uh-huh.
6    Q. It says: On or about March 8th, 2020, an
7    individual was in our Whippany who tested positive for
8    COVID-19 on March 11th, 2020.
9    A. Uh-huh.
10   Q. What about that specific bullet point was
11   insufficient? I know that you mentioned earlier the
12   time frame when the person contracted or tested positive
13   for COVID-19.
14        Can you think of anything else that was
15   insufficient about this bullet outside of the time frame
16   that you mentioned?
17   A. In this one here, I might like to know if there
18   were other people that potentially tested positive at
19   this location, because this individual who tested
20   positive three days later could have been someplace else
21   when he contracted, you know.
22        And like I said, I don't need names if
23   they were concerned about privacy and everything. But,
24   you know, was there any consistency? Were there more
25   people, you know, because given the three days and the

Page 193

1    72 hours that, you know, it's all done and over with,
2    you know, could this individual have been someplace else
3    when they contracted. So I would have liked to have
4    seen that.
5         You know, was there an incident report
6    filed? You know, did they notify the -- did they have
7    to notify the health authorities? Do they have that
8    report?
9         They said they don't have any
10   decontamination or cleanup costs. But, you know, did
11   they try to do anything, you know, that would be
12   something that I could do an equivalent, you know,
13   toward that 2.5 million in coverage, you know, so that I
14   could confirm and evaluate, you know, what it was?
15        Did -- we know that they shut down; but,
16   you know, how long did it turn around and take to clean
17   up.
18        You know, so it's all tied to direct --
19   you know, to that damage to that location that would
20   need -- that we would need the information to evaluate,
21   you know, putting aside the COVID -- sorry, the civil
22   authority order.
23        So, you know, that alone is not sufficient
24   to -- for me to turn around and say, oh, yeah, you had a
25   million dollar loss. Here you go. You know, it's

49 (Pages 190 to 193)

Exhibit 52 to Plaintiff's Appendix of Evidence
in support of Plaintiff's Motion for Partial Summary Judgment
Page 899 of 1418

Page 194

1  just --
2  Q. So --
3  A. The information is just not there.
4  Q. So when we're looking at this one bullet --
5  A. Yeah.
6  Q. -- you mentioned time frame, whether there are
7  other people at the location that tested positive,
8  whether there's an incident report filed.
9  A. Maybe a health -- anything. Anything to help
10 us to evaluate it. You know, what did you lose? You
11 know, you're saying that you closed, you know, what's --
12 what's the loss, you know.
13 Q. Did the insurers expressly ask anywhere in this
14 question or in the questions that we previously reviewed
15 for the -- expressly ask the exact time frame, whether
16 other -- other people were in the location, whether an
17 incident report was filed, did Beazley or the insurers
18 ever ask that specifically of 24 Hour Fitness?
19 A. I think you're looking at a snapshot in time.
20 And, you know, as I said, you know, you're looking at a
21 fluid event, you know, so that as responses are coming
22 in, these are the things going through your mind and how
23 you can turn around and support and evaluate the claim.
24     So, you know, I'm looking at this, and I
25 would say to my insured, hey, you know, this is what

Page 195

1  we're going to need to turn around and evaluate the
2  coverage under the policy.
3      So to turn around and simply look at the
4  snapshot here, I think you need to look at it in its
5  totality. So that when you're looking at the -- the
6  next letter that goes out, it's explaining some of this
7  stuff.
8      Now, did Mike have any of these specific
9  conversations, you know, with either Karen or Jeremy? I
10 don't know. But these are --
11 Q. I think I'm asking --
12 A. Yeah.
13 Q. Oh, I'm sorry. Go ahead.
14 A. I'm just saying that, you know, to -- you're
15 looking at a snapshot in time. And I just -- I don't,
16 you know, to see this now, I think if you look at the
17 follow-up letter that went out, I think it addressed
18 some of these issues.
19 Q. I think I'm asking something a little bit more
20 targeted.
21     Do you have -- are you aware of any
22 documentation with questions or a statement asking 24
23 Hour Fitness to specifically provide the information
24 regarding the timeline, the other people at the
25 location, the incident report, everything that we just

Page 196

1  talked about, are you aware of a specific document or
2  question asked that the insurers asked of 24 Hour?
3  A. I think that supports probably was used.
4  Please support your claim. What information do you have
5  that supports your claim? I just tossed these out as
6  things that could -- could have been used to support the
7  claim.
8  Q. Okay.
9  A. So if I'm looking --
10 Q. So maybe --
11 A. Yeah, so if I'm looking for support of a claim,
12 you know, you and I are sitting here having a
13 conversation, all those things could have been used as
14 evidence to support these bullet points or the insured's
15 claim.
16     So, I mean, it doesn't have to be specific
17 to this one thing. I think that that's being a little
18 too tight on the draw. I think what we're looking for
19 is anything that could have supported a claim, and I
20 just tossed those out as suggestions.
21 Q. But if you're asking the insured to provide
22 information supporting a claim, how is the insured ever
23 going to know what information to provide that you're
24 looking for, like the things that you listed as an
25 example?

Page 197

1  A. Well, who better would have that information
2  than the insured. Hey, I've got a claim, I closed my
3  operation. Look, here's the order of civil authority
4  prohibiting access. Here's the cleanup bills, you know,
5  that I -- you know, that I incurred to turn and clean
6  these locations. This is the incident report, you know,
7  that was filed. Look, here's the health report that was
8  filed. You know, I mean, I just -- I don't -- I don't
9  think that that's a fair assessment in what's going on
10 here.
11 Q. Isn't the insurance company in a better
12 position to know exactly what their policy should say
13 and exactly what they need to support coverage?
14     MS. MURPHY: Objection, form.
15 A. No. I think it can be intuitive as well. I
16 mean, if I'm submitting a claim and I know somebody is
17 looking for something, like if -- if I said that, you
18 know, it cost me $1,000 to turn around and have my car
19 repaired, I'd know that I should probably have that
20 $1,000 estimate available. I think it's the same thing
21 here.
22 Q. (By Ms. Ochoa) But you can acknowledge that
23 COVID-19 was a fluid situation, and these claims weren't
24 the typical claims that were -- had been present before?
25 In other words, how could you expect 24 Hour Fitness to

50 (Pages 194 to 197)

Exhibit 52 to Plaintiff's Appendix of Evidence          Page 900 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

Page 210

1  Q. Okay. And you didn't --
2  A. And I didn't --
3  Q. -- go to --
4  A. Oh, sorry. And I was going to say I wouldn't
5  think that they'd have their income records on there
6  either, so...
7  Q. You didn't go there just to look at what
8  locations reopened and what remained closed?
9  A. No. I would assume I would have gotten that as
10 part of the support for the claim.
11 Q. Okay. All right. Let's mark Exhibit 12.
12     (Exhibit U marked.)
13 Q. (By Ms. Ochoa) This is an email from Mike
14 Allen to, it looks like, a variety of the different
15 market insurers' representatives. And it appears that
16 you're included on this email, and it's dated July 2nd,
17 2020.
18 A. Right.
19 Q. Do you see that?
20 A. Yes.
21 Q. And then if we go down to here, this is an
22 email from Odell Bradley.
23     Do you know who Odell Bradley is?
24 A. No. Other than that he's at CNA, because
25 that's what it says in the email.

Page 211

1  Q. Okay. Do you know that he was responsible for
2  the claim at CNA?
3  A. Just based on the email, I would say okay.
4  Q. And are you aware that the other individuals
5  listed on this email are handlers or adjusters for the
6  other carriers relating to this claim?
7  A. That's what I would assume, yes.
8  Q. Okay. And this is the email from Odell to
9  everyone that we just talked about dated June 25th --
10 A. Uh-huh.
11 Q. -- 2020. And it says: Market, after further
12 review of endorsement for interruption by communicable
13 disease, I believe it is best to engage coverage counsel
14 moving forward.
15     And then it appears that he copied and
16 pasted the interruption by communicable disease
17 endorsement and says: There seems to be a good chance
18 business interruption coverage will be triggered. I
19 think we all agree.
20     Do you see that?
21 A. Uh-huh. Yes. Sorry.
22 Q. By the time this email was written in June 20
23 -- at June 25th, 2020, the insurers had already received
24 a number of responses from 24 Hour Fitness that we've
25 looked at today, right?

Page 212

1  A. Yes.
2  Q. And had market calls prior to the sending of
3  this email, right?
4  A. Correct.
5  Q. And Mr. Bradley's comment that there seems to
6  be a good chance business information was -- business
7  interruption coverage was triggered was based on
8  information that the market had at that point in the
9  calls that took place, right?
10 A. Right.
11 Q. And do you agree with Mr. Bradley's statement
12 that there's a good chance business interruption will be
13 triggered?
14     MS. MURPHY: Objection.
15     Go ahead.
16 A. I don't agree with how he's worded it. I think
17 he should have put could be triggered assuming the
18 conditions under the endorsement were met. And as we've
19 talked, I didn't have enough information. And if he
20 felt comfortable making that comment, then he was making
21 the comment on behalf of CNA, not on behalf of
22 underwriters.
23 Q. (By Ms. Ochoa) Did his assessment -- do you
24 think his assessment reflected discussions with the
25 market up until that point in the answers received from

Page 213

1  24 Hour?
2  A. No.
3      MS. MURPHY: Objection.
4      Go ahead.
5  A. No, I don't.
6  Q. (By Ms. Ochoa) Why not?
7  A. Because we were continuing to request supports
8  for the claim. So it could have been just an
9  off-the-cuff thing. You'd have to ask Mr. Odell why he
10 sent this email.
11     I don't agree with it, and quite clearly,
12 nothing has been paid because we don't have the
13 information that we've -- that we've discussed to
14 support the claim.
15 Q. So if you didn't agree with Mr. Bradley at the
16 time that he sent this email, did you ever respond to
17 him to let him know that you did not agree with this
18 statement?
19 A. I don't -- I didn't think I needed to send
20 anything to him. It could have been the subject of a
21 follow-up call later on. It could have been a
22 discussion that may have been had by the market at a
23 later point in time. I don't -- I don't remember.
24     But, you know, to me, I wasn't concerned
25 with his comment because I knew what I needed as for

54 (Pages 210 to 213)

Page 214

1  Beazley and for underwriters to evaluate the claim
2  pursuant to the communicable disease endorsement. So I
3  wasn't worried about what Mr. Odell had to say.
4     Q.  So you didn't think it was important to correct
5  an alleged incorrect statement regarding whether
6  coverage was triggered?
7     A.  No, not to him because he could be looking at
8  it in a different situation. He could have had
9  discussions internally. There could be a lot of things
10 going on that I'm not aware of that would have made him
11 put something like that together. You'd have to ask Mr.
12 Odell.
13    Q.  Are you aware -- do you know whether Beazley
14 produced this email thread in this case?
15    A.  I don't know. It doesn't concern me, so I
16 don't know.
17    Q.  I'll represent that this was produced by
18 Allianz, and it was not produced by Beazley in this
19 case.
20    A.  Okay. I'm not concerned about it. If that's
21 the case, we can look for it. But I'm not overly
22 concerned with it because it didn't -- as we've
23 discussed throughout the entirety of this deposition,
24 the conditions of the endorsement weren't met. And
25 something said by another carrier doesn't turn around

Page 215

1  and mean that I agree with it or that it's something
2  that we would have acted upon or felt the need to act
3  upon. That's -- that's his commentary. And even if you
4  look at it, he waffles at the end and goes back and
5  forth even questioning himself.
6         So to me, in addition to all of that, it
7  just seems as though he maybe didn't understand the
8  endorsement.
9     Q.  Maybe he didn't understand what the endorsement
10 was saying?
11    A.  Right. The conditions of the endorsement.
12    Q.  Okay. If this wasn't produced by -- do you
13 remember whether you saved this document in the claims
14 file?
15    A.  If it's in the claims file, it's in the claims
16 file. You know, I mean --
17    Q.  So if it's -- go ahead.
18    A.  -- if it's there, it's there. I mean, as I
19 said, you know, I tried to keep things that I felt were
20 material to the claim. And obviously, I don't think
21 this is material to my claim file, so...
22    Q.  And you don't think it was material to your
23 claim file because it was an email from a different
24 insurer regarding whether coverage was triggered?
25    A.  I think he's musing as to whether or not the

Page 216

1  coverage was triggered. So, you know, musings, you
2  know, and my understanding of what the coverage was, you
3  know, two different things.
4     Q.  To your knowledge, did anyone respond to this
5  email in writing other than to schedule a market call
6  which --
7     A.  Yeah, I don't remember offhand.
8     Q.  Okay. You touched upon this a little bit. The
9  second paragraph says: However, there is a question
10 based on language of the endorsement that is not
11 straightforward specifically speaking to business
12 interruption.
13         Had the market had any discussions about
14 the language of the endorsement prior to Mr. Bradley's
15 email that the language was not straightforward?
16    A.  And I don't recall anything specific about
17 that.
18    Q.  Do you recall any discussions about the
19 language of the policy not being straightforward after
20 this email was sent?
21    A.  No. I think the endorsement speaks for itself.
22 I think the policy speaks for itself.
23    Q.  But you acknowledge that one of the insurers,
24 Mr. Bradley --
25    A.  Didn't understand it?

Page 217

1     Q.  -- was saying -- yeah.
2     A.  Yeah, I think he --
3         MS. MURPHY: Objection.
4         THE WITNESS: Sorry.
5         MS. MURPHY: Go ahead.
6     A.  I think he's musing about it, so it does make
7  me wonder if he appreciated the, you know, the
8  conditions -- terms and conditions of the endorsement.
9  You'd have to ask him.
10    Q.  (By Ms. Ochoa) Was coverage counsel hired
11 shortly after this email, if you know?
12    A.  I can't remember exactly when counsel was
13 retained, but it could have been right around then
14 because it looks like people are talking about
15 attorneys.
16    Q.  Do you know when Beazley hired counsel?
17    A.  I don't specifically remember.
18    Q.  Okay. All right. Here we go.
19    A.  Yay.
20    Q.  Last one.
21    A.  Sorry.
22    Q.  Don't act so excited.
23        (Exhibit V marked.)
24    Q.  (By Ms. Ochoa) This appears to be the eighth
25 report by McLarens that you received on or about

55 (Pages 214 to 217)

Exhibit 52 to Plaintiff's Appendix of Evidence
in support of Plaintiff's Motion for Partial Summary Judgment        Page 902 of 1418

Page 222

1  I, ANDREA MATOTT, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5
6  _____
7  ANDREA MATOTT
8
9  THE STATE OF _____)
10 COUNTY OF _____)
11
12    Before me, _____, on this day personally
   appeared ANDREA MATOTT, known to me (or proved to me
13 under oath or through _____) (description of
   identity card or other document)) to be the person whose
14 name is subscribed to the foregoing instrument and
   acknowledged to me that they executed the same for the
15 purposes and consideration therein expressed.
16    Given under my hand and seal of office this _____
   day of _____, _____.
17
18
19 _____
20 NOTARY PUBLIC IN AND FOR
   THE STATE OF _____
21 COMMISSION EXPIRES: _____
22
23
24
25

Page 223

1       IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE DISTRICT OF DELAWARE
2
3  IN RE:         *
                  *
4  RS FIT NW LLC, * Chapter 11
      Debtors.    *
5  _____* Case No.: 20-11558 (KBO)
   24 HOUR FITNESS *
6  WORLDWIDE, INC., * (Jointly Administered)
      Plaintiff,  *
7                 *
   VS.            *
8                 * Adv. Proc. No. 20-51051 (KBO)
   CONTINENTAL CASUALTY *
9  COMPANY, ET AL., *
      Defendants. *
10
11          REPORTER'S CERTIFICATE
12        DEPOSITION OF ANDREA MATOTT
13              OCTOBER 11, 2022
14
15    I, CAROL JENKINS, Certified Shorthand
16 Reporter in and for the State of Texas, hereby certify
17 that this transcript is a true record of the testimony
18 given by the witness named herein, after said witness
19 was duly sworn by me.
20    I further certify that the deposition
21 transcript was submitted on _____,
22 _____ to the witness or to the attorney for the
23 witness for examination, signature, and return to me by
24 _____, _____.
25    I further certify the amount of time used

Page 224

1  by each party at the deposition is as follows:
2      Ms. Nat Ochoa - (04h09m)
3      Mr. Matthew S. Sarna - (00h00m)
4      Ms. Courtney Murphy - (00h00m)
5      Mr. Austin Westergom - (00h00m)
6      Ms. Marlie McDonnell - (00h00m)
7      Mr. Joel L. McNabney - (00h00m)
8      I further certify that I am neither
9  attorney nor counsel for, related to, nor employed by
10 any of the parties to the action in which this testimony
11 was taken. Further, I am not a relative or employee of
12 any attorney of record in this cause, nor do I have a
13 financial interest in the action.
14    SUBSCRIBED AND SWORN TO by the undersigned
15 on this the 17th day of October, 2022.
16
17 _____
     CAROL JENKINS, CSR, RPR, CRR
18   Certificate No. 2660
     Date of Expiration: 8/31/2023
19   Nell McCallum & Associates, Inc.
     Firm Registration No. 10095
20   718 Westcott Street
     Houston, Texas 77007
21   713.861.0203
22
23
24
25

57 (Pages 222 to 224)

Exhibit 52 to Plaintiff's Appendix of Evidence    Page 903 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

```
1           IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE DISTRICT OF DELAWARE
2

3    IN RE:                      *
                                 *
4    RS FIT NW LLC,              *   Chapter 11
           Debtors.              *
5    _____ *   Case No.: 20-11558 (KBO)
     24 HOUR FITNESS             *
6    WORLDWIDE, INC.,            *   (Jointly Administered)
           Plaintiff,            *
7                                *
     VS.                         *
8                                * Adv. Proc. No. 20-51051 (KBO)
     CONTINENTAL CASUALTY        *
9    COMPANY, ET AL.,            *
           Defendants.           *
10

11                    REPORTER'S CERTIFICATE

12                 DEPOSITION OF ANDREA MATOTT

13                      OCTOBER 11, 2022

14

15          I, CAROL JENKINS, Certified Shorthand

16   Reporter in and for the State of Texas, hereby certify

17   that this transcript is a true record of the testimony

18   given by the witness named herein, after said witness

19   was duly sworn by me.

20          I further certify that the deposition

21   transcript was submitted on  Oct. 17, 2022  ,

22   _____ to the witness or to the attorney for the

23   witness for examination, signature, and return to me by

24    Nov. 17,          ,  2022          .

25          I further certify the amount of time used
```

NELL McCALLUM & ASSOCIATES, INC.

```
 1   by each party at the deposition is as follows:
 2              Ms. Nat Ochoa - (04h09m)
 3              Mr. Matthew S. Sarna - (00h00m)
 4              Ms. Courtney Murphy - (00h00m)
 5              Mr. Austin Westergom - (00h00m)
 6              Ms. Marlie McDonnell - (00h00m)
 7              Mr. Joel L. McNabney - (00h00m)
 8              I further certify that I am neither
 9   attorney nor counsel for, related to, nor employed by
10   any of the parties to the action in which this testimony
11   was taken.  Further, I am not a relative or employee of
12   any attorney of record in this cause, nor do I have a
13   financial interest in the action.
14              SUBSCRIBED AND SWORN TO by the undersigned
15   on this the 17th day of October, 2022.
16
17              _____
                CAROL JENKINS, CSR, RPR, CRR
18              Certificate No. 2660
                Date of Expiration: 8/31/2023
19              Nell McCallum & Associates, Inc.
                Firm Registration No. 10095
20              718 Westcott Street
                Houston, Texas 77007
21              713.861.0203
22
23
24
25
```

NELL McCALLUM & ASSOCIATES, INC.

Exhibit 52 to Plaintiff's Appendix of Evidence
in support of Plaintiff's Motion for Partial Summary Judgment
Page 905 of 1418