# EXHIBIT 54

```
            IN THE UNITED STATES BANKRUPTCY COURT

               FOR THE DISTRICT OF DELAWARE

                         ---o0o---

In re:                              )
                                    ) Chapter 11
RS FIT NW LLC,                      )
                                    ) Case No. 20-11558 (KBO)
         Debtors.                   )
                                    ) (Jointly Administered)
_____)

24 HOUR FITNESS WORLDWIDE, INC.,    )
                                    )
         Plaintiff,                 ) Adv. Proc. No.
v.                                  ) 20-51051 (KBO)
                                    )
CONTINENTAL CASUALTY COMPANY;       )
ENDURANCE AMERICAN SPECIALTY        )
INSURANCE COMPANY; STARR SURPLUS    )
LINES INSURANCE COMPANY; ALLIANZ    )
GLOBAL RISKS US INSURANCE           )
COMPANY; et al.,                    )
                                    )
         Defendants.                )
_____)


    REMOTE VIDEOTAPED DEPOSITION OF LOURDES REYES


DATE:             THURSDAY, SEPTEMBER 29, 2022

TIME:             9:03 A.M.

LOCATION:         REMOTE




REPORTED BY:

MARY JACKSON, CSR 8688

JOB NO. 76836
```

**First Legal Depositions - Calendar@firstlegal.com**
**855.348.4997**

**LOURDES REYES**

**September 29, 2022**

### Page 2

```
 1              A P P E A R A N C E S
 2   For 24 Hour Fitness:
 3        NAT OCHOA, ESQUIRE
          ELIZABETH BOWMAN, ESQUIRE
 4        REED SMITH
          101 2nd Street, Suite 1800
 5        San Francisco, California 94105
          415.659.4765
 6        nochoa@reedsmith.com
 7   For Allianz Global Risks US Insurance Company:
 8        MARLIE MCDONNELL, ESQUIRE
 9        CLYDE & CO
          271 17th Street, Suite 1720
10        Atlanta, Georgia 30363
          404.410.3150
11        marlie.mcdonnell@clydeco.com
12
13   For Starr Surplus Lines Insurance Company
     and Beazley-Lloyd's Syndicates 2623/623:
14
          FERDUSI Z. CHOWDHURY, ESQUIRE
15        HINSHAW & CULBERTSON
          800 Third Avenue, 13th Floor
16        New York, New York 10022
          212.471.6200
17        fchowdhury@hinshawlaw.com
18
19   For Liberty Mutual Insurance Company:
20        JOEL L. MCNABNEY, ESQUIRE
          ROBINSON & COLE
21        777 Brickell Avenue, Suite 680
          Miami, Florida 33131
22        786.725.4119
          jmcnabney@rc.com
23
24
25
```

### Page 3

```
 1              A P P E A R A N C E S
 2   For Allied World National Assurance Company:
 3        AUSTIN WESTERGOM, ESQUIRE
          MOUND COTTON WOLLAN & GREENGRASS
 4        Three Greenway Plaza, Suite 1300
          Houston, Texas 77046
 5        281.572.8350
          bwestergom@moundcotton.com
 6
 7   For CNA:
 8        MATTHEW SARNA, ESQUIRE
          DLA PIPER
 9        1201 North Market Street, Suite 2100
          Wilmington, Delaware 19801
10        302.468.5700
          matthew.sarna@dlapiper.com
11
12   ALSO PRESENT:  Alejandro Solorzano, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1                     INDEX
 2   Examination By                              Page
 3   Ms. Ochoa                                     8
 4   Ms. McDonnell                               173
 5              ----oOo----
 6                   EXHIBITS
 7   Letter                                      Page
 8   Exhibit A    Plaintiff's Amended Deposition  13
                  Notice for Lourdes Reyes
 9
     Exhibit B    3/23/20 email from Allianz to   49
10                24 Hour Fitness
11   Exhibit C    McLarens Report No. 1 dated 3/28/20  65
12   Exhibit D    4/2/20 email from Violeta Tuufuli   75
13   Exhibit E    Claims file for the 24 Hour Fitness 80
                  claim
14
     Exhibit F    Allianz Global policy that was in   94
15                place for 24 Hour Fitness
16   Exhibit G    Document titled COVID-19 Changing  114
                  Claims Patterns
17
     Exhibit H    Reservation of Rights letter from  120
18                McLarens to Mr. Gotleib
19   Exhibit I    McLarens Report No. 2 dated 4/24/20  124
20   Exhibit J    McLarens Report No. 3 dated 4/27/20  135
21   Exhibit K    McLarens Report No. 4 dated 5/15/20  138
22   Exhibit L    McLarens Report No. 5 dated 6/4/20   150
23   Exhibit M    McLarens Report No. 6 dated 6/19/20  152
24   Exhibit N    6/2020 email string between Delores  154
                  Varela and Odell Bradley
25
```

### Page 5

```
 1                   EXHIBITS
 2   Letter                                      Page
 3   Exhibit O    6/16/20 email from Stephen Sursene  156
                  to Lourdes Reyes
 4
     Exhibit P    Article sent to Lourdes Reyes by    156
 5                Stephen Sursene that says, 24 Hour
                  Fitness declares bankruptcy citing
 6                devastating coronavirus hit
 7   Exhibit Q    McLarens Report No. 7 dated 6/22/20  161
 8   Exhibit R    Email from Mike Allen to the market  165
                  insurers dated 7/2/20
 9
     Exhibit S    McLarens Report No. 8 dated 9/3/20   170
10
     Exhibit T    4/2/20 email from Lourdes Reyes to    76
11                Mike Allen
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

First Legal Depositions - Calendar@firstlegal.com   855.348.4997   2 to 5

Exhibit 54 to Plaintiff's Appendix of Evidence in support of Plaintiff's Motion for Partial Summary Judgment   Page 927 of 1418

**LOURDES REYES**

September 29, 2022

### Page 6

```
 1       REMOTE, THURSDAY, SEPTEMBER 29, 2022
 2                  9:03 a.m.
 3              P R O C E E D I N G S
 4
 5       THE VIDEOGRAPHER:  Good morning.  We are
 6   on the record.  This is the beginning of Media No. 1
 7   in the deposition of Lourdes Reyes in the matter of
 8   RS FIT NW LLC.  Case No. 20-11558 KBO, held via MS
 9   Teams.
10       This deposition is being taken on
11   September 29th, 2022 at 9:03 a.m.  The time on the
12   monitor -- I'm sorry, the time on the monitor is
13   9:03 a.m.
14       The court reporter today is Mary Jackson.
15   I am Alejandro Solorzano, the videographer on behalf
16   of First Legal Depositions located in Los Angeles,
17   California.
18       This deposition is being videotaped at all
19   times unless specified to go off the video record.
20       Would all present please identify
21   themselves beginning with the noticing attorney?
22       MS. OCHOA:  Hi, my name is Nat Ochoa.  I
23   represent 24 Hour Fitness.  I am here with my
24   colleague Elizabeth Bowman, who is also on.
25       MS. MCDONNELL:  Hello, this is Marlie
```

### Page 7

```
 1   McDonnell.  I represent Allianz Global Risks US
 2   Insurance Company, and I'm from Clyde & Co.
 3       THE WITNESS:  I'm Lourdes Reyes with
 4   Allianz Global Risks US Insurance Company.
 5       MS. CHOWDHURY:  Hello, this Ferdusi
 6   Chowdhury.  I'm from the law firm of Hinshaw and
 7   Culbertson, and we represent Starr and Beazley.
 8       THE VIDEOGRAPHER:  Thank you.  Do we have
 9   anyone else present?
10       MS. BOWMAN:  Hi.  Elizabeth Bowman is
11   here.  My computer just dropped power, but I'm back.
12       MR. MCNABNEY:  This is Joel McNabney from
13   Robinson & Cole.  I represent Liberty Mutual.
14       MR. WESTERGOM:  Austin Westergom from
15   Mound Cotton.  I represent Allied World.
16       MR. SARNA:  Matthew Sarna, DLA Piper,
17   filling in today on behalf of CNA.
18       THE VIDEOGRAPHER:  Thank you, all.  If
19   there is no one else, would the court reporter
20   please swear in the witness, after which, we may
21   begin.
22              LOURDES REYES,
23        having been first duly sworn, was
24        examined and testified as follows:
25
```

### Page 8

```
 1              EXAMINATION
 2   BY MS. OCHOA:
 3       Q.  Okay.  Good morning, Ms. Reyes.  My
 4   name --
 5       A.  Morning.
 6       Q.  My name is Nat Ochoa, and I'm an attorney
 7   representing 24 Hour in this case.
 8           How are you doing?
 9       A.  I'm good.
10       Q.  Good.  Can you please state and spell your
11   name for the record?
12       A.  Lourdes Bernadette Santos Reyes.
13       Q.  And can you spell it for me?
14       A.  L-O-U-R-D-E-S.  The whole name?
15       Q.  Yes, please.
16       A.  Oh.  Bernadette, B-E-R-N-A-D-E-T-T-E;
17   Santos, S-A-N-T-O-S; Reyes, R-E-Y-E-S.
18       Q.  Thank you.  So I'd like to go over a
19   couple of ground rules relating to the fact that
20   this deposition is remote.  First, Ms. Reyes, can
21   you please confirm that you will not use text
22   message, chats, emails or any other form of
23   communication while testifying under oath during
24   this deposition today?
25       A.  Yes.
```

### Page 9

```
 1       Q.  Can you affirm that you will not review
 2   any notes or other documentation while testifying
 3   under oath, except when asked by me to review
 4   exhibits?
 5       A.  Yes.  Just to let you know, I have
 6   notifications that pop up, so I just need to delete
 7   it while we're doing it, so, I mean --
 8       Q.  Okay.
 9       A.  -- I just hit the X or dismiss so that it
10   goes away.
11       Q.  Okay.  Sounds good.  And if at any time
12   anything pops up for a prolonged period, just let me
13   know and we can wait for you to exit it.
14       A.  Okay.
15       Q.  Did you bring any notes with you today?
16       A.  No.
17       Q.  And is anyone in the room with you?
18       A.  No.
19       Q.  If at any point someone joins you in the
20   room, you or your counsel should affirmatively
21   disclose their presence and identify them on the
22   record.  Do you understand that?
23       A.  Yes.
24       Q.  Great.  Have you given testimony before?
25       A.  Yes.
```

**LOURDES REYES**

September 29, 2022

Page 98

1  any other coverage provisions in the policy might
2  apply to the claim?
3      A.  At the time I wrote -- I reviewed the
4  policy?
5      Q.  Right.  At the time you reviewed the
6  policy.
7      A.  If I didn't put it, I didn't -- I didn't
8  probably -- at the time that I reviewed the policy,
9  if I didn't put it in my notes, then I probably
10 didn't see it applicable.
11     Q.  Okay.  Are you familiar with the civil
12 authority provision?
13     A.  Correct.
14     Q.  And you noted the 45 days civil authority
15 limit, you noted that in your notes, so you're
16 familiar with that provision generally, right?
17     A.  Yes.
18     Q.  Do you remember looking at it in
19 connection with the 24 Hour Fitness claim?
20     A.  I don't remember if I did.  I assume I
21 did.
22     Q.  Why do you assume you did?
23     A.  If I put the notes on the civil authority,
24 I assume I read it.
25     Q.  When you referred to the 45 days civil

Page 99

1  authority in your notes, that makes you think that
2  you reviewed it in connection with the claim?
3      A.  Correct.
4      Q.  Did you attempt to evaluate whether there
5  might be coverage under that provision for the
6  claim?
7      A.  No, we don't have details of the lost yet.
8      Q.  So to this day, you've never attempted to
9  evaluate whether there might be coverage under that
10 provision?
11         MS. MCDONNELL:  Object to the form.
12         THE WITNESS:  We don't have the supporting
13 documentation that I requested from the insured and
14 the lawsuit was filed.  We've asked for information,
15 and nothing was provided that we would have to
16 evaluate the applicable coverages under the policy.
17 BY MS. OCHOA:
18     Q.  Okay.  So that's a no, right?
19         MS. MCDONNELL:  Object to the form.
20         THE WITNESS:  What's a no?  To what?
21 BY MS. OCHOA:
22     Q.  That you have not evaluated whether
23 coverage under that provision -- whether there is
24 coverage under that provision?
25         MS. MCDONNELL:  Are you -- I'm just going

Page 100

1  to object to the extent you're asking for an
2  evaluation that would have occurred post litigation
3  with counsel.  I'm assuming you're referring to
4  part -- prelitigation?
5          MS. OCHOA:  Right.
6          THE WITNESS:  So prior to litigation, no.
7  BY MS. OCHOA:
8      Q.  Okay.  And did you ever make
9  determinations about whether there could be coverage
10 under that provision prelitigation?
11     A.  I said no already.
12     Q.  Just clarifying.
13         Did you ever discuss that with anybody?
14     A.  Discuss what?
15     Q.  The applicability of the civil authority
16 provision with anybody?
17         MS. MCDONNELL:  Object to the extent it
18 calls for attorney-client privilege but you can
19 answer.
20         THE WITNESS:  Before the litigation, no.
21 BY MS. OCHOA:
22     Q.  Did you ever review the general business
23 coverage of the policy?
24     A.  I may have.
25     Q.  You don't recall?

Page 101

1      A.  I don't recall.  It's 20 years -- two
2  years ago.
3      Q.  How many COVID claims have you handled
4  again, you said 20 or so?
5      A.  20 to 30.
6      Q.  Okay.  And you don't recall whether or not
7  you've reviewed the business interruption coverage
8  section of the 24 Hour Fitness policy with regard to
9  this claim, right?
10         MS. MCDONNELL:  Object to the form.
11         THE WITNESS:  I would have not reviewed it
12 because the claim -- there is no detail of claim.
13 What would I review on the policy if there's no
14 claim?  I need to get the details of the loss for me
15 to review the applicable coverage.  If there is no
16 claim submitted, there's nothing for me to review.
17 So I'm not going to review it, I'm just going to
18 note that the policies that could -- or the policy
19 language could be applicable to the loss, but I
20 would have not reviewed it until I have the claim
21 information.
22 BY MS. OCHOA:
23     Q.  But you reviewed whether the communicable
24 disease endorsement was applicable?
25         MS. MCDONNELL:  Object to the form.

First Legal Depositions - Calendar@firstlegal.com                98 to 101
855.348.4997

Exhibit 54 to Plaintiff's Appendix of Evidence                   Page 929 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

**LOURDES REYES**

September 29, 2022

Page 102

1    THE WITNESS: I told you I just noted the
2  clauses under the policy that would be applicable.
3  I don't have the details of the loss. What am I
4  going to review it from or how it will apply? I
5  don't have a claim.
6  BY MS. OCHOA:
7    Q.   I'm not trying to attack you right now.
8    A.   I know, it's just like uh -- you asked me,
9  and then you ask me again. I just told you.
10       Okay. Let's move on.
11   Q.   Do we need to take a break here just to
12 sort of diffuse the situation? I'm not trying to be
13 antagonist. I'm just trying to ask you about
14 details of your thought process at the time.
15       MS. MCDONNELL: Yeah, let's take a break.
16 And I don't want to put a pending question out
17 there, but I wasn't sure, Nat, if, when you're
18 saying review, do you mean like read the policy
19 provision or evaluate it?
20       MS. OCHOA: My first line of questioning
21 was about simply reading the policy provision. The
22 second line of questioning was whether prelitigation
23 there was an evaluation of the applicability of the
24 coverage.
25       MS. MCDONNELL: Right. I just meant when

Page 103

1  you said "review," I didn't know if you meant that
2  to read or evaluate, and that's all. I don't know
3  if maybe that would clarify anything, but...
4        MS. OCHOA: Evaluate, yeah.
5        MS. MCDONNELL: Review it means evaluate?
6        MS. OCHOA: Yes, in this line of
7  questioning, review meant evaluate.
8        MS. MCDONNELL: Okay. Let's just take a
9  quick break, and we can come back.
10       MS. OCHOA: Okay. That sounds good.
11       MS. MCDONNELL: Okay, thanks.
12       MS. OCHOA: Five minutes?
13       MS. MCDONNELL: Yeah, that's perfect.
14       MS. OCHOA: Okay.
15       THE VIDEOGRAPHER: Okay. The time is now
16 11:25 a.m., and we are off the record.
17       (Whereupon a recess was taken.)
18       THE VIDEOGRAPHER: Okay. The time is now
19 11:32 a.m., and we are back on the record.
20 BY MS. OCHOA:
21   Q.   Hi again. I -- before we move on to a
22 different topic, I want to just clarify and circle
23 back where we just were and confirm just one thing.
24       You testified that you read the policy
25 from cover to cover and that would have included,

Page 104

1  obviously, the civil authority provision or the
2  business interruption coverage section, but you
3  didn't evaluate whether coverage applied under those
4  provisions, correct, because you're saying that you
5  didn't have enough information to do so?
6    A.   Correct.
7    Q.   What information would you need to have
8  evaluated that that you didn't receive?
9    A.   The details of the loss, of what happened,
10 and how the circumstance of the loss would trigger
11 coverage under the policy.
12   Q.   Had you received, though, details as far
13 as like 24 Hour Fitness has confirmed at these
14 locations that there was a presence of COVID-19,
15 that sort of thing, that's not enough?
16       MS. MCDONNELL: Object to the form.
17       THE WITNESS: No.
18 BY MS. OCHOA:
19   Q.   No, that's not enough?
20   A.   No.
21   Q.   What more would you need specifically?
22       MS. MCDONNELL: Object to the form.
23       THE WITNESS: If you look at the coverage
24 for interruption by communicable disease, there is a
25 requirement for the actual presence of the

Page 105

1  disease -- of the spreadable disease, and the direct
2  result of a declaration of civil authority enforcing
3  or regulating the communicable disease. So we did
4  not have that information.
5    Q.   Let's open Exhibit F if you could, if you
6  already have it open, and I want to direct your
7  attention to the paragraph at the bottom that says,
8  For the purpose of this extension. Do you see that?
9    A.   Yes.
10   Q.   It says, For the purpose of this extension
11 the presence of and spread of communicable disease
12 will be considered direct physical damage. Do you
13 see that?
14   A.   Yes.
15   Q.   Do you agree that if there is presence of
16 COVID-19, there is direct physical damage?
17   A.   If there's --
18       MS. MCDONNELL: Object to form.
19       THE WITNESS: -- actual presence of the
20 disease at the location and there is a direct -- and
21 the declaration of civil authority, then this
22 endorsement would be triggered.
23 BY MS. OCHOA:
24   Q.   Thank you. Around the time that you were
25 first assigned to work on the 24 Hour Fitness claim,

First Legal Depositions - Calendar@firstlegal.com                102 to 105
855.348.4997

Exhibit 54 to Plaintiff's Appendix of Evidence                   Page 930 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

**LOURDES REYES**

September 29, 2022

Page 106

1  were you aware of any measures that were available
2  to test for the presence of COVID-19 inside of a
3  business location?
4      A.    I don't recall.  I don't think so.
5      Q.    You don't think that around the time, in
6  March of 2020, there was capability to test for the
7  presence of COVID-19, right?
8      A.    Yes.
9      Q.    Have you ever been made aware of any
10 measures that were available to test for the
11 presence of COVID in a business location at any
12 time?
13     A.    Test of COVID how?  On a person?
14     Q.    To confirm -- to confirm whether there's
15 COVID-19 on the premises, i.e., on equipment; sure,
16 people on the premises.
17         MS. MCDONNELL:  Object to the form.
18         THE WITNESS:  Testing on people, yes; but
19 on the premises, no.
20 BY MS. OCHOA:
21     Q.    To your knowledge did Allianz do any
22 testing of any insured business locations for the
23 presence of COVID-19?
24     A.    I'm not aware.
25     Q.    Have you ever seen any guidance that

Page 107

1  Allianz published for its policyholder to give
2  advice on how to test for the presence of COVID-19
3  at a -- at a location?
4      A.    I'm not aware.
5      Q.    Would that have not been a subject of the
6  COVID memorandum that you referred to earlier?
7      A.    I don't even recall that memo.  I just
8  said if there is, that was sent, but I don't recall.
9      Q.    Okay.  Have you ever read any literature
10 that discussed the testing of any insured business
11 locations for the presence of COVID?
12     A.    Not that I recall.
13     Q.    As part of the investigation of the 24
14 Hour Fitness claim that McLarens did, to your
15 knowledge, did anyone from McLarens visit any of the
16 24 Hour Fitness cite locations?
17     A.    To my knowledge, I don't recall, no.  I
18 don't know.
19     Q.    On any claims that you've worked on, have
20 you ever had a market adjuster go and visit a
21 location where a loss took place?
22     A.    Can you repeat the question?
23     Q.    Sure.  On any claims that you've worked
24 on, have you ever had a market adjuster go and visit
25 a location where a loss took place?

Page 108

1      A.    On any claim?
2      Q.    Yeah.
3      A.    That's their job, yes.
4      Q.    Do they always go and visit a location?
5      A.    Yes.
6      Q.    So if you're saying they always go visit a
7  location, wouldn't that mean that you would also say
8  that someone like McLarens went and visited the 24
9  Hour Fitness location, is that what you're saying?
10     A.    If there was damage that they are going to
11 show the adjuster, then, yes, they will.
12     Q.    Okay.  But you don't know specifically as
13 it relates to this claim?
14     A.    No.
15     Q.    Is it -- scratch that.
16         In connection with your work on the 24
17 Hour Fitness claim specifically, did you ever
18 determine what 24 Hour Fitness would need to
19 demonstrate to show that it had the actual presence
20 of COVID-19 at its locations?
21         MS. MCDONNELL:  Object to the form.
22         THE WITNESS:  We asked specific
23 information for locations that the insured had
24 advised that they presumed and so we requested
25 further information to clarify that there was actual

Page 109

1  presence of COVID of the site and what orders of
2  civil authority where applicable to the location.
3  BY MS. OCHOA:
4      Q.    Actual presence as in -- where are you
5  getting the language "actual presence" from?
6      A.    On the communicable disease language
7  endorsement.
8      Q.    Let's pull that up if you still have it.
9          Are you referring to the paragraph that
10 reads, All coverage must be directly resulting from
11 access being prohibited or described at any location
12 or portion thereof, quote, due to the actual
13 presence of and spread of communicable diseases --
14     A.    Yes.
15     Q.    -- is that what you're referring to?
16         What do you mean by -- what's your
17 understanding of "actual presence"?
18         MS. MCDONNELL:  Object to form.
19         THE WITNESS:  That they determined that
20 COVID was actually at the site, and they are unable
21 to go to the location and that civil authority was
22 enforcing that ordinance prohibiting access to the
23 location because of the COVID.
24 BY MS. OCHOA:
25     Q.    Do you agree that if someone infected with

First Legal Depositions - Calendar@firstlegal.com
855.348.4997

106 to 109

Exhibit 54 to Plaintiff's Appendix of Evidence
in support of Plaintiff's Motion for Partial Summary Judgment

Page 931 of 1418

**LOURDES REYES**

September 29, 2022

Page 110

```
 1  COVID entered a 24 Hour Fitness location that
 2  COVID-19 would have been present at that location?
 3       MS. MCDONNELL:  Object to the form.
 4       THE WITNESS:  We would have to verify when
 5  that person had the COVID, when they entered the
 6  premises, how long they were at the premises.  I
 7  mean, details that would help us understand how the
 8  COVID would be present at the location.
 9  BY MS. OCHOA:
10    Q.  Why would -- well, let me ask it this way.
11       If someone has COVID-19, and it's
12  determined that they had COVID-19, and they walked
13  into a 24 Hour Fitness gym and they worked out,
14  would you agree that that would mean that COVID-19
15  was present at that location?
16       MS. MCDONNELL:  Object to the form.
17       THE WITNESS:  They knew already that they
18  had COVID, and they still went to the gym?
19  BY MS. OCHOA:
20    Q.  It doesn't matter whether or not they knew
21  if anyone had COVID.  I'm saying if they had COVID.
22  Just a fact.  If someone had COVID, and they went to
23  the gym and they worked out in the gym, would you
24  agree that that means that COVID was present at the
25  location?
```

Page 111

```
 1       MS. MCDONNELL:  Object to the form.
 2       THE WITNESS:  Like I said, I need to
 3  confirm whether that person knew that he had already
 4  COVID and still went to the gym.  If he had
 5  claimed he had COVID, when did he have the COVID?
 6  Did he have it after he went to the gym or before he
 7  went to the gym, how long he has had the COVID.
 8  BY MS. OCHOA:
 9    Q.  Let's say that he knew that he had COVID
10  and he walked into the gym with COVID?
11       MS. MCDONNELL:  Object to the form.  Are
12  you -- are you asking her to answer a hypothetical?
13       MS. OCHOA:  This is a very -- it's a very
14  straightforward question.
15  BY MS. OCHOA:
16    Q.  If someone had COVID-19, they knew that
17  they had COVID, they walked into the gym, and they
18  worked out, would you agree that COVID was present
19  at that location?
20    A.  It's possible.
21    Q.  What do you mean "it's possible"?
22       MS. MCDONNELL:  Object to the form.
23       THE WITNESS:  Well, COVID is transmitted
24  through -- through the air, so I don't know how --
25  like I said, it's possible that if he had COVID and
```

Page 112

```
 1  used the equipment, then maybe he had brought the
 2  COVID to the location.
 3    Q.  In what circumstance would he have not
 4  brought the COVID to the location if he had COVID
 5  and walked in?
 6       MS. MCDONNELL:  Object to the form.
 7       THE WITNESS:  I don't know how -- I mean,
 8  COVID people -- was he wearing a mask?  I mean, I
 9  don't know.  I...
10  BY MS. OCHOA:
11    Q.  Okay.  Did you ever have any discussions
12  with Mr. Allen about what information 24 Hour
13  Fitness could provide that would demonstrate the
14  presence of COVID-19 at the location?
15       MS. MCDONNELL:  Object to the form.
16       THE WITNESS:  Personally discussing it
17  with Mike, I don't remember.  But I'm assuming we
18  all did require what needed to satisfy the
19  conditions under the policy.
20  BY MS. OCHOA:
21    Q.  So presumably there would have been a call
22  with all the market insurers and Mr. Allen that
23  discussed what 24 Hour Fitness could provide that
24  would demonstrate the presence of COVID-19?
25    A.  Possibly.  I don't remember.
```

Page 113

```
 1    Q.  And you don't remember what specifically
 2  what was decided on or discussed?
 3    A.  No.
 4    Q.  What about with anyone internally at
 5  Allianz did you ever talk to anyone about that?
 6    A.  No.
 7    Q.  Do you recall receiving information from
 8  24 Hour Fitness about individuals that tested
 9  positive for COVID-19 that were on 24 Hour Fitness's
10  premises?
11    A.  I vaguely recall getting a list of
12  locations, and I presumed -- or people going, with
13  COVID, going to the locations, but I believe there's
14  not -- we requested additional information, but we
15  never got it and the lawsuit was filed.
16    Q.  Okay.  Do you know what 24 Hour Fitness
17  locations were implicated?
18    A.  I don't recall.
19    Q.  Do you remember being provided information
20  that allowed you to verify that an employee had
21  tested positive for COVID?
22       MS. MCDONNELL:  Object to the form.
23       THE WITNESS:  Can you repeat the question,
24  please?
25
```

First Legal Depositions - Calendar@firstlegal.com          110 to 113
855.348.4997

Exhibit 54 to Plaintiff's Appendix of Evidence          Page 932 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

**LOURDES REYES**

September 29, 2022

Page 118

```
 1         MS. MCDONNELL:  Object to the form.
 2         THE WITNESS:  Is that what it said?
 3   BY MS. OCHOA:
 4      Q.   Yeah, I'll read it one more time.  It
 5   says, A number of outbreaks of coronavirus have been
 6   linked to high risks -- high-risk environments such
 7   as gyms.
 8      A.   Okay.  So what's your question again?
 9      Q.   Would you agree with Allianz that a gym is
10   a high-risk environment?
11      A.   Yes.
12      Q.   And why would you agree with that?  Why
13   would you agree that a gym is a high-risk
14   environment?
15      A.   Because the people are the carriers, and
16   people go in and out of the gym.
17      Q.   And do you think the -- as opposed to
18   other locations, a gym is a high-risk environment
19   because more people go in and out of that location?
20         MS. MCDONNELL:  Object to the form.
21         THE WITNESS:  Yes.
22   BY MS. OCHOA:
23      Q.   If a gym a high-risk environment because
24   more people go in and out of that location as
25   opposed to other environments and someone that
```

Page 119

```
 1   entered the gym tested positive, do you believe that
 2   it would be likely that COVID would spread in that
 3   gym?
 4         MS. MCDONNELL:  Object to the form.
 5         THE WITNESS:  It will depend if the person
 6   that tested positive was wearing a mask or the
 7   other -- I mean, it depends on the circumstance, but
 8   it could.
 9   BY MS. OCHOA:
10      Q.   Do you believe that if more people are
11   present in the gym such that it's a high-risk
12   environment that the chance of COVID-19 would likely
13   increase since more people would be in the space?
14         MS. MCDONNELL:  Object to the form.
15         THE WITNESS:  Yes.  If there's more
16   people, more chance of spreading it.
17   BY MS. OCHOA:
18      Q.   Okay.  We're going briefly go back to
19   Exhibit D just for the purpose of reminding you what
20   it is.  So if you can open that back up.
21      A.   Okay.
22      Q.   Once again, this is the email from Mike
23   Allen that says, Attached is the revised draft ROR
24   with revisions made by Starr and Sompo.
25         Now, I would like you to open Exhibit H.
```

Page 120

```
 1         (Whereupon Exhibit H was marked for
 2   identification.)
 3         THE WITNESS:  Okay.
 4   BY MS. OCHOA:
 5      Q.   And if you could briefly skim this, you
 6   will see that it is a Reservation of Rights letter
 7   from McLarens to Mr. Gotleib, and throughout the
 8   document there are revisions in red and blue, right?
 9      A.   Yes.
10      Q.   And the email let's us know that those
11   were made by Starr and Sompo, correct?
12      A.   Yes.
13      Q.   Can you please go down to PDF, Page 4,
14   Bates No. AGRUS000405.
15      A.   Okay.
16      Q.   And it says, In addition, Endurance
17   American Specialty Insurance company policy number,
18   and then it lists the policy number, contains the
19   following general change endorsement as Endorsement
20   4., and then it lists -- it seems like it has a copy
21   and paste of the endorsement there in the letter.
22   Do you see that?
23      A.   Yes.
24      Q.   Do you recall that the endurance policy
25   had an exclusion for communicable disease?
```

Page 121

```
 1      A.   I don't recall, but I've seen this as
 2   showing they did have it.
 3      Q.   Okay.  Do you recall any other insurers
 4   that had this exclusion?
 5      A.   No, not aware.
 6      Q.   Now, if you could go to the bottom of that
 7   same page, there are -- and it's in red, and it
 8   says, as we continue our investigation, we request
 9   that you provide us with the following information,
10   colon, and then it has five different things listed
11   out there.
12         Do you recall having any comment on those
13   particular questions?
14      A.   What do you mean, that it came from me?
15      Q.   Right.
16      A.   No.
17      Q.   Did you have any hand whatsoever in
18   drafting the questions at all?
19      A.   I don't recall, no.
20      Q.   Do you recall any discussions with the
21   market about these questions?
22      A.   I don't recall.
23      Q.   To your knowledge, who drafted these
24   questions?
25      A.   I'm assuming based -- if it was red that
```

First Legal Depositions - Calendar@firstlegal.com   118 to 121
855.348.4997

Exhibit 54 to Plaintiff's Appendix of Evidence   Page 933 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

**LOURDES REYES**

September 29, 2022

Page 142

1  A.  I'm going to be speculating.  I don't know
2  what the main reason why he specifically asked that.
3  Q.  I'm going to read the first paragraph of
4  the response.  If the question seeks to ascertain
5  whether access to or from our clubs was physically
6  blocked by some object, then we are not aware of
7  that at this time.
8      However, as a result of the presence of
9  individuals with -- with or presumed to have
10 COVID-19 at our locations, including our members and
11 employees, the social distancing guidelines enacted
12 by government agencies indicating it would be unsafe
13 to operate given the prevalence of individuals in
14 the community with the COVID-19 disease, including
15 our members and employees, and the various
16 stay-at-home and similar orders requiring closure of
17 our business, access to our clubs has been
18 prohibited.  Do you see that?
19 A.  Yes.
20 Q.  Did you discuss this response with anyone?
21 A.  No.
22 Q.  The second paragraph reads, It should be
23 noted that governmental orders confirmed the fact
24 that the virus causes contamination of property.
25 For instance, the City of New York's order dated

Page 143

1  March 16, 2020 states that the virus physically is
2  causing property loss and damage.  Orders issued in
3  various other locations contain similar language
4  including Los Angeles and San Francisco.
5      Did you ever review the orders referenced
6  in this paragraph?
7  A.  I don't recall.
8  Q.  Were you aware that there were certain
9  orders that specifically said the virus was causing
10 property loss and damage?
11 A.  I don't remember.  I don't recall.
12 Q.  Would it have been your practice to have
13 reviewed government orders if an insured is
14 referencing them?
15 A.  Yes.
16 Q.  So is it likely that you reviewed those
17 orders or no?
18 A.  If they provided the order.
19 Q.  The insured would have to have attached
20 the order, is that what you're saying?
21 A.  Yes.
22 Q.  So the only time you would review the
23 order is if the insured attached it?
24 A.  If the insured provided it.
25 Q.  Which means attached --

Page 144

1  A.  Yes.
2  Q.  -- in your definition?
3  A.  Yes.
4  Q.  After receiving this information, this
5  additional information, with the positive test
6  outlined as well as information to Question 2, at
7  that time, you still were saying there was not
8  enough information to evaluate the claim?
9      MS. MCDONNELL:  Object to the form.
10     THE WITNESS:  The items that they were
11 saying that -- where -- those 20-something items
12 that they said, they were not specific.  Let's just
13 go to the first one that said that on March 8th was
14 in -- an individual was in Whippany who tested
15 positive for COVID-19.  We needed further
16 information.
17     When did that individual test positive and
18 when was he at the site and which site -- okay, in
19 Whippany.  When was he or she tested positive.  He
20 was on -- at the facility on March 8th and tested
21 positive on March 11.  So when did he test positive?
22 Was it March 10th; March 9th?  We don't know.  So
23 additional information were requested from the
24 insured, but we never got it.
25 Q.  So the additional information you're

Page 145

1  saying you needed was the date when they tested
2  positive?
3  A.  Well, further information.  Not just for
4  the specific -- further information that will
5  confirm that the COVID person -- that COVID was at
6  the site at the time, by whom and when.  And, like I
7  said, when they tested positive, was it before or
8  when they were at the site?  There were questions
9  that were asked but never responded to.
10 Q.  I'm talking about this question
11 specifically.  I want to know what more you need
12 from this question specifically, this answer, in
13 order to evaluate the claim.  I believe you just
14 said what you needed specifically was when the
15 person tested positive?
16 A.  When he --
17 Q.  Is there anything else you needed from
18 this question and answer to evaluate the claim?
19     MS. MCDONNELL:  Object to the form,
20 mischaracterizes the testimony.
21     THE WITNESS:  What was the government
22 issue -- order, because under the communicable
23 disease, it required that the actual presence of
24 COVID and the government order that prohibited
25 access to the facility.

First Legal Depositions - Calendar@firstlegal.com          142 to 145
855.348.4997

Exhibit 54 to Plaintiff's Appendix of Evidence          Page 934 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

**LOURDES REYES**

September 29, 2022

Page 158

1  investigation reports; title, Report No. 6.  And
2  under notes, it says, No response received from
3  insured, only communicable disease coverage.
4  Insured filed for bankruptcy Chapter 11.  Insured
5  expects to receive 250 million in financing to
6  assist in restructuring operations.  Insured will
7  continue operations while restructuring.  Do you see
8  that?
9      A.  Yes.
10     Q.  Why do you think it was important to note
11 in the claim file that 24 Hour Fitness expected to
12 receive financing to assist in restructuring its
13 operations?
14     A.  If the insured is receiving financing, and
15 the insured is claiming BI, or financial loss, we
16 need to know what's going on with the bankruptcy and
17 their claim.
18     Q.  For what reason?  Can you expand on that a
19 little bit?
20     A.  If they're going to be receiving a
21 claim -- payment on the bankruptcy, is there going
22 to be a loss?  I don't know.  We didn't do any
23 investigation or complete the investigation because
24 we didn't have enough information, but we need to
25 know if the insured received money and how much

Page 159

1  money did the insured lose.
2      Q.  How would the insured receiving money from
3  a bankruptcy affect a coverage determination in a
4  pay-out by the insurers?
5      MS. MCDONNELL:  Object to the form.
6      THE WITNESS:  The insured, on the news,
7  said that the bankruptcy was due to the COVID -- or
8  the coronavirus.  So if they're getting money, and
9  they're claiming from insurers, we need to know
10 what's going on.  We -- like I said, we didn't do
11 evaluation of their BI because they haven't
12 submitted documentation.
13     Q.  I'm focusing just on the bankruptcy.  Why
14 would receiving money via the bankruptcy affect the
15 coverage determination?
16     MS. MCDONNELL:  Object to the form.
17     THE WITNESS:  The insured said they're
18 filing bankruptcy due to Corona.
19 BY MS. OCHOA:
20     Q.  Can you explain how that would affect --
21 why that would affect your evaluation of coverage in
22 your coverage determination?
23     A.  Like I said, if they received money and
24 they're filing for a claim, we need to know that
25 there's no overlap on their loss of income and the

Page 160

1  money that they're getting from the bankruptcy.
2      Q.  So if the insured is receiving money -- if
3  they suffered -- if they had to become bankrupt
4  because of COVID-19 and they had recovered a certain
5  amount of money, are you saying that would affect
6  the coverage determination because the payout from
7  the insurer should be essentially reduced from that
8  or there shouldn't be overlap from that?
9      MS. MCDONNELL:  Object to the form.
10     THE WITNESS:  That's speculation.  I don't
11 know what their claim is.  I'm just looking at a
12 bigger picture.
13         If they receive money, they're filing a
14 loss for income, I need to know what they're
15 claiming for, making sure there's no overlap.
16 BY MS. OCHOA:
17     Q.  Overlap of what?
18     A.  Of the loss they're claiming.  If they're
19 claiming a bankruptcy and receiving money for the
20 bankruptcy, and they're filing a loss of income, is
21 there an overlap?  I don't know.  I don't know what
22 their claim is.
23     MS. OCHOA:  Okay.  We've been going for an
24 hour.  Do you want to stop here for a minute before
25 I go on to my next line of questioning?

Page 161

1      MS. MCDONNELL:  Yeah.  How much longer do
2  you have left?
3      MS. OCHOA:  Not -- not too much longer,
4  maybe another 45.
5      MS. MCDONNELL:  Okay.  Yeah, let's take a
6  five minute.
7      MS. OCHOA:  Okay.  Sounds good.
8      MS. MCDONNELL:  Bye.
9      THE VIDEOGRAPHER:  Okay.  The time is now
10 1:24 p.m., and we are now off the record.
11     (Whereupon a recess was taken.)
12     THE VIDEOGRAPHER:  The time is now 1:32
13 p.m., and we are back on the record.
14 BY MS. OCHOA:
15     Q.  Okay.  If you could open up and we can
16 mark Exhibit Q.
17     (Whereupon Exhibit Q was marked for
18 identification.)
19 BY MS. OCHOA:
20     Q.  And let mow know when you have that pulled
21 up.
22     A.  Okay.
23     Q.  This is the seventh McLarens report dated
24 June 22nd, 2020.  You would have received this on
25 or -- on or about that time, correct?

First Legal Depositions - Calendar@firstlegal.com          158 to 161
855.348.4997

Exhibit 54 to Plaintiff's Appendix of Evidence          Page 935 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

**LOURDES REYES**

September 29, 2022

Page 178

```
 1   STATE OF CALIFORNIA        )
 2   COUNTY OF SAN JOAQUIN      )
 3        I, MARY JACKSON, hereby certify that the
 4   witness in the foregoing deposition was by me duly
 5   sworn to testify to the truth, the whole truth, and
 6   nothing but the truth in the within-entitled cause;
 7   that said deposition was taken at the time and place
 8   therein stated; that to the best of my ability, the
 9   foregoing transcript constitutes a full, true, and
10   correct report of the proceedings heard via Zoom by
11   me, a Certified Shorthand Reporter and disinterested
12   person, and was thereafter transcribed into
13   typewriting, and that the pertinent provisions of
14   the applicable code or rules of civil procedure
15   relating to the notification of the witness and
16   counsel for the parties hereto of the availability
17   of the original transcript of the deposition for
18   reading, correcting and signing have been met.
19        And I further certify that I am not of
20   counsel or attorney for either or any of the parties
21   to said deposition, nor in any way interested in the
22   outcome of the cause named in said action.
23        DATED: October 29, 2022
24                  [signature: Mary Jackson]
25             MARY JACKSON, CSR NO. 8688
```

Page 179

```
 1   Errata Sheet
 2
 3   NAME OF CASE: 24 HOUR FITNESS vs CONTINENTAL CASUALTY CO.
 4   DATE OF DEPOSITION: SEPTEMBER 29, 2022
 5   NAME OF WITNESS:  LOURDES REYES
 6   Reason Codes:
 7       1. To clarify the record.
 8       2. To conform to the facts.
 9       3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24                     _____
25                         LOURDES REYES
```

**First Legal Depositions - Calendar@firstlegal.com**
**855.348.4997**    178 to 179

Exhibit 54 to Plaintiff's Appendix of Evidence    Page 936 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment