# EXHIBIT 59

TONY UEBER
July 27, 2022

```
          UNITED STATES BANKRUPTCY COURT

              DISTRICT OF DELAWARE

In re:

RS FIT NW LLC,                   :Chapter 11
                                 :Case No. 20-11568(KBO)
          Debtor.                :(Jointly Administered)
_____:
24 HOUR FITNESS WORLDWIDE,       :
INC.,                            :
                                 :
          Plaintiff,             :
                                 :
     -vs.-                       :
                                 :
CONTINENTAL CASUALTY COMPANY;    :
ENDURANCE AMERICAN SPECIALTY     :
INSURANCE COMPANY; STARR         :
SURPLUS LINES INSURANCE COMPANY; :
ALLIANZ GLOBAL RISKS US INSURANCE:
COMPANY; LIBERTY MUTUAL INSURANCE:
COMPANY; BEAZLEY-LLOYD'S         :
SYNDICATES 2623/623;             :
ALLIED WORLD NATIONAL ASSURANCE  :
COMPANY; QBE SPECIALTY INSURANCE :
COMPANY; and GENERAL SECURITY    :
INDEMNITY COMPANY OF ARIZONA,    :
                                 :
          Defendants.            :
```

JULY 27, 2022


ZOOM VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF TONY UEBER, held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, July 27, 2022, at 12:02 p.m. before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.

U.S. Legal Support | www.uslegalsupport.com

TONY UEBER
July 27, 2022

Page 6

1      - - -
2           (It is hereby stipulated and agreed
3      by and between counsel for the respective
4      parties that sealing, certification, and
5      filing are waived; and that all
6      objections, except as to the form of the
7      question, are reserved until the time of
8      trial.)
9           THE VIDEOGRAPHER:  Good afternoon.
10     We are now on the record.
11          Participants should be aware that
12     this proceeding is being recorded, and, as
13     such, all conversations held will be
14     recorded unless there is a request and
15     agreement to go off the record.
16          This is the remote video-recorded
17     deposition of Tony Ueber.  Today is
18     Wednesday, July 27, 2022, and the time is
19     approximately 12:02 p.m. Eastern.  We are
20     here in the matter of 24 Hour Fitness
21     Worldwide, Inc., versus Continental
22     Casualty Company.
23          My name is James Soto, Junior, remote
24     video technician on behalf of U.S. Legal
25     Support.  I am not related to any party in

Page 7

1      this action, nor am I financially
2      interested in the outcome.
3           At this time, will the reporter
4      Michelle Keys, on behalf of U.S. Legal
5      Support please enter the statement for
6      remote proceedings into the record.
7           THE STENOGRAPHER:  The attorneys
8      participating in this deposition
9      acknowledge that I am not physically
10     present in the deposition room and that I
11     will be reporting this deposition
12     remotely.  They further acknowledge that,
13     in lieu of an oath administered in person,
14     the witness will verbally declare his/her
15     testimony in this matter is under penalty
16     of perjury.  The parties and their counsel
17     consent to this arrangement and waive any
18     objections to this manner of reporting.
19          Attorneys, please indicate your name,
20     as well as who you represent, and your
21     agreement on the record.
22          MR. DENN:  Matt Denn for CNA, agreed.
23          MR. WEISS:  David Weiss for
24     24 Hour Fitness, and on behalf of
25     Mr. Ueber, agreed.

Page 8

1           MR. ANDERSON:  Dennis Anderson for
2      QBE Specialty Insurance Company and
3      General Security Indemnity Company of
4      Arizona, and on their behalf, we agree.
5           THE STENOGRAPHER:  I'm still waiting
6      on three people.
7           MR. MCNABNEY:  Joel McNabney on
8      behalf of Liberty Mutual, agrees.
9           MS. MCDONNELL:  Marlie McDonnell from
10     Clyde & Co for Defendant Allianz, and we
11     agree.
12          MR. WHANG:  Calvin Whang for
13     Defendant Allied World National Assurance
14     Company, and we agree.
15          - - -
16          TONY UEBER,
17     after having been first duly sworn,
18     was examined and testified as follows:
19          - - -
20          THE STENOGRAPHER:  Thank you.
21          You may proceed.
22 ///
23 ///
24 ///
25 ///

Page 9

1      - - -
2      E X A M I N A T I O N
3      - - -
4  BY MR. DENN:
5  Q.   Good morning, Mr. Ueber.  You said it's
6  11:00 o'clock where you are?
7  A.   It is, yes.
8  Q.   And, good morning.  My name is Matt Denn.  I
9  represent Continental Casualty.  I'm going to be
10 taking your deposition today.
11          Have you -- have you had your
12 deposition taken before?
13 A.   I have, yes.
14 Q.   Okay.  You -- you probably know the process.
15 I'll just run through, quickly, some of the
16 formalities.
17          You've just been sworn in by a court
18 reporter.  So you're -- you're testifying under oath
19 today, just as you would be if you were testifying
20 in court.  I'm going to have a series of questions
21 for you.  If at any point one of my questions is
22 unclear or you don't understand it, then please just
23 ask me to clarify my question and I'd be happy to do
24 that.
25          If you answer a question, we'll

U.S. Legal Support | www.uslegalsupport.com    6 to 9

Exhibit 59 to Plaintiff's Appendix of Evidence                     Page 977 of 1418
in support of Plaintiff's Motion for Partial Summary Judgment

TONY UEBER
July 27, 2022

Page 38

1    THE WITNESS: I would say generally
2    speaking, yes.
3 BY MR. DENN:
4 Q.   Is -- is the draft letter correct that in the
5 weeks leading up to March 15th, the company had seen
6 a significant decline in club member traffic and
7 sign-ups?
8 A.   That's what it says in the letter, so I would
9 assume that that was true.
10 Q.   Well, I certainly don't want you to assume.
11 I'm just asking you based on your recollection if --
12 if that was a -- was a correct statement at the
13 time?
14 A.   Yes.
15         MR. WEISS: Objection to form.
16         THE WITNESS: Yes.
17         MR. WEISS: You can go ahead and
18    answer.
19         THE WITNESS: Yes.
20 BY MR. DENN:
21 Q.   Is the letter also correct that this decline
22 had put an even greater financial strain on an
23 already challenging financial position?
24         MR. WEISS: Objection to form.
25         THE WITNESS: Yes.

Page 39

1 BY MR. DENN:
2 Q.   Could you -- could you describe what that
3 already challenging financial position was?
4 A.   I think at the time, it was the decline in
5 guest traffic through the beginning of the year,
6 primarily as a result of people's concern around
7 COVID.
8 Q.   And to that point, is it correct that the
9 pandemic in the first two weeks of March of 2020 was
10 having a dramatic impact on the company's business?
11         MR. WEISS: Objection to form.
12         THE WITNESS: Yes.
13 BY MR. DENN:
14 Q.   In this draft message from March 15th, there
15 are a list of six bullet points representing various
16 changes that will happen in the company.
17         Does this represent what your plan
18 was on March 15th with respect to potential changes
19 at the company?
20 A.   Yeah. Again, I don't know if this is the
21 final version of the document or final, you know,
22 version of the steps that we were planning to take.
23 It was a very, very fluid situation throughout that.
24 I think -- I don't know if March 15th was -- must
25 have been a Sunday, right?

Page 40

1         So, at that point, we were doing --
2 trying to do everything we could to be able to
3 operate the clubs in a safe manner and be able to,
4 you know, manage the business to meet the demand.
5 Q.   Could you explain what you meant by the --
6 the last thing that you just said, "manage the
7 business to meet the demand"?
8 A.   Well, sure. When the demand goes down, you
9 need to take actions to reduce expenses and reduce
10 staffing, which is normal course of business.
11 Q.   So looking at this list of bullet points,
12 the -- the first one "Overall reduction of labor
13 hours by 30 percent," is that an effort to do what
14 you just described, to adjust staffing to meet
15 traffic?
16 A.   Correct.
17 Q.   And then the second -- the "Temporary closure
18 of Kid's Clubs," was that the purpose of that or was
19 there a different purpose to that?
20 A.   That probably was two purposes. One, to
21 reduce expenses; and, two, again, to, you know,
22 ensure the health and safety of our members, team
23 members, and their children.
24 Q.   And then number 3, the -- the "elimination of
25 the overnight hours." Was -- was that for staffing

Page 41

1 reasons?
2 A.   That would have been twofold as well. One,
3 to reduce expenses; and then also to give us
4 opportunities to be able to clean the clubs if we
5 needed to.
6 Q.   There is a reference to "Significant
7 modification of GX 24 schedules."
8         What is GX 24?
9 A.   Again, those are group fitness classes. So
10 that would have had a twofold as well. One, to
11 reduce expenses; and, two -- I don't remember the
12 exact specific things that were happening in the
13 public health environment at that point, but one of
14 them was creating support for social distancing.
15         Our group exercise rooms tend to be
16 small. You know, you've got a lot of people in
17 there for various types of classes, whether it's
18 Zumba or yoga class or kickboxing class or whatever
19 it might be, so it's more difficult to be able to
20 ensure people have the space that they would have
21 needed in order to social distance. So it was
22 certainly safer to close those spaces and not take
23 risks.
24 Q.   And the elimination of the low-attendance
25 classes, was that -- that was to adjust staffing to

TONY UEBER
July 27, 2022

**Page 66**

1  A.    Yes.
2  Q.    And the purpose of the -- the letter is to
3  let people know what changes the company is going to
4  be making and to explain the reason for those
5  changes?
6         MR. WEISS:  Objection to form.
7         THE WITNESS:  Yes.
8  BY MR. DENN:
9  Q.    So this draft is dated March 15, 2020.
10        Does -- does this draft indicate to
11 the best of your recollection what the plan was on
12 March 15, 2020, and what the public explanation for
13 that plan would be on March 15, 2020?
14        MR. WEISS:  Objection to form.
15        THE WITNESS:  Yes.  As of 7:44 p.m.
16    and as of draft 4 of God knows how many
17    drafts.
18 BY MR. DENN:
19 Q.    And the plan as far as what was going to be
20 communicated to -- to members and -- and the rest of
21 the outside community is these three bullet points
22 that are listed under "Changes to Operating Our
23 Business"?
24        MR. WEISS:  Objection to form.
25        THE WITNESS:  Can you rephrase,

**Page 67**

1    please?
2  BY MR. DENN:
3  Q.    Sure.
4         There is a section of this draft
5  message that is entitled "Changes to Operating Our
6  Business."
7         Do you see that?
8  A.    Yes.
9  Q.    And there are three bullet points and then a
10 fourth one which says "Additional decisions here?
11 Any other moves we are making?"
12        Do you see that?
13 A.    Yes.
14 Q.    So -- so do the three bullet points represent
15 the changes to operating the business that
16 24 Hour Fitness was planning as of March 15, 2020?
17        MR. WEISS:  Objection to form.
18        THE WITNESS:  Yes.  As of March 15th,
19    we were trying to do two things:  One, you
20    know, act on the best available
21    information at the time in order to
22    provide a safe environment for our team
23    members and our members, which is what the
24    touch-free club check-in with 24 Hour GO,
25    promoting the programs and workouts that

**Page 68**

1    we had on the 24GO app, our meal delivery,
2    pointing out other benefits that we could
3    provide to people to keep them engaged
4    with us if they weren't comfortable coming
5    to the club because a lot of members
6    clearly weren't comfortable coming to the
7    club, which was indicative of the decline
8    in member check-ins, and also the decline
9    in guest traffic.
10        And it was also letting them know
11    about the specific operational changes
12    that were being made.  Again, temporary
13    closing all the Kid's Clubs because those
14    are smaller spaces where, you know, we
15    weren't -- we didn't know whether or not
16    they were safe for the kids to be in.
17    Closing overnight in order for -- to allow
18    us to be able to ensure that the clubs
19    were -- we had time to clean the clubs.
20    And then getting -- you know, removing the
21    GX classes, which again were in smaller
22    spaces.  Either canceling the classes or
23    moving them into the larger spaces in the
24    basketball courts.
25        So, yes, that was -- at the time,

**Page 69**

1    that was our best thinking on what it
2    would take to be able to both meet
3    members' needs, keep our members engaged,
4    and keep the clubs open in the context of
5    the broader public health disaster that
6    was unfolding in front of us.
7  BY MR. DENN:
8  Q.    And to the point that you just made, there's
9  a -- a sentence immediately after these bullet
10 points that says "These decisions also follow CDC,
11 local, and state health agency social distancing
12 recommendations and will help us keep the club
13 environment healthy and safe for everyone."
14        Do you see that?
15 A.    Yes.
16 Q.    So were -- were these -- were these steps the
17 company's best efforts to ensure member and staff
18 health and safety as of March 15, 2020, based on the
19 information that you had?
20 A.    Yes.
21 Q.    And -- and going back to the -- the paragraph
22 that precedes those bullet points it says "This
23 unprecedented situation is having a dramatic impact
24 on our business and our people, and it is imperative
25 that we take immediate action to ensure we can

TONY UEBER
July 27, 2022

### Page 70

1  continue providing services to you, our club
2  members, and maintain our business for our team
3  members over the long term."
4       "Team members" is -- is staff people?
5  A.   Yes.
6  Q.   So -- so when you say "maintain our business
7  for our team members over the long term," what --
8  what is that a reference to?
9  A.   I'm not sure that that would have been
10 anything that would have made it -- just rereading
11 that, I would be surprised if that was in the final
12 version because it doesn't feel very elegant.  But I
13 think it's just making sure that we can keep the
14 clubs open for our team members and our members in a
15 safe and effective manner given the -- given the
16 circumstances.
17 Q.   There has been some reference during this
18 case to 24 Hour Fitness assuming that COVID-19 was
19 present in all of its clubs.
20      Did you assume that COVID-19 was
21 present in all of 24 Hour Fitness' clubs?
22           MR. WEISS:  Objection to form.
23           THE WITNESS:  I think, at that point,
24      given, you know, how things were
25      unfolding, you know, at the date of this

### Page 71

1       letter on March 15th, we felt like these
2       actions were the appropriate actions to
3       take, given the information that we had in
4       order to ensure the safety of our members
5       and team members from COVID, which was --
6       you know, we were getting more and more
7       information hourly at this point on the
8       spread and how many people were infected
9       and where people were that were infected
10      across all the different geographies that
11      we did business within.
12           So, yes, at this point, we felt like
13      these actions would enable us to be able
14      to keep the clubs open, follow the
15      guidelines that were being, you know --
16      that were being offered by public health
17      officials, and be able to keep the clubs
18      open for people and for our team members.
19 BY MR. DENN:
20 Q.   In terms of my question, did you -- did you
21 assume that COVID-19 was present in -- in each and
22 every one of the clubs?
23 A.   I think we had to assume that it certainly
24 could have been present in all of the clubs at that
25 point.

### Page 72

1  Q.   Did you assume that it, in fact, was present?
2  A.   Well, we assumed that it was because we took
3  these actions to be able to mitigate any spread if
4  it was present in the clubs.
5  Q.   Do you recall on what date you began to
6  assume that it was present in all the clubs?
7            MR. WEISS:  Objection to form.
8            THE WITNESS:  I think -- yeah.  I
9       mean, I think -- this was a Sunday, the
10      15th.  And I think as -- and then at this
11      point, we felt like -- you know, we felt
12      like it was still possible to be able to
13      mitigate -- you know, mitigate the spread.
14      So if somebody did have COVID, but they
15      were masked, they were dis- -- you know,
16      6 feet of social distancing, we were
17      disinfecting the clubs.  We had touch-free
18      check-in.  You know, I think at this
19      point, I can't recall whether we had
20      plastic partitions put up at the front
21      desk or not, just like a lot of other
22      businesses were doing at this point this
23      time.
24           So we felt that these actions would
25      allow us to keep the clubs open and have a

### Page 73

1       confidence level that we would be able to
2       mitigate any risk of transmission within
3       the clubs.
4            I think as this unfolded over the
5       next couple of days and it became apparent
6       that this was much bigger and more
7       dangerous and more transmissible, and that
8       these actions may not be sufficient,
9       that's when, you know, we decided to make
10      the decision to close the clubs in --
11      yeah, you know, in the best interest of
12      our members and team members because we
13      weren't confident that we would be able
14      to, you know, control or mitigate the
15      spread of the virus inside of the clubs at
16      that point, given what we knew.
17 BY MR. DENN:
18 Q.   So just sticking with -- with this date of
19 March 15th, you -- you presumed on March 15th that
20 COVID-19 was present in all the clubs?
21 A.   I think we had to presume that COVID-19 was
22 present, otherwise why take these actions to
23 mitigate the spread of COVID-19?
24 Q.   And do you recall when you began to make that
25 assumption?  If it was that day, a week prior to

U.S. Legal Support | www.uslegalsupport.com    70 to 73

TONY UEBER
July 27, 2022

### Page 74

1  that day, two weeks prior?
2       At what point you began to assume
3  that it was present in all the clubs?
4       MR. WEISS:  Objection to form.
5       THE WITNESS:  I mean, I don't recall
6       at that point.  Again, you know, it's --
7       it was a very rapidly evolving situation.
8       We're getting new information every day
9       from state, local, and national public
10      health officials about, you know, what
11      needed to be done to mitigate the
12      transmission and -- and what was working
13      and what wasn't working.
14  BY MR. DENN:
15  Q.   So as of this email exchange on March 15th, I
16  just want to make sure I understand.  You presumed
17  that COVID was present in all the clubs, but you
18  believe that the steps outlined in this letter were
19  sufficient to -- to protect the health of staff and
20  members?
21  A.   Correct.
22       MR. WEISS:  Objection to form.
23  BY MR. DENN:
24  Q.   So if we can jump up one day later to
25  March 16th.  The plan changed on March 16th,

### Page 75

1  correct?
2  A.   Sometime on the 15th, 16th, yes.
3  Q.   And I think you indicated that you, along
4  with the board and owners, were the -- the people
5  who made the ultimate decision to close all the
6  clubs?
7  A.   Correct.
8  Q.   What -- what new piece of information did you
9  receive between the -- you know, the drafting of
10 this document and -- and March 16th that changed
11 your -- your view as to what the plan should be?
12 A.   I don't recall specifically.  So generally
13 speaking, I think, you know, we were getting more
14 information again from state, local, and public
15 health officials.  More states were issuing -- and
16 local municipalities were issuing orders to close
17 health clubs and -- and other businesses.
18      And it became -- you know, people
19 were stopped -- people were stopping travel.  It
20 just -- this became more and more apparent that this
21 was bigger and more serious.  And nobody had a good
22 answer on what needed to be done in order to control
23 the spread.  And that was the information that then
24 led us to say the actions that we had, you know,
25 thought would be sufficient over the course of the

### Page 76

1  weekend were -- were not sufficient.
2       We didn't feel at that point that
3  we -- we could comfortably ensure the health and
4  safety of our team members and members.  And so we
5  made what, you know, was a very difficult decision
6  to close all the clubs until we could sort through,
7  you know, what needed to be done, if anything, at
8  that point, which is why one of the reasons we
9  referred to a temporary closure in a lot of the
10 communications because we weren't sure how long this
11 was going to take, how long the pandemic was going
12 to last, what new information would come out and
13 what type of risk mitigation actions needed to be
14 taken.
15      So, you know, in the best interests
16 of our team members' and members' health, we made
17 the difficult decision to close the clubs until we
18 could have a better handle on where things stood and
19 what needed to be done.
20 Q.   Sitting here today, would you agree that --
21 that the difference between the steps that were
22 outlined on March 15th and closing all clubs
23 nationally is -- is fairly significant?
24 A.   It -- taking the actions that we were taking
25 were already very significant.  This was just the

### Page 77

1  next step in -- you know, 100 percent assurance that
2  this virus was not going to be spread in the clubs
3  until we could get more information on what we
4  needed to do to -- to be able to operate safely.
5  Q.   And sitting here today, you don't recall any
6  specific piece of public health information that you
7  received on the 16th that -- that caused the -- the
8  change?
9       MR. WEISS:  Objection to form.
10      THE WITNESS:  I don't.  No.  I mean,
11      it's -- no.
12 BY MR. DENN:
13 Q.   On the 16th, you also learned that
14 Fitness International was going to be closing all of
15 its clubs that evening, right?
16 A.   Yes.
17 Q.   And Fitness International is LA Fitness?
18 A.   Correct.
19 Q.   And are they one of your primary competitors?
20 A.   Yes.
21 Q.   And that was -- that was new information to
22 you on the 16th, that they were going to be closing
23 that evening?
24 A.   Yes.  Specifically that they were going to
25 close all their clubs on -- on that date at a

TONY UEBER
July 27, 2022

### Page 78

1 specific time. Was new information -- I can't
2 recall whether they'd already closed some clubs in
3 some markets or not, but as far as broad, national
4 closure, yes, that was new information.
5 Q.    And you -- you forwarded that information on
6 to your investors on the 16th as well, correct?
7 A.    If there's a letter to that effect, I
8 don't recall. But I would assume so.
9 Q.    Well, if you can pull out Exhibit Q, and I
10 think that that is 11 for your deposition.
11 A.   Okay.
12                - - -
13        (Whereupon, Exhibit 11 was marked for
14         identification.)
15                - - -
16 BY MR. DENN:
17 Q.    And just let me know when you've had a chance
18 to look it over.
19 A.    Yes. Okay.
20 Q.    So this is an email from you to Roland Smith,
21 Alex Mehfar, Chandler Anthony, and Martin Eltrich,
22 correct?
23 A.    Correct.
24 Q.    And are they -- are they the owners of the
25 club, of the company?

### Page 79

1 A.    They are one of the owners. They're the --
2 well, Roland was the chairman. So not an owner.
3 But he was a chairman of the board. Alex, Chandler,
4 and Martin are the three principals with AEA, which
5 was the lead investor.
6 Q.    And you are forwarding to them the
7 information that LA Fitness is going to close all
8 clubs effective 8:00 p.m. on March 16th, correct?
9 A.    Correct.
10 Q.   And your email to them states "They are
11 targeting 8:00 p.m. PST. I think it would be good
12 if we could announce jointly with them and
13 Lifetime."
14           Do you see that?
15 A.   Yes.
16 Q.   So am I correct in inferring that at the time
17 that you sent this email, that the decision had not
18 yet been made to close nationally?
19 A.   No. It -- I wouldn't make that assumption
20 based off of the email. But it is saying that if we
21 could announce with them, that that would be -- that
22 would be good.
23 Q.   Well, do you recall if at the time that you
24 sent this email that -- that -- whether or not
25 24 Hour Fitness had made its decision?

### Page 80

1 A.    I don't recall specifically what time we made
2 that decision, no.
3 Q.    Do you recall if at the time the decision was
4 made, you were aware that LA Fitness was going to be
5 closing nationally?
6 A.    Can you repeat the question, please?
7 Q.    Sure.
8 A.    I just want to make sure I give an accurate
9 answer.
10 Q.   Yeah.
11           I -- at the time that -- that you
12 decided to close all of 24 Hour Fitness' clubs
13 nationally, were you aware that LA Fitness was
14 planning to close all of its clubs down?
15 A.   I don't recall. No.
16 Q.   Why did you think it would be good if you
17 could announce jointly with them?
18 A.   Well, I think it shows that, you know, as an
19 industry, that we're collectively taking actions to
20 do the right thing to protect members and -- and
21 team members. And that, you know, we're not out
22 there on our own. But, you know, as an industry,
23 we're doing what -- what we need to do to -- to do
24 what's right for our members and team members.
25 Q.   You've indicated that -- that health concerns

### Page 81

1 played a role in the change from March 15th to
2 March 16th.
3           Did concerns -- did some of the
4 concerns that you had mentioned regarding membership
5 attrition also play a role in that decision?
6           MR. WEISS: Objection to form.
7           THE WITNESS: No. Not at this point.
8       No, definitely not. I mean, this was
9       about health and public safety and making
10      sure we were doing the right thing,
11      regardless of the business implications.
12      I mean, closing the clubs is not -- I
13      mean, you can see from the emails over the
14      weekend we were trying to do everything we
15      could to balance those two competing, you
16      know, challenges. But by this point, it
17      became apparent that, you know, there was
18      no way possible to be able to keep the
19      clubs open given the information that we
20      had. And so we made the difficult
21      decision to have to close all the clubs.
22      I mean, that's the only information that
23      changed.
24 BY MR. DENN:
25 Q.   Okay.

TONY UEBER
July 27, 2022

### Page 82

1  A.     The business trends were the business trends.
2  There was no business trend difference between that
3  Sunday and that Monday.
4  Q.     If you could take a look at Exhibit R.  And
5  we can mark that as --
6              MR. DENN:  Let me ask the court
7  reporter.  I forgot.  Is it 11 or 12?
8              THE WITNESS:  I believe it's 12.
9              THE STENOGRAPHER:  It's 12.
10             MR. DENN:  Okay.  And I can mark this
11  as Exhibit 12.
12                    - - -
13             (Whereupon, Exhibit 12 was marked for
14  identification.)
15                    - - -
16  BY MR. DENN:
17  Q.     And just let me know when you've had a chance
18  to look it over.
19  A.     Yes.  Okay.
20  Q.     So this is a set of documents that were sent
21  to people internal to 24 Hour Fitness, correct?
22             MR. WEISS:  Objection.
23             THE WITNESS:  Which one?  I mean,
24  there's -- there's two -- are you
25  referring to the email from Amy or to the

### Page 83

1  email that she forwarded from field
2  communications?
3  BY MR. DENN:
4  Q.     I'm referring to the attachments to -- to the
5  email.
6  A.     Yes.  They would have been internal and
7  within the operations organization to provide more
8  details on exactly what was happening and what they
9  needed to do.
10  Q.    And -- and the purpose of -- of the -- just
11  looking at the first one, which is the GM Leaders
12  Guide?
13  A.    Yes.
14  Q.    The purpose of this document is to explain to
15  management, people at the club level what was
16  happening and the reasons for it?
17  A.    Correct.
18             MR. WEISS:  Objection to form.
19  BY MR. DENN:
20  Q.    Is that correct?
21  A.    Yes.  Correct.
22  Q.    Okay.  So just looking at that document, if
23  we can -- well, let me ask you first.
24             Did you -- do you recall seeing this
25  particular document before it went out?

### Page 84

1  A.     I most likely would not have, no.  I mean,
2  this was probably within the operations team taking
3  our macro communications and -- and moving it into
4  more details for the club personnel.  I wouldn't
5  have reviewed this.  I would be surprised if I did.
6  Q.     Whose job was it to review communications
7  like this?
8  A.     Ultimately, it would have been Karl Sanft who
9  was the chief operating officer at the time.
10  Q.    Okay.  Looking at the first page of this
11  GM Leaders Guide titled "What's happening?"  And I
12  just wanted to review with you the -- the language
13  of that.
14             The second paragraph states "Due to
15  the outbreak of COVID-19, the world is now grappling
16  with an issue of enormous scale and human impact.
17  Employers everywhere are having to take emergency
18  actions to deal with slowing business operations
19  across the board.  The current situation is
20  similarly impacting 24 Hour Fitness.  We've seen a
21  significant decline in club member traffic and
22  sign-ups, putting even greater strain on our already
23  challenging financial picture.  This unprecedented
24  situation is having a dramatic impact on our
25  business and our people, and it is imperative that

### Page 85

1  we take immediate action to ensure that we can
2  continue providing services to our club members and
3  sustain our business for ours team members over the
4  long term.  As a result, starting the week of
5  March 16th we are temporarily closing all clubs
6  until further notice no later than Tuesday,
7  March 17th, at 12:00 o'clock a.m."
8              You see the section that I was just
9  reading?
10  A.    Yes.
11  Q.    This GM Leaders Guide seems to indicate --
12  and you can correct me if I'm wrong -- to the
13  leadership at the club level that to some degree at
14  least, the temporary closure of all clubs is being
15  done for business reasons, correct?
16             MR. WEISS:  Objection to form.
17             THE WITNESS:  No.  I think that says
18  in the first sentence, "Due to outbreak of
19  COVID-19, the clubs are being closed."
20  BY MR. DENN:
21  Q.    Yeah, I'm -- can you -- you can feel free to
22  disagree with me about what it says.  It's obviously
23  in black and white.
24             But is it your testimony that there
25  is not a suggestion in this message to the club

TONY UEBER
July 27, 2022

Page 90

1    THE VIDEOGRAPHER: Before we conclude
2    the deposition, Counsel, could we just
3    have all transcript and video orders on
4    the record?
5        And we don't need Mr. Ueber for this.
6    I -- if you're okay with that, Mr. Weiss.
7        MR. WEISS: Yeah, you can sign off,
8    if you want, Tony.
9        THE WITNESS: All right.
10       THE VIDEOGRAPHER: Thank you,
11   Mr. Ueber.
12       MR. WEISS: Thank you.
13       I think we probably have an order --
14   like a standing order, if I'm not
15   mistaken. I do not have that because I'm
16   not -- like, I don't know the ins and outs
17   of, like, the type -- form of video and
18   stuff that we typically order, but
19   whatever we've done in the past for other
20   depositions, we'd want to do the same
21   thing here. And probably if we could just
22   get a rough transcript for the court
23   reporter, that would be good too.
24       I don't know about you guys.
25       Matt?

Page 91

1    MR. DENN: Yeah. We -- I believe
2    we've been getting a regular transcript
3    and a rough transcript.
4        MR. WEISS: Yeah. Yeah. And so,
5    James, if you have any questions, you
6    could email me after -- if you don't see,
7    like, an order in there for us.
8        Do you have my email address or --
9        THE VIDEOGRAPHER: I believe Michelle
10   has it.
11       MR. WEISS: Yeah. Yeah. So just
12   send it --
13       THE VIDEOGRAPHER: That'll work too.
14       MR. WEISS: So just send an email if
15   you have a problem.
16       THE VIDEOGRAPHER: Okay.
17       MR. WEISS: If that's okay.
18       THE VIDEOGRAPHER: Yeah. I think
19   that works.
20       Is that okay for you, Michelle?
21       THE STENOGRAPHER: Yeah. Any other
22   orders?
23       MR. ANDERSON: This is
24   Dennis Anderson for QBE and Gsinda. We
25   would just like a full-sized and a

Page 92

1    condensed PDF.
2        MR. MCNABNEY: And this is
3    Joel McNabney for Liberty Mutual. We'll
4    take a copy of the final. We don't need a
5    rough draft. Whenever the final is ready.
6        MS. MCDONNELL: Michelle, this is
7    Marlie. I emailed you our order.
8        THE STENOGRAPHER: Okay. Thank you.
9        THE VIDEOGRAPHER: And, Mr. Whang, if
10   you're still there?
11       (No verbal response.)
12       THE VIDEOGRAPHER: I'll conclude the
13   deposition right now, Counsel.
14       So with that, we conclude the
15   deposition. The time is approximately
16   2:22 p.m. Eastern.
17       Thank you, everyone.
18           -  -  -
19       (Whereupon, the deposition was
20   concluded at 2:22 p.m.)
21           -  -  -
22
23
24
25

Page 93

1                CERTIFICATE
2        I HEREBY CERTIFY that the proceedings, evidence,
3    and objections are contained fully and accurately in the
4    stenographic notes taken by me upon the deposition of
5    TONY UEBER taken on JULY 27, 2022, and that this is a true
6    and correct transcript of same.
7
8        I FURTHER CERTIFY that I am neither attorney nor
9    counsel for, not related to nor employed by any of the
10   parties to the action in which this deposition was taken;
11   further, that I am not a relative or employee of any
12   attorney or counsel employed in this case, nor am I
13   financially interested in this action.
14
15                 *Michelle Keys* (signature)
16
17              Michelle Keys
                Stenographer
18              and Notary Public
19
20
21       (The foregoing certification of
22   this transcript does not apply to any
23   reproduction of the same by any means
24   unless under the direct control and/or
25   supervision of the certifying reporter.)