**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (TMH) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (TMH) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF 24 HOUR FITNESS WORLDWIDE, INC.'S OPPOSITION**
**TO PROPERTY INSURERS' MOTION FOR SUMMARY JUDGMENT**

David E. Weiss (admitted *pro hac vice*)      Mark W. Eckard (No. 4542)
T. Connor O'Carroll (admitted *pro hac vice*)   REED SMITH LLP
REED SMITH LLP                            1201 North Market Street, Suite 1500
101 Second Street, Suite 1800              Wilmington, DE 19801
San Francisco, CA  94105-3659              Telephone: (302) 778-7500
Telephone: (415) 543-8700                  E-mail:  meckard@reedsmith.com
E-mail:  dweiss@reedsmith.com
E-mail:  cocarroll@reedsmith.com

Counsel for Plaintiff 24 HOUR FITNESS
WORLDWIDE, INC.

# TABLE OF CONTENTS

**Page**

NATURE OF THE PROCEEDING ................................................................ 1

SUMMARY OF ARGUMENT ..................................................................... 1

STATEMENT OF FACTS .......................................................................... 2

A.    24 Hour Operated Health and Fitness Clubs Throughout the U.S. ................ 2

B.    24 Hour Purchased Insurance Coverage to Mitigate Risks Associated with Communicable Disease ............................................................................ 3

       1.    Communicable Disease Endorsement .................................................... 4

       2.    Business Interruption Coverage Provision ............................................. 4

       3.    Interruption by Civil or Military Authority and Ingress/Egress Extensions ........... 5

C.    By January 2020, COVID-19 Arrived in the U.S. and Spread Uncontrollably ................. 5

       1.    The Nature of Virus and Disease Transmission ...................................... 5

       2.    COVID-19 Spread Rapidly and Largely Undetected ................................ 6

       3.    Compounding the Problem, COVID-19 Emerged During Cold and Flu Season ........ 8

D.    COVID-19 Forced 24 Hour to Close and Prohibit Access to its Clubs .............................. 9

       1.    Concerns About Employee and Member Safety ...................................... 9

       2.    24 Hour Had No Choice but to Completely Shut Down All of the Clubs ........... 10

       3.    Shut Down Orders Also Prohibited Access to the Clubs ...................................... 10

E.    24 Hour Tendered its Claim and Insurers Privately Agreed Coverage was Likely But Publicly Refused to Provide Coverage ..................................................... 12

GOVERNING INSURANCE PRINCIPLES .............................................. 14

ARGUMENT ........................................................................................... 15

A.    Triable Issues of Material Fact Regarding the Communicable Disease Endorsement .............................................................................................. 16

       1.    Triable Issues of Material Fact Exist as to Whether Communicable Diseases Were Present and Spreading at 24 Hour's Locations ........................................... 16

i

     2.      Access to Clubs was Prohibited by Laws Regulating Communicable Diseases ........................................................................................................ 20

     3.      24 Hour Need Not Demonstrate it Incurred Cleaning Costs to Obtain Business Interruption Coverage and the Losses Are Not Limited to the Clean-up Period ............................................................................................ 22

B.     Physical Loss or Damage is Not Required Under the Business Interruption Provision or the Civil or Military Authority and Ingress/Egress Coverage Extensions .................................................................................................................. 24

     1.      The Policies Require only "Loss" to 24 Hour's "Interest" in Property ............... 24

     2.      The Civil or Military Authority and Ingress/Egress Coverage Extensions Do Not Require Physical Loss or Damage to Property ................................................. 26

C.     Assuming Arguendo That Physical Loss or Damage Was Required, Triable Issues Exist That Preclude Summary Judgment ......................................................... 27

     1.      A Triable Issue of Fact Exists Whether the Closure of 24 Hour's Business Due to COVID-19 Constitutes Physical Loss or Damage ................................... 27

     2.      Triable Issues Exist that COVID-19 Caused Physical Loss or Damage .............. 27

     3.      The Court Should Avoid Summary Judgment on the Physical Loss or Damage Question While the Issue is Before the California Supreme Court ........ 30

CONCLUSION ............................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIU Ins. Co. v. Superior Ct.,*
   51 Cal. 3d 807 (1990) .................................................................................14, 26

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (2016)........................................................................................17

*Another Planet Entm't, LLC v. Vigilant Ins. Co.,*
   56 F.4th 730 (9th Cir. 2022) ........................................................................24, 30

*Another Planet Entm't, LLC v. Vigilant Ins. Co.,*
   No. S277893, 2023 Cal. Lexis 1111 (Mar. 1, 2023)......................................24, 30

*Azur v. Chase Bank, USA,*
   601 F.3d 212 (3d Cir. 2010).........................................................................22

*Baldwin Acad., Inc. v. Markel Ins. Co.,*
   2020 U.S. Dist. LEXIS 239916 (S.D. Cal. 2020) ..................................................22

*Bank of the W. v. Superior Ct.,*
   2 Cal. 4th 1254 (1992) ................................................................................14

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,*
   5 Cal. 4th 854 (1993) .................................................................................15

*Bichai v. DaVita, Inc.,*
   72 Cal. App. 5th 1126 (2021) ......................................................................17

*People ex rel. Brown v. Tri-Union Seafoods, LLC,*
   171 Cal. App. 4th 1549 (2009) ....................................................................17

*Buss v. Superior Court,*
   16 Cal. 4th 35 (1997) .................................................................................16

*Cal. Cas. Indem. Exch. v. Frerichs,*
   74 Cal. App. 4th 1446 (1999) ......................................................................26

*Coast Restaurant Grp., Inc. v. AmGUARD Ins. Co.,*
   90 Cal. App. 5th 332 ...............................................................................26, 27

*Danville Reg'l Med. Ctr., LLC v. Am. Guarantee,*
   No. 4:21-cv-00012, 2022 U.S. Dist. LEXIS 206563 (W.D. Va. Nov. 14, 2022) ...................21

iii

*Doheny W. Homeowners' Ass'n v. Am. Guar. & Liab. Ins. Co.*,
   60 Cal. App. 4th 400 (1997) ................................................................24

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,
   32 Cal. 4th 465 (2004) ............................................................... 15, 25

*Fed. Ins. Co. v. Simon Wiesenthal Ctr., Inc.*,
   No. 21-56334 (9th Cir. Jan. 10, 2023) ..............................................30

*Fireman's Fund Ins. Cos. v. Atl. Richfield Co.*,
   94 Cal. App. 4th 842 (2001) ............................................... 15, 25, 26

*French Laundry Partners, LP v. Hartford Fire Ins. Co.*,
   58 F.4th 1305 (9th Cir. 2023) ...........................................................30

*Great W. Drywall, Inc. v. Interstate Fire & Cas. Co.*,
   161 Cal. App. 4th 1033 (2008) .........................................................15

*Hotel Adventures LLC v. Fireman's Fund Ins. Co.*,
   No. 30-2021-01188889 (Cal. Super. Mar. 14, 2023).........................30

*Hozier v. Midwest Fasteners, Inc.*,
   908 F.2d 1155 (3d Cir. 1990)............................................................17

*K.C. Hopps Ltd. v. Cincinnati Ins. Co.*,
   561 F. Supp. 3d 827 (W.D. Mo. 2021) ..............................................29

*Koons v. XL Ins. Am., Inc.*,
   516 F. App'x 217 (3d Cir. 2013) .......................................................17

*Lawrence Gen. Hosp. v. Cont'l Cas. Co.*,
   No. 23-1286, 2024 U.S. App. LEXIS 676 (1st Cir. Jan. 10, 2024) ........23

*Lipari v. Sullivan*,
   No. 17 CV 1566, 2018 U.S. Dist. Lexis 212127 (N.D. Ill. Dec. 17, 2018) ...........17

*Los Angeles Lakers v. Fed. Ins. Co.*,
   No. 2:21-cv-02281 (C.D. Cal. Feb. 14, 2024) .........................................30

*Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*,
   81 Cal. App. 5th 96 (2022) .....................................................25, 27, 29

*Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*,
   No. 20SMCV00952 (Jan. 20, 2023) ..................................................29

*Markowitz v. Fid. Nat. Title Co.*,
   142 Cal. App. 4th 508 (2006) ...........................................................15

*Meyer v. Gibson*,
    17 F. App'x 821 (10th Cir. 2001) ........................................................................11

*Montrose Chem. Corp. v. Admiral Ins. Co.*,
    10 Cal. 4th 645 (1995) ..................................................................14, 15, 25

*Nationwide Mut. Ins. Co. v. William Hukill*,
    No. 4:CV-04-0399, 2005 U.S. Dist. Lexis 55993 (M.D. Pa. July 12, 2005)..........................17

*Northwell Health, Inc. v. Lexington Ins. Co.*,
    550 F. Supp. 3d 108 (S.D.N.Y. 2021)...................................................................21

*Paulino v. Harrison*,
    542 F.3d 692 (9th Cir. 2008) .............................................................................17

*Riverside Dental of Rockford, Ltd. v. Cincinnati Ins. Co.*,
    No. 20 CV 50284, 2021 U.S. Dist. LEXIS 120957 (N.D. Ill. June 29, 2021).........................22

*S. Cal. Counseling Ctr. v. Great Am. Ins. Co.*,
    162 F. Supp. 3d 1045 (C.D. Cal. 2014) .................................................................20

*Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation Cal.*
    *v. Lexington Ins. Co.*,
    310 Cal. Rptr. 3d 149 (2023) ............................................................................30

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*,
    12 Cal. App. 4th 715 (1993) ............................................................................17

*Shusha, Inc. v. Century-National Ins. Co.*,
    307 Cal. Rptr. 3d 1, 527 P.3d 271 (2023) ..............................................................30

*Shusha, Inc. v. Century-National Ins. Co.*
    87 Cal. App. 5th 250 (2022) ............................................................................28

*St. Mary & St. John Coptic Orthodox Church v. SBC Ins. Servs., Inc.*,
    57 Cal. App. 5th 817 (2020) ............................................................................14

*St. Tammany Par. Hosp. Serv. Dist. No. 2 v. Zurich Am. Ins. Co.*,
    593 F. Supp. 3d 399 (E.D. La. 2022)...................................................................21

*Treo Salon, Inc. v. West Bend Mut. Ins. Co.*,
    538 F. Supp. 3d 859 (S.D. N.Y. 2021)..................................................................22

*Vuckson v. United States*,
    354 F.2d 918 (9th Cir. 1966) ............................................................................17

*Zurich Am. Ins. Co. v. Wm. Bolthouse Farms, Inc.*,
    No. 1:21-CV-00783-JLT-CDB (E.D. Cal. Feb. 15, 2023) ...................................................30

**Statutes**

Cal. Civ. Code § 1636...................................................................................................14

Cal. Civ. Code § 1638...................................................................................................14

Cal. Civ. Code § 1639...................................................................................................14

Cal. Civ. Code § 1641...................................................................................................14

Cal. Civ. Code § 1644...................................................................................................14

Cal. Gov. Code § 8665..................................................................................................20

Cal. Gov. Code § 68210 (2022).....................................................................................30

**Rules**

Fed. R. Evid. 803(8)(C) ...............................................................................................11

## NATURE OF THE PROCEEDING

Plaintiff 24 Hour Fitness Worldwide, Inc. ("24 Hour") suffered devastating business losses due to the presence and spread of COVID-19. 24 Hour turned to its insurers who provide broad Business Interruption coverage, including coverage for losses from communicable disease outbreaks. In response, Insurers[1] refused to provide coverage. 24 Hour sought bankruptcy protection, and then commenced this action to establish that the losses it suffered due to COVID-19 are covered by the Insurers' policies. Insurers submitted their Motion for Summary Judgment under Federal Rule of Civil Procedure 56 as "Property Insurers' Motion for Summary Judgment" ("Motion"). 24 Hour submits this Memorandum of Law in opposition.[2]

## SUMMARY OF ARGUMENT

The Insurers' Motion must be denied for the following reasons:

1.      Triable issues of material fact exist regarding the presence of a virus (either SARS-CoV-2 or otherwise) was present "on, at or under" 24 Hour's fitness club locations (each a "Club").

2.      Insurers fail to meet their burden of proof on summary judgment to establish there is no Triable issue of material fact exist concerning 23 Hours' inability to access its Clubs in accordance with applicable government orders.

3.      24 Hour does not need to demonstrate that it incurred cleaning costs to obtain coverage for its business interruption losses and coverage for such losses is not limited to the clean-up period.

---

[1]      "Insurers" means Defendants Continental Casualty Company ("Continental"), Starr Surplus Lines Insurance Company, Allianz Global Risks US Insurance Company, Liberty Mutual Fire Insurance Company, Certain Underwriters at Lloyd's, London, Allied World National Assurance Company, QBE Specialty Insurance Company, and General Security Indemnity of Arizona.

[2]      24 Hour and Insurers stipulated to bifurcate this case into phases: Phase I, the current phase of the case, is limited to issues of liability and insurance coverage and Phase II will determine Plaintiff's monetary losses. [Doc. 66-1.] Although this proceeding is still in Phase I, some issues the Insurers raise relate to Phase II and are not properly before the Court.

4.      Physical loss or damage to insured property is not required under the Business Interruption Provision or the Civil or Military Authority and Ingress/Egress coverage extensions.

5.      Even if the policies require "physical loss or damage" to property, triable issues of material fact exist regarding whether closure of Clubs or the presence of COVID-19 in the Clubs constitutes a physical loss or damage to the property. In addition to all the foregoing, the Court should defer ruling while California's high court decides this issue in a pending case.

## STATEMENT OF FACTS[3]

**A.      24 Hour Operated Health and Fitness Clubs Throughout the U.S.**

At COVID-19's inception, 24 Hour operated more than 400 Clubs in fourteen states, serving approximately 3.4 million members. Larson Decl. at ¶ 4. The Clubs were in high-density areas, such as Los Angeles County, California, New York County, New York, King County, Washington, and Harris County, Texas. *Id.* at ¶ 7. 24 Hour Fitness experienced high volumes of traffic between January and March 31, 2020; during that time, each Club hosted on average 1,400 visitors per day. *Id.* at ¶ 10. Across its Clubs in Los Angeles County alone, 24 Hour hosted an average of 65,000 guests per day (1,300 guests across 50 Clubs); more than enough to *fill* a football stadium to capacity daily.[4] *Id.* Importantly, all of these guests were frequenting the Clubs while COVID-19 was spreading unabated. As explained by Insurers' epidemiologist, Allison Stock, PhD, MPH, MS, COVID-19 was "likely circulating in certain populations . . . [such as] Seattle, Los Angeles, and New York City" as early as January 2020. Appx, Ex. 166 at 2397.

---

[3]      24 Hour objects to Insurers' statement of facts as it contains improper arguments contrary to Local Rule 7007-2(b)(i)(E). 24 Hour also incorporates herein the Statement of Facts from its Opposition to Allied World's motion for summary judgment on its pollution policy filed concurrently herewith.

[4]      A chart depicting the daily volume of individuals in various jurisdictions where 24 Hour operated is contained at paragraph 10 of the Larson Decl.

**B.    24 Hour Purchased Insurance Coverage to Mitigate Risks Associated with Communicable Disease**

Fitness clubs (gyms) "are high-risk settings that facilitate the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) transmission." Appx, Ex. 171 at 2912–2913. Gyms are particularly prone to spreading respiratory diseases, including COVID-19, as individuals tend to spend an extended amount of time in gyms and breathe heavily while working out. Carnethon Decl. at ¶ 40; Appx, Exs. 168–169, 171–173.

In 2014, 24 Hour experienced a legionella outbreak in Memphis, Tennessee, affecting at least nine members. Gottlieb Decl. ¶ 4. This event reinforced 24 Hour's need to maintain broad coverage for communicable disease and virus losses. *Id.* at ¶¶ 5–8. Since at least 2014, 24 Hour purchased policies from Insurers with specific endorsements covering such losses. *Id.* at ¶ 8; Appx, Exs. 2, and 4–9. This coverage was important as a large-scale outbreak could affect multiple Clubs. Gottlieb Decl. ¶ 4. Insurers also understood this risk. For example, in 2019, just *before* the COVID-19 outbreak, 24 Hour's lead insurer, Continental, stated in an SEC filing that "pandemics" are among the catastrophic events that "are an inevitable part of [its] business," and thus, an important risk worth insuring against. Appx, Ex. 130 at 1501.

To obtain the broadest coverage possible, 24 Hour purchased comprehensive insurance providing "all risks" property and coverage for business interruption losses ("Business Interruption") commencing between June 30, 2019 to June 30, 2020, with each Insurer providing a percentage of the overall coverage limits. Gottlieb Decl. ¶ 9; Appx, Exs. 2, and 4–9. Insurers all agreed to the same master policy form, while issuing their own endorsements. *Id.* The coverage provisions implicated by Insurers' Motion include the: (1) "Interruption by Communicable Disease" coverage endorsement ("Communicable Disease Endorsement"); (2) "Business Interruption" coverage provision; and (3) "Interruption by Civil or Military Authority" and

- 3 -

"Ingress/Egress" coverage extensions.[5]

### 1.    Communicable Disease Endorsement

The policies[6] all contain the Communicable Disease Endorsement, covering Business Interruption losses when access to any part of a Club is prohibited (a) "due to the actual presence of and the spread of a communicable disease"; and (b) resulting from a "declaration by a civil authority enforcing any law or ordinance regulating communicable diseases." Appx, Ex. 2 at 101. (Communicable Disease Endorsement in Continental Policy).[7] Notably, the provision states that the presence and spread of a communicable disease is "direct physical damage." *Id.* The Insurers all admit that COVID-19 is a communicable disease. Appx, Exs. 153 at 2179, 154 at 2197, 157 at 2265, 158 at 2280, 159 at 2296, 160 at 2312, 161 at 2331, 162 at 2365. The Communicable Disease Endorsement is not limited to COVID-19. *See* Appx, Ex. 2 at 101. The Policies cover any communicable disease, including other respiratory illnesses that were spreading at the same time as COVID-19 and were indistinguishable from COVID-19. *See Id.*; Carnethon Decl. ¶¶ 23, 29, 32. The presence of these other respiratory illnesses at the Clubs (along with the requisite civil authority declaration) was sufficient to trigger coverage. *Id.*

### 2.    Business Interruption Coverage Provision

The Policies also include broad "Business Interruption" coverage for "Loss resulting from necessary interruption of business conducted by the Insured whether total or partial, and caused

---

[5]    Each of these coverages can apply separately to the events at issue here. *See* "Primary Deductibles" provision addressing when "two or more deductibles" apply to a single occurrence or an occurrence caused by more than one insured peril. Appx, Ex. 2 at 74.

[6]    This Opposition cites to the specific policy provisions in the Continental Policy. However, each of Insurers policies contain the same master policy language. *See* Appx, Exs. 2, and 4–9. 24 Hour will identify if one of the policies does not contain the same language as the cited Continental Policy.

[7]    All Insurers include this same Communicable Disease Endorsement in their respective policies. Appx, Ex. 4 at 219; Appx, Ex. 5 at 277; Appx, Ex. 6 at 340; Appx, Ex. 7 at 412; Appx, Ex. 8 at 469; Appx, Ex. 9 at 526.

by loss, damage, or destruction covered herein during the term of this policy to real and personal property as described in Clause 7.A". Appx, Ex. 2 at 77. The coverage period runs until 24 Hour's business is restored "to the condition that would have existed had no loss occurred" and then for an additional 365 days. *Id.* at 80. Coverage is further extended where "loss or damage . . . causes the enforcement of any law, ordinance, governmental directive or standard regulating the . . . use or occupancy of property." *Id.* at 83. This includes "any increase in the Business Interruption . . . loss arising out of the additional time required to comply with said law or ordinance." *Id.* at 84.

### 3.    Interruption by Civil or Military Authority and Ingress/Egress Extensions

The policies extend coverage under the "Interruption by Civil or Military Authority" and "Ingress/Egress" Time Element extensions to Business Interruption losses from access to insured property being prevented due to a "peril insured against" within five miles of the insured property:

> (2)    Interruption by Civil or Military Authority:  This policy is extended to cover the loss sustained during the period of time when access to real or personal property is prohibited by order or action of civil or military authority issued in connection with or following a peril insured against within five (5) statute miles of the insured premises and for a period not to exceed thirty (30) days.
>
> (3)    Ingress/Egress:  This policy is extended to cover the loss sustained during the period of time when, in connection with or following a peril insured against, access to or egress from real or personal property is prevented within five (5) statute miles of the insured premises and for a period not to exceed thirty (30) days.

Appx, Ex. 2 at 79.[8]

### C.    By January 2020, COVID-19 Arrived in the U.S. and Spread Uncontrollably

### 1.    The Nature of Virus and Disease Transmission

COVID-19 primarily spreads when an infected person expresses viral particles when breathing, talking, coughing, sneezing, etc. Carnethon Decl. at ¶¶ 13, 25, and 40. COVID-19 may also be transmitted on surfaces. *See Id.* at ¶¶ 13 and 38; Appx, Ex. 174 at 2454; Appx, Ex. 188 at

---

[8]    These provisions do not contain a physical loss or damage requirement. Appx, Ex. 2 at 79. Moreover, the 30 days coverage period was extended in the policies to 45 days. *Id.* at 73.

2711. Insurers' expert, Alexis Sauer-Budge, PhD, agreed that the virus can remain infectious on surfaces. Appx, Ex. 170 at 2426. One study relied upon by Dr. Sauer-Budge found that the virus "can be detected in room-temperature environments at least 57 days after the last exposure, much longer than previous reports." Appx, Ex. 174 at 2454.[9] Insurers' experts agree that human transmitted viruses are "ubiquitous" and found everywhere, including in all the Clubs. Appx, Ex. 166 at 2387, Appx, Ex. 170 at 2425.

## 2.    COVID-19 Spread Rapidly and Largely Undetected

After originating in Wuhan, China, COVID-19 spread around the world and the World Health Organization ("WHO") declared a global pandemic on March 11, 2020. Carnethon Decl. ¶ 6. COVID-19 began spreading in the U.S. at least as early as January 2020, including where 24 Hour operated. Carnethon Decl. ¶ 42. The first confirmed case in the U.S. was in Snohomish County, Washington, where 24 Hour operated two Clubs. Larson Decl. ¶¶ 8 ,14; Appx, Ex. 133 at 1679. By the time the first instances of community spread (cases of unknown origin) were identified, the virus had already "rooted itself" throughout the country. Carnethon Decl. ¶ 12. It was not until March 2020, after thousands of cases accumulated, that the virus "burst into public view." Carnethon Decl. ¶ 12.

Early confirmed cases were mostly tied to international travel. Carnethon Decl. ¶¶ 7, 11. Notably, 24 Hour operated near busy international airports. Larson Decl. ¶ 9.[10] Metropolitan areas

---

[9]    Disinfecting or otherwise removing COVID-19 from surfaces is not entirely effective. As Dr. Sauer-Budge agreed, even if COVID-19 can be cleaned from a surface or degrade over time, someone else with COVID-19 can simply re-introduce the virus after a surface is cleaned. Appx, Ex. 170 at 2427. For this reason, Dr. Sauer-Budge also agreed that studies measuring the length of time COVID-19 persisted on surfaces were of limited utility for operating businesses where individuals were coming in and out on a regular basis. *Id.* at 2428.

[10]    *See e.g.*, Dallas/Fort Worth International Airport serves about 6 million passengers every month, 24 Hour operated 21 Clubs in Dallas and Tarrant Counties, Texas (Larson Decl. ¶ 9; Appx, Ex. 124); Denver International Airport serves about 5.75 million passengers every month, 24 Hour operated 31 Clubs in

where 24 Hour operated, such as Seattle, New York, Los Angeles, and Dallas, demonstrated the link between travel and spread of COVID-19, as these cities experienced the rapid spread of the disease in early 2020. Carnethon Decl. ¶ 34; Appx, Ex. 166 at 2396 ("We know that it was hitting large major metropolitan areas where there was increased travel in and out of those locations[.]").

Government authorities confirmed the rapid spread of COVID-19 where 24 Hour operated. For instance, 24 Hour operated 20 Clubs in Washington and 13 Clubs in Nevada. Larson Decl. ¶ 8. On February 29, 2020, Washington's Governor Inslee issued an emergency proclamation that COVID-19 posed a serious threat "and is a public disaster that affects life, health, property or the public peace." Appx, Ex. 21 at 648. Governor Sisolak of Nevada likewise explained, "[B]ased on the rapid spread of the virus around the world and what we've already seen in Nevada, we know that we must act quickly." Appx, Ex. 191 and 2914.[11] On March 12, 2020, Governor Cuomo of New York identified "the largest cluster [of COVID-19] in the country" in Westchester County (where 24 Hour operated four Clubs). Appx, Ex. 192 at 2912; Larson Decl. ¶ 10. The Governor created a "containment area" around a synagogue where individuals were not allowed to gather and deployed the National Guard. Appx, Ex. 192. This "containment area" was less than 5 miles from a Club location. Appx, Ex. 192.[12]

---

Colorado (Larson Decl. ¶ 9; Appx, Ex. 125); the three major airports in Los Angeles County (LAX, BUR, and LGB) serve about 6 million passengers every month, 24 Hour operated 50 Clubs in Los Angeles County (Larson Decl. ¶ 9; Appx, Ex. 121–123); the three major airports serving the New York City area (JFK, EWR, and LGA) serve about 7.5 million passengers every month, 24 Hour operated 5 Clubs in New York City and 12 Clubs in surrounding counties (Larson Decl. ¶ 9; Appx, Ex. 126–128); Seattle-Tacoma International Airport serves about 3.9 million passengers every month, 24 Hour operated 11 Clubs in King County, Washington. (Larson Decl. ¶ 9; Appx, Ex. 129).

[11]       Additional government orders applicable to 24 Hour's Clubs can be found at pages 751 through 1428 of the appendix of evidence in support of 24 Hour's Oppositions to Motions for summary judgment.

[12]       In early 2020, the Los Angeles County Department of Public Health ("LADPH") issued almost daily updates, including information on confirmed cases and deaths. Larson Decl. ¶ 23. LADPH warned that there were "positive cases across the entire County," and that "the public should not think one location is safer than the other." *Id.* at ¶ 24; Appx, Ex. 24. 24 Hour operated 50 Clubs in Los Angeles County. Larson Decl. ¶ 10.

Despite the national concern regarding COVID-19, the ability to test for and detect the virus was extremely limited, and *actual* case numbers were much higher than what health departments were reporting as "confirmed." Carnethon Decl. ¶ 35. As Dr. Stock explained, before April 2020, PCR testing (where a nasal swab is tested in a lab) was the only way to detect COVID-19. Appx, Ex. 166 at 2390.[13] Even when limited testing was available, "testing rules [were] so strict that doctors may [have] not notice[d] a community outbreak until [it was] too late." Carnethon Decl. ¶ 24; Appx, Ex. 38. Testing was limited to individuals with certain travel histories or those exposed to positive individuals, so infected people with minor or no symptoms likely would not have been tested, allowing them unknowingly to spread the disease. Carnethon Decl. ¶ 30. As Dr. Stock testified, "by mid-March transmission of SARS-CoV-2 . . . had accelerated with rapidly increasing case counts indicating established transmission in the U.S. Ongoing traveler importation of SARS-CoV-2, attendance at professional and social events, introduction into facilities or settings prone to amplification, and challenges in virus detection all contributed to rapid acceleration of transmission during March." Appx, Ex. 166 at 2402.

### 3. Compounding the Problem, COVID-19 Emerged During Cold and Flu Season

COVID-19 was not the only communicable disease spreading in early 2020. Carnethon Decl. ¶ 25–27. As Dr. Stock explained, 2020 "was a bad flu year" and "RSV . . . was [also spreading]." Appx, Ex. 166 at 2392. The government health organizations reported high influenza activity in 2019–2020. Carnethon Decl. ¶ 26; Appx, Ex. 39. Without testing, COVID-19 could not be distinguished from these other illnesses. Appx, Ex. 166 at 2394. This is because, as Dr. Stock explained, "[l]ots of viral illnesses cause cough. . . . [and] other symptoms that people think about with COVID . . .." *Id.* at 2393. This made it difficult to detect and prevent the spread of COVID-

---

[13]    As confirmed by Allied World, COVID-19 "tests were developed [only] after March of 2020 . . . to test people to determine whether they had COVID." Appx, Ex. 185 at 2595.

19, and individuals with any respiratory illnesses were treated as having COVID-19. Carnethon Decl. ¶ 27; Larson Decl. ¶ 45; Appx, Ex. 26 (example of local health department warning that anyone with "flu-like symptoms should contact [local health departments] . . . to not risk spreading COVID-19").

**D.     COVID-19 Forced 24 Hour to Close and Prohibit Access to its Clubs**

**1.      Concerns About Employee and Member Safety**

In early 2020, 24 Hour became concerned about the growing spread of COVID-19 and the inability to differentiate between it and other illnesses. Larson Decl. ¶ 30. 24 Hour closely monitored COVID-19 in its communities, and sick or potentially sick employees and members. *Id.* at ¶¶ 11–12. Before closing the Clubs, 24 Hour's management received regular reports of members and employees exposed or potentially exposed to COVID-19 or experiencing symptoms. *Id.* at ¶ 31; Gottlieb Decl. ¶¶ 14–15; 20; Appx. Ex, 14. For example, on March 13, 2020, a member in Bergen, New Jersey tested positive after checking in to the Club at least five times in the days before the positive test. Larson Decl. at ¶ 32; Appx, Ex. 27. That same day, in Alameda County, California, an individual informed 24 Hour he tested positive for COVID-19 and was exposed when someone coughed in his face while playing basketball at the Club. Gottlieb Decl. ¶ 15; Appx, Ex. 13.[14] 24 Hour's management also received emails from employees concerned about others testing positive. Larson Decl. ¶ 33; Appx, Ex. 28. 24 Hour attempted to investigate, but these efforts were limited as individuals were not required to self-report confirmed cases. Larson Decl. ¶¶ 31, 33. Had widespread testing existed, 24 Hour likely would have received far more reports of confirmed cases. Carnethon Decl. ¶ 37.

24 Hour also experienced *significantly* more employee sick time usage in early 2020, as

---

[14]     When asked why he came to the Club while sick, the individual stated that, at that time, "[he] was not showing any symptoms." Gottlieb Decl. ¶ 15; Appx, Ex. 13.

compared to 2019. Healon Decl. ¶ 5. In the pay period ending on March 13, 2020, 24 Hour had a 27.6% increase in paid sick hours over the same pay period of 2019. Healon Decl. ¶ 10. A reasonable inference is that this increase was at least partially attributable to COVID-19, and at least some of these sick individuals were at Clubs while infected. Carnethon Decl. ¶ 37. Moreover, "it is without reasonable dispute that individuals with the common cold and related symptoms would have been present in each Club during this period, as well as individuals with the flu." Carnethon Decl. ¶ 28.

## 2. 24 Hour Had No Choice but to Completely Shut Down All of the Clubs

By mid-March, 24 Hour explored business modifications to keep employees and members safe, while staying open. Larson Decl. ¶ 35; Appx, Ex. 184 at 2563. 24 Hour's then-CEO, Tony Ueber, explained: "[W]e felt like these were the appropriate actions to take, given the information that we had in order to ensure the safety of our members and team members from COVID. . . ." Appx, Ex. 184 at 2565. Though, soon after, it became obvious that modifications were not enough to slow the spread and 24 Hour could not safely continue to operate. Larson Decl. ¶ 35; Appx, Ex. 184 at 2565. At the time, approximately 500 to 2,500 people visited each Club daily and more information was being released regarding the high transmissibility and dangers of COVID-19. Larson Decl. ¶¶ 10, 20, 25. The high number of Club visitors, coupled with the highly contagious nature of COVID-19, especially in gyms, led 24 Hour to close all Clubs across the country effective midnight on March 16, 2020, as 24 Hour could not be confident it could control or mitigate the spread of the virus in the Clubs. Larson Decl. ¶ 39; Appx, Ex. 184 at 2565.[15]

## 3. Shut Down Orders Also Prohibited Access to the Clubs

COVID-19 cases doubled every two or three days between January and March 2020.

---

[15]     Most other large fitness club businesses also decided to close around this time. Appx, Ex. 184 at 2566; Larson Decl. ¶ 36.

Carnethon Decl. ¶ 12; Appx, Ex. 34 at 690. This led public health officials to conclude that the spread could only be curtailed by preventing people from gathering. Government entities began issuing shutdown orders around the time that 24 Hour closed the Clubs. [16] Appx, Exs. 41–119; Larson Decl. ¶¶ 38–43; Carnethon Decl. ¶ 21. Health officials originally focused on "high risk" businesses, like gyms and fitness centers and ordered them closed. Carnethon Decl. ¶ 20; Larson Decl. ¶ 37. For example, on March 16, 2020, Los Angeles County ordered all gyms and fitness centers to be closed "because of the rapid spread of COVID-19. . . ." Larson Decl. ¶ 38–39; Appx, Ex. 29. Realizing that targeted closings were not enough to prevent rapid spread, governments began mandating that *everyone* in non-essential positions stay home. Carnethon Decl. ¶¶ 22, 33. For example, on March 16, 2020, Alameda County, California ordered closed *all* "non-essential" businesses, including "fitness and exercise gyms and similar facilities," "based on [the] increasing occurrence of COVID-19 within the County and throughout the Bay Area[.]" Larson Decl. ¶ 40; Appx, Ex. 46.[17] 24 Hour operated 63 Clubs in Alameda and the Bay Area at that time. *Id.*[18]

Other jurisdictions where 24 Hour operated followed suit and issued closure orders, recognizing that COVID-19 caused loss and damage to property because of its ability to attach to surfaces. Decl. ¶ 43; *see* Appx, Exs. 41–119. For example, on March 16, 2020, New York City, where 24 Hour operated seven Clubs, ordered all commercial gyms closed, noting that "the virus [was] physically causing property loss and damage" in addition to infecting individuals. Larson

---

[16]      The Federal Rules of Evidence permit the use of government orders as for the truth of the matter asserted. Fed. R. Evid. 803(8)(C); *see Meyer v. Gibson*, 17 F. App'x 821, 823 n.1 (10th Cir. 2001) (government orders are admissible under the public records exception to the hearsay rule). Insurers' expert, Dr. Stock, also agrees that federal, state and county governments were reliable sources of information regarding COVID-19. Appx, Ex. 166 at 2389.

[17]      The county further confirmed that "widespread testing for COVID-19 [was] not yet available." Appx, Ex. 46 at 788.

[18]      Relatedly, on March 19, 2020, the State of California, where 24 Hour operated 240 Clubs, ordered the shutdown of all non-essential activities, noting that, "in a short period of time, COVID-19 has rapidly spread throughout California[.]" Larson Decl. ¶¶ 8, 42; Appx, Ex. 31.

Decl. ¶ 8, 41; Appx, Ex. 97 at 1258. Similarly, in its March 26, 2020 order, Broward County, Florida, where 24 Hour operated five Clubs, noted that the virus was "physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time." Larson Decl. ¶ 8 n.3; Appx, Ex. 80 at 1106. On March 31, 2020, Dallas County, Texas, where 24 Hour operated 11 Clubs, ordered individuals to "avoid . . . visiting gyms," recognizing that "[t]he COVID-19 virus causes property loss or damage due to its ability to attach to surfaces for prolonged periods of time[.]" Larson Decl. ¶ 10; Appx, Ex. 105 at 1316.[19] Ultimately, orders issued across the country prohibited access to all Clubs. 24 Hour could not reopen until health authorities deemed the localities safe, and then only with various requirements and restrictions. *See* Appx, Exs. 41–119.

**E.    24 Hour Tendered its Claim and Insurers Privately Agreed Coverage was Likely But Publicly Refused to Provide Coverage**

On March 21, 2020, 24 Hour submitted its claim to Insurers. Gottlieb Decl. ¶ 16. Thereafter, 24 Hour responded to multiple rounds of information requests from Insurers and the Insurers already held several calls to discuss the claim. *Id.* at 17–19. On June 25, 2020, Insurers' lead claims adjuster for Continental, Odell Bradley, expressed to the other Insurers that coverage was triggered under the policies. Bradley opined, "***There seems to be a good chance Business Interruption coverage will be triggered. I think we all agree.***" Appx, Ex. 165 at 2383 (emphasis added).

---

[19]    Other jurisdictions where 24 Hour operated also issued COVID-19 orders acknowledging that, not only is the virus dangerous to human life, it can physically alter and/or damage property due to its proclivity to attach to surfaces. *See* fn. 42, below.

> There seems to be a good chance Business interruption coverage will be triggered. I think we all agree.
> However, there is question based on language of the endorsement that is not straight forward specifically speaking to business interruption.
>
> Will coverage for BI be limited to the Sub-limits of $2.5M?
> On the other hand does the endorsement open coverage speaking to BI limits and Extra expense pertaining to the base policy $20M?
>
> Market thoughts?
>
> **Odell Bradley**
> **Associate General Adjuster, Property Large Loss Claim**
> **CNA** | 801 Warrenville Road, Suite 700, Lisle, IL 60532
> Mobile: 469-992-5220

Thus, Mr. Bradley concluded that the only issue with respect to the claim concerned applicable coverage limits, not whether coverage existed. None of the other Insurers disagreed with Mr. Bradley's conclusion. Appx, Ex. 165; Appx, Ex. 176 at 2482–83; Appx, Ex. 177 at 2501–02; Appx, Ex. 180 at 2528.[20]

Rather than convey their internal position to 24 Hour, Insurers claimed (without merit) that 24 Hour failed to provide sufficient information to demonstrate coverage. Gottlieb Decl. ¶ 22–23; Appx, Ex. 11. Critically, when asked what Insurers need from 24 Hour, Continental stated, "[i]n terms of what would be required, I don't have an answer to that. I just know that what was provided did not demonstrate or did not meet that requirement." Appx, Ex. 183 at 2556.

Simultaneously, Insurers asked (and continue to ask) 24 Hour for information that is impossible to obtain and was not required or delineated in the policies. 24 Hour identified various incidents of sick individuals present at its Clubs and explained why it believed coverage was triggered. Gottlieb Decl. ¶ 20; Appx, Ex. 14. However, Insurers contend 24 Hour must identify, among other things, when specific individuals visited Clubs in relation to receiving confirmed positive test results, whether those individuals wore masks, whether they coughed or sneezed while at a Club, and whether 24 Hour had tested any of its property for COVID-19, despite knowing that

---

[20]      Mr. Bradley's note also acknowledges the possibility for coverage in addition to the Communicable Disease Endorsement and its $2.5 million per occurrence limit.

no such property testing was available. *See* Appx, Ex. 181 at 2538; Appx, Ex. 183 at 2556; Appx, Ex. 164 at 2375; Appx, Ex. 176 at 2478–79; Appx, Ex. 177 at 2503. Further, one Insurer, Starr Surplus Lines, testified that there could be no coverage at all for COVID-19-related losses because the policy only covers "a communicable disease that can actually be tested." Appx, Ex. 177 at 2496.

## GOVERNING INSURANCE PRINCIPLES

Insurers advance coverage restrictions that are not found in the policies and are not supported by law. In doing so, Insurers ignore well-settled law that insurance policies must be interpreted broadly and reasonably in favor of coverage and that any ambiguities must be resolved against the insurer. Insurers also misread and misapply their own policies leading them to erroneously conclude that coverage is not triggered.

California law is clear that insurance contracts are generally subject to the "ordinary rules of contractual interpretation." *Bank of the W. v. Superior Ct*., 2 Cal. 4th 1254, 1264 (1992). As such, the parties' mutual intentions and understandings usually govern the policy's interpretation, which are ascertained from the language that the parties used in the policy, whenever possible. Cal. Civ. Code §§ 1636, 1639; *AIU Ins. Co. v. Superior Ct*., 51 Cal. 3d 807, 821-22 (1990). "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. Words and policy provisions are given their "clear and explicit" meanings, interpreted in their "ordinary and popular sense." *Id.*; §§ 1638, 1644. Thus, "[i]f the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." *Montrose Chem. Corp. v. Admiral Ins. Co*., 10 Cal. 4th 645, 666–67 (1995).

Critically, insurance policies must be "*interpreted broadly in favor of the insured*" as to "*afford the insured the greatest possible protection*." *St. Mary & St. John Coptic Orthodox Church*

*v. SBC Ins. Servs., Inc*., 57 Cal. App. 5th 817, 825 (2020) (emphasis added); *Great W. Drywall, Inc. v. Interstate Fire & Cas. Co*., 161 Cal. App. 4th 1033, 1040 (2008) (emphasis added).[21] If the court determines that *only one* interpretation of a policy provision is reasonable, then that interpretation must be adopted. Conversely, if the court determines that the provision is "susceptible to *two or more* reasonable constructions," the policy provision is ambiguous which must then be construed strictly against the insurer and liberally in favor of coverage. *E.M.M.I. Inc. v. Zurich Am. Ins. Co*., 32 Cal. 4th 465, 470 (2004); *Montrose Chem. Corp.*, 10 Cal. 4th at 667. This is because "the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications." *Id.*

Whether a provision is subject to more than one reasonable construction is a context-specific inquiry. Although "the intention of the parties is to be ascertained from the writing alone, if possible[,]" an insurance contract "may be explained by reference to the circumstances under which it was made, and the matter to which it relates." *Markowitz v. Fid. Nat. Title Co*., 142 Cal. App. 4th 508, 527 (2006). As such, "the proper question [for courts to consider] is whether the [policy provision] is ambiguous in the context of [the specific] policy and the circumstances of [the specific claim]. The provision will "shift between clarity and ambiguity with changes in the event at hand." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co*., 5 Cal. 4th 854, 868 (1993) (citations omitted).

## ARGUMENT

Insurers knew they were never going to cover 24 Hour's claim. Thus, they continued (and continue) to "move the goalposts" so that 24 Hour could never meet their disingenuous, fabricated

---

[21]     Exclusionary clauses and coverage limitations, by contrast, must be interpreted narrowly against the insurer. *Id.* An insurer's "failure to use available [exclusionary] language . . . gives rise to the inference that the parties intended not to so limit coverage" and supports a reading of coverage. *Fireman's Fund Ins. Cos. v. Atl. Richfield Co.*, 94 Cal. App. 4th 842, 852 (2001).

coverage requirements. Insurers continue to advance coverage restrictions that are not found in the policies and not supported by law. Insurers argue (1) that 24 Hour offers no evidence of "physical loss or damage" under the business interruption and time element provisions and (2) that 24 Hour cannot meet the requirements for coverage under the Communicable Disease Endorsement. In this opposition, 24 Hour first addresses coverage under the Communicable Disease Endorsement, and second why "physical loss or damage" is not required under the business interruption and time element provisions, and even so, 24 Hour does have sufficient evidence to show "physical loss or damage" to its properties. Denial of summary judgment is warranted in full.

**A.    Triable Issues of Material Fact Regarding the Communicable Disease Endorsement**

       **1.    Triable Issues of Material Fact Exist as to Whether Communicable Diseases Were Present and Spreading at 24 Hour's Locations**

Insurers contend 24 Hour lacks evidence of the "presence" and "spread" of COVID-19 at the Clubs because (1) there is no proof of "confirmed" cases of COVID-19 at its Clubs, and (2) 24 Hour did not conduct contact tracing that might allow it to infer the spread of the disease within its Clubs. [Doc. 232 at 25.] These arguments hinge on the false premises that: (a) 24 Hour must demonstrate the actual "presence and spread" of *COVID-19*, rather than any "*communicable disease,*" which is what the policies cover, (b) 24 Hour does not have direct evidence of COVID-19 at the Clubs, and (c) 24 Hour may not rely on circumstantial evidence to establish coverage.[22]

The burden of proof in an insurance case "is proof by a preponderance of the evidence." *Buss v. Superior Court*, 16 Cal. 4th 35, 54 (1997). This standard is met when "the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily

---

[22]    24 Hour filed its own motion for partial summary judgment regarding coverage under the Communicable Disease Endorsement for its Clubs in Los Angeles County. In that Motion, 24 Hour explains that there is no genuine issue of material fact that communicable diseases were present in 24 Hour's Los Angeles County Clubs and that government orders regulating communicable diseases prohibited 24 Hour from accessing its Clubs. [Doc. 238.]

in number of witnesses or quantity, but in its effect on those to whom it is addressed." *Bichai v. DaVita, Inc*., 72 Cal. App. 5th 1126, 1138 (2021). In other words, "a party 'need prove only that [a fact] is ***more likely to be true than not true*.'"** *People ex rel. Brown v. Tri-Union Seafoods, LLC*, 171 Cal. App. 4th 1549, 1567 (2009) (emphasis added). To establish this, a party may use any manner of evidence, including circumstantial evidence. *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 744 (1993). Circumstantial evidence may be used to establish the "fact to be proved ***through inference based on human experience*.**" *Paulino v. Harrison*, 542 F.3d 692, 700 n.6 (9th Cir. 2008) (emphasis added). On summary judgment, specifically, "the record need not contain direct evidence to create a genuine issue as to a material fact; ***circumstantial evidence which would allow a jury to find for the nonmovant is sufficient*.**" *Koons v. XL Ins. Am., Inc.*, 516 F. App'x 217, 221–22 (3d Cir. 2013) (emphasis added).[23]

Accordingly, to establish the "actual presence and spread" of a communicable disease at trial, 24 Hour need only show that it was "more likely than not" that one or more communicable diseases were present and spreading at any of its Clubs. *Tri-Union Seafoods, LLC*, 171 Cal. App. 4th at 1567. To meet this standard, 24 Hour may rely on circumstantial evidence, the credibility of which must be judged by inference "based on human experience." *Vuckson v. United States*, 354 F.2d 918, 920 (9th Cir. 1966). In opposing a motion for summary judgment, 24 Hour has a far lesser burden than at trial. It need only present evidence from which a jury *might* conclude that 24 Hour has met its burden, and it is not for the Court to make the ultimate determination.[24]

---

[23]     *See also Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir. 1990) ("[N]othing in Rule 56 prevents [plaintiffs] from creating a genuine issue of material fact by pointing to sufficiently powerful countervailing circumstantial evidence."); *Nationwide Mut. Ins. Co. v. William Hukill*, No. 4:CV-04-0399, 2005 U.S. Dist. Lexis 55993, at *6 (M.D. Pa. July 12, 2005); *Lipari v. Sullivan*, No. 17 CV 1566, 2018 U.S. Dist. Lexis 212127, at *30 (N.D. Ill. Dec. 17, 2018) ("[C]ircumstantial evidence can be enough to defeat a motion for summary judgment").

[24]     *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (2016) ("The judge's inquiry [is] whether

Here, there is no doubt that triable issues of fact exist from which a jury might conclude that communicable diseases, including COVID-19, were present and spreading at one or more Clubs. *First,* Insurers improperly attempt to evade coverage by limiting the Communicable Disease Endorsement to COVID-19 alone. That provision extends coverage to *all* communicable diseases, including, for instance, the cold and flu. Here, there is ample uncontroverted evidence that other communicable diseases – such as these – were present and spreading at the Clubs. *See* Carnethon Decl. ¶ 26; Appx, Ex. 39; Appx, Ex. 166 at 2392 (Carnethon) (Insurers' expert, Dr. Stock, opines how COVID-19 arose during a particularly bad flu season); Healon Decl. ¶ 5–10 (significant amount of more employee sick time usage in early 2020); Appx, Ex. 166 at 2387, Appx, Ex. 170 at 2425 (viruses are "ubiquitous" and would have been present at each Club).[25] These diseases could not be distinguished from COVID-19, so were treated as if they were COVID-19 and their presence and spread at the Clubs, alone, is sufficient to trigger coverage.

*Second*, even if proof of COVID-19 was required, 24 Hour's position that COVID-19 was present at the Clubs is not speculative.  Direct evidence supports 24 Hour's position. 24 Hour operated where COVID-19 was rapidly spreading, and its members reported confirmed cases of COVID-19. At least two members reported testing positive for COVID-19—one in Bergen, New Jersey and another in Alameda County, California. Larson Decl. at ¶ 32; Appx, Ex. 27; Gottlieb Decl. ¶ 15; Appx, Ex. 13. 24 Hour also learned about members likely testing positive for COVID-19 who were not reporting those positive tests to 24 Hour. Larson Decl. ¶ 33; Appx, Ex. 28.

*Third*, circumstantial evidence demonstrates that COVID-19 was present and spreading throughout the locales where 24 Hour operated, and necessarily at the Clubs. This is underscored

---

reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict.").

[25]     This is addressed more fully in 24 Hour's separate motion for partial summary judgment regarding coverage under the Communicable Disease Endorsement for its Clubs in Los Angeles County. [Doc. 238.]

by the various government proclamations highlighting the prevalence of COVID-19 and the rapid

spread of the virus. *See, e.g.*, Larson Decl. ¶¶ 23, 42; Appx, Ex. 191 and 2914 (Governor Steve

Sisolak of Nevada opining, "[W]e don't know the full extent of what we're dealing with. But based

on the rapid spread . . . we know that we must act quickly"); Larson Decl. ¶ 24; Appx, Ex. 24

(LADPH cautioning that there were "positive cases across the entire County" and that "the public

should not think one location is safer than the other"); Appx, Ex. 192 at 2912 (Governor Andrew

Cuomo of New York identifying "the largest cluster [of COVID-19] in the country" in Westchester

County, where 24 Hour operated four Clubs, just four days before 24 Hour's closure date). As

these government authorities recognized, COVID-19 infiltrated every state, county, and city in the

nation. It was thus more likely than not that COVID-19 was present at the Clubs, given the high

volume of patrons 24 Hour hosted daily at its heavily trafficked Clubs.

Critically, at this time, more than *1,400 members* per day on average visited each Club.

This means that, for the 400 Clubs at issue in this case, a combined total of more than *425,000*

*individuals* visited the Clubs every day. In Los Angeles County alone, a county that experienced

an extremely high increase of confirmed cases over a short period, 1,300 members visited each

Club daily. Larson Decl. ¶ 10. This equates to 65,000 members/day in Los Angeles County,

enough guests to fill a football stadium. Even so, the statistics regarding confirmed cases are

incomplete because the number of actual COVID-19 cases was much higher considering the lack

of testing in early 2020. Carnethon Decl. ¶ 23. Nevertheless, the high volume of members visiting

the Clubs, while case counts were increasing exponentially, leads to the conclusion that COVID-

19 was more likely than not present and spreading at the Clubs.

There is sufficient evidence for the Court to determine that a jury might find it "more likely

than not" that communicable diseases, including COVID-19, were present and spreading at the

Clubs due to (1) the *tens of thousands of individuals* frequenting Clubs daily and the nature of

gyms as "high risk" breeding grounds for COVID-19; (2) the heightened rate of COVID-19 in the

areas where 24 Hour operated; (3) the increased levels of influenza and cold during this same

period; (4) the increased levels of sick time in comparison to the prior year; and (5) the confirmed

cases of COVID-19 reported by guests to 24 Hour.

**2.      Access to Clubs was Prohibited by Laws Regulating Communicable Diseases**

Insurers next contend coverage is precluded because the government orders were not "in

any way related to a specific condition at an insured location." [Doc. 232 at 26.] The

Communicable Disease Endorsement affords coverage where access to Clubs is "prohibited" as a

"direct result" of a "declaration . . . enforcing any law or ordinance regulating communicable

diseases." Appx, Ex. 2 at 101. This provision does not require a government order specific to 24

Hour, and Insurers cannot rewrite the policy to add such a limitation. *S. Cal. Counseling Ctr. v.*

*Great Am. Ins. Co.*, 162 F. Supp. 3d 1045, 1050 (C.D. Cal. 2014) ("A court may not rewrite the

terms of the policy or engage in a forced construction."). If Insurers intended coverage to be so

narrow, they should have used limiting language to effectuate such intent. They did not.

24 Hour has sufficiently shown that coverage is triggered under a proper reading of the

Communicable Disease Endorsement. As demonstrated above, governmental orders prohibited 24

Hour from accessing and operating the Clubs. For example, LADPH's March 16, 2020 Order

"immediately require[d] closing" gyms and fitness centers and warned that noncompliance was a

criminal offense. Appx, Ex. 53.[26] The same is true for other jurisdictions where 24 Hour operated.

---

[26]      Similarly, on March 19, 2020, Governor Newsom of California issued a statewide order, shutting down all non-essential business locations, including fitness clubs. Appx, Ex. 31 at 676. The order provided that it was "enforceable pursuant to California law, including but not limited to, Government Code section 8665" (*Id.* at 676–77), which states that any person "who refuses or willfully neglects to obey any lawful order or regulation promulgated or issued as provided in this chapter, shall be guilty of a misdemeanor [.]" Cal. Gov. Code § 8665.

In Texas, for example, where 24 Hour operated 74 Clubs, Governor Greg Abbott issued an executive order that prohibited individuals from visiting gyms and required gyms to close in all Texas counties, to combat the "imminent threat of disaster [due to COVID-19]." Larson Decl. ¶ 8; Appx, Ex. 99 at 1270. In Colorado, where 24 Hour operated 31 Clubs, Governor Polis directed the closure of all non-critical businesses, including Clubs. Larson Decl. ¶ 8; Appx, Ex. 63. Every jurisdiction where 24 Hour operated issued orders regulating COVID-19 and prohibited 24 Hour from accessing the Clubs to operate its business. Larson Decl. ¶ 43.[27] There is no credible dispute that 24 Hour was prohibited from accessing the Clubs by governmental orders issued under laws regulating communicable diseases.

Further, the policy language in the cases Insurers cite is more restrictive than the language at issue here. [Doc. 232 at 26.] For example, the policy language in *Danville*, *St. Tammany*, and *Northwell*, all required access to the insured property be prohibited by "order of an authorized governmental agency enforcing any law or ordinance regulating communicable disease ***and that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the Location.***" *Danville Reg'l Med. Ctr., LLC v. Am. Guarantee*, No. 4:21-cv-00012, 2022 U.S. Dist. LEXIS 206563, at *2 (W.D. Va. Nov. 14, 2022) (emphasis added); *St. Tammany Par. Hosp. Serv. Dist. No. 2 v. Zurich Am. Ins. Co.*, 593 F. Supp. 3d 399, 416 (E.D. La. 2022) (same); *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 112 (S.D.N.Y. 2021) (same). Here, by contrast, the policies do not require the Clubs be deemed "uninhabitable." 24 Hour's policies merely require access "prohibited" as a "direct result" of a "declaration . . . enforcing any law or ordinance regulating communicable diseases." Appx, Ex. 2 at 101. Such standards are met by the government orders

---

[27]    *See e.g.*, Appx, Exs. 41–119 (all orders).

cited herein, which prohibited access to the Clubs for their intended use as fitness centers.[28]

Insurers' contrary arguments lack all merit.[29]

3.      **24 Hour Need Not Demonstrate it Incurred Cleaning Costs to Obtain Business Interruption Coverage and the Losses Are Not Limited to the Clean-up Period**

Insurers also argue that 24 Hour has not provided evidence of expenses to "clean up, remove, and dispose of" COVID-19 or to "restore the premises" after 24 Hour closed the Clubs, that this is required under the Communicable Disease Endorsement, and that the policies limit Business Interruption losses to the time it takes to clean the property. [Doc. 232 at 27–30.] Preliminarily, this argument is premature as the Parties agreed to defer litigating 24 Hour's monetary losses to Phase II of this case. The case is still in Phase I— addressing issues of coverage and liability. The Motion should be denied on this issue simply because the Parties have not yet conducted discovery on monetary damages. *Azur v. Chase Bank, USA*, 601 F.3d 212, 216 (3d Cir. 2010) (holding motions for summary judgment are based on the "pleadings, depositions, answers to interrogatories, admissions, and affidavits").

Nevertheless, Insurers' arguments fail. There is no requirement that 24 Hour spend money to address communicable diseases at its Clubs to trigger Business Interruption coverage. *See* Appx, Ex. 2 at 77–109. At most, Business Interruption losses must be tied to 24 Hour's efforts to clean and dispose of a communicable disease or restore the property. Such losses are not tied to whether

---

[28]     The cases cited are also factually inapposite, as they **concern hospital or medical facilities that were only partially closed due to the applicable government orders**.[28] As *Riverside Dental* noted, access to these properties was not "prohibited" because "the premises could be accessed for purposes of *performing and receiving essential services*." *Riverside Dental of Rockford, Ltd. v. Cincinnati Ins. Co.*, No. 20 CV 50284, 2021 U.S. Dist. LEXIS 120957, *7 (N.D. Ill. June 29, 2021) (emphasis added). Here, in contrast, the government orders prohibited 24 Hour from using its facilities to *perform its services* as a fitness club, i.e. 24 Hour was unable to offer its facilities to club members, the very purpose of its existence.

[29]     Courts have been "skeptical" of Insurers' argument that there must be a causal connection between the outbreak on the insured's premises and the government order with policies like 24 Hour's. *Baldwin Acad., Inc. v. Markel Ins. Co.*, 2020 U.S. Dist. LEXIS 239916 at *12-*13 (S.D. Cal. 2020); *Treo Salon, Inc. v. West Bend Mut. Ins. Co.*, 538 F. Supp. 3d 859 (S.D. N.Y. 2021).

24 Hour incurred specific expenses on those efforts. Moreover, 24 Hour "disposed" of the communicable disease(s) and "restored the property" by closing the Clubs.[30] As a result, 24 Hour sustained Business Interruption losses. Indeed, closing the Clubs was the *only* proper way to dispose of COVID-19 and restore the property because, even if the virus could be simply removed from the surfaces or air, infected persons would continue to reintroduce the virus as they continued to visit the Clubs to work out. Carnethon Decl. ¶ 38; Appx, Ex. 170 at 2427.[31]

Contrary to Insurers' assertion otherwise [Doc. 232 at 29–30], and although this, too, is a Phase II issue, there also is nothing in the policies that limits Business Interruption losses to the time it takes to clean the property. Insurers fail to cite the entire "Period of Recovery" provision which shows that the exact opposite is true.[32] Further, limiting any recovery to cleanup time, would render the coverage worthless since it would be unlikely such losses would ever surpass the $250,000 deductible[33] and 24 Hour would not reasonably expect to purchase such a large ($2.5 million per occurrence) limit of liability only to cover a short window of time to clean a location.

---

[30]    While Clubs were open, 24 Hour engaged in regular cleaning activities to try to dispose of the virus. Larson Decl. ¶ 35. After Clubs closed, government orders required 24 Hour to comply with operating requirements as a condition to reopening. *See* Appx, Ex. Larson Decl. ¶ 41–119.

[31]    Defendant Insurer Continental also agrees that an insured cannot remove COVID-19 from its properties "because it is repeatedly reintroduced by people." *Lawrence Gen. Hosp. v. Cont'l Cas. Co.*, No. 23-1286, 2024 U.S. App. LEXIS 676, at *29  (1st Cir. Jan. 10, 2024).

[32]    Insurers claim that the "Period of Recovery" provision limits the amount of losses to the period when 24 Hour was cleaning the properties, not the period that Clubs were closed due to government orders. Insurers again ignore the plain language of the policy and fail to cite the provision's entire language which defines the length of time for which Business Interruption may be claimed as including "such additional length of time to restore the Insured's business to the condition that would have existed had no loss occurred . . . but in no event for more than 365 consecutive calendar days from said later commencement date[.]" Further, Insurers fail to address the coverage extension for Business Interruption losses where "loss or damage…causes the enforcement of any law, ordinance, governmental directive or standard regulating the…use or occupancy of property." Appx, Ex. 2 at 80. Insurers are liable for, among other things, "any increase in the Business Interruption…loss arising out of the additional time required to comply with said law or ordinance." *Id.* at 83–84.

[33]    Insurers also claim that 24 Hour will not meet the per occurrence deductible of $250,000. 24 Hour's Business Interruption losses are certainly higher than the deductible. Gottlieb Decl. ¶ 24. Regardless, though, the parties agreed to litigate damages in Phase II of the trial.

Insurers' position is thus unfounded.

**B.      Physical Loss or Damage is Not Required Under the Business Interruption Provision or the Civil or Military Authority and Ingress/Egress Coverage Extensions**

**1.      The Policies Require only "Loss" to 24 Hour's "Interest" in Property**

Insurers erroneously argue that the Business Interruption coverage requires "physical loss or damage" to covered property for coverage to be triggered. [Doc. 232 at 12–15.] The "Coverage" sections of the policies state that they cover the "interest of the Insured" in real or personal property, including property that is "leased or intended for use by the Insured." Appx, Ex. 2 at 76. The "Perils Insured" section states that the policies apply to all "risks" of "physical loss or damage," and the Business Interruption section states that it covers Business Interruption caused by "loss, damage or destruction" that is "covered herein." *Id.* at 77 and 86. There is no explicit requirement that Business Interruption be caused by any "physical loss or damage." Rather, in the policies at issue, coverage is afforded if there is a "loss" to covered property from a "risk" of "physical loss or damage."[34] This contrasts with other property policies covering similar risks. For example, the policy language at issue in *Another Planet Entm't, LLC v. Vigilant Ins. Co.*, provides coverage only where business interruption results from "direct physical loss or damage" to covered property caused by a covered peril. 56 F.4th 730 (9th Cir. 2022).[35] Similarly, in *Marina Pacific Hotels and Suites, LLC v. Fireman's Fund Ins. Co.*, a case cited by the Insurers, the California appellate court described the policy language at issue there as follows: "The policy provided Business Interruption coverage (with a $22 million limit) for "the actual loss of business income

---

[34]      In the insurance context, "risk" is "the chance of injury, damage, or loss" or "exposure to the chance of injury or loss; a hazard or dangerous condition." *Doheny W. Homeowners' Ass'n v. Am. Guar. & Liab. Ins. Co.*, 60 Cal. App. 4th 400, fn. 4 (1997) (citing various dictionary definitions).

[35]      The California Supreme Court accepted review of the Ninth Circuit's certified question regarding this "direct physical loss or damage" issue. *Another Planet Entm't, LLC v. Vigilant Ins. Co.*, No. S277893, 2023 Cal. Lexis 1111, at *1 (Mar. 1, 2023).

and necessary extra expense you sustain due to the necessary suspension of your operation during the period of restoration ***arising from direct physical loss or damage to [covered] property***." 81 Cal. App. 5th 96, 99 (2022) (emphasis added).

Unlike the language at issue in *Another Planet* or *Marina Pacific,* the Policies do not clearly limit coverage to Business Interruption from "physical loss or damage to" property. The policies require only a "loss." The significance of this distinction is demonstrated by the fact that Allianz recognized there was no "physical loss or damage" requirement and, before the policy was issued, sought unsuccessfully to amend the policy wording to include such a requirement per the comparison below between what Allianz wanted and the actual policy wording:

> **Proposed Language:** "Loss resulting from necessary interruption of business conducted by the insured, whether total or partial, and caused by *direct physical* loss, damage, or destruction covered herein during the term of this policy to real and personal property as described in Clause 7.A." (emphasis added).

> **Actual Language:** "Loss resulting from necessary interruption of business conducted by the insured, whether total or partial, and *caused by loss*, damage, or destruction covered herein during the term of this policy to real and personal property as described in Clause 7.A." (emphasis added).

*Compare* Appx, Ex. 187 at 2674, with Appx, Ex. 2 at 77. Allianz testified this was the "preferred language . . . for business interruption to be caused by physical loss or damage" because it is "more restrictive." Appx., Ex. 186 at 2646. But this additional language was not added to the policy. Accordingly, there is no requirement that Business Interruption be caused by physical loss or damage.[36] At the very least, this gives rise to an ambiguity which should be interpreted in 24 Hour's favor.[37] Because Insurers' Motion is premised on a "physical loss or damage" requirement

---

[36]     *See Fireman's Fund Ins. Cos.*, 94 Cal. App. 4th at 852 (holding insurer's "failure to use available [exclusionary] language . . . gives rise to the inference that the parties intended not to so limit coverage.").
[37]     *See E.M.M.I. Inc.*, 32 Cal. 4th at 470 (holding a policy provision is ambiguous if it "is susceptible to two or more reasonable constructions"); *Montrose Chem. Corp.*, 10 Cal. 4th at 667 (stating ambiguities should be resolved "in favor of coverage.") To the extent resolution of the ambiguity "turns on disputed

that does not exist, denial is warranted.[38]

> **2.** **The Civil or Military Authority and Ingress/Egress Coverage Extensions Do Not Require Physical Loss or Damage to Property**

The Civil or Military Authority and Ingress/Egress coverage extensions[39] also do not require physical loss or damage to property. All that is required is an insured peril within five miles of an insured location and either (a) an "order or action" by a civil authority prohibiting access to an insured location, that is issued "in connection with or following" such peril to trigger the Civil or Military Authority coverage, or (b) "access to or egress from real or personal property" being prevented to trigger the Ingress/Egress provision. Appx, Ex. 2 at 79. As with the Business Interruption coverage, Allianz recognized there was no "physical loss or damage" requirement in these provisions and suggested edits that were never incorporated. Appx, Ex. 186 at 2644 and 2647.[40] Despite the Insurers disingenuous attempt to read this requirement into their policies, the law is clear that the actual policy language controls the meaning of the contract. *See AIU Ins. Co.*, 51 Cal. 3d at 821–22 (the parties' intent is ascertained from the language of the policy); *Fireman's Fund Ins. Cos.*, 94 Cal. App. 4th at 852 (failure to use available exclusionary language gives rise to inference policy does not limit coverage). Thus, there is *at least* a triable issue of fact whether coverage under these provisions is triggered for 24 Hour's resulting Business Interruption losses.

---

extrinsic evidence, the dispute must be resolved by a jury" and not by the court as a matter of law. *Cal. Cas. Indem. Exch. v. Frerichs*, 74 Cal. App. 4th 1446, 1450 (1999).

[38] Insurers recognize no requirement exists for Business Interruption to be caused by "direct physical loss or damage." In searching for one, they rely on the "Period of Recovery" provision, which they claim "reinforces" that physical loss or damage is required. But that provision cannot "reinforce" something that does not already exist, and the provision does not state that "physical loss or damage" to covered property is required to trigger Business Interruption coverage. The Period Recovery provision merely defines the period for which losses can be claimed, setting an outer limit as the time to restore the insured's business to pre-loss conditions. *See Coast Restaurant Grp., Inc. v. AmGUARD Ins. Co.*, 90 Cal. App. 5th 332, 341 (rejecting similar argument in COVID-19 case, stating that the provision "does not purport to define the scope of coverage" but simply addresses the duration of coverage for certain losses).

[39] Insurers refer to these extensions as the "Time Element Provisions."

[40] The adjuster hired by the Insurers in response to 24 Hour's claim also noted that there was no physical damage requirement in these provisions. Appx, Ex. 181 at 2543– 2545; Appx, Ex. 182.

**C.**     **Assuming *Arguendo* That Physical Loss or Damage Was Required, Triable Issues Exist That Preclude Summary Judgment**

**1.**     **A Triable Issue of Fact Exists Whether the Closure of 24 Hour's Business Due to COVID-19 Constitutes Physical Loss or Damage**

In *Coast Restaurant Grp., Inc. v. AmGUARD Ins. Co.,* 90 Cal. App. 5th 332, 340 (2023), the policy at issue covered business interruption losses from a "suspension" of operations "caused by direct physical loss of or damage to property at the described premises." *Id.* at 336.[41] The court "conclude[d] that appellant suffered a covered *loss* under the policy because the governmental restrictions in this case deprived the appellant of important property rights in the covered property" and that "[a] governmental order that temporarily deprives the insured of possession and use of covered property can qualify as a "'direct physical loss.'" *Id.* at 340 (emphasis added). Insurers agree that government authorities issued closure and "stay at home" orders in 2020 that required "non-essential businesses such as 24 Hour's to close." [Doc. 232 at 27]. These orders made clear that 24 Hour could not reopen until authorities deemed the localities safe. Appx, Exs. 41–119. Since these government orders "temporarily deprive[d] the insured of possession and use of covered property," there is at least a triable issue of fact that 24 Hour suffered "physical loss" of its properties. *Coast,* 90 Cal. App. 5th at 340.

**2.**     **Triable Issues Exist that COVID-19 Caused Physical Loss or Damage**

Triable issues of material fact exist as to whether COVID-19 at the Clubs caused "physical loss or damage," by adhering to property and rendering it unsafe. California appellate courts have held that COVID-19 inside businesses can cause physical loss or damage sufficient to trigger coverage for associated business interruption losses. *See Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.,* 81 Cal. App. 5th 96, 108–109 (2022) (holding allegations that virus was

---

[41]     Note the requirement of "physical loss or damage" to trigger coverage, unlike in the policies here.

present on surfaces and continually reintroduced requiring insured to close sufficient to plead physical loss or damage); *Shusha, Inc. v. Century-National Ins. Co.* 87 Cal. App. 5th 250, 264–265 (2022) (finding allegations that virus can remain on surfaces at least 28 days adhering to surfaces, sufficient to plead physical loss or damage).

Testimony from Insurers' experts demonstrates that COVID-19 causes physical loss or damage. Dr. Sauer-Budge testified that COVID-19 adheres to surfaces, and cited studies showing that COVID-19 can survive for as long as 57 days on surfaces within a building. Appx, Ex. 174 at 2454. Dr. Sauer-Budge also confirmed that efforts to clean COVID-19 from surfaces do not prevent it from being reintroduced as infected individuals are allowed to continue entering a business location. Appx, Ex. 170 at 2427. Dr. Carnethon agrees. Carnethon Decl. ¶ 38. Similarly, Dr. Sauer-Budge cited articles demonstrating that COVID-19 can contaminate indoor air creating hazardous conditions. Appx, Ex. 174. Further, both Insurer experts cite studies concluding that fitness centers are dangerous because individuals working out are more likely to expel viral particles. Appx, Exs. 168–168, 171–173.[42]

There are also triable issues of material fact as to whether COVID-19 was present at the Clubs. COVID-19 was spreading rapidly in the communities where 24 Hour operated at the time

---

[42]    Finally, several government orders specifically found COVID-19 caused property damage. *See e.g.*, Appx, Ex. 96 (New York City) ("the virus [was] physically causing property loss and damage".); Appx, Ex. 80 at 1106 (Broward County) (virus was "physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time."); Appx, Ex. 105 at 1316 (Dallas County) ("virus causes property loss or damage due to its ability to attach to surfaces for prolonged periods of time[.]"); Appx, Ex. 76 at 1069 (Osceola County) ("serious threat to life and property within the County arising from COVID-19."); Appx, Ex. 87 at 1157 (Prince George County) ("such assistance is needed for the continued protection of life and property"); Appx, Ex. 66 at 979 (City of Boulder, Colorado) (finding a "need to issue this Order in order to protect the health, safety and welfare of persons or property within the city"); Appx, Ex. 51 at 832 (Santa Barbara County) ("virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); Appx, Ex. 118 at 1422 (State of Washington) ("to help preserve and maintain life, health, property or the public peace . . . I hereby impose the following necessary restrictions . . ."); Appx, Ex. 62 at 918 (Solano County) ("the virus physically is causing property loss or damage due to its proclivity to attach to surfaces").

it closed the Clubs and when state and local authorities issued closure orders. 24 Hour had thousands of employees, and thousands of visitors each day to the Clubs. Further, 24 Hour received information about confirmed COVID-19 cases, not to mention suspected cases of COVID-19. *See* above discussion at **A.1**.

24 Hour need only produce sufficient evidence from which a trier of fact could find it "more likely than not" that COVID-19 was present. There is no limitation to the evidence 24 Hour can submit, including circumstantial evidence. *See* above discussion at **A.1**. This was illustrated in *K.C. Hopps Ltd. v. Cincinnati Ins. Co.*, where the court rejected arguments like those being made by Insurers here. 561 F. Supp. 3d 827 (W.D. Mo. 2021). Like here [Doc. 232 at 21–25], the insurance company claimed that summary judgment was proper because the policyholder could not present test results showing the virus was present. *Id.* at 839. The court rejected this, finding the policyholder put forth "sufficient evidence to support the inference that SARS-CoV-2 was present on its premises." *Id.* at 838. The policyholder, among other things, relied on an expert epidemiologist who provided information regarding the nature of the virus, how it spreads and data regarding its prevalence in the community. *Id.* at 838. The court stated that the insured "does not need definitive proof of the virus's presence, but instead must prove that it was more likely than not that the virus physically contaminated its premises." *Id.* at 839.[43] Similarly, the evidence submitted by 24 Hour demonstrates triable issues of fact that preclude summary judgment.[44]

---

[43]    Likewise, in *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*, the trial court denied a motion for summary judgment based on similar evidence: "expert testimony regarding the nature of the COVID-19 virus. . ., the estimated number of patrons [with] COVID based on public health information" and "percipient witness testimony regarding specific cases of COVID". Minute Order at 6, *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*, No. 20SMCV00952 (Jan. 20, 2023).

[44]    The arguments in this section also demonstrate triable issues that COVID-19 caused physical loss or damage within five miles 24 hour locations with civil authority orders prohibiting access. Thus, there is a triable issue under the Civil or Military Authority and Ingress/Egress coverage extensions.

**3.     The Court Should Avoid Summary Judgment on the Physical Loss or Damage Question While the Issue is Before the California Supreme Court**

Lastly, if the Court finds physical loss or damage is required, 24 Hour requests that the Court refrain from ruling until the California Supreme Court rules. In March 2023, that court accepted this certified question from the Ninth Circuit: "Can the actual or potential presence of the COVID-19 virus on an insured's premises constitute 'direct physical loss or damage to property' for purposes of coverage under commercial property insurance?" *Another Planet*, 56 F.4th 730.[45] While 24 Hour disagrees that the policies here are the same, Insurers posit that this is the same issue raised in their Motion. [Doc. 232 at 16]. The case has been briefed and is awaiting argument. Once argued, a decision should be announced within 90 days. CA Govt Code § 68210 (2022).

Nevertheless, Insurers urge this Court to grant their motion, as they are "confident" the court will rule their way. [Doc. 232 at 16]. This confidence is neither persuasive nor justified. As discussed above, California courts have ruled the other way, and many courts in pending cases have issued stays until the California Supreme Court settles the issue.[46] Should this Court read a "physical loss or damage" requirement into the Business Interruption coverage and accept Insurers' argument that there is no triable issue of fact, the Court should defer ruling until the California Supreme Court rules.

**CONCLUSION**

For the foregoing reasons, the Insurers' Motion should be denied in full.

---

[45]     *See Another Planet Entm't, LLC v. Vigilant Ins. Co.*, No. S277893, 2023 Cal. Lexis 1111, at *1 (Mar. 1, 2023).

[46]     *See Los Angeles Lakers v. Fed. Ins. Co.*, No. 2:21-cv-02281 (C.D. Cal. Feb. 14, 2024); *Hotel Adventures LLC v. Fireman's Fund Ins. Co.*, No. 30-2021-01188889 (Cal. Super. Mar. 14, 2023); *Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation Cal. v. Lexington Ins. Co.*, 310 Cal. Rptr. 3d 149, 531 (2023); *Shusha, Inc. v. Century-National Ins. Co.*, 307 Cal. Rptr. 3d 1, 527 P.3d 271 (2023); *Zurich Am. Ins. Co. v. Wm. Bolthouse Farms, Inc.*, No. 1:21-CV-00783-JLT-CDB (E.D. Cal. Feb. 15, 2023); *French Laundry Partners, LP v. Hartford Fire Ins. Co.*, 58 F.4th 1305 (9th Cir. 2023); *Fed. Ins. Co. v. Simon Wiesenthal Ctr., Inc.*, No. 21-56334 (9th Cir. Jan. 10, 2023).

Dated: January 12, 2024

Respectfully submitted,

**REED SMITH LLP**

/s/ Mark W. Eckard
Mark W. Eckard (No. 4542)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500
(302) 778-7575 (Fax)
meckard@reedsmith.com

David E. Weiss (admitted *pro hac vice*)
T. Connor O'Carroll (admitted *pro hac vice*)
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
(415) 543-8700
(415) 391-8269 (Fax)
dweiss@reedsmith.com
cocarroll@reedsmith.com

*Counsel for Plaintiff 24 HOUR FITNESS WORLDWIDE, INC.*