## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (TMH) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| ———————————————— | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (TMH) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

## PLAINTIFF 24 HOUR FITNESS WORLDWIDE, INC.'S OPPOSITION TO ALLIED WORLD'S MOTION FOR SUMMARY JUDGMENT RE ITS POLLUTION POLICY

David E. Weiss (admitted *pro hac vice*)
T. Connor O'Carroll (admitted *pro hac vice*)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
E-mail: dweiss@reedsmith.com
E-mail: cocarroll@reedsmith.com

Mark W. Eckard (No. 4542)
REED SMITH LLP
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
E-mail: meckard@reedsmith.com

Counsel for Plaintiff 24 HOUR FITNESS
WORLDWIDE, INC.

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF THE PROCEEDING ............................................................................ 1

STATEMENT OF FACTS ........................................................................................ 2

A.    24 Hour Operated Health and Fitness Clubs Throughout the United States ..................... 2

B.    24 Hour Purchased the Policy in Response to a Disease Outbreak in its Gyms ................. 3

C.    By At Least January 2020, COVID-19 Arrived in the United States and Spread
       Uncontrollably ................................................................................................. 5

       1.    The Nature of COVID-19 and Disease Transmission ........................................... 5

       2.    The COVID-19 Virus Spread Rapidly and Largely Undetected ........................... 6

       3.    The Emergence of COVID-19 During Cold and Flu Season Compounded
              the Problem of Detection and Containment of COVID-19 .................................. 8

D.    COVID-19 and SARS-CoV-2 Forced 24 Hour to Close its Clubs .................................. 9

       1.    Concerns About Employee and Member Safety .................................................... 9

       2.    24 Hour Had No Choice but to Completely Shut Down All its Clubs ................. 10

E.    24 Hour Tendered its Claim and Allied World Erroneously and Unjustifiably Denied
       Coverage ........................................................................................................ 13

GOVERNING INSURANCE PRINCIPLES ............................................................ 14

ARGUMENT .......................................................................................................... 16

A.    Triable Issues of Material Fact Preclude Summary Judgment Regarding Whether 24
       Hour's Losses Are Covered Under the Policy .................................................. 16

       1.    Triable Issues of Material Fact Exist Regarding Whether Viruses Were on,
              at or Under 24 Hour's Properties .................................................................... 16

       2.    Triable Issue of Material Fact Exist as to Whether 24 Hour's Losses were
              Caused "Solely and Directly" by the Presence of a Virus at its Insured
              Locations .......................................................................................................... 22

              a.    Allied World Incorrectly Asserts that Government Orders are
                     Distinct Causes of Loss from the Presence of the Virus and Ignores
                     that it Recently Lost this Very Argument in a Similar Case ..................... 22

b.      Allied World Improperly Cites Inapposite Cases to Support its False Plain Meaning Argument.......................................................................... 26

c.      Allied World's Reading of the "Solely and Directly" Language Violates California Law.......................................................................... 29

CONCLUSION...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIU Ins. Co. v. Superior Ct.*,
  51 Cal. 3d 807 (1990) .......................................................................................................14

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (2016).........................................................................................................18

*Bank of the W. v. Superior Ct.*,
  2 Cal. 4th 1254 (1992) .....................................................................................................14

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
  5 Cal. 4th 854 (1993) .......................................................................................................16

*Bichai v. DaVita, Inc.*,
  72 Cal. App. 5th 1126 (2021) ..........................................................................................16

*People ex rel. Brown v. Tri-Union Seafoods, LLC*,
  171 Cal. App. 4th 1549 (2009) ...................................................................................16, 17

*Buss v. Superior Court*,
  16 Cal. 4th 35 (1997) .......................................................................................................16

*Dove v. Prudential Ins. Co. of Am.*,
  364 F. App'x 461 (10th Cir. 2010) ..................................................................................27

*Dove v. Prudential Ins. Co. of Am.*,
  No. 07-1311-EFM, 2009 U.S. Dist. LEXIS 41896 (D. Kan. May 18, 2009) ...............26, 27

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,
  32 Cal. 4th 465 (2004) .....................................................................................................15

*Great W. Drywall, Inc. v. Interstate Fire & Cas. Co.*,
  161 Cal. App. 4th 1033 (2008) ........................................................................................15

*Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.*,
  539 F. Supp. 3d 409 (E.D. Pa. 2021) ..............................................................................25

*Howell v. State Farm Fire & Casualty Co.*,
  218 Cal. App. 3d 1446 (1990) .........................................................................................29

*Hozier v. Midwest Fasteners, Inc.*,
  908 F. 2d 1155 (3d Cir. 1990)..........................................................................................17

*James v. Getty Oil Co. (Eastern Operations), Inc.*,
　472 A. 2d 33 (Del. Super. Ct. 1984) ................................................................................27

*Julian v. Hartford Underwriters Ins. Co.*,
　35 Cal. 4th 747 (2005) ....................................................................................................28

*K.C. Hopps Ltd. v. Cincinnati Ins. Co.*,
　561 F. Supp. 3d 827 (W.D. Mo. 2021) ......................................................................21, 22

*Koons v. XL Ins. Am., Inc.*,
　516 F. App'x 217 (3d Cir. 2013) .....................................................................................17

*Lipari v. Sullivan*,
　No. 17 CV 1566, 2018 U.S. Dist. Lexis 212127 (N.D. Ill. Dec. 17, 2018) ....................17

*Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*,
　No. 20SMCV00952 (Jan. 20, 2023) ................................................................................22

*Markowitz v. Fid. Nat. Title Co.*,
　142 Cal. App. 4th 508 (2006) .........................................................................................15

*Montrose Chem. Corp. v. Admiral Ins. Co.*,
　10 Cal. 4th 645 (1995) ..............................................................................................14, 15

*Mortar & Pestle Corp. v. Atain Specialty Ins. Co.*,
　508 F. Supp. 3d 575 (N.D. Cal. 2020) ............................................................................25

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
　15 F. 4th 885 (9th Cir. 2021) .....................................................................................24, 25

*Muriel's New Orleans, LLC v. State Farm Fire & Cas. Co.*,
　535 F. Supp. 3d 556 (E.D. La. 2021) ..............................................................................25

*Nationwide Mut. Ins. Co. v. William Hukill*,
　No. 4:CV-04-0399, 2005 U.S. Dist. Lexis 55993 (M.D. Pa. July 12, 2005) ..................17

*Paulino v. Harrison*,
　542 F. 3d 692 (9th Cir. 2008) .........................................................................................17

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*,
　12 Cal. App. 4th 715 (1993) ...........................................................................................16

*Simon Mktg., Inc. v. Gulf Ins. Co.*,
　149 Cal. App. 4th 616 (2007) .........................................................................................28

*St. Mary & St. John Coptic Orthodox Church v. SBC Ins. Servs., Inc.*,
　57 Cal. App. 5th 817 (2020) ...........................................................................................15

*Sunstone Hotel Invs. v. Endurance Am. Specialty Ins. Co.*,
    607 F. Supp. 3d 1006 (C.D. Cal. 2022) ..................................................................24

*TRB Invs., Inc. v. Fireman's Fund Ins. Co.*,
    40 Cal. 4th 19 (2006) .............................................................................................15

*Vardanyan v. AMCO Ins. Co.*,
    243 Cal. App. 4th 779 (2015) ...........................................................................29, 30

*ViacomCBS Inc. v. Great Divide Ins. Co.*,
    640 F. Supp. 3d 931 (C.D. Cal. 2022) ..................................................................27

*Vons Cos. v. Fed. Ins. Co.*,
    212 F.3d 489 (9th Cir. 2000) .................................................................................27

*Vuckson v. United States*,
    354 F.2d 918 (9th Cir. 1966) .................................................................................17

*William F. Shea, LLC v. Bonutti Research, Inc.*,
    No. 2:10-cv-615, 2011 U.S. Dist. LEXIS 1752 (S.D. Ohio Jan. 7, 2011) .............27

**Statutes**

Cal. Civ. Code § 1636 ...................................................................................................14

Cal. Civ. Code § 1638 ...................................................................................................14

Cal. Civ. Code § 1639 ...................................................................................................14

Cal. Civ. Code § 1641 ...................................................................................................14

Cal. Civ. Code § 1644 ...................................................................................................14

## NATURE OF THE PROCEEDING

Plaintiff 24 Hour Fitness Worldwide Inc. ("24 Hour") suffered devastating business losses due to COVID-19 and turned to Defendant Allied World National Assurance Company ("Allied World") to offset those losses under an insurance policy[1] that provides broad business interruption coverage from the presence of viruses at its locations (the "Policy"). In response, Allied World refused coverage, and 24 Hour was forced to seek bankruptcy protection. 24 Hour commenced this action to establish that its COVID-19 related losses are covered under the Policy. Allied World thereafter submitted its Motion for Summary Judgment and Incorporated Memorandum of Law Regarding the Allied World Policy pursuant to Federal Rule of Civil Procedure 56 ("Motion"). 24 Hour submits this Memorandum of Law in opposition to Allied World's Motion.

## SUMMARY OF ARGUMENT

Allied World's Motion must be denied for the following reasons:

1.    Allied World fails to show that there is no triable issue of fact regarding the presence of a virus (either SARS-CoV-2 or otherwise) "on, at or under" 24 Hour's fitness club locations (each, a "Club").

2.    Allied World fails to show that there is no triable issue of fact as to whether 24 Hour's business interruption losses were the caused "solely and directly" by the presence of a virus "on, at or under" a Club. Allied World wrongly argues that government orders are separate causes of loss from the virus itself. Allied World also fails to address the fact that it has already lost this exact argument in another case involving COVID-19 losses. Further, Allied World's unduly restrictive interpretation of its Policy violates California law, which Allied World claims applies in this case.

---

[1]    Policy No. 0309-1873 for the period from September 3, 2017 to September 3, 2020.

1

## STATEMENT OF FACTS[2]

**A.     24 Hour Operated Health and Fitness Clubs Throughout the United States**

At COVID-19's inception, 24 Hour operated more than 400 Clubs in fourteen states, serving approximately 3.4 million members. Larson Decl. ¶ 4. 24 Hour's Clubs were in high-density urban and suburban areas, such as Los Angeles County, California, New York County, New York, King County, Washington, and Harris County, Texas. *Id.* at ¶ 7. The average Club was approximately 36,000 square feet. Certain Clubs featured amenities, including full-size basketball courts, saunas, lap pools, and "TurfZones" for high-intensity interval training. *Id.* at ¶ 5. Before the pandemic, 24 Hour employed more than 19,000 individuals in its Clubs across the United States. *Id.* at ¶ 6.

Between January and March 16, 2020, each Club hosted on average 1,400 visitors per day. *Id.* at ¶ 10. Clubs in Los Angeles County averaged 1,300 visits per day. *Id.* Clubs in other jurisdictions were also highly trafficked during this period, hosting similar numbers of daily visitors. The following chart shows Club traffic in various counties across the United States:

| County | Number of 24 Hour Clubs per County | Average Number of Employees in January–March 16, 2020 Across All Clubs | Average Number of Club Visitors Per Day Across All Clubs |
|---|---|---|---|
| Los Angeles, CA | 50 | 2,000 | 65,000 |
| Alameda, CA | 14 | 600 | 10,000 |
| Orange, CA | 38 | 1,400 | 8,000 |
| San Diego, CA | 31 | 1,300 | 11,500 |
| Miami-Dade, FL | 6 | 220 | 1,000 |
| Clark, NV | 11 | 410 | 7,000 |
| Westchester, NY | 4 | 130 | 3,500 |
| Multnomah, OR | 6 | 210 | 11,900 |
| Harris, TX | 25 | 860 | 8,000 |
| Collin, TX | 6 | 260 | 5,900 |

---

[2]     24 Hour objects to Allied World's statement of facts as it contains improper arguments contrary to Local Rule 7007-2(b)(i)(E).

| County | Number of 24 Hour Clubs per County | Average Number of Employees in January–March 16, 2020 Across All Clubs | Average Number of Club Visitors Per Day Across All Clubs |
|---|---|---|---|
| Travis, TX | 5 | 300 | 13,700 |
| Dallas, TX | 11 | 330 | 7,000 |
| King, WA | 11 | 540 | 8,900 |

*Id.*

To help visualize the magnitude of 24 Hour's guest traffic each day, depicted below is Allegiant Stadium in Las Vegas, Nevada, which holds 65,000 seats.



Across its Clubs in Los Angeles County alone, 24 Hour hosted an average of 65,000 guests per day (1,300 guests across 50 Clubs); more than enough to *fill* Allegiant Stadium to capacity on a daily basis. Importantly, all of these guests were frequenting Clubs while COVID-19 was spreading unabated. As explained by Allied World's epidemiologist, Allison Stock, PhD, MPH, MS, COVID-19 was "likely circulating in certain populations . . . [such as] Seattle, Los Angeles, and New York City" as early as January 2020. Appx, Ex. 166 at 2397.

## B.   24 Hour Purchased the Policy in Response to a Disease Outbreak in its Gyms

It is well-accepted among experts, including Allied World's experts, that fitness clubs (gyms) "are high-risk settings that facilitate the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) transmission." Appx, Ex. 171 at 2912–2913. Fitness clubs are particularly prone

to spreading respiratory viruses, including SARS-CoV-2 (the virus causing COVID-19), as individuals tend to spend an extended amount of time in gyms, breathing heavily while working out, and gyms may have poor ventilation and/or moist and warm atmospheres. Carnethon Decl. at ¶ 40; Appx, Exs. 168–169, 171–173. 24 Hour thus well understood that health-related events, including from viruses, were a business risk for a chain of fitness clubs. Gottlieb Decl. at 5.

For example, in 2014, 24 Hour experienced a legionella outbreak at a Club in Memphis, which affected at least nine members. Gottlieb Decl. at 5.[3] While this outbreak was contained and did not cause 24 Hour significant losses, it reinforced 24 Hour's need to maintain broad coverage for losses from communicable diseases and viruses. *Id.* Subsequent to the Memphis legionella outbreak, 24 Hour's Director of Risk Management, Jeremy Gottlieb, worked with a broker from Lockton Companies, LLC ("Lockton") to procure insurance that would specifically cover similar health-related risks. Gottlieb Decl. at *Id.* at 6. Lockton's representatives advised Mr. Gottlieb that an environmental policy that specifically covered losses from viruses, bacteria, and similar organisms would insure such health-related risks, along with the coverage it obtained under its separate property insurance policies. *Id.*

As a result, 24 Hour purchased coverage from Allied World to provide coverage for risks associated with viruses, among other things. *Id.* at 7; Appx, Ex. 1. The Policy thus covers "business interruption costs resulting from business interruption caused solely and directly by a pollution incident on, at or under a scheduled location." Appx, Ex. 1 at 47. The Policy defines "pollution incident," in part, as:

******** 

b. The presence of **microbial matter** on, at or within buildings or structures; or

---

[3]     Legionella is a bacterium that infects the lungs causing inflammation.

c. The presence of **pollutants**, whether contained or uncontained, that have been illegally disposed of or abandoned at a **scheduled location** by parties other than an insured, provided that no insured had knowledge of such disposal or abandonment.

*Id.* at 60 (emphasis in original). "Pollutants" includes "microbial matter", which includes "viruses." *Id.* at 26. Allied World does not dispute that "microbial matter" includes the term "virus" nor does it dispute that COVID-19 is a "virus." Appx. Ex. 185 at 2609.

**C.      By At Least January 2020, COVID-19 Arrived in the United States and Spread Uncontrollably**

**1.      The Nature of COVID-19 and Disease Transmission**

COVID-19 primarily spreads through respiratory excretions when an infected person expresses viral particles when breathing, talking, coughing, sneezing, etc. Carnethon Decl. at ¶¶ 13, 25, and 40. COVID-19 may also be transmitted on surfaces. C *See Id.* at ¶¶ 13 and 38; Appx, Ex. 174 at 2454; Appx, Ex. 188 at 2711. Allied World's expert, Alexis Sauer-Budge, PhD, agreed that the virus can remain infectious on surfaces. Appx, Ex. 170 at 2426. One study relied upon by Dr. Sauer-Budge found that the virus "can be detected in room-temperature environments at least 57 days after the last exposure, much longer than previous reports." Appx, Ex. 174 at 2454.[4] Both Allied World's experts, Drs. Sauer-Budge and Stock agree that human transmitted viruses are "ubiquitous" and found everywhere, including in all 24 Hour locations. Appx, Ex. 166 at 2387, Appx, Ex. 170 at 2425.

---

[4]      Disinfecting or otherwise removing COVID-19 from surfaces is not entirely effective. As Dr. Sauer-Budge agreed, even if COVID-19 can be cleaned from a surface or degraded over time, someone else with COVID-19 can simply re-introduce the virus after a surface is cleaned. Appx, Ex. 170 at 2427. For this reason, Dr. Sauer-Budge also agreed that studies measuring the length of time COVID-19 persisted on surfaces were of limited utility for operating businesses where individuals were coming in and out on a regular basis. *Id.* at 2428.

2.      **The COVID-19 Virus Spread Rapidly and Largely Undetected**

COVID-19 originated in Wuhan, China, and the World Health Organization ("WHO") declared a global pandemic on March 11, 2020. Carnethon Decl. ¶ 6. The SARS-CoV-2 virus began spreading in the U.S. at least as early as January 2020, including in areas where 24 Hour operated. Carnethon Decl. ¶ 42. In fact, the first confirmed COVID-19 case in the United States was in Snohomish County, Washington, where 24 Hour operated two Clubs. Larson Decl. ¶¶ 8, 14; Appx, Ex. 133 at 1679. By the time the first cases of community spread (cases of unknown origin) were identified, the virus had already "rooted itself" throughout the United States. Carnethon Decl. ¶ 12. It was not until March 2020, after thousands of cases accumulated, that the virus "burst into public view." *Id.* Indeed, in another case in New York, counsel for Allied World recognized that COVID-19 was widespread, representing to the court about COVID-19 that "[i]t was everywhere, it was everywhere, New York and all of New York." Appx, Ex. 151 at 2142.

Early COVID-19 cases were mostly tied to international travel. Carnethon Decl. ¶¶ 7, 11. 24 Hour operated Clubs near multiple international airports, including some of the most heavily trafficked airports in the United States. Larson Decl. ¶ 9.[5] Metropolitan areas where 24 Hour operated, such as Seattle, New York, Los Angeles, and Dallas demonstrated the correlation between travel and the spread of COVID-19, as each of these cities experienced rapid spread of

---

[5]     *See e.g.*, Dallas/Fort Worth International Airport serves about 6 million passengers every month, 24 Hour operated 21 Clubs in Dallas and Tarrant Counties, Texas (Larson Decl. ¶ 9; Appx, Ex. 124); Denver International Airport serves about 5.75 million passengers every month, 24 Hour operated 31 Clubs in Colorado (Larson Decl. ¶ 9; Appx, Ex. 125); the three major airports in Los Angeles County (LAX, BUR, and LGB) serve about 6 million passengers every month, 24 Hour operated 50 Clubs in Los Angeles County (Larson Decl. ¶ 9; Appx, Ex. 121–123); the three major airports serving the New York City area (JFK, EWR, and LGA) serve about 7.5 million passengers every month, 24 Hour operated 5 Clubs in New York City and 12 Clubs in surrounding counties (Larson Decl. ¶ 9; Appx, Ex. 126–128); Seattle-Tacoma International Airport serves about 3.9 million passengers every month, 24 Hour operated 11 Clubs in King County, Washington. (Larson Decl. ¶ 9; Appx, Ex. 129).

the virus in early 2020. Carnethon Decl. ¶ 34; Appx, Ex. 166 at 2396 ("We know that it was hitting large major metropolitan areas where there was increased travel in and out of those locations[.]").

Information published by state and local government authorities confirmed the rapid spread of COVID-19 in the jurisdictions where 24 Hour operated. Larson Decl. ¶ 8. On February 29, 2020, the Governor of the State of Washington (where 24 Hour operated 20 Clubs) issued an emergency proclamation stating that COVID-19 posed a serious threat that "impacts the life and health of our people . . . and is a public disaster that affects life, health, property or the public peace." Appx, Ex. 21 at 648. Around the same time, the Governor of the State of Nevada (where 24 Hour operated 13 Clubs) stated, "we don't know the full extent of what we're dealing with. But based on the rapid spread of the virus around the world and what we've already seen in Nevada, we know that we must act quickly." Larson Decl. ¶ 8; Appx, Ex. 191 and 2914.

On March 12, 2020, the Governor Cuomo of New York identified "the largest cluster [of COVID-19] in the country" in Westchester County (where 24 Hour operated four Clubs). Appx, Ex. 192 at 2912; Larson Decl. ¶ 10. Governor Cuomo created a "containment area" around a synagogue in Westchester where individuals were not allowed to gather and to which the Governor deployed the National Guard. Appx, Ex. 192 at 2912. This "containment area" was in close proximity to a Club. Similarly, in early 2020, the Los Angeles County Department of Public Health ("LADPH") issued almost daily updates on the mounting disaster, including information on confirmed cases and deaths. Larson Decl. ¶ 23. LADPH warned that there were "positive cases across the entire County" and that "the public should not think one location is safer than the other." *Id.* at ¶ 24; Appx, Ex. 24. 24 Hour operated 50 Clubs in Los Angeles County. Larson Decl. ¶ 10.

Despite national concern regarding COVID-19, the ability to test for and detect the virus was extremely limited, leading to severe undercounting, with the number of *actual* cases being

much higher than what health departments were reporting as "confirmed." Carnethon Decl. ¶ 23.

As Dr. Stock explained, prior to April 2020 when a "rapid analyzer" test was approved, PCR

testing (where a nasal swab is tested in a lab) was the only way to detect COVID-19. Appx, Ex.

166 at 2390.[6] Even when limited testing was available, "in many states, testing rules [were] so

strict that doctors may [have] not notice[d] a community outbreak until [it was] too late."

Carnethon Decl. ¶ 24; Appx, Ex. 38. Testing was limited to individuals with certain travel histories,

or those exposed to such individuals, so infected people presenting with minor, or no symptoms

likely would not have been tested, allowing such individuals to unknowingly spread the disease.

Carnethon Decl. ¶ 30. As Insurers'[7] expert, Dr. Stock, testified, "by mid-March transmission of

SARS-CoV-2 . . . had accelerated with rapidly increasing case counts indicating established

transmission in the United States. Ongoing traveler importation of SARS-CoV-2, attendance at

professional and social events, introduction into facilities or settings prone to amplification, and

challenges in virus detection all contributed to rapid acceleration of transmission during March."

Appx, Ex. 166 at 2402.

### 3. The Emergence of COVID-19 During Cold and Flu Season Compounded the Problem of Detection and Containment of COVID-19

SARS-CoV-2 was not the only virus spreading throughout the country in early 2020.

Carnethon Decl. ¶ 25–27. As Dr. Stock explained, in addition to COVID-19, 2020 "was a bad flu

year" and "RSV . . . was [also spreading]." Appx, Ex. 166 at 2392. Government health

organizations reported high influenza activity in 2019–2020. Carnethon Decl. ¶ 26; Appx, Ex. 39.

Without testing, COVID-19 could not be distinguished from these other illnesses. Appx, Ex. 166

---

[6]     As confirmed by Allied World, COVID-19 "tests were developed [only] after March of 2020 . . . to test people to determine whether they had COVID." Appx, Ex. 185 at 2595.

[7]     24 Hour incorporates herein its definition of "Insurers" from its Opposition to Property Insurers' motion for summary judgment filed concurrently herewith.

at 2394. This is because, as Dr. Stock explained, "[l]ots of viral illnesses cause cough. Lots of viral illnesses cause other symptoms that people think about with COVID, malaise, headache, sore throat. All those can be attributed to other viruses." *Id.* at 2393. Because COVID-19 was "[s]imilar to influenza" and other viruses in terms of presentation and symptoms, it was difficult to detect and prevent the spread of the virus. Carnethon Decl. ¶ 23; Larson Decl. ¶ 45. As a result, in early 2020, individuals with respiratory illnesses were treated as having COVID-19. Carnethon Decl. ¶ 28; Larson Decl. ¶ 30.

**D.    COVID-19 and SARS-CoV-2 Forced 24 Hour to Close its Clubs**

**1.    Concerns About Employee and Member Safety**

In early 2020, 24 Hour grew concerned about the growing spread of COVID-19 and the inability to differentiate it from other illnesses. Larson Decl. ¶ 30. 24 Hour closely monitored the spread of COVID-19 throughout the communities where it operated, including monitoring of sick or potentially sick employees and members. *Id.* at ¶¶ 11–12. Before 24 Hour decided to close Clubs, management received regular reports of members and employees exposed to COVID-19 or experiencing symptoms. *Id.* at ¶ 31; Gottlieb Decl. ¶¶ 14–15; 20; Appx. Ex, 14. For example, on March 13, 2020, a member in Bergen, New Jersey tested positive for COVID-19 after checking in to the Club at least five times in the days before the positive test. Larson Decl. at ¶ 32; Appx, Ex. 27. That same day, in Alameda County, California, an individual called a Club to disclose that he tested positive for COVID-19. Gottlieb Decl. ¶ 15; Appx, Ex. 13. He advised he was exposed to the virus when someone coughed in his face while playing basketball. *Id.* When asked why he came to the Club if he was sick, the individual responded that, at that time, "[he] was not showing any symptoms." *Id.* 24 Hour also received emails from employees with concerns of others testing positive. Larson Decl. ¶ 33; Appx, Ex. 28. 24 Hour attempted to investigate these claims, but these

efforts were limited as individuals were not required to self-report whether they tested positive. Larson Decl. ¶¶ 31, 33.

24 Hour also had *significantly* more employee sick time in early 2020, as compared to the same period in prior years. Healon Decl. ¶ 5. In the pay period ending on March 13, 2020, 24 Hour had a 27.6% increase in sick hours paid than the same pay period of 2019. Healon Decl. ¶ 10. A reasonable inference from this data is that the increase in sick time was at least partially attributable to COVID-19 in the communities where 24 Hour operated, and at least some of these sick individuals were at Clubs while infected with the virus. Carnethon Decl. ¶ 37. Moreover, "it is without reasonable dispute that individuals with the common cold and related symptoms would have been present in each of the 24 Hour locations during this period, as well as individuals with the flu." Carnethon Decl. ¶ 28.

### 2.   24 Hour Had No Choice but to Completely Shut Down All its Clubs

COVID-19 cases doubled every two or three days between January and March 2020. Carnethon Decl. ¶ 12; Appx, Ex. 34 at 690. By this time, it became clear to public health officials that the spread of COVID-19 could only be curtailed by preventing people from gathering in groups. Health officials originally focused their attention on "high risk" businesses like gyms, ordering such businesses to close. Carnethon Decl. ¶ 20; Larson Decl. ¶ 37. As 24 Hour's and Allied World's experts agree, gyms are particularly prone to spreading respiratory diseases, including COVID-19, due to the nature of exercising and gym infrastructure, discussed above. Carnethon Decl. at ¶ 40; Appx, Exs. 168–169, 171–173.

Still, social distancing and isolation measures were not enough to prevent the spread of the virus and positive COVID-19 cases were rapidly increasing. Carnethon Decl. ¶¶ 22, 33. 24 Hour continuously monitored the data and spread of SARS-CoV-2, as well as decisions being made by other businesses to limit or close operations. Larson Decl. ¶ 11–12. 24 Hour recognized that the

virus was spreading rapidly especially among individuals with few or no symptoms. Larson Decl. ¶ 45. As Dr. Carnethon states, these reports of sick individuals were just the "tip of the iceberg" because COVID-19 cases were going largely unreported either due to lack of testing, or because people were confusing their symptoms with those of other virus-caused illnesses like cold or flu. Carnethon Decl. ¶ 23. Articles appeared widely in the press regarding the safety of gyms, and local governments targeted fitness clubs as locations of heightened concern. Larson Decl. ¶ 44.

By mid-March, 24 Hour explored business modifications, e.g., closing certain club amenities, eliminating or reducing number of group exercise classes, and closing overnight hours to allow for deep cleaning operations, etc., to keep employees and members safe, while staying open. Appx, Ex. 35. 24 Hour's then-CEO, Tony Ueber, explained: "[W]e felt like these were the appropriate actions to take, given the information that we had in order to ensure the safety of our members and team members from COVID . . . we were getting more and more information hourly at this point on the spread and how many people were infected and where people were that were infected across all the different geographies that we did business within." Appx, Ex. 184 at 2565.

Soon thereafter, it became obvious that modifications were not enough to slow the spread and 24 Hour could not safely continue to operate. Larson Decl. ¶ 35; Appx, Ex. 184 at 2565. At the time, Clubs were averaging 500 to 2,500 daily visits and more information was being released regarding the high transmissibility and dangers of COVID-19. Larson Decl. ¶¶ 10, 20, 25. "[I]t became apparent that this was much bigger and more dangerous and more transmissible, and . . . we weren't confident that we would be able to . . . control or mitigate the spread of the virus inside of the clubs at that point, given what we knew" and, as a result, 24 Hour made the decision to close

all Clubs across the county effective midnight on March 16, 2020. Appx, Ex. 184 at 2565.[8] Around the same time as 24 Hour's complete shutdown, government entities began issuing shutdown orders in response to the spread of SARS-CoV-2.[9] Appx, Exs. 41–119; Larson Decl. ¶¶ 38–43; Carnethon Decl. ¶ 21. These government orders recognized that the spread SARS-CoV-2 had "substantially worsened" with a "significant escalation in the number of positive [COVID-19] cases, hospitalizations, and deaths[.]" Appx, Ex. 56 at 866. Since self-imposed isolation was not enough to curtail the spread of SARS-CoV-2, most government entities ordered non-essential businesses to close. *See* Appx, Exs. 41–119.[10]

---

[8]     Allied argues that 24 Hour did not incur clean-up expenses greater than $250,000 [Doc. 239 at 9.], but there is no such requirement in its policy. *See* Appx, Ex. 1. The provision Allied cites does not even apply to Business Interruption coverage. Appx, Ex. 1 at 21. There is no requirement that 24 Hour incur any such expenses to obtain coverage for its business interruption losses. *See* Appx, Ex. 1. To the extent Allied argues that 24 Hour's business losses do not exceed a deductible, that argument is premature, but also is incorrect. Gottlieb Decl. ¶ 24.

[9]     Most other large fitness club businesses also decided to close around this time. Appx, Ex. 184 at 2566; Larson Decl. ¶ 36.

[10]     Appx, Ex. 46 (Alameda) ("This Order is issued based on evidence of increasing occurrence of COVID-19 within the County and throughout the Bay Area"); Appx, Ex. 52 (Contra Costa) (same); Appx, Ex. 53 (Los Angeles ("Because of the rapid spread of COVID-19 . . ."); Appx, Ex. 94 (New York) ("due to the threat posed by COVID-19"); Appx, Ex. 68 (Broomfield) ("to stop the spread of coronavirus 2019"); (Denver) ("due to the risk of spread of COVID-19"); Appx, Ex. 71 (Jefferson) (the county "is working to stop the spread of coronavirus 2019 . . . It [is] necessary to implement emergency measures"); Appx, Ex. 73 (Larimer) ("COVID-19 continues to spread throughout the State"); Appx, Ex. 67 (Colorado Tri-County) ("as to control and slow the spread of the SARS-CoV-2 virus"); Appx, Ex. 79 (Broward) ("to reduce the spread of COVID-19"); Appx, Ex. 78 (Miami-Dade) ("due to the discovery of COVID-19/novel Coronavirus in Florida"); Appx, Ex. 83 (Honolulu) ("Due to the risk of the rapid spread of the virus causing COVID-19"); Appx, Ex. 87 (Prince George) ("to prevent the control and spread of COVID-19"); (Nevada) (this order is a "response to the COVID-19 pandemic"); Appx, Ex. 89 (Bergen) ("in response to the health emergency posed by COVID-19"); Appx, Ex. 98 (Oregon) ("due to the public health threat posed by the novel infectious coronavirus"); Appx, Ex. 102 (Collin County) ("[t]he intent of this Order is . . . to slow the spread of COVID-19"); Appx, Ex. 105 (Dallas) ("due to a novel coronavirus now designated SARS-CoV2 which causes the disease COVID-19"); Appx, Ex. 114 (Salt Lake City) ("to respond to the evolving COVID-19 global pandemic, recognizing COVID-19 as a threat to the health and safety of the residents of the State"); Appx, Ex. 116 (Virginia) ("to mitigate the impacts of this virus on our Commonwealth"); Appx, Ex. 119 (Snohomish) ("in response to the COVID-19 declared emergency").

**E.    24 Hour Tendered its Claim and Allied World Erroneously and Unjustifiably Denied Coverage**

24 Hour submitted its insurance claim under the Policy to Allied World on March 21, 2020. Gottlieb Decl. ¶ 16. Allied World did virtually nothing in response. Allied World did not hire a claims adjuster to review or investigate 24 Hour's claim. Allied World did not hire any consultants to test any Clubs for the SARS-CoV-2 virus. Allied World did not inspect a single Club. Appx, Ex. 185 at 2583–2585, 2587, 2597. Instead, Allied World claimed, as it has done for each and every COVID-19 claim tendered by its insureds, that 24 Hour could not obtain coverage because there was no "pollution incident" as defined by the Policy and that 24 Hour's business interruption losses were not caused by a "pollution incident," but rather by government orders. *Id.* at 2613.

Instead of working with 24 Hour to evaluate the merits of the claim, Allied World erected insurmountable barriers to coverage, not required or delineated in the Policy, and demanded that 24 Hour provide unobtainable information. For instance, Allied World went so far as to claim that 24 Hour needed test results demonstrating the presence of COVID-19 in the air or surfaces at Clubs to show coverage, despite the inability to conduct such tests at that time. *Id.* at 2599–2602. Indeed, Allied World itself acknowledged that there were no available tests for property—let alone for individuals—that would satisfy Allied World's request until after 24 Hour submitted its Claim. *Id.* at 2595–2596 ("Tests were developed <u>after March of 2020</u> . . . I'm not here as a medical expert or a scientist; however, if tests can take a culture from somebody and identify that person as having COVID, that person's bacteria or droplets upon a surface may also be able to capture that."). However, even if 24 Hour could have provided tests, Allied World would have still denied coverage. Allied World admits that, even if an insured presented to Allied World scientific evidence of COVID on a surface of the insured property and evidence of the need to close because

of it, as soon as there is also a governmental order requiring closure, there cannot be coverage. *Id.* at 2617–2619.

Allied World has attempted to distinguish between the presence of the virus and the orders meant to address its presence. Allied World's position seems to be that 24 Hour's business interruption losses were caused by government orders (instead of a "pollution incident") and Allied World's requests for information, demonstrate that Allied World *never* intended to cover 24 Hour's losses – or any other policyholders' COVID-19 business interruption losses. In fact, since 2020, Allied World has denied coverage for *_every single one_* of the more than *_500_* COVID-19 business interruption claims. *Id.* 2596.

## GOVERNING INSURANCE PRINCIPLES

In its Motion, Allied World ignores well-settled law that insurance policies must be interpreted broadly and reasonably in favor of coverage and that any ambiguities must be resolved against the insurer. In so doing, Allied World misreads and misapplies its own Policy leading it to erroneously conclude that coverage is not triggered. California law is clear that insurance contracts are generally subject to the "ordinary rules of contractual interpretation." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992). As such, the parties' mutual intentions and understandings usually govern the policy's interpretation, which are ascertained from the language that the parties used in the policy, whenever possible. Cal. Civ. Code §§ 1636, 1639; *AIU Ins. Co. v. Superior Ct.*, 51 Cal. 3d 807, 821-22 (1990). "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. Words and policy provisions are given their "clear and explicit" meanings, interpreted in their "ordinary and popular sense." *Id.*; §§ 1638, 1644. Thus, "[i]f the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10

Cal. 4th 645, 666–67 (1995). Critically, insurance policies must be "*interpreted broadly in favor of the insured*" as to "*afford the insured the greatest possible protection*." *St. Mary & St. John Coptic Orthodox Church v. SBC Ins. Servs., Inc.*, 57 Cal. App. 5th 817, 825 (2020) (emphasis added); *Great W. Drywall, Inc. v. Interstate Fire & Cas. Co.*, 161 Cal. App. 4th 1033, 1040 (2008) (emphasis added).[11]

If the Court determines that *only one* interpretation of a policy provision is reasonable, then that interpretation must be adopted. Conversely, if the Court determines that the provision is "susceptible to *two or more* reasonable construction," the policy provision is ambiguous which must then be construed strictly against the insurer and liberally in favor of coverage. *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004); *Montrose Chem. Corp.*, 10 Cal. 4th at 667. This is because "the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications." *Id.*

Determining whether a provision is subject to more than one reasonable construction is context specific. While "the intention of the parties is to be ascertained from the writing alone, if possible[,]" an insurance contract "may be explained by reference to the circumstances under which it was made, and the matter to which it relates." *Markowitz v. Fid. Nat. Title Co.*, 142 Cal. App. 4th 508, 527 (2006). As such, "the proper question [for courts to consider] is whether the [policy provision] is ambiguous in the context of [the specific] policy and the circumstances of [the specific claim]. The provision will "shift between clarity and ambiguity with changes in the

---

[11]    Because the phrase "pollution incident on, at or under a scheduled location" constitutes a coverage grant, such insuring language must be interpreted "broadly so as to afford the greatest possible protection to [24 Hour]." *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006). To the extent such language is deemed ambiguous, such ambiguity must be resolved "in favor of coverage." *Montrose Chem. Corp.*, 10 Cal. 4th at 667.

event at hand." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co*., 5 Cal. 4th 854, 868

(1993) (citations omitted).

## ARGUMENT

**A.  Triable Issues of Material Fact Preclude Summary Judgment Regarding Whether 24 Hour's Losses Are Covered Under the Policy**

Allied World wrongfully attempts to escape its coverage obligations by arguing that (a) 24

Hour cannot demonstrate that COVID-19 or SARS-CoV-2 was "on, at or under" any scheduled

location and (b) 24 Hour's business interruption was not "solely and directly" caused by a

"pollution incident" on, at or under a scheduled location. Allied World's positions are misguided.

**1.  Triable Issues of Material Fact Exist Regarding Whether Viruses Were on, at or Under 24 Hour's Properties**

Allied World argues that 24 Hour has failed to prove that the COVID-19 virus was "on, at

or under" its facilities in order to trigger coverage. Allied World's arguments hinge on the false

premises that: (a) 24 Hour must demonstrate that *COVID-19*, specifically, was "on, at or under"

the properties, rather than any virus(es) generally; (b) 24 Hour does not have direct evidence of

the virus being present; and (c) 24 Hour may not rely on circumstantial evidence to establish that

COVID-19 was "on, at or under" its Clubs. Allied World is wrong.

To begin, the burden of proof in an insurance case "is proof by a preponderance of the

evidence." *Buss v. Superior Court*, 16 Cal. 4th 35, 54 (1997). This standard is met when "the

evidence on one side outweighs, preponderates over, is more than, the evidence on the other side,

not necessarily in number of witnesses or quantity, but in its effect on those to whom it is

addressed." *Bichai v. DaVita, Inc*., 72 Cal. App. 5th 1126, 1138 (2021). In other words, "a party

'need prove only that [a fact] is ***more likely to be true than not true***.'" *People ex rel. Brown v.

Tri-Union Seafoods, LLC*, 171 Cal. App. 4th 1549, 1567 (2009) (emphasis added). To establish

this, a party may use any manner of evidence, including circumstantial evidence. *Shell Oil Co. v.

*Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 744 (1993). Circumstantial evidence may be used to establish the "fact to be proved ***through inference based on human experience***." *Paulino v. Harrison*, 542 F. 3d 692, 700 n. 6 (9th Cir. 2008) (emphasis added). On summary judgment, specifically, "the record need not contain direct evidence to create a genuine issue as to a material fact; ***circumstantial evidence which would allow a jury to find for the nonmovant is sufficient***." *Koons v. XL Ins. Am., Inc.*, 516 F. App'x 217, 221–22 (3d Cir. 2013) (emphasis added).[12]

Accordingly, to establish that a virus was "on, at or under" a scheduled location, 24 Hour need only establish that it was "more likely than not" that one or more virus was at any of its insured locations.[13] *Tri-Union Seafoods, LLC*, 171 Cal. App. 4th at 1567. In meeting this standard, 24 Hour may rely on circumstantial evidence, the credibility of which must be judged by inference "based on human experience." *Vuckson v. United States*, 354 F.2d 918, 920 (9th Cir. 1966). On a motion for summary judgment, 24 Hour has a far lesser burden than at trial. It need only present

---

[12]    *See also Hozier v. Midwest Fasteners, Inc.,* 908 F. 2d 1155, 1165 (3d Cir. 1990) ("[N]othing in Rule 56 prevents [plaintiffs] from creating a genuine issue of material fact by pointing to sufficiently powerful countervailing circumstantial evidence."); *Nationwide Mut. Ins. Co. v. William Hukill*, No. 4:CV-04-0399, 2005 U.S. Dist. Lexis 55993, at *6 (M.D. Pa. July 12, 2005); *Lipari v. Sullivan*, No. 17 CV 1566, 2018 U.S. Dist. Lexis 212127, at *30 (N.D. Ill. Dec. 17, 2018) ("[C]ircumstantial evidence can be enough to defeat a motion for summary judgment").

[13]    Allied World argues that 24 Hour agreed, during a hearing, it "***must prove*** the presence of COVID-19 on, at or under a scheduled location . . . [and thus, can] not rely on its theory that COVID-19 is everywhere[.]" [Doc. 239 at 12 (emphasis added).] First, 24 Hour only agreed that a "virus" has to be on, at or under its locations—not just COVID-19. [Adv. DE 108, Motion Tr., at pp. 25:22–26:4.] Second, while 24 Hour does not dispute that it needs to demonstrate a virus was "on, at or under" its Clubs, as discussed above, the law is clear that in a civil case, the burden is only "preponderance of the evidence" which can be demonstrated through circumstantial evidence. The burden at summary judgment is even less, only requiring the nonmoving party to show that there is a genuine issue of material fact. The facts that COVID-19 was "everywhere" (as Allied World has even admitted) and that viruses were at each Club, as Allied World's experts both admit, among other things, create triable issues of material fact that COVID-19 and other viruses were present in 24 Hour's Clubs.

sufficient evidence from which a jury *might* conclude that 24 Hour has met its burden. It is not for the Court to make the ultimate determination.[14]

*First*, Allied World ignores the fact that the Policy does not limit a "pollution incident" or "microbial matter" to SARS-CoV-2, and there is ample uncontroverted evidence that other respiratory viruses were present at the Clubs. COVID-19 arose during a particularly bad flu season, with other diseases also circulating, as confirmed by Allied World's epidemiology expert, Dr. Stock. Appx, Ex. 166 at 2392. The symptoms of these illnesses are the same as the symptoms of COVID-19 and these illnesses had to be treated as if they were COVID-19. *Id.* Moreover, both defense experts acknowledge that viruses are "ubiquitous" and would have been present at each Appx, Ex. 166 at 2387, Appx, Ex. 170 at 2425. Accordingly, it is not just the presence and spread of COVID-19 in Clubs that triggers coverage. The fact that there were other communicable diseases and viruses present and spreading in Clubs is equally important, as the Policy covers losses from viruses, not just COVID-19. Their presence at the Clubs, by itself, is sufficient to trigger coverage.

*Second*, even if proof of COVID-19 was required, 24 Hour's position that COVID-19 and SARS-CoV-2 was present at its Clubs is not speculative. As Allied World and its experts admit, 24 Hour operated in locations where the virus was rapidly spreading. In fact, ***Allied World admits COVID-19 was everywhere***. Appx, Ex. 151 at 2142. 24 Hour's members reported confirmed positive cases of COVID-19. Larson Decl. ¶ 31. Although they had no duty to do so, at least two 24 Hour members reported that they tested positive for COVID-19—one in Bergen, New Jersey and another in Alameda County, California. Larson Decl. at ¶ 32; Appx, Ex. 27; Gottlieb Decl. ¶

---

[14]    *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (2016) ("The judge's inquiry [is] whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict.").

15; Appx, Ex. 13. As Dr. Carnethon notes, this was just the "tip of the iceberg" given lack of available testing at the time, and the fact that individuals did not need to report positive tests to businesses they visited. Carnethon Decl. ¶ 23. In addition, 24 Hour learned about members testing positive for COVID-19 that were not reporting those positive tests to 24 Hour. Larson Decl. ¶ 33; Appx, Ex. 28. This evidence alone raises triable issues of fact.

*Third*, significant circumstantial evidence demonstrates that COVID-19 was present and spreading in Clubs because it was spreading rapidly throughout the locales where 24 Hour operated. Even though Allied World understood that COVID-19 was "***everywhere***," it asks this Court to determine, as a matter of law, that COVID-19 was everywhere *except* at 24 Hour's Clubs. Appx, Ex. 151 at 2142. The evidence that COVID-19 was present at Clubs is underscored by the nation's response to COVID-19 and the various government proclamations highlighting the ubiquitous nature and prevalence of the disease and the rapid spread of the virus. *See, e.g.*, Larson Decl. ¶¶ 23, 42; Appx, Ex. 191 and 2914 (Governor Steve Sisolak of Nevada opining, "[W]e don't know the full extent of what we're dealing with. But based on the rapid spread . . . we know that we must act quickly"); Larson Decl. ¶ 24; Appx, Ex. 24 (LADPH cautioning that there were "positive cases across the entire County" and that "the public should not think one location is safer than the other"); Appx, Ex. 192 at 2912 (Governor Andrew Cuomo of New York identifying "the largest cluster [of COVID-19] in the country" in Westchester County, where 24 Hour operated four Clubs, just four days before 24 Hour's closure date). As these government authorities recognized, COVID-19 infiltrated every state, county, and city throughout the nation. It was thus more likely than not that COVID-19 was present at 24 Hour's heavily trafficked Clubs.

Critically, at this time, more than ***1,400 members*** on average visited each Club daily. This means that, for the 400 Clubs at issue in this case, a combined total of more than ***425,000***

19

*individuals* visited the Clubs every day. In Los Angeles County alone, a county that experienced a 1,627% increase in confirmed cases of COVID-19 in only 13 days between March 5–18, 2020, 1,300 members visited each Club daily. Larson Decl. ¶ 10, 28; Appx, Ex. 25. This equates to 65,000 members/day in Los Angeles County total, enough guests to fill an entire professional football stadium. 24 Hour's members were likely being exposed to COVID-19 by each other and other members of the community. For instance, 24 Hour operated near multiple international airports, including some of the most heavily trafficked airports in the United States. Larson Decl. ¶ 9. 24 Hour also operated in densely-populated metropolitan areas, such as Seattle, New York, Los Angeles, and Dallas—each of these cities experienced rapid spread of the virus in early 2020. Larson Decl. ¶ 7; Carnethon Decl. ¶ 40; Appx, Ex. 166 at 2396 ("We know that it was hitting large major metropolitan areas where there was increased travel in and out of those locations . . ..."). Some of the earliest identified cases of COVID-19 were in locations where 24 Hour operated. Larson Decl. ¶¶ 8 ,14; Appx, Ex. 133 at 1679. But, by the time the first cases of community spread (cases of unknown origin) were identified, the virus had already "rooted itself" throughout the United States and it was not until March 2020, after thousands of cases accumulated, that the virus "burst into public view." Carnethon Decl. ¶ 12; Appx, Ex. 34. Accordingly, individuals located in areas where 24 Hour operated were unknowingly spreading the virus everywhere in the months leading up to 24 Hour's decision to close. Carnethon Decl. ¶ 27, 33.

24 Hour does not merely "assume[s]" that COVID-19 was at its Clubs. [Doc. 239 at 7.] As discussed above, there is ample evidence from which a jury can determine that SARS-CoV-2 and other viruses were more likely than not present at 24 Hour's Clubs. Allied World understands that COVID-19 was "*everywhere*." Appx, Ex. 151 at 2142. Nevertheless, Allied World claims that 24 Hour lacks evidence because it has not presented positive COVID-19 tests from employees, guests,

or other visitors and does not have confirmation from a governmental authority confirming the presence of COVID-19 at any Clubs. Allied World also complains that 24 Hour did not conduct "contact tracing." [Doc. 232 at 19–20]. At its deposition, Allied World claimed that 24 Hour needed to obtain tests of the air or surfaces to prove the presence of COVID-19. Appx, Ex. 185 at 2599–2602.

Under the Policy, none of these things are required to establish coverage. Moreover, most, if not all, of Allied World's newly created "requirements" could not have been presented at the time 24 Hour closed its Clubs because Allied World's purportedly "required" tests did not exist. *See Id.* at 2595–2596. Moreover, Allied World's speculation that tests to detect the virus in humans can also detect viruses on surfaces or property is false. Carnethon Decl. ¶ 23–27, 31, 37. Accordingly, Allied World's argument that 24 Hour cannot demonstrate the presence of the COVID-19 virus should be rejected as it was asking the impossible.

There is thus sufficient evidence from which a jury might find it "more likely than not" that viruses, including SARS-CoV-2, were "on, at or under" 24 Hour's Clubs. This is illustrated by *K.C. Hopps Ltd. v. Cincinnati Ins. Co.*, where the court rejected arguments like those being made by Allied World in this case. 561 F. Supp. 3d 827 (W.D. Mo. 2021). The insurance company there claimed that summary judgment was proper because the policyholder could not present test results showing the virus was present on its premises. *Id.* at 839. The court rejected this, finding the policyholder put forth "sufficient evidence to support the inference that SARS-CoV-2 was present on its premises" and thus raised triable issues. The policyholder, among other things, relied on an expert epidemiologist, who provided information regarding the nature of the virus, how it spreads, and data regarding its prevalence in the community. *Id.* at 838. The court stated that the insured "does not need definitive proof of the virus's presence, but instead must prove that it was

more likely than not that the virus physically contaminated its premises." *Id.* at 839.[15] The same

result is necessitated here.

Allied World's request for summary judgment fails because triable issues of fact exist

concerning the presence of viruses at the Clubs.

> **2.    Triable Issue of Material Fact Exist as to Whether 24 Hour's Losses were Caused "Solely and Directly" by the Presence of a Virus at its Insured Locations**

>> **a.    Allied World Incorrectly Asserts that Government Orders are Distinct Causes of Loss from the Presence of the Virus and Ignores that it Recently Lost this Very Argument in a Similar Case**

Allied World partly bases its request for summary judgment on the untenable position that

that coverage under the Policy is precluded because government orders – not the presence of the

virus that gave rise to such government orders – caused 24 Hour's business interruption losses.[16]

Allied World's argument has already been expressly rejected in *Urban Edge Properties, et al. v.*

*Allied World Assur. Co. (U.S.) Inc., et al.*, Superior Ct. of New Jersey Law Div.: Bergen County,

Docket No.: BER-L-007987-20 [Appx, Ex. 152], a case Allied World conspicuously fails to

address in its Motion. There, the Superior Court of New Jersey, denied Allied World's motion for

---

[15]    Likewise, in *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*, a California state trial court denied the insurance company's motion for summary judgment based on similar evidence: "expert testimony regarding the nature of the COVID-19 virus. . ., the estimated number of patrons who would have been carrying COVID based on public health information regarding infections in the general population and percipient witness testimony regarding specific cases of COVID" during the relevant period. Minute Order at 6, *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Ins. Co.*, No. 20SMCV00952 (Jan. 20, 2023).

[16]    Allied World seemingly contradicts itself and the other Defendant Insurers' argument within Property Insurer Defendants' Motion for Summary Judgment. [Doc. 232.] In that Motion, Allied World and the other property insurers state that 24 Hour, through its corporate representative, "affirmatively asserted that 24 Hour closed its clubs not because they were ordered to do so by government authorities," but out of concern for the health and safety of its employees and guests. [Doc. 232 at 27.] At deposition, Allied World admitted it did not dispute 24 Hour's stated reason for closure. Appx, Ex. 185 at 2606. Now Allied World seemingly takes the position that 24 Hour closed not because of the virus was present, but rather, because of the government orders. This dichotomy alone creates a triable issue that precludes summary judgment.

summary judgment, expressly rejecting Allied World's efforts to unfairly and illogically restrict coverage. In that case, like here, Urban Edge sought coverage under its Allied World policy for the business interruption losses it sustained during the pandemic. Urban Edge had a similar policy to 24 Hour, covering business losses for "pollution incident[s]" including "viruses." Allied World rejected coverage for Urban Edge's losses on the same grounds that it asserts here—namely that, because the government orders were at least an intervening cause, a policyholder cannot satisfy the "solely and directly" causation standard required by the policy. The *Urban Edge* court disagreed, determining that Allied World's position would be impossible to meet and thus was "unacceptable." As the court explained:

> [I]f this Court understood "solely" to mean "exclusively," then the Policy would practically impose an instantaneous temporal limitation on the insured's coverage period. To achieve coverage, the Pollution Incident would have had to interrupt [the Insured's] business so quickly that almost no person or thing could have had an opportunity to react or respond to the situation. If a person did act, or something did change, to compound or affect [the Insured's] business in any way – causally linked by proximate cause standards or not – then those intermediate causes would preclude coverage. One might argue that it was not the presence of COVID-19 that caused the interruption, but the actions of each individual person who visited [the Insured's] properties and transmitted COVID-19 to another that caused the interruption. Or one might argue it was abnormally strong winds that day which carried the infected water droplets through the air that caused the spread of this deadly disease, and thus the interruption. ***This exclusive standard practically demands that the world cease to move once the covered risk arises. This is an unacceptable standard*** in New Jersey because it is too far afield of the reasonable expectations of the insured.

Appx, Ex. 152 at 2164 (emphasis added).[17]

---

[17]    Allied World moved for reconsideration of this ruling and that motion was soundly rejected by the Court which stated: "In exceedingly simple terms this Court found that there was enough evidence that the pandemic caused the closure orders which caused Urban Edge's tenants to close which caused Urban Edge to experience a business interruption in order to deny summary judgment. . . . This Court cited cases which acknowledge, as this Court does as well, that the closure orders were ***obviously*** proximately caused by the pandemic." Appx, Ex. 150 at 2115.

*Sunstone Hotel Invs. v. Endurance Am. Specialty Ins. Co.*, is further instructive in demonstrating that government orders addressing the virus are not separate causes of loss from the virus itself. There, the insured, a hotel group, sought coverage for business interruption losses sustained as a result of COVID-19 after it was forced to close its operations. 607 F. Supp. 3d 1006, 1009 (C.D. Cal. 2022). The policy provided coverage for loss that "directly result[ed]" from "biological agent conditions." *Id.* at 1015 (2022). The insurer denied coverage arguing, in part, that government orders issued in response to the virus were intervening circumstances causing the hotel's closure. *Id.* at 1017. The court rejected the insurer's argument, finding that such an interpretation would produce an absurd result:

> It would make little sense in such a scenario to suggest that the hotel's closure was a result of the ordinance alone. After all, the only reason the ordinance exists in the first place is because of the virus…Suggesting coverage does not exist for [the hotel's] claim because the [government order] is an intervening cause of [the hotel's] Business Interruption Losses is not reasonable because it does not disprove that the virus itself is the origin of [the hotel's] business interruption. The [government order] does not exist without the virus. But the virus, and the interruption it causes, certainly exists without the [order].

*Id.* at 1017-18. *Sunstone* is not alone. Indeed, the Ninth Circuit has similarly rejected arguments that government orders can somehow be disengaged from COVID-19 and constitute a separate cause of loss. *See e.g.*, *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F. 4th 885, 894 (9th Cir. 2021) (holding that it is "not debatable" that the stay-at-home orders "were issued in response to the COVID-19 pandemic," and that the "efficient cause" of the policyholder's losses could not be "anything other than the spread of the virus").[18]

---

[18]    Allied World cites *Mudpie* and other cases for the proposition that government orders were used to prevent the spread of SARS-CoV-2 (as opposed to respond to the presence of the virus). [Doc 239 at 24–25]. These cases involved **property** insurance policies containing **virus exclusions** and actually support 24 Hour's position here that government orders are not distinct causes of loss from the virus itself. In these cases, the courts held that virus exclusions precluded coverage despite the policyholder arguments that government orders were separate causes of loss from the virus. In *Mudpie*, for example, the court concluded

This case necessitates the same result that befell Allied World in *Urban Edge* and this Court should not give Allied World a second bite at the apple. Allied World is trying to make a distinction without a difference between COVID-19 and government orders necessitated by COVID-19. Such orders do not break the chain of causation between COVID-19 and the business interruption losses at issue. A finding that the government orders are separate and distinct from the presence of COVID-19 would lead to the absurd result of imposing "an instantaneous temporal limitation." *Id.* Allied World's own testimony underscores this absurdity. At deposition, Allied World testified that coverage would be precluded even if an insured demonstrated scientific evidence of COVID-19 on a surface of the insured's property if a government order subsequently required a property's closure. Appx, 49 at 2617–2619. Under Allied World's analysis, one is hard-pressed to discern any situation involving a virus outbreak that would give rise to coverage, even though the Policy covers the presence of viruses at insured locations. *Urban Edge* recognizes the fallacy in Allied World's argument.

Here, the government orders are clear that they were issued due to the presence of COVID-19 and its rampage throughout the communities where 24 Hour operated. For example, the Order of the Health Officer of the County of Alameda explained that the "Order [was] issued based on evidence of ***increasing occurrence of COVID-19 within the County*** and throughout the Bay Area." Appx, Ex. 46. Other orders provided similar reasoning. *See* Appx, Ex. 53 (Los Angeles County Health Officer's Order for the Control of COVID-19 stating, "***Because of the rapid spread***

---

that there was not an "attenuated casual chain between the virus and [the policyholder's losses]" because the virus "prompted state and local authorities to issue the Stay at Home Orders in the first place." *Mudpie*, 15 F. 4th 893–94. *See also Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.*, 539 F. Supp. 3d 409 (E.D. Pa. 2021) ("Plaintiff's claims are expressly barred by the 'Virus Exclusion.'"); *Mortar & Pestle Corp. v. Atain Specialty Ins. Co.*, 508 F. Supp. 3d 575 (N.D. Cal. 2020) ("the Court finds the [Virus] Exclusion applies"); *Muriel's New Orleans, LLC v. State Farm Fire & Cas. Co.*, 535 F. Supp. 3d 556 (E.D. La. 2021) ("the Virus Exclusion bars coverage for the alleged losses").

*of COVID-19* and the need to protect the most vulnerable members of [the] community . . . the Health Officer requires the immediate closure of…[g]yms and [f]itness [c]enters"); Appx, Ex. 41 (State of California's March 19, 2020 Executive Order N-33-20 shutting down all non-essential business locations, including fitness clubs, noting that, "in a short period of time, *COVID-19 has rapidly spread* throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials") (emphasis added); Appx, Ex. 96 (Emergency Executive Order from The Office of the Mayor of New York stating, "*[D]ue to the threat posed by COVID-19* the health and welfare of City residents") (emphasis added). The government orders do not break the chain of causation as there is no doubt they were issued in response to the presence of COVID-19 in the communities where 24 Hour operated, including at 24 Hour's locations. There are at least triable issues of fact that prevent summary judgment.

> **b.**   **Allied World Improperly Cites Inapposite Cases to Support its False Plain Meaning Argument**

Citing inapposite authorities, including a reversed case, Allied World incorrectly argues that the "solely and directly" language in its Policy plainly means that if there is any other event in the causal chain between the presence of the virus and the loss there can be no coverage. [Doc. 239 at 22–25.] For example, Allied World cites *Dove v. Prudential Ins. Co. of Am.*, No. 07-1311-EFM, 2009 U.S. Dist. LEXIS 41896, at *18 (D. Kan. May 18, 2009), as authority for the proposition that solely and directly" is unambiguous. [Doc. 239 at 23–24.] There, the beneficiary to an accidental death and dismemberment plan suffered an accident that resulted in damage to his eye. *Id.* at *2. The plan only covered an "injury that result[ed] solely and directly from a covered accident." *Id.* However, records indicated that the beneficiary suffered from vision loss in that eye prior to the accident. *Id.* at *3–6. Allied World cites the district court's decision, accepting the insurer's argument that the accident did not create a "new circumstance" causing the injury,

because the beneficiary was already blind. *Id.* at *18. However, the district court decision was

***reversed and remanded*** by the Tenth Circuit. *Dove v. Prudential Ins. Co. of Am.*, 364 F. App'x

461, 466 (10th Cir. 2010). The Tenth Circuit held that summary judgment was improperly granted

due to an unresolved issue of "whether the accident was the independent cause of Dove's vision

loss, such that it would have brought about the loss without the direct or indirect influence of

Dove's pre-existing conditions." *Id.* Allied World fails to address the Tenth Circuit decision

because it supports 24 Hour's position, including that there are triable issues preventing summary

judgment as to whether the virus was an "independent cause" of 24 Hour's business interruption

losses, even if the government closure orders could be considered separate from the virus. Indeed,

Allied World admitted at deposition that it did not dispute that the presence of the virus was the

reason for 24 Hour's closure. Appx, Ex. 185 at 2606.[19]

The other cases on which Allied World bases its argument also have inapposite facts and

were decided in other contexts.[20] Allied World's "solely and directly" argument must fail, as it

---

[19]     Allied World also cites *ViacomCBS Inc. v. Great Divide Ins. Co.*, 640 F. Supp. 3d 931 (C.D. Cal. 2022), a case involving COVID-19, as supporting its "plain meaning" argument. [Doc. 239 at 22.] However, this case also supports 24 Hour. There, the policyholder sought coverage for costs incurred in preparing to produce a television show and live award ceremony. *Id.* at 936–37. After some of those costs were incurred, the pandemic began, and the policyholder had to develop protocols for the television show and canceled the live event. *Id.* The policy's definitions of "loss," required that the expenditures be incurred "solely and directly" by reason of the insured peril. *Id.* at 944. The court explained that the pre-pandemic costs were business expenses that would have been incurred regardless of the pandemic and thus were not insured. *Id.* at 945. On the other hand, costs incurred implementing COVID-19 protocols, including protocols the policyholder developed based on government guidance were covered. *Id.* at 941. As in *Dove* (where the insurer alleged the plaintiff's injuries resulted from a pre-existing condition), the policyholders in *ViacomCBS* had pre-pandemic business losses. While these cases might support a reading of the "solely and directly" language to preclude coverage where the uncovered condition or event had ***already occurred*** before the covered event, that is not the case here.

[20]     Allied World's cases either (1) do not involve insurance or (2) do not relate to the same type of policy at issue here. *See James v. Getty Oil Co. (Eastern Operations), Inc.*, 472 A. 2d 33, 39 (Del. Super. Ct. 1984) (analyzing the word "solely" in the phrase "injuries or death solely and proximately caused by . . . the negligence of Owner"); *William F. Shea, LLC v. Bonutti Research, Inc.*, No. 2:10-cv-615, 2011 U.S. Dist. LEXIS 1752, at *10 (S.D. Ohio Jan. 7, 2011) (analyzing the phrase "sole purpose" in a Consultant Agreement); *Vons Cos. v. Fed. Ins. Co.*, 212 F.3d 489 (9th Cir. 2000) (analyzing "direct losses" that were

failed in *Urban Edge*. Indeed, Allied World ignores *Urban Edge,* the very case where its argument was rejected and, instead, cites factually inapposite cases that interpret "solely and directly" in other contexts. [Doc. 239 at 22–24.] Whatever these terms have been interpreted to mean outside of COVID-19 or the insurance context, such interpretations do not allow the Court to apply them here when doing so would eviscerate all coverage and frustrate the objectively reasonable expectations of the insured. *See Julian v. Hartford Underwriters Ins. Co.*, 35 Cal. 4th 747, 760 (2005) (finding insurer's interpretation of clear policy language, though reasonable, would render coverage "virtually illusory").

Accepting Allied World's definition of "solely and directly" in the context of this case would allow Allied World to essentially point to any event as an additional cause for business interruption losses. As here, even though Allied World accepts 24 Hour's explanation that it closed the Clubs because of the threats associated with the presence of SARS-CoV-2 on its properties, it can reject coverage for 24 Hour's claim and the more-than 500 claims like it because there were government orders that prohibited businesses from operating due to the virus. Appx, Ex. 185 at 2613–2615. Allied World's argument would allow it to pick and choose when it will provide coverage and when it can claim there is an independent reason for business interruption losses, rendering coverage "virtually illusory." *Julian*, 35 Cal. 4th at 760. With respect to COVID-19 claims, Allied World always chooses improperly to deny coverage by manufacturing an "unacceptable" alternative cause of loss. Allied World's plain meaning argument must be rejected.

---

"caused by" employee theft or forgery under policy covering losses from misconduct of plaintiff's employees); *Simon Mktg., Inc. v. Gulf Ins. Co.*, 149 Cal. App. 4th 616 (2007) (same).

### c.    Allied World's Reading of the "Solely and Directly" Language Violates California Law

Finally, Allied World's interpretation of the policy violates California law. Under California law, an insurer "may not limit its liability" by "contractually exclud[ing] coverage when a covered peril is the efficient proximate cause of the loss, but an excluded peril has contributed or was necessary to the loss," since "the statutory and judicial law of [California] make the insurer liable whenever a covered peril is the 'efficient proximate cause' of the loss, regardless of other contributing causes." *Howell v. State Farm Fire & Casualty Co.*, 218 Cal. App. 3d 1446, 1452 (1990). Thus, coverage is still afforded even where there is more than one cause of loss so long as the loss resulted from a covered cause (here, a virus). *Id.*

Here, even though the presence of a virus is undoubtedly a covered cause of loss, Allied World argues that coverage is excluded because government orders are a separate uncovered cause. While this is factually wrong as discussed above, even if the government orders could be considered separate causes of loss, Allied World's argument runs afoul of California law. In *Vardanyan v. AMCO Ins. Co.*, 243 Cal. App. 4th 779, 788-89 (2015), for example, the insured's house was settling from leaks, termite infestation, inadequate ventilation, faulty gutters, and decay. *Id.* at 782-83. The policy excluded coverage for collapse, other than for "losses involving collapse of a building or part of a building '**caused only by** one or more of' a list of perils, including hidden decay, hidden insect damage, and weight of contents, equipment, or people." *Id*. at 783 (emphasis added). The insurer, however, denied coverage citing an exclusion for damage caused by seepage or leakage of water, settlement of foundations, mold, water damage, faulty design and more. *Id*. at 783. The California Court of Appeal disagreed and found that, when a policy covers a specified peril and the specified peril is the predominant cause of the loss, the loss is covered even if there were excluded contributing causes. *Id*. at 792. The court held that, to the extent the "caused only

by one or more" language could "be construed to mean the contribution of any unlisted peril, in any way and to any degree, would result in the loss being excluded from coverage, the provision is an unenforceable attempt to contract around the efficient proximate cause doctrine." *Id*. at 796.

The policy language in *Vardanyan* (i.e., "caused only by") is analogous to the Policy language here (i.e. "solely and directly") because they both purport to exclude all losses except those resulting from a ***single*** cause in isolation from all others. As discussed above, there are at least triable issues of fact that the efficient proximate cause of 24 Hour's business interruption was the shutdown of its business locations due to the presence of viruses. Even if government orders could somehow be considered separate causes, which they cannot, the fact that government orders also might have required 24 Hour to close its Clubs is immaterial under the Policy and at law, as any policy provision to the contrary is unenforceable.

## CONCLUSION

For the foregoing reasons, 24 Hour respectfully requests that this Court deny Allied World's Motion for Summary Judgment in its entirety.

Dated: January 12, 2024                                  Respectfully submitted,

**REED SMITH LLP**

*/s/ Mark W. Eckard*
Mark W. Eckard (No. 4542)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500
(302) 778-7575 (Fax)
meckard@reedsmith.com

David E. Weiss (admitted *pro hac vice*)
T. Connor O'Carroll (admitted *pro hac vice*)
101 Second Street, Suite 1800
San Francisco, CA 94105-3659

(415) 543-8700
(415) 391-8269 (Fax)
dweiss@reedsmith.com
cocarroll@reedsmith.com

*Counsel for Plaintiff 24 HOUR FITNESS
WORLDWIDE, INC.*