EXHIBIT 137

Electronically FILED by Superior Court of California, County of Los Angeles on 01/21/2022 10:37 AM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Lara,Deputy Clerk

1 | ROBINS KAPLAN LLP
Amy Churan (SBN 216932)
2 | AChuran@RobinsKaplan.com
2049 Century Park East, Suite 3400
3 | Los Angeles, CA  90067
Telephone:    310 552 0130
4 | Facsimile:    310 229 5800

5 | Melissa D'Alelio (admitted *pro hac vice*)
MDAlelio@RobinsKaplan.com
6 | 800 Boylston Street, Suite 2500
Boston, MA  02199
7 | Telephone:    617 267 2300
Facsimile:    617 267 8288

8 |

9 | Attorneys for Defendants Ironshore Specialty Insurance
Company; Certain Underwriters at Lloyd's, London and
London market companies Subscribing to Policy No.
10 | (UMR) B0180PG1902606; Certain Underwriters at
Lloyd's, London and London market companies
11 | Subscribing to Policy No. (UMR) B0180PG1902611;
Certain Underwriters at Lloyd's, London Subscribing to
12 | Policy No. (UMR) B0180PG1902610; Certain
Underwriters at Lloyd's, London Subscribing to Policy
13 | No. (UMR) B0180PG1903066; Certain Underwriters at
Lloyd's, London Subscribing to Policy No. (UMR)
14 | B0180PG1902622; Ategrity Specialty Insurance
Company; and RSUI Indemnity Company

15 |

16 | (Additional counsel listed on following page)

17 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

18 | JRK PROPERTY HOLDINGS, INC.,    |    Case No.  21STCV19983

19 | Plaintiff,

20 | v.    |    DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

21 | COLONY INSURANCE
22 | COMPANY, et al.    |    Notice of Motion and Motion, Memorandum of Points and Authorities, other papers referenced in the Motion, and [Proposed] Order filed concurrently herewith

23 | Defendants.    |    RESERVATION NO. 280833900024
Date:  April 6, 2022
24 | Time: 8:30 a.m.

25 | Complaint Filed: May 27, 2021
Judge: Hon. Daniel S. Murphy
26 | Department: 32

27 |

28 |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1759 of 2921**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  **ADDITIONAL DEFENDANTS' COUNSEL**

2

| Counsel | Defendants |
|---|---|
| DENTONS US LLP<br>Julia M. Beckley (SBN 247493)<br>2000 McKinney Avenue, Suite 1900<br>Dallas, Texas 75201<br>Tel (214) 259-1854<br>Fax (214) 259-0910<br>julia.beckley@dentons.com<br><br>G. Richard Dodge , Jr. (*pro hac vice* application pending)<br>1900 K Street NW<br>Washington, DC 20006<br>Tel (202)496-7500<br>Fax (202) 496-7756<br>rich.dodge@dentons.com<br><br>Keith Moskowitz (*pro hac vice* application pending)<br>233 South Wacker Drive, Suite 5900<br>Chicago, IL 60606-6361<br>Tel (312) 876-8220<br>Fax (312) 876 7934<br>keith.moskowitz@dentons.com | Attorneys for Defendant<br>American International Group UK<br>Limited as Subscriber to Policy No.<br>(UMR) BO180PG1902606 |
| CUMMINS & WHITE, LLP<br>Larry M. Arnold (SBN 060459)<br>Margaret R. Miglietta (SBN 116026)<br>Noura K. Rizzuto (SBN 291455)<br>2424 S.E. Bristol Street, Suite 300<br>Newport Beach, CA 92660-0757<br>Tel (949) 852-1800<br>Fax (949) 852-8510<br>larnold@cwlawyers.com<br>mmiglietta@cwlawyers.com<br>nrizzuto@cwlawyers.com<br><br>STEWART SMITH<br>William F. Stewart (admitted *pro hac vice*)<br>300 Four Falls Corporate Center<br>300 Conshohocken Road, Suite 670<br>West Conshohocken, PA 19428<br>Tel (484) 344-5296<br>Fax (484) 534-9470<br>WStewart@stewartsmithlaw.com | Attorneys for Defendant<br>Colony Insurance Company |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF AMY M. CHURAN IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS
ii

| Counsel | Defendants |
|---|---|
| **KENNEDYS CMK LLP**<br>Susan Frances Dent (SBN 292900)<br>101 California Street, Suite 1225<br>San Francisco, CA 94111<br>Tel (415) 323-4460<br>Fax (415) 323-4445<br>Susan.Dent@kennedyslaw.com<br><br>Gary S. Kull (*pro hac vice* application pending)<br>120 Mountain View Boulevard<br>Basking Ridge, NJ 07920<br>Tel (908) 848-6300<br>Fax (908) 647-8390<br>Gary.Kull@kennedyslaw.corn | Attorneys for Defendant<br>Crum & Forster Specialty Insurance<br>Company |
| **CLYDE & CO US LLP**<br>Susan Koehler Sullivan (SBN 156418)<br>Brett Charles Safford  (SBN 292048)<br>355 S. Grand Avenue, Suite 1400<br>Los Angeles, CA 90071<br>Telephone: (213) 358-7600<br>Facsimile: (213) 358-7650<br>susan.sullivan@clydeco.us<br>brett.safford@clydeco.us | Attorneys for Defendants<br>Endurance American Specialty<br>Insurance Company; and<br>Maxum Indemnity Company |
| **DICKINSON WRIGHT RLLP**<br>Bennett Evan Cooper (SBN 128544)<br>800 W. California Avenue, Suite 110<br>Sunnyvale, California 94086<br>Tel: (602) 285-5044<br>Fax: (844) 670-6009<br>bcooper@dickinsonwright.com | Attorneys for Defendant<br>Evanston Insurance Company |
| **MUSICK, PEELER & GARRETT LLP**<br>David A. Tartaglio (SBN 117232)<br>624 South Grand Avenue, Suite 2000<br>Los Angeles, CA 90017-3383<br>Tel (213) 629-7600<br>Fax (213) 624-1376<br>d.tartaglio@musickpeeler.com<br><br>WILEY REIN LLP<br>Benjamin C. Eggert (*pro hac vice* forthcoming)<br>Joseph W. Gross (*pro hac vice* forthcoming)<br>2050 M Street NW<br>Washington, DC  20036<br>Tel (202) 719-7000<br>Fax (202) 719-7049<br>BEggert@wiley.law<br>JGross@wiley.law | Attorneys for Defendant<br>General Star Indemnity Company |

DECLARATION OF AMY M. CHURAN IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS
iii

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1761 of 2921**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

| Counsel | Defendants |
|---|---|
| AKERMAN, LLP<br>Michael R. Weiss (SBN 180946)<br>601 West Fifth Street, Suite 300<br>Los Angeles, CA 90071<br>Tel (213) 688-9500<br>Fax (213) 627-6342<br>Michael.Weiss@akerman.com<br><br>Bryan G. Scott (*pro hac vice* forthcoming)<br>100 North Main Street, Suite 2425<br>Winston-Salem, NC 27101<br>Tel (336) 296-7104<br>Fax (336) 296-7010<br>Bryan.Scott@akerman.com<br><br>LEWIS BRISBOIS BISGAARD<br>& SMITH LLP<br>Seth I. Weinstein (*pro hac vice* forthcoming)<br>77 Water Street, 21st Floor<br>New York, NY 10005<br>Tel (212) 232-1300<br>Fax (212) 232-1399<br>Seth.Weinstein@lewisbrisbois.com | Attorneys for Defendants<br>Homeland Insurance Company; and<br>Hallmark Specialty Insurance<br>Company |
| FAEGRE DRINKER BIDDLE & REATH LLP<br>Kristopher S. Davis (SBN 193452)<br>1800 Century Park East Suite 1500<br>Los Angeles, CA 90067-1517<br>Tel (310) 203-4000<br>Fax (310) 229-1285<br>kristopher.davis@faegredrinker.com<br><br>RIKER DANZIG SCHERER HYLAND<br>& PERRETTI LLP<br>Brian E. O'Donnell (*pro hac vice* application pending)<br>Maura C. Smith (*pro hac vice* application pending)<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, NJ 07962-1981<br>Tel (973) 538-0800<br>Fax (973) 538-1984<br>bodonnell@riker.com<br>msmith@RIKER.com | Attorneys for Defendant<br>Mitsui Sumitomo Insurance<br>Company of America |

DECLARATION OF AMY M. CHURAN IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

iv

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1762 of 2921

| Counsel | Defendants |
|---|---|
| PHELPS DUNBAR LLP<br>Jay R. Sever  (SBN 165859)<br>365 Canal Street, Suite 2000<br>New Orleans, LA 70130-6534<br>Tel (504) 566-1311<br>Fax (504) 568-9130<br>jay.sever@phelps.com<br><br>SELMAN BREITMAN LLP<br>Meka Moore  (SBN 180017)<br>Damian L. Palombi (SBN 311252)<br>11766 Wilshire Boulevard, 6th Floor<br>Los Angeles, CA 90025-6538<br>Tel (310) 445-0800<br>Fax (310) 473-2525<br>mmoore@selmanlaw.com<br>dpalombi@selmanlaw.com | Attorneys for Defendant<br>Scottsdale Insurance Company |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF AMY M. CHURAN IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

v

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1763 of 2921

I, Amy M. Churan, declare as follows:

1.     I am an attorney duly licensed to practice law in California and before this Court. I am a partner in the law firm of Robins Kaplan LLP and counsel of record for Defendants Ironshore Specialty Insurance Company; Certain Underwriters at Lloyd's, London and London market companies Subscribing To Policy No. (UMR) B0180PG1902606; Certain Underwriters at Lloyd's, London and London market companies Subscribing To Policy No. (UMR) B0180PG1902611; Certain Underwriters at Lloyd's, London Subscribing To Policy No. (UMR) B0180PG1902610; Certain Underwriters at Lloyd's, London Subscribing To Policy No. (UMR) B0180PG1903066; Certain Underwriters at Lloyd's, London Subscribing To Policy No. (UMR) B0180PG1902622; Ategrity Specialty Insurance Company; and RSUI Indemnity Company. I am familiar with and have first-hand personal knowledge of the pleadings, records, and proceedings in this matter.

2.     This Declaration is made in support of Defendants' Motion for Judgment on the Pleadings. The matters contained within this declaration are based upon based upon materials provided to me by the Defendants I represent or my review of the files in this and related matters, and if called upon to do so, I could and would competently testify thereto.

3.     As set forth in the Joint Stipulation Regarding Briefing Schedule and Citations to Policy Provisions, dated January 14, 2022, and entered by the Court on January 18, 2022, and in accordance with section 439 of the California Code of Civil Procedure, JRK and the Defendants met and conferred on January 7, 2022, to discuss the issues raised in the Defendants' Motion for Judgment on the Pleadings.  JRK and the Defendants met and conferred in good faith but were not able to reach an agreement that would resolve the arguments to be raised in Defendants' Motion.

4.     Attached hereto as **Exhibit 1** is a copy of JRK Property Holdings, Inc.'s First Amended Complaint filed in *JRK Property Holdings, Inc. v. Colony Insurance Company, et al.*, No. 21-cv-71-RDA-MSN, in the United States District Court, Eastern District of Virginia, dated February 18, 2021.

5.     Attached hereto as **Exhibit 2** is a copy of the Order Dismissing the Complaint for Failure to State a Claim and Transcript of Motion Hearing entered in *Savage City Strength, L.L.C.*

DECLARATION OF AMY M. CHURAN IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS
1

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment                    Page 1764 of 2921

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    *v. Covington Specialty Insurance*, Case No. SOM-L-831-20, by the Superior Court of New Jersey,

2    Somerset County, dated April 8, 2021.

3

4        I declare under penalty of perjury under the laws of the United States of America and the

5    State of California that the foregoing is true and correct to the best of my knowledge.

6        Executed at Los Angeles, California, on January 21, 2022.

7

8                                        **ROBINS KAPLAN LLP**

9                                   By: _____

10                                        Amy M. Churan

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF AMY M. CHURAN IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

2

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

# Exhibit 1

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1766 of 2921

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| JRK PROPERTY HOLDINGS, INC.,<br>                        Plaintiff,<br><br>        v.<br><br>COLONY INSURANCE COMPANY, GENERAL STAR INDEMNITY COMPANY, IRONSHORE SPECIALTY INSURANCE COMPANY, LLOYD'S UNDERWRITER SYNDICATE NO. 1967 WRB; LLOYD'S UNDERWRITER SYNDICATE NO. 1861 ATL; AXIS SPECIALTY EUROPE SE; LLOYD'S UNDERWRITERS SYNDICATE AFB 2623; LEXINGTON LONDON AS A DIVISION OF AMERICAN INTERNATIONAL GROUP UK LIMITED; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B0180PG1902611; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B01PG1902610; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B0180PG1903066; ARGO (NO. 604) LIMITED; MAXUM INDEMNITY COMPANY, ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, EVANSTON INSURANCE COMPANY, MAXUM INDEMNITY COMPANY, CRUM & FORSTER SPECIALTY INSURANCE COMPANY, ATEGRITY SPECIALTY INSURANCE COMPANY, SCOTTSDALE INSURANCE COMPANY, HOMELAND INSURANCE COMPANY, HALLMARK SPECIALTY INSURANCE COMPANY, RSUI INDEMNITY COMPANY, and MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA,<br>                        Defendant. | Civil Action No. 1:21-cv-00071-RDA-MSN<br><br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff JRK Property Holdings, Inc. ("JRK" or "Plaintiff"), by and through the

undersigned attorneys, as and for its First Amended Complaint against Colony Insurance

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1767 of 2921

Company; General Star Indemnity Company; Ironshore Specialty Insurance Company; Lloyd's

Underwriter Syndicate No. 1967 WRB, Lloyd's Underwriter Syndicate No. 1861 ATL, Axis

Specialty Europe SE, Lloyd's Underwriters Syndicate AFB 2623, and Lexington London as a

division of American International Group UK Limited, all who have subscribed to Policy No.

PG1902606; ARGO (No. 604) Limited participating on Policy No. PG1902622; Certain

Underwriters at Lloyd's of London Subscribing to Policy Nos. B0180PG1902611,

B01PG1902610, and B0180PG1903066.  Endurance American Specialty Insurance Company;

Evanston Insurance Company; Maxum Indemnity Company; Crum & Forster Specialty

Insurance Company; Ategrity Specialty Insurance Company; Scottsdale Insurance Company;

Homeland Insurance Company; Hallmark Specialty Insurance Company; RSUI Indemnity

Company; and Mitsui Sumitomo Insurance Company of America (collectively, "Insurers" or

"Defendants"), alleges as follows:

## INTRODUCTION

1.      This diversity action for anticipatory breach of contract and declaratory judgment

arises out of Insurers' refusal to provide coverage they owe under an "all risk" insurance

program for JRK's significant business losses arising out of the novel coronavirus outbreak and

ongoing COVID-19 pandemic.  Despite issuing broad Business Interruption coverage policies

that expressly include coverage for Interruption by Communicable Disease, Insurers have

refused to compensate JRK for its losses.

2.      JRK specializes in ownership, management, leasing and redevelopment of real

estate in primary and secondary markets throughout the United States.  JRK is invested in nearly

100 hotel and residential apartment properties in 22 states, including five in Virginia.  JRK

employs more than 500 full and part-time employees and provides housing to more than 50,000

2

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1768 of 2921

residents. JRK increases the value of its properties by sustaining high occupancy levels, keeping expenses low, and maintaining a dedicated team. Its business model, of course, depends on maintaining these high occupancy levels and charging competitive market rents and rates.

3.     The very qualities that make JRK a successful real estate investment firm made it particularly vulnerable to the devastating effects of the pandemic. In March 2020, with confirmed cases of coronavirus already present in many of the states where JRK's properties are located, state and local leadership began implementing stay-at-home orders to stem the spread of the pandemic (the "Orders"). The Orders generally directed all non-essential businesses to cease operations and permitted residents to leave their homes only for limited purposes such as getting groceries or medicine, or to perform essential jobs. Restaurants and other non-essential businesses near JRK's properties were forced to close. Many government officials across the country explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus, including that the COVID-19 virus physically causes property loss or damage due to its tendency to attach to surfaces for prolonged periods of time.

4.     The Orders, most of which have been renewed and extended multiple times, have devastated JRK's business. Overnight, hotel properties that were once busy, bustling destinations for travelers became ghost towns, decimating JRK's business. Due in part to loss of jobs and the economic decline, many of the existing residents of JRK's apartment properties have cancelled their leases, sought rent abatements or decreased rates, or simply have been unable to pay their rent. As a result of the pandemic and its consequences, JRK has been forced to lease its apartments at prices significantly lower than those common before the pandemic. Based on the information available to it, JRK has sustained tens of millions of dollars in damages since March 2020 and expects to suffer potentially hundreds of millions in losses from lost revenue, including

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1769 of 2921**

unpaid and/or significantly decreased rent, as well as other losses and expenses in connection

with the pandemic.  These losses are expected to continue for the indefinite future, given that,

even once the Orders are lifted, a return to normalcy will take many months, if not years.

     5.     However, like many prudent businesses, JRK had the foresight to purchase

insurance for "business interruption" that covers the very risk to its business that materialized

during the pandemic. To cover the majority of its portfolio, JRK purchased $250 million worth

of property insurance in a layered program from the Insurers.  Each of the Insurers issued a

policy that incorporates or follows form to a master property policy (the "Policy," and

collectively, the "Policies") and each provides a specified share of the total coverage.  Except as

noted within the individual Policies, the Insurers provide substantially identical coverage.

     6.     That coverage includes, among other things, Business Interruption coverage for

losses resulting from direct physical loss or damage, including interruption by communicable

disease (such as the coronavirus).

     7.     Relying on the terms of its Business Interruption Policies, JRK promptly wrote to

the JRK Insurers and made a claim for coverage under the Policy following its initial losses

caused by the pandemic and shutdowns.  However, in this time of crisis, the Insurers did not act

to reimburse JRK's losses.  Instead, on July 6, 2020, through their appointed adjuster, Sedgwick

Claims Management Services, Inc. ("Sedgwick"), the Insurers refused to take a coverage

position, reserved their rights, and identified the Policy provisions they believed barred or

limited coverage for JRK's claim.

     8.     Insurers have given every indication they will not cover JRK's losses stemming

from the pandemic and resulting shutdowns. In its correspondence to JRK, Sedgwick noted the

Policy's requirement of direct physical loss or damage to insured property may bar coverage,

4

suggesting it will follow others in the insurance industry attempting to claim that neither the virus nor the attendant disease causes physical loss or damage to property, as that terminology is used in the Policy. Insurers' refusal to cover JRK's losses lacks any justifiable basis in law or fact.

9.     The Insurers' position contravenes the plain meaning of the coverage language and case law in Virginia and across the country interpreting the same or similar language. Moreover, in direct contrast to other policies in the marketplace, the Policies expressly contain coverage for communicable diseases, confirming that the presence of a virus can cause loss or damage to property.

10.     As a result, JRK has been forced to bring this anticipatory breach of contract action through which it seeks damages and a declaratory judgment that Insurers' "defenses" do not bar its right to the coverage it paid substantial premiums for and badly needs.

## THE PARTIES

11.     Plaintiff JRK Property Holdings, Inc. ("JRK") is a corporation organized under the laws of California with its principal place of business in California. JRK owns and manages five multifamily properties in Virginia, including in Alexandria, Virginia.

12.     Upon information and belief, Defendant Colony Insurance Company is a Virginia corporation with its principal place of business in Virginia.

13.     Upon information and belief, Defendant General Star Indemnity Company is a Delaware corporation with its principal place of business in Connecticut.

14.     Upon information and belief, Defendant Ironshore Specialty Insurance Company is an Arizona corporation with its principal place of business in Massachusetts.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Opposition to Defendants' Motions for Summary Judgment**

15.     Upon information and belief, a number of the Policies were issued by Lloyd's

underwriting syndicates or consortiums that are organized and registered under the laws of the

United Kingdom.  The specific Lloyd's syndicates or consortiums at issue in this Amended

Complaint are set forth below:

> a.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1967 WRB is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.
>
> b.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1861 ATL is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.
>
> c.  Upon information and belief, Defendant Axis Specialty Europe SE, LIRMA A9505 is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.
>
> d.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate AFB 2623 is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.
>
> e.  Upon information and belief, Defendant Lex London is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.
>
> f.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1225 AES is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902611 that is organized and registered under the laws of the United Kingdom.
>
> g.  Upon information and belief, Defendant Endurance Worldwide Insurance Ltd., LIRMA E9105 is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902611 that is organized and registered under the laws of the United Kingdom.
>
> h.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1886 is an underwriting syndicate subscribing to Policy No. (UMR) B01PG1902610 that is organized and registered under the laws of the United Kingdom.

6

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1772 of 2921

       i.    Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 0382 HDU is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1903066 that is organized and registered under the laws of the United Kingdom.

       j.    Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1945 SII is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1903066 that is organized and registered under the laws of the United Kingdom.

       k.    Upon information and belief, Defendant Lloyd's Underwriter Syndicate member ARGO (No. 604) Limited subscribes to Policy No. (UMR) B0180PG1902622 that is organized and registered under the laws of the United Kingdom.

16.     The Underwriters subscribing to said policies are incorporated in the United Kingdom and none have a principal place of business in California. The Underwriters may be served with process at FLWA Service Corp., c/o Foley & Lardner LLP, 555 California Street, Suite 1700, San Francisco, California 94104-1520.

17.     Upon information and belief, Defendant Endurance American Specialty Insurance Company is a Delaware corporation with its principal place of business in New York.

18.     Upon information and belief, Defendant Evanston Insurance Company is an Illinois corporation with its principal place of business in Illinois.

19.     Upon information and belief, Defendant Maxum Indemnity Company is a Connecticut corporation with its principal place of business in Connecticut.

20.     Upon information and belief, Defendant Crum & Forster Specialty Insurance Company is a Delaware corporation with its principal place of business in New Jersey.

21.     Upon information and belief, Defendant Ategrity Specialty Insurance Company is a Delaware corporation with its principal place of business in Arizona.

22.     Upon information and belief, Defendant Scottsdale Insurance Company is an Ohio corporation with its principal place of business in Arizona.

23.     Upon information and belief, Defendant Homeland Insurance Company is a New York corporation with its principal place of business in Minnesota.

24.     Upon information and belief, Defendant Hallmark Specialty Insurance Company is an Oklahoma corporation with its principal place of business in Texas.

25.     Upon information and belief, Defendant RSUI Indemnity Company is a New Hampshire corporation with its principal place of business in Georgia.

26.     Upon information and belief, Defendant Mitsui Sumitomo Insurance Company of America is a New York Stock Company with a home office in New York City.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

28.     Because Defendants have consented to the jurisdiction of JRK's choosing in the Policies, this Court has personal jurisdiction over Defendants with respect to these claims, pursuant to the Policies.

29.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's jurisdiction and a portion of the property that is the subject of this action is located in this district.

## FACTUAL ALLEGATIONS

### I.     The Coronavirus Outbreak

30.     In December 2019, during the term of the Policies, an outbreak of illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hubei Province, China. In an event that has not occurred in more than a

8

century, a pandemic of global proportions then ensued, with the virus quickly spreading to Europe and then to the United States.

31.    From the first reported case in the United States in January 2020 to the present, the impact of the virus and the resulting disease has been staggering on life and property. And specifically, the impact on businesses such as JRK, whose livelihoods depend on travel, tourism, and steady incomes for Americans, has been particularly acute.

32.    As of February 26, 2020, the Centers for Disease Control and Prevention (the "CDC") warned that community transmission of the disease existed in the United States. The virus was spreading with no ability to trace the origins of new infections.[1] Moreover, the nature of the virus has made its containment particularly challenging. Numerous scientific studies and articles have concluded the virus spreads when droplets from an infected person land on objects and surfaces and then, after contacting the infected objects and surfaces, other individuals touch their eyes, noses, or mouths.

33.    Coronavirus has several modes of transmission.  Indeed, according to the CDC, "everyone is at risk for getting COVID-19." Per the CDC and World Health Organization (the "WHO"), a person may become infected by: (1) coming into close contact (about 6 feet) with a person who has COVID-19; (2) absorbing respiratory droplets when an infected person talks, sneezes, or coughs; or (3) touching surfaces or objects that have the virus on them and then touching his or her mouth, eyes, or nose.  Thus the coronavirus is present both in fluid particles in the air, and on surfaces.

---

[1] *CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html (last visited July 24, 2020).

9

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Opposition to Defendants' Motions for Summary Judgment

Page 1775 of 2921

34.     COVID-19 is not only highly contagious but deadly. According to the CDC, more than 27 million Americans have contracted the disease, of which more than 490,000 have died.

35.     Besides being deadly, the virus is challenging to contain because infected individuals can be asymptomatic—and thus unaware that they might be spreading the virus through the mere touching of objects and surfaces. Indeed, studies have estimated that more than 40% of infected individuals may never develop any symptoms.[2] But even individuals who appear healthy and present no identifiable symptoms of the disease will still spread the virus by merely breathing, speaking, or touching objects and surfaces.

36.     The virus also continues to evolve, making it more difficult to contain.  In late December 2020, a new strain of COVID-19 was detected, which is believed to be more contagious and easily spread.  Early research also suggests the new strain is resistant to antiviral treatment, making it more dangerous.

37.     Though droplets carrying the virus are not visible, they are nonetheless physical objects, carrying a physical substance, that attach to and cause harm to property. Studies have shown that the virus can actively survive on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth.

38.     And unlike many other viruses that are unable to survive for long periods of time outside the body, the novel coronavirus is resilient and survives on surfaces for days and even weeks. The virus thus compromises the physical integrity of the structures it permeates and poses an imminent risk of physical damage to all other structures. The virus likewise renders such structures unusable.

---

[2] Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected*, NBC News (May 27, 2020, 12:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-common-suspected-n1215481.

10

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1776 of 2921

## II.    Coronavirus Causes Direct Physical Loss or Damage

39.    The United States reported its first COVID-19 case on January 20, and on January 30, the WHO declared the pandemic a "Public Health Emergency of International Concern."  On March 13, 2020, the federal government declared a national emergency. Three days later, the CDC and members of the national Coronavirus Task Force issued public guidance, styled as "30 Days to Slow the Spread," that advocated for the first time far-reaching social-distancing measures, such as: working from home; avoiding shopping trips and gatherings of more than 10 people; and staying away from bars, restaurants, and food courts.

40.    By mid-March, it became clear that drastic action had to be taken to slow down the rate of infections.  Many states and local governments then began to impose sweeping restrictions on residents' daily lives and property to protect them and stop the spread.[3] Most states restricted or prohibited the operation of non-essential businesses or public gatherings or required individuals to stay at home except for essential purposes.

41.    States, counties, and cities where JRK properties are located declared states of emergency to limit the spread of the virus.  They issued Orders suspending or severely curtailing the operations of all non-essential or high-risk businesses and permitting residents to leave their homes only for limited purposes, such as for groceries, medicine, and to perform essential jobs. These Orders directly impacted JRK's hotels, residential tenants, and commercial tenants at issue in this lawsuit.

42.    For example, on March 12, 2020, the Governor of Virginia, Ralph Northam, declared a "State of Emergency" throughout the Commonwealth of Virginia.  On March 23,

---

[3] Jasmine C. Lee et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. Times (updated July 31, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

11

2020, Governor Northam issued an Executive Order closing all non-essential businesses.  On March 30, 2020, Governor Northam issued a Stay-at-Home Order for all Virginia residents, requiring residents to stay home.

43. Similar orders were issued in the other states where JRK owns properties, with similar effects.  For example, New York Mayor de Blasio signed a series of stay-home orders and explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus and, of particular relevance here, stating that "the virus physically is causing property loss and damage[.]"  Similarly, Los Angeles Mayor Eric Garcetti issued a stay-at-home order that closed non-essential businesses and operations and directed residents to remain at home except for limited, essential purposes, recognizing that "the COVID-19 virus . . . is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time."  The stay-home orders had wide-reaching impacts, including loss of jobs, resulting in tenants unable to pay previous market rents.

44. Some of the above orders, as well as comparable orders from county and city officials in the states wherein JRK does business, specifically stated they were being issued because the virus has caused, causes, or will cause physical loss or damage to property.

45. As the pandemic has evolved, the Orders have been renewed and amended by such authorities and continue to impose severe restrictions on all non-essential businesses and operations.  In late 2020 and early 2021, as coronavirus cases continued to increase throughout the United States, cities and states that had lifted Orders or loosened restrictions entered a "second wave" of lockdowns.  Renewed restrictions were applied throughout states where JRK has properties, including Virginia, Washington, New York, New Jersey, and Pennsylvania.

12

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

Page 1778 of 2921

## III. JRK's Business Interruption Losses

46.    JRK was founded in 1991 and owns modern, renovated apartments and hotels to rent and reserve throughout the United States.  JRK currently owns properties in Virginia, California, Colorado, Connecticut, Florida, Georgia, Illinois, Massachusetts, Maryland, Michigan, Minnesota, North Carolina, Nebraska, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Texas, and Washington.

47.    JRK prides itself on staffing its properties with friendly professionals who provide personalized service.  JRK's business model depends on sustaining high occupancy levels, keeping expenses low, charging competitive market rates and rents, and maintaining a dedicated team.

48.    The pandemic and the Orders have had a devastating effect on JRK's business. Before the pandemic, JRK's apartment properties attracted consistent and financially stable renters, but now, due to the pandemic and shutdown Orders, many of the residential tenants to whom JRK had leased apartments have been unable to continue paying rent, have sought and obtained decreased rental rates, or have terminated their leases.  Many Orders have not only prohibited residential evictions, but also allowed tenants to defer rent payments.  Other Orders have prohibited traditional lease enforcement mechanisms including late fees or interest on unpaid rent and the ability to charge premium rates for short-term leases; others have prohibited rent increases during the pandemic.  The state of Washington, for example, banned rent increases and late fees, stalled all evictions, and imposed restrictions on property owners' communications with tenants and rent collection efforts.

49.    These Orders have compounded JRK's losses by making it nearly impossible for it to recover late or unpaid rent payments.

13

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

50.     Pre-pandemic, JRK's hotels brought in millions of dollars in room revenue. But access to these properties has been limited or even prohibited by the Orders, and the hotels lost virtually all travelers, and thus revenue, overnight.  Hotels that remained open or have re-opened have incurred new costs for purchasing industrial disinfecting tools, installing hand sanitizer stations, and other remedial measures.

51.     Access to JRK's properties has been severely limited.  Some JRK residential properties were forced to close their leasing offices temporarily due to the presence of the virus on the premises and to contain the spread.  Prospective tenants who might have filled empty units have delayed or cancelled plans to move into a new property.  In properties with confirmed cases of coronavirus (including all of JRK's properties in Virginia), leasing offices have gone fully virtual, meaning prospective tenants are not able to tour or view open apartments, drastically reducing new rentals.  Businesses near JRK properties that would otherwise draw potential guests and tenants to the area have been closed or significantly reduced their services and capacity.

52.     The coronavirus is ubiquitous — it has spread throughout all fifty states, some individuals carry it with no symptoms, it cannot be visibly detected on surfaces and can remain on surfaces for weeks.  Indeed, there have been over 100 confirmed cases of COVID-19 in JRK properties across 18 states, including both tenants and employees.  The majority of JRK's residential properties (at least 60 properties) have had at least one resident test positive.  For example, in Virginia, at least 10 residents of JRK properties have had confirmed or suspected COVID cases.  JRK's residential properties are uniquely vulnerable to the physical damage the virus causes, as its apartment properties face increased exposure when tenants are ordered to "stay home," yet the public areas such as lobbies and elevators are required to be open for safety

14

and building use.  Given the countless employees, tenants, and visitors entering and inhabiting JRK's nearly 100 properties since the start of the pandemic, and the number of cases already confirmed in JRK's properties, it is statistically certain that the virus has been present at *all* of JRK's properties for some period of time since the COVID-19 outbreak began and that the virus continues to pose an actual imminent threat to the properties.

53.     The JRK properties are within one mile of many other hotels, apartments, restaurants, cafes, bars, and parks that also have suffered and continue to suffer direct physical loss or damage to property arising out of the pandemic. The direct physical loss or damage to these surrounding properties has restricted access to those properties as well as JRK's nearby properties.

54.     As of the filing of this Complaint, JRK has sustained tens of millions of dollars in losses, which will increase substantially (potentially to hundreds of millions of dollars) depending on the length and ultimate severity of the pandemic and governmental responses. Indeed, many jurisdictions have halted or reversed plans to reopen non-essential businesses. In late 2020, many states, including the jurisdictions where JRK owns properties, reversed their reopening plans and/or ordered extensions to their stay-home orders, halting reopening plans. Regardless, a second wave of coronavirus infections came in the Fall and Winter, further compounding JRK's losses.

55.     As a result, JRK has suffered, and will continue to suffer, significant business interruption losses, potentially on the scale of hundreds of millions of dollars.

56.     The losses result from direct physical loss *or* damage to property, including, but not necessarily limited to: the actual presence of the virus at JRK's properties; the threatened presence of the virus at the properties due to its ubiquity; and the loss of function, purpose, and

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

Page 1781 of 2921

use of the properties—all caused by the virus, the resulting disease, the pandemic, governmental responses, the economic recession, inter-state and international travel restrictions, and/or the Orders.

## IV.    JRK's Business Interruption Policies

57.    In exchange for substantial premiums, the Insurers sold the Policies covering JRK as the Named Insured for the policy period June 1, 2019 to June 1, 2020.  See Ex. A (General Star Policy No. IAG966951B) at PP 98 0028 (07/17), page 1 of 36.[4]  Each Policy is part of a layered property insurance program (collectively, the "Policies"), in which each Insurer provides a specified per-occurrence[5] limit of liability, as part of either a $5 million primary layer or an excess layer, with various sublimits, time limits, and waiting periods for certain coverages, and a per-occurrence deductibles. See Ex. A (page 1 of 36 ff).  The total property insurance program JRK purchased provides up to $250 million in coverage.[6]

58.    Unless damage is clearly included within a listed sublimit, the full limit of liability of each Policy is available for JRK's damages. *Id.*

59.    The Policy contains a broad grant of coverage, stating that except as otherwise excluded, the "Perils Insured Against" are "all risks of direct physical loss or damage to Insured Property."  Ex. A (page 23 of 36).

---

[4] Each of the Policies listed and described herein is incorporated by reference into this Complaint.

[5] "Occurrence" means "the sum of all losses (individual or otherwise) covered under this Policy directly occasioned by any one disaster, accident or loss arising out of one event ('Loss or Losses') or series of disasters, accidents or losses arising out of one event ('Series of Losses') that occur(s) during the Policy Period anywhere within the Policy territory.  Except as specifically set forth below, the duration and extent of any one Occurrence shall be limited to all losses covered under this Policy occurring during any period of 168 consecutive hours arising out of and directly occasioned by the same event."  Ex. A (page 29 of 36).

[6] The Defendant Insurers make up $248,750,000 of the $250 million property program, as shown on the attached the schedule of insurance located in Exhibit A, at PP 98 0029 (page 1 of 1).  Two additional insurers that participate in the program are not party to this action, due to forum selection provisions in their policies.

16

60.     The Policy does not define the phrase "direct physical loss or damage to Insured Property."

61.     Courts throughout the country have interpreted this "direct physical loss or damage" to property language as including situations where a covered peril threatens property or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy or continued use.

62.     Relevant here, the Policy's Business Interruption coverage part "covers loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss, damage, or destruction by any of the perils covered herein during the term of this policy to property insured herein." See Ex. A (page 7 of 36).

63.     As additional protection from perils insured under the Policy, the Policy provides Extra Expense coverage, and Rental Value/Rental Income coverage. The categories of compensable losses include, but are not limited to: lost profits; extra expense;[7] and rental income.[8]

64.     As part of its coverage for Business Interruption, Extra Expense, and Rental Value losses resulting from physical loss or damage to the JRK properties, the Policy provides several specific coverages.  They include, but are not limited to:

- Contingent Time Element coverage for losses resulting from direct physical loss or damage to a JRK supplier or customer;

- Loss resulting from orders of civil or military authority;

---

[7] "Extra Expense" means "the excess of the total cost during the period of restoration of the damaged property chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no loss or damage occurred." Ex. A (page 8 of 36).

[8] "Rental Value" is "the sum of: a) The total anticipated gross rental income from tenant occupancy and/or use of the described property as furnished and equipped by the Insured, and b) The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured, and c) The fair rental value of any portion of said property which is occupied by the Insured." Ex. A (page 8 of 36).

17

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 1783 of 2921**

- • Loss relating to ingress or egress; and

- • Loss relating to the presence of communicable disease.

65. The Policy also includes several potentially applicable "coverage extensions." They include:

- • Loss resulting from ordinances regulating the use and occupancy of insured property;

- • Costs of decontamination;

- • Expenses of preparing and certifying details of a claim for loss under the Policy; and

- • Expenses of relocating and returning tenants or residents.

66. The Policy covers **contingent time element losses**—that is, losses sustained by JRK during the Period of Interruption, resulting from direct physical loss or damage to the real or personal property of a direct or indirect supplier or customer of the Insured which wholly or partially prevents such supplier or customer from supplying or accepting goods to or from JRK. Ex. A (pages 9-10 of 36).

67. The Policy covers **ingress/egress losses**—that is, "losses sustained … when as a direct result of a peril insured against, ingress to or egress from [JRK's] premises is thereby impaired." Ex. A (page 10 of 36).

68. The Policy covers **Rental Value loss**, meaning "loss sustained by [JRK] resulting directly from the necessary untenantability caused by direct physical loss, damage, or destruction by any of the perils covered herein during the term of this policy to Real and Personal Property as insured herein, but not exceeding the reduction in rental value less charges and expenses which do not necessarily continue during the period of untenantability." Ex. A (page 8-9 of 36).

18

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 1784 of 2921**

69.     The Policy provides Business Interruption coverage for **interruption by civil or military authority losses**—that is, losses sustained when, as a result of necessary interruption of business conducted by the Insured and caused by direct physical loss, damage, **or** destruction by any of the perils insured against, access to real or personal property is impaired by order of civil or military authority.  Ex. A (page 10 of 36).

70.     The Policy also specifically recognizes that communicable disease creates direct physical loss or damage to property, and as such, is a "peril insured against."  Specifically, the Policy covers **communicable disease losses**, including:

> Actual Loss Sustained and Extra Expense incurred by [JRK] during the Period of Liability if access to a Location owned, leased or rented by [JRK] is limited, restricted, or prohibited as a result of:
>
> a. An order of an authorized governmental agency regulating the actual not suspected presence of communicable disease[9]; or
>
> b. A decision of an Officer of [JRK] as a result of the actual not suspected presence of communicable disease.

Ex. A (page 10 of 36).[10]

71.     The JRK properties where JRK has sustained losses are insured properties under the Policy, and the insured losses include long-term deterioration in value of JRK's properties and portfolio, and increased costs, expenses, and resulting debts.

72.     JRK reasonably expected that the Policy would cover such losses, based on, among other things, the broad language of the Policy, the express coverage for losses resulting from communicable disease, and the fact that the Policy does not contain language excluding damages resulting from viruses or diseases.

---

[9] "Communicable Disease" means "disease" that is" "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges" or "[l]egionellosis." Ex. A (page 11 of 36).

[10] The policy issued by Defendant Ironshore contains an endorsement excluding coverage for Communicable Disease.

19

73.     JRK has paid all premiums due to Insurers to purchase the Policy and has complied with all applicable duties under the Policy.

74.     Throughout the pandemic, JRK has taken actions, some of which qualify to protect the property, and thus Insurers, from further loss, including taking short term bridge financing on properties whose mortgages were maturing in 2020 and, without such financing, would had to have been sold at a substantial discount. The Policy covers expenses "incurred by [JRK] in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder," which expenses "shall be added to the total physical loss or damage otherwise recoverable under this Policy." Ex. A (page 35 of 36).

75.     Moreover, none of the Policy's exclusions preclude JRK's claim for coverage. Rather, the exclusions in the Policy consist of standardized language and terms that have been developed by the insurance industry through its trade associations and are used industry-wide and nationwide. These terms have acquired specialized meaning and application over time as they have been interpreted by courts.

## V.     JRK's Claim for Coverage

76.     In March 2020, after some of the JRK properties were temporarily closed or use was limited, access to these properties was denied, and JRK apartment properties faced severe decreases in rent collected, JRK gave prompt notice of its claim to the primary and first-excess Insurers.  Sedgwick, Insurers' adjuster, initially responded to that notice on July 6, 2020, reserving its rights and indicating that the Insurers on the program "do not have sufficient information to advise you as to whether or not there may be coverage under the Policies," but it did not make any specific requests for information (the "July 6 Letter").[11]

---

[11] The July 6 Letter was sent on behalf of Defendants Ironshore, General Star, Certain Underwriters, and Colony.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1786 of 2921**

77.     In August 2020, in view of its increasing losses likely to exceed $10 million, JRK gave notice of its claim to its higher-level excess carriers, Defendants Maxum, Endurance, Evanston, Crum & Forster, Ategrity, Scottsdale, Homeland, Hallmark, RSUI, and Mitsui Sumitomo on August 17, 2020.  Sedgwick has acknowledged receipt but has not provided a coverage position.

78.     Instead of honoring its obligations under the Policy, Sedgwick, on behalf of the JRK Insurers, effectively denied coverage by identifying the Policy provisions it claims may bar or limit coverage and/or failing to respond substantively to JRK's second notice.

79.     JRK Insurers' suggestion that coverage is barred by the Policy is erroneous. As pleaded, there has been direct physical loss or damage to property, including, but not necessarily limited to, the actual presence of the virus in the JRK properties; the threatened presence of the virus in the JRK properties due to its ubiquity; and the loss of function and purpose of the JRK properties—all caused by the virus, the resulting disease, the pandemic, governmental negligence, or the Orders.

80.     In the July 6 Letter, Sedgwick indicated Insurers' view that, to the extent it believes coverage is available, coverage may be limited to the Communicable Disease provisions. As Sedgwick wrote, "Insurers wish to draw JRK's attention to applicable sub-limits for those Policies providing coverage identified as Interruption by Communicable Disease coverage."

81.     That position is likewise erroneous. While Insurers correctly acknowledged that the coronavirus triggers the Policy's Business Interruption coverage, their singular focus on the Communicable Disease sublimit is a blatant attempt to limit their exposure and reduce the amount JRK can recover for its losses.  JRK's significant costs and losses are not limited solely

21

to recovery under the Communicable Disease provisions. The limited or prohibited access to JRK properties was a result of the global pandemic and government responses to it, not due to an order by a governmental agency or JRK officer arising from the actual not suspected presence of the virus. Regardless, the threatened presence of the virus at the JRK properties or the loss of function and purpose of the properties qualifies as "physical loss or damage to [property]." Moreover, the Orders regulate not the communicable disease itself, but the threat of the communicable disease or the spread of the virus that causes the disease.

82.     Sedgwick also raised a variety of exclusions, including the Pollution or Contamination exclusion, communicating that the Insurers deny that JRK's losses are covered under the Policy.

83.     No exclusion applies, however, because, among other potential reasons, JRK's losses do not stem from the "release, discharge, dispersal, seepage, migration, or escape of Pollutants or Contaminants."  And even if such pollution or contamination did occur, such pollution or contamination would have led to a covered peril and, as such, would be covered by the Policy.

84.     Moreover, the "Pollution and Contamination Exclusion Clause" plainly does not apply to JRK's losses.  That clause begins with the word "Pollution," showing that it only applies to actual Pollution, and not to the pandemic.  The remainder of the provision confirms that excluded damages must result from the "release, discharge, dispersal, seepage, migration, or escape" of pollutants and/or contaminants, which terms are well-established terms of art in environmental law and applicable to pollutants or contaminants used or maintained in the course of an insured's business that may be accidentally released or discharged from their containment. This exclusion does not apply to JRK's claim.

22

85.     As evidence that pollution or contamination does not apply to the coronavirus pandemic, in 2006, the Insurance Services Office (an insurance industry trade group) drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents. The endorsement, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Defendants chose to not include this endorsement or an analogous provision in the Policy; instead, it included only the exclusion for "pollution or contamination."

86.     JRK's losses, moreover, resulted from a number of causes other than the virus or disease, including, but not necessarily limited to, the pandemic, governmental negligence, or the Orders, all of which are other covered causes of loss under the Policy.

87.     The July 6 letter from Sedgwick sent a clear message that Insurers did not intend to pay JRK's significant losses covered under the Policy.

88.     The Insurers' responses (or lack thereof) have further harmed JRK by depriving it of the benefit of the bargain it purchased in the Policy.  Insurers' refusal to reimburse JRK for its losses have had detrimental effects on the overall financial strength of the company and its ability to invest in properties.  Without the coverage JRK bargained for, it is facing significant cash flow deficits such that it is being forced to sell properties at below market prices, halt renovations to its residential properties, and enter into financing deals with onerous, unfavorable terms just to keep some properties.  Had Insurers abided by the terms of the Policy and reimbursed JRK for its losses, JRK would have been able to refinance mortgages on certain properties instead of taking on these onerous short term bridge financing deals.

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

# FIRST CAUSE OF ACTION
## (Anticipatory Breach of Contract)

89.     JRK repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

90.     The Policies constitute valid and enforceable contracts between JRK, as the "Named Insured," and Insurers, as the "Company" providing the insurance, under each Policy.

91.     As described above, JRK has sustained, and is continuing to sustain, losses covered under the Policy and during the policy period.

92.     JRK provided prompt notice of its losses, and had performed all obligations required of it under the Policy at the time Insurers effectively denied coverage on July 6 by providing only Policy provisions it claimed would bar or limit coverage, with no good faith follow up or investigation.  The July 6 Letter was a clear expression that Insurers would not perform their obligations to provide coverage to JRK under the Policy and in breach of the Policy.

93.     Insurers' further statement that JRK's recovery may be limited by the communicable disease coverage of the Policy was a positive and unequivocal expression that Insurers would not perform their obligations to provide coverage outside of the communicable disease coverage, despite admitting that the virus triggered the Policy's Business Interruption coverage.

94.     Under the terms of the Policy, Insurers must pay up to the full limits for each Policy for any loss covered under the Policy, subject only to sublimits, time limits, waiting periods, or deductibles for specific coverages.

95.     Insurers have not paid any amounts to JRK in connection with its claim, and JRK has a reasonable belief that they will not pay the full amount they are required to pay under the

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1790 of 2921

Policy for JRK's coronavirus losses. Instead, Insurers have asserted various inapplicable bases to wrongfully deny coverage for JRK's claim.

96.     As a direct and proximate result of Insurers' anticipatory breach of contract, JRK has suffered and will continue to suffer damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

97.     JRK repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     Pursuant to the terms of the Policy, Insurers are obligated to pay, up to the limit of liability, for property damage or time element losses covered under the Policy and not otherwise excluded from coverage.

99.     As detailed above, JRK's losses are covered under multiple coverages of the Policy and are not excluded from coverage.

100.    Insurers dispute, or JRK reasonably believes Insurers will dispute, Insurers' legal obligation to pay JRK's claim.

101.    JRK seeks a declaration by this Court of Insurers' obligations under the Policies.

102.    An actionable and justiciable controversy exists or will exist between JRK and Insurers concerning the proper construction of the Policy, and the rights and obligations of the parties thereto, with respect to JRK's claim for expenses or losses arising out of the pandemic.

103.    JRK seeks a declaratory judgment in favor of JRK and against Insurers declaring the following:

• JRK has experienced "direct physical loss or damage to [property]" as that phrase is used

25

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1791 of 2921

in the Policy, sufficient to trigger coverage;

- No exclusion, including the so-called pollution or contamination exclusion, or the "loss of use" exclusion, bars that coverage;

- Defendants must pay JRK up to their respective limits of liability for all losses covered under the Policy; and

- The award of such additional relief as the Court deems just and appropriate.

104. A declaratory judgment would be useful in resolving this case or controversy. JRK's losses are ongoing. By clarifying the parties' rights and duties under the Policy, a declaratory judgment would guide Insurers' treatment of JRK's covered, but yet unaccrued, losses, in addition to the significant damages JRK has already accrued. Because JRK's unaccrued losses have not yet ripened such that a final amount of damages can be ascertained, the declaratory judgment claim would afford JRK relief independent of the anticipatory breach of contract claim.

## **PRAYER FOR RELIEF**

WHEREFORE, JRK prays for relief as follows:

a. On the First Cause of Action, JRK requests that the Court enter judgment against Insurers, awarding JRK damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

b. On the Second Cause of Action, JRK requests that the Court enter a declaratory judgment in favor of JRK against Insurers that JRK's losses are covered under the Policy, declaring that Insurers are required to pay JRK, up to the applicable limits of each Policy, for claimed amounts under the Policy;

26

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1792 of 2921**

      c.      For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all JRK's costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

      d.      JRK requests such other and further relief as the Court deems just and proper.

## JURY DEMAND

JRK hereby demands a trial by jury on all issues so triable.

Dated: February 18, 2021

**MITCHELL SANDLER, LLC**

/s/ *Robyn Cort Quattrone*
Robyn Cort Quattrone (VA Bar No 43117)
rquattrone@mitchellsandler.com
Andrew L Sandler (*pro hac vice*)
asandler@mitchellsandler.com
Stephen LeBlanc (*pro hac vice*)
sleblanc@mitchellsandler.com
Rebecca Guiterman (*pro hac vice*)
rguiterman@mitchellsandler.com
**MITCHELL SANDLER LLC**
1120 20th Street NW, Suite 725
Washington, DC 20036
Telephone: (202) 886-5260

Robin Cohen (*pro hac vice* forthcoming)
rcohen@cohenziffer.com
Meredith Elkins (*pro hac vice* forthcoming)
melkins@cohenziffer.com
**COHEN ZIFFER FRENCHMAN &
McKENNA LLP**
1350 Avenue of the Americas
New York, NY 10019

***Attorneys for Plaintiff***

27

# EXHIBIT A

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1794 of 2921



**NAME INSURED:**  JRK PROPERTY HOLDINGS, INC.

**POLICY NUMBER:** IAG966951B

**POLICY PERIOD: From**     June 1, 2019     **To**     June 1, 2020

**NOTICE**

**THIS IS A SURPLUS LINES POLICY AND IS NOT PROTECTED BY THE CONNECTICUT INSURANCE GUARANTY ASSOCIATION OR SUBJECT TO REVIEW BY THE CONNECTICUT INSURANCE DEPARTMENT.  IT IS IMPORTANT THAT YOU READ AND UNDERSTAND THIS POLICY.**

120 Long Ridge Road
STAMFORD, CONNECTICUT 06902-1843

IL 94 0004CT 01 15

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**



CA - Surplus Lines Tax
CA Stamping Office Fee

# GENERAL STAR INDEMNITY COMPANY
## (A STOCK INSURANCE COMPANY)
### P.O. Box 10354
### Stamford, Connecticut 06904-2354

## COMMON POLICY DECLARATIONS

**POLICY NUMBER**   IAG966951B      **Previous Policy Number**   IAG966951A

**NAMED INSURED**   JRK PROPERTY HOLDINGS, INC.      **BROKER**   R-T Specialty LLC
One Embarcadero Center
Suite 2700

**MAILING ADDRESS**   11766 Wilshire Boulevard
Suite 1450
Los Angeles, CA 90025      San Francisco,   CA   94111

**BILLPOINT CODE**   0007B665

**FORM OF BUSINESS:**  Corporation

**BUSINESS DESCRIPTION:**   Management company for apartments and hotels

**POLICY PERIOD:**   Policy shall be effective and shall terminate at 12:01 a.m. at the location(s) of property involved on the inception and expiration dates specified below:

INCEPTION: June 1, 2019      EXPIRATION: June 1, 2020

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

|  | PREMIUM |
|---|---|
| Commercial General Liability Coverage Part | NOT COVERED |
| Commercial Property Coverage Part | ▮ |
| Commercial Inland Marine Coverage Part | NOT COVERED |
| **TOTAL PREMIUM** | ▮ |

Premium shown is payable at inception, unless otherwise stated.
Audit Period: Annual, unless otherwise stated.

## FORMS AND ENDORSEMENTS (other than applicable Forms and Endorsements shown elsewhere in the policy.):

PP 09 0001 (04/19), IL 94 0003CA (06/13), IL 0260 (02/10), 02 FL 500 (10/09), IL 0255 (03/16), IL 0262 (02/15), CP 0131 (03/13), IL 94 0001IL (07/16), CP 0109 (10/00), CP 0106 (08/96), IL 0259 (09/07), CP 0133 (05/18), IL 94 0002NC (01/13), IL 0236 (09/07), IL 0246 (09/07), IL 0273 (01/10), 02 TX 500 (01/19), CP 0142 (03/12), 02 WA 500 (04/09), IL 05 0001 (02/11), 02 PP 608 (11/04)

**THESE COMMON POLICY DECLARATIONS, COVERAGE PART DECLARATIONS AND COVERAGE FORMS TOGETHER WITH THE COMMON POLICY CONDITIONS AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.**

**COUNTERSIGNED AT**  Los Angeles, California      **on**      June 14, 2019

**BY:**

AUTHORIZED REPRESENTATIVE

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment      Page 1796 of 2921

# GENERAL STAR INDEMNITY COMPANY

# IMPORTANT NOTICE

## WHAT TO DO IN CASE OF A CLAIM

In the event of loss or damage to Covered Property, you should immediately report the details in writing to:

General Star Management Company
Property Claims
P.O. Box 1255
Stamford, CT  06904
Fax:  866-464-3678
E-Mail: GStarPropertyClaims@generalstar.com

Note: Failure to promptly report loss or damage could jeopardize your coverage.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

# GENERAL STAR INDEMNITY COMPANY

ATTACH THIS NOTICE TO YOUR POLICY

# IMPORTANT NOTICE – CALIFORNIA

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.  THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER.  YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT

IL 94 0003CA 06 13                                                      Page 1 of 3

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1798 of 2921

OF INSURANCE AT THE FOLLOWING TOLL-FREE
TELEPHONE NUMBER: 1-800-927-4357.  ASK WHETHER
OR NOT THE INSURER IS LICENSED AS A FOREIGN OR
NON-UNITED STATES (ALIEN) INSURER AND FOR
ADDITIONAL INFORMATION ABOUT THE INSURER.  YOU
MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE
AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE
   IN THE UNITED STATES AND YOU MAY CONTACT THAT
   STATE'S DEPARTMENT OF INSURANCE TO OBTAIN
   MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE
   INSURER SHOULD BE LICENSED BY A COUNTRY
   OUTSIDE OF THE UNITED STATES AND SHOULD BE ON
   THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT
   (IID) LISTING OF APPROVED NONADMITTED NON-UNITED
   STATES INSURERS.  ASK YOUR AGENT, BROKER, OR
   "SURPLUS LINE" BROKER TO OBTAIN MORE
   INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS
   LINE INSURERS.  ASK YOUR AGENT OR BROKER IF THE
   INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE
   WEB SITE OF THE CALIFORNIA DEPARTMENT OF
   INSURANCE:  WWW.INSURANCE.CA.GOV

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE
   INSURANCE POLICY YOU HAVE PURCHASED BE BOUND

IL 94 0003CA 06 13                                        Page 2 of 3

**IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**GENERAL STAR INDEMNITY COMPANY**

INTERLINE
IL 02 60 02 10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONNECTICUT CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**Cancellation**

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** Cancellation of policies in effect for less than 60 days.

If this policy has been in effect for less than 60 days and is not a renewal of a policy we issued, we may cancel this policy for any reason by giving you written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** Cancellation of policies in effect for 60 days or more.

**a.** If this policy has been in effect for 60 days or more or this is a renewal of a policy we issued, we may cancel this policy by giving you written notice of cancellation at least:

**(1)** 10 days before the effective date of cancellation if we cancel for one or more of the following reasons:

**(a)** Nonpayment of premium;

**(b)** Conviction of a crime arising out of acts increasing the hazard insured against;

**(c)** Discovery of fraud or material misrepresentation by you in obtaining the policy or in perfecting any claim thereunder;

**(d)** Discovery of any willful or reckless act or omission by you increasing the hazard insured against; or

 Exhibit 137 to Plaintiffs Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

(e) A determination by the Commissioner that continuation of the policy would violate or place us in violation of the law; or

**(2)** 60 days before the effective date of cancellation if we cancel for one or more of the following reasons:

    **(a)** Physical changes in the property which increase the hazard insured against;

    **(b)** A material increase in the hazard insured against; or

    **(c)** A substantial loss of reinsurance by us affecting this particular line of insurance.

**b.** We may not cancel policies in effect for 60 days or more or renewal policies for any reason other than the reasons described in Paragraph **3.a.** above.

**c.** If we cancel for nonpayment of premium, you may continue the coverage and avoid the effect of the cancellation by payment in full at any time prior to the effective date of cancellation.

**d.** Notice of cancellation will be delivered or sent by:

    **(1)** Registered mail;

    **(2)** Certified mail; or

    **(3)** Mail evidenced by a United States Post Office certificate of mailing.

**4.** We will give notice to you at your last mailing address known to us.

**5.** Notice of cancellation will state the specific reason for the cancellation and the effective date of cancellation. The policy period will end on that date.

**6.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**7.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B.** The following is added and supersedes any other provision to the contrary:

**Nonrenewal**

**1.** If we decide not to renew this policy, we will mail or deliver to you a written notice of nonrenewal, stating the specific reason for nonrenewal, at least 60 days before the expiration date of this policy. The notice will be sent to your address last known to us.

**2.** This notice will be delivered or sent by:

    **a.** Registered mail;

    **b.** Certified mail; or

    **c.** Mail evidenced by a certificate of mailing.

If notice is mailed, proof of mailing is sufficient proof of notice.

**3.** However, we are not required to send this notice if nonrenewal is due to your failure to pay any advance premium required for renewal.

**4.** With respect to automobile liability insurance policies only, your policy shall terminate on the effective date of any other insurance policy you purchase with respect to any automobile designated in both policies.

# GENERAL STAR INDEMNITY COMPANY

# IMPORTANT NOTICE – FLORIDA

"THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW.  PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGH TOF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER."

## "SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY."

This notice is for information only and does not become a part or condition of the attached document.

02 FL 500 (10/09)                                                                                     Page 1 of 1

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

**GENERAL STAR INDEMNITY COMPANY**

IL 02 55 03 16

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Cancellation For Policies In Effect 90 Days Or Less**

   **a.** If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the specific reasons for cancellation, at least:

   **(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **(2)** 20 days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

   **(a)** A material misstatement or misrepresentation; or

   **(b)** A failure to comply with underwriting requirements established by the insurer.

   **b.** We may not cancel:

   **(1)** On the basis of property insurance claims that are the result of an act of God, unless we can demonstrate, by claims frequency or otherwise, that you have failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property; or

   **(2)** Solely on the basis of a single property insurance claim which is the result of water damage, unless we can demonstrate that you have failed to take action reasonably requested by us to prevent a future similar occurrence of damage to the insured property.

**B.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

   **5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect, unless this is an audit policy.

   If this is an audit policy, then, subject to your full cooperation with us or our agent in securing the necessary data for audit, we will return any premium refund due within 90 days of the date cancellation takes effect. If our audit is not completed within this time limitation, then we shall accept your own audit, and any premium refund due shall be mailed within 10 working days of receipt of your audit.

   The cancellation will be effective even if we have not made or offered a refund.

 Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

**C.** The following is added to the **Cancellation** Common Policy Condition:

**7. Cancellation For Policies In Effect For More Than 90 Days**

  **a.** If this policy has been in effect for more than 90 days, we may cancel this policy only for one or more of the following reasons:

    **(1)** Nonpayment of premium;

    **(2)** The policy was obtained by a material misstatement;

    **(3)** In the event of failure to comply, within 90 days after the effective date of coverage, with underwriting requirements established by us before the effective date of coverage;

    **(4)** There has been a substantial change in the risk covered by the policy;

    **(5)** The cancellation is for all insureds under such policies for a given class of insureds;

    **(6)** On the basis of property insurance claims that are the result of an act of God, if we can demonstrate, by claims frequency or otherwise, that you have failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property;

    **(7)** On the basis of a single property insurance claim which is the result of water damage, if we can demonstrate that you have failed to take action reasonably requested by us to prevent a future similar occurrence of damage to the insured property; or

    **(8)** The cancellation of some or all of our policies is necessary to protect the best interests of the public or policyholders and such cancellation is approved by the Florida Office of Insurance Regulation.

  **b.** If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the specific reasons for cancellation, at least:

    **(1)** 10 days before the effective date of cancellation if cancellation is for nonpayment of premium;

    **(2)** 45 days before the effective date of cancellation if:

      **(a)** Cancellation is for one or more of the reasons stated in Paragraphs **7.a.(2)** through **7.a.(7)** above, and this policy does not cover a residential structure or its contents; or

      **(b)** Cancellation is based on the reason stated in Paragraph **7.a.(8)** above;

    **(3)** 120 days before the effective date of cancellation if:

      **(a)** Cancellation is for one or more of the reasons stated in Paragraphs **7.a.(2)** through **7.a.(7)** above; and

      **(b)** This policy covers a residential structure or its contents.

  **c.** If this policy has been in effect for more than 90 days and covers a residential structure or its contents, we may not cancel this policy based on credit information available in public records.

**D.** The following is added:

**Nonrenewal**

**1.** If we decide not to renew this policy, we will mail or deliver to the first Named Insured written notice of nonrenewal, accompanied by the specific reason for nonrenewal, at least:

  **a.** 45 days prior to the expiration of the policy if this policy does not cover a residential structure or its contents, or if nonrenewal is for the reason stated in Paragraph **D.5.**; or

  **b.** 120 days prior to the expiration of the policy if this policy covers a residential structure or its contents.

**2.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured at the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**3.** We may not refuse to renew this policy:

  **a.** On the basis of property insurance claims that are the result of an act of God, unless we can demonstrate, by claims frequency or otherwise, that you have failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property;

**b.** On the basis of filing of claims for sinkhole loss. However, we may refuse to renew this policy if:

**(1)** The total of such property insurance claim payments for this policy equals or exceeds the policy limits in effect on the date of loss for property damage to the covered building; or

**(2)** You have failed to repair the structure in accordance with the engineering recommendations upon which any loss payment or policy proceeds were based; or

**c.** Solely on the basis of a single property insurance claim which is the result of water damage, unless we can demonstrate that you have failed to take action reasonably requested by us to prevent a future similar occurrence of damage to the insured property.

**4.** Notwithstanding the provisions of Paragraph **D.3.,** we may refuse to renew this policy if this policy includes Sinkhole Loss coverage. If we nonrenew this policy for purposes of removing Sinkhole Loss coverage, pursuant to section 627.706, Florida Statutes, we will offer you a policy that includes catastrophic ground cover collapse coverage.

**5.** Notwithstanding the provisions of Paragraph **D.3.,** we may refuse to renew this policy if nonrenewal of some or all of our policies is necessary to protect the best interests of the public or policyholders and such nonrenewal is approved by the Florida Office of Insurance Regulation.

**E. Limitations On Cancellation And Nonrenewal In The Event Of Hurricane Or Wind Loss – Residential Property**

**1.** The following provisions apply to a policy covering a residential structure or its contents, if such property has sustained damage as a result of a hurricane or windstorm that is the subject of a declaration of emergency by the Governor and filing of an order by the Commissioner of Insurance Regulation:

**a.** Except as provided in Paragraph **E.1.b.,** we may not cancel or nonrenew the policy until at least 90 days after repairs to the residential structure or its contents have been substantially completed so that it is restored to the extent that it is insurable by another insurer writing policies in Florida. If we elect to not renew the policy, we will provide at least 100 days' notice that we intend to nonrenew 90 days after the substantial completion of repairs.

**b.** We may cancel or nonrenew the policy prior to restoration of the structure or its contents for any of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Material misstatement or fraud related to the claim;

**(3)** We determine that you have unreasonably caused a delay in the repair of the structure; or

**(4)** We have paid the policy limits.

If we cancel or nonrenew for nonpayment of premium, we will give you 10 days' notice. If we cancel or nonrenew for a reason listed in Paragraph **b.(2), b.(3)** or **b.(4),** we will give you 45 days' notice.

**2.** With respect to a policy covering a residential structure or its contents, any cancellation or nonrenewal that would otherwise take effect during the duration of a hurricane will not take effect until the end of the duration of such hurricane, unless a replacement policy has been obtained and is in effect for a claim occurring during the duration of the hurricane. We may collect premium for the period of time for which the policy period is extended.

**3.** With respect to Paragraph **E.2.,** a hurricane is a storm system that has been declared to be a hurricane by the National Hurricane Center of the National Weather Service (hereafter referred to as NHC). The hurricane occurrence begins at the time a hurricane watch or hurricane warning is issued for any part of Florida by the NHC and ends 72 hours after the termination of the last hurricane watch or hurricane warning issued for any part of Florida by the NHC.

# GENERAL STAR INDEMNITY COMPANY

IL 02 62 02 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **A.1.** of the **Cancellation** Common Policy Condition is replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation stating a future date on which the policy is to be cancelled, subject to the following:

**a.** If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later. However, upon receiving a written notice of cancellation from the first Named Insured, we may waive the requirement that the notice state the future date of cancellation, by confirming the date and time of cancellation in writing to the first Named Insured.

**b.** If by statute, regulation or contract this policy may not be cancelled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days' notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

Our notice will state the effective date of cancellation, which will be the later of the following:

**(1)** 10 days from the date of mailing or delivering our notice; or

**(2)** The effective date of cancellation stated in the first Named Insured's notice to us.

**B.** Paragraph **A.5.** of the **Cancellation** Common Policy Condition is replaced by the following:

**5. Premium Refund**

**a.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

**b.** If we cancel, the refund will be pro rata, except as provided in **c.** below.

**c.** If the cancellation results from failure of the first Named Insured to pay, when due, any premium to us or any amount, when due, under a premium finance agreement, then the refund may be less than pro rata. Calculation of the return premium at less than pro rata represents a penalty charged on unearned premium.

**d.** If the first Named Insured cancels, the refund may be less than pro rata.

**e.** The cancellation will be effective even if we have not made or offered a refund.

**Exhibit 137 to Plaintiffs' Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**C.** The following is added to the **Cancellation** Common Policy Condition and supersedes any other provisions to the contrary:

If we decide to:

**1.** Cancel or nonrenew this policy; or

**2.** Increase current policy premium by more than 15% (other than any increase due to change in risk, exposure or experience modification or resulting from an audit of auditable coverages); or

**3.** Change any policy provision which would limit or restrict coverage;

then:

We will mail or deliver notice of our action (including the dollar amount of any increase in renewal premium of more than 15%) to the first Named Insured and lienholder, if any, at the last mailing address known to us. Except as applicable as described in Paragraph **D.** or **E.** below, we will mail or deliver notice at least:

**a.** 10 days before the effective date of cancellation if this policy has been in effect less than 60 days or if we cancel for nonpayment of premium; or

**b.** 45 days before the effective date of cancellation if this policy has been in effect 60 or more days and we cancel for a reason other than nonpayment of premium; or

**c.** 45 days before the expiration date of this policy if we decide to nonrenew, increase the premium or limit or restrict coverage.

**D.** The following provisions apply to insurance covering residential real property only provided under the:

Capital Assets Program (Output Policy) Coverage Part;

Commercial Property Coverage Part;

Farm Coverage Part;

if the named insured is a natural person.

With respect to such insurance, the following is added to the **Cancellation** Common Policy Condition and supersedes any provisions to the contrary except as applicable as described in Paragraph **E.:**

**1.** When this policy has been in effect for 60 days or less and is not a renewal with us, we may cancel for any reason by notifying the first Named Insured at least 10 days before the date cancellation takes effect.

**2.** When this policy has been in effect for more than 60 days, or at any time if it is a renewal with us, we may cancel for one or more of the following reasons:

**a.** Nonpayment of premium, whether payable to us or to our agent;

**b.** Upon discovery of fraud, concealment of a material fact, or material misrepresentation made by or with the knowledge of any person insured under this policy in obtaining this policy, continuing this policy or presenting a claim under this policy;

**c.** Upon the occurrence of a change in the risk which substantially increases any hazard insured against; or

**d.** Upon the violation of any of the material terms or conditions of this policy by any person insured under this policy.

We may cancel by providing notice to the first Named Insured at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 45 days before the effective date of cancellation if we cancel for any of the reasons listed in **b.**, **c.** or **d.** above.

**E.** With respect to a policy that is written to permit an audit, the following is added to the **Cancellation** Common Policy Condition:

If you fail to submit to or allow an audit for the current or most recently expired term, we may cancel this policy subject to the following:

**1.** We will make two documented efforts to send you and your agent notification of potential cancellation. After the second notice has been sent, we have the right to cancel this policy by mailing or delivering a written notice of cancellation to the first Named Insured at least 10 days before the effective date of cancellation, but not within 20 days of the first documented effort.

**2.** If we cancel this policy based on your failure to submit to or allow an audit, we will send the written notice of cancellation to the first Named Insured at the last known mailing address by certified mail or statutory overnight delivery with return receipt requested.

Exhibit 137 to Plaintiffs' Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

GENERAL STAR INDEMNITY COMPANY

COMMERCIAL PROPERTY
CP 01 31 03 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99,** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** The following exclusion and related provisions are added to Paragraph **B.2. Exclusions** in the Causes Of Loss Forms and to any Coverage Form or policy to which a Causes Of Loss Form is not attached:

   **1.** We will not pay for loss or damage arising out of any act committed:

   **a.** By or at the direction of any insured; and

   **b.** With the intent to cause a loss.

   **2.** However, this exclusion will not apply to deny coverage to an innocent co-insured, provided the loss:

   **a.** Is otherwise covered under this Coverage Part; and

   **b.** Arose out of an act of family violence by an insured against whom a family violence complaint is brought for such act.

   **3.** If we pay a claim pursuant to Paragraph **B.2.,** our payment to the insured is limited to that insured's legal interest in the property less any payments we first made to a mortgageholder or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

**C.** The following explanation is added with respect to application of the Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria and the Limited Coverage of the same title:

With respect to the portion of Covered Property that would still have required repair or replacement had there been no "fungus", wet or dry rot or bacteria, this Exclusion and Limited Coverage will not serve to limit the amount of recovery for such repair or replacement.

However, the Exclusion and Limited Coverage shall continue to apply to:

   **1.** The cost to treat, contain, remove or dispose of "fungus", wet rot, dry rot or bacteria beyond that which is required to repair or replace Covered Property;

   **2.** The cost of testing as described in the Limited Coverage; and

   **3.** Any increase in loss under Business Income and/or Extra Expense Forms resulting from **1.** or **2.** above.

Regardless of whether the Exclusion and Limited Coverage apply to a loss, the Limit of Insurance on Covered Property is not increased. The maximum recoverable, for the total of the cost to repair or replace Covered Property and any additional covered cost to treat, contain, remove, dispose of or test for "fungus", wet or dry rot or bacteria, is the applicable Limit of Insurance on the affected Covered Property.

**D.** This Paragraph, **D.,** applies to the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

CONDOMINIUM ASSOCIATION COVERAGE FORM

CONDOMINIUM COMMERCIAL UNIT OWNERS COVERAGE FORM

BUILDERS RISK COVERAGE FORM

STANDARD PROPERTY POLICY

Paragraph **a.** of the **Loss Payment** Condition is replaced by the following:

**a.** In the event of loss or damage covered by this Coverage Form, at our option we will either:

**(1)** Repair, rebuild or replace the property with other property of like kind and quality, or pay the cost of such repair, rebuilding or replacement, as limited by Paragraph **b.** of this Loss Payment Condition and any other applicable policy provisions, such as the Limit of Insurance provision, the Valuation Condition or any provision which amends or supersedes the Valuation Condition; or

**(2)** Take all or any part of the property at an agreed or appraised value.

With respect to Paragraph **a.(1),** this policy covers only the cost of repair, rebuilding or replacement. Such cost does not include recovery of, and therefore this policy does not pay any compensation for, an actual or perceived reduction in the market value of any property. But if the property that has sustained loss or damage is subject to an endorsement which explicitly addresses market value, then that endorsement will apply to such property in accordance with its terms.



**ILLINOIS CONSUMER NOTICE**

**Questions regarding your Policy or coverage should be directed to your agent.**

If you are unable to resolve the problem or are not satisfied with the results you receive you may write to General Star National Insurance Company at:

General Star National Insurance Company
120 Long Ridge Road
Stamford, Connecticut 06902-1843

You may also contact us using the following toll-free telephone number: 1-800-431-9994

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that should any complaints arise regarding this insurance you may contact the Department of Insurance at either of the following addresses:

Illinois Department of Insurance
Consumer Division
122 South Michigan Avenue, 19th Floor
Chicago, IL  60603

Illinois Department of Insurance
Consumer Division
320 West Washington Street
Springfield, IL  62767

You may also direct your complaint to: Consumer Assistance Hotline:  1-312-814-2420 or 1-217-782-4515
Complaints may be filed electronically at: *http://insurance.illinois.gov/*

Written correspondence is preferable so that a recording of your inquiry is maintained.  When contacting General Star National Insurance Company, your agent, or the Department of Insurance, please have your Policy number available.

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
Copyright, General Star Management Company, used with its permission

**Page 1811 of 2921**

**GENERAL STAR INDEMNITY COMPANY**

COMMERCIAL PROPERTY
CP 01 09 10 00

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MASSACHUSETTS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** If loss or damage is caused by fire or lightning, the **Vacancy** Loss Condition is replaced by the following:

**VACANCY OR UNOCCUPANCY**

If the building where loss or damage occurs, whether intended for occupancy by owner or tenant, has been vacant or unoccupied for more than:

**1.** 60 consecutive days for residential premises of 3 units or less; or

**2.** 30 consecutive days for all other premises;

immediately before that loss or damage, we will not pay for the loss or damage.

A building is vacant when it does not contain enough business personal property to conduct customary operations.

**C.** The **Mortgageholders** Additional Condition is replaced by the following:

We will pay for covered loss of or damage to real estate to each mortgageholder shown in the Declarations, or in an attached schedule, in the order of precedence, as interests may appear.

**D.** Paragraph **3.d.** of the **Replacement Cost** Optional Coverage is replaced by the following:

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced:

**(a)** On the described premises; or

**(b)** At some other location in the Commonwealth of Massachusetts; and

**(2)** Unless the repairs or replacement are made within a reasonable time, but no more than 2 years after the loss or damage.

With respect to tenants' improvements and betterments, if covered, the following also apply:

**(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Condition of the applicable Coverage Form; and

**(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**E.** The following provisions are added:

**1.** In spite of any provision of any general or special law:

**a.** We will not pay for loss or damage to real property caused by any Covered Cause of Loss if the amount of loss is $5,000 or more unless you first submit to us a certificate of municipal liens from the collector of taxes of the city or town where the property is located.

**b.** We will pay to the city or town any amount outstanding on the certificate of municipal liens arising from the provisions of Massachusetts General Law Chapters 40, 59, 60, 80, 83 and 164, Sections 58B through 58F.

The payment will not exceed the amount of loss payable under this Coverage Part.

We will send you and the mortgageholder proof of our payment to the city or town.

**c.** The claim of the city or town will have priority over the claim of any mortgageholder, assignee, you or any other interested party, except where otherwise provided by the laws of the United States.

d. We will not be liable to any city, town, mortgageholder, assignee, you or any other interested party for:

(1) Amounts paid to a city or town; or

(2) Amounts not paid to a city or town based upon a certificate showing that no municipal liens exist.

e. Paragraphs **1.a., 1.b., 1.c.,** and **1.d.** above will not apply to any owner-occupied one- to four-family dwelling if the owner of the dwelling lived there when the claim for loss or damage arose.

2. We will not pay any claim for:

a. Loss, damage or destruction of $1,000 or more to a building or structure; or

b. Loss, damage or destruction, of any amount, that causes a building or structure to become:

(1) Dangerous to life or limb; or

(2) Unused, uninhabited or abandoned and open to the weather;

as provided under Massachusetts General Law, Section 6 of Chapter 143;

without giving at least 10 days' written notice before such payment to:

c. The Building Commissioner or the appointed Inspector of Buildings; and

d. The Board of Health or the Board of Selectmen of the city or town where the property is located.

3. If at any time before our payment, the city or town notifies us by certified mail of its intent to begin proceedings designed to perfect a lien under Massachusetts General Law:

a. Chapter 143, Section 3A or 9; or

b. Chapter 111, Section 127B;

we will not pay while the proceedings are pending. The proceedings must be started within 30 days after we receive the notice.

Any lien perfected under the Massachusetts General Laws referred to in **3.a.** and **3.b.** above will extend to the city or town and may be enforced by it against the proceeds of this policy.

4. We will not be liable to any city, town, mortgageholder, assignee, you or any other interested party for:

a. Amounts paid to a city or town; or

b. Amounts not paid to a city or town;

under Provisions **2.** and **3.** above.

F. The following condition is added and supersedes any provisions to the contrary:

**NONRENEWAL**

This provision applies to coverage on real property which is used predominantly for residential purposes and consists of not more than four dwelling units, and to coverage on personal property of a person residing in such real property:

1. Ordinarily we will renew this policy automatically and send you the renewal notice. Our notice will explain what you should do if you do not want to continue this policy.

2. We may elect not to renew this policy. We may do so by delivering to you or mailing to you at your last mailing address shown in the Declarations, written notice of nonrenewal, accompanied by the specific reasons for nonrenewal, at least 45 days before the expiration date of this policy. However, if your policy was executed on behalf of us, in whole or in part, by or on behalf of your insurance agent or our insurance broker, we will send such written notice only to the agent or broker. Every insurance agent or broker receiving this notice is required to, within 15 days of its receipt, send a copy to you unless the agent or broker has replaced the insurance.

**G.** The following is added:

**STANDARD FIRE POLICY PROVISIONS**

Your policy contains Legal Action Against Us, Appraisal and Cancellation Provisions. Massachusetts law requires that the Suit, Appraisal and Cancellation Provisions of the Massachusetts Standard Fire Policy supersede any similar provisions contained in your policy. Therefore, all Legal Action Against Us, Appraisal and Cancellation Provisions contained in your policy are void. The Suit, Appraisal and Cancellation Provisions of the Massachusetts Standard Fire Policy shall apply instead.

In consideration of the Provisions and Stipulations Herein or Added Hereto and of the Premium Specified in the Declarations, this company, for the term of years specified in the Declarations from inception date (At 12:01 A.M. Standard Time) to expiration date (At 12:01 A.M. Standard Time) at location of property involved, to an amount not exceeding the amount(s) specified in the Declarations, does insure the Insured named in the Declarations and legal representatives, to the extent of the actual cash value of the property at the time of loss, but in no event for more than the interest of the insured, against all Loss By Fire, Lightning And By Removal From Premises Endangered By The Perils Insured Against In This Policy, Except As Hereinafter Provided, to the property described in the Declarations while located or contained as described in this policy or pro rata for five days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this policy, but not elsewhere.

Assignment of this policy shall not be valid except with the written consent of this Company.

This policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this policy together with such other provisions, stipulations and agreements as may be added hereto, as provided in this policy.

| | |
|---|---|
| **Concealment Fraud** | This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance |

concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

| | |
|---|---|
| **Uninsurable And Excepted Property** | This policy shall not cover accounts, bills, currency, deeds, evidences of debt, money or securities; nor, unless specifically named hereon in writing, bullion or manuscripts. |
| **Perils Not Included** | This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by **(a)** enemy attack by armed |

forces, including action taken by military, naval or air forces in resisting an actual or an immediately impending enemy attack; **(b)** invasion; **(c)** insurrection; **(d)** rebellion; **(e)** revolution; **(f)** civil war; **(g)** usurped power; **(h)** order of any civil authority except acts of destruction at the time of and for the purpose of preventing the spread of fire, provided that such fire did not originate from any of the perils excluded by this policy; **(i)** neglect of the insured to use all reasonable means to save and preserve the property at and after a loss, or when the property is endangered by fire in the neighboring premises; **(j)** nor shall this company be liable for loss by theft.

| | |
|---|---|
| **Other Insurance** | Other insurance may be prohibited or the amount of insurance may be limited by endorsement attached hereto. |

| | |
|---|---|
| **Conditions Suspending Or Restricting Insurance** | Unless otherwise provided in writing added hereto this company shall not be liable for loss occurring **(a)** while the hazard is increased by any means within the control or knowledge of the insured; or **(b)** while the described premises, whether intended |

for occupancy by owner or tenant, are vacant or unoccupied beyond a period of sixty consecutive days, for residential premises of three units or less and thirty (30) consecutive days for all other premises, or **(c)** as a result of explosion or riot, unless fire ensue, and in that event for loss by fire only.

| | |
|---|---|
| **Other Perils Or Subjects** | Any other peril to be insured against or subject of insurance to be covered in this policy shall be by endorsement in writing hereon or added hereto. |

| | |
|---|---|
| **Added Provisions** | The extent of the application of insurance under this policy and of the contribution to be made by this company in case of loss, and any other provision or |

agreement not inconsistent with the provisions of this policy, may be provided for in writing added hereto, but no provision may be waived except such as by the terms of this policy is subject to change.

| | |
|---|---|
| **Waiver Provisions** | No permission affecting this insurance shall exist, or waiver of any provision be valid, unless granted herein or expressed in writing added hereto. No pro- |

vision, stipulation or forfeiture shall be held to be waived by any require-ment or proceeding on the part of this company relating to appraisal or to any examination provided for herein.

| | |
|---|---|
| **Cancellation Of Policy** | This policy shall be cancelled at any time at the request of the insured, in which case this company shall, upon demand and surrender of this policy, re- |

fund the excess of paid premium above the customary short rates for the expired time. This policy may be cancelled at any time by this company by giving to the insured a five days written notice of cancellation, and to the mortgagee to whom this policy is payable twenty days written notice of cancellation except where the stated reason for cancellation is non-payment of premium where, in such instance, this policy may be can-celled at any time by this company by giving to the insured a ten days written notice of cancellation, and the mortgagee a twenty days written notice of cancellation, with or without tender of the excess paid premium above the pro rata premium for the expired time, which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand and shall state or be accompanied by a statement of the specific reason or reasons for such cancellation. After this policy has been in effect for sixty days, or after sixty days from any anniversary date, no notice of cancellation shall be effective unless it is based on the occurrence, after the effective date of the policy, of one or more of the following: **(1)** nonpayment of premium; **(2)** conviction of a crime arising out of acts increasing the hazard insured against; **(3)** discovery of fraud or material misrepresentation by the insured in obtaining the policy; **(4)** discovery of willful or reckless acts or omissions by the insured increasing the hazard insured against; **(5)** physical changes in the property insured which result in the property becoming uninsurable; or **(6)** a determina-tion by the commissioner that continuation of the policy would violate or place the insurer in violation of the law. Where the stated reason is nonpayment of premium, the insured may continue the coverage and avoid the effect of the cancellation by payment at any time prior to the effective date of cancellation.

| **Mortgagee Interests And Obligations** | Notwithstanding any other provisions of this policy, if this policy shall be made payable to a mortgagee of the covered real estate, no act or default of any person other than such mortgagee or his agent or |

those claiming under him, whether the same occurs before or during the term of this policy, shall render this policy void as to such mortgagee nor affect such mortgagee's right to recover in case of loss on such real estate; provided, that the mortgagee shall on demand pay according to the established scale of rate for any increase of risk not paid for by the insured; and whenever this company shall be liable to a mortgagee for any sum for loss under this policy for which no liability exists as to the mortgagor, or owner, and this company shall elect by itself, or with others, to pay the mortgagee the full amount secured by such mortgage, then the mortgagee shall assign and transfer to the company interested, upon such payment, the said mortgage together with the note and debt thereby secured.

| **Pro Rata Liability** | This company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property |

against the peril involved.

| **Requirements In Case Loss Occurs** | The insured shall give immediate written notice to this company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best |

possible order, furnish a complete inventory of the destroyed and damaged property, showing in detail the quantity, description, actual cash value and amount of loss claimed; and the insured shall forthwith render to this company a signed, sworn statement in proof of loss which sets forth to the best knowledge and belief of the insured the following: the time and cause of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupancy, location, possession or exposures of said property, since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all policies and detailed estimates for repair of the damage. The insured, as often as may be reasonably required, shall exhibit to any person designated by this company all that remains of any property herein described, and submit to examinations under oath by any person named by this company, and subscribe the same; and as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this company or its representative, and shall permit extracts and copies thereof to be made.

**When Loss**
**Payable**
In case of any loss or damage, the company within thirty days after the insured shall have submitted a statement, as provided in the preceding clause, shall either pay the amount for which it shall be liable, which amount if not agreed upon shall be ascertained by award of referees as hereinafter provided, or replace the property with other of the same kind and goodness, or it may, within fifteen days after such statement is submitted, notify the insured of its intention to rebuild or repair the premises, or any portion thereof separately covered by this policy, and shall thereupon enter upon said premises and proceed to rebuild or repair the same with reasonable expedition. It is moreover understood that there can be no abandonment of the property described to the company, and that the company shall not in any case be liable for more than the sum insured, with interest thereon from the time when the loss shall become payable, as provided above. The company shall be liable for the payment of interest to the insured at a rate of one percent over the prime interest rate on the agreed figure commencing thirty days after the date an executed proof of loss for such figure is received by the company, said interest to continue so long as the claim remains unpaid.

**Appraisal**
In case of loss under this policy and a failure of the parties to agree as to the amount of loss, it is mutally agreed that the amount of such loss shall be referred to three disinterested men, the company and the insured each choosing one out of three persons to be named by the other, and the third being selected by the two so chosen, and the award in writing by a majority of the referees shall be conclusive and final upon the parties as to the amount of loss or damage, and such reference, unless waived by the parties, shall be a condition precedent to any right of action in law or equity to recover for such loss; but no person shall be chosen or act as a referee, against the objection of either party, who has acted in a like capacity within four months.

**Suit**
No suit or action against this company for the recovery of any claim by virtue of this policy shall be sustained in any court of law or equity in this commonwealth unless commenced within two years from the time the loss occurred; provided, however, that if, within said two years, in accordance with the provisions of the preceding paragraph, the amount of the loss shall have been referred to arbitration after failure of the parties to agree thereon, the limitation of time for bringing such suit or action shall in no event be less than ninety days after a valid award has been made upon such reference or after such reference or award has been expressly waived by the parties. If suit or action upon this policy is enjoined or abated, suit or action may be commenced at any time within one year after the dissolution of such injunction, or the abatement of such suit or action, to the same extent as would be possible if there was no limitation of time provided herein for the bringing of such suit or action.

**Subrogation**
This company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this company.

CP 01 09 10 00

**GENERAL STAR INDEMNITY COMPANY**

Policy Number    IAG966951B

COMMERCIAL PROPERTY
CP 01 06 08 96

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MINNESOTA CHANGES – CONDOMINIUMS

This endorsement modifies insurance provided under the following:

CONDOMINIUM ASSOCIATION COVERAGE FORM

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following and supersedes any provision to the contrary:

  **2.** We may cancel this policy by mailing or delivering to:

    **a.** The first Named Insured, and

    **b.** Each unit-owner and owner of a security interest to whom certificates of insurance were issued,

    written notice of cancellation at least 60 days before the effective date of cancellation.

**B.** The following is added to the **Waiver Of Rights Of Recovery** Loss Condition:

  We waive our rights to recover payment against:

  **1.** Any unit-owner described in the Declarations of this policy including a declarant, as defined in the Minnesota Common Interest Ownership Act (MINN. STAT. ANN. Section 515B.1-103), and members of his or her household;

  **2.** The Association; and

  **3.** Members of the board of directors for acts or omissions within the scope of their duties for you.

  But we reserve our rights to recover against a declarant for acts or omissions for which he or she may be held liable in his or her capacity as a declarant.

**C.** Paragraph **f.** of the **Loss Payment** Loss Condition is replaced by the following:

  **f.** Provided you have complied with all the terms of this Coverage Part, we will pay for covered loss or damage within 5 business days after we have received the proof of loss and:

    **(1)** We have reached agreement with you or, in the event we use an independent claims adjuster, we have received the agreement and you have satisfied the conditions of the agreement, if any; or

    **(2)** An appraisal award has been made.

    If you named an insurance trustee, we will adjust losses with you but we will pay the insurance trustee. If we pay the trustee, the payments will satisfy your claims against us.

**D.** Paragraph **b.** of the **Mortgageholders** Additional Condition is replaced by the following:

  **b.** If the condominium is terminated, we will pay for covered loss of, or damage to, buildings or structures to each mortgageholder shown in the Declarations of this policy in their order of precedence, as interests may appear.

  In all other respects, we will pay for covered loss of or damage to buildings or structures to you or a designated insurance trustee in accordance with the Loss Payment Loss Condition contained in this Coverage Part.

**E.** Paragraphs **f.** and **g.** of the **Mortgageholders** Additional Condition are replaced by the following:

  **f.** If we cancel this policy, we will give written notice to the mortgageholder at least 60 days before the effective date of cancellation.

  **g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 30 days before the expiration date of this policy.

**F.** The following is added to the **Additional Conditions:**

  **3.** You may elect not to repair or replace lost or damaged property if:

    **a.** The condominium is terminated and the Association votes not to repair or replace all or part of it;

    **b.** Repair or replacement would be illegal under any state or local health or safety statute or ordinance; or

CP 01 06 08 96    Exhibit 137 to Plaintiffs' Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment    Page 1 of 2

Page 1818 of 2921

**c.** 80% of the unit-owners vote not to rebuild. This includes every unit-owner and first mortgageholder of a unit or assigned limited common element that will not be rebuilt.

**G.** The following is added:

No act or omission by any unit-owner or owner of a security interest will void this policy or be a condition to recovery under this policy. But this does not apply to unit-owners or interest holders acting within the scope of their authority on behalf of the Association.

# GENERAL STAR INDEMNITY COMPANY

IL 02 59 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEBRASKA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2. Cancellation Of Policies In Effect**

**a. 60 Days Or Less**

If this policy has been in effect for 60 days or less, we may cancel this policy for any reason.

**b. More Than 60 Days**

If this policy has been in effect for more than 60 days or if this is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** The policy was obtained through material misrepresentation;

**(3)** Any insured has submitted a fraudulent claim;

**(4)** Any insured has violated the terms and conditions of this policy;

**(5)** The risk originally accepted has substantially increased;

**(6)** Certification to the Director of Insurance of our loss of reinsurance which provided coverage to us for all or a substantial part of the underlying risk insured; or

**(7)** The determination by the Director of Insurance that the continuation of the policy could place us in violation of the Nebraska Insurance Laws.

**c.** If we cancel this policy subject to **2.a.** or **2.b.** above, we will mail to the first Named Insured a written notice of cancellation, stating the reasons for cancellation, at least:

**1.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**2.** 60 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail our notice by first class mail to the first Named Insured's last mailing address known to us. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

IL 02 59 09 07          Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its          Page 1 of 2
Oppositions to Defendants' Motions for Summary Judgment

**B.** Paragraph **6.** of the Cancellation Common Policy Condition does not apply.

**C.** The following is added and supersedes any provisions to the contrary:

**NONRENEWAL**

**1.** If we decide not to renew this policy, we will mail written notice of nonrenewal, stating the reasons for nonrenewal, to the first Named Insured, at least 60 days prior to the expiration date of this policy.

**2.** Any notice of nonrenewal will be mailed by first class mail to the first Named Insured's last mailing address known to us. A United States Postal Service Certificate of Mailing shall be sufficient proof of receipt of notice on the third calendar day after the date of the certificate of mailing.

Page 2 of 2     Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment     IL 02 59 09 07

Page 1821 of 2921

**GENERAL STAR INDEMNITY COMPANY**

COMMERCIAL PROPERTY
CP 01 33 05 18

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** If this policy covers the interest of the owner of any of the following types of buildings or structures:

**1.** Residential, except owner-occupied single-family or owner-occupied two-family buildings or structures;

**2.** Commercial; or

**3.** Industrial;

the following provision is added:

Before payment to you for loss or damage to the above buildings or structures caused by or resulting from fire, we will:

**(1)** Deduct from your payment the claim of any tax district that issues a certificate of lien in accordance with the Insurance Law; and

**(2)** Pay directly to the tax district the amount of the claim.

When we pay that claim, we will have no obligation to pay the amount of that claim to you. Our payment of that claim within 30 days of our receipt of the certificate of lien will be a conclusive presumption that the claim was valid and properly paid.

**B.** The following is added with respect to any Condition of this Coverage Part which requires you to notify us of loss or to notify us of an accident, claim or "suit":

**1.** Notice given by or on your behalf; or

**2.** Written notice by or on behalf of any claimant;

to any of our agents in New York State, which adequately identifies you, will be the same as notice to us.

**C. Legal Action Against Us**

**1.** The **Legal Action Against Us** Loss Condition in the Legal Liability Coverage Form is replaced by the following:

No person or organization has a right under this Coverage Form:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from you; or

**b.** To sue us on this Coverage Form unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against you; but we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

**2.** Paragraph **b.** of Additional Condition **H.5. Legal Action Against Us** in the Mortgageholders Errors And Omissions Coverage Form is replaced by the following:

**b.** No person or organization has a right under Coverages **C** and **D:**

**(1)** To join us as a party or otherwise bring us into a "suit" asking for damages from you; or

**(2)** To sue us on this Coverage Form unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against you; but we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

**D.** The **Examination Of Your Books And Records** Common Policy Condition is replaced by the following:

**Examination Of Your Books And Records**

**1.** Except as provided in **2.** below, we may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**2.** We will conduct an audit to determine the final premium due or to be refunded, for coverage for which an advance or deposit premium was paid based on estimated exposure. But the audit may be waived if:

**a.** The total annual premium attributable to the auditable exposure base is not reasonably expected to exceed $1,500; or

**b.** The policy requires notification to the insurer with the specific identification of any additional exposure units (e.g., buildings) for which coverage is requested.

If the audit is not waived, it must be completed within 180 days after:

**a.** The expiration date of the policy; or

**b.** The anniversary date, if this is a continuous policy or a policy written for a term longer than one year.

**E.** The following sentence is deleted from Paragraph **A.** in the Legal Liability Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages.

The following sentence is added to Paragraph **A.** in the Legal Liability Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.

**F.** The following sentence is deleted from Paragraph **A.3.** in the Mortgageholders Errors And Omissions Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages.

The following is added to Paragraph **A.3.** in the Mortgageholders Errors And Omissions Coverage Form:

We will have the right and duty to defend any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent.

**G.** The following Condition is added to Paragraph **D.** of the Legal Liability Coverage Form and Paragraph **F.4.** of the Mortgageholders Errors And Omissions Coverage Form:

**Transfer Of Duties When A Limit Of Insurance Is Used Up**

**1.** If we conclude that, based on claims or "suits" which have been reported to us and to which this insurance may apply, a Limit of Insurance is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

**2.** When the Limit of Insurance has actually been used up in the payment of judgments or settlements:

**a.** We will notify the first Named Insured, in writing, as soon as practicable, that:

**(1)** Such a limit has actually been used up; and

**(2)** Our duty to defend "suits" seeking damages subject to that limit has also ended.

**b.** We will initiate, and cooperate in, the transfer of control, to any appropriate insured, of all claims and "suits" seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and "suits".

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or "suit" seeking damages that would have been subject to that limit, had it not been used up, if the claim or "suit" is reported to us after that limit of insurance has been used up.

c. The first Named Insured, and any other insured involved in a "suit" seeking damages subject to that limit, must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

3. The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with Paragraph **2.b.** above.

The duty of the first Named Insured to reimburse us will begin on:

a. The date on which the applicable limit of insurance is used up, if we sent notice in accordance with Paragraph **1.** above; or

b. The date on which we sent notice in accordance with Paragraph **2.a.** above, if we did not send notice in accordance with Paragraph **1.** above.

4. The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

H. Except as provided in **I.** below, the **Appraisal** Condition is replaced by the following:

**Appraisal**

1. If we and you disagree on the value of the property, the extent of the loss or damage or the amount of the loss or damage, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand.

2. If we or you fail to proceed with the appraisal of the covered loss after a written demand is made by either party, then either party may apply to a court having jurisdiction for an order directing the party that failed to proceed with the appraisal to comply with the demand for the appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such order.

3. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property, the extent of the loss or damage and the amount of the loss or damage. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

4. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

I. The **Appraisal** Condition in:

1. Business Income (And Extra Expense) Coverage Form **CP 00 30;** and

2. Business Income (Without Extra Expense) Coverage Form **CP 00 32;**

is replaced by the following:

**Appraisal**

1. If we and you disagree on the amount of Net Income and operating expense, the extent of the loss or damage or the amount of the loss or damage, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand.

2. If we or you fail to proceed with the appraisal of the covered loss after a written demand is made by either party, then either party may apply to a court having jurisdiction for an order directing the party that failed to proceed with the appraisal to comply with the demand for the appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such order.

3. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense, the extent of the loss or damage and the amount of the loss or damage. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

4. Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

**J.** The following provision is added to the Commercial Property Coverage Part:

   **Estimation Of Claims**

   Upon request, we will furnish you or your representative with a written estimate of damages to real property specifying all deductions, provided such an estimate has been prepared by us or has been prepared on our behalf for our own purposes. This estimate will be provided within 30 days after your request or its preparation, whichever is later.

**K.** The following provision is added to the Legal Liability Coverage Form and supersedes any provision to the contrary:

   Failure to give prompt notice to us, as required under this Coverage Form, shall not invalidate any claim made by you or any other claimant, unless the failure to provide such timely notice has prejudiced us. However, no claim made by you or any other claimant will be invalidated if it shall be shown not to have been reasonably possible to give such timely notice and that notice was given as soon as was reasonably possible thereafter.

GENERAL STAR INDEMNITY COMPANY

# GENERAL STAR INDEMNITY COMPANY

### ATTACH THIS NOTICE TO YOUR POLICY

# IMPORTANT NOTICE – NORTH CAROLINA

WARNING:  THIS PROPERTY INSURANCE POLICY DOES NOT PROTECT YOU AGAINST LOSSES FROM

- ☐ WINDSTORM OR HAIL
- ☐ EARTHQUAKES
- ☐ FLOODS
- ☒ MUDSLIDES
- ☒ MUDFLOWS
- ☒ LANDSLIDES

YOU SHOULD CONTACT YOUR INSURANCE COMPANY OR AGENT TO DISCUSS YOUR OPTIONS FOR OBTAINING COVERAGE FOR THESE LOSSES.  THIS IS NOT A COMPLETE LISTING OF ALL OF THE CAUSES OF LOSSES NOT COVERED UNDER YOUR POLICY.  YOU SHOULD READ YOUR ENTIRE POLICY TO UNDERSTAND WHAT IS COVERED AND WHAT IS NOT COVERED.

IL 94 0002NC 01 13

Page 1 of 1

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 1826 of 2921**

**GENERAL STAR INDEMNITY COMPANY**

IL 02 36 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OKLAHOMA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

After coverage has been in effect for more than 45 business days or after the effective date of a renewal of this policy, no notice of cancellation will be issued by us unless it is based on at least one of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted under it;

**(3)** Discovery of willful or reckless acts or omissions by you that increase any hazard insured against;

**(4)** The occurrence of a change in the risk that substantially increases any hazard insured against after insurance coverage has been issued or renewed;

**(5)** A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any covered property or its occupancy that substantially increases any hazard insured against;

**(6)** A determination by the Insurance Commissioner that the continuation of the policy would place us in violation of the insurance laws of this state;

**(7)** Your conviction of a crime having as one of its necessary elements an act increasing any hazard insured against; or

**(8)** Loss of or substantial changes in applicable reinsurance.

**B.** The following are added to the Common Policy Conditions and supersede any provisions to the contrary:

**1. Nonrenewal**

**a.** If we elect not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured at least 45 days before:

**(1)** The expiration date of this policy; or

**(2)** An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**b.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured at the last mailing address known to us.

**c.** If notice is mailed:

   **(1)** It will be considered to have been given to the first Named Insured on the day it is mailed.

   **(2)** Proof of mailing will be sufficient proof of notice.

**d.** If notice of nonrenewal is **not** mailed or delivered at least 45 days before the expiration date or an anniversary date of this policy, coverage will remain in effect until 45 days after notice is given. Earned premium for such extended period of coverage will be calculated pro rata based on the rates applicable to the expiring policy.

**e.** We will **not** provide notice of nonrenewal if:

   **(1)** We, or another company within the same insurance group, have offered to issue a renewal policy; or

   **(2)** You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

**f.** If we have provided the required notice of nonrenewal as described in **B.1.a.** above, and thereafter extend the policy for a period of 90 days or less, we will **not** provide an additional nonrenewal notice with respect to the period of extension.

**2. Premium Or Coverage Changes At Renewal**

**a.** If we elect to renew this policy, we will give written notice of any premium increase, change in deductible, or reduction in limits or coverage, to the first Named Insured, at the last mailing address known to us.

**b.** Any such notice will be mailed or delivered to the first Named Insured at least 45 days before:

   **(1)** The expiration date of this policy; or

   **(2)** An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

**c.** If notice is mailed:

   **(1)** It will be considered to have been given to the first Named Insured on the day it is mailed.

   **(2)** Proof of mailing will be sufficient proof of notice.

**d.** If the first Named Insured accepts the renewal, the premium increase or coverage changes will be effective the day following the prior policy's expiration or anniversary date.

**e.** If notice is **not** mailed or delivered at least 45 days before the expiration date or anniversary date of this policy, the premium, deductible, limits and coverage in effect prior to the changes will remain in effect until:

   **(1)** 45 days after notice is given; or

   **(2)** The effective date of replacement coverage obtained by the insured;

   whichever occurs first.

   If the first Named Insured then elects **not** to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring policy.

**f.** We will **not** provide notice of the following:

   **(1)** Changes in a rate or plan filed pursuant to the Property and Casualty Competitive Loss Cost Rating Act applicable to an entire class of business;

   **(2)** Changes which are based upon the altered nature or extent of the risk insured; or

   **(3)** Changes in policy forms filed with or approved by the Insurance Commissioner and applicable to an entire class of business.

## GENERAL STAR INDEMNITY COMPANY

IL 02 46 09 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

**1.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**2. Cancellation Of Policies In Effect For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**3. Cancellation Of Policies In Effect For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**a.** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**b.** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**c.** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**d.** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**e.** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**f.** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

**4.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**5.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**6.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**7.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

**B.** The following are added and supersede any provisions to the contrary:

**1. Nonrenewal**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**2. Increase Of Premium**

If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

## GENERAL STAR INDEMNITY COMPANY

IL 02 73 01 10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RHODE ISLAND CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99,** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** With respect to the:

Capital Assets Program (Output Policy) Coverage Part

Commercial Inland Marine Coverage Part

Commercial Property Coverage Part

Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions

Farm – Livestock Coverage Form

Farm – Mobile Agricultural Machinery And Equipment Coverage Form;

Paragraph **1.** of the **Cancellation** Common Policy Condition is replaced by the following:

**1.** The first Named Insured shown in the Declarations may cancel this policy by giving, mailing or delivering advance written notice of cancellation to us or to the insurance agent or producer who issued the policy.

**C.** With respect to all Coverage Parts and Policies addressed in this endorsement, the **Cancellation** Common Policy Condition is amended by replacing Paragraphs **2., 3., 5.** and **6.** with the following:

**2.** We may cancel this policy by giving, mailing or delivering to the first Named Insured and the insurance producer of record, if any, written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

If this policy has been in effect for 60 days or more, or if this is a renewal of a policy we issued, we may cancel only for one or more of the following reasons:

**a.** Nonpayment of premium;

**b.** Fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

**c.** Activities or omissions on your part which increase any hazard insured against, including a failure to comply with loss control recommendations;

**d.** Change in the risk which increases the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to regulation, legislation, or court decision;

**e.** Loss or decrease of our reinsurance covering all or part of the risk or exposure covered by the policy;

**f.** Determination by the Commissioner of Insurance that the continuation of the policy would jeopardize our solvency or would place us in violation of the insurance laws of this state;

**g.** Owner or occupant incendiarism;

**h.** Violation or breach by you of any policy terms or conditions;

**i.** Constructive or actual total loss of the Covered Property; or

**j.** Such other reasons as may be approved by the Commissioner of Insurance.

**3.** We will give, mail or deliver written notice to the first Named Insured at the address shown on the policy, and to the insurance producer of record, if any.

However, with respect to the:

Capital Assets Program (Output Policy) Coverage Part

Commercial Inland Marine Coverage Part

Commercial Property Coverage Part

Employment-Related Practices Liability Coverage Part

Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions

Farm – Livestock Coverage Form

Farm – Mobile Agricultural Machinery And Equipment Coverage Form;

We will give, mail or deliver written notice to the first Named Insured at the last address known to us, and to the insurance producer of record, if any.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

The cancellation will be effective even if we have not made or offered a refund.

The following provisions govern calculation of return premium:

**a.** We will compute return premium pro rata and round to the next higher whole dollar when this policy is:

**(1)** Cancelled at our request;

**(2)** Cancelled because you no longer have a financial or insurable interest in the property or business operation that is the subject of insurance;

**(3)** Cancelled and rewritten by us or a member of our company group;

**(4)** Cancelled after the first year, if it is a prepaid policy written for a term of more than one year; or

**(5)** Cancelled by us at the request of a premium finance company upon default of the first Named Insured, when this policy is financed under a premium finance agreement.

**b.** When this policy is cancelled at your request (except when Paragraph **a.(2), a.(3)** or **a.(4)** applies), we will return 90% (75% for Equipment Breakdown policies) of the pro rata unearned premium, rounded to the next higher whole dollar. However, when such cancellation takes place during the first year of a multiyear prepaid policy, we will return the full annual premium for the subsequent years.

**6.** Proof of giving, mailing or delivering notice of cancellation will be sufficient proof of notice.

**D.** With respect to all Coverage Parts and Policies addressed in this endorsement, the following is added to the **Cancellation** Common Policy Condition:

**7.** We will provide you with the reason or reasons for cancellation if:

**a.** You request in writing a statement of the reasons for cancellation; and

**b.** You agree in writing to hold us harmless from liability for any:

**(1)** Communication giving notice of, or specifying the reasons for, cancellation; or

**(2)** Statement made in connection with an attempt to discover or verify the existence of conditions which would be a reason for cancellation as provided under Paragraph **C.2.**

E. With respect to all Coverage Parts and Policies addressed in this endorsement, the following is added and supersedes any provision to the contrary:

**Nonrenewal**

1. If we elect not to renew this policy, we will give, mail or deliver to the first Named Insured and the insurance producer of record, if any, written notice of nonrenewal at least 60 days before:

   a. The expiration date of the policy; or

   b. An anniversary date of the policy, if the policy is written for a term longer than one year or with no fixed expiration date.

2. However, we need not give, mail or deliver this notice if:

   a. We have offered to issue a renewal policy; or

   b. The first Named Insured has obtained, or has agreed in writing to obtain, replacement coverage.

F. The following is added to the Common Policy Conditions with respect to the Coverage Parts to which this endorsement applies, except the Employment-Related Practices Liability Coverage Part:

If notice of nonrenewal is mailed to the insured, we shall forward the notice of nonrenewal to the last known address of the first Named Insured by first class mail and maintain proof of mailing by the United States Postal Service certificate of mailing. This proof of mailing will be sufficient proof of notice.

G. With respect to the:

Capital Assets Program (Output Policy) Coverage Part

Commercial Inland Marine Coverage Part

Commercial Property Coverage Part

Farm Property – Other Farm Provisions Form – Additional Coverages, Conditions, Definitions

Farm – Livestock Coverage Form

Farm – Mobile Agricultural Machinery And Equipment Coverage Form;

The following is added to the Common Policy Conditions:

If notice of cancellation is mailed to the insured, we shall forward the notice of cancellation to the last known address of the first Named Insured by first class mail and maintain proof of mailing by the United States Postal Service certificate of mailing. This proof of mailing will be sufficient proof of notice.

H. With respect to a loss payee named in the policy, if any, we will give, mail or deliver written notice of cancellation, subject to **C.2.** above, and written notice of nonrenewal, subject to **E.1.** above. Mailing will be accomplished in accordance with the applicable procedure stated in **F.** or **G.** above.

I. Under the **Mortgageholders** Condition, the paragraphs pertaining to cancellation and nonrenewal are replaced by the following:

1. If we cancel this policy, we will give, mail or deliver written notice to the mortgageholder at least:

   a. 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

2. If we do not renew this policy, we will give, mail or deliver written notice to the mortgageholder at least 10 days before:

   a. The expiration date of the policy; or

   b. An anniversary date of the policy, if the policy is written for a term longer than one year or with no fixed expiration date.

# GENERAL STAR INDEMNITY COMPANY

## ATTACH THIS NOTICE TO YOUR POLICY

# IMPORTANT NOTICE – TEXAS

|

To obtain information or make a complaint:

You may contact your agent or you may call General Star Indemnity Company's toll-free number for information or to make a complaint at:

**1-800-431-9994**

You may also write to General Star Indemnity Company at:

General Star Indemnity Company
120 Long Ridge Road
P.O. Box 10354
Stamford, CT 06904-2354

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at the consumer help line below:

**1-800-252-3439**

You may also write to the Texas Department of Insurance at:

P.O. Box 149104
Austin, TX 78714-9104
Fax: (512) 490-1007
Web:  https://www.tdi.texas.gov
E-mail:  ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**

Should you have a dispute concerning your premium or about a claim, contact the agent first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**

This notice is for information only and does not become a part or condition of the attached document.

02 TX 500 (01/19)                                                                                        Page 1 of 1

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1834 of 2921**

GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99,** the term Coverage Part is replaced by the term Policy.

**B. Legal Action Against Us**

1. The **Legal Action Against Us** Commercial Property Condition is replaced by the following, except as provided in **B.2.** below:

   **Legal Action Against Us**

   **a.** Except as provided in Paragraph **b.,** no one may bring a legal action against us under this Coverage Part unless:

      **(1)** There has been full compliance with all of the terms of this Coverage Part; and

      **(2)** The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

   **b.** With respect to loss or damage in the State of Texas caused by windstorm or hail in the catastrophe area as defined by the Texas Insurance Code, no one may bring a legal action against us under this Coverage Part unless:

      **(1)** There has been full compliance with all the terms of this Coverage Part; and

      **(2)** The action is brought within the earlier of the following:

         **(a)** Two years and one day from the date we accept or reject the claim; or

         **(b)** Three years and one day from the date of the loss or damage that is the subject of the claim.

2. Paragraph **B.1.** above does not apply to the Legal Action Against Us Loss Condition in the Legal Liability Coverage Form **CP 00 40.**

**C. Appraisal**

1. Except as provided in **C.2.** below, the **Appraisal** Loss Condition in the:

   BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
   BUILDERS RISK COVERAGE FORM;
   CONDOMINIUM ASSOCIATION COVERAGE FORM;
   CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM;
   EXTRA EXPENSE COVERAGE FORM;
   LEASEHOLD INTEREST COVERAGE FORM;
   TOBACCO SALES WAREHOUSES COVERAGE FORM; and
   STANDARD PROPERTY POLICY

   is replaced by the following:

   **Appraisal**

   If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal:

   **a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

   **b.** We will still retain our right to deny the claim.

 Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

**2.** The **Appraisal** Condition in the:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM; and BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

is replaced by the following:

**Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense and the amount of loss.

If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

**a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

**b.** We will still retain our right to deny the claim.

**D.** Under the **Duties In The Event Of Loss Or Damage** Loss Condition:

**a.** Paragraph **a.(2)** is replaced by the following:

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved. However, with respect to loss or damage in the State of Texas caused by windstorm or hail in the catastrophe area as defined by the Texas Insurance Code, any claim must be filed with us not later than one year after the date of the loss or damage that is the subject of the claim, except that a claim may be filed after the first anniversary of the date of the loss or damage for good cause shown by the person filing the claim.

**b.** The provision requiring signed, sworn proof of loss is replaced by the following:

Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**E.** Under the Loss Payment Condition, the provisions pertaining to notice of our intentions and the time period for payment of claims are deleted and replaced by the following:

**1. Claims Handling**

**a.** Within 15 days after we receive written notice of claim, we will:

**(1)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

**(2)** Begin any investigation of the claim; and

**(3)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**b.** We will notify you in writing as to whether:

**(1)** The claim or part of the claim will be paid;

**(2)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

**(3)** More information is necessary; or

**(4)** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **b.(1)** through **b.(4)** above, within:

**(1)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

**(2)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

**Exhibit 137 to Plaintiffs' Omnibus Appendix of Evidence in support of its Opposition to Defendants' Motions for Summary Judgment**

**2.** We will pay for covered loss or damage within five business days after:

   **a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

   **b.** An appraisal award has been made.

   However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within five business days after the date you have complied with such terms.

The following paragraphs are added:

**3. Catastrophe Claims**

   If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **E.1.** and **E.2.** above are extended for an additional 15 days.

   Catastrophe or Major Natural Disaster means a weather related event which:

   **a.** Is declared a disaster under the Texas Disaster Act of 1975; or

   **b.** Is determined to be a catastrophe by the State Board of Insurance.

**4.** The term "business day", as used in the Loss Payment Condition, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**F.** The following is added to the **Valuation** Loss Condition:

   **Chapter 862 – Subsection 862.053. Policy A Liquidated Demand.** A fire insurance policy, in case of total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. This subsection does not apply to personal property.

**G.** Paragraphs **d.** and **f.** of the **Mortgageholders** Additional Condition are replaced by the following:

   **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

     **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

     **(2)** Submits a signed, sworn proof of loss within 91 days after receiving notice from us of your failure to do so; and

     **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

   All of the terms of this Coverage Part will then apply directly to the mortgageholder.

   **f.** If this policy is cancelled, we will give the mortgageholder named in the Declarations written notice of cancellation.

   If we cancel this policy, we will give written notice to the mortgageholder at least:

     **(1)** 14 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

     **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

   If you cancel the policy, we will give the mortgageholder notice of cancellation to be effective on the date stated in the notice. The date of cancellation cannot be before the 10th day after the date we mail the notice.

**H.** The following is added to Paragraph **D.1.** in the **Duties In The Event Of Accident, Claim Or Suit** Loss Condition in the Legal Liability Coverage Form:

   We will notify the first Named Insured in writing of:

**1.** An initial offer to settle a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 10th day after the date on which the offer is made.

**2.** Any settlement of a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 30th day after the date of the settlement.

# GENERAL STAR INDEMNITY COMPANY

### ATTACH THIS NOTICE TO YOUR POLICY

# IMPORTANT NOTICE – WASHINGTON

This policy does not cover damage to your property caused by flooding. The federal government offers flood insurance through the National Flood Insurance Program to residents of communities that participate in its program. You can learn more about the National Flood Insurance Program at www.floodsmart.gov or by calling (888) 379-9531.

02 WA 500 (04/09)                                               Page 1 of 1

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**

**Page 1838 of 2921**

GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of General Star Indemnity Company (the "Insurer") to pay any amount claimed to be due hereunder, the Insurer, at the request of the insured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction. All matters arising hereunder shall be determined in accordance with the law and practice of such Court. However, nothing in this provision constitutes a waiver of the Insurer's rights to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States of America or of any State in the United States.

It is further agreed that service of process in such suit may be made upon the Insurer by certified mail, return receipt requested, addressed to the Insurer in care of its **Corporate Secretary**, Attention: Legal Department, General Star Indemnity Company, 120 Long Ridge Road, Stamford, CT 06902-1843. In any suit instituted under this contract, Insurer will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-referenced Corporate Secretary, or his designee, is authorized and directed to accept service of process on behalf of the Insurer in any such suit or upon the request of the insured to give a written undertaking to the insured that it will enter a general appearance upon the Insurer's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance, or such other insurance department representative, or such other governmental officer, such as the Secretary of State, specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the Insurer's Corporate Secretary as the person to whom the said insurance department representative is authorized to mail such process or a true copy thereof.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MINIMUM EARNED ENDORSEMENT

This endorsement modifies insurance provided under this Policy.

This endorsement, effective       June 1, 2019       forms a part of Policy # IAG966951B

issued to   JRK PROPERTY HOLDINGS, INC.  by  General Star Indemnity Company.

In the event of cancellation of this policy by the Insured, or cancellation by us for non-payment of premium, no less than the amount of 35%       shall be retained as fully earned minimum premium, and the premium will not be subject to pro-rata or short rate cancellation calculations.

All other terms, conditions and exclusions remain unchanged.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

## GENERAL STAR INDEMNITY COMPANY

### Stamford, Connecticut

# COMMERCIAL PROPERTY DECLARATIONS

**POLICY NUMBER** IAG966951B

---

## DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | Location | Construction Type | Occupancy |
|---|---|---|---|---|
| See Supplemental Declarations Page | | | | |

---

## COVERAGES PROVIDED (INSURANCE AT THE DESCRIBED PREMISES APPLIES ONLY FOR COVERAGES FOR WHICH A LIMIT OF INSURANCE IS SHOWN.)

| Prem. No. | Bldg. No. | Coverage | Limit of Insurance | Sublimit of Insurance** | Covered Causes of Loss | Coinsurance* | Rates | Premium |
|---|---|---|---|---|---|---|---|---|
| 1-85 | 1 | Building, Business Personal Property, Business Income with Extra Expense including Rental Value | $750,000 per Occurrence part of $5,000,000 per Occurrence | | Special | NIL | Included | Included |

SEE JRK PROPERTY HOLDINGS COVERAGE FORM PP 98 0028 (07/17)

\** Any Sublimit listed on these Declarations is part of, and not in addition to, the lesser of the Limit of Insurance or the Values shown on the Location Schedule (Form 02 PP 639)
\* If Extra Expense Coverage, Limits On Loss Payment

---

## OPTIONAL COVERAGES APPLICABLE ONLY WHEN ENTRIES ARE MADE IN THE SCHEDULE BELOW

| Prem. No. | Bldg. No. | Agreed Value Expiration Date | Coverage Amount | Replacement Cost Building ✔ | Business Personal Property | Including "Stock" |
|---|---|---|---|---|---|---|
| 1-85 | 1 | | | ✔ | ✔ | |

| | | Inflation Guard Building | (Percentage) Personal Property | *Monthly Limit of Indemnity (Fraction) | *Maximum Period Of Indemnity | *Extended Period Of Indemnity (Days) |
|---|---|---|---|---|---|---|

*Applies to Business Income Only.

---

## MORTGAGE HOLDERS

| Prem. No. | Bldg. No. | Mortgage Holder Name | Street Address | City | State | Zip |
|---|---|---|---|---|---|---|

---

## DEDUCTIBLE

SEE JRK PROPERTY HOLDINGS COVERAGE FORM PP 98 0028 (07/17)

---

## FORMS APPLICABLE

**To all coverages:**
PP 98 0028 (07/17), PP 97 0024 (05/19), PP 98 0023 (04/17), PP 98 0024 (04/17), PP 98 0029 (07/17), PP 98 0016 (04/17), PP 98 0027 (07/17), PP 98 0026 (07/17), IL 0953 (01/15)

**To Specific Premises/Coverages:**

| Prem. No. | Bldg. No. | Coverages | Form Number |
|---|---|---|---|

---

**THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

# GENERAL STAR INDEMNITY COMPANY
## Stamford, Connecticut

## COMMERCIAL PROPERTY DECLARATIONS

**POLICY NUMBER** IAG966951B

---

## DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | Location Address | City | State | Zip Code | Construction | Occupancy |
|---|---|---|---|---|---|---|---|
| 1 | 1 | Diamond Hillside<br>2205 East Leland Road | Pittsburg | CA | 94565 | Frame | Apartments |
| 2 | 1 | Cascades<br>9436 N Saybrook Dr | Fresno | CA | 93720 | Frame | Apartments |
| 3 | 1 | Crown Pointe<br>9199 N Saybrook Dr | Fresno | CA | 93720 | Frame | Apartments |
| 4 | 1 | Dominion Heights<br>1164 E Perrin Ave | Fresno | CA | 93720 | Frame | Apartments |
| 5 | 1 | Corporate Office<br>11766 Wilshire Blvd | Los Angeles | CA | 90025 | Frame | Apartments |
| 6 | 1 | Hotel Oceana - Santa Monica<br>849 Ocean Avenue | Santa Monica | CA | 90403 | Frame | Apartments |
| 7 | 1 | Somerset Glen<br>13380 Hillsborough Drive | La Mirada | CA | 90638 | Frame | Apartments |
| 8 | 1 | Terraces at Highland Reserve<br>700 Gibson Drive | Roseville | CA | 95678 | Frame | Apartments |
| 9 | 1 | The Arbors ar California Oaks<br>24375 Jackson Avenue | Murrieta | CA | 92562 | Frame | Apartments |
| 10 | 1 | Montage Apartments<br>12801 Fair Oaks Blvd | Citrus Heights | CA | 95610 | Frame | Apartments |
| 11 | 1 | Parkside Glen<br>800 Hillside Ave | San Jose | CA | 95118 | Frame | Apartments |
| 12 | 1 | Enclave Adobe Creek<br>1 Lakeville Circle | Petaluma | CA | 94954 | Frame | Apartments |
| 13 | 1 | Rancho Solana<br>2444 Alverado St | Oxnard | CA | 93036 | Frame | Apartments |
| 14 | 1 | Serenade at Riverpark<br>700 Forest Park Blvd | Oxnard | CA | 93036 | Frame | Apartments |
| 15 | 1 | Courtyards at Buckley (fka<br>Landings at Buckley)<br>2134 South Richfield Way | Aurora | CO | 80013 | Frame | Apartments |
| 16 | 1 | Shadow Ridge at Southlands (fka<br>Broadstone Southlands)<br>24750 E Applewood Circle | Aurora | CO | 80016 | Frame | Apartments |
| 17 | 1 | Briargate on Main<br>18931 E Briargate Lane | Parker | CO | 80134 | Frame | Apartments |

---

**THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1842 of 2921

# GENERAL STAR INDEMNITY COMPANY
## Stamford, Connecticut

## COMMERCIAL PROPERTY DECLARATIONS

**POLICY NUMBER** IAG966951B

---

## DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | Location Address | City | State | Zip Code | Construction | Occupancy |
|---|---|---|---|---|---|---|---|
| 18 | 1 | Pinnacle<br>6416 Honey Grove | Colorado Springs | CO | 80923 | Frame | Apartments |
| 19 | 1 | 6th Avenue<br>12 South Holman Way | Golden | CO | 80401 | Frame | Apartments |
| 20 | 1 | Westcliff (fka AMLI at Westcliff)<br>9820 Westcliff Parkway | Westminster | CO | 80021 | Frame | Apartments |
| 21 | 1 | Courtney Park Apartments<br>4470 South Lemay Ave | Fort Collins | CO | 80525 | Frame | Apartments |
| 22 | 1 | Governor's Park<br>700 East Drake Road | Fort Collins | CO | 80525 | Frame | Apartments |
| 23 | 1 | Scotch Pines<br>915 East Drake Road | Fort Collins | CO | 80525 | Frame | Apartments |
| 24 | 1 | Cornerstone at Bedford Apartment Homes<br>1425-1435 Bedford Street | Stamford | CT | 6905 | Fire Resistive, SFR | Apartments |
| 25 | 1 | Century Hills<br>98 Cold Spring Road | Rocky Hill | CT | 6067 | Masonry Non-Combustible | Apartments |
| 26 | 1 | Cabana West (fka The Columns at Cabana West) | Panama City Beach | FL | 32407 | Frame | Apartments |
| 27 | 1 | Citigate<br>8451 Gate Parkway West | Jacksonville | FL | 32216 | Frame | Apartments |
| 28 | 1 | Eagles Point<br>14551 North 46th Street | Tampa | FL | 33613 | Frame | Apartments |
| 29 | 1 | Citra at Windermere<br>11353 Citra Circle | Windermere | FL | 34786 | Frame | Apartments |
| 30 | 1 | Gates at Harbortown<br>2333 Lake Debra Drive | Orlando | FL | 32835 | Frame | Apartments |
| 31 | 1 | Lakeside Villas (fka Waterside)<br>7950 Shoals Drive | Orlando | FL | 32817 | Frame | Apartments |
| 32 | 1 | Addison Place<br>21925 Mizner Way | Boca Raton | FL | 33433 | Frame | Apartments |
| 33 | 1 | Arbor Oaks<br>9817 Arbor Oaks Lane | Boca Raton | FL | 33428 | Joisted Masonry | Apartments |
| 34 | 1 | Saratoga Place<br>5010 Central Sarasota Parkway | Sarasota | FL | 34238 | Frame | Apartments |
| 35 | 1 | GrandeVille at River Place<br>2980 Grandeville Circle | Oviedo | FL | 32765 | Frame | Apartments |
| 36 | 1 | Terra Mar (Phase 1)<br>93 Dunes Lake Circle | Santa Rosa Beach | FL | 32459 | Frame | Apartments |

---

**THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

# GENERAL STAR INDEMNITY COMPANY
## Stamford, Connecticut

## COMMERCIAL PROPERTY DECLARATIONS

**POLICY NUMBER** IAG966951B

---

## DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | Location Address | City | State | Zip Code | Construction | Occupancy |
|---|---|---|---|---|---|---|---|
| 37 | 1 | Terra Mar (Phase 2) 93 Dunes Lake Circle | Santa Rosa Beach | FL | 32459 | Frame | Apartments |
| 38 | 1 | Springs at Chatham Parkway 1699 Chatham Pkwy | Savannah | GA | 31405 | Frame | Apartments |
| 39 | 1 | Belmont Place 2825 Windy Hill Road | Marietta | GA | 30067 | Frame | Apartments |
| 40 | 1 | The London (fka Wellesley at the Perimeter fka Gables Metropolitan) 350 Perimeter Center North | Atlanta | GA | 30346 | Frame | Apartments |
| 41 | 1 | Residences at Arlington Heights (fka Tanglewood) 2134 S Goebbert Road | Arlington Heights | IL | 60005 | Frame | Apartments |
| 42 | 1 | Clover Creek Apartments 830 Foxworth Blvd | Lombard | IL | 60148 | Frame | Apartments |
| 43 | 1 | Royal Crest Estates 37 Courtney Street | Fall River | MA | 2720 | Frame | Apartments |
| 44 | 1 | Essex Apartments One Avalon Dr | Peabody | MA | 1960 | Frame | Apartments |
| 45 | 1 | Residences at Stevens Pond One Founders Way | Saugus | MA | 1906 | Frame | Apartments |
| 46 | 1 | Halsted Tewksbury 7 Archstone Avenue | Tewksbury | MA | 1876 | Frame | Apartments |
| 47 | 1 | Cabot Crossing 130 Bowden Street | Lowell | MA | 1852 | Frame | Apartments |
| 48 | 1 | One Webster 1 Webster Avenue | Chelsea | MA | 2150 | Frame | Apartments |
| 49 | 1 | Belmont Station 6900 Tasker Falls | Elkridge | MD | 21075 | Frame | Apartments |
| 50 | 1 | Cedar Place (fka Avalon Cedar Place) 5458 Harpers Farm Road | Columbia | MD | 21044 | Frame | Apartments |
| 51 | 1 | Park Place of Northville 43001 Northville Pl Dr | Northville | MI | 48167 | Frame | Apartments |

---

**THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in Support of its Oppositions to Defendants' Motions for Summary Judgment

# GENERAL STAR INDEMNITY COMPANY
**Stamford, Connecticut**

## COMMERCIAL PROPERTY DECLARATIONS

**POLICY NUMBER** IAG966951B

## DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | Location Address | City | State | Zip Code | Construction | Occupancy |
|---|---|---|---|---|---|---|---|
| 52 | 1 | Concierge<br>7620 Penn Avenue South | Richfield | MN | 55423 | Frame | Apartments |
| 53 | 1 | Arwen Vista<br>11505 Masterton Rd | Charlotte | NC | 28262 | Frame | Apartments |
| 54 | 1 | Hideaway Lakes (fka Carrington Place at Tyvola)<br>1825 Carrington Oaks Drive | Charlotte | NC | 28237 | Frame | Apartments |
| 55 | 1 | Park at Steele Creek<br>13301 Crescent Springs Drive | Charlotte | NC | 28273 | Frame | Apartments |
| 56 | 1 | Heritage Lakes<br>9100 Heritage Lakes Drive | Lincoln | NE | 68526 | Frame | Apartments |
| 57 | 1 | Southpoint<br>25 Weaver Drive | Massapequa | NY | 11758 | Frame | Apartments |
| 58 | 1 | Modera Hudson Riverfront<br>20 Water Grant Street | Yonkers | NY | 10701 | Joisted Masonry | Apartments |
| 59 | 1 | The Apex at 290<br>290 E Main Street | Elmsford | NY | 10523 | Frame | Apartments |
| 60 | 1 | Bexley House<br>2877 E Broad Street | Columbus | OH | 43209 | Frame | Apartments |
| 61 | 1 | Glenbridge Manors<br>11513 Village Brook Drive | Cincinnati | OH | 45249 | Frame | Apartments |
| 62 | 1 | Northridge<br>8114 West Britton Road | Oklahoma City | OK | 73132 | Frame | Apartments |
| 63 | 1 | The Parc at East 51st (fka Springs at East 51st)<br>5091 S 136th Ave | Tulsa | OK | 74134 | Frame | Apartments |
| 64 | 1 | The Vue<br>1717 SW Park Ave | Portland | OR | 97201 | Non-Combustible | Apartments |
| 65 | 1 | Jefferson At Westtown<br>1000 Skiles Blvd | West Chester | PA | 19382 | Frame | Apartments |
| 66 | 1 | Venice Lofts (All Other Buildings)<br>4601 Flat Rock Road | Philadelphia | PA | 19127 | Frame | Apartments |
| 67 | 1 | Venice Lofts (Mid-Rise Building)<br>4601 Flat Rock Road | Philadelphia | PA | 19127 | Joisted Masonry | Apartments |

**THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in Support of its
Oppositions to Defendants' Motions for Summary Judgment

## GENERAL STAR INDEMNITY COMPANY

### Stamford, Connecticut

## COMMERCIAL PROPERTY DECLARATIONS

**POLICY NUMBER** IAG966951B

## DESCRIPTION OF PREMISES

| Prem. No. | Bldg. No. | Location Address | City | State | Zip Code | Construction | Occupancy |
|---|---|---|---|---|---|---|---|
| 68 | 1 | Harbor Village (fka Harbor Village at the Commons) 1 Grande Isle Drive | Wakefield | RI | 2879 | Frame | Apartments |
| 69 | 1 | Sheraton Downtown 623 Union St | Nashville | TN | 37219 | Fire Resistive, SFR | Apartments |
| 70 | 1 | AMLI at Breckinridge 4250 East Renner Road | Richardson | TX | 75082 | Frame | Apartments |
| 71 | 1 | Heritage at Lakeside 5900 Baywater Drive | Plano | TX | 75093 | Frame | Apartments |
| 72 | 1 | Kia Ora Park 9300 Coit Road | Plano | TX | 75025 | Frame | Apartments |
| 73 | 1 | Colinas Del Sol 945 South Mesa Hills Drive | El Paso | TX | 79912 | Frame | Apartments |
| 74 | 1 | Summerbrooke 1225 Lawrence Rd | Kemah | TX | 77565 | Frame | Apartments |
| 75 | 1 | West 18th 2727 West 18th Street | Houston | TX | 77008 | Frame | Apartments |
| 76 | 1 | Centreport 14301 Centre Station | Fort Worth | TX | 76115 | Frame | Apartments |
| 77 | 1 | Manchester Lakes II 7131 Silver Lake Blvd | Alexandria | VA | 22315 | Frame | Apartments |
| 78 | 1 | Manchester Lakes I 7131 Silver Lake Blvd | Alexandria | VA | 22315 | Frame | Apartments |
| 79 | 1 | Hideaway at Greenbrier (fka Empirian Chesapeake) 150 Coveside Lane | Chesapeake | VA | 23320 | Frame | Apartments |
| 80 | 1 | Heritage at Freemason Harbour 200 College Place | Norfolk | VA | 23501 | Joisted Masonry | Apartments |
| 81 | 1 | Greens of Salem Run 5600 Salem Run Blvd | Fredricksburg | VA | 22407 | Frame | Apartments |
| 82 | 1 | Chase Arbor 1500 Chase Arbor Common | Virginia Beach | VA | 23462 | Frame | Apartments |
| 83 | 1 | Trillium Heights 12240 Daphne Lane NW | Silverdale | WA | 98383 | Frame | Apartments |
| 84 | 1 | The Boulders at Puget Sound (fka The Westridges Apartments) 2602 Westridge Avenue West | Tacoma | WA | 98466 | Frame | Apartments |
| 85 | 1 | Carroll's Creek 18111 25th Ave NE | Marysville | WA | 98271 | Frame | Apartments |

**THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment

<u>NAMED INSURED</u>: **JRK Property Holdings, Inc.** and all affiliated, subsidiary, associated, or allied companies, corporations, limited liability companies, limited liability partnerships, firms, entities, management companies, partnerships, organizations or joint ventures as now exist, or may hereafter be constituted or acquired, or for which the Named Insured has the responsibility of placing insurance and for which similar coverage is not otherwise more specifically provided and for any other party or interest that is required by contract or agreement.

<u>POLICY TERM</u>: Policy shall be effective and shall terminate at 12:01 a.m. at the location(s) of property involved on the inception and expiration dates specified below:

INCEPTION:       June 1, 2019          EXPIRATION:    June 1, 2020

<u>TIME OF ATTACHMENT:</u> It is agreed that, anything in this policy to the contrary notwithstanding, the actual effective time of attachment of this insurance on the above date shall be the same time on the above date as the actual effective time of cancellation or expiration of the policy replaced or renewed by this policy.

<u>LOSS PAYABLE</u>: Loss or damage shall be adjusted with and payable to the First Named Insured, subject to any certificates on file which require payment to a loss payee or mortgagee.

<u>TOTAL PARTICIPATION</u>: The total maximum limit of liability in a single **Occurrence** is $250,000,000 excess of applicable deductibles, and this Company shall not be liable for more than its proportion of the Program Limits of Liability.

<u>COVERAGE OF INSURANCE AND SPECIAL PROVISIONS:</u>

I.       <u>COVERAGE INCLUDES</u> – Real and Personal Property, Property in the Care, Custody or Control of the Insured, Improvements and Betterments, Business Interruption, Contingent Business Interruption, Extra Expense, Tenant Relocation and Move Back Expenses, Extended Period of Indemnity, Rental Value, Leasehold Interest, Unnamed Locations, Newly Acquired Property, Property in the Course of Construction, Property in Transit, **Electronic Data and Media, Electronic Data Processing or Control Equipment**, Accounts Receivable, Valuable Papers, Off-Premises Utility Interruption, Debris Removal, Demolition and Building Ordinance Law, Ingress/Egress, Civil or Military Authority, **Fine Arts**, **Landscape** and Expediting Expense, and as per policy form.

II.      <u>PROGRAM LIMITS OF LIABILITY</u> (Policy Limit): This Company's maximum liability in any one **Occurrence** as a result of all covered loss or damage regardless of the number of Locations, coverages, or perils insured under this Policy shall not exceed its proportion of the total limit shown above, except for the program sub-limits detailed below. When a program sublimit of liability is shown as applying in the annual aggregate, this Company's maximum limit of liability will not exceed its proportion of such limit during any policy year regardless of the number of locations and coverages involved.

Sublimits of Liability stated below are subject to and not in addition to the Policy Limit shown above. Insurers shall not be liable hereunder for more than one of the following limits of liability for the loss arising from any one loss or disaster, but never to exceed the policy limits shown herein:

If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or Covered Cause of Loss, then no coverage is provided for that coverage or Covered Cause of Loss.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                          **Page 1847 of 2921**

| | | | |
|---|---|---|---|
| A. | USD | 50,000,000 | Per **Occurrence** and in the aggregate during the policy term for all **Earthquake**, except; |
| | USD | 50,000,000 | Per **Occurrence** and in the aggregate during the policy term for the peril of **Earthquake** in California. |
| | USD | 50,000,000 | Per **Occurrence** and in the aggregate during the policy term for the peril of **Earthquake** in New Madrid Counties. |
| | USD | 50,000,000 | Per **Occurrence** and in the aggregate during the policy term for the peril of **Earthquake** in the Pacific Northwest Counties. |
| B. | USD | 50,000,000 | Per **Occurrence** and in the aggregate during the policy term for all **Flood**, except; |
| | USD | 35,000,000 | Per **Occurrence** and annually in the aggregate during the policy term as respects the Peril of **Flood** for Buildings wholly or partially within Special Flood Hazard Areas (SFHA), areas of 100-year flooding as defined by the Federal Emergency Management Agency (FEMA). |
| C. | USD | 250,000,000 | Per **Occurrence** during the policy term as respects **Named Windstorm** (a storm that has been declared by the National Weather Service to be a hurricane; typhoon, tropical cyclone or tropical storm). |

However, the Limit of Liability for **Earthquake**, **Flood** and/or **Named Windstorm** shall not apply to loss or damage caused by or resulting from ensuing fire, explosion or leakage from fire protective equipment.  In such case the Limit of Liability in II. above shall apply.

| | | | |
|---|---|---|---|
| D. | | Policy Limit | Per **Occurrence** Building Ordinance Law: |
| | | Included | Coverage A – Undamaged Portion |
| | | Included | Coverage B – Demolition Costs |
| | | Included | Coverage C – Increased Cost of Construction |
| | | Included | Coverage D – Business Interruption |
| E. | | 60 Days | Per **Occurrence** for Civil or Military Authority |
| F. | USD | 2,500,000 | Per **Occurrence** for Communicable Disease |
| G. | USD | 5,000,000 | Per **Occurrence** Contingent Business Interruption with a supplier or customer with a direct or indirect relationship with the insured |
| H. | 25% of Loss or USD | 10,000,000 | Per **Occurrence** Debris Removal (applicable sublimit is the greater of the two) |
| I. | | Not Covered | Per **Occurrence** for Equipment Breakdown |
| J. | USD | 5,000,000 | Per **Occurrence** Expediting Expense |
| K. | | 365 Days | Extended Period of Indemnity |
| L. | USD | 10,000,000 | Per **Occurrence** for Leader Properties within 5 miles of a covered **Location** |
| M. | USD | 5,000,000 | Per **Occurrence** Fine Arts |

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                      **Page 1848 of 2921**

| N. | | 60 Days | Per **Occurrence** for Ingress/Egress |
|---|---|---|---|
| O. | | Included | Per **Occurrence Landscape**, including shrubs, trees and plants |
| P. | USD | 5,000,000 | Per **Occurrence** for Leasehold Interest |
| Q. | USD | 10,000,000 | Per **Occurrence** for **Miscellaneous Unnamed Locations** |
| R. | | 180 Days | Newly Acquired Property for a period of 180 days, if not reported to the Company in that 180 day period then coverage ceases. |
| S. | USD | 25,000,000 | Per **Occurrence** Off Premises Utility Interruption (Property Damage and resultant Time Element). A qualifying period of 24 hours applies to this coverage. |
| T. | USD | 5,000,000 | Per **Occurrence** Personal Property Off Premises |
| U. | USD | 5,000,000 | Per **Occurrence** Pollution Clean-Up and Removal. Annual Aggregate applies. |
| V. | USD | 5,000,000 | Per **Occurrence** Professional Fees |
| W. | | Included | Per **Occurrence** for Property in the Course of Construction and/or During Erection, Assembly and/or Installation Including Soft Costs |
| X. | USD | 5,000,000 | Per Conveyance Property in Transit |
| Y. | USD | 5,000,000 | Per **Occurrence** for Resultant Mold |
| Z. | USD | 5,000,000 | Per **Occurrence** for Upgrade to Green |

III.   <u>DEDUCTIBLES</u> – All losses, damages, or expenses arising out of one **Occurrence** shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted $100,000 per **Occurrence**, subject to a $2,500,000 Annual Aggregate Retention of loss not recoverable under this policy in the policy year commencing June 1, 2019.

The first $100,000 of each loss shall be deducted from the per **Occurrence** deductible before being applied towards erosion of the Annual Aggregate Retention. Upon exhaustion of the Annual Aggregate Retention, the deductible shall be $100,000 per **Occurrence** (hereafter referred to as the Maintenance Deductible). Loss or damage arising out of a California, Alaska, Hawaii, Washington state and New Madrid **Earthquake**, Tier I **Named Windstorm** losses (including ensuing **Flood**, hail and wind-driven rain damage), and **Flood** in 100-year zones do not contribute towards the erosion of the annual aggregate deductible.

A.   **Earthquake** (Excluding **Earthquake** Sprinkler Leakage): The sum of $100,000 shall be deducted from any adjusted loss due to **Earthquake** except:

1.   In the state of California, Alaska and Hawaii the **Earthquake** deductible shall be 5% per **Occurrence** of the reported total insurable values at each **Location** submitting a claim, per unit of insurance which sustains loss or damage, subject to a minimum of $250,000 for any one **Occurrence**;

2.   In Pacific Northwest Counties the **Earthquake** deductible shall be 2% per **Occurrence** of the reported total insurable values at each **Location** submitting a claim, per unit of insurance which sustains loss or damage, subject to a minimum of $100,000 any one **Occurrence**.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1849 of 2921**

3. In New Madrid Counties the **Earthquake** deductible shall be 2% per **Occurrence** of the reported total insurable values at each **Location** submitting a claim, per unit of insurance which sustains loss or damage, subject to a minimum of $100,000 any one **Occurrence**.

**PACIFIC NORTHWEST COUNTIES BY STATE:**
**Washington**: Clallam, Jefferson, King, Kitsap, Mason, Pierce, San Juan, Skagit, Snohomish, Thurston, Whatcom

**NEW MADRID COUNTIES BY STATE:**

| | |
|---|---|
| **Arkansas**: | Clay, Craighead, Crittenden, Cross, Greene, Jackson, Lawrence, Mississippi, Poinsett |
| **Illinois:** | Alexander, Johnson, Massac, Pope, Pulaski, Saline, Union, Williamson |
| **Kentucky:** | Ballard, Calloway, Carlisle, Fulton, Graves, Hickman, Livingston, Marshall, McCracken |
| **Mississippi:** | DeSoto |
| **Missouri:** | Bollinger, Butler, Cape Girardeau, Dunklin, Mississippi, New Madrid, Pemiscot, Scott, Stoddard, Wayne |
| **Tennessee:** | Crockett, Dyer, Gibson, Lake, Lauderdale, Obion, Shelby, Tipton |

B. **Flood**:

1. With respect to buildings wholly or partially within Special Flood Hazard Areas (SFHA) of 100-year flooding, as defined by the Federal Emergency Management Agency (FEMA) and as agreed upon per the statement of values at the time of binding or addition to the program:

   a) If insurance is maintained through: (i) the National Flood Insurance Program (NFIP); or (ii) any other primary or underlying policy or program covering property damaged by **Flood**, with limits equal to the full replacement cost of the building or contents, or the maximum NFIP limit available per building; then the deductible shall be the amount recovered from the NFIP or any other primary or underlying policy or program for such damage plus $50,000 per **Occurrence** (not per building) for any business interruption or rental value loss.

   b) If insurance is not maintained in accordance with B.1 (a) above, the deductible shall be $250,000 per building submitting a claim.

   In the event that the Insured maintains underlying insurance through the National Flood Insurance Program or its equivalent, it is agreed that this policy shall be excess over the recovery under such policy(ies). Should the amount of loss payable under such policy(ies) exceed the applicable **Flood** deductible under this policy, then no deductible shall apply hereunder. However, if the amount to be paid under such policy(ies) is less than the applicable **Flood** deductible under this policy, then the amount to be deducted hereunder shall not exceed the difference between the amount to be paid under the Insured's policy(ies) and the applicable **Flood** deductible under this policy. Insurance maintained through the National Flood Insurance Program or its equivalent shall be considered Underlying Insurance.

   With respect to other building(s) at the same **Location** but outside of the Special Flood Hazard Area, deductible B.2. below shall apply per **Occurrence**.

2. With respect to other **Flood** loss or damage, the deductible shall be $100,000 per **Occurrence**.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Opposition to Defendants' Motions for Summary Judgment**                    **Page 1850 of 2921**

Should primary or underlying insurance which insures against loss or damage caused by or resulting from **Flood** exist, if the amount of loss payable under your primary/underlying insurance:

a) Exceeds or meets the Flood deductible shown above, no deductible shall apply to Flood under this policy.

b) Is less than the applicable Flood deductible under this policy, then the amount to be deducted hereunder shall not exceed the difference between the amount to be paid under the Insured's policy(s) and the applicable Flood deductible under this policy.

C. **Windstorm and Hail**: The following sum(s) shall be deducted from any adjusted loss due to Windstorm and Hail:

1. With respect to **Named Windstorm** in the counties of Broward, Miami-Dade and Palm Beach in the state of Florida, the deductible shall be 5% per **Occurrence** of the reported total insurable values at each **Location** submitting a claim, per unit of insurance which sustains loss or damage, subject to a minimum of $100,000 for any one **Occurrence**;

2. With respect to **Named Windstorm** in all other Tier I wind zones, the deductible shall be 2% per **Occurrence** of the reported total insurable values at each **Location** submitting a claim, per unit of insurance which sustains loss or damage, subject to a minimum of $100,000 for any one **Occurrence**.

3. With respect to the peril of hail in the states of Colorado, Texas and Oklahoma, the deductible shall be 2% per **Occurrence** of the reported total insurable values at each **Location** submitting a claim, per unit of insurance which sustains loss or damage, subject to a minimum of $100,000 for any one **Occurrence**;

4. With respect to all other locations, all loss, damage, and/or expense arising out of any one **Occurrence** shall be adjusted as one loss, and from the amount of each such adjusted loss shall be deducted the sum of $100,000 per **Occurrence**.

Tier I Wind Zones means all buildings situated within Tier I States or Counties from Texas (including Harris County) through Virginia as specified below:

| | |
|---|---|
| **Alabama**: | Baldwin, Mobile; |
| **Florida:** | Entire State of Florida; |
| **Georgia:** | Bryan, Camden, Chatham, Glynn, Liberty, McIntosh; |
| **Hawaii:** | Entire State of Hawaii; |
| **Louisiana:** | Cameron, Iberia, Jefferson, Lafourche, Orleans, Plaquemines, St. Mary, St. Bernard, St. Tammany, Terrebonne, Vermilion; |
| **Mississippi:** | Hancock, Harrison, Jackson; |
| **North Carolina:** | Beaufort, Brunswick, Carteret, Craven, Dare, Hyde, New Hanover, Onslow, Pamlico, Pender; |
| **South Carolina:** | Beaufort, Charleston, Colleton, Georgetown, Horry, Jasper; |
| **Texas:** | Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Harris, Jackson, Jefferson, Kenedy, Kleberg, Matagorda, Nueces, Orange, Refugio, San Patricio, Victoria, Willacy; |
| **Virginia:** | Accomack, Northampton, Virginia Beach City, Chesapeake, Gloucester, Hampton City, Lancaster, Mathews, Middlesex, Newport News, Norfolk City, Northumberland, Poquoson City, Portsmouth City, Suffolk City, York. |

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Opposition to Defendants' Motions for Summary Judgment**                    **Page 1851 of 2921**

D.  Each of the following shall be considered a separate "unit of Insurance":

    1.  Each separate building or structure sustaining loss or damage;

    2.  The contents of each separate building or structure sustaining loss or damage;

    3.  Property in each yard sustaining loss or damage; and

    4.  100% Time Element (Business Interruption, Tuition Fees, Extra Expense, Additional Living Expense, Rents or Rental Value, or Leased Interest values for each building) sustaining loss or damage.

E.  In the event of loss or damage involving more than one deductible, the Insured can either elect to have the deductibles apply separately or have the single largest deductible apply.

F.  If any **Occurrence** where loss or damage is caused by more than one cause of loss or damage (peril) insured against under this policy, the insured shall have the right to separate the loss amount by peril for the purposes of application of the deductible(s) specified in this section, notwithstanding the above reference to two or more deductibles and the policy limit.

G.  The Insured shall be the sole determiner of what damage or locations will be claimed against Insurers, and; at no point will insurers consider, for deductible calculation purposes, any damage or locations for which the Insured is not making claim.

If two or more deductible amounts provided in this Policy apply to a single **Occurrence**, the total to be deducted shall not exceed the largest deductible applicable unless otherwise stated in this Policy.

IV.  <u>TERRITORIAL LIMITS</u> – This policy covers property wherever situated within and between the fifty states comprising the United States of America including the District of Columbia, its territories and possessions and Canada.

V.  <u>ASSIGNED ADJUSTER</u> – It is agreed that at the Insured's option, the Company will use York Specialized Loss Adjusting for the adjustment of all claims made against this policy. The assignment may be changed by mutual consent of the Insured and the Company.

VI.  <u>COVERAGE</u>

Except as hereinafter excluded, this policy covers:

A.  <u>Real and Personal Property</u>

    1.  The interest of the Insured in all Real and Personal Property, including improvements and betterments owned, used, managed, leased or intended for use by the Insured, or in which the Insured may have an insurable interest, or hereafter constructed, erected, installed, or acquired including while in course of construction, erection, installation, and/or assembly. In the event of loss or damage, Insurers agree to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or leases to the contrary. Real property includes buildings, appurtenant structures, and all permanent improvements to real property or land including landscaping.

    2.  The interest of the Insured in the Real and Personal Property of others in the Insured's care, custody, or control, and the Insured's liability imposed by law or assumed by contract, whether written or oral, for such property.

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment  **Page 1852 of 2921**

3. At the insured's sole option, personal property belonging to or in use by officers and employees of the insured while on premises of locations insured hereunder, and when not otherwise insured; loss, if any, to be adjusted with and payable to the insured.

4. Contractors' and subcontractors' interest in property covered to the extent of the Insured's liability imposed by law or assumed by written contract prior to the date of the direct physical loss or damage. However, such interests will not extend to any time element coverage provided by this Policy.

5. Building coverage is defined to include but not limited to all building permit fees including municipal construction permit fees and/or charges.

6. Architects and supervision fees.

B. Business Interruption

1. This policy covers loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss, damage, or destruction by any of the perils covered herein during the term of this policy to property insured herein.

2. If such loss occurs during the term of this policy, it shall be adjusted on the basis of ACTUAL LOSS SUSTAINED by the Insured, consisting of the net profit which is thereby prevented from being earned and all charges and expenses including payroll, to the extent that these must necessarily continue during the interruption of business and only to the extent such charges and expenses would have been earned had no loss occurred.

3. In the event of direct physical loss, damage, or destruction to property insured herein caused by any of the perils covered herein, which result in an interruption of research and development activities which in themselves would not have produced income during the indemnity period, this policy shall cover the actual loss sustained of the continuing fixed charges and expenses including payroll directly attributable to such research and development activities.

4. Insurers shall not be liable for any loss resulting from damage to or destruction of finished stock nor for the time required to reproduce said finished stock. Finished stock shall mean stock manufactured by the Insured which in the ordinary course of the Insured's business is ready for packing, shipment, or sale.

5. Coverage shall include soft costs. Soft costs shall mean expenses related to the delay of completion of a project over and above those costs which would have been incurred, including, but not limited to, interest payments on financing under loan agreements, legal and accounting fees, advertising and promotional expenses which become necessary as a result of the loss, and real estate and property taxes accruing during the period of delay.

6. Resumption of Operations: It is a condition of this insurance that if the Insured could reduce the loss resulting from the interruption of business at the **Location** where the loss occurred by a complete or partial resumption of operation of the property insured, whether damaged or not; or by making use of available stock, merchandise, or other units of similar size at the insured **Location** where the loss occurred, such reduction shall be taken into account in arriving at the amount of loss hereunder.

7. This policy is extended to cover Time Element coverage for the locations which are managed by the Insured, but covered under other primary and/or underlying property policies of insurance within the territorial provisions of this policy.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1853 of 2921**

The Insurer reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the Business Interruption Loss. However, the Business Interruption loss sustained by each financially independent Insured under this policy shall be determined based on the separate operating results of each such separate financially independent Insureds.

8. Experience of the Business:

a) In determining the amount of net profit, charges and expenses covered hereunder for the purposes of ascertaining the amount of loss sustained, due consideration shall be given to the experience of the business before the date of damage or destruction and to the probable experience thereafter had no loss occurred.

b) With respect to alterations, additions, and property while in the course of construction, erection, installation, or assembly, due consideration shall be given to the anticipated experience of the business from the date of damage or destruction herein during the term of this policy.

C. Extra Expense

This policy covers Extra Expense necessarily incurred resulting from direct physical loss or damage to property insured herein by any of the perils covered herein during the term of this policy.

"Extra Expense" means the excess of the total cost during the period of restoration of the damaged property chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no loss or damage occurred.

D. Rental Value/Rental Income

1. This policy covers Rental Value loss sustained by the Insured resulting directly from the necessary untenantability caused by direct physical loss, damage, or destruction by any of the perils covered herein during the term of this policy to Real and Personal Property as insured herein, but not exceeding the reduction in rental value less charges and expenses which do not necessarily continue during the period of untenantability.

2. "Rental Value" is defined as the sum of:

a) The total anticipated gross rental income from tenant occupancy and/or use of the described property as furnished and equipped by the Insured, and

b) The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured, and

c) The fair rental value of any portion of said property which is occupied by the Insured.

3. Experience of the Business:

a) In determining the amount of rental value covered hereunder for the purposes of ascertaining the amount of loss sustained, due consideration shall be given to the rental

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Opposition to Defendants' Motions for Summary Judgment**                    **Page 1854 of 2921**

experience before the date of damage or destruction and to the probable experience thereafter had no loss occurred.

b)  With respect to alterations, additions and property while in the course of construction, erection, installation, or assembly, due considerations shall be given to the available rental experience of the business after completion of the construction, erection, installation or assembly.

E.  <u>Provisions Applicable to Business Interruption, Extra Expense, and Rental Value</u>

1.  Period of Recovery: The length of time for which loss may be claimed:

    a)  Shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property as has been destroyed or damaged.

    b)  With respect to alterations, additions and property while in the course of construction, erection, installation, or assembly shall be determined as provided in a) above, but such determined length of time shall be applied to the experience of the business after the business has reached its planned level of production/occupancy of business operations;

    c)  Shall commence with the date of such loss or damage and shall not be limited by date of expiration of this policy or cancellation date.

    d)  In addition to the time as defined in 1.a) above, this policy shall provide an extended period of indemnity or additional length of time of 365 days to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

        (1)  The date on which the liability of the Company for loss or damage would otherwise terminate, or

        (2)  The date on which repair, replacement or rebuilding of such part of the property as has been damaged is actually completed;

2.  Special Exclusions: This section of the policy does not insure against any increase of loss which may be occasioned by the suspension, lapse, or cancellation of any lease, license, contract, or order, nor for any increase of loss due to interference at the Insured's premises by strikers or other persons with rebuilding, repairing, or replacing the property damaged or destroyed, or with the resumption or continuation of business, or with the re-occupancy of the premises.

3.  Expense to Reduce Loss: This policy also covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy. However, such coverage is provided only to the extent that the expenses do not exceed the amount by which loss under the policy is thereby reduced.

4.  CONTINGENT TIME ELEMENT: If direct physical loss or damage to the real or personal property of a direct or indirect supplier or customer of the Insured is damaged by a Covered Cause of Loss under this Policy, and such damage:

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1855 of 2921**

a) Wholly or partially prevents any direct or indirect supplier to the Insured from supplying their goods and/or services to the Insured, or

b) Wholly or partially prevents any direct or indirect customer of the Insured from accepting the Insured's goods and/or services;

Then this Policy is extended to cover the actual loss sustained by the Insured during the Period of Interruption with respect to such real or personal property. The property of the supplier or customer which sustains loss or damage must be of the type of property which would be Insured Property under this Policy.

This coverage applies to the Insured's direct suppliers or direct customers located in the COVERAGE TERRITORY.

5. Interruption by Civil or Military Authority: This policy is extended to cover the loss sustained during the period of time specified in the sublimits, when as a direct result of a peril insured against, access to real or personal property is impaired by order of civil or military authority.

6. Ingress/Egress: This policy is extended to cover the loss sustained during the period of time specified in the sublimits, when as a direct result of a peril insured against, ingress to or egress from the Insured's premises is thereby impaired.

7. Leader properties shall mean any property not owned or operated by the Insured, located within the number of miles shown in the Sublimits of Liability section of this policy, of a covered **Location**, which attracts business to the Insured that sustains a direct physical loss or damage to the real or personal property of the leader property and is damaged by a Covered Cause of Loss under this Policy.

8. Interruption by **Communicable Disease**: This Policy covers the Actual Loss Sustained and Extra Expense incurred by the Insured during the PERIOD OF LIABILITY if access to a **Location** owned, leased or rented by the Insured is limited, restricted, or prohibited as a result of:

a) An order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or

b) A decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**.

Interruption by Communicable Disease Exclusions: As respects **Interruption by Communicable Disease**, the following additional exclusions apply: This Policy does not insure loss resulting from:

a) The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **Communicable Disease**.

b) Loss or damage caused by or resulting from Terrorism, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be: The period of time:

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1856 of 2921**

    a)  Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

    b)  Not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

This period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

For purposes of applying Interruption by **Communicable Disease** coverage, the hours waiting period is 24 hours.

**"Communicable Disease"** shall mean a disease which is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or Legionellosis.

VII.   <u>Coverage Extensions</u>

    A.   <u>Accounts Receivable</u>

    1.  This policy covers all sums due the Insured from customers provided the Insured is unable to effect collection thereof as the direct result of loss of or damage to records of accounts receivable.

    2.  This policy covers interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage.

    3.  This policy covers collection expense in excess of normal collection cost and made necessary because of such loss or damage.

    4.  This policy covers other expenses, when reasonably incurred by the Insured in reestablishing records of accounts receivable following such loss or damage.

    5.  For the purpose of this insurance, credit card company charge media shall be deemed to represent sums due the Insured from customers, until such charge media is delivered to the credit card company.

    6.  When there is proof that a loss of records of accounts receivable has occurred but the Insured cannot more accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be computed as follows:

    a)  The monthly average of accounts receivable during the last available twelve months, together with collection expenses in excess of normal collection costs and made necessary because of such loss or damage, and reasonable expenses incurred in re-establishing records of accounts receivable following such loss or damage, shall be adjusted in accordance with the percentage increase or decrease in the twelve months average of monthly gross revenues which may have occurred in the interim.

    b)  The monthly amount of accounts receivable thus established shall be further adjusted in accordance with any demonstrable variance from the average for the particular month in which the loss occurred, due consideration also being given to the normal fluctuations in the amount of accounts receivable within the fiscal month involved.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**    **Page 1857 of 2921**

c) There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the Insured, and an amount to allow for probable bad debts which would normally have been uncollectible by the Insured.

B. <u>Arson or Theft Reward</u>

This policy is extended to cover payment of any reward offered on the Insured's behalf for information that leads to conviction of the perpetuator(s) of arson (fire) and/or theft to insured property that sustains physical loss or damage insured by this policy.

C. <u>Building Ordinance Law</u>

In the event of physical loss or damage covered under this policy that causes the enforcement of any law, ordinance, governmental directive or standard in effect at the time of such loss or damage regulating the construction, repair or use and occupancy of the property, Insurers shall be liable for:

1. Coverage A: The proportion that the value of the undamaged part of the property bears to the value of the entire property prior to loss;

2. Coverage B: The cost of demolishing the undamaged property including the cost of cleaning the site;

3. Coverage C: For the increased cost of repair or replacement of the damaged building and undamaged part of the same building, limited to the cost that would have been incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or replacement of the damaged building. However, this Company shall not be liable for any such increased cost of construction unless the damaged building is actually rebuilt or replaced.

   The insured may elect to rebuild on another site, provided that, such rebuilding does not increase the amount of loss or damage that would otherwise be payable to rebuild at the same site.

4. Coverage D: Any increase in the business interruption, extra expense, rental value, leasehold interest or other time element loss arising out of the additional time required to comply with said law, ordinance or governmental directive.

5. The Company shall not be liable for any cost of demolition or increased cost of replacement, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating any form of contamination or pollution.

D. <u>Decontamination Costs</u>

If insured property is contaminated as a direct result of physical damage insured by this policy and there is in force at the time of the loss any law or ordinance regulating contamination due to the actual, not suspected, presence of contaminants, then this policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                               **Page 1858 of 2921**

E.  Debris Removal

This policy covers the following expenses resulting from direct physical loss from a peril insured against to a covered **Location**:

1.  The cost of removal of debris of property covered hereunder;

2.  The cost of removal of debris of property not insured hereunder from the premises of the insured;

F.  Downzoning

In the event of direct physical loss, damage or destruction insured under this Policy that causes the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use, or occupancy of property, this Policy insures the additional Business Interruption and/or Rental Value loss resulting from the inability to rebuild existing property to like kind and quality, height, area, use and/or occupancy. Such loss shall be measured for the length of time as would have been required with the exercise of due diligence and dispatch to rebuild or replace such existing property and where such loss is not otherwise recoverable elsewhere under the Policy. In determining the amount of net profit, charges, expenses and/or rental value covered hereunder for the purpose of ascertaining the amount of loss sustained for such demolished property under this paragraph, due consideration shall be given to the experience of the business before the date of damage or destruction and to the probably experience thereafter had no loss occurred involving said demolished property.

G.  Expediting Expense

This policy covers the reasonable extra cost of temporary repair and of expediting the repair of damaged property insured hereunder, including overtime and express freight or other rapid means of transportation.

H.  Fire Brigade Charges and Extinguishing Expenses

This policy covers charges made by a fire department or other organization involved in the saving or protection of property insured hereunder and other extinguishing expense for which the Insured may be assessed; loss of fire extinguishing materials expended.

I.  Key and Lock Expense

If a master or grand master key is lost or damaged by an insured cause of loss, the Insurer will pay for the actual cost of replacement keys, the cost of adjusting locks to accept new keys or the cost of new locks, if required, of like kind and quality, including the cost of their installation.

J.  Leasehold Interest

1.  This policy covers pro-rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on the Insured's interest in:

a)  The amount of bonus paid by the Insured for the acquisition of the lease not recoverable under the terms of the lease for the unexpired term of the lease.

b)  Improvements and betterments to real property during the unexpired term of the lease which is not covered under any other section of this policy.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**                **Page 1859 of 2921**

    c) The amount of advance rental paid by the Insured and not recoverable under the terms of the lease for the unexpired term of the lease when property is rendered wholly or partially untenantable due to physical loss or damage by any of the perils covered herein during the term of this policy and the lease is canceled by the lessor in accordance with the conditions of the lease or by statutory requirements of the state in which the damaged or destroyed property is located; and

2. The "Interest of the Insured as Lessee" when property is rendered wholly or partially untenantable by any of perils covered herein during the term of this policy and the lease is canceled by the lessor in accordance with the conditions of the lease or by statutory requirements of the state in which the damaged or destroyed property is located.

The "Interest of the Insured as Lessee" as referred to herein shall be paid for the first three months succeeding the date of the loss and the "Net Lease Interest" shall be paid for the remaining months of the unexpired lease.

3. The following terms, wherever used in this section shall mean as follows:

    a) The "Interest of the Insured as Lessee" is defined as:

        (1) The excess of the rental value of similar premises over the actual rental payable by the lessee (including any maintenance or operating charges paid by the lessee) during the unexpired term of the lease.

        (2) The rental income which would have been earned by the Insured from sublease agreements, to the extent not covered under any other section of the policy, over and above the rental expenses specified in the lease between the Insured and the lessor.

    b) "Net Lease Interest" is defined as that sum, which placed at six percent interest compounded annually will be equivalent to the "Interest of the Insured as Lessee".

4. Insurers shall not be liable for any increase of loss which may be occasioned by the suspension, lapse or cancellation of any license or by the Insured exercising any option to cancel the lease.

K.   <u>Newly Acquired Premises</u>

This policy is automatically extended to cover additional premises which may be purchased, leased, managed, constructed or acquired during the policy period, subject to the sublimits shown in this policy.

The value of such additional premises upon which liability is hereby assumed by the Company shall be reported to the Company within the number of days shown in the Sublimits of Liability section of this policy from the date on which the insured acquires an insurable interest in such premises failing which, the Company shall be relieved of all liability as assumed hereunder on such premises of the Company.

The premium for any newly acquired premises declared under this policy shall be due and payable at the time reported and shall be calculated pro rata of the rate applying at such property or properties, from the date on which the insured acquires an insurable interest in such property or properties to the expiration of this policy.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**     **Page 1860 of 2921**

L.   Off Premises Utility Interruption

This policy is extended to cover loss or damage to Insured Property and resultant time element losses covered hereunder, caused by the interruption of electrical or service utilities, including water, gas, telephone, fuel, liquid gases, telecommunications, heating, refrigeration and/or air conditioning systems and steam, outgoing sewerage, to locations insured under this policy. The interruption must result from direct physical loss or damage by a peril insured against hereunder to property supplying such services. A qualifying period of 24 hours applies to this coverage. There shall be no loss payable under this additional coverage unless the interruption exceeds 24 hours. In such case, the loss shall be measured from the date and time of the loss.

M.   Personal Property Off Premises

This policy covers personal property usual to the conduct of business stored off premises.

N.   Pollution Clean-Up and Removal

This policy covers reasonable and necessary additional expense to extract **Pollutants or Contaminants** from land or water at insured premises if the discharge, dispersal, seepage, migration, release or escape of the **Pollutants or Contaminants** is caused by or results from a Peril Insured Against that occurs during the policy period. The expenses will be paid only if reported to us in writing within 180 days of the date on which the Peril Insured Against occurs.

O.   Professional Fees

This policy is extended to include reasonable and necessary expenses incurred by the insured, or by the insured's representatives, including the cost of using the Insured's employees (but excluding salaries of such employees), for preparing and certifying details of a claim resulting from a loss which is payable under this policy. However, the Insurers shall not be liable under this clause for expenses incurred by the Insured in utilizing the services of a public adjuster, attorney, loss appraisers, insurance Agents or brokers, or any of their subsidiary, related or associated entities. This Policy also excludes any fees or costs for consultation on coverage or negotiation of claims and the costs or expenses of overhead or operating expenses of any Insured.

This additional coverage is subject to the deductible that applies to the loss.

P.   Property In Transit

1.   This policy covers property in transit, attaches and covers shipments within and between the territorial limits of this policy, including the coastal waters thereof, by any means of conveyance, from the time the property is moved for purpose of loading and continuously hereafter while awaiting and during loading and unloading and in temporary storage, including temporary storage on any conveyance intended for use for any outbound or used for inbound shipment, including during deviation and delay, until safely delivered to place of final destination.

2.   This insurance is extended to cover loss or damage to property:

a)   Sold and shipped by the Insured under terms of F.O.B. point of origin or other terms usually regarded as terminating the shipper's point of delivery.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                         **Page 1861 of 2921**

    b) Arising out of any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for shipment or to accept goods for delivery.

    c) Occasioned by the acceptance by the Insured, by its agents, or by its customers of fraudulent bills of lading, shipping and delivery orders, or similar documents.

3. The Insured may waive right(s) of recovery against private and contract carrier and accept bills of lading or receipts from carriers, bailees, warehousemen, or processors limiting their liability, but this transit insurance shall not inure to the benefit of any carrier, bailee, warehouseman, or processor.

4. With respect to shipments made under F.O.B. or similar terms, Insurers agrees to waive its rights of subrogation against consignees at the option of the Insured.

5. The Insured is not to be prejudiced by any agreements exempting lightermen from liability.

6. It is agreed that the following additional exclusions apply to coverage as provided under this additional coverage;

    a) Samples in the custody of salespersons or selling agents.

    b) Property insured under import or export ocean cargo policies.

    c) Waterborne shipments via the Panama Canal or waterborne to and from the United States territories or possessions, Alaska, Puerto Rico, and Hawaii.

    d) Shipments made by air unless via regularly scheduled airlines.

    e) Property shipped by mail.

    f) Property of others, including the Insured's legal liability therefor, hauled on vehicles owned, leased, or operated by the Insured when acting as a common or contract carrier as defined by the Interstate Commerce Commission Regulations or other state regulatory agencies.

    g) Any transporting vehicle or conveyance.

7. This additional coverage attaches from the time the property leaves the original point of shipment for the commencement of transit and covers thereafter continuously in the due course of transit within the Coverage Territory until delivered at destination.

Coverage on export shipments not insured under ocean cargo policies does not extend beyond the time when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies does not attach until after discharge from overseas vessels or aircraft.

This additional coverage does not cover or apply to delay, loss of market, or any Time Element coverage.

Permission is granted to the Insured without prejudice to this insurance to accept the ordinary bills of lading used by carriers, including released and/or undervalued bills of lading and/or shipping or messenger receipts. The Insured may waive subrogation against

railroads under sidetrack agreements, but the Insured shall not enter into any special agreement with carriers releasing them from their common law or statutory liability.

Q.   Valuable Papers

Valuable papers and records shall mean written, printed or otherwise inscribed documents and records, including but not limited to books, maps, films, drawings, abstracts, deeds, mortgages, micro inscribed documents, manuscripts and media, but not including **Electronic Data and Media** or money and/or securities.

The term "securities" shall mean all negotiable and non-negotiable instruments or contracts representing either money or other property, and includes revenue and other stamps in current use, tokens and tickets, but does not include money.

R.   Tenant Relocation and Move Back Expense

This policy is extended to cover relocation expenses incurred by the Insured to relocate:

1.   Residents; tenants; patients or

2.   Lawful occupants;

To other quarters in the shortest possible time when rented space or living quarter(s) at an insured **Location** are made uninhabitable as a result of direct physical loss or damage insured by this policy.

Coverage is provided for the reasonable and necessary expense of:

1.   Packing, sorting and transportation cost for personal property;

2.   Reestablishing new utility services, less refunds from discontinued services, at the damaged **Location**;

3.   Searching for new quarters;

4.   Disconnecting and reconnecting fixtures and equipment; and

5.   Storage costs while awaiting possession of other quarters or restoration of existing quarters.

6.   Expenses to move back.

No coverage is provided for:

a)   Loss caused by termination of a lease or other agreement;

b)   Security deposits or other payments made to the landlord or lessors of the new quarters;

c)   Down payments, legal fees and closing costs for the purchase of new quarters.

In the event of an imminent or direct physical loss to a **Location** that is considered to be a senior living community, we will pay for the reasonable and necessary tenant relocation expense you incur to remove your patients or residents from the premises, transport your patients or residents to the nearest available facilities, and return your patients or residents from those facilities to that

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                          **Page 1863 of 2921**

premises following the repair or replacement of that premises. We will pay no more than the applicable sub-limit of insurance. The term "imminent" is defined as "about to happen" and must be subject to an evacuation order issued by a local, state, or federal authority.

S.   Upgrade to Green

The coverages and valuation provision provided by this limit only apply if direct physical loss or damage to covered real and/or personal property is caused by any of the perils covered by the policy and replacement cost valuation applies. This coverage does not apply to: (1) personal property of others in the Insured's care, custody, and control, (2) leased personal property, and/or (1) finished or unfinished stock.

In no event, does this limit increase or change the per **Occurrence** limit of liability shown in the declarations or the annual aggregate for specified perils.

1.   Notwithstanding the Valuation Provision of this policy or limits of liability applicable to specific locations or perils, if replacement cost valuation applies to real and/or personal property, then the Company's liability for loss applicable to this coverage section shall be the cost to repair or replace the covered damaged property, subject to the applicable limit of liability, plus the least of the following amounts:

   a)   The reasonable and necessary amount to upgrade to green the covered damaged property as described in Coverage Section A - Non-LEED® Certified Coverage or as described in Coverage Section B - LEED® Certified Coverage, whichever is applicable; or

   b)   An additional 25% of the applicable limit of liability for the building and/or business personal property shown in the Statement of Values or similar schedule to upgrade to green; or

   c)   The limit shown in Declarations Page for upgrade to green.

      At the Insured's sole discretion, the Insured may elect not to upgrade to green any or all property for which upgrade to green coverage is provided under this coverage. In such case, the Company will adjust the claim in accordance with the standard provisions of the policy, as modified by all other applicable endorsements.

      Subject to the least of a), b), or c) above, if business interruption coverage is provided as part of this policy, if necessary, the Period of Restoration shall be increased to allow for additional time to upgrade to green the damaged property plus up to an additional two week period to meet the requirements set forth in 4.b) below.

2.   COVERAGE SECTION A: NON-LEED CERTIFIED COVERAGE

   In the event of direct physical loss or damage by any of the perils covered by the policy to a building that is not LEED certified at the time of the loss, or to the personal property within such a building, the Company will pay to repair or replace damaged or destroyed:

   a)   "Total Loss" means: The covered building is completely destroyed regardless of whether any damage is done to the foundation or slab, or The covered building is in such condition after the loss that the standard method of rebuilding or repairing the covered building is to raze the structure except for the foundation or slab or including all or part of the foundation or slab and rebuild the entire structure, whether such structure is actually rebuilt or not.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1864 of 2921**

"Water Efficient" means dry fixtures such as composting toilet systems and non-water using urinals, flush toilets using no more than 1.6 gallons of water per flush, and shower heads a1nd faucets with a flow rate of no more than 2.2 gallons per minute.

All other terms and conditions of the policy remain the same.

b) Loss Settlement for Personal Property

(1) "Appliances" or "Office Equipment" with products of like kind and quality that have been identified as "ENERGY STAR®" or equivalent products of such energy efficiency. If there are no such products available at the time of the loss, this upgrade to green coverage does not apply.

(2) "Systems Furniture" or "Seating", with products of like kind and quality that are certified as GREENGUARD Indoor Air Quality Certified® or products with similar emissions characteristics. If there are no such products available at the time of the loss, this upgrade to green coverage does not apply.

c) Loss Settlement for Your Building

(1) Interior Finish Materials Upgrade

(a) Lower Emissions Products Upgrade Coverage

"Defined Building Materials" with products of like kind and quality that have "Lower Emissions". If there are no such products available at the time of the loss, this upgrade to green coverage does not apply.

(b) Environmentally Preferable Products Upgrade Coverage

Interior wood, carpeting and flooring with products of like kind and quality that have "Lower Emissions", are "Sustainably Produced", are "Rapidly Renewable" or include "Recycled Content". If there are no such products available at the time of the loss, this upgrade to green coverage does not apply.

(2) Interior Plumbing Systems Upgrade Coverage

Interior plumbing fixtures including, but not limited to, toilets, shower heads, and lavatory faucets with products of like kind and quality that are more "Water Efficient". If there are no such products available at the time of the loss, this upgrade to green coverage does not apply. For damaged or destroyed faucets, the Company will also pay to install occupant sensors to reduce the potable water demand.

(3) Lighting Systems Upgrade Coverage

Lighting systems, with products of like kind and quality that have been identified as "ENERGY STAR®" or equivalent products of such energy efficiency. If there are no such products available at the time of the loss, this upgrade to green coverage does not apply. The Company will also pay to repair or replace damaged light bulbs with light bulbs which have low mercury content.

(4) Efficient Heating and Cooling Equipment Upgrade Coverage

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**                                                          **Page 1865 of 2921**

"Heating and cooling equipment" with products of like kind and quality that have been identified as "ENERGY STAR" or equivalent products of such energy efficiency. If there are no such products available at the time of the loss, this upgrade to green coverage does not apply.

(5) Building Reconstruction Following Total Loss

(a) Solely with respect to a "Total Loss" to a building, the Company will pay to replace the building on its existing foundation using the most cost effective techniques, products and materials that should satisfy the prerequisites and earn the minimum number of points required to qualify for LEED Silver certification using the LEED New Construction (LEED NC®) Rating System.

(b) Certification Expenses

(i) The Company will pay the reasonable and necessary registration and certification fees charged by the United States Green Building Council (USGBC) that the Insured incurs should the Insured decide to seek LEED Silver certification. However, the Company will not pay to modify the reconstructed structure if it is not certified.

(ii) The Sublimit of Insurance for this coverage is $25,000.

3. COVERAGE SECTION B: LEED CERTIFIED COVERAGE

In addition to all Coverages provided in Coverage Section A (with the exception of 2.d)(5) Building Reconstruction Following a Total Loss) and in the event of direct physical loss or damage by any of the perils covered by the policy to a building that is LEED certified at the time of the loss, or to the personal property within such building, the Company will pay to repair or replace damaged or destroyed:

a) Loss Settlement for Trees, Shrubs, and Vegetative Roofs

(1) Trees and shrubs planted specifically to secure the Heat Island Effect: Non- Roof point as described in LEED NC. For the purposes of this coverage only, notwithstanding any provision of the policy to the contrary, trees and shrubs are Covered Property. The sublimit of insurance for this coverage is $3,000 per tree or $3,000 per shrub up to a maximum of $25,000.

(2) Vegetative roofs on LEED certified buildings. Notwithstanding any other provision of the policy to the contrary, vegetative roofs are Covered Property.

b) Loss Settlement for Your Building

(1) Recertification Expenses

(a) In the event of direct physical loss or damage by any of the perils covered by the policy that necessitates recertification of the damaged building, the Company will pay the reasonable and necessary registration and certification fees charged by the USGBC that the Insured incurs as a result of the recertification process.

(b) The Sublimit of Insurance for this coverage is $25,000.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Opposition to Defendants' Motions for Summary Judgment**                    **Page 1866 of 2921**

      (2) Building Reconstruction Following Total Loss

        (a) Solely with respect to a "Total Loss" to a building that is LEED certified at the time of the loss, the Company will pay to replace the building on its existing foundation using the most cost effective techniques, products and materials that would satisfy the prerequisites and should earn the minimum number of points required to qualify for LEED certification at one level above the certification in effect at the time of the loss using the LEED NC Rating System.

        (b) Certification Expenses

          (i) The Company will pay the reasonable and necessary registration and certification fees charged by the USGBC that the Insured incurs should the Insured decide to seek LEED certification. However, the Company will not pay to modify the reconstructed structure if it is not certified.

          (ii) The Sublimit of Insurance for this coverage is $25,000.

4. COVERAGES INCLUDED WITHIN COVERAGE SECTIONS A OR B AND APPLICABLE TO LEED® AND NON-LEED® CERTIFIED BUILDINGS

In the event of direct physical loss or damage by any of the perils covered by the policy to a LEED or Non-LEED certified building:

a) Recycling Expenses

    (1) The Company will pay the Insured's expenses to clean-up, sort, segregate, and transport debris from the Insured's damaged building to recycling facilities, if such debris can be recycled.

    (2) The Sublimit of Insurance for this coverage is $25,000 and is in addition to the debris removal expense sublimit provided by the policy, if any.

    (3) Any income or remuneration derived from this recycling shall be used to reduce the loss

b) Air Testing and Outdoor Air Ventilation of the Reconstructed Space

    (1) In accordance with the requirements for the Construction IAQ Management Plan: Before Occupancy Credit as described in the LEED NC rating system (hereinafter, "Construction IAQ"), the Company will pay to conduct air testing and a building flush-out (if required because of a failure to meet air quality standards set forth in the Construction IAQ) and follow-up air testing for a total period of time not to exceed two weeks.

    (2) After the two week period of increased outdoor air ventilation of the reconstructed space, the Company will pay to replace the filtration media with new media.

    (3) The Sublimit of Insurance for this coverage is $25,000.

c) Professional Services

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1867 of 2921**

The Company will pay reasonable and necessary expenses to hire a LEED Accredited architect or engineer to participate in the design and/or construction administration of the damaged portion of the building or the entire building, whichever is applicable.

The Sublimit for this coverage is $50,000.

d)  Building Commissioning Expenses

In the event of direct physical loss or damage to mechanical, electrical, or electronic building systems, by any of the perils covered by the policy which necessitates the commissioning or re-commissioning of those systems, the Company will pay reasonable and necessary expenses of a Professional Engineer to commission or re-commission those damaged systems in accordance with LEED protocols.

The Sublimit of Insurance for this coverage is $25,000.

5.  ADDITIONAL DEFINITIONS

a)  "Appliances" means products including, but not limited to, dishwashers, refrigerators, freezers, ovens, microwave ovens, room air conditioners, room air cleaners and water heaters.

b)  "Defined Building Materials" means: (1) all carpet and floor coverings, including, adhesives to affix them to the floor, (2) all interior paints, architectural coatings, primers, undercoatings, adhesives, sealants, and (3) permanently installed composite wood fixtures, including, counters, cabinets, and partitions.

c)  "ENERGY STAR" means any product that has been identified by the United States Government Department of Energy, Environmental Protection Agency as ENERGY STAR qualified at the time of the loss.

d)  "Heating and Cooling Equipment" means products including, but not limited to, heat pumps, boilers, central air conditioning, ceiling fans, dehumidifiers, exhaust fans, furnaces, thermostats, and ventilating fans.

e)  "Lower emissions" means:

(1)  With respect to adhesive and sealant products, such as, general construction adhesives, flooring adhesives, fire-stopping sealants, caulking, duct sealants, plumbing adhesives, and cove base adhesives, products that meet the requirements of South Coast Air Quality Management District (SCAQMD) Rule#1168; with respect to aerosol adhesives, products that meet Green Seal Standard GS-36 requirements;

(2)  With respect to architectural paints, coatings, and primers, products that do not exceed the volatile organic compound (VOC) content limits established in Green Seal Standard GS-11, with respect to anti-corrosive and anti-rust paints, products that do not exceed the VOC content limits established in Green Seal Standard GS-03; and with respect to clear wood finishes, floor coatings, stains, and shellacs, products that do not exceed the VOC content limits established by SCAQMD Rule # 1113;

(3)  With respect to carpet and carpet cushion, products that meet the requirements of the Carpet and Rug Institute's Green Label Plus Program; and

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1868 of 2921**

(4) With respect to composite wood and agrifiber products such as particleboard, medium density fiberboard (MDF), plywood, wheatboard, strawboard, panel substrates and door cores as well as laminating adhesives used to fabricate on-site and shop-applied composite wood and agrifiber assemblies, products that contain no added urea• formaldehyde resins.

f) "Office Equipment" means electronic products including, but not limited to, desktop computers, laptop computers, monitors, printers, fax machines, scanners, copiers, and telephones.

g) "Recycled Content" means those products that contain at least 20% post- consumer recycled content.

h) "Rapidly Renewable" means products that are made from plant resources that are harvested within a ten-year cycle or shorter, including, but not limited to, bamboo, eucalyptus, wheat straw, sunflower hulls, cork oak, wheatboard, linoleum, and sorghum.

i) "Seating" means task and guest chairs used with "System Furniture".

j) "Sustainably Produced" means those products certified by the Forest Stewardship Council ("FSC").

k) "System Furniture" means either a panel-based workstation comprised of modular interconnecting panels, hang-on components and drawer/filing components of a freestanding grouping of furniture items and their components that have been designed to work in concert.

VIII. PERILS INSURED AGAINST

This Policy insures against all risks of direct physical loss or damage to Insured Property, except as excluded.

IX. PROPERTY EXCLUDED

A. Currency, money, notes, securities, stamps, furs, jewelry, precious metals, precious stones, and semi-precious stones. This exclusion does not apply to precious metals and precious stones used by the Insured for industrial purposes

B. Land and land values and but not excluding land improvements and foundations.

C. Water, except water found and used in fire protective systems and water contained in building amenities.

D. Growing crops and standing timber;

E. Aircraft, watercraft and motor vehicles licensed for highway use, but this exclusion shall not apply to contractor's equipment.

F. Waterborne shipments via the Panama Canal, and to and from Puerto Rico, Virgin Islands, Hawaii and Alaska.

G. Export shipments after loading on board an overseas vessel or watercraft or after ocean marine insurance attaches, whichever occurs first, and import shipments prior to discharge from the overseas vessel or watercraft or until the ocean marine insurance terminates, whichever occurs last.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1869 of 2921**

H.   Animals.

I.   Transmission and distribution lines of every type and description; except when located on the Insured premises or within one mile thereof.

J.   Offshore oil rigs, platforms and property contained therein or thereon.

X.   PERILS EXCLUDED

This policy does not insure:

A.   Against loss or damage caused directly or indirectly by moth, vermin, rodents, termites or other insects including larvae or pupae thereof unless loss or damage from a peril insured herein ensues and then this policy shall cover for such ensuing loss or damage.

B.   Any fraudulent or dishonest act or acts committed by the Insured or any of the Insured's employees meaning only dishonest or fraudulent acts committed by the Insured or the Insured's employees with the manifest intent to:

   1.   Cause the Insured to sustain such loss; and

   2.   Obtain financial benefit for the Insured, Insured's employee, or for any other person or organization intended by the Insured or the employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment.

C.   Against the cost of making good defective design or specifications, faulty material, or faulty workmanship; however, this exclusion shall not apply to loss or damage resulting from such defective design or specifications, faulty material, or faulty workmanships; or the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the faulty material is located.

D.   Against electrical injury or disturbance to electrical appliances, devices, or wiring caused by electrical currents artificially generated unless loss or damage from a peril insured herein ensues and then this policy shall cover for such ensuing loss or damage.

E.   Against mechanical breakdown unless physical loss or damage from a peril insured herein ensues and then this policy shall cover for such ensuing loss or damage. This exclusion shall not apply to loss or damage to **Electronic Data Processing or Control Equipment** or **Electronic Data and Media**.

F.   Against nuclear reaction, or nuclear radiation, or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate, or remote; or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this policy, except;

   1.   if fire ensues, liability is specifically assumed for direct loss by such ensuing fire but not including any loss due to nuclear reaction, nuclear radiation, or radioactive contamination;

   2.   Insurers shall be liable for loss or damage caused by sudden and radioactive contamination including resultant radiation damage for each **Occurrence** from material used or stored or from processes conducted on an insured premises and provided at the time of loss there is

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1870 of 2921**

neither nuclear reactor capable of sustaining a nuclear fission in a self-supporting chain reaction nor any new or used nuclear fuel on the insured premises.

G.  Against hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending, or expected attack;

   1.  By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces, or

   2.  By military, naval, or air forces, or

   3.  By an agent of any such government, power, authority, or forces;

   Against any weapon employing atomic fission;

   Against rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against each **Occurrence**;

   Against seizure of destruction by order of public authority, except destruction by order of authority to prevent the spread of, or to otherwise contain, control or minimize loss, damage or destruction which occurs due to a peril insured against under this policy.

H.  Ordinary wear and tear or gradual deterioration, inherent vice, mold, mildew, dry rot, fungi unless other loss or damage from a peril insured against herein ensues and then this policy shall cover for such ensuing loss or damage.

I.  Pollution caused directly or indirectly by the release, discharge, dispersal, seepage, migration, or escape of **Pollutants or Contaminants** unless the release, discharge, dispersal, seepage, migration, or escape is caused by a peril not otherwise excluded herein. However, if a peril not otherwise excluded herein ensues due to the release, discharge, dispersal, seepage, migration, or escape of **Pollutants or Contaminants**, such ensuing loss or damage shall be covered.

J.  Against normal settling or shrinkage of walls, floors, or ceilings unless damage from a peril insured herein ensues and then this policy shall cover for such ensuring loss or damage.

K.  Against asbestos material removal from any good, product or structure unless the asbestos itself incurs direct physical loss or damage caused by peril not otherwise excluded;

   Against any governmental direction or request declaring that asbestos materials present in or part of or utilized on any undamaged portion of the insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified.

L.  Against mysterious disappearance and shortage disclosed solely upon taking Inventory or audit.

M.  Explosion, rupture or bursting of steam boiler, steam pipes, steam turbines or steam engines owned or operated by the Insured unless loss or damage not otherwise excluded ensues and then this policy shall insure for such ensuing loss or damage; it is agreed that direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox (or combustion chamber) of any fired vessel or within the flue or passages which conduct the gases of combustion therefore shall be covered hereunder.

N.  Error or omission in **Electronic Data and Media** machine programming or instructions, including, loss attributable to program design constraints, networking compatibility and original business applications.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1871 of 2921**

    O.   Delay, Loss of Market, Loss of Use

XI.   <u>VALUATION</u> – In case of loss the basis of adjustment unless otherwise endorsed herein shall be as follows:

    A.   <u>Stock</u>

        1.   Raw Stock (materials and supplies in the state in which the Insured acquires them for conversion by the Insured into finished stock, including supplies consumed in such conversion or in the service rendered by the Insured) shall be valued at replacement cost including all unrecoverable prepaid sales, value added or other similar taxes.

        2.   Stock in process (raw stock which has undergone any aging, seasoning, or other processing by the Insured but which has not become finished stock) shall be valued at the Insured's selling price at the time and place of loss, less any manufacturing expense not incurred by the Insured and less any discounts or rebates to which the sales price would have been subject.

        3.   Finished stock (stock which in the ordinary course of the Insured's business is ready for packing, shipment or sale) and merchandise shall be valued at the Insured's selling price at the time and place of loss, less all discounts or rebates to which such sales price would have been subject. Finished goods sold but not delivered shall be valued at the price for which sold.

    B.   <u>Real and Personal Property</u>

    Real and Personal Property, structures, furniture and fixtures, equipment, improvements and betterments, shall be valued at the cost for replacement of the damaged or destroyed property in a new condition with materials of like size, kind and quality, all subject to the following conditions:

    If property damaged or destroyed is useless to the Insured or is not repaired, built or replaced on the same or another site (The Insured may elect to rebuild on another site, provided that, such rebuilding does not increase the amount of loss or damage that would otherwise be payable to rebuild at the same site) within two years after the loss or damage, Insurers shall not be liable for more than the actual cash value (ascertained with proper deduction) of the property destroyed.

    The total liability of Insurers under this policy for loss to property included shall not exceed the smallest of the following:

        1.   The cost of repair; or

        2.   The cost to rebuild or replace with new materials of like size, kind and quality, or

        3.   The actual expenditure incurred in rebuilding, replacing on the same or another site; **Electronic Data Processing or Control Equipment** or any part thereof at the cost to repair or replace new with like kind and quality except, that with respect to items for which replacement with identical property is impossible, the replacement cost shall be the cost of items similar to the destroyed property and intended to perform the same function but which may include technological advances provided that this can be accomplished without increasing the liability of the insurers.

    Data Processing Media shall be valued at the actual Reproduction cost of the property; if not replaced or reproduced at blank value of media or paper; Data Processing Media shall mean all forms of converted data and/or program and/or instruction vehicles employed in the Insured's Data Processing operations; Production machinery and equipment of any part thereof at the cost

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**    **Page 1872 of 2921**

to repair or replace new with like kind and quality on the same premises except, that with respect to items for which replacement with identical property is impossible, the replacement cost shall be the cost of items similar to the destroyed property and intended to perform the same function but which may include technological advances provided that this can be accomplished without increasing the liability of the insurers.

Valuable papers and records: The cost to reproduce the property with other of like kind and quality including the cost of gathering and/or assembling information; if not so replaced at actual cash value:

Exhibitions and displays, at replacement cost new;

Patterns, molds, jigs, and dies at replacement cost if actually replaced; otherwise, at actual cash value on the date of loss;

**Fine Arts** at appraised value at time of loss; if not appraised, then at fair market value at time of loss.

Other property not otherwise provided for, at replacement cost new; and if not replaced, then at actual cash value.

The insured may elect not to repair or replace the property. Loss valuation may be elected on the lesser of repair or replacement cost basis if the proceeds of the loss valuation are expended on other capital expenditures related to the Insured's operations within two (2) years from the date of loss. As a condition of collecting under this item, such expenditures must be unplanned as of the date of loss.

C.  Brand or Trademarks

In case of damage by a peril insured against to property bearing a brand or trademark or which in any way carries or implies the guarantee of the responsibility of the manufacturer or Insured, the salvage value of such damaged property shall be determined after removal at Insurers expense in the customary manner of all such brands or trademarks or other identifying characteristics. The Insured shall have full right to the possession of all goods involved in any loss under this policy and shall retain control of all damaged goods. The Insured, exercising a reasonable discretion, shall be the sole judge as to whether the goods involved in any loss under this policy are fit for consumption. No goods so deemed by the Insured to be unfit for consumption shall be sold or otherwise disposed of except by the Insured or with the Insured's consent, but the Insured shall allow Insurers any salvage obtained by the Insured on any sale of other disposition of such goods.

D.  Machinery

In case of physical loss or damage by a peril insured against to any part of a machine or unit consisting of two or more parts when complete for use, the liability of Insurers shall be limited to the value of the part or parts lost or damaged or, at the Insured's option, to the cost and expense of the replacing or duplication of the lost or damaged part or parts or after repairing the machine or unit.

E.  Pair and Set

Except as provided under the Machinery Paragraph, in the event of physical loss or damage by a peril insured against to any article or articles which are a part of a pair or set, the measure of loss

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment  Page 1873 of 2921

or damage to such article or articles shall be a reasonable and fair proportion of the total value of the pair or set, giving consideration to the importance of said article or articles, but in no event shall such loss or damage be construed to mean total loss of the pair or set.

XII.　**DEFINITIONS**

    **A.**　**"Earthquake", "Flood"** and **"Named Windstorm"**

        1.　**"Flood"** is defined as a rising and overflowing of a body of water onto normally dry  land.

        It is understood and agreed that, whenever used in this policy, the term "loss caused by" or "loss arising from" **Flood** shall not include ensuing loss or damage, if any resulting from other loss or damage insured. Such ensuing loss shall be construed to have been of the same **Occurrence**, but of a different proximate cause.

        **"Earthquake"** is defined as a shaking or trembling of the earth that is tectonic in origin.

        It is understood and agreed that, wherever used in this policy, the term "loss caused by" or "loss arising from" **Earthquake** shall be restricted exclusively to the actual, specific cracking, rupturing, shifting or toppling of property and shall not include ensuing loss or damage, if any, resulting from other loss or damage insured. Such ensuing loss shall be construed to have been of the same **Occurrence**, but of a different proximate cause.

        A **"Named Windstorm"** is defined as a storm that has been declared by the National Weather Service as a hurricane, typhoon, tropical cyclone or tropical storm. It is understood that coverage for **Named Windstorm** shall apply to all loss or damage, not otherwise excluded to property insured, caused by, or resulting from a **Named Windstorm**, ensuing **Flood**, storm surge and wind driven rain damage, whether such losses include damage to real or personal property, Time element, or both. Any such ensuing loss that is subject to its own sublimit of liability is still subject to that sublimit of liability, except ensuing **Flood** shall be part of the limits applicable to **Named Windstorm**.

        2.　Each loss by **Earthquake** or **Flood** shall constitute a single loss  hereunder

        a)　If more than one **Earthquake** shock occurs within any period of 168 hours during the term of this policy, the beginning of which 168 hour period may be determined by the Insured; or

        b)　If a **Flood** occurs within a period of the continued rising or overflowing of any river(s) or stream(s) and the subsidence of same within the banks of such river(s) or stream(s); or

        c)　If any **Flood** results from any tidal wave or series of tidal waves caused by any one disturbance.

        Such **Earthquake** shocks or **Flood** shall be deemed to be a single **Occurrence** within the meaning of this policy.

        3.　Should any time period referred to in 2. above extend beyond the expiration date of this policy and commence prior to the expiration or cancellation, Insurers shall pay all such **Earthquake** or **Flood** losses occurring during such period as if such period fell entirely within the term of this policy but in no event shall Insurers be liable for any loss or damage occurring more than 168 hours after the expiration date of this  policy.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**　　　　**Page 1874 of 2921**

4. Insurers shall not be liable, however, for any loss caused by any **Earthquake** or **Flood** occurring before the effective date and time or commencing after the expiration date and time of this policy.

B. **"Fine Arts"** means works of rarity, works of historical value, works of artistic merit, photographs, original records, sculptures, valuable rugs, rare or art glass windows, bric-a- brac, or antique jewelry. **Fine Arts** does not mean and does not include any item which would qualify as Valuable Papers and Records.

C. **"Electronic Data and Media"** means data, messages, information, coding, programs, instructions or any other software stored on electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment and distributed by means of a computer network or is produced in a format for use with a computer.

D. **"Electronic Data Processing or Control Equipment"** means electronic data processing systems including keyboards, display screens, terminals, printers and related peripheral equipment.

E. "**Landscape**" means lawns (including fairways, greens and tees), trees, shrubs, and plants.

F. **"Location"** means the location as specified in the Statement of Values, but if not so specified, location means any building, yard, dock, wharf, pier or bulkhead or any group of the foregoing bounded on all sides by public streets, clear land space or open waterways, each not less than fifty feet wide. Any bridge or tunnel crossing such street, space or waterway shall render such separation inoperative for the purpose of this definition.

G. **"Miscellaneous Unnamed Locations"** means any **Location** which is not specifically on file, identified, or scheduled.

H. **"Occurrence"** means the sum of all losses (individual or otherwise) covered under this Policy directly occasioned by any one disaster, accident or loss arising out of one event ("Loss or Losses") or series of disasters, accidents or losses arising out of one event ("Series of Losses") that occur(s) during the Policy Period anywhere within the Policy territory. Except as specifically set forth below, the duration and extent of any one **Occurrence** shall be limited to all losses covered under this Policy occurring during any period of 168 consecutive hours arising out of and directly occasioned by the same event.

The Insured may choose the date and time when such period of consecutive hours commences, provided that it is not earlier than the date and time of the **Occurrence** of the first recorded individual Loss sustained by the Insured arising out of that disaster, accident or loss.

Nothing in this definition alters or increases any Policy limit or Policy sublimit.

I. **"Pollutants or Contaminants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water, Pollution Control Act , Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U. S. Environmental Protection Agency. Waste includes materials to be recycled, reconditioned or reclaimed.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Opposition to Defendants' Motions for Summary Judgment**                                **Page 1875 of 2921**

XIII. CONDITIONS

A. Contributing Insurance

Contributing insurance is insurance written upon the same plan, terms, conditions and provisions as those contained in the policy. The insurance shall contribute in accordance with the conditions of this policy only with other contributing insurance as defined.

B. Excess Insurance

Excess insurance is insurance over the limit of liability set forth in this policy. The existence of such excess insurance shall not prejudice the coverage provided under this policy nor will it reduce any liability hereunder.

C. Other Insurance

Except for insurance described by the contributing insurance clause or the excess insurance clause, this policy shall not cover to the extent of any other insurance whether prior or subsequent hereto in date, and whether directly or indirectly covering the same property against the same perils. Insurers shall be liable for loss or damage only to the extent of that amount in excess of the amount recoverable from such other insurance.

D. Subrogation

1. Any release from liability entered into by the Insured in writing prior to loss hereunder shall not affect this policy or the right of the Insured to recover hereunder. Insurers waive their right of subrogation against the Insured, or subsidiaries or affiliated corporations or companies, or any other corporations or companies associated with the Insured through ownership or management and parties contractually released by the Insured.

2. Except as described in Paragraph 1. above, in the event of any payment under this policy, Insurers shall be surrogated to the extent of such payment to all the Insured's rights of recovery therefore. The Insured shall execute all papers required and shall do anything that may be reasonably necessary at the expense of Insurers to secure such right. Insurers will act in concert with all other interests concerned, i.e., the Insured and any other Company(ies) participating in the payment of any loss as primary or excess Insurers, in the exercise of such rights of recovery. If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the cost of recovery shall be divided between the interests concerned in the proportion of their respective interests. If there should be no recovery, the expense of proceedings shall be borne proportionally by the interests instituting the proceedings.

E. Salvage and Recoveries

All salvages, recoveries and payments, excluding proceeds from subrogation recovered or received subsequent to a loss settlement under this policy, shall be applied as if recovered or received prior to the said settlement and all necessary adjustments shall be made to the parties involved.

F. Errors or Omissions

Any unintentional error or omission made by the Insured shall not void or impair the insurance hereunder provided the Insured reports such error or omission as soon as reasonably possible

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment                    Page 1876 of 2921

after discovery by the Insured's home office insurance department. It is further understood and agreed that any error in description of locations, or values of locations insured or to be insured by this policy shall not invalidate or reduce the policy limit of liability, or otherwise prejudice any recovery under this policy.

G.  Notice of Loss

As soon as practicable after loss or damage occurring under this policy is known to the Insured's Home Office Insurance Department, the Insured shall report such loss or damage to Insurers.

**H.**  Knowledge of **Occurrence**

It is agreed that knowledge of an **Occurrence** by an agent, servant or employee of the Insured shall not in itself constitute knowledge by the Insured. Knowledge is understood to occur only when the Director of the Risk Management Department (or the individual acting in a similar capacity) of the Insured.

I.  Proof of Loss

It shall be necessary for the Insured to render a signed and sworn proof of loss to Insurers or their appointed representative stating the place, time, cause of the loss, damage, or expense; the interest of the Insured and of all others; the value of the property involved in the loss; and the amount of loss, damage or expense.

J.  Appraisal

If the Insured and Insurers fail to agree on the amount of the loss, each, upon written demand of either of the Insured or of Insurers made within sixty (60) days after receipt of proof of loss by Insurers, shall select a competent and disinterested appraiser. The appraisers shall then select a competent and disinterested umpire. If they should fail for fifteen (15) days to agree upon such umpire, then upon the request of the Insured or of Insurers, such umpire shall be selected by a judge of a court of record in the county and state in which such appraiser is pending. Then, at a reasonable time and place, the appraisers shall appraise the loss, stating separately the value at the time of loss and the amount of loss. If the appraisers fail to agree, they shall submit their differences to the umpire. An award in writing by any two shall determine the amount of loss. The Insured and Insurers shall each pay his or its chosen appraiser and shall bear equally the other expenses of the appraisal and of the umpire.

K.  Assistance and Cooperation of the Insured

The Insured shall cooperate with Insurers, and upon Insurers request and expense shall attend hearings and trials and shall assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses and in conducting suits.

L.  Payment of Loss

All adjusted claims shall be due and payable no later than thirty days after presentation and acceptance of proofs of loss by Insurers or their appointed representative.

M.  Reinstatement

With the exception of loss caused by perils which are subject to annual aggregate limits as noted in Paragraph II, no loss hereunder shall reduce the amount of this policy.

N.  Breach of Warranty or Condition

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Opposition to Defendants' Motions for Summary Judgment                    Page 1877 of 2921**

If a breach of any warranty or condition contained in this policy or any endorsement attached to or made a part of this policy shall occur, which breach by the terms of such warranty or condition, shall operate to suspend or avoid this insurance, it is agreed that such suspension or avoidance due to such breach shall only apply as to the building, fire division, contents, therein, or other separate **Location** to which such warranty or condition has reference and in respect of which such breach occurs.

O.  Suit against Insurers

No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this  policy.

P.  Certificates of Insurance

All parties to whom a certificate of insurance or evidence of Insurance has been issued are automatically added and endorsed to this policy upon issuance of said documents, either as Additional Named Insured, loss payees and/or mortgagees, in accordance with the terms and conditions of said documents.

Alliant Insurance Services, Inc. is hereby authorized to issue certificates of insurance including any Mortgagee, Loss Payee and Additional Insured clauses.

Q.  Cancellation

1.  This policy may be canceled at any time at the request of the Insured, or it may be canceled or non-renewed by Insurers by mailing to the Insured at the Notification Address shown in this policy and to the additional named insured/loss payees indicated on the certificates of insurance issued during the term of this policy, written notice stating when, not less than 90 days thereafter, such cancellation or non-renewal shall be effective. The earned premium shall be computed on a pro-rata basis in the event of cancellation by Insurers and on a short-rate basis if canceled by the insured.

2.  The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Insured or by Insurers shall be equivalent to mailing.

3.  Cancellation shall not affect coverage on any shipment in transit on the  date  of cancellation. Coverage will continue in full force until such property is delivered and accepted.

4.  In the event of non-payment of premium this policy may be canceled by Insurers by mailing to the Insured at the Notification Address shown in this policy stating when not less than 10 days thereafter such cancellation shall be effective. Reinstatement of coverage shall be effective immediately upon receipt of premium by Insurers within this 10-day period.

R.  Cancellation –  Mortgage Holder

The Company will pay loss or damage, if any, to any mortgage holder (or trustee) as on file, as interest may appear, under all present or future mortgages which are: 1) in effect prior to such loss or damage; 2) upon any property to which this policy applies; and 3) which such mortgage holder (or trustee) has an interest as mortgagee (or trustee).  Such payment will be made in order of precedence of said mortgages.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                     **Page 1878 of 2921**

This insurance as to the interest of the mortgage holder (or trustee), shall not be invalidated by: 1) any failure (except failure by such mortgage holder (or trustee)) to comply with the terms and conditions of this policy; or 2) commencement of any foreclosure or other proceedings or notice of sale relating to the property, provided the mortgage holder (or trustee):

Notifies the Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of the mortgage holder or (or trustee);
2) pays any premium due at our request that the insured has failed to do so; and
3) submits a signed, sworn proof of loss within 60 days after receiving notice from the Company of the Insured's failure to do so.

If the Company makes loss payments to any mortgage holder (or trustee) when the Insured fails to comply with the terms of this insurance, the Insured will have to pay the Company to the extent the Company pays the mortgage holder (or trustee) will still have the right to receive the balance of the mortgage debt from the Insured. The Company will also have the right to take over the mortgage after making loss payment to the mortgage holder. If the Company does so, the Insured will pay the remaining mortgage debt to the Company.

If you fail to pay your premium, we may request it from your mortgage holder.

The mortgage holder (or trustee) must notify the Company of any change in ownership known to the mortgage holder.

If the Company cancels this policy, the Company will give written notice to the mortgage holder (or trustee) at least 1) 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or 2) 90 days before the effective date of cancellation, if the Company cancels for any other reason; to the last known mailing address of such mortgage holder (or trustee), if any, on file with the Company. Failure to provide such notice shall not invalidate such cancellation.

To satisfy the requirements of any mortgage holder (or trustee) shown in the Schedule of Mortgages and Loss Payees, copies of policies or certified copies of policies may be sent to these mortgage holders. In no event are copies of policies sent to mortgage holders to be considered as increasing the Limits of Insurance shown in the Declarations or changing the terms of this insurance, nor are they to be considered duplicate or contributing insurance.

S.   <u>Joint Loss Agreement</u>

With respect to insurance provided by this policy, it is agreed that:

1.   If at the time of loss, there is in existence a policy(ies) issued by either these Insurers or by a boiler and machinery insurance company which may cover the same property or cover the **Location** at which the property subject to loss is situated; and

2.   if there is a disagreement between the Insurers under this policy and such other contract either as to:

   (a)   whether such damage or destruction was caused by a peril insured against by this policy or by an accident insured against by such boiler and machinery insurance policy; or

   (b)   the extent of participation of this policy and of such boiler and machinery insurance policy in a loss which is insured against, partially or wholly, by any one or all of said policies;

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Opposition to Defendants' Motions for Summary Judgment**                    **Page 1879 of 2921**

3. These Insurers shall, upon written request of the Insured, pay to the Insured one-half of the amount of the loss which is in disagreement, but in no event more than these Insurers would have paid if there had been no boiler and machinery insurance policy in effect, subject to the following conditions:

   (a) The amount of the loss which is in disagreement, after making provisions for any undisputed claims payable under the said policies and after the amount of the loss is agreed upon by the Insured and the Insurers is limited to the minimum amount remaining payable under either the boiler and machinery or this policy(ies);

   (b) The boiler and machinery insurance company shall simultaneously pay to the Insured at least one half of said amount which is in disagreement;

   (c) The payments by the Insurers hereunder and acceptance of the same by the Insured signify the agreement of the Insurers to submit to and proceed with arbitration within ninety (90) days of such payments. The arbitrators shall be three in number, one of whom shall be appointed by the boiler and machinery insurance company, one of whom shall be appointed by these Insurers, and the third of whom shall be appointed by consent of the other two. The decision by the arbitrators shall be binding on the Insurers and that judgment upon such an award may be entered in any court of competent jurisdiction;

   (d) The Insured agrees to cooperate in connection with such arbitration but not to intervene therein;

   (e) The provisions shall not apply unless such other policy issued by the boiler and machinery insurance company is similarly endorsed;

   (f) Acceptance by the Insured of sums paid pursuant to the provisions, including any arbitration award, shall not operate to alter, waive, surrender or in any way affect the rights of the Insured against any of the Insurers.

T.  **Titles of Paragraphs**

The titles of paragraphs of this form and of endorsements and supplemental contracts, if any, now or hereinafter attached hereto are inserted solely for convenience of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

U.  **Conformance**

1. The terms of this policy which are in conflict with the applicable statutes of the state wherein this policy is issued are hereby amended to conform to such statutes.

2. Any provisions required by law to be stated by policies issued by the Insurers shall be deemed to have been stated herein.

V.  **Notification Address**

It is agreed that all notices or communication of this policy shall be addressed to the First Named Insured at the address submitted to the Company and listed on the declarations page of this policy.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**                                    **Page 1880 of 2921**

W.   Attachment Clause

This policy is made and accepted subject to the foregoing provisions and stipulations which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as are endorsed hereon or added hereto, as provided in this policy.

X.   Reporting and Adjustment Clause

This policy is extended to cover additional property and interests as described in this policy that may be acquired or otherwise become at the risk of the Insured during the policy term. As respects locations and acquisitions, the Insured will report all such additional properties, along with deletions of and/or amendments to existing properties covered under this policy, on a quarterly basis. Any premium adjustment will be calculated at the end of the quarterly report.

Y.   Preservation of Property Clause

In case of actual or imminent physical loss or damage of the type insured against by this Policy, the expenses incurred by the Insured in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder shall be added to the total physical loss or damage otherwise recoverable under this Policy and be subject to the applicable Deductible and without increase in the Limit provisions contained in the Policy.

Z.   Drop Down and Priority of Payments

In determining the amount of any one loss, disaster or casualty for which this policy is excess, the total loss for all coverages caused by any combination of perils, one or more of which is insured against under the primary policy(ies), shall be used even though all such perils or property or coverages are not insured against under this excess policy.

1.   Any recoveries made under the primary policy shall be considered as first applying to those perils and/or property and/or coverages not insured against by this policy. Upon exhaustion of the primary policy limits, this policy shall drop down and be liable for the loss in excess of the amount attributed to the primary policy as respects those perils and/or property and/or coverages insured hereunder subject to the limit of this policy.

2.   If there is any other excess insurance covering the perils insured against in the primary policy but not covered by this policy, this insurance shall then allocate any loss recoveries made under the primary policy in the same proportion as the amount of loss by a peril insured against by this policy bears to the combined total loss, upon exhaustion of the primary policy limits, this policy shall drop down and be liable for the loss in excess of the amount attributed to the primary policy as respects those perils covered hereunder subject to the limit of this policy.

3.   Paragraph two shall not apply, however, when the amount of loss attributed to the perils insured under the primary policy, but not covered under this policy, exceed the total amount of insurance provided by the primary and excess coverages with respect to said perils.  In this situation any recoveries made under the primary policy shall first apply to those perils not insured against by this policy. Upon exhaustion of the primary policy limits, this policy shall drop down and be liable for the loss in excess of the amount attributed to the primary policy as respects those perils covered hereunder subject to the limit of the policy.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1881 of 2921**

4. In the event the annual aggregate limits provided for **Flood** and/or **Earthquake** in any underlying insurance are diminished or exhausted in any one policy year, the coverage provided under this policy shall respond as excess of the remaining limits.

In such event, the applicable amount of the deductible provision of the primary policy shall apply to the combination of all policies. It shall be at the sole option of the Insured to apportion recovery under this Policy when submitting final proof of loss, subject to the overall amount of claim not exceeding the overall limit of liability contained herein for any one loss.

Nothing herein contained shall vary, alter, waive, or extend any of the terms, representations, conditions or agreements of the policy other than as above stated.

AA. <u>Liberalization</u>

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will accrue to the benefit of the insured within such jurisdiction, effective the date of change specified in the statute.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                        **Page 1882 of 2921**

## GENERAL STAR INDEMNITY COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TERRITORIAL LIMITS ENDORSEMENT

This endorsement modifies insurance provided under this Policy.

**COMMERCIAL PROPERTY COVERAGE PART**

This endorsement, effective     June 1, 2019     forms a part of Policy  #  IAG966951B

issued to  JRK PROPERTY HOLDINGS, INC.        by GENERAL STAR INDEMNITY COMPANY.

Section IV. <u>TERRITORIAL LIMITS</u> of the <u>COVERAGE OF INSURANCE AND SPECIAL PROVISIONS</u> is deleted and replaced with the following:

IV. <u>TERRITORIAL LIMITS</u> – This policy covers property wherever situated within and between the fifty states comprising the United States of America including the District of Columbia.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

## GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMERCIAL PROPERTY CONDITIONS

This endorsement modifies insurance provided under the following:

**The insurance policy issued to JRK Property Holdings, Inc.**

This endorsement, effective     June 1, 2019     forms a part of Policy No.   IAG966951B

issued to   JRK PROPERTY HOLDINGS, INC.   by   General Star Indemnity Company.

The following paragraphs are added to the **insurance policy issued to JRK Property Holdings, Inc.**

This insurance policy is subject to the following conditions:

**A. Concealment, Misrepresentation or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material act concerning:

**1.** This policy;
**2.** The Covered Property;
**3.** Your interest in the Covered Property; or
**4.** A claim under this policy.

**B. Control of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this insurance policy at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. Insurance Under Two or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. Legal Action Against Us**

No one may bring a legal action against us under this insurance policy unless:

**1.** There has been full compliance with all of the terms of this insurance policy; and

PP 98 0023 04 17                                           Page **1** of 2

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

# GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# Additional Coverage Conditions

This endorsement modifies insurance provided under the following: **The insurance policy issued to JRK**

**Property Holdings, Inc.**

This endorsement, effective      June 1, 2019      forms a part of Policy No. IAG966951B

issued to   JRK PROPERTY HOLDINGS, INC.   by   General Star Indemnity Company.

The following paragraphs are added to the **insurance policy issued to JRK Property Holdings, Inc.**

**1. Changes**

This policy contains all the agreements between the Insured and the Company concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with the Company's consent. This policy's terms can be amended or waived only by endorsement issued by the Company and made a part of this policy.

**2. Examination Of The Insured's Books And Records**

The Company may examine and audit the Insured's books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**3. Inspections And Surveys**

**A.** The Company has the right to:

**(1)** Make inspections and surveys at any time;
**(2)** Give the Insured reports on the conditions the Company finds; and
**(3)** Recommend changes.

**B.** The Company is not obligated to make any inspections, surveys, reports or recommendations and any such actions the Company does undertake relate only to insurability and the premiums to be charged. The Company does not make safety inspections. The Company does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And the Company does not warrant that conditions:

**(1)** Are safe or healthful; or
**(2)** Comply with laws, regulations, codes or standards.

**C.** Paragraphs **A.** and **B.** of this condition apply not only to the Company, but also to any rating, advisory, rate service or similar organization, which makes insurance inspections, surveys, reports or recommendations.

**D.** Paragraph **B.** of this condition does not apply to any inspections, surveys, reports or recommendations the Company may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 1886 of 2921**

**4. Premiums**

The first Named Insured shown in the Declarations:

**A.** Is responsible for the payment of all premiums; and
**B.** Will be the payee for any return premiums the Company pays.

**5. Representations On Application Warranty**

The following representations on application warranty applies to this policy. By accepting this policy, the Insured agrees, represents and warrants that:

**A.** The statements and information contained in the applications for insurance, including all statements, information and documents accompanying or relating to the application are:

    **(1)** Accurate and complete and no facts have been suppressed, omitted or misstated; and
    **(2)** Material to the Company, and the Company has issued this policy in reliance upon them.

**B.** Any failure to fully disclose the information requested in the application for insurance, whether by omission or suppression, or any misrepresentation in the statements and information contained in the application for insurance, including all statements, information and documents accompanying or relating to the application, renders coverage for any claim(s) null and void and entitles the Company to rescind the policy from its inception; and

**C.** The application for this policy is incorporated and made part of the policy by reference.

**6. Transfer Of The Insured's Rights And Duties Under This Policy**

The Insured's rights and duties under this policy may not be transferred without the Company's written consent except in the case of death of an individual named insured.

If the Insured dies, the Insured's rights and duties will be transferred to the Insured's legal representative but only while acting within the scope of duties as the Insured's legal representative. Until the Insured's legal representative is appointed, anyone having proper temporary custody of the Insured's property will have the Insured's rights and duties but only with respect to that property.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

## PARTICIPATION PAGE

In consideration of the premium charged, the subscribers hereto, hereinafter referred to as the Insurer(s) and/or Company(ies), do severally, but not jointly, agree to indemnify the Insured for the amount recoverable in accordance with the terms and conditions of the Policy.

Provided that:

1.  The collective liability of Insurers shall not exceed the Limit of Liability or any appropriate Sublimit of Liability or any Annual Aggregate limit.
2.  The liability of each of the Insurers shall not exceed the Limit to the pro-rata percentage of liability set against its name.

Named Insured: JRK Property Holdings, Inc., and all affiliated, or related subsidiary, associated, or allied companies, corporations, limited liability companies, limited liability partnerships, firms, entities, management companies, partnerships, organizations or joint ventures as now exist, or may hereafter be constituted or acquired, or for which the Named Insured provides property management services and has agreed to place insurance pursuant to contract or agreement.

11766 Wilshire Boulevard
Los Angeles, CA 90025

Policy Period:     June 1, 2019 – June 1, 2020

| Description | Insurance Company | Policy # |
|---|---|---|
| $250,000 po $5,000,000 | First Specialty Insurance Corporation | ESP200223102 |
| $750,000 po $5,000,000 | General Star Indemnity Company | IAG966951B |
| $500,000 po $5,000,000 | Ironshore Specialty Insurance Company | 001689806 |
| $4,950,000 po $10,000,000 | Lloyd's of London (WRB Line) | PG1902606 |
| $900,000 po $10,000,000 | Lloyd's of London (Aegis Line) | PG1902611 |
| $750,000 po $10,000,000 | Lloyd's of London (QBE Line) | PG1902610 |
| $1,000,000 po $25,000,000 | Allied World Assurance Company, Ltd. | P045553002 |
| $750,000 po $5,000,000 xs $5,000,000 | Colony Insurance Company | XP180329-1 |
| $750,000 po $5,000,000 xs $5,000,000 | Lloyd's of London (Hardy Line) | PG1903066 |
| $8,250,000 po $15,000,000 xs $10,000,000 | Maxum Indemnity Company | MSP-6028787-04 |
| $2,625,000 po $15,000,000 xs $10,000,000 | Endurance American Specialty Insurance Company | ESP30000684001 |
| $525,000 po $15,000,000 xs $10,000,000 | Lloyd's of London (Argo Line) | PG1902622 |
| $2,625,000 po $15,000,000 xs $10,000,000 | Evanston Insurance Company | MKLV14XP012320 |
| $10,000,000 po $25,000,000 xs $25,000,000 | Crum & Forster Specialty Insurance Company | PPP-910515 |
| $5,000,000 po $25,000,000 xs $25,000,000 | Colony Insurance Company | XP180329-1 |
| $10,000,000 po $25,000,000 xs $25,000,000 | Ategrity Specialty Insurance Company | 01-B-XP-P00000408-0 |
| $50,000,000 x $50,000,000 | Scottsdale Insurance Company | BXS0001371 |
| $25,000,000 po $50,000,000 xs $100,000,000 | Homeland Insurance Company of New York | 79500999-0000 |
| $25,000,000 po $50,000,000 xs $100,000,000 | Hallmark Insurance Company | 73PRX19ADEA |
| $50,000,000 po $100,000,000 xs $150,000,000 | RSUI Indemnity Company | NHD424523 |
| $50,000,000 po $100,000,000 xs $150,000,000 | Mitsui Sumitomo Insurance Company of America | EXP7000083 |

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**          **Page 1888 of 2921**

**Endorsement #1**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement, effective 12:01 A.M. – June 1, 2019

Issued to: JRK Property Holdings, Inc.

**Third Party (Loss Payee) Deductible and Reimbursement Endorsement**

The Company agrees that notwithstanding any provisions to the contrary in any policy deductible, at the Insured's written request, the Company will adjust and pay a loss, regardless of the deductible which would otherwise apply, under the following circumstances and subject to the following limitations:

1.  The Insured has agreed in writing, prior to the loss, to maintain, for the benefit of a third party, and to protect the third party's insurable interest, insurance which is not subject to a deductible or which is subject to a deductible that is lower than that actually maintained by the insured under this policy;

2.  The loss will be adjusted with the Insured and payable to both the Insured and the appropriate loss payee (third party) as their interest may appear; however, if the policy permits the Company to adjust the loss directly with the third party, the Company reserves the right to do so, and to make payment solely to the third party;

3.  The Company is only obligated under this endorsement to pay the amount of the deductible that satisfies the Insured's written agreement to maintain insurance for the benefit of the third party. For example, if the Insured has agreed to maintain insurance for the third party with a $10,000 deductible, and actually maintains insurance with a $25,000 per **Occurrence** deductible, the Company will only pay the amount of covered loss in excess of $10,000 ($15,000). The Insured remains obligated to pay the first $10,000 of any loss;

4.  After a loss has been adjusted and payment made in accordance with this endorsement, the Insured shall, and hereby agrees, to reimburse the Company simultaneously, in full for any amount that would have been subject to the deductible had it not been paid by the Company under the terms of this endorsement. For example, if the Insured has agreed to maintain insurance for the third party with a $10,000 deductible, and the third party suffers a loss of $25,000 the Insured will pay the first $10,000 of the loss, the Company will pay $15,000, and the Insured will simultaneously reimburse the Insurer $15,000
    A.) Failure by the Insured to reimburse the Company within 30 days of Payment of Loss will result in cancellation per the Non Payment of Premium Provisions contained within the Policy.

5.  All other policy terms remain in full force and effect, including coverage, limits, conditions and exclusions.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                **Page 1889 of 2921**

**Endorsement #2**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement, effective 12:01 A.M. – June 1, 2019

Issued to: JRK Property Holdings, Inc.

**Change Endorsement**

This endorsement changes Section 6. COVERAGE, E. Provisions Applicable to Business Interruption, Extra Expense and Rental Value (1)(d) to read:

In addition to the time as defined in 1.a) above, this policy shall provide an extended period of indemnity or additional length of time of 18 months to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

This change is only for the **Location**:
Hotel Oceana
849 Ocean Avenue
Santa Monica, CA 90403

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                      **Page 1890 of 2921**

**Endorsement #3**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement, effective 12:01 A.M. – June 1, 2019

Issued to: JRK Property Holdings, Inc.

**Change Endorsement**

For the properties listed below, **Section III PROGRAM DEDUCTIBLES** the following wording shall be added subsequent to paragraph two:

All losses, damages, or expenses shall be adjusted and from the amount of such adjusted loss shall be deducted $25,000 per **Occurrence**. Losses associated with these properties will not erode the Annual Aggregate Retention.

JRK Nashville Hotel Partners, LLC & Nashville Hospitality, LLC 623 Union
Street
Nashville, TN 37219

All other terms and conditions remain unchanged.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**                **Page 1891 of 2921**

POLICY NUMBER: IAG966951B                                              IL 09 53 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

## SCHEDULE

The **Exception Covering Certain Fire Losses** (Paragraph **C**) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy:

| State(s) | Coverage Form, Coverage Part Or Policy |
|---|---|
| CA, GA, IL, NC, NY, OR, WA | IAG966951B |
|  |  |
|  |  |
|  |  |
|  |  |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The following exclusion is added:

**CERTIFIED ACT OF TERRORISM EXCLUSION**

We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**C. Exception Covering Certain Fire Losses**

The following exception to the exclusion in Paragraph **B.** applies only if indicated and as indicated in the Schedule of this endorsement.

If a "certified act of terrorism" results in fire, we will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements which apply to those forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

# GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SIGNATURE PAGE

IN WITNESS WHEREOF the **GENERAL STAR INDEMNITY COMPANY** has caused this Policy to be signed by its President and Secretary at Stamford, Connecticut.

.

GENERAL STAR INDEMNITY COMPANY

_____          _____
Secretary                                              President

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

# Exhibit 2

**HINSHAW & CULBERTSON LLP**
COURTNEY E. MURPHY, ESQ.
(ID. No.058731994)
800 Third Avenue
New York, New York
(212) 471-6200
*Attorneys for Defendants*

| | | |
|---|---|---|
| SAVAGE CITY STRENGTH, LLC, | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION |
| | : | SOMERSET COUNTY |
| Plaintiff, | : | |
| | : | Docket No.: SOM-L-831-20 |
| vs. | : | |
| | : | CIVIL ACTION |
| | : | |
| COVINGTON SPECIALTY INSURANCE | : | |
| COMPANY, et., al., | : | **ORDER DISMISSING THE COMPLAINT** |
| | : | **FOR FAILURE TO STATE A CLAIM** |
| | : | |
| Defendant | : | |

This matter having been opened to the Court by Covington Specialty Insurance Company ("Covington"), by and through its counsel, by way of a motion seeking an Order Granting Covington's Motion to Dismiss Plaintiff's Complaint, and the Court having considered the moving papers and opposition papers (if any), and for other good cause shown;

IT IS ON THIS 8th day of _____ April _____, 2021:

ORDERED that Defendant Covington's Motion to Dismiss Plaintiff's Complaint is hereby GRANTED;

ORDERED that Plaintiff's Second Amended Complaint is DISMISSED WITH PREJUDICE AND WITHOUT COSTS; and

IT IS FURTHER ORDERED that a copy of this Order be served upon the attorneys for the parties of record within 7 days of the date hereof by ordinary mail.

Robert G. Wilson, J.S.C.

Signature affixed electronically
with permission of Judge Wilson

( X ) Opposed

(    ) Unopposed

Statement of Reasons placed on the record on April 8, 2021.

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1896 of 2921**

                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION: CIVIL PART
                              SOMERSET COUNTY
                              DOCKET NO.: SOM-L-831-20
                              A.D. # _____

SAVAGE CITY              )
STRENGTH, L.L.C.,        )
                         )              TRANSCRIPT
        Plaintiffs,      )                 OF
                         )               MOTION
     vs.                 )
                         )
COVINGTON SPECIALTY      )
INSURANCE,               )
                         )
        Defendants.      )

                    Place: Somerset County
                           (Heard Via Zoom)


                    Date: April 8, 2021

BEFORE:

     HONORABLE ROBERT G. WILSON, J.S.C.

TRANSCRIPT ORDERED BY:

     COURTNEY MURPHY, (Hinshaw & Culbertson, L.L.C.)

APPEARANCES:

     COURTNEY MURPHY, ESQ., (Hinshaw & Culbertson,
     L.L.C.)
     Attorney for Defendants


                    Transcriber:  Nitsa Carrozza
                    PHOENIX TRANSCRIPTION
                    796 Macopin Road
                    West Milford, NJ 07480
                    (862)248-0670

                    Audio Recorded
                    Recording Opr: Sarah Han

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1897 of 2921**

2

I N D E X

PAGE

Colloquy re: Housekeeping........................4,18


MOTION TO DISMISS:

THE COURT:                                        PAGE
Decision                                          4




EXHIBITS:                          Ident.    Evid.
Exhibit E Exclusion                          8

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1898 of 2921**

3

1           (Proceeding commenced at 2:34:30 p.m.)

2           COURT CLERK:  Hi, Judge.

3           THE COURT:  Hi, Millie.

4           COURT CLERK:  I have -- Ms. Murphy is present

5    but Plaintiff's Counsel is not, Michael (indiscernible)

6           MS. MURPHY:  Good afternoon, Your Honor.

7           THE COURT:  Good afternoon, Ms. Murphy.  Okay

8    and we are on the record, right, Millie?

9           COURT CLERK:  Yes, Judge.

10          THE COURT:  All right, thanks.  Okay, for the

11   record, this is Judge Robert G. Wilson, sitting Civil

12   in Somerset County.  Today is April 8, 2021, it is 2:35

13   p.m., we are conducting remote proceedings again today.

14   This next proceeding is via Teams.  Our Court Clerk

15   working remotely is Sarah Han.

16          The next matter is Savage City Strength,

17   L.L.C. versus Covington Specialty Insurance Company,

18   this is docket L-831-20.  Ms. Murphy, would you please

19   place your appearance on the record and spell your last

20   name because we're remote?

21          MS. MURPHY:  Very good, Your Honor.  My name

22   is Courtney Murphy, I am a partner within the law firm

23   of Hinshaw and Culbertson and I represent -- and my

24   last name is spelled M-U-R-P-H-Y and I represent

25   Defendant Covington in this matter.

1           THE COURT:  All right, thank you.  Excuse me.

2      So I scheduled this matter for today to render my

3      decision in connection with Defendant's motion to

4      dismiss the complaint in this matter.  I invited

5      counsel to join, counsel was not required to join.  I'm

6      going to be entering an order which will reference the

7      fact that I placed this decision on the record and of

8      course, either counsel can obtain an audio disc that

9      contains the recording or, of course for a little bit

10      more money, can obtain a transcript.

11           So first, to dispel the suspense, I am going

12      to grant the motion.  It will take me a little bit to

13      place the decision on the record but that decision is

14      as follows.  This is Defendant Covington Specialty

15      Insurance Company's motion pursuant to Rule 4:6-2(e),

16      to dismiss the Plaintiff, Savage City Strength,

17      L.L.C.'s second amended complaint for failure to state

18      a claim upon which relief can be granted.

19           So the standard on a motion pursuant to this

20      rule is as set forth in <u>Printing Mart Morristown versus</u>

21      <u>Sharp Electronics Corp.</u>, 116 <u>New Jersey</u> 739, Supreme

22      Court decision from 1989.  A court must test the

23      adequacy of a pleading by determining whether a cause

24      of action is suggested by the facts alleged in the

25      complaint, without regard to the ability of the

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1900 of 2921

1    Plaintiff to prove those facts.

2              To the extent that I have considered

3    materials outside of the pleadings and there are

4    substantial materials supplied, including the insurance

5    policy at issue, Governor Murphy's order.  To the --

6    the complaint itself is quite lengthy and does

7    incorporate the same documents.  So I'm honestly -- it

8    may be that everything that I have been supplied is

9    also in the complaint itself.

10             To the extent that I'm looking at things that

11   are outside of the complaint, it's automatically -- the

12   motion is automatically converted or considered as one

13   for summary judgement.  Give me just a second, yeah.

14   It -- the rule expressly provides that such a motion is

15   automatically converted into one of summary judgement

16   and I'll cite for that proposition, as well, Lederman

17   versus Prudential Life Insurance, 385 N.J. Super 324,

18   an Appellate Division decision where cert. was denied

19   at 188 New Jersey 353 in 2006.

20             If I call -- assuming that I consider a

21   motion for summary judgement, the standard is as set

22   forth in the seminal case of Brill v. Guardian Life

23   Insurance Company of America, 142 N.J. 520, 1995.

24             The question is whether the movant is

25   entitled to judgement and that at the end, if the

1    movant is entitled to judgement, if on the full motion

2    record the adverse party who is entitled to have the

3    facts and inferences viewed most favorably to it has

4    not demonstrated the existence of a dispute whose

5    resolution in his favor will ultimately entitle him to

6    judgement.  So these standards are very similar and

7    under either one of them, as I indicated, I find that

8    the motion should be granted.

9            With respect to the history of this matter,

10   Plaintiff is a health and exercise club located in

11   Hillsborough, New Jersey.  In March of 2020, Plaintiff

12   Savage closed its business to comply with the orders of

13   civil authorities in the State of New Jersey, most

14   notably Governor Murphy, requiring all non-essential

15   businesses to close in order to mitigate the spread of

16   the COVID-19 virus.

17           Savage made a claim for business interruption

18   coverage under the business income and extra expense

19   coverage form of a Covington policy of insurance which

20   provides additional coverage for action of civil

21   authority.  Covington denied the claim on the grounds

22   that Savage's economic losses were not caused by direct

23   physical loss of or damage to property, a prerequisite

24   for coverage.

25           And also denied per a coverage exclusion in

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1902 of 2921

1     the policy that precludes coverage for losses caused

2     directly or indirectly by pathogenic or poisonous

3     biological materials.  Savage filed this suit seeking a

4     declaratory judgement the coverage exists under the

5     Covington policy for its lost business income and is

6     seeking to recover damages for bad faith and breech of

7     contract.

8          Defendant submits that it is entitled to a

9     dismissal because there has not been any direct

10    physical loss of or damage to Savage's property or

11    other property caused by COVID-19 and loss of use of

12    property does not amount to direct physical loss.

13    Also, the Covington policy's coverage exclusion for

14    pathogenic or poisonous biological materials precludes

15    coverage for Savage's lost business income.

16         So with respect to some additional factual

17    background, Covington issued Savage a policy of

18    commercial insurance that has been supplied to the

19    Court.  Defendant points to a number of potentially

20    relevant provisions in the policy, notably the business

21    and property coverage form, the business income and

22    extra expense coverage form, because of loss special

23    form and the exclusion of pathological or poisonous

24    biological or chemical materials endorsement.

25         In Savage's second amended complaint,

1    Plaintiff alleges that Governor Phillip Murphy's March

2    9, 2020 Executive Order 103 declared a state of

3    emergency and a public health emergency throughout New

4    Jersey, which resulted in the mandatory closure of

5    Savage's business.  In March, 2020, Savage filed a

6    claim for business interruption coverage under the

7    Covington policy.  Covington denied that claim.

8         So I am granting the motion on the basis of

9    the exclusion, which is set forth at Exhibit E to the

10   certification supplied in support of the motion and I'm

11   going to read the entire exclusion into the record.  So

12   this policy exclusion states as follows, "This

13   endorsement changes the policy, please read it

14   carefully."

15        It's entitled, "Exclusion of Pathogenic or

16   Poisonous Biological or Chemical Materials."  "This

17   endorsement modified insurance provided under the

18   following: commercial property coverage park," and then

19   it states, "The following exclusion is added.  We will

20   not pay for loss or damage caused directly or

21   indirectly by the discharge, dispersal, seepage,

22   migration, release, escape or application of any

23   pathogenic or poisonous biological or chemical

24   materials."

25        "Such loss or damage is excluded, regardless

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1904 of 2921

1    of any other cause or event that contributes

2    concurrently or in any sequence to the loss, however,

3    if both A and B below apply, we will pay for such loss

4    or damage subject to the terms in Paragraph A, Coverage

5    4.  Additional coverages D for the cleanup and removal

6    in the attached coverage form," colon and then here is

7    sub-paragraph A.

8         A, "The pathogenic or poisonous biological or

9    chemical materials are normally kept at or brought onto

10   your premises with your consent or you see your

11   business operations at your premises," and sub-

12   paragraph V, "The discharge, dispersal, seepage,

13   migration, release, escape or application of the

14   pathogenic or poisonous biological or chemical

15   materials is accidental and is not the result of a

16   willful or malicious act against any persons,

17   organizations or property of any nature."

18        So as set forth in Covington's brief, the

19   policy contains the endorsement that I just read into

20   the record.  I agree with Defendant that the

21   endorsement makes clear that it changes in terms of the

22   policy and the terms of the endorsement control the

23   policy.

24        The endorsement states the coverage is

25   precluded for loss or damage caused directly or

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1905 of 2921

10

1    indirectly by the discharge, dispersal, seepage,

2    migration, release, escape or application of any

3    pathogenic or biological materials, as set forth by

4    Defendant in the brief.

5         The Merriam-Webster online dictionary defines

6    pathogen as, "A specific causative agent," paren.,

7    "Such as a bacterium or virus," close paren., "Of

8    disease."  WWW.dictionary.com defines pathogen as, "Any

9    disease producing agent, especially a virus, bacterium

10   or other microorganism."  And therefore, I agree with

11   Defendant that the Corona Virus or COVID-19 is a

12   pathogenic material within the meaning of the policy's

13   coverage exclusion.

14        It is Plaintiff's position that the exclusion

15   at issue is ambiguous and reviewing Plaintiff's brief,

16   specifically this issue was addressed.  Starting on

17   page 7 of the brief, Plaintiff notes that when members

18   of the public purchase policies of insurance, they're

19   entitled to the broad measure of protection necessary

20   to fulfill their reasonable expectations.  They should

21   not be subject to technical incumbrances or to hidden

22   pitfalls in their policies should be construed

23   liberally in their favor, to the end that coverage is

24   afforded to the full extent that any fair

25   interpretation will allow.

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1906 of 2921

1          A court can consider -- well, if a court is

2     called upon to interpret an ambiguous phrase, the Court

3     should consider whether more precise language by the

4     insurer, had this language been included in the policy,

5     would have put the matter beyond reasonable question.

6     Plaintiff cites the case of Gibson v. Callaghan, 150

7     N.J. 662 from 1999 for that proposition.

8          Plaintiff submits that the language is

9     ambiguous, that the language may have more than one

10    legitimate meaning.  Notes that there is a genuine

11    ambiguity where the phrasing of a policy is so

12    confusing that the average policy holder cannot make

13    out the boundaries of coverage.  Specifically with

14    respect to this exclusion, Plaintiff suggests or

15    Plaintiff submits that the language suggests, to the

16    average reader that in order for the exclusion to

17    apply, the pathogen would have come into the scheduled

18    premises.

19         And Plaintiff notes that there is an anti-

20    concurrent causation clause but that the policy never

21    delineated the geographic scope or boundary for the,

22    quote, "Discharge, dispersal, seepage, migration,

23    release, escape or application," including the

24    geographic scope of, quote, "Any other cause or event

25    that contributes concurrently for in any sequence to

12

1      the loss."

2            It is submitted that the policy seems to read

3      as though the pathogen must emanate from the within

4      scheduled premises for the exclusion to apply.  It is

5      argued that Plaintiff's property was not contaminated

6      and therefore, the claimed loss is not for

7      decontaminating the premises as a result of the

8      infestation.

9            It's -- okay, so the argument is repeated but

10     it is also argued that, since the insurer knew when it

11     wrote the policy that there was a distinction between

12     excluding a risk that occurs on insured premises and a

13     risk that does not occur on the insured -- does not

14     occur on the insured premises, the insurer here chose

15     not to include such defining language in the exclusion

16     and there were -- there was language used in other

17     fruitions.

18           It is argued that this distinction leads a

19     reasonable person to believe two things.  First, that

20     the pathogen must reach the insured premises in order

21     for the exclusion to apply.  Second, the pathogenic

22     exclusion does not apply to an attempt to control or

23     prevent the spread of a virus.

24           I disagree with those arguments.  I think

25     that the -- the exclusion is clear.  It -- and a

1    reasonable person should be able to interpret it

2    clearly.  There is no geographic limitation for a

3    specific reason and that is that, when there is, as I

4    understand it -- well first of all, there is no

5    geographic limitation.  There's nothing like that in

6    the exclusion.

7            It seems logical to me that the reason there

8    is no such limitation is that, when there is a

9    discharge, dispersal, seepage, migration, release,

10   escape or application of such materials, materials such

11   as a pathogen, it is that dispersal, that migration,

12   that release can be limited or can be brought with the

13   virus that we are experiencing around the world and

14   that has led to the order that led to the closing of

15   this business.

16           The virus is something that is experienced

17   virtually across the entire globe.  Essentially, the

18   entire world has experienced the migration of this

19   virus.  So the virus has not been excluded from the

20   United States, the virus has not been excluded from New

21   Jersey, the virus has not been excluded from

22   Hillsborough Township and I did take judicial notice on

23   the Hillsborough Township official website and there

24   had been positive incidents.

25           I certainly was not surprised to see that

1    there have been positive cases of COVID-19 in

2    Hillsborough and there have been deaths that resulted

3    from COVID-19 in Hillsborough and that's the reason

4    that Governor Murphy largely shut the state down, was

5    to deal with a pandemic and -- a pandemic and a spread

6    of a virus that, of course, knows no orders.

7         It exists on and within businesses like the

8    one at issue and of course, it exists throughout

9    municipalities, throughout the State of New Jersey,

10   throughout the country and throughout the world.  So

11   that's -- there is no geographic limitation, I suspect,

12   because it doesn't make sense to have a geographic

13   limitation.

14         The -- when the exclusion talks about on

15   premises versus off premises, what it says is that

16   there can't -- there will be coverage for materials --

17   and under certain circumstances.  If materials are

18   utilized or stored on premises and there is an

19   accidental discharge of the materials, then there's

20   going to be coverage.

21         The language, to me, seems rather clear with

22   respect to that and logic tells me, all right, certain

23   businesses utilize certain chemicals, they're

24   biological material and when those business go to get

25   insurance coverage, assumedly, the underwriter assesses

1  the appropriate risk involved with that business and if

2  there's an accidental discharge, then there's coverage

3  and the business paid for that coverage and that is why

4  the exclusion is worded the way that it's worded.

5          So it does not seem to be ambiguous to me.

6  It seems that it clearly provides for an exclusion for

7  this -- for this virus.  I note, as set forth in

8  Defendant's reply brief, that in the context of an

9  insurance policy, exclusionary clauses are

10  presumptively valid and are enforced if they are

11  specific, plain, clear, prominent and not contrary to

12  public policy.  So there's a citation to Flomerfelt

13  versus Cardiello, 202 N.J. 432, 2010.

14          I agree with Defendant that the exclusion is

15  plain and clear and that therefore, it should be

16  enforced.  I also agree with Defendant that, to the

17  extent that -- and I think that this is true.

18  Plaintiff does argue that for the coverage to apply --

19  excuse me, for the exclusion to apply, there must be

20  proof that the virus came onto the premises.  I do

21  agree with Defendant that, that argument ignores the

22  plain meaning of the phrase directly or indirectly, in

23  the coverage exclusion.

24          Okay, let me note that policies of insurance

25  are generally interpreted in favor of the insured and

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1911 of 2921

1    against the insurer, <u>Salem Group versus Oliver</u>, 128

2    <u>N.J.</u> 1, decision from 1992.  All ambiguities and

3    uncertainties in an insurance policy are resolved in

4    favor of the insured and against the insurer, <u>Sparks v.</u>

5    <u>Saint Paul Insurance Company</u>, 100 <u>New Jersey</u> 325, 1985.

6    However, the Court must enforce clear and unambiguous

7    terms of a policy of insurance, <u>Erdo versus Torcon</u>

8    <u>Construction Company</u>, 275 <u>N.J. Super</u> 117, Appellate

9    Division decision from 1994.

10        The test for determining whether an ambiguity

11   exists is whether the phrasing of the policy of

12   insurance is sufficiently confusing such that the

13   average policy holder cannot make out the boundaries of

14   coverage, <u>Nunn v. Franklin Mutual Insurance Company</u>,

15   274 <u>N.J. Super</u> 543, Appellate Division decision from

16   1994.

17        A policy of insurance is ambiguous only where

18   reasonably intelligent persons would differ regarding

19   its meaning, <u>the Aviation Charters, Inc., versus Avemco</u>

20   <u>Insurance Company</u>, 335 <u>N.J. Super</u> 591, Appellate

21   Division decision that was affirmed as modified at 170

22   <u>N.J.</u> 76 in 2000.

23        Where the insurance policy language is clear

24   and unambiguous, the Court need not consider the

25   claimants -- excuse me, the claimed reasonable

**Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

1    expectation of the insured, <u>Katchen v. Government</u>

2    <u>Employers Insurance Company</u>, 457 <u>N.J. Super</u> 600,

3    Appellate Division decision from 2019.  Words utilized

4    in the insurance policy are interpreted in accordance

5    with their plain and ordinary meaning, <u>Voorhees v.</u>

6    <u>Preferred Mutual Insurance Company</u>, 128 <u>New Jersey</u> 165,

7    1992.

8            With respect to that interpretation of

9    ordinary meaning, it is appropriate for the Court to

10   examine dictionary definitions, <u>Cypress Point Condo</u>

11   <u>Association, Inc.</u> (phonetic), 226 <u>N.J.</u> 403, decision

12   from 2016.  Courts often use dictionary definitions to

13   determine a word's meaning when the policy does not

14   otherwise define it, <u>Aleynikov v. Goldman Sachs Group,</u>

15   <u>Inc.</u>, 765 <u>F.3d</u> 350, 3rd Circuit decision from 2014.

16           Although exclusions are ordinarily strictly

17   construed against the insurer, that interpretive

18   principle does not permit the Court to disregard an

19   exclusion's plain meaning, <u>Flomerfelt v. Cardiello</u>, 202

20   <u>New Jersey</u> 432, decision from 2010.

21           So it's clear to the Court that under the

22   exclusion, pathogens -- losses due to the spread of

23   pathogens are excluded and that's why they're -- it's

24   directly or indirectly due to the spread of the

25   pathogens.  It is clear to the Court that a virus is a

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1913 of 2921

1    pathogen.  It is clear to the Court that COVID-19 is a

2    virus, it's called the Corona Virus, that's set forth

3    in the Governor's order.  As indicated, it is clear to

4    the Court that the virus is present worldwide, in the

5    United States, in New Jersey, in Hillsborough.

6        I do not agree with Plaintiff that the

7    exclusion only applies if the virus is present on the

8    Plaintiff's premises.  Again, that's the nature of the

9    spread of material of this type.  It's not confined to

10   a premises, it's not confined to a municipality.  It

11   can be and is, in this case, something that has spread

12   across the entire world.  I -- I do not find the

13   exclusion to be ambiguous.  The business at issue in

14   this matter shut down due to a pathogen and it is

15   excluded.

16        Therefore, I am granting the motion to

17   dismiss this matter.  I am not going to reach the --

18   because I do not need to give that -- it's my decision,

19   I do not need to rule on the very interesting arguments

20   regarding the direct physical loss.  I'm satisfied that

21   the exclusion is clear and therefore, the motion is

22   granted.

23        All right, that is my decision in this

24   matter.  An order should be uploaded today.  Ms.

25   Murphy, do you have any questions?

Exhibit 137 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

19

1          MS. MURPHY:  I do not, Your Honor, thank you.

2          THE COURT:  All right, thank you very much,

3  have a good day.

4          MS. MURPHY:  You too, thank you.

5          THE COURT:  Thank you, bye-bye.

6       (Proceeding concluded at 3:07:40 p.m.)

7              * * * * *

8

9

10

11

12               CERTIFICATION

13     I, Nitsa Carrozza, the assigned transcriber, do

14  hereby certify the foregoing transcript of proceedings

15  on CourtSmart, from timestamp 02:34:30 p.m. to 03:07:40

16  p.m., is prepared to the best of my ability and in full

17  compliance with the current Transcript Format for

18  Judicial Proceedings and is a true and accurate non-

19  compressed transcript of the proceedings, as recorded.

20
21
22  /s/ Nitsa Carrozza          AD/T 639
23    Nitsa Carrozza            AOC Number
24
25
26  Phoenix Transcription LLC     04/10/2021
27    Agency Name           Date
28

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA            )
                               ) ss.
COUNTY OF LOS ANGELES          )

5

      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 2049 Century Park East, Suite 3400, Los Angeles, California 90067-3208.

7

      On January 21, 2022, I served the foregoing document **DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** on the interested parties in this action as follows:

| Kevin J. Minnick<br>Sperstus, Landes & Umhofer LLP<br>617 West 7th Street, Suite 200<br>Los Angeles, CA 90017<br>Tel.: 213.205.6520<br>kminnick@spertuslaw.com | Attorney for Plaintiff<br>JRK PROPERTY HOLDINGS, INC. |
|---|---|

**[X]**    **(BY ELECTRONIC SERVICE ):** I caused each document to be sent by electronic transmission through One Legal through the user interface at www.onelegal.com to all email addresses on the list maintained by One Legal.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 21, 2022 at Los Angeles, California.

_____
Jwana Harrold

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF AMY M. CHURAN IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS
3