# EXHIBIT 140

Electronically FILED by Superior Court of California, County of Los Angeles on 03/23/2022 11:25 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Gonzalez,Deputy Clerk

Case 20-51051-TMH    Doc 258-140    Filed 01/12/24    Page 2 of 36

1

**ROBINS KAPLAN LLP**
Amy Churan (SBN 216932)

2

AChuran@RobinsKaplan.com
2049 Century Park East, Suite 3400

3

Los Angeles, CA  90067
Telephone:    310 552 0130

4

Facsimile:    310 229 5800

5

Melissa D'Alelio (admitted *pro hac vice*)
MDAlelio@RobinsKaplan.com

6

800 Boylston Street, Suite 2500
Boston, MA  02199

7

Telephone:    617 267 2300
Facsimile:    617 267 8288

8

9

Attorneys for Defendants Ironshore Specialty Insurance
Company; Certain Underwriters at Lloyd's, London and
London market companies Subscribing to Policy No.

10

(UMR) B0180PG1902606; Certain Underwriters at
Lloyd's, London and London market companies

11

Subscribing to Policy No. (UMR) B0180PG1902611;
Certain Underwriters at Lloyd's, London Subscribing to

12

Policy No. (UMR) B0180PG1902610; Certain
Underwriters at Lloyd's, London Subscribing to Policy

13

No. (UMR) B0180PG1903066; Certain Underwriters at
Lloyd's, London Subscribing to Policy No. (UMR)

14

B0180PG1902622; Ategrity Specialty Insurance
Company; and RSUI Indemnity Company

15

16

(Additional counsel listed on following page)

17

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

18

JRK PROPERTY HOLDINGS, INC.,

19

Plaintiff,

20

v.

21

COLONY INSURANCE

22

COMPANY, et al.

23

Defendants.

24

25

26

27

28

Case No.  21STCV19983

DECLARATION OF AMY M. CHURAN IN
SUPPORT OF DEFENDANTS' REPLY
MEMORANDUM OF POINTS AND AUTHORITIES
IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS

[Reply Memorandum of Points and Authorities in
Further Support of Defendants' Motion for Judgment
on the Pleadings filed concurrently herewith]

**RESERVATION NO. 280833900024**
DATE:  April 6, 2022
TIME:   8:30 a.m.
DEPT:   32
Complaint Filed: May 27, 2021
Trial Date: August 9, 2022
Judge: Hon. Daniel S. Murphy
Department: 32

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ADDITIONAL DEFENDANTS' COUNSEL

| Counsel | Defendants |
|---|---|
| DENTONS US LLP<br>Julia M. Beckley (SBN 247493)<br>2000 McKinney Avenue, Suite 1900<br>Dallas, Texas 75201<br>Tel (214) 259-1854<br>Fax (214) 259-0910<br>julia.beckley@dentons.com<br><br>G. Richard Dodge , Jr. (admitted *pro hac vice*)<br>1900 K Street NW<br>Washington, DC 20006<br>Tel (202)496-7500<br>Fax (202) 496-7756<br>rich.dodge@dentons.com<br><br>Keith Moskowitz (admitted *pro hac vice*)<br>233 South Wacker Drive, Suite 5900<br>Chicago, IL 60606-6361<br>Tel (312) 876-8220<br>Fax (312) 876 7934<br>keith.moskowitz@dentons.com | Attorneys for Defendant<br>American International Group UK<br>Limited as Subscriber to Policy No.<br>(UMR) BO180PG1902606 |
| CUMMINS & WHITE, LLP<br>Larry M. Arnold (SBN 060459)<br>Margaret R. Miglietta (SBN 116026)<br>Noura K. Rizzuto (SBN 291455)<br>2424 S.E. Bristol Street, Suite 300<br>Newport Beach, CA 92660-0757<br>Tel (949) 852-1800<br>Fax (949) 852-8510<br>larnold@cwlawyers.com<br>mmiglietta@cwlawyers.com<br>nrizzuto@cwlawyers.com<br><br>STEWART SMITH<br>William F. Stewart (admitted *pro hac vice*)<br>300 Four Falls Corporate Center<br>300 Conshohocken Road, Suite 670<br>West Conshohocken, PA 19428<br>Tel (484) 344-5296<br>Fax (484) 534-9470<br>WStewart@stewartsmithlaw.com | Attorneys for Defendant<br>Colony Insurance Company |

DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' REPLY
2

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1986 of 2921**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

| Counsel | Defendants |
|---|---|
| KENNEDYS CMK LLP<br>Susan Frances Dent (SBN 292900)<br>101 California Street, Suite 1225<br>San Francisco, CA 94111<br>Tel (415) 323-4460<br>Fax (415) 323-4445<br>Susan.Dent@kennedyslaw.com<br><br>Gary S. Kull (*pro hac vice* application pending)<br>120 Mountain View Boulevard<br>Basking Ridge, NJ 07920<br>Tel (908) 848-6300<br>Fax (908) 647-8390<br>Gary.Kull@kennedyslaw.corn | Attorneys for Defendant<br>Crum & Forster Specialty Insurance<br>Company |
| CLYDE & CO US LLP<br>Susan Koehler Sullivan (SBN 156418)<br>Brett Charles Safford  (SBN 292048)<br>355 S. Grand Avenue, Suite 1400<br>Los Angeles, CA 90071<br>Telephone: (213) 358-7600<br>Facsimile: (213) 358-7650<br>susan.sullivan@clydeco.us<br>brett.safford@clydeco.us | Attorneys for Defendants<br>Endurance American Specialty<br>Insurance Company; and<br>Maxum Indemnity Company |
| DICKINSON WRIGHT RLLP<br>Bennett Evan Cooper (SBN 128544)<br>800 W. California Avenue, Suite 110<br>Sunnyvale, California 94086<br>Tel: (602) 285-5044<br>Fax: (844) 670-6009<br>bcooper@dickinsonwright.com | Attorneys for Defendant<br>Evanston Insurance Company |
| MUSICK, PEELER & GARRETT LLP<br>David A. Tartaglio (SBN 117232)<br>624 South Grand Avenue, Suite 2000<br>Los Angeles, CA 90017-3383<br>Tel (213) 629-7600<br>Fax (213) 624-1376<br>d.tartaglio@musickpeeler.com<br><br>WILEY REIN LLP<br>Benjamin C. Eggert (*pro hac vice* forthcoming)<br>Joseph W. Gross (*pro hac vice* forthcoming)<br>2050 M Street NW<br>Washington, DC  20036<br>Tel (202) 719-7000<br>Fax (202) 719-7049<br>BEggert@wiley.law<br>JGross@wiley.law | Attorneys for Defendant<br>General Star Indemnity Company |

DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' REPLY

3

Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1987 of 2921

| Counsel | Defendants |
|---|---|
| AKERMAN, LLP<br>Michael R. Weiss (SBN 180946)<br>601 West Fifth Street, Suite 300<br>Los Angeles, CA 90071<br>Tel (213) 688-9500<br>Fax (213) 627-6342<br>Michael.Weiss@akerman.com<br><br>Bryan G. Scott (*pro hac vice* forthcoming)<br>100 North Main Street, Suite 2425<br>Winston-Salem, NC 27101<br>Tel (336) 296-7104<br>Fax (336) 296-7010<br>Bryan.Scott@akerman.com<br><br>LEWIS BRISBOIS BISGAARD<br>& SMITH LLP<br>Seth I. Weinstein (*pro hac vice* forthcoming)<br>77 Water Street, 21st Floor<br>New York, NY 10005<br>Tel (212) 232-1300<br>Fax (212) 232-1399<br>Seth.Weinstein@lewisbrisbois.com | Attorneys for Defendants<br>Homeland Insurance Company; and<br>Hallmark Specialty Insurance<br>Company |
| FAEGRE DRINKER BIDDLE & REATH LLP<br>Kristopher S. Davis (SBN 193452)<br>1800 Century Park East Suite 1500<br>Los Angeles, CA 90067-1517<br>Tel (310) 203-4000<br>Fax (310) 229-1285<br>kristopher.davis@faegredrinker.com<br><br>RIKER DANZIG SCHERER HYLAND<br>& PERRETTI LLP<br>Brian E. O'Donnell (admitted *pro hac vice*)<br>Maura C. Smith (admitted *pro hac vice*)<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, NJ 07962-6981<br>Tel (973) 538-0800<br>Fax (973) 538-1984<br>bodonnell@riker.com<br>msmith@RIKER.com | Attorneys for Defendant<br>Mitsui Sumitomo Insurance<br>Company of America |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' REPLY
4

Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1988 of 2921

| Counsel | Defendants |
|---|---|
| PHELPS DUNBAR LLP<br>Jay R. Sever  (SBN 165859)<br>365 Canal Street, Suite 2000<br>New Orleans, LA 70130-6534<br>Tel (504) 566-1311<br>Fax (504) 568-9130<br>jay.sever@phelps.com<br><br>SELMAN BREITMAN LLP<br>Meka Moore  (SBN 180017)<br>Damian L. Palombi (SBN 311252)<br>11766 Wilshire Boulevard, 6th Floor<br>Los Angeles, CA 90025-6538<br>Tel (310) 445-0800<br>Fax (310) 473-2525<br>mmoore@selmanlaw.com<br>dpalombi@selmanlaw.com | Attorneys for Defendant<br>Scottsdale Insurance Company |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' REPLY

5

Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1989 of 2921

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    I, Amy M. Churan, declare as follows:

2        1.    I am an attorney duly licensed to practice law in California and before this Court. I

3    am a partner in the law firm of Robins Kaplan LLP and counsel of record for Defendants Ironshore

4    Specialty Insurance Company; Certain Underwriters at Lloyd's, London and London market

5    companies Subscribing To Policy No. (UMR) B0180PG1902606; Certain Underwriters at Lloyd's,

6    London and London market companies Subscribing To Policy No. (UMR) B0180PG1902611;

7    Certain Underwriters at Lloyd's, London Subscribing To Policy No. (UMR) B0180PG1902610;

8    Certain Underwriters at Lloyd's, London Subscribing To Policy No. (UMR) B0180PG1903066;

9    Certain Underwriters at Lloyd's, London Subscribing To Policy No. (UMR) B0180PG1902622;

10    Ategrity Specialty Insurance Company; and RSUI Indemnity Company. I am familiar with and

11    have first-hand personal knowledge of the pleadings, records, and proceedings in this matter.

12        2.    This Declaration is made in support of Defendants' Reply Memorandum of Points

13    and Authorities in Further Support of Defendants' Motion for Judgment on the Pleadings filed

14    concurrently herewith. The matters contained within this declaration are based upon materials

15    provided to me by the Defendants I represent or my review of the files in this and related matters,

16    and if called upon to do so, I could and would competently testify thereto.

17        3.    Attached hereto as **Exhibit 1** is a copy of JRK Property Holdings, Inc.'s original

18    Complaint, dated January 19, 2021, filed in *JRK Property Holdings, Inc. v. Colony Insurance*

19    *Company*, No. 21-cv-71-RDA-MSN, in the United States District Court for the Eastern District of

20    Virginia.

21        I declare under penalty of perjury under the laws of the United States of America and the

22    State of California that the foregoing is true and correct to the best of my knowledge.

23        Executed at Los Angeles, California, on March 23, 2022.

24

25                                **ROBINS KAPLAN LLP**

26

27                                By: _____
                                    Amy M. Churan

28

DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' REPLY
6

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 1990 of 2921**

# Exhibit 1

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1991 of 2921**

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| JRK PROPERTY HOLDINGS, INC.,<br>                         Plaintiff,<br><br>         v.<br><br>COLONY INSURANCE COMPANY, GENERAL STAR INDEMNITY COMPANY, IRONSHORE SPECIALTY INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B0180PG1902606; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B0180PG1902611; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B01PG1902610; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B0180PG1903066; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. (UMR) B0180PG1902622; MAXUM INDEMNITY COMPANY, ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, EVANSTON INSURANCE COMPANY, CRUM & FORSTER SPECIALTY INSURANCE COMPANY, ATEGRITY SPECIALTY INSURANCE COMPANY, SCOTTSDALE INSURANCE COMPANY, HOMELAND INSURANCE COMPANY, HALLMARK SPECIALTY INSURANCE COMPANY, RSUI INDEMNITY COMPANY, and MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA,<br>                         Defendant. | Civil Action No.<br><br><br>JURY TRIAL DEMANDED |

# __COMPLAINT__

Plaintiff JRK Property Holdings, Inc. ("JRK" or "Plaintiff"), by and through the

undersigned attorneys, as and for its Complaint against Colony Insurance Company, General Star

Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 1992 of 2921

Indemnity Company, Ironshore Specialty Insurance Company, Certain Underwriters at Lloyd's of London Subscribing to the Policies listed herein, Endurance American Specialty Insurance Company, Evanston Insurance Company, Maxum Indemnity Company, Crum & Forster Specialty Insurance Company, Ategrity Specialty Insurance Company, Scottsdale Insurance Company, Homeland Insurance Company, Hallmark Specialty Insurance Company, RSUI Indemnity Company, and Mitsui Sumitomo Insurance Company of America (collectively, "Insurers" or "Defendants"), alleges as follows:

## **INTRODUCTION**

1.     This diversity action for anticipatory breach of contract and declaratory judgment arises out of Insurers' refusal to provide coverage they owe under an "all risk" insurance program for JRK's significant business losses arising out of the novel coronavirus outbreak and ongoing COVID-19 pandemic.  Despite issuing broad Business Interruption coverage policies that expressly include coverage for Interruption by Communicable Disease, Insurers have refused to compensate JRK for its losses.

2.     JRK specializes in ownership, management, leasing and redevelopment of real estate in primary and secondary markets throughout the United States.  JRK is invested in nearly 100 hotel and residential apartment properties in 22 states, including five in Virginia.  JRK employs more than 500 full and part-time employees and provides housing to more than 50,000 residents.  JRK increases the value of its properties by sustaining high occupancy levels, keeping expenses low, and maintaining a dedicated team.  Its business model, of course, depends on maintaining these high occupancy levels and charging competitive market rents and rates.

3.     The very qualities that make JRK a successful real estate investment firm made it particularly vulnerable to the devastating effects of the pandemic. In March 2020, with

confirmed cases of coronavirus already present in many of the states where JRK's properties are located, state and local leadership began implementing stay-at-home orders to stem the spread of the pandemic (the "Orders"). The Orders generally directed all non-essential businesses to cease operations and permitted residents to leave their homes only for limited purposes such as getting groceries or medicine, or to perform essential jobs. Restaurants and other non-essential businesses near JRK's properties were forced to close. Many government officials across the country explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus, including that the COVID-19 virus physically causes property loss or damage due to its tendency to attach to surfaces for prolonged periods of time.

4. The Orders, most of which have been renewed and extended multiple times, have devastated JRK's business. Overnight, hotel properties that were once busy, bustling destinations for travelers became ghost towns, decimating JRK's business. Due in part to loss of jobs and the economic decline, many of the existing residents of JRK's apartment properties have cancelled their leases, sought rent abatements or decreased rates, or simply have been unable to pay their rent. As a result of the pandemic and its consequences, JRK has been forced to lease its apartments at prices significantly lower than those common before the pandemic. Based on the information available to it, JRK has sustained tens of millions of dollars in damages since March 2020 and expects to suffer potentially hundreds of millions in losses from lost revenue, including unpaid and/or significantly decreased rent, as well as other losses and expenses in connection with the pandemic. These losses are expected to continue for the indefinite future, given that, even once the Orders are lifted, a return to normalcy will take many months, if not years.

5. However, like many prudent businesses, JRK had the foresight to purchase insurance for "business interruption" that covers the very risk to its business that materialized

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 1994 of 2921**

during the pandemic. To cover the majority of its portfolio, JRK purchased $250 million worth of property insurance in a layered program from the Insurers.  Each of the Insurers issued a policy that incorporates or follows form to a master property policy (the "Policy," and collectively, the "Policies") and each provides a specified share of the total coverage.  Except as noted within the individual Policies, the Insurers provide substantially identical coverage.

6.      That coverage includes, among other things, Business Interruption coverage for losses resulting from direct physical loss or damage, including interruption by communicable disease (such as the coronavirus).

7.      Relying on the terms of its Business Interruption Policies, JRK promptly wrote to the JRK Insurers and made a claim for coverage under the Policy following its initial losses caused by the pandemic and shutdowns.  However, in this time of crisis, the Insurers did not act to reimburse JRK's losses.  Instead, on July 6, 2020, through their appointed adjuster, Sedgwick Claims Management Services, Inc. ("Sedgwick"), the Insurers refused to take a coverage position, reserved their rights, and identified the Policy provisions they believed barred or limited coverage for JRK's claim.

8.      Insurers have given every indication they will not cover JRK's losses stemming from the pandemic and resulting shutdowns. In its correspondence to JRK, Sedgwick noted the Policy's requirement of direct physical loss or damage to insured property may bar coverage, suggesting it will follow others in the insurance industry attempting to claim that neither the virus nor the attendant disease causes physical loss or damage to property, as that terminology is used in the Policy.  Insurers' refusal to cover JRK's losses lacks any justifiable basis in law or fact.

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 1995 of 2921**

9.     The Insurers' position contravenes the plain meaning of the coverage language and case law in Virginia and across the country interpreting the same or similar language. Moreover, in direct contrast to other policies in the marketplace, the Policies expressly contain coverage for communicable diseases, confirming that the presence of a virus can cause loss or damage to property.

10.    As a result, JRK has been forced to bring this anticipatory breach of contract action through which it seeks damages and a declaratory judgment that Insurers' "defenses" do not bar its right to the coverage it paid substantial premiums for and badly needs.

## THE PARTIES

11.    Plaintiff JRK Property Holdings, Inc. ("JRK") is a corporation organized under the laws of California with its principal place of business in California. JRK owns and manages five multifamily properties in Virginia, including in Alexandria, Virginia.

12.    Upon information and belief, Defendant Colony Insurance Company is a Virginia corporation with its principal place of business in Virginia.

13.    Upon information and belief, Defendant General Star Indemnity Company is a Delaware corporation with its principal place of business in Connecticut.

14.    Upon information and belief, Defendant Ironshore Specialty Insurance Company is an Arizona corporation with its principal place of business in Massachusetts.

15.    Upon information and belief, a number of the Policies were issued by Lloyd's underwriting syndicates or consortiums that are organized and registered under the laws of the United Kingdom. The specific Lloyd's syndicates or consortiums that participate in the program are set forth below:

      a.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1967 WRB is an underwriting syndicate subscribing to Policy No.

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 1996 of 2921**

(UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.

b.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1861 ATL is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.

c.  Upon information and belief, Defendant Axis Specialty Europe SE, LIRMA A9505 is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.

d.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate AFB 2623 is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.

e.  Upon information and belief, Defendant Lex London is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902606 that is organized and registered under the laws of the United Kingdom.

f.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1225 AES is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902611 that is organized and registered under the laws of the United Kingdom.

g.  Upon information and belief, Defendant Endurance Worldwide Insurance Ltd., LIRMA E9105 is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902611 that is organized and registered under the laws of the United Kingdom.

h.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1886 is an underwriting syndicate subscribing to Policy No. (UMR) B01PG1902610 that is organized and registered under the laws of the United Kingdom.

i.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 0382 HDU is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1903066 that is organized and registered under the laws of the United Kingdom.

j.  Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1945 SII is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1903066 that is organized and registered under the laws of the United Kingdom.

      k.   Upon information and belief, Defendant Lloyd's Underwriter Syndicate No. 1200 AMA is an underwriting syndicate subscribing to Policy No. (UMR) B0180PG1902622 that is organized and registered under the laws of the United Kingdom.

16.    The Underwriters subscribing to said policies are incorporated in the United Kingdom and none have a principal place of business in California. The Underwriters may be served with process at FLWA Service Corp., c/o Foley & Lardner LLP, 555 California Street, Suite 1700, San Francisco, California 94104-1520.

17.    Upon information and belief, Defendant Endurance American Specialty Insurance Company is a Delaware corporation with its principal place of business in New York.

18.    Upon information and belief, Defendant Evanston Insurance Company is an Illinois corporation with its principal place of business in Illinois.

19.    Upon information and belief, Defendant Maxum Indemnity Company is a Connecticut corporation with its principal place of business in Connecticut.

20.    Upon information and belief, Defendant Crum & Forster Specialty Insurance Company is a Delaware corporation with its principal place of business in New Jersey.

21.    Upon information and belief, Defendant Ategrity Specialty Insurance Company is a Delaware corporation with its principal place of business in Arizona.

22.    Upon information and belief, Defendant Scottsdale Insurance Company is an Ohio corporation with its principal place of business in Arizona.

23.    Upon information and belief, Defendant Homeland Insurance Company is a New York corporation with its principal place of business in Minnesota.

24.    Upon information and belief, Defendant Hallmark Specialty Insurance Company is an Oklahoma corporation with its principal place of business in Texas.

25.    Upon information and belief, Defendant RSUI Indemnity Company is a New Hampshire corporation with its principal place of business in Georgia.

26.    Upon information and belief, Defendant Mitsui Sumitomo Insurance Company of America is a New York Stock Company with a home office in New York City.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

28.    Because Defendants have consented to the jurisdiction of JRK's choosing in the Policies, this Court has personal jurisdiction over Defendants with respect to these claims, pursuant to the Policies.

29.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's jurisdiction and a portion of the property that is the subject of this action is located in this district.

## FACTUAL ALLEGATIONS

### I.    The Coronavirus Outbreak

30.    In December 2019, during the term of the Policies, an outbreak of illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hubei Province, China. In an event that has not occurred in more than a century, a pandemic of global proportions then ensued, with the virus quickly spreading to Europe and then to the United States.

31.    From the first reported case in the United States in January 2020 to the present, the impact of the virus and the resulting disease has been staggering on life and property. And

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 1999 of 2921**

specifically, the impact on businesses such as JRK, whose livelihoods depend on travel, tourism, and steady incomes for Americans, has been particularly acute.

32.     As of February 26, 2020, the Centers for Disease Control and Prevention (the "CDC") warned that community transmission of the disease existed in the United States. The virus was spreading with no ability to trace the origins of new infections.[1] Moreover, the nature of the virus has made its containment particularly challenging. Numerous scientific studies and articles have concluded the virus spreads when droplets from an infected person land on objects and surfaces and then, after contacting the infected objects and surfaces, other individuals touch their eyes, noses, or mouths.

33.     Coronavirus has several modes of transmission.  Indeed, according to the CDC, "everyone is at risk for getting COVID-19." Per the CDC and World Health Organization (the "WHO"), a person may become infected by: (1) coming into close contact (about 6 feet) with a person who has COVID-19; (2) absorbing respiratory droplets when an infected person talks, sneezes, or coughs; or (3) touching surfaces or objects that have the virus on them and then touching his or her mouth, eyes, or nose.  Thus the coronavirus is present both in fluid particles in the air, and on surfaces.

34.     COVID-19 is not only highly contagious but deadly. According to the CDC, more than 24 million Americans have contracted the disease, of which more than 400,000 have died.

35.     Besides being deadly, the virus is challenging to contain because infected individuals can be asymptomatic—and thus unaware that they might be spreading the virus through the mere touching of objects and surfaces. Indeed, studies have estimated that more than

---

[1] *CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html (last visited July 24, 2020).

40% of infected individuals may never develop any symptoms.[2] But even individuals who appear healthy and present no identifiable symptoms of the disease will still spread the virus by merely breathing, speaking, or touching objects and surfaces.

36.     The virus also continues to evolve, making it more difficult to contain.  In late December 2020, a new strain of COVID-19 was detected, which is believed to be more contagious and easily spread.  Early research also suggests the new strain is resistant to antiviral treatment, making it more dangerous.

37.     Though droplets carrying the virus are not visible, they are nonetheless physical objects, carrying a physical substance, that attach to and cause harm to property. Studies have shown that the virus can actively survive on a whole range of surfaces, including stainless steel, wood, paper, plastic, glass, ceramic, cardboard, and cloth.

38.     And unlike many other viruses that are unable to survive for long periods of time outside the body, the novel coronavirus is resilient and survives on surfaces for days and even weeks. The virus thus compromises the physical integrity of the structures it permeates and poses an imminent risk of physical damage to all other structures. The virus likewise renders such structures unusable.

## II.     Coronavirus Causes Direct Physical Loss or Damage

39.     The United States reported its first COVID-19 case on January 20, and on January 30, the WHO declared the pandemic a "Public Health Emergency of International Concern."  On March 13, 2020, the federal government declared a national emergency. Three days later, the CDC and members of the national Coronavirus Task Force issued public guidance, styled as "30

---

[2] Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected*, NBC News (May 27, 2020, 12:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-common-suspected-n1215481.

Days to Slow the Spread," that advocated for the first time far-reaching social-distancing

measures, such as: working from home; avoiding shopping trips and gatherings of more than 10

people; and staying away from bars, restaurants, and food courts.

40.     By mid-March, it became clear that drastic action had to be taken to slow down

the rate of infections.  Many states and local governments then began to impose sweeping

restrictions on residents' daily lives and property to protect them and stop the spread.[3] Most

states restricted or prohibited the operation of non-essential businesses or public gatherings or

required individuals to stay at home except for essential purposes.

41.     States, counties, and cities where JRK properties are located declared states of

emergency to limit the spread of the virus.  They issued Orders suspending or severely curtailing

the operations of all non-essential or high-risk businesses and permitting residents to leave their

homes only for limited purposes, such as for groceries, medicine, and to perform essential jobs.

These Orders directly impacted JRK's hotels, residential tenants, and commercial tenants at issue

in this lawsuit.

42.     For example, on March 12, 2020, the Governor of Virginia, Ralph Northam,

declared a "State of Emergency" throughout the Commonwealth of Virginia.  On March 23,

2020, Governor Northam issued an Executive Order closing all non-essential businesses.  On

March 30, 2020, Governor Northam issued a Stay-at-Home Order for all Virginia residents,

requiring residents to stay home.

43.     Similar orders were issued in the other states where JRK owns properties, with

similar effects.  For example, New York Mayor de Blasio signed a series of stay-home orders

---

[3] Jasmine C. Lee et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. Times (updated July 31, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

and explained that these drastic measures were needed because of the unique characteristics of the novel coronavirus and, of particular relevance here, stating that "the virus physically is causing property loss and damage[.]" Similarly, Los Angeles Mayor Eric Garcetti issued a stay-at-home order that closed non-essential businesses and operations and directed residents to remain at home except for limited, essential purposes, recognizing that "the COVID-19 virus . . . is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time." The stay-home orders had wide-reaching impacts, including loss of jobs, resulting in tenants unable to pay previous market rents.

44.     Some of the above orders, as well as comparable orders from county and city officials in the states wherein JRK does business, specifically stated they were being issued because the virus has caused, causes, or will cause physical loss or damage to property.

45.     As the pandemic has evolved, the Orders have been renewed and amended by such authorities and continue to impose severe restrictions on all non-essential businesses and operations. In late 2020 and early 2021, as coronavirus cases continued to increase throughout the United States, cities and states that had lifted Orders or loosened restrictions entered a "second wave" of lockdowns. Renewed restrictions were applied throughout states where JRK has properties, including Virginia, Washington, New York, New Jersey, and Pennsylvania.

## III.     JRK's Business Interruption Losses

46.     JRK was founded in 1991 and owns modern, renovated apartments and hotels to rent and reserve throughout the United States. JRK currently owns properties in Virginia, California, Colorado, Connecticut, Florida, Georgia, Illinois, Massachusetts, Maryland, Michigan, Minnesota, North Carolina, Nebraska, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Texas, and Washington.

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 2003 of 2921**

47.     JRK prides itself on staffing its properties with friendly professionals who provide personalized service.  JRK's business model depends on sustaining high occupancy levels, keeping expenses low, charging competitive market rates and rents, and maintaining a dedicated team.

48.     The pandemic and the Orders have had a devastating effect on JRK's business. Before the pandemic, JRK's apartment properties attracted consistent and financially stable renters, but now, due to the pandemic and shutdown Orders, many of the residential tenants to whom JRK had leased apartments have been unable to continue paying rent, have sought and obtained decreased rental rates, or have terminated their leases.  Many Orders have not only prohibited residential evictions, but also allowed tenants to defer rent payments.  Other Orders have prohibited traditional lease enforcement mechanisms including late fees or interest on unpaid rent and the ability to charge premium rates for short-term leases; others have prohibited rent increases during the pandemic.  The state of Washington, for example, banned rent increases and late fees, stalled all evictions, and imposed restrictions on property owners' communications with tenants and rent collection efforts.

49.     These Orders have compounded JRK's losses by making it nearly impossible for it to recover late or unpaid rent payments.

50.      Pre-pandemic, JRK's hotels brought in millions of dollars in room revenue. But access to these properties has been limited or even prohibited by the Orders, and the hotels lost virtually all travelers, and thus revenue, overnight.  Hotels that remained open or have re-opened have incurred new costs for purchasing industrial disinfecting tools, installing hand sanitizer stations, and other remedial measures.

51.     Access to JRK's properties has been severely limited.  Some JRK residential properties were forced to close their leasing offices temporarily due to the presence of the virus on the premises and to contain the spread.  Prospective tenants who might have filled empty units have delayed or cancelled plans to move into a new property.  In properties with confirmed cases of coronavirus (including all of JRK's properties in Virginia), leasing offices have gone fully virtual, meaning prospective tenants are not able to tour or view open apartments, drastically reducing new rentals.  Businesses near JRK properties that would otherwise draw potential guests and tenants to the area have been closed or significantly reduced their services and capacity.

52.     The coronavirus is ubiquitous — it has spread throughout all fifty states, some individuals carry it with no symptoms, it cannot be visibly detected on surfaces and can remain on surfaces for weeks.  Indeed, there have been over 100 confirmed cases of COVID-19 in JRK properties across 18 states, including both tenants and employees.  The majority of JRK's residential properties (at least 60 properties) have had at least one resident test positive.  For example, in Virginia, at least 10 residents of JRK properties have had confirmed or suspected COVID cases.  JRK's residential properties are uniquely vulnerable to the physical damage the virus causes, as its apartment properties face increased exposure when tenants are ordered to "stay home," yet the public areas such as lobbies and elevators are required to be open for safety and building use.  Given the countless employees, tenants, and visitors entering and inhabiting JRK's nearly 100 properties since the start of the pandemic, and the number of cases already confirmed in JRK's properties, it is statistically certain that the virus has been present at *all* of JRK's properties for some period of time since the COVID-19 outbreak began and that the virus continues to pose an actual imminent threat to the properties.

53.     The JRK properties are within one mile of many other hotels, apartments, restaurants, cafes, bars, and parks that also have suffered and continue to suffer direct physical loss or damage to property arising out of the pandemic. The direct physical loss or damage to these surrounding properties has restricted access to those properties as well as JRK's nearby properties.

54.     As of the filing of this Complaint, JRK has sustained tens of millions of dollars in losses, which will increase substantially (potentially to hundreds of millions of dollars) depending on the length and ultimate severity of the pandemic and governmental responses. Indeed, many jurisdictions have halted or reversed plans to reopen non-essential businesses. In late 2020, many states, including the jurisdictions where JRK owns properties, reversed their reopening plans and/or ordered extensions to their stay-home orders, halting reopening plans. Regardless, a second wave of coronavirus infections came in the Fall and Winter, further compounding JRK's losses.

55.     As a result, JRK has suffered, and will continue to suffer, significant business interruption losses, potentially on the scale of hundreds of millions of dollars.

56.     The losses result from direct physical loss *or* damage to property, including, but not necessarily limited to: the actual presence of the virus at JRK's properties; the threatened presence of the virus at the properties due to its ubiquity; and the loss of function, purpose, and use of the properties—all caused by the virus, the resulting disease, the pandemic, governmental responses, the economic recession, inter-state and international travel restrictions, and/or the Orders.

Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 2006 of 2921

## IV.    JRK's Business Interruption Policies

57.     In exchange for substantial premiums, the Insurers sold the Policies covering JRK

as the Named Insured for the policy period June 1, 2019 to June 1, 2020.  See Ex. A (General

Star Policy No. IAG966951B) at PP 98 0028 (07/17), page 1 of 36.[4]  Each Policy is part of a

layered property insurance program (collectively, the "Policies"), in which each Insurer provides

a specified per-occurrence[5] limit of liability, as part of either a $5 million primary layer or an

excess layer, with various sublimits, time limits, and waiting periods for certain coverages, and a

per-occurrence deductibles. See Ex. A (page 1 of 36 ff).  The total property insurance program

JRK purchased provides up to $250 million in coverage.[6]

58.     Unless damage is clearly included within a listed sublimit, the full limit of

liability of each Policy is available for JRK's damages. *Id.*

59.     The Policy contains a broad grant of coverage, stating that except as otherwise

excluded, the "Perils Insured Against" are "all risks of direct physical loss or damage to Insured

Property."  Ex. A (page 23 of 36).

60.     The Policy does not define the phrase "direct physical loss or damage to Insured

Property."

---

[4] Each of the Policies listed and described herein is incorporated by reference into this Complaint.

[5] "Occurrence" means "the sum of all losses (individual or otherwise) covered under this Policy directly occasioned by any one disaster, accident or loss arising out of one event ('Loss or Losses') or series of disasters, accidents or losses arising out of one event ('Series of Losses') that occur(s) during the Policy Period anywhere within the Policy territory.  Except as specifically set forth below, the duration and extent of any one Occurrence shall be limited to all losses covered under this Policy occurring during any period of 168 consecutive hours arising out of and directly occasioned by the same event."  Ex. A (page 29 of 36).

[6] The Defendant Insurers make up $248,750,000 of the $250 million property program, as shown on the attached the schedule of insurance located in Exhibit A, at PP 98 0029 (page 1 of 1).  Two additional insurers that participate in the program are not party to this action, due to forum selection provisions in their policies.

61.     Courts throughout the country have interpreted this "direct physical loss or damage" to property language as including situations where a covered peril threatens property or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy or continued use.

62.     Relevant here, the Policy's Business Interruption coverage part "covers loss resulting from necessary interruption of business conducted by the Insured and caused by direct physical loss, damage, or destruction by any of the perils covered herein during the term of this policy to property insured herein." See Ex. A (page 7 of 36).

63.     As additional protection from perils insured under the Policy, the Policy provides Extra Expense coverage, and Rental Value/Rental Income coverage. The categories of compensable losses include, but are not limited to: lost profits; extra expense;[7] and rental income.[8]

64.     As part of its coverage for Business Interruption, Extra Expense, and Rental Value losses resulting from physical loss or damage to the JRK properties, the Policy provides several specific coverages.  They include, but are not limited to:

- Contingent Time Element coverage for losses resulting from direct physical loss or damage to a JRK supplier or customer;
- Loss resulting from orders of civil or military authority;
- Loss relating to ingress or egress; and
- Loss relating to the presence of communicable disease.

---

[7] "Extra Expense" means "the excess of the total cost during the period of restoration of the damaged property chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no loss or damage occurred." Ex. A (page 8 of 36).

[8] "Rental Value" is "the sum of: a) The total anticipated gross rental income from tenant occupancy and/or use of the described property as furnished and equipped by the Insured, and b) The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured, and c) The fair rental value of any portion of said property which is occupied by the Insured." Ex. A (page 8 of 36).

65. The Policy also includes several potentially applicable "coverage extensions." They include:

- Loss resulting from ordinances regulating the use and occupancy of insured property;
  Costs of decontamination;
- Expenses of preparing and certifying details of a claim for loss under the Policy; and
- Expenses of relocating and returning tenants or residents.

66. The Policy covers **contingent time element losses**—that is, losses sustained by JRK during the Period of Interruption, resulting from direct physical loss or damage to the real or personal property of a direct or indirect supplier or customer of the Insured which wholly or partially prevents such supplier or customer from supplying or accepting goods to or from JRK. Ex. A (pages 9-10 of 36).

67. The Policy covers **ingress/egress losses**—that is, "losses sustained … when as a direct result of a peril insured against, ingress to or egress from [JRK's] premises is thereby impaired." Ex. A (page 10 of 36).

68. The Policy covers **Rental Value loss**, meaning "loss sustained by [JRK] resulting directly from the necessary untenantability caused by direct physical loss, damage, or destruction by any of the perils covered herein during the term of this policy to Real and Personal Property as insured herein, but not exceeding the reduction in rental value less charges and expenses which do not necessarily continue during the period of untenantability." Ex. A (page 8-9 of 36).

69. The Policy provides Business Interruption coverage for **interruption by civil or military authority losses**—that is, losses sustained when, as a result of necessary interruption of business conducted by the Insured and caused by direct physical loss, damage, *or* destruction by any of the perils insured against, access to real or personal property is impaired by order of civil or military authority. Ex. A (page 10 of 36).

70.     The Policy also specifically recognizes that communicable disease creates direct

physical loss or damage to property, and as such, is a "peril insured against." Specifically, the

Policy covers **communicable disease losses**, including:

> Actual Loss Sustained and Extra Expense incurred by [JRK] during the
> Period of Liability if access to a Location owned, leased or rented by
> [JRK] is limited, restricted, or prohibited as a result of:
>
> a. An order of an authorized governmental agency regulating the
> actual not suspected presence of communicable disease[9]; or
>
> b. A decision of an Officer of [JRK] as a result of the actual not
> suspected presence of communicable disease.

Ex. A (page 10 of 36).[10]

71.     The JRK properties where JRK has sustained losses are insured properties under

the Policy, and the insured losses include long-term deterioration in value of JRK's properties

and portfolio, and increased costs, expenses, and resulting debts.

72.     JRK reasonably expected that the Policy would cover such losses, based on,

among other things, the broad language of the Policy, the express coverage for losses resulting

from communicable disease, and the fact that the Policy does not contain language excluding

damages resulting from viruses or diseases.

73.     JRK has paid all premiums due to Insurers to purchase the Policy and has

complied with all applicable duties under the Policy.

74.     Throughout the pandemic, JRK has taken actions, some of which qualify to

protect the property, and thus Insurers, from further loss, including taking short term bridge

financing on properties whose mortgages were maturing in 2020 and, without such financing,

---

[9] "Communicable Disease" means "disease" that is" "transmissible from human to human by direct or indirect contact
with an affected individual or the individual's discharges" or "[l]egionellosis." Ex. A (page 11 of 36).

[10] The policy issued by Defendant Ironshore contains an endorsement excluding coverage for Communicable Disease.

would had to have been sold at a substantial discount. The Policy covers expenses "incurred by [JRK] in taking reasonable and necessary actions for the temporary protection and preservation of property insured hereunder," which expenses "shall be added to the total physical loss or damage otherwise recoverable under this Policy." Ex. A (page 35 of 36).

75.     Moreover, none of the Policy's exclusions preclude JRK's claim for coverage. Rather, the exclusions in the Policy consist of standardized language and terms that have been developed by the insurance industry through its trade associations and are used industry-wide and nationwide. These terms have acquired specialized meaning and application over time as they have been interpreted by courts.

## V.     JRK's Claim for Coverage

76.     In March 2020, after some of the JRK properties were temporarily closed or use was limited, access to these properties was denied, and JRK apartment properties faced severe decreases in rent collected, JRK gave prompt notice of its claim to the primary and first-excess Insurers.  Sedgwick, Insurers' adjuster, initially responded to that notice on July 6, 2020, reserving its rights and indicating that the Insurers on the program "do not have sufficient information to advise you as to whether or not there may be coverage under the Policies," but it did not make any specific requests for information (the "July 6 Letter").[11]

77.     In August 2020, in view of its increasing losses likely to exceed $10 million, JRK gave notice of its claim to its higher-level excess carriers, Defendants Maxum, Endurance, Evanston, Crum & Forster, Ategrity, Scottsdale, Homeland, Hallmark, RSUI, and Mitsui Sumitomo on August 17, 2020.  Sedgwick has acknowledged receipt but has not provided a coverage position.

---

[11] The July 6 Letter was sent on behalf of Defendants Ironshore, General Star, Certain Underwriters, and Colony.

78.     Instead of honoring its obligations under the Policy, Sedgwick, on behalf of the JRK Insurers, effectively denied coverage by identifying the Policy provisions it claims may bar or limit coverage and/or failing to respond substantively to JRK's second notice.

79.     JRK Insurers' suggestion that coverage is barred by the Policy is erroneous. As pleaded, there has been direct physical loss or damage to property, including, but not necessarily limited to, the actual presence of the virus in the JRK properties; the threatened presence of the virus in the JRK properties due to its ubiquity; and the loss of function and purpose of the JRK properties—all caused by the virus, the resulting disease, the pandemic, governmental negligence, or the Orders.

80.     In the July 6 Letter, Sedgwick indicated Insurers' view that, to the extent it believes coverage is available, coverage may be limited to the Communicable Disease provisions. As Sedgwick wrote, "Insurers wish to draw JRK's attention to applicable sub-limits for those Policies providing coverage identified as Interruption by Communicable Disease coverage."

81.     That position is likewise erroneous. While Insurers correctly acknowledged that the coronavirus triggers the Policy's Business Interruption coverage, their singular focus on the Communicable Disease sublimit is a blatant attempt to limit their exposure and reduce the amount JRK can recover for its losses.  JRK's significant costs and losses are not limited solely to recovery under the Communicable Disease provisions. The limited or prohibited access to JRK properties was a result of the global pandemic and government responses to it, not due to an order by a governmental agency or JRK officer arising from the actual not suspected presence of the virus. Regardless, the threatened presence of the virus at the JRK properties or the loss of function and purpose of the properties qualifies as "physical loss or damage to [property]."

Moreover, the Orders regulate not the communicable disease itself, but the threat of the communicable disease or the spread of the virus that causes the disease.

82.     Sedgwick also raised a variety of exclusions, including the Pollution or Contamination exclusion, communicating that the Insurers deny that JRK's losses are covered under the Policy.

83.     No exclusion applies, however, because, among other potential reasons, JRK's losses do not stem from the "release, discharge, dispersal, seepage, migration, or escape of Pollutants or Contaminants."  And even if such pollution or contamination did occur, such pollution or contamination would have led to a covered peril and, as such, would be covered by the Policy.

84.     Moreover, the "Pollution and Contamination Exclusion Clause" plainly does not apply to JRK's losses.  That clause begins with the word "Pollution," showing that it only applies to actual Pollution, and not to the pandemic.  The remainder of the provision confirms that excluded damages must result from the "release, discharge, dispersal, seepage, migration, or escape" of pollutants and/or contaminants, which terms are well-established terms of art in environmental law and applicable to pollutants or contaminants used or maintained in the course of an insured's business that may be accidentally released or discharged from their containment. This exclusion does not apply to JRK's claim.

85.     As evidence that pollution or contamination does not apply to the coronavirus pandemic, in 2006, the Insurance Services Office (an insurance industry trade group) drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents. The endorsement, which other insurers have since incorporated in policies,

provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Defendants chose to not include this endorsement or an analogous provision in the Policy; instead, it included only the exclusion for "pollution or contamination."

86.     JRK's losses, moreover, resulted from a number of causes other than the virus or disease, including, but not necessarily limited to, the pandemic, governmental negligence, or the Orders, all of which are other covered causes of loss under the Policy.

87.     The July 6 letter from Sedgwick sent a clear message that Insurers did not intend to pay JRK's significant losses covered under the Policy.

88.     The Insurers' responses (or lack thereof) have further harmed JRK by depriving it of the benefit of the bargain it purchased in the Policy.  Insurers' refusal to reimburse JRK for its losses have had detrimental effects on the overall financial strength of the company and its ability to invest in properties.  Without the coverage JRK bargained for, it is facing significant cash flow deficits such that it is being forced to sell properties at below market prices, halt renovations to its residential properties, and enter into financing deals with onerous, unfavorable terms just to keep some properties.  Had Insurers abided by the terms of the Policy and reimbursed JRK for its losses, JRK would have been able to refinance mortgages on certain properties instead of taking on these onerous short term bridge financing deals.

## FIRST CAUSE OF ACTION
### (Anticipatory Breach of Contract)

89.     JRK repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

90.     The Policies constitute valid and enforceable contracts between JRK, as the "Named Insured," and Insurers, as the "Company" providing the insurance, under each Policy.

91.     As described above, JRK has sustained, and is continuing to sustain, losses covered under the Policy and during the policy period.

92.     JRK provided prompt notice of its losses, and had performed all obligations required of it under the Policy at the time Insurers effectively denied coverage on July 6 by providing only Policy provisions it claimed would bar or limit coverage, with no good faith follow up or investigation.  The July 6 Letter was a clear expression that Insurers would not perform their obligations to provide coverage to JRK under the Policy and in breach of the Policy.

93.     Insurers' further statement that JRK's recovery may be limited by the communicable disease coverage of the Policy was a positive and unequivocal expression that Insurers would not perform their obligations to provide coverage outside of the communicable disease coverage, despite admitting that the virus triggered the Policy's Business Interruption coverage.

94.     Under the terms of the Policy, Insurers must pay up to the full limits for each Policy for any loss covered under the Policy, subject only to sublimits, time limits, waiting periods, or deductibles for specific coverages.

95.     Insurers have not paid any amounts to JRK in connection with its claim, and JRK has a reasonable belief that they will not pay the full amount they are required to pay under the Policy for JRK's coronavirus losses.  Instead, Insurers have asserted various inapplicable bases to wrongfully deny coverage for JRK's claim.

96.     As a direct and proximate result of Insurers' anticipatory breach of contract, JRK has suffered and will continue to suffer damages in an amount to be determined at trial, plus

consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent

permitted by law.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment)**

97.     JRK repeats and realleges the allegations set forth in the foregoing paragraphs of

this Complaint as if fully set forth herein.

98.     Pursuant to the terms of the Policy, Insurers are obligated to pay, up to the limit of

liability, for property damage or time element losses covered under the Policy and not otherwise

excluded from coverage.

99.     As detailed above, JRK's losses are covered under multiple coverages of the

Policy and are not excluded from coverage.

100.    Insurers dispute, or JRK reasonably believes Insurers will dispute, Insurers' legal

obligation to pay JRK's claim.

101.    JRK seeks a declaration by this Court of Insurers' obligations under the Policies.

102.    An actionable and justiciable controversy exists or will exist between JRK and

Insurers concerning the proper construction of the Policy, and the rights and obligations of the

parties thereto, with respect to JRK's claim for expenses or losses arising out of the pandemic.

103.    JRK seeks a declaratory judgment in favor of JRK and against Insurers declaring

the following:

- JRK has experienced "direct physical loss or damage to [property]" as that phrase is used
  in the Policy, sufficient to trigger coverage;

- No exclusion, including the so-called pollution or contamination exclusion, or the "loss
  of use" exclusion, bars that coverage;

- Defendants must pay JRK up to their respective limits of liability for all losses covered
  under the Policy; and

- The award of such additional relief as the Court deems just and appropriate.

104.    A declaratory judgment would be useful in resolving this case or controversy. JRK's losses are ongoing. By clarifying the parties' rights and duties under the Policy, a declaratory judgment would guide Insurers' treatment of JRK's covered, but yet unaccrued, losses, in addition to the significant damages JRK has already accrued. Because JRK's unaccrued losses have not yet ripened such that a final amount of damages can be ascertained, the declaratory judgment claim would afford JRK relief independent of the anticipatory breach of contract claim.

## PRAYER FOR RELIEF

WHEREFORE, JRK prays for relief as follows:

a.    On the First Cause of Action, JRK requests that the Court enter judgment against Insurers, awarding JRK damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

b.    On the Second Cause of Action, JRK requests that the Court enter a declaratory judgment in favor of JRK against Insurers that JRK's losses are covered under the Policy, declaring that Insurers are required to pay JRK, up to the applicable limits of each Policy, for claimed amounts under the Policy;

c.    For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all JRK's costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

d.    JRK requests such other and further relief as the Court deems just and proper.

## JURY DEMAND

JRK hereby demands a trial by jury on all issues so triable.

Dated: January 19, 2021

**MITCHELL SANDLER, LLC**

/s/  *Robyn Cort Quattrone*
Robyn Cort Quattrone (VA Bar No. 43117)
Andrew L Sandler (*pro hac vice* forthcoming)
Stephen LeBlanc (*pro hac vice* forthcoming)
Rebecca Guiterman (*pro hac vice*
forthcoming)
**MITCHELL SANDLER LLC**
1120 20th Street NW, Suite 725
Washington, DC 20036
Telephone: (202) 886-5260

Robin Cohen (*pro hac vice* forthcoming)
rcohen@cohenziffer.com
Meredith Elkins (*pro hac vice* forthcoming)
melkins@cohenziffer.com
**COHEN ZIFFER FRENCHMAN &
McKENNA LLP**
1350 Avenue of the Americas
New York, NY 10019

*Attorneys for Plaintiff*

Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 2018 of 2921

1

2

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES        )

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 2049 Century Park East, Suite 3400, Los Angeles, California 90067-3208.

On March 23, 2022, I served the foregoing document **DECLARATION OF AMY M. CHURAN IN SUPPORT OF DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** on the interested parties in this action as follows:

| | |
|---|---|
| Kevin J. Minnick<br>Sperstus, Landes & Umhofer LLP<br>617 West 7th Street, Suite 200<br>Los Angeles, CA 90017<br>Tel.:  213.205.6520<br>kminnick@spertuslaw.com | Attorney for Plaintiff<br>JRK PROPERTY HOLDINGS, INC. |

**[X]**    **(BY ELECTRONIC SERVICE ):** I caused each document to be sent by electronic transmission through One Legal through the user interface at www.onelegal.com to all email addresses on the list maintained by One Legal.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 23, 2022 at Los Angeles, California.

_____
Jwana Harrold

**Exhibit 140 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**    **Page 2019 of 2921**