EXHIBIT 152

Lisa C. Wood, Esq. (ID No. 050411992)
Gregory T. Dennison, Esq. (ID No. 039111997)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932-2266
(973) 622-3689
lwood@saiber.com
*Attorneys for Defendant*
*Allied World Assurance Company (U.S.) Inc.*

| | |
|---|---|
| URBAN EDGE PROPERTIES, and URBAN EDGE PROPERTIES LP,<br><br>Plaintiffs,<br><br>v.<br><br>ALLIED WORLD ASSURANCE COMPANY (U.S.) INC. and GREENWICH INSURANCE COMPANY,<br><br>Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: BERGN COUNTY DOCKET NO.: BER-L-007987-20<br><br>Civil Action<br><br>**ORDER GRANTING PARTIAL SUMMARY JUDGMENT** |

**THIS MATTER** having been opened to the Court upon application of Saiber LLC, counsel for Defendant Allied World Assurance Company (U.S.) Inc., pursuant to Rule 4:46-2 of the Rules Governing the Courts of the State of New Jersey, and the Court having read and considered the moving papers and any opposition therewith, and oral argument having been heard, and for good cause having been shown;

**IT IS** on this 10th day of January 2023,

**ORDERED** that the motion of Defendant Allied World Assurance Company (U.S.) Inc. for summary judgment against Urban Edge Properties, and Urban Edge Properties LP, be and the same hereby is **GRANTED IN PART AND DENIED IN PART**; and

**ORDERED** that Urban Edge Properties' and Urban Edge Properties LP's Complaint against Allied World Assurance Company (U.S.), Inc. be and the same hereby is **DISMISSED IN PART** with prejudice.

**Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**IT IS FURTHER ORDERED** that this Order is automatically served via eCourts to all

parties of record.

_____

**HON. DAVID V. NASTA, J.S.C.**

[ X ]  Opposed
[   ]  Unopposed

ORAL ARGUMENT HELD
Reasons stated on the record.

Re: **Urban Edge Properties, et. al v. Allied World Assurance Company (U.S.), Inc. [BER L-7987-20]**

Motion for Summary Judgment                    Return Date/Oral Argument: 12/16/22

**Preliminary Statement:**

      This matter comes before the Court on Allied World Assurance Company (U.S.) Inc.'s ("Defendant" or "AWAC") motion for summary judgment. The court renders the decision herein after extensive briefing and oral argument. This matter arises as a result of the hundreds (and perhaps thousands) of issues resulting from the COVID-19 pandemic that has gripped the world for three (3) years. The potential broad implications of this matter are not lost on this Court.

      As a general matter AWAC urges the Court to consider the fundamental principle that a Court should not write a better contract than the parties have written for themselves. In opposition, Urban Edge Properties and Urban Edge Properties LP (together, "Plaintiff" or "Urban Edge") argues that the governing insurance agreement is the by-product of extensive negotiations between sophisticated parties, so the resulting insurance contract may be interpreted in vastly different ways. Urban Edge urges that numerous questions of fact are thus created for ultimate adjudication by a jury.

**Questions Presented:**

      Initially, there are two general questions which this Court must address: (1) whether Urban Edge has presented a sufficient factual dispute on the issue of its Business Interruption Coverage to survive summary judgment, and (2) whether Urban Edge has presented a sufficient factual dispute on the issue of its Contingent Business Interruption Coverage.

      More specifically, several other questions arise for the court's review including the following:

1. Whether the Policy requires a complete or partial suspension of operations for Business Interruption coverage;

2. What the word "solely," as used in the causation provision "solely and directly," means in the Policy;

3.  Whether the governmental orders which denied access to Urban Edge's properties had to do so completely or partially;

4.  Whether there is sufficient evidence that Urban Edge was denied access by the government orders to survive summary judgment; and

5.  Whether AWAC denied coverage to Urban Edge for its COVID-19 related Business Interruption and Contingent Business Interruption claims or in the alternative whether Urban Edge's actions to suspend or modify rent payments constituted a violation of policy provisions forbidding such action or compliance with a duty to mitigate.

**Statement of Facts:**

Urban Edge is a commercial landlord that owns properties primarily in New Jersey and the greater New York Metropolitan area. Urban Edge's primary source of revenue is rent from its commercial retail tenants.

AWAC is an insurance company that sold a Scheduled Location Pollution Liability Insurance Policy (the "Policy") to Urban Edge.

Plaintiffs have sued Defendants AWAC and Greenwich Insurance Company under their respective policies which supposedly cover business losses Urban Edge sustained during the COVID-19 global pandemic. A stipulation of dismissal for Greenwich Insurance Company was filed on December 2, 2021. AWAC now moves for summary judgment on the issue of coverage.

Urban Edge alleges that its claim is similar to nearly six hundred (600) other claims made throughout the country by other insureds under the same or similar policy provisions. They further allege that all of these claims have been denied by AWAC, that only three (3) of these cases (including the one presently before this Court) have advanced through litigation, and no decision on the merits has ultimately been rendered. These assertions are uncontested by AWAC.

I.  Events

**Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its Oppositions to Defendants' Motions for Summary Judgment**

**Page 2150 of 2921**

In the Spring of 2020, various state and local governments issued orders closing non-essential businesses to combat the COVID-19 pandemic.

Some of Urban Edge's tenants continued to pay rent, some claimed bankruptcy, and others litigated their obligations to pay rent. Urban Edge offered a rental assistance program on its own initiative to maintain its relationships with its tenants and secure future rent. Applications for rent abatements above $20,000 had to be approved by Urban Edge's CEO. The parties agree that in the relevant time period, Urban Edge granted a total of $12,015,587 in rent abatements to some of its tenants on a case-by-case basis.

II.    Contract Language

The Policy covers "business interruption costs resulting from business interruption" subject to other conditions irrelevant to this dispute. This coverage is provided in Endorsement No. 5.

"Business Interruption Costs" is defined in Endorsement No. 5 as "actual loss of business income and extra expense you incur during the business interruption period. Business interruption costs will be reduced to the extent that the insured can resume operations, in whole or in part, at the scheduled location, or by making use of other locations. Business interruption costs shall not include any amounts that do not directly result from a covered pollution incident."

"Business Income" is defined inconsistently across Endorsement No. 5 and Endorsement No. 18. The definition in Endorsement No. 5 reads, "(a) Your net profit or loss before income taxes that would have been earned or incurred had there been no business interruption; (b) Your continuing normal operating and payroll expenses, except for payroll expenses of officers, executive, department managers and employees under contract." The definition in Endorsement No. 18 reads "(a) Your net profit or loss before income taxes, including rental income, that would have been earned or incurred had there been no business interruption." (emphasis added). The rest of the language is the same. The Court will accept the definition in No. 18 as controlling because it is more inclusive and it was was crafted by AWAC; the

Court is required to make all reasonable inferences in favor of Urban Edge on a motion for summary judgment and in the face of this discrepancy the Policy will be construed against the drafter.

"Rental Income" is defined in Endorsement No. 18 as "the actual net rental income, if any, that would have been earned by you under an existing written lease of premises at the scheduled location had there been no business interruption, provided that the leased premises is rendered untenable for the use disclosed to us in the Application for this policy."

"Business Interruption" is defined in Endorsement No. 5 as "the necessary suspension of your operations at a scheduled location, provided that such suspension of your operations first commenced during the policy period and is caused solely and directly by a pollution incident on, at or under at a scheduled location; or [c]ontingent business interruption."

"Contingent Business Interruption" is defined in Endorsement No. 5 as "the necessary suspension of your operations at a scheduled location as a result of an order by a government body or authority denying access to the scheduled location, provided that: (a) [s]uch suspension first commenced during the policy period and is caused solely and directly by a pollution incident on, at or under an independent location; (b) [s]uch order is solely and directly the result of a pollution incident at the independent location; and (c) [a]n insured is not legally liable for such pollution incident."

"Business Interruption Period" is defined in Endorsement No. 5 as "the period of time that begins the 72 hours… after the time and date that the business interruption first commenced, and ends at the time and on the date that is the earlier of: (a) [t]he time and date that the insured resumes normal business operation at the scheduled location or at another location; … (c) [t]he time and date that is three hundred sixty five (365) days after the time and date that the business interruption first commenced; and (d) [w]ith respect to business interruption costs resulting from contingent business interruption only, the date and time the insured is allowed access to the scheduled location on an other-than-temporary basis."

"Scheduled Location" is defined in Endorsement No. 30 as "the location(s) entered in Item 5[] of the Declarations and an inadvertently omitted location." The definition of "inadvertently omitted location" is not relevant at this moment.

"Independent Location" is defined in Endorsement No. 5 as "a location that is not and was not at any time: (a) a scheduled location; or (b) a location owned, leased, managed, operated, or used by an insured."

"Pollution Incident" is defined in Endorsement No. 17 as "… (b) [t]he presence of microbial matter… on, at or within buildings or structures…"

"Microbial Matter" is defined in Endorsement No. 14 as "fungi, mold, bacteria or viruses which reproduce through the splitting of cells, the release of spores or by any other means, whether or not such microbial matter is living."

"Emergency Response Expense" is defined in Section VII, subpart 11 as "reasonable and necessary expenses incurred by you: (a) on an emergency basis, to remediate a pollution incident which is an imminent and substantial threat to human health or the environment; and (b) for the period of no more than seven (7) consecutive days beginning on the day that the pollution incident was first discovered."

Section VI, subpart 17(c) of the Policy reads: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than emergency response expense for which you are entitled to recover under this policy, without our prior consent."

III.   <u>AWAC's Arguments</u>

A.   <u>Business Interruption Coverage</u>

In response to Urban Edge's claim for business interruption coverage, AWAC essentially argues that the COVID-19 virus was an insufficient cause of Urban Edge's property closures and both the factual and proximate causes were the government orders; in other words, but for the government orders, the properties would have remained open. Because the government orders were at least an intervening cause, Urban Edge cannot satisfy the "solely and directly" causation standard required by the Policy.

AWAC argues that Urban Edge has failed to show that they ceased their operations completely as required by the Policy and that the presence of COVID-19 "solely and directly" caused the suspension. AWAC argues that the presence of COVID-19 "everywhere," in the vague sense, does not establish a

causal link between COVID-19's presence and Urban Edge's suspension of operations. They concede on reply, however, that COVID-19 was most likely present at the scheduled locations.

AWAC interprets the language "necessary suspension of your operations" to mean a complete cessation of operations, and the language "solely and directly by a pollution incident on, at or under at a scheduled location" to impose the burden on Urban Edge to show (1) that COVID-19 existed at the scheduled location, and (2) that COVID-19 was the exclusive and immediate cause of the cessation of operations. AWAC cites Miller v. Monumental Life Ins. Co., 761 F. Supp 2d 1123, 1149 (D.N.M. 2009) and Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co., 693 F.3d 665, 674 (6th Cir. 2012) in support of this interpretation of the word "solely." To show that this "solely and directly" causation standard is greater than proximate causation, AWAC cites the unpublished decision in Arkema, Inc. v. Commerce & Indus. Ins. Co., 2007 U.S. Dist. LEXIS 23454 at *10-11 (E.D. Pa. March 6, 2007). AWAC cites Cent. Laundry, LLC v. Ill. Union Ins. Co., 578 F. Supp. 3d 781, 794-795 (E.D. Va. 2022) for its interpretation of the phrase "directly attributable;" that Court held "directly attributable" required proximate causation, and that despite evidence of employees testing positive for COVID-19, the government's restrictions on the insured's business caused their losses rather than COVID-19. Id. at *26-27.

AWAC initially cited Colectivo Coffee Roasters, Inc. v. Soc'y Ins., 974 N.W.2d 442, 449 (Wis. 2022) in support of its proposition that the "possible presence" of COVID-19 does not trigger contamination coverage and that without proof of actual presence, the suspension may have been caused by government orders rather than the pollution as required by the Policy; again, however, AWAC has conceded this point on reply. AWAC points to Urban Edge's answers to Interrogatories, which show the dates and times on which it closed its properties coincided with the dates of the government orders in their respective jurisdictions. They further point to Urban Edge's letter stating the properties would remain open as permitted by state executive orders to demonstrate that the suspension was caused by the government's orders, rather than the presence of COVID-19.

B.  Contingent Business Interruption Coverage

AWAC submits that the single pollution incident which triggers coverage must be the sole and direct cause of both the suspension and the government order denying access to that property. In response to Urban Edge's claim for contingent business interruption coverage, AWAC asserts that Urban Edge has failed to show that the government orders (1) completely denied access to any scheduled locations, and (2) were solely and directly the result of a pollution incident at an independent location.

AWAC claims the COVID orders did not completely prohibit access to properties, as in cases like Mac Property Group LLC v. Selective Fire & Cas. Ins. Co., 473 N.J. Super. 1, 30 (App. Div. 2022), Highgate Hotels, L.P. v. Liberty Mut. Fire Ins. Co., 2021 N.J. Super. Unpub. LEXIS 2404, at *16-17 (Law Div. Oct. 5, 2021) (Wilson, J.), John Gore Org., Inc. v. Fed. Ins. Co., 2022 U.S. Dist. LEXIS 52803, at *33 (S.D.N.Y. Mar. 23, 2022), Sandy Point Dental, PC v. Cincinnati Ins. Co., 2020 WL 5630465, at *3 (N.D. Ill. Sept. 20, 2020), and Mark's Engine Co. No. 28 Rest. v. Travelers Indem. Co., 2020 U.S. Dist. LEXIS 188463, at *13 (C.D.Ca. Oct. 20, 2020).

AWAC states the government orders were prophylactic measures implemented to combat the threat of the pandemic and "flatten the curve," but they were not implemented because COVID-19 existed in any particular independent location. AWAC interprets the phrase "flatten the curve," as used by the American government and all its subparts, means to reduce the rate of future infections, not reduce the number of current ones. AWAC cites JWC Fitness, LLC v. Murphy, 469 N.J. Super. 414 (App. Div. 2021), Valley Health Sys. v. Zurich Am. Ins. Co., 2021 N.J. Super. Unpub. LEXIS 2505, at *18-19 (Law Div. Oct. 18, 2021) (stay at home orders "were not issued in response to any specific physical loss or damage to any identifiable property"), and Infinity Real Estate, LLC v. Travelers Excess & Surplus Lines Co., 2021 U.S. Dist. LEXIS 173912, at *10 (E.D. Pa. Sept. 13, 2021) (omnipresence of COVID-19 was insufficient to trigger coverage because the government orders were not responsive to a specific property) in support of these positions. AWAC further cites United Air Lines v. Ins. Co. of the State of Pa., 439 F.3d 128, 132-135 (2d Cir. 2006) (dealing with government closure orders following the September 11, 2001, terrorist attacks) and S. Tex. Med. Clinics, P.A. v. CNA Fin. Corp., 2008 U.S. Dist. LEXIS 11460

(S.D.Tx., Feb. 15, 2008) (dealing with government closure orders in anticipation of Hurricane Rita) as examples of government closure orders that were not responsive to physical damage at specific locations.

    C.  <u>Waiver</u>

AWAC further argues that even if coverage under the policy is assumed, Urban Edge waived its right to claim coverage by granting voluntary rent abatements to its tenants. AWAC asserts that they did not immediately deny coverage to Urban Edge when they received Urban Edge's claim, so Urban Edge was required to seek AWAC's consent before "voluntarily mak[ing] a payment, assum[ing] any obligation, or incur[ring] any expense" for which they could seek coverage.

AWAC asserts that the rent abatements Urban Edge granted to some of its tenants constitute voluntary payments which were prohibited by Section VI, subpart 17(c) of the Policy. AWAC claims it had not denied coverage to Urban Edge at the time these abatements were granted, so Urban Edge had a continuing obligation not to make such payments without AWAC's prior consent.

  IV.  <u>Urban Edge's Arguments</u>

    A.  <u>Business Interruption Coverage</u>

Urban Edge correctly states that the Policy explicitly covers viruses within its definition of "pollutants" by Endorsement Nos. 14 and 17 and adds "Rental Income" to the definition of "Business Income" by Endorsement No. 18. They argue that although the term "operations" is undefined, the Policy contemplates the collection of rent as one of Urban Edge's "operations" because Rental Income is included in the definition of Business Income. Thus, they argue, a suspension of the collection of rents is a suspension of Urban Edge's operations and that suspension is covered by the Policy.

Urban Edge argues that merely a partial suspension of their operations was sufficient to trigger coverage, and requiring it to completely cease all operations would be too great a requirement considering the Policy does not state that the suspension must be "complete" or "total." In support of their partial suspension interpretation, they point to the definition of "Business Income" which provides that a "portion" of a scheduled location can be affected, the requirement of Urban Edge to "mitigate or

**Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

minimize the necessary suspension," and the definition of "Business Interruption Period" which provides

that the resumption of "normal business operations" terminates the period (as opposed to simply any

"business operations"). Urban Edge argues that if it was required to completely suspend operations to

claim coverage, then it would have breached its duty to mitigate or minimize the suspension it faced.

Alternatively, the duty to minimize the suspension would be meaningless if a complete suspension were

required for coverage. Instead of completely shutting down, Urban Edge reduced its operations to match

the reduced hours of its tenants – a state of operations which it asserts was not "normal business

operations."

Urban Edge then argues that the presence of COVID-19 proximately – in other words, "solely

and directly" – caused the suspension of its provision of usable rentable property to tenants and the

suspension of its collection of rent. Urban Edge relies heavily on the testimony of its General Counsel,

Mr. Robert Milton, to support this contention, and also on documents created by tenants which explain

that they closed because "employees tested positive for COVID." Urban Edge presents an expert report

from Dr. Lemuel Moyé which utilizes biostatistics to show that COVID-19 was present at the scheduled

locations; again, AWAC contests this point in their main brief, but concedes it on reply. Urban Edge cites

Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 259 (2004) to support their

contention that "direct" causation means proximate causation. Urban Edge rejects AWAC's interpretation

of "solely" because the Policy may provide coverage under multiple provisions simultaneously, though it

prohibits a double-claim in such a situation.

Urban Edge cites Mac Property Group LLC, 473 N.J. Super. 1, 40 (App. Div. 2022) and Sunstone

Hotel Invs. v. Endurance Am. Specialty Ins. Co., 2022 WL 2206900, at *6 (C.D. Cal. June 15, 2022) to

support its position that the government orders do not break the chain of causation between pollution and

suspension because the government orders were caused by the pandemic too. They assert that government

orders cannot break the "sole and direct" chain of causation because the definition of Contingent Business

Interruption requires that *both* the suspension of operations and the issuance of the government order

which results in a suspension be caused "solely and directly" by a pollution incident at an independent

**Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 2157 of 2921**

location. Urban Edge asserts that there could never be a claim for Contingent Business Interruption if the government orders precluded the pollutant from being the "sole and direct" cause of the suspension because the Policy requires that the "sole and direct" cause of the suspension be the pollution incident at the same time as it requires that suspension be a "result of an order by a government body" that denied access to the scheduled location. They argue that "solely and directly" should function the same way for Business Interruption coverage as it does for Contingent Business Interruption coverage, and that "solely" cannot have its literal meaning in this context.

Urban Edge says that "flattening the curve" is not forward-looking because the "curve" already exists; in other words, the orders were a response to a current pandemic where people are already infected and are already being infected at a high rate. Urban Edge sees the orders as a responsive attempt to decrease the rate of infection based on the already existing pandemic, not a prophylactic measure to prevent future infections.

B.  Contingent Interruption Coverage

Urban Edge asserts that it was denied access to the scheduled locations due to a pollution incident at an independent location. They focus on the breadth of the term "Independent Location" to argue that the government's orders closing non-essential businesses were in fact responsive to the COVID-19 pandemic in practically every location that was not Urban Edge's scheduled locations. Urban Edge points out that there is no specificity requirement attached to the government's orders; the government need not state which specific location prompted it to respond. Thus, Urban Edge argues, a general order closing all non-essential business in response to a global pandemic meets the terms of the Policy. As with its arguments related to Business Interruption coverage, Urban Edge argues that "solely and directly" means proximate causation and that the orders were not prophylactic, but responsive.

Urban Edge next argues that they did not need to be precluded from accessing the properties completely; they were only required to be precluded enough to lose rental income. They point out that the words "completely" or "totally" are not in the Policy in reference to the denial of access, nor in reference

to the cessation of operations. They cite <u>New York Botanical Garden v. Allied World Assurance Co.</u>, 168 N.Y.S.3d 305, 306 (1st Dep't 2022) (the policy in that case and the Policy before this Court are highly similar regarding Contingent Business Interruption and the definitions of Business Interruption Period and Business Interruption Costs, among others) where the court distinguished between policies covering viruses and not, and policies premising denial of access on physical damage and those which did not, like the pollution-based policy before it. That court of appeals affirmed a denial of a motion to dismiss because it found that complete denial of access was not required by the policy to claim contingent business interruption coverage – partial denial was sufficient and explicitly contemplated by the policy. Indeed, as in that case, the definitions of "Business Interruption Period" and "Business Interruption Costs" are asserted here to cover partial denials of access.

Urban Edge finally argues on this issue that they were in fact denied access to their properties because the government orders required total closure of non-essential businesses, including malls and shopping centers.

### C. <u>Waiver</u>

Urban Edge asserts that AWAC denied coverage almost immediately after Urban Edge filed its claims. They point to a telephone call and email where Urban Edge's General Counsel stated he was disappointed with the parties' disagreement on coverage. Urban Edge mentions AWAC's practices related to covering other claims of a similar nature, but those facts are irrelevant to whether Urban Edge is covered under its own policy. They also point out that AWAC has not "paid one penny" on any of the nearly six hundred (600) similar claims to bolster their argument that AWAC was couching their denial in language to preserve the argument that the claimants waived their rights by failing to obtain consent to mitigate.

**Analysis of the Parties Arguments:**

As a general matter a motion for summary judgment should be granted when the movant shows "there is no genuine issue as to any material fact challenged and that the moving party is entitled to

judgment or order as a matter of law. R. 4:46-2(c). A genuine issue of material fact exists when a rational

factfinder could resolve the alleged dispute in favor of the non-movant, considering the competent

evidential materials in the light most favorable to the non-movant. Brill v. Guardian Life Ins. Co. of Am.,

142 N.J. 520, 540 (1995).

The interpretation of an insurance contract is a question of law, making the pending motion ripe

for consideration. Rena, Inc. v. Brien, 310 N.J. Super. 304 (App. Div. 1998). "In attempting to discern the

meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route."

Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008). "If the plain language of

the policy is unambiguous, the Court will 'not engage in a strained construction to support the imposition

of liability' or write a better policy for the insured than the one purchased." Templo Fuente De Vida Corp.

v. National Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 200 (2016) (quoting Chubb, 195 N.J. at 238).

If the language is ambiguous, the court may "look to extrinsic evidence as an aid to interpretation." Id.

"Only where there is a genuine ambiguity, that is, 'where the phrasing of the policy is so confusing that

the average policyholder cannot make out the boundaries of coverage,' should the reviewing court read

the policy in favor of the insured." Id.

I.   Business Interruption Coverage

The Court begins with the plain language of the contract. The definitions of Microbial Matter and

Pollution Incident explicitly place viruses within the bounds of coverage. COVID-19 is indisputably a

virus, so the presence of COVID-19 at a Scheduled Location can constitute a Pollution Incident. The

parties do not dispute that COVID-19 was actually present at the Scheduled Locations. The determinative

issues for Business Interruption coverage are thus whether the Pollution Incident is required to cause a

complete or partial suspension of operations at the Scheduled Location, and the meaning of the phrase

"solely and directly."

A.   The Policy requires merely a partial suspension of operations for Business Interruption
coverage

Importantly for purposes of this motion, neither the word "operations" nor "suspended" is defined in the Policy. AWAC asserted at oral argument that "suspended" means a complete cessation – as a dictionary would suggest – and that "operations" refers to discrete tasks rather than broad goals. Urban Edge disagreed and proposed that "suspended" cannot be a complete cessation when read in the context of the Policy, and that "operations" is contemplated to include rental activities given the Endorsements covering Rental Income.

According to the definition of Business Interruption Period, coverage extends until the insured resumes or reasonably should have resumed "normal business operations" at the disrupted location. The use of the word "normal" to modify "business operations" suggests that reduced, sporadic, or otherwise abnormal business operations are covered. If this were not the case, the contract could have simply read "business operations" or "any business operations." Indeed, Federal circuit courts have interpreted the phrase "normal business operations" to imply coverage when business is slowed or reduced. E.g., Am. Med. Imaging Corp. v. St. Paul Fire & Marine Ins. Co., 949 F.2d 690, 693 (3d Cir. 1991) (indemnification until "normal business operations" resume implies obligations arise when business is merely slowed); Maher v. Cont'l Cas. Co., 76 F.3d 535 (4th Cir. 1996) (policy compensated lost income for reduced operations).

The definition of Business Interruption Costs is also indicative. The Policy provides that such costs "will be reduced to the extent that the insured can resume operations, in whole or in part, at the location owned by or leased to you, or by making use of other locations." This language clearly contemplates coverage for a partial suspension of operations by carving out an exclusion for the operations that continue during the Business Interruption.

Both parties must have understood at the outset that "operations" included rental operations – including the collection of rent and maintenance of properties – because Endorsement No. 18 adds Rental Income to the definition of Business Income. Loss of Rental Income is covered by the Policy if the leased premises are rendered "untenable for the use disclosed to [AWAC] in the Application" for the Policy.

There is sufficient evidence in the record to demonstrate that the leased properties were untenable for use as shopping centers or for other relevant purposes during a global pandemic.

AWAC correctly points out that the effect of COVID-19 on the businesses of Urban Edge's tenants is not covered by the Policy, but they cannot ignore the effect COVID-19 had on Urban Edge's own rent collection and property management operations. Urban Edge's rental collection operations were undoubtedly interrupted by the pandemic because the pandemic created the tenants' inability to pay. There is sufficient evidence in the record that Urban Edge's rent collection and property management operations were reduced.

B.   "Solely and directly" requires a sufficient, proximate cause.

New Jersey courts have frequently applied "Appleman's rule" on causation to various types of insurance policies when considering the "directness" of a cause to a result. Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 257 (citing, among others, Stone v. Royal Ins. Co., 211 N.J. Super. 246, 248 (App. Div. 1986); Karadontes v. Cont'l Ins. Co., 139 N.J. Super. 599, 601 n.1 (Bergen County Ct. 1976)) ("[T]he courts frequently referred to 'Appleman's rule' on causation… That approach has specifically been employed even when the applicable policy language required a 'direct loss.'"). Appleman's rule is:

> *Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss… In other words, it has been held that recovery may be allowed where the insured risk was the last step in the chain of causation set in motion by an uninsured peril, or where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk.*

5 John Alan Appleman, Insurance Law & Practice, § 3083, at 309-11 (1970). New Jersey courts have taken this rule, and its many applications, to create a proximate-cause test. The Court in Auto Lenders, having seen this test applied in homeowner's insurance policies, fire insurance policies, errors and omissions policies, and vandalism policies, concluded that there was "no sound reason why a proximate-cause analysis should not be employed when determining whether a loss is direct under a fidelity insurance policy." Indeed, general principles of insurance law in New Jersey guide courts to

interpret coverage provisions broadly "to comport with the reasonable expectations of the insured."

Gibson v. Callaghan, 158 N.J. 662 (1999); *See also* Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 273

(2001) ("[P]olicies should be construed liberally in the insured's favor to the end that coverage is afforded

to the full extent that any fair interpretation will allow."). This Court will follow the New Jersey Supreme

Court's example and apply a proximate-cause test in the context of a policy which requires "direct"

causation, but this does not end the inquiry. AWAC's citation to Cent. Laundry, LLC v. Ill. Union Ins.

Co., 578 F. Supp. 3d 781 at 793, accords with this approach because that court also acknowledged that

"directly attributable" meant proximate cause. AWAC cites the case because the plaintiffs did not

establish the presence of COVID-19 at its locations, so coverage was not found. *Id.* at 795. Because the

presence of COVID-19 is conceded here, the case does not support AWAC's position.

The language of this Policy does not simply require "direct" causation, but "sole and direct"

causation. AWAC urges this Court to interpret the word "solely" as "exclusively," and points to Arkema,

Inc. v. Commerce & Indus. Ins. Co., but that case interpreted New York law; in fact, that Pennsylvania

court acknowledged that various jurisdictions, including New Jersey, have "refused to give narrow, literal

interpretation to restrictive causation language." 2007 U.S. Dist. LEXIS 23454 at *8-9 (E.D. Pa. Mar. 6,

2007) (citing Shiffler v. Equitable Life Assur. Soc'y, 838 F.2d 78, 84 (3d Cir. 1988)).

"Solely" cannot mean "exclusively" because of the way the word is used in the definition of

Contingent Business Interruption. Coverage under this definition requires that a Pollution Incident at an

Independent Location solely and directly cause both the suspension and the government order which

results in suspension. This language is confusing because if the Pollution Incident at an independent

location is the sole and direct cause of the suspension, then it is impossible for the subsequent government

order which denied access to also be a cause of the suspension without precluding coverage. This

confounds the language because it requires that the suspension be "a result of an order by a government

body or authority denying access to the scheduled location." Interpreting "solely" as "exclusively" would

render Contingent Business Interruption coverage under the Policy illusory.

**Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**                    **Page 2163 of 2921**

Alternatively, if this Court understood "solely" to mean "exclusively," then the Policy would practically impose an instantaneous temporal limitation on the insured's coverage period. To achieve coverage, the Pollution Incident would have had to interrupt Urban Edge's business so quickly that almost no person or thing could have had an opportunity to react or respond to the situation. If a person did act, or something did change, to compound or affect Urban Edge's business in any way - causally linked by proximate cause standards or not - then those intermediate causes would preclude coverage. One might argue that it was not the presence of COVID-19 that caused the interruption, but the actions of each individual person who visited Urban Edge's properties and transmitted COVID-19 to another that caused the interruption. Or one might argue it was the abnormally strong winds that day which carried the infected water droplets through the air that caused the spread of this deadly disease, and thus the interruption. This exclusive standard practically demands that the world cease to move once the covered risk arises. This is an unacceptable standard in New Jersey because it is too far afield of the reasonable expectations of the insured.

Urban Edge would have us ignore the word "solely" because other language in the Policy acknowledges that coverage may arise under multiple provisions and prohibits multiple claims in such a situation, but this Court cannot simply ignore the word entirely. The word "solely" may reasonably impose a requirement that the covered risk be an independently sufficient cause of the interruption. The word does not preclude intermediate causes, nor does it require that the covered risk be a necessary condition of the interruption. The word merely requires that the covered risk be an independently sufficient cause of the interruption.

It could be reasonably argued that it was the presence of COVID-19 "on, at, or under" the scheduled locations that caused Urban Edge's interruption; indeed, it was the presence of COVID-19 practically everywhere that proximately caused the closure orders. The words "on, at, or under" do not restrict the Pollution Incident to *only* the scheduled locations where the incident is so severe that it extends beyond the boundaries of the insured's premises.

II.   <u>Contingent Business Interruption Coverage</u>

**Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 2164 of 2921**

Contingent Business Interruption under this Policy is analogous to Civil Authority provisions in other insurance contracts. Coverage under this provision cannot be denied because the government was an intervening cause or else Contingent Business Interruption coverage would be "illusory." Sunstone Hotel Invs. v. Endurance Am. Specialty Ins. Co., 2022 U.S. Dist. LEXIS 111147 at *21 (C.D. Cal. June 15, 2022) (interpretation of clear policy language covering viruses, though reasonable, would render coverage illusory and would be unfair because "the only reason the [order] exists in the first place is because of the virus.").

AWAC asserts that these orders were not proximately caused by the presence of COVID-19 because they were "prophylactic," as in United Air Lines, Inc. v. Ins. Co. of State of Pa., 439 F.3d 128 (2d Cir. 2006) (government stop on air travel in D.C. was in anticipation of additional attacks after 9/11, not a response to existing physical damage in faraway New York or the Pentagon) and S. Tex. Med. Clinic, P.S. v. CAN Fin. Corp., 2008 U.S. Dist. LEXIS 11460 (S.D. Tex. Feb. 15, 2008) (anticipating Hurricane Rita in 2005 before physical damage occurred). The government orders in New Jersey were not a response to COVID-19 elsewhere in the world – they were a response to rising infection rates within the State, so these cases are inapplicable. Mac Property Group LLC v. Selective Fire and Casualty Insurance Company, 473 N.J. Super. 1, 40 (App. Div. 2022) ("the virus was the sole reason the [executive orders] were issued").

AWAC also cites several cases where civil authority coverage is premised on "physical loss" or "physical damage" to the property; there is no such "physical" requirement under the Policy, so these cases are distinguishable. Cf. Mac Property Group, 473 N.J. Super. at 25-28; Valley Health Systems v. Zurich American Insurance Company, 2021 N.J. Super. Unpub. LEXIS 3505 (Law Div. October 18, 2021); Broad St., LLC v. Gulf Ins. Co., 832 N.Y.S.2d 1 (1st Dep't 2006); 54th St. Ltd. Partners, L.P. v. Fid. & Guar. Ins. Co., 763 N.Y.S.2d 243 (1st Dep't 2003); John Gore Org., Inc. v. Fed. Ins. Co., 2022 U.S. Dist. LEXIS 52803 at *33 (S.D.N.Y. Mar. 23, 2022) (noting that in New York, "direct physical loss or damage" is more than mere "loss of use."); Dental v. Cincinnati Ins. Co., 2021 U.S. Dist. LEXIS 4299 at *5 (N.D. Ill. Jan. 10, 2021) ("[T]he majority of courts to address this issue have agreed with this court,

finding that COVID-19 and corresponding closure orders do not cause physical damage or physical loss to the insured property."). Several of those cases also excluded virus coverage, while this Policy explicitly provides for it. *E.g.*, Mac Property Group, 473 N.J. Super. at 37-41; Highgate Hotels, L.P. v. Liberty Mut. Fire Ins. Co., 2021 N.J. Super. Unpub. LEXIS 2404 at *16-17 (Law Div. Oct. 5, 2021) (Wilson, J.); Mark's Engine Co. No. 28 Rest. v. Travelers Indem. Co., 492 F. Supp. 3d 1051, 1058 (C.D. Cal. 2020).

Having established that "sole" does not mean "exclusive" in this Policy, the issues related to Contingent Business Interruption coverage are (1) whether the Policy requires a government order to deny access to the Scheduled Location completely or partially, and (2) whether there is an issue of fact that the orders sufficiently denied Urban Edge access to its premises.

A.   The denial of access for Contingent Business Interruption coverage must be merely partial.

An alternate version of this Policy was considered by the New York 1st Department Court of Appeals in New York Botanical Garden v. Allied World Assurance Co., 168 N.Y.S.3d 305, 306 (1st Dep't 2022). That appellate court affirmed the trial court's decision that the denial of access for Contingent Business Interruption need only be partial based on the definitions of Business Interruption Period and Business Interruption Costs.

AWAC suggested at oral argument that this case was not persuasive because it merely acknowledged that plaintiff's claim *could* be sustainable; it was procedurally too early for that court to make any substantive findings of law. That case settled after the motion to dismiss was denied, so this Court is left without further suggestion from New York.

A reasonable insured could expect that a partial denial of access to the premises – however caused – could result in a business interruption. Urban Edge's and the New York trial court's recognition of this fact, as well as its acknowledgement through the Policy language, leads this Court to believe that only a partial denial of access was required for a claim of Contingent Business Interruption. New York Botanical Garden v. Allied World Assur. Co., 2021 WL 5566137 at *5.

**B.** <u>Even though merely a partial denial was required, Urban Edge has not suggested any time where its personnel could not access the property.</u>

What constitutes a denial of access in the context of COVID-19 has been litigated across the country. The government orders have been known to limit the public's access to the relevant properties, but not to prevent the owners or operators from entering those properties; thus, courts in New Jersey, New York, and California have held that the orders have not denied access to the insureds for the purposes of civil authority coverage – here called Contingent Business Interruption. <u>Mac Property Group</u>, 473 N.J. Super. at 36 ("[T]he EOs neither prohibited access to plaintiff's premises nor prevented plaintiff owners from being on their premises, but merely restricted their business activities."); <u>John Gore Org., Inc. v. Fed. Ins. Co.</u>, 2022 U.S. Dist. LEXIS 52803, at *16-17, 33 (S.D.N.Y. Mar. 23, 2022) (the government's shutdown orders "merely limited the public's access to [p]laintiff's properties, but there was no 'per se' prohibition of access since 'individual employees could enter the premises.'"); <u>Mark's Engine Co. No. 28 Rest. v. Travelers Indem. Co.</u>, 492 F. Supp. 3d 1051, 1057 (C.D. Cal. 2020) ("[Plaintiff] always had complete access to the premises even after the order was issued. The only individuals who could potentially clam 'direct physical loss of' access to the premises would be patrons who were no longer allowed to dine in.").

Urban Edge has admitted that it could continue some of its operations at all relevant times. It has not alleged that it was prohibited by the government from entering its properties in any way, at any time. Thus, there was not even a partial denial of access, and Urban Edge's claim for Contingent Business Interruption coverage must fail as a matter of law.

**III.** <u>Mitigation and Waiver of Damages</u>

The parties agree that if an insurer disclaims coverage, then the insured is relieved of its duty to cooperate with their insurer regardless of any contractual terms. <u>In re Envtl. Ins. Declaratory Judgment Actions</u>, 252 N.J. Super. 510, 515 (Law Div. 1991); <u>State Farm Ins. Co. v. Domotor</u>, 697 N.Y.S.2d 348, 349 (2d Dep't 1999). General statements by the insurer regarding their stance on coverage can be sufficient to relieve the insured. WINDT, 1 Insurance Claims and Disputes § 3:10 (6th ed.) (an expression

of general position regarding coverage issues will free insured from K obligations). *See also*, J.P. Morgan

Sec. Inc. v. Vigilant Ins. Co., 58 N.Y.S.3d 38, 39-40 (2017); NL Indus., Inc. v. Commercial Union Ins.

Co., 926 F. Supp. 446, 456 (D.N.J. 1996). The issue thus is whether AWAC disclaimed coverage such

that Urban Edge was relieved of its duty to refrain from making voluntary payments under Section VI,

subpart 17(c) of the Policy.

Whether coverage was repudiated is a question of fact for the jury, and both parties in their briefs

and at oral argument presented evidence that coverage was or was not disclaimed. Therefore, Urban Edge

has presented facts sufficient to survive summary judgment on this issue.


**Conclusion:**

This Court's obligation in the instant matter is limited by the rule and case law governing the

review of summary judgment applications. The review and analysis set forth herein does not constitute

final and binding decisions on the merits of the myriad of issues and arguments presented to the Court.

Although the matter and issues are complex and with potential broad implication the Court's assignment

here is simple. Are sufficient questions of fact presented to the Court to indicate a need for review and

resolution by a finder of fact? The answer at this juncture is yes.

The Policy is unlike a boilerplate auto policy whose provisions are likely subject to rote review

and application of law. It is undisputed that the Policy anticipated covering viruses and the parties

negotiated its terms and provisions. That fact that the Policy explicitly covers viruses distinguishes this

contract from the multitude of others that contain either virus exclusions or condition coverage on

physical loss or damage. While Courts are free to make decisions as a matter of law when language and

intentions are unambiguous, the Court cannot dispose of this case while ambiguities exist.

Neither party could have anticipated the magnitude of COVID-19. The law is often a derivative

of unexpected and unaccounted for events. While insurers are busily writing provisions to guard against

future claims of this nature, the Court is confined to address the one before it. The parties will have

adequate opportunity to present their cases and evidence to a jury. Summary Judgment is **DENIED**

regarding Plaintiff's claims for Business Interruption Coverage and regarding the issues of waiver and

Plaintiff's duty to mitigate damages. Summary Judgment is **GRANTED** in favor of AWAC on the issue

of Contingent Business Interruption Coverage only.

**Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**Page 2169 of 2921**

Exhibit 152 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment

Page 2170 of 2921