# EXHIBIT 185

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE DISTRICT OF DELAWARE
 2
     In re:                      )Chapter 11
 3                               )
     RS FIT NW LLC,              )Case No.: 20-11558 (KBO)
 4                               )
            Debtors.            )(Jointly Administered)
 5
     24 HOUR FITNESS WORLDWIDE,  )
 6   INC.,                       )
            Plaintiff,           )
 7                               )
     VS.                         ) Adv. Proc. No. 20-51051
 8                               ) (KBO)
     CONTINENTAL CASUALTY        )
 9   COMPANY; ENDURANCE          )
     AMERICAN SPECIALTY          )
10   INSURANCE COMPANY; STARR    )
     SURPLUS LINES INSURANCE     )
11   COMPANY; ALLIANZ GLOBAL     )
     RISKS US INSURANCE          )
12   COMPANY; LIBERTY MUTUAL     )
     INSURANCE COMPANY;          )
13   BEAZLEY-LLOYD'S SYNDICATES  )
     2623/623; ALLIED WORLD      )
14   NATIONAL ASSURANCE          )
     COMPANY; QBE SPECIALTY      )
15   INSURANCE COMPANY; and      )
     GENERAL SECURITY INDEMNITY  )
16   COMPANY OF ARIZONA,         )
            Defendants.          )
17

18   ************************************************************

19

20      REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION OF ALLIED

21    WORLD NATIONAL ASSURANCE COMPANY THROUGH GLENN SERRANO,

22            AND DEPOSITION OF GLENN SERRANO,

23                   SEPTEMBER 15, 2022

24   ************************************************************

25
```

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2570 of 2921

1      REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION OF ALLIED

2    WORLD NATIONAL ASSURANCE COMPANY THROUGH GLENN SERRANO,

3    AND DEPOSITION OF GLENN SERRANO, produced as a witness

4    at the instance of the Plaintiff and duly sworn, was

5    taken in the above styled and numbered cause on

6    Thursday, September 15, 2022, from 11:04 a.m. to 5:53

7    p.m., before ROBIN GROSS, CSR in and for the State of

8    Texas, reported by shorthand machine, with the Witness

9    in New York, New York, pursuant to the

10   Federal Rules of Civil Procedure, the Emergency

11   Order Regarding the COVID-19 State of Disaster, and the

12   provisions stated on the record herein.

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.                    Page 2571 of 2921

```
 1              R E M O T E   A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3       MR. DAVID E. WEISS
         Reed Smith LLP
 4       101 Second Street, Suite 1800
         San Francisco, California  94105
 5       (415) 543-8700
         dweiss@reedsmith.com
 6
    FOR DEFENDANT CONTINENTAL CASUALTY COMPANY:
 7       MR. MATTHEW DENN
         DLA PIPER LLP
 8       6225 Smith Avenue
         Baltimore, Maryland  21209
 9       (410) 580-3000
         matthew.denn@us.dlapiper.com
10
    FOR DEFENDANTS STARR SURPLUS LINES INSURANCE COMPANY and
11  BEAZLEY-LLOYD'S SYNDICATES 2623/623:
         MS. FERDUSI CHOWDHURY
12       Hinshaw & Culbertson
         800 Third Avenue, Suite 1300
13       New York, New York  10022
         (212) 471-6200
14       fchowdhury@hinshawlaw.com

15  FOR DEFENDANT ALLIED WORLD NATIONAL ASSURANCE COMPANY:
         MS. ELIZABETH M. BROCKMAN
16       Selman Breitman LP
         11766 Wilshire Boulevard, Suite 600
17       Los Angeles, California  90025
         (310) 445-0800
18       ebrockman@selmanlaw.com
                   AND
19       MR. ANDREW HALPERN
         Otterbourg P.C.
20       230 Park Avenue
         New York, New York  10169-0075
21       (212) 661-9100
         ahalpern@otterbourg.com
22               AND
         MS. DEANNA MANZO
23       Mound Cotton Wollan & Greengrass LLP
         One Water Street, 44th Floor
24       New York, New York  10004
         (212) 804-4200
25       dmanzo@moundcotton.com
```

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2572 of 2921

```
1    FOR DEFENDANT ALLIANZ GLOBAL RISKS US INSURANCE COMPANY:
         MR. CHARLES COWAN
2        Clyde & Co
         271 17th Street NW, Suite 1720
3        Atlanta, GA  30363
         (404) 410-3150
4        charles.cowan@clydeco.us

5    FOR DEFENDANT LIBERTY MUTUAL INSURANCE COMPANY:
         MR. JOEL L. MCNABNEY
6        Robinson & Cole LLP
         777 Brickell Avenue, Suite 680
7        Miami, Florida  33131
         (786) 725-4119
8        jmcnabney@rc.com

9


10   ALSO PRESENT:

11
         MS. JESS RAWLS, Videographer, Legal Media, Inc.
12
         MR. PHIL GONZALES, Videographer, Legal Media, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
NELL McCALLUM & ASSOCIATES, INC.          **Page 2573 of 2921**

I N D E X

PAGE

Appearances ................................. 2

30(b)(6) DEPOSITION OF ALLIED WORLD NATIONAL ASSURANCE
COMPANY THROUGH GLENN SERRANO, AND DEPOSITION OF GLENN
SERRANO

     Examination by Mr. Weiss.................. 7

Signature and Changes........................ 191

Reporter's Certificate....................... 193

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of 30(b)(6) deposition | 18 |
| 2 | Scheduled Location Pollution Liability Policy, AWPLL 000148-208 | 76 |
| 3 | Brief for Defendant-Appellant, New York Botanical Garden versus Allied World | 82 |
| 4 | Scheduled Location Pollution Liability Policy re City of Chicago | 86 |
| 5 | Letter from Ueber to Member, Bates 0003423 | 89 |
| 6 | Email dated March 21, 2020 from Gottlieb to World Allied, AWPLL 001251-53 | 133 |
| 7 | Email dated March 23, 2020 from Manasia to Cowart, AWPLL 001183 | 148 |
| 8 | Email dated April 7, 2020 from Manasia to Cowart, AWPLLSP 000042 | 151 |
| 9 | Email dated April 7, 2020 from Pertain to Gottlieb, AWPLL 000006-9 (Oregon) | 152 |

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**                    Page 2574 of 2921

| | | | |
|---|---|---|---|
| 1 | 10 | Email dated April 7, 2020 from Pertain to Gottlieb, AWPLLSP 000027-30 | 156 |
| 2 | | | |
| 3 | 11 | Undated email from Gottlieb to Pertain, AWPLL 000135-139 | 158 |
| 4 | 12 | Email dated April 27, 2020 from Pertain to Gottlieb, AWPLL 000023-32 (Claim 6252) | 167 |
| 5 | | | |
| 6 | 13 | Email dated April 27, 2020 from Pertain to Gottlieb, AWPLLSP 000059-81 (Claim 7357) | 172 |
| 7 | | | |
| 8 | 14 | Email dated June 10, 2020 from Weiss to Brockman, AWPLL 000001-5 | 173 |
| 9 | | | |
| 10 | 15 | Email dated June 22, 2020 from Brockman to Weiss, AWPLL 001151-53 | 179 |
| 11 | 16 | Article, COVID-19: FCA Test Case | 181 |
| 12 | 17 | Notepad Detail All Claimants, AWPLL 000144-146 (Claim 7357) | 183 |
| 13 | | | |
| 14 | 18 | Notepad Detail All Claimants, AWPLLSP 000017-21 (Claim 6252) | 187 |

15

16

17                              *   *   *   *

18

19

20

21

22

23

24

25

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.                    Page 2575 of 2921

```
 1              P R O C E E D I N G S (11:04 a.m.)
 2    30(b)(6) DEPOSITION OF ALLIED WORLD NATIONAL ASSURANCE
 3    COMPANY THROUGH GLENN SERRANO, AND DEPOSITION OF GLENN
 4    SERRANO,
 5         having been duly sworn, testified as follows:
 6                          EXAMINATION
 7    BY MR. WEISS:
 8       Q.  Good morning, Mr. Serrano.  My name is David
 9    Weiss and I'm at the Reed Smith law firm and I represent
10    24 Hour Fitness in this case.
11           How are you today?
12       A.  Terrific.  How about you?
13       Q.  Good.  Could you please tell us your business
14    address?
15       A.  Business address is Allied World Assurance
16    Company, 199 Water Street, New York -- 24th floor, New
17    York, New York 10038.
18       Q.  Is that where you are today?
19       A.  Yes, I am.
20       Q.  Were you working in the office before the
21    pandemic?
22       A.  Yes, I was.
23       Q.  During the pandemic did you continue to work from
24    the office?
25       A.  Not initially, no.
```

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2576 of 2921

1    Q.  Is it vice president of environmental claims?

2    A.  He -- Joseph supervises me, and I have

3    environmental claims.  But Joseph also supervise --

4    supervises two other claim groups separate and apart

5    from environmental claims.

6    Q.  What are those claim groups?

7    A.  Primary construction and commercial auto.

8    Q.  So is it fair to say that you are -- you are in

9    charge of the environmental claims group at Allied

10   World?

11   A.  I am.

12   Q.  Since March of 2020, approximately how many

13   COVID-19 claims has the environmental claims group

14   handled?

15           MS. BROCKMAN:  Objection to form.

16   A.  Quite a few.

17   Q.  (BY MR. WEISS)  Would you say it's more than a

18   hundred?

19   A.  Yes.

20   Q.  More than -- more than 200?

21   A.  Yes.

22   Q.  All right.  More than 500?

23   A.  Yes, I believe so.

24   Q.  Okay.  Are you -- do you have an understanding as

25   to about how many of those claims are in litigation?

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2577 of 2921

1    A.   Let me ask you, by "litigation" are you referring

2    to coverage litigation --

3    Q.   Yes.

4    A.   -- or --

5    Q.   Yeah, that's a good clarification.  Coverage

6    litigation, yes.

7    A.   Well, I told you about the one.

8    Q.   Yeah.

9    A.   There's another I'm aware of, and I believe

10   that's it.  However, I'd have to -- I would have to

11   double-check.

12   Q.   Is the other that you're aware of the Botanical

13   Garden case in New York?

14   A.   Yes.

15   Q.   Have you -- does any of your -- do any of your

16   job responsibilities involve overseeing the coverage

17   litigation against the company?

18   A.   It does not.

19   Q.   Have you reviewed any of the depositions that

20   have been taken in the 24 Hour Fitness coverage

21   litigation?

22   A.   I have not.

23   Q.   Have you reviewed any discovery, written

24   discovery responses from the 24 Hour Fitness litigation?

25        MS. BROCKMAN:  You mean in preparation for

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2578 of 2921

1    his deposition or just generally?

2              MR. WEISS:  In general.

3        A.  No.

4        Q.  (BY MR. WEISS)  In preparation for your

5    deposition, did you review any documents that you

6    understood were documents produced by any party in the

7    24 Hour Fitness coverage case?

8              MS. BROCKMAN:  Objection to form.

9        A.  One document comes to mind.

10       Q.  (BY MR. WEISS)  Okay.  What was that?

11       A.  The deposition notice that you shared with me a

12   few moments ago.  But other than that, I don't

13   recollect.

14       Q.  Did you review -- were you aware that we shared

15   with counsel yesterday PDFs of potential deposition

16   exhibits?

17       A.  Yes, I was made aware of that by Elizabeth.

18       Q.  Did you review any of those potential deposition

19   exhibits to prepare for your deposition?

20       A.  I did not.

21       Q.  Did you -- Ms. Pertain no longer works for the

22   company; is that right?

23       A.  That is correct.

24       Q.  When did she leave the company?

25       A.  I would say -- I don't remember the date.  I

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**          **Page 2579 of 2921**

1    believe it was April or May of 2021.

2        Q.   Okay.  Have you spoken with Ms. Pertain at all

3    regarding the 24 Hour Fitness matter since she left the

4    company?

5        A.   I have not.

6        Q.   Are you aware that 24 Hour Fitness also submitted

7    a claim for its COVID-related losses under a property

8    insurance policy that was subscribed to by Allied World?

9        A.   Yes, I was -- I was made aware of that.

10       Q.   When did you become aware of that?

11       A.   Well, certainly recently in dealing with

12   Elizabeth Brockman, I -- I learned about that; but

13   anecdotally I heard something about it, but the details

14   of which I was not familiar with.

15       Q.   Did you talk to any individuals within Allied

16   World regarding the property policy claim in connection

17   with preparing for your deposition?

18       A.   I did not.

19       Q.   Is there a separate claim department at Allied

20   World that handles claims under property insurance

21   policies?

22       A.   Yes.

23       Q.   What is that claims department called?

24       A.   The actual name itself?  I don't remember, don't

25   know.  But it's along the lines of -- mine is called

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2580 of 2921

1    environmental claims department; that, it may be a

2    property claims department.  I would assume so, but I --

3    I can't tell you for certain.

4        Q.  With regard to any of the more than 500 COVID

5    claims that are -- that have been handled by your

6    department, are you aware of any other ones that are

7    similar to 24 Hour Fitness where there's an overlap with

8    a property policy claim at Allied World?

9                MS. BROCKMAN:  Objection to form.

10       A.  I am not.

11       Q.  (BY MR. WEISS)  Is that something that you would

12   necessarily become aware of or you just may not know one

13   way or the other?

14       A.  I can't say for certain, but I don't believe --

15   maybe I'm wrong, but I don't believe they're involved in

16   the other two coverage litigation matters we have.  They

17   may be, I -- but I don't know.

18       Q.  And how about any of the other claims that are

19   not in litigation, are you aware of any of those where

20   there's a property claim as well as an environmental

21   claim?

22       A.  I don't remember any right now.

23       Q.  Let's briefly talk about your educational

24   background.  Where did you attend college?

25       A.  City University of the City of New York.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2581 of 2921

1    on how many hours you need to take, log, in order to

2    maintain your licensing in that jurisdiction.  And if

3    you don't, then you can't handle claims in those

4    jurisdictions.

5        Q.  How many claims handlers are there that work

6    underneath you in your group, in the environmental

7    claims group?

8        A.  Three.

9        Q.  Three.  And has that been pretty much steady from

10   February 2020 to the present?

11       A.  Yes, it has.

12       Q.  And are there categories of employees that work

13   underneath the claims handlers as well?

14       A.  If you're asking if they have subordinates?

15       Q.  Yes.

16       A.  No, they don't.

17       Q.  When -- when something of interest comes -- comes

18   in from, say, Law360 regarding a topic like COVID, is

19   there somebody responsible for summarizing it and

20   sending around a summary to the group?

21       A.  No.  Because we're all tuned in with it, we're

22   all on those email chains.

23       Q.  Is that something that you might do from time to

24   time, see a story that's interesting to you and send a

25   summary around to the team?

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.                    Page 2582 of 2921

1      A.  I -- not a summary, but I may bring to someone's

2   attention a case, a ruling; not necessarily on COVID, of

3   course.  It could involve whether ABC is a pollutant or

4   not, and a decision from a given jurisdiction that

5   people need to know or want to know about.

6      Q.  Does Allied World, in your department in

7   particular, maintain some central repository where

8   articles of interest are stored so that somebody can go

9   onto the system and see what's -- what's available?

10     A.  We do not.

11     Q.  Do you maintain your own file electronically

12   where you store articles of interest to you as part of

13   your job?

14     A.  I do not.

15     Q.  Do you know if any of the claims handlers

16   maintain folders, like email folders or some other

17   folders electronically, where they store information of

18   interest to them?

19     A.  I don't believe so.

20     Q.  Is there -- has there been some directive that

21   people not do that?

22     A.  No.

23     Q.  Does the environmental claims group use claims

24   adjusters from time to time on claims it handles?

25     A.  Well, we're the claim handler.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
**NELL McCALLUM & ASSOCIATES, INC.**

Page 2583 of 2921

1    Q.  Okay.

2    A.  If -- I'm not sure -- if you want to rephrase or

3    ask the question separately, I'm not understanding.

4    Q.  Yes.  Let me try to frame it this way.  So on the

5    property side of this -- of this case, there's a -- the

6    insurance policy designated a claims adjuster, an

7    outside firm, to be responsible for adjusting claims and

8    obtaining information from the policyholder, maybe doing

9    investigation if appropriate.  And so it's not somebody

10   who is an employee of the insurance company, but it's an

11   outside firm.

12        You know, there's firms like McLarens and things

13   like that that you might be familiar with.  So I guess

14   my question is does the environmental claims group ever

15   use an outside adjusting firm to assist?

16   A.  Oh, thank you for clarity.

17   Q.  Yeah.

18   A.  Thank you for clarification.  99.9 percent of the

19   time, no.  I'm here now five years.  I've used McLarens

20   once and it was a mold claim -- I'm sorry.  I'm sorry.

21   It was a lead claim, a lead claim, where people were

22   asserting PD, property damage, damage -- in other words,

23   damage to their furniture and clothing.

24   Q.  Uh-huh.

25   A.  And so as you can well imagine, there's like

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2584 of 2921

1    hundreds of items of clothing and furniture that needed

2    to be categorized, itemized.  So I brought in McLarens

3    on it.  That was the only time.

4        Q.  Got it.  Does the environmental claims team

5    retain outside consultants from time to time, such as an

6    environmental consultant, to -- to do testing, for

7    example?

8                MS. BROCKMAN:  Objection to form.

9        A.  Sorry.

10       Q.  (BY MR. WEISS)  You can go ahead and answer.

11       A.  Yes.

12       Q.  Can you just briefly explain the circumstances

13   under, generally, where you would retain an outside

14   environmental consultant on a claim?

15       A.  Of course.  We bring in environmental consultants

16   to conduct investigations.  And do you want me to

17   present you with an example of one?

18       Q.  Yeah, that would be fine.  Yeah, that would be

19   fine, thank you.

20       A.  An insured submits a notice of mold incident at a

21   warehouse and they say, Glenn, I've got mold at a

22   warehouse.  Here are the photos.  I got an estimate for

23   the cleanup.  It's going to be X millions of dollars to

24   conduct the mold remediation.

25              So I see the photos.  It looks like mold -- would

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2585 of 2921

1    look like mold to you, too.  But, you know what?  It's a

2    lot of money.  I'm going to pay somebody to go get out

3    there and do our own tests, of which we did.  But guess

4    what happened?

5        Q.  It wasn't mold?

6        A.  How did you know?  (Laughing.)  He went out

7    there.  You know what?  The walls were dirty.

8        Q.  Okay.

9        A.  And he said to me, Glenn, soap and water will do

10   the trick.

11       Q.  Okay.

12       A.  I said -- now, this guy is a certified CIH,

13   certified industrial hygienist, very talented, very

14   experienced.  He's testified before.  He's top of -- top

15   of the line.

16           I said, are you certain of that?

17           He said, Glenn, I'm certain of it.

18           We got the insured on the phone with my

19   consultant.  He didn't know.  All he has is an estimate.

20           He said, Thanks so much.  Appreciate that.

21           So they cleaned the walls down, there was no mold

22   associated with it, and we had another happy insured.

23           So to answer your question, the long -- the long

24   answer, but the short -- the short abbreviation of it is

25   yes.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2586 of 2921

1    Q.  Okay.  With regard to any of the COVID-19 claims,

2    has Allied retained any outside consultants to do any

3    sort of investigation?

4    A.  Yes.

5    Q.  What type of investigation do they retain

6    consultants to do?

7            MS. BROCKMAN:  Objection to form.

8    Q.  (BY MR. WEISS)  Let me ask what type of

9    investigations did Allied World retain consultants to do

10   in connection with COVID-19?

11           MS. BROCKMAN:  Same objection.

12   A.  Okay.  It involved invoicing, Mr. Weiss, for

13   cleanup.

14   Q.  (BY MR. WEISS)  Okay.  So was that an accountant

15   expert?

16   A.  No, it was an environmental -- environmental

17   consultant.

18   Q.  To review invoices that had been submitted by the

19   policyholder?

20   A.  And their environmental engineering company.

21   Q.  Okay.  Has Allied World retained any

22   environmental consultants to do any testing of any

23   properties in connection with a COVID-19 claim?

24           MS. BROCKMAN:  Objection to form.

25   A.  I don't recall any.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2587 of 2921

1    Q.   (BY MR. WEISS)  Are you aware of any prior claims

2    submitted by 24 Hour Fitness under an Allied World

3    pollution or environmental policy, besides the COVID

4    claims?

5    A.   I am not.

6    Q.   Other than COVID-19, have you worked on any prior

7    claims that involved losses allegedly caused by a virus?

8    A.   Yes.

9    Q.   Okay.  Can you generally describe what those are?

10   A.   Mold.  Mold claims and -- one of the biggest

11   frequency of claims that we get in environmental claims

12   is mold.  So that -- we -- we have received, handled,

13   evaluated, many mold claims.

14   Q.   Have you worked on any prior claims unrelated to

15   COVID that involved a communicable disease?

16              MS. BROCKMAN:  Objection to form.

17   A.   None come to mind.  If -- you're asking like

18   eboli -- or --

19   Q.   (BY MR. WEISS)  Like SARS, Ebola.

20   A.   Ebola.

21   Q.   Things of that nature.

22   A.   I have not.  We have not.

23   Q.   Have you worked on claims involving Legionella

24   before?

25   A.   Yes, I have.  Thank you.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.
Page 2588 of 2921

1    Q.  And what is your understanding of Legionella?

2    A.  From time to time we get Legionella -- notices of

3    Legionella from insureds, some cleanup and some

4    third-party claims.

5    Q.  Is --

6    A.  We don't have -- I'm sorry.  Go ahead.

7    Q.  Oh, finish.  Sorry.

8    A.  We don't have great frequency with them; but we

9    do have them from time to time, yes.

10    Q.  What is your understanding of what Legionella is,

11    not a scientific understanding, but just from a lay

12    perspective?

13    A.  Legionella is -- is carried through water systems

14    and in the atmosphere; and one of the treatment

15    modalities associated with it is the flushing out of

16    water systems to clear it, the Legionella out of

17    systems.  Usually it occurs from stagnant water in

18    piping or in structures.

19    Q.  In any of those Legionella claims, has Allied

20    World retained experts to do testing?

21        MS. BROCKMAN:  Objection to form.

22    A.  We do not do the testing, but we evaluate -- we

23    evaluated tests performed and/or requested additional

24    testing to be done.  And when the tests are conducted,

25    we review them.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**                    **Page 2589 of 2921**

1    Q.  (BY MR. WEISS)  Was the testing that you

2    requested to be done by the policyholder?

3    A.   Their consultant, environmental -- environmental

4    expert or consultant.

5    Q.   So you're not aware of any situation where Allied

6    retained its own environmental consulting -- consultant

7    to do testing in a Legionella situation?

8    A.   Well, in a third-party bodily injury context,

9    Mr. Weiss, due to attorney-client privilege, we request

10   insureds to -- or counsel to retain those individuals

11   such that there's privileged protection, of course.

12   But --

13   Q.   You --

14   A.   -- we evaluate, I have outside consultants

15   evaluate those reports, but they're not preparing

16   reports.

17   Q.   Do you recall any Legionella claims submitted by

18   24 Hour Fitness before?

19   A.   I don't recollect any.

20   Q.   In any of the other COVID-19 claims that Allied

21   World is handling, has Allied World made a determination

22   that COVID-19 was actually present at an insured's

23   location?

24        MS. BROCKMAN:  Objection to form.

25   A.   Mr. Weiss, I was distracted by somebody walking

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2590 of 2921

1   by.  I'm sorry.

2       Q.  (BY MR. WEISS)  Oh, no problem.

3       A.  If you don't mind the court reporter repeating

4   it, or you want to repeat it for me?

5       Q.  Let me try.  In any of the other claims that

6   Allied World is handling involving COVID-19, other than

7   24 Hour Fitness, do you know if Allied World has made a

8   determination that COVID-19 was present at an insured's

9   location?

10              MS. BROCKMAN:  Objection to form.

11      A.  Allied World did not make an independent

12  evaluation to determine whether COVID was present at a

13  location; however, I did ask for information, data,

14  evidence of it.

15      Q.  (BY MR. WEISS)  In any other COVID-19 insurance

16  claim, has the policyholder provided satisfactory

17  evidence to Allied that there was COVID-19 present at an

18  insured location?

19              MS. BROCKMAN:  Objection to form.

20      A.  In the -- in the cleanup context, I was

21  provided -- we were provided with invoicing for cleanup,

22  but not presented with evidence of COVID-19 at a

23  location.

24      Q.  (BY MR. WEISS)  Did -- keep going, sorry.

25      A.  I was advised in various -- various scenarios

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2591 of 2921

1   where people informed me that these were preventative

2   measures taken based on somebody reporting that they

3   were at a specific location and a person identifying

4   themselves as being diagnosed with COVID.

5      Q.  Okay.  In -- in a situation like that, where you

6   were presented with information that someone had been

7   diagnosed with COVID at a location, did Allied accept

8   that as -- as evidence that there was COVID present at

9   the location?

10              MS. BROCKMAN:  Objection to form.

11      A.  We -- we asked for evidence of it -- by that, I

12   mean swipe samples taken on a surface -- and were not

13   provided with same.  We were provided with invoicing,

14   but not with evidence of COVID on a particular site or

15   location.

16      Q.  (BY MR. WEISS)  Okay.  The particular claim that

17   you're thinking of where you received information of an

18   individual who may have tested positive and had been

19   present at the location, is that the same claim that

20   you -- that you're also thinking about where the

21   invoicing was provided?

22              MS. BROCKMAN:  Objection to form.

23      A.  That's --

24              THE WITNESS:  Pardon me, Elizabeth?

25              MS. BROCKMAN:  You can answer.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.
Page 2592 of 2921

1          THE WITNESS:  Thank you.

2     A.   That's one of them, Mr. Weiss.

3     Q.   (BY MR. WEISS)  And there have been other claims

4 involving COVID-19, correct, where the policyholder has

5 provided information of individuals who they said had

6 tested positive for COVID and were present at the

7 location; is that correct?

8               MS. BROCKMAN:  Objection to form.

9     A.   That's what I was advised.

10    Q.   (BY MR. WEISS)  In those particular -- in any of

11 those particular cases, did Allied World accept that

12 information as sufficient evidence of COVID being

13 present at the location?

14              MS. BROCKMAN:  Objection to form, and I'll

15 also object to the extent that it seeks information

16 protected by the attorney-client privilege.

17    A.   In environmental claims we -- we ask for

18 information, data of a pollution incident, what it was,

19 what was -- the nature of it, mold or anything else,

20 what was the spill, what was the nature of the

21 contamination, where it happened, when it happened.

22          And in these scenarios I would ask -- we would

23 ask:  Please present us with swipe samples of the area

24 that you identified as containing COVID.

25    Q.   (BY MR. WEISS)  Is it Allied's position that in

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2593 of 2921

1   the absence of a swipe sample showing the presence of

2   COVID on a surface that the -- that there -- that no

3   pollution incident has occurred at a particular

4   location?

5             MS. BROCKMAN:  Objection to form.

6       A.  There has to be some evidence submitted to Allied

7   World of a pollution incident and what it is.

8       Q.  (BY MR. WEISS)  And is it Allied World's position

9   that that evidence has to be evidence of the virus

10  present on a surface?

11      A.  On a surface, a structure -- on a surface or

12  structure.

13      Q.  How about evidence of the virus in the air inside

14  of a structure, would that constitute a pollution

15  incident?

16            MS. BROCKMAN:  Objection to form.

17      A.  If -- if presented with air sampling, it very

18  well may constitute a pollution incident of -- under the

19  policy, if presented with air sampling.

20      Q.  (BY MR. WEISS)  Is Allied World aware of any

21  surface testing that was available in the 2020 time

22  period that would -- that a policyholder could use to

23  demonstrate the presence of COVID-19 on a surface?

24            MS. BROCKMAN:  Objection to form.

25      A.  Well, samples in -- did you say -- I'm sorry, did

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**                    Page 2594 of 2921

1    you say 2019?

2        Q.   (BY MR. WEISS)   I'm sorry.   Is Allied World --

3    was Allied World -- strike it.   Let me try this again.

4        Is Allied World aware of any testing that was

5    available during 2020 that a policyholder could have

6    undertaken to demonstrate the presence of COVID-19 on a

7    surface inside of a building?

8            MS. BROCKMAN:   Objection to form.

9        A.   Well, if sampling was taken of bacterium on a

10   surface and that was submitted to a lab and from that

11   bacterium it was determined that COVID was present --

12   present on that surface, and that data was presented to

13   Allied, me, Allied World and my handlers, that was --

14   that's an example of COVID on a surface, yes, I would

15   say so.

16       Q.   (BY MR. WEISS)   Is Allied World aware that that

17   type of testing was available in 2020, where you could

18   test a surface for the presence of COVID-19?

19       A.   Tests were developed after March of 2020,

20   Mr. Weiss, to test people to determine whether they had

21   COVID.   I'm not here as a medical expert or a scientist;

22   however, if tests can take a culture from somebody and

23   identify that person as having COVID, that person's

24   bacteria or droplets upon a surface may also be able to

25   capture that.   I would assume so.   But I'm -- I'm not a

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**                    **Page 2595 of 2921**

1    medical expert.

2       Q.   In any -- in any of the COVID-19 claims that have

3    been made to Allied, has a policyholder in any of those

4    claims submitted a test result showing the presence of

5    COVID-19 on a surface inside of a building?

6                  MS. BROCKMAN:   Objection to form.

7       A.   Attempts, but I haven't seen any.

8       Q.   (BY MR. WEISS)   And in any of those COVID-19

9    claims that have been submitted to Allied, have any

10   policyholders submitted a test result to Allied showing

11   the presence of COVID-19 in the air inside of a

12   building?

13                  MS. BROCKMAN:   Objection to form.

14      A.   No.

15                  MR. WEISS:   Can we take -- why don't we take

16   a break now because we've been going like almost an hour

17   and a half.   Is that okay --

18                  THE VIDEOGRAPHER:   Off the record -- I'm

19   sorry.

20                  MR. WEISS:   Is that okay?

21                  THE VIDEOGRAPHER:   Off the record at 12:24.

22                  (Recess from 12:24 p.m. to 12:35 p.m.)

23                  THE VIDEOGRAPHER:   We're back on the record

24   at 12:35.

25      Q.   (BY MR. WEISS)   Mr. Serrano, where did you work

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2596 of 2921

1    A.   There are other situations like that where I'll

2    send someone out to do a test, to do a site inspection.

3    Let's say there's a tank in the ground, needs to come

4    out.   Insured tells me, Glenn, we're taking this tank

5    out.   We're affording you the opportunity of reviewing

6    it, test it, photograph it, before it comes out of the

7    ground.   It's up to you if you want to do it.

8         So we either say the photos are fine, or we send

9    someone.

10   Q.   Has Allied sent anybody out to visit any sites in

11   connection with any COVID-19 claims that have been

12   submitted?

13        MS. BROCKMAN:   Objection to form.

14   A.   I have not.   No.   I testified a few moments ago

15   I've had a lot of claims come in, but I don't recollect

16   any.

17   Q.   (BY MR. WEISS)   And you -- and you talked about

18   the mold claim where you sent out somebody to test for

19   mold.   Why hasn't Allied sent anybody out to any of

20   these COVID-19 claim locations to do any testing?

21        MS. BROCKMAN:   Objection to form.

22   A.   Well, when -- when notices come in, a notice

23   says -- typically said that someone in the finance

24   department, for example, reported that they have

25   COVID -- that they had COVID; and they're now at home

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**                    **Page 2597 of 2921**

1   until they recover.  And I ask for evidence of the

2   testing of the work environment to determine whether

3   COVID was present at the work environment.  And what

4   would typically happen, Mr. Weiss, was a tenant -- a

5   tenant would clean down a surface, report to me that

6   they cleaned down a surface.  I asked for testing, and I

7   wasn't provided with evidence of COVID on a surface at

8   the work environment.

9      Q.   (BY MR. WEISS)   In -- are you aware, in any of

10  the COVID claims that Allied is handling, of Allied

11  providing names of testing companies to any

12  policyholders that they might consider using to do the

13  type of testing that you've talked about?

14           MS. BROCKMAN:   Objection to form.

15     A.   Our insureds are aware of environmental

16  consultants available out there, certified industrial

17  hygienists and other people who specialize in -- in work

18  environment, safety issues, and health.

19     Q.   (BY MR. WEISS)   How do you know that your

20  insureds are aware of that?

21           MS. BROCKMAN:   Objection to form.

22     A.   Oftentimes insureds would advise me that they

23  retained such and such company to come out and conduct a

24  cleaning, sanitary cleaning of the work area where a

25  given individual self-reported that they -- they had

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2598 of 2921

1    COVID.  And I typically would ask, well, provide me with

2    the tests, because I need that under my policy to show

3    evidence of a pollution incident.

4        Q.   (BY MR. WEISS)  Are you aware of any claims where

5    Allied has told a policyholder, please, before you clean

6    the surfaces, do a test for COVID?

7             MS. BROCKMAN:  Objection to form.

8        A.   We quoted the policy verbiage on it, which --

9    which sets forth that the insured has the burden of

10   establishing a pollution incident, and so they were made

11   aware of what we needed.

12       Q.   (BY MR. WEISS)  Do you agree that under the

13   24 Hour Fitness policy, the policy says that the

14   presence of microbial matter inside of a building

15   constitutes a pollution incident?

16            MS. BROCKMAN:  Objection to form.

17       A.   The policy requires evidence of a pollution

18   incident, whether it's -- whatever the pollutant is on a

19   surface -- let's say it's mold on a surface -- we need

20   photos or independent evidence of it, testing, in order

21   for us to determine whether there is a pollution

22   incident.  It may not be.  And so that's part of our

23   investigation and analysis.

24       Q.   (BY MR. WEISS)  Does the policy require that the

25   pollution -- or strike that.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**
**Page 2599 of 2921**

1      Does the policy provide that the substance be

2   actually on a surface?

3           MS. BROCKMAN:  Objection to form.

4      A.  The -- it's a reference, Mr. Weiss, to land,

5   structure on land, pollutant into or upon land or any

6   structure on land or the atmosphere, including indoor

7   air and so forth.

8      Q.  (BY MR. WEISS)  Okay.  So indoor air is not a

9   surface, correct?

10          MS. BROCKMAN:  Objection to form.

11     A.  It's one -- it's not a surface, but it's -- the

12  verbiage right before "indoor air" references a surface,

13  land or a structure on land.

14     Q.  (BY MR. WEISS)  And are you reading from the

15  24 Hour Fitness policy?

16     A.  Yes, the definition of pollution incident.

17     Q.  And is one of the definitions of pollution

18  incident the presence of microbial matter on, at, or

19  within buildings or structures?

20     A.  Yes.

21     Q.  And is it your understanding that microbial

22  matter under the 24 Hour Fitness policy includes a

23  virus?

24          MS. BROCKMAN:  Objection to form.

25     A.  Yes, I am.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2600 of 2921

1       Q.  (BY MR. WEISS)  So why isn't it sufficient to

2   show the presence of a virus within a building to

3   demonstrate that someone who was infected with the virus

4   was present within the building?

5           MS. BROCKMAN:  Objection to form.

6       A.  Well, I -- we're looking for evidence of a

7   pollution incident.  And you quoted from the microbial

8   matter --

9       Q.  (BY MR. WEISS)  Correct.

10      A.  -- where a virus is contained.  And some surface

11  or structure -- mold -- mold is in the atmosphere.  We

12  don't remediate the atmosphere.  We remediate mold on a

13  surface environment.

14      Q.  But in a situation where the policyholder is not

15  seeking coverage for remediation costs but is seeking

16  coverage for a business interruption loss caused by the

17  presence of microbial matter on, at, or within a

18  building or structure, why isn't demonstrating that the

19  business interruption loss was due to the fact that

20  individuals infected with the virus were present within

21  the structure sufficient to establish coverage?  Why do

22  you need to have an -- a test showing the presence of

23  the virus on a surface?

24          MS. BROCKMAN:  Objection to form.

25      A.  Or indoor air.  And so testing air, taking air

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.
Page 2601 of 2921

1    samples, as is done in the mold context, we -- for mold,

2    there's sampling done of air and surface structure --

3    and surfaces.

4         It's part of our analysis.  We don't, of course,

5    remediate air for mold because mold is omnipresent in

6    the air; but air can be tested.  And regarding these

7    COVID-19 notices, we -- we did not receive testing in

8    the air of -- showing evidence of COVID in the air,

9    within a -- within a structure.

10   Q.  (BY MR. WEISS)  So if you're presented with

11   evidence of somebody who is positive for COVID who is

12   inside of a building, who sneezed into the air in the

13   building, that would not be sufficient evidence because

14   you need to have a test of the air; is that what you're

15   saying?

16        MS. BROCKMAN:  Objection to form.

17   A.  Well, using the mold example -- and then we'll go

18   to COVID.  With mold, there has to be evidence of a --

19   of a pollution incident, documentation of a pollution

20   incident for mold.  And we test -- we test surfaces, and

21   they test air sampling, of course, for mold.

22   Q.  (BY MR. WEISS)  Okay.

23   A.  Same application here.  Here, surfaces for COVID

24   or testing of the atmosphere, testing of the indoor air.

25   Q.  Well, you're an attorney; and there's all

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2602 of 2921

1    different kinds of evidence.  So why isn't a person with

2    COVID inside a building, who sneezes into the air,

3    sufficient evidence of the presence of COVID in the air,

4    as an alternative type of evidence to a test of the air?

5           MS. BROCKMAN:  Objection to form.

6       A.  Well, I haven't seen the tests of what you're

7    referring to on any of these notices we received.

8       Q.  (BY MR. WEISS)  My -- my question is assuming

9    there is no test; but we do have evidence of an

10   individual with COVID, who is inside a building, who is

11   coughing or sneezing into the air.  And my question is,

12   why isn't that sufficient evidence to show a pollution

13   incident, meaning the presence of the virus?

14          MS. BROCKMAN:  Objection to form.

15      A.  Well, the insured has a burden of presenting

16   me -- presenting Allied World with evidence of a

17   pollution incident.  And if presented with such

18   reportings, I would evaluate that and determine whether

19   there was a pollution incident in that -- in that

20   structure.

21          But I haven't been, in the -- in handling of

22   these claims, haven't been presented with either the

23   bacterium on a surface or air sampling.

24      Q.  (BY MR. WEISS)  Okay.  So it's Allied's position

25   that it needs either a surface test showing the presence

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2603 of 2921

1  of COVID or air sampling test showing the presence of

2  COVID in order for the insured to establish a pollution

3  incident; is that right?

4         MS. BROCKMAN:   Objection to form.

5     A.   We need data, as we would, Mr. Weiss, in the mold

6  context.   If somebody calls Allied World and says,

7  There's mold here.

8         Okay, what -- what's the support thereof?

9         Well, Glenn, it's here.   And so we're going to

10  engage somebody to remediate it, and then we'll provide

11  you with the invoicing for it.

12         It's anecdotal and it's not -- it doesn't present

13  me with objective data about it.

14     Q.   (BY MR. WEISS)   Okay.   So you need a test result,

15  correct?

16     A.   And it could -- yes.   And -- and with mold, the

17  insured either conducts tests or if -- if they don't,

18  then I may send someone out there to do it.   And here, I

19  haven't -- I haven't been presented with samples of

20  droplets from -- from a person onto a surface or air

21  sampling, Mr. Weiss.

22     Q.   Has Allied World paid any COVID-19 claims?

23         MS. BROCKMAN:   Objection to form.   Also

24  object to the extent that this seeks other insured

25  information, proprietary.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**           Page 2604 of 2921

1    A.   I may have.  I don't remember.

2    Q.   Are you aware that this was published by 24 Hour

Fitness on the internet and social media at around the

time that it was issued?

5    A.   Yes, I have no reason to doubt that.

6    Q.   You see at the beginning, Mr. Ueber from 24 Hour

Fitness wrote:  As we all grapple with the enormous

scale and impact of the coronavirus in the U.S., it

reminds us of how precious life is and the importance of

protecting our own health.  For the health and safety of

our members, team members and guests, we will be closing

all 24 Hour Fitness clubs at 12 midnight tonight, Monday

March 16th, until further notice.

14        Do you see that?

15   A.   I -- I heard you reading it.  I can't read the

fine print, but I -- I heard what you said.

17   Q.   Okay.  Here, is that better?  I was reading from

the first paragraph.

19   A.   Could you make it just a tiny bit larger, please,

sir.

21   Q.   Sure.

22   A.   Thank you.

23   Q.   So do you see that first paragraph?

24   A.   Yes, I'm reading.  Thank you.

25        (Examining document.)  Thank you.  I just read

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.        Page 2605 of 2921

1    that.  Thank you.

2      Q.  Okay.  So does Allied World dispute the statement

3    that the CEO of 24 Hour Fitness made that 24 Hour

4    Fitness was closing its clubs for the health and safety

5    of its members, team members, and guests?

6            MS. BROCKMAN:  Objection to form.

7      A.  Yes, I -- I'm reading exactly what -- what you

8    read from a moment ago, yes.

9      Q.  (BY MR. WEISS)  Okay.  But does Allied World

10    dispute that that was the reason why 24 Hour Fitness

11    decided to close the clubs?

12            MS. BROCKMAN:  Objection to form.

13      A.  I don't impute any separate mens rea to

14    Mr. Ueber's letter than what is -- what he writes there.

15    I don't.

16      Q.  (BY MR. WEISS)  Has Allied World, to your

17    knowledge, done any investigation to determine whether

18    there was some other reason 24 Hour Fitness closed its

19    clubs, besides closing for the health and safety of its

20    members, team members, and guests?

21      A.  I'm not aware of any other reasons.

22      Q.  Does -- now, we talked earlier about the need for

23    test results either of a surface or in the air; but I

24    wanted to ask you more generally if Allied World

25    disputes that people infected with COVID-19 likely

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**
**Page 2606 of 2921**

1    visited 24 Hour Fitness clubs prior to March 16th, 2020?

2              MS. BROCKMAN:  Objection to form.

3    Q.  (BY MR. WEISS)  You would -- you would agree that

4    it's pretty likely that people infected with COVID

5    visited these fitness clubs, wouldn't you?

6              MS. BROCKMAN:  Objection to form.

7    A.  I haven't seen evidence of or data reflecting

8    that there was a COVID at -- on a structure, a surface,

9    piece of equipment at 24 Hour Fitness as a result of

10   someone diagnosed with COVID at that location.

11   Q.  (BY MR. WEISS)  Okay.  But my question was a

12   little bit different.  My question was does -- do you --

13   do you dispute that people with COVID visited 24 Hour

14   Fitness clubs before March 16th, 2020?

15             MS. BROCKMAN:  Objection to form.

16   A.  They very well may have or perhaps not.  I

17   certainly can't say for certain here with you.

18   Q.  (BY MR. WEISS)  Do you know how many people on

19   average visited each 24 Hour Fitness club on a daily

20   basis before March 16th, 2020?

21             MS. BROCKMAN:  Objection to form.

22   A.  You mean aggregated over all their clubs

23   nationwide or a particular -- or a particular location?

24   Q.  (BY MR. WEISS)  On average, how many people

25   visited each individual club on a daily basis?

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2607 of 2921

1           MS. BROCKMAN:  Objection to form.

2      A.  I don't know.

3      Q.  (BY MR. WEISS)  Okay.  Do you know on average how

4  many people visited each club on a weekly basis?

5      A.  No, I don't.

6      Q.  Did Allied World ever ask that, for that

7  information from 24 Hour Fitness?

8      A.  We -- we sent out a request for information that

9  I -- I'd have to review, but I don't believe so.

10      Q.  Do you know how many clubs 24 Hour Fitness

11  operated in March of 2020?

12           MS. BROCKMAN:  Objection to form.

13      A.  I don't know.  I'm sure quite a few, but I don't

14  know the number.

15      Q.  (BY MR. WEISS)  And is it your understanding that

16  24 Hour Fitness clubs were in pretty populated urban

17  areas?

18      A.  Yes, they were.

19      Q.  So is it Allied World's position that it's

20  possible that out of all the clubs 24 Hour Fitness

21  operated across the country, that it's possible that

22  there's not a single club where someone with COVID was

23  present before March 16, 2020?

24           MS. BROCKMAN:  Objection to form.

25      A.  Well, those are two distinct issues.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2608 of 2921

1      Q.  All right.  So the definition of pollution

2   incident has three different parts.  And the first one

3   relates to:  The discharge, emission, seepage,

4   migration, dispersal, release or escape of a pollutant

5   into or upon land, or any structure on land, the

6   atmosphere (including indoor air) or any watercourse or

7   body of water.

8         And then it continues, that's No. 1 -- that's

9   "a."  Do you see that?

10     A.  Yes, I do.

11     Q.  And then "b." is:  The presence of microbial

12  matter on, at, or within buildings or structures.

13         Do you see that?

14     A.  Yes, I do.

15     Q.  Okay.  And we've agreed earlier that "microbial

16  matter" here includes the term "virus," correct?

17     A.  Yes, it does.

18     Q.  And Allied does not dispute that COVID-19 is a

19  virus, right?

20     A.  That's correct.

21     Q.  All right.  And do you agree that the definition

22  of pollution incident that we're looking at does not

23  require that the incident be contained to a specific

24  scheduled location, correct?

25         MS. BROCKMAN:  Objection to form.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2609 of 2921

1    interruption was caused solely and directly by a

2    pollution incident -- namely, the smoke being a

3    pollution incident -- that's one of the requirements for

4    business interruption coverage.  So I would have to

5    determine, Mr. Weiss, whether the smoke was a pollution

6    incident and it was solely and directly -- the business

7    interruption was caused solely and directly from smoke.

8        Q.   (BY MR. WEISS)  Okay.

9        A.   As opposed to other reasons.

10       Q.   Well, smoke is a pollution incident under the

11   policy, correct?

12       A.   Smoke is a pollution incident, and there may be

13   other reasons for closure.  I'd have to -- I'd have to

14   evaluate that.

15       Q.   In the situation with the smoke, if they had to

16   close because of the smoke being present in their

17   facility, but there also was a -- a directive from the

18   fire department that says all businesses within X radius

19   of the fire have to be closed as well, would that have

20   any bearing on whether the business interruption loss

21   was covered or not?

22       A.   Yes, it would.

23       Q.   Okay.  How would that have bearing?

24            MS. BROCKMAN:  Objection to form.

25            Go ahead, you can answer.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2610 of 2921

1        THE WITNESS:  Thank you.

2     A.  The pollution incident must be on, at, or under a

3  scheduled location.

4     Q.  (BY MR. WEISS)  Right.

5     A.  And I don't know that the -- the smoke from the

6  neighboring property may constitute a pollution incident

7  on, at, or under a scheduled location.  I'd have to

8  evaluate that.

9        But assuming there are alternative causes of the

10  closure -- namely, water damage from the fire

11  abatement -- may be a reason for closure.  So that's not

12  solely and directly from a pollution incident and that

13  may, may not -- probably would not be covered.

14     Q.  Okay.  And what about in my hypothetical, if we

15  assume that the -- that the smoke from the fire is a

16  pollution incident that was in the scheduled location,

17  and you couldn't operate the scheduled location because

18  of the smoke, because it was so smokey, but you also had

19  a directive from the fire department that said all

20  businesses in a certain area, including where our

21  business is located, have to close down regardless of

22  whether you have smoke or not, you know, would that fire

23  department directive implicate whether there was

24  coverage or not at all?

25        MS. BROCKMAN:  Objection to form.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**

**Page 2611 of 2921**

1      A.   Depending upon what the fire department order or

2   directive was, it may not constitute a "solely and

3   directly" from the pollution incident.  It may be, for

4   example, on this -- in this scenario, water damage

5   that -- that presented a situation where it was unsafe

6   to return to the facility.

7      Q.   (BY MR. WEISS)  What if the fire department says

8   we just want -- we need to cordon off this whole area

9   because we need to investigate this fire.  So nobody can

10  come in, including our business which had the smoke

11  situation.  So --

12           MS. BROCKMAN:  Objection to form.

13     Q.   (BY MR. WEISS)  -- we not only -- so we not only

14  couldn't operate because of the smoke, but we also

15  couldn't operate because of the fire department

16  directive.  Would that implicate coverage at all?

17           MS. BROCKMAN:  Objection to form.

18     A.   Yes, that would say that -- if there are other

19  reasons for closure, other than a pollution incident in

20  and of itself, there may not be coverage for business

21  interruption.

22     Q.   (BY MR. WEISS)  Okay.  And so we --

23     A.   There may not be coverage -- there may not be

24  coverage, anyway, because if -- if the fire -- if the

25  fire came from a neighboring property, the pollution

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2612 of 2921

1    incident in and of itself, it wasn't at, on, or under a

2    scheduled location.  So there may not be business

3    interruption at all under our policy.

4          I'd have to evaluate that and what was submitted

5    as such, in order to properly evaluate that notice of

6    incident when it came in or notice of pollution -- of

7    business interruption incident when it came in.

8    Q.  Okay.  Under the 24 Hour Fitness, can there ever

9    be a covered business interruption loss where there is a

10   pollution incident at a scheduled location but there

11   also is a governmental order that prevents the insured

12   from operating its business?

13              MS. BROCKMAN:  Objection to form.

14   A.  Yes, I would say it takes it out of the realm of

15   solely and directly by a pollution incident because,

16   Mr. Weiss, these orders were directed to people to abate

17   the proliferation of the virus.

18   Q.  (BY MR. WEISS)  I wasn't talking specifically

19   with the virus.  Let's take my fire example.  Assuming

20   that the -- let's say we have a fire that starts on our

21   scheduled location, so we don't have that problem, and

22   we have smoke that inundates the business and that's the

23   reason why we closed, because we have a bunch of smoke

24   in our property.  And then the fire department comes in

25   and says you have to close your property, too.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.                    Page 2613 of 2921

1    So now we have the fire department saying we have

2    to close our property, plus we have -- we're closing it

3    because of the smoke.  Does the fact that there is a

4    fire department order in that situation take it out of

5    the "solely and directly" language?

6         MS. BROCKMAN:  Objection to form.

7    A.  Yes, if the fire department order was for a

8    reason other than solely and directly from pollution

9    incident, yes, it takes it out of the context of "solely

10   and directly."

11   Q.  (BY MR. WEISS)  Okay.  So if the fire department

12   order was because of the smoke, then would we still be

13   within the "solely and directly" language?  In other

14   words, the fire department order is based on the fact

15   that we have smoke and smoke is the pollution incident,

16   so are we okay and can get coverage in that situation?

17        MS. BROCKMAN:  Objection to form.

18   A.  Smoke is a pollutant within the definition of the

19   policy.  And if the order about closure is for smoke

20   from the fire?

21   Q.  (BY MR. WEISS)  Yes.

22   A.  With no other reasoning behind it?

23   Q.  Yes.

24   A.  And in this -- in this fact pattern you're

25   presenting me, the fire was from the insured location?

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.
Page 2614 of 2921

1      Q.   Correct.

2      A.   There very well be may business interruption

3   associated with that.

4      Q.   Okay.   But it's your testimony that if the order

5   from the fire department was for some other reason in

6   addition to just the smoke, then we would no longer be

7   within that "solely and directly" language, correct?

8      A.   That --

9           MS. BROCKMAN:   Objection to form.

10     A.   Excuse me.   Yeah, that's right.   If -- if in this

11  scenario, Mr. Weiss, the order was, well, there's water

12  damage and it's a safety hazard because of electrical

13  fires and live wires for someone to walk into this

14  facility and be injured, that's alternative cause and

15  that would not be solely and directly from a pollution

16  incident on, at, or under a scheduled location.

17     Q.   (BY MR. WEISS)   Okay.   Finally, I don't know what

18  your --

19           MR. WEISS:   Let's go off the record if it's

20  okay.

21           THE VIDEOGRAPHER:   We're off the record at

22  2:18.

23           (Recess from 2:18 p.m. to 3:03 p.m.)

24           THE VIDEOGRAPHER:   We're back on the record

25  at 3:03.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**
**Page 2615 of 2921**

1        Does the -- or even, let's say, the government

2    order comes out during the two-week period that they're

3    closed.  But do they get any business interruption

4    coverage for the period of time before the governmental

5    order comes out?

6            MS. BROCKMAN:  Objection to form.

7    A.  When presented with those situations, our

8    insureds are in a consult -- consultation with me,

9    always -- we were always able to find someone.

10        Now, Mr. Weiss, were the charges high?  Because,

11   you know, markets dictate.  You know, what somebody

12   charged before COVID to clean something, went up two or

13   three times as much during COVID.  We always found

14   somebody.  I never had a situation where somebody had to

15   wait a week to get a cleaning company to do the work.

16   Now, they -- they may have paid a premium associated

17   with it, and I understand that, but they got someone

18   there because they wanted to reopen as soon as possible.

19   Q.  (BY MR. WEISS)  So you're just not going to

20   accept my hypothetical, then?

21            MS. BROCKMAN:  Objection to form.

22   A.  Of all the claims I've had, I've never been

23   presented with that.

24   Q.  (BY MR. WEISS)  Let me ask you this question,

25   then:  In the context of COVID-19, is it Allied World's

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2616 of 2921

1    position that even if an insured can prove the presence

2    of COVID with a test, that there can't be any business

3    interruption losses solely and directly from a pollution

4    incident because of the various governmental orders that

5    also prevented businesses from operating?

6              MS. BROCKMAN:   Objection to form.

7         A.   Well, let's leave out of that the governmental

8    orders.

9         Q.   (BY MR. WEISS)   Uh-huh.

10        A.   If an insured presents me with scientific

11   evidence of COVID on a surface and they advise me,

12   Glenn, we're closing because we need to abate it and we

13   don't want people to get sick, and that's how it's

14   presented to Allied World, that's solely and directly --

15   that's solely and directly caused by a pollution

16   incident on, at, or under a scheduled location.

17        Q.   Uh-huh.

18        A.   If presented with that, I see a scenario where

19   there is coverage.

20        Q.   Okay.

21        A.   Now, you're asking me about a governmental order

22   as -- on top of that?

23        Q.   Right.

24        A.   I don't want to argue with you.   But I don't know

25   how -- why an insured would present me with that, if --

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2617 of 2921

1    just looking at the insuring agreement, Mr. Weiss.  If

2    they meet the requirements of Section 5.a., then I -- I

3    spring into action evaluating the coverage.

4        Q.   What do you mean?

5        A.   In other words, you tell me, well, Glenn, there's

6    a -- here's documentation -- documented evidence of a --

7    of a pollution incident, COVID at a scheduled location,

8    it's on the barbells in the weight room.

9        Q.   Uh-huh.

10       A.   And we need to close to clean it up.  That

11   meets -- that meets the requirements of "solely and

12   directly."  Now, there's a 72-hour deductible or waiting

13   period for BI, business interruption, to be applicable

14   here; but after application of the 72-hour, then there

15   may be coverage.

16           Now, if you said, well, what about also if I give

17   you the governmental order requiring closure?  Now

18   that's another reason for closure unrelated to solely

19   and directly from a pollution incident.  That's

20   separate.  Now there wouldn't be solely and directly

21   from a pollution incident based upon the governmental

22   order.

23           Because the governmental order is not issued for

24   that location, but it's issued to a city or a

25   municipality that people shelter in place to abate the

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.                    Page 2618 of 2921

1    virus.  They didn't have doctors to treat people, they

2    didn't have medicine to give to people.  So until they

3    did, we had these shelter -- these orders in place not

4    having to do with the pollution incident.

5            Because, of course, you remember that its central

6    operations stayed open, so Walmart stayed open, the food

7    portion of Walmart stayed open.  It's not because people

8    couldn't get COVID in the food section.  They were

9    considered an essential operation.  So it's abatement to

10   prevent people from getting the virus.

11       Q.  Do you see the policy up on your screen now?

12       A.  Yes, I do.

13       Q.  Okay.  So we're back to Exhibit 2.  I'm going to

14   go to page that's Bates numbered 205 -- that's probably

15   too big.

16       A.  Thanks, appreciate it.

17       Q.  How's that?

18       A.  Good, good.

19       Q.  Okay.  So I'm looking at the definition of

20   business interruption, No. 3.  Do you see that?

21       A.  Yes, I do.

22       Q.  And it says:  Business interruption means the

23   necessary suspension of your operations, at a scheduled

24   location, but only if such suspension of your operations

25   first commenced during the policy period.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**                    **Page 2619 of 2921**

1       Does Allied World agree that -- at least that the

2   closure of 24 Hour Fitness's clubs was a suspension of

3   its operations?

4           MS. BROCKMAN:   Objection to form.

5   A.   Suspension in here is -- I'd have to look up the

6   definition of it, but if suspension means closure, then

7   I assume it's synonymous with it.

8   Q.   (BY MR. WEISS)   And so the close -- the closure

9   of operations would be the same thing as a suspension;

10  is that how Allied operates when it's handling claims

11  under this language?

12          MS. BROCKMAN:   Objection to form.

13  A.   Suspension could be temporary, but it could also

14  mean permanent.   And suspension and closure, I would

15  assume, are one and the same.

16  Q.   (BY MR. WEISS)   Okay.   And then how does Allied

17  World apply the term "necessary" when it's referring to

18  whether -- to a suspension?   Are you aware of any

19  particular definition of -- that Allied uses to

20  determine whether a suspension of operations was

21  necessary?

22          MS. BROCKMAN:   Objection to form.

23  A.   I construe that as suspension coming -- necessary

24  suspension coming from somebody within authority within

25  an organization to issue such suspension.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**

**Page 2620 of 2921**

1    Q.   (BY MR. WEISS)   What type of -- within what

2    organization, within the insured's organization or some

3    outside organization?

4    A.   Within --

5              MS. BROCKMAN:   Objection to form.

6    A.   Within the insured's organization.

7    Q.   (BY MR. WEISS)   Okay.   Okay.   So -- so in the

8    case of 24 Hour Fitness, if the decision was -- to

9    suspend its operations was made by the management of the

10   company with authority to make the decision, do you

11   agree then that that was a necessary suspension of

12   operations?

13             MS. BROCKMAN:   Objection to form.

14   A.   It was a decision made by the insured to close

15   its operations to abate the virus and prevent its

16   members from being exposed to other people who may have

17   the virus.

18   Q.   (BY MR. WEISS)   Maybe I should ask it this way:

19   Does Allied World take the position that it -- that the

20   closure of the clubs was not necessary?

21   A.   Up until the order of the governmental

22   authorities, it was not necessary.   But it -- after the

23   orders came out about non-essential operations being

24   closed, but up until that point, it was not necessary --

25   Q.   And why do you -- why wasn't it necessary -- if

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2621 of 2921

1   24 Hour Fitness's management decided that they should

2   close their operations, why are you saying that it

3   wasn't necessary for them to do so?

4       A.  Well, I thought you were asking me separate from

5   the closure orders.

6       Q.  Right.  Separate from the --

7       A.  So you're asking me separate from the closure

8   orders?

9       Q.  Yes.

10      A.  So, in other words, pre-closure order, they

11  decided to suspend operations?

12      Q.  Correct.

13      A.  That was a voluntary decision on their part,

14  without -- without submitting to Allied World

15  documentation of a pollution incident at the location.

16  But after the orders ordering non-essential businesses

17  to close to abate the virus -- not that there was a

18  pollution incident or COVID at a location, but to abate,

19  prevent people from mingling in public spaces that were

20  not necessary -- they had no choice in the matter.

21      Q.  Okay.  So does Allied World then define the term

22  "necessary" to mean whether you have a choice or no

23  choice?

24              MS. BROCKMAN:  Objection to form.

25      A.  Well, after these orders came out, I -- I

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2622 of 2921

1    certainly could tell you that some non-essential

2    businesses in the New York area, Mr. Weiss, attempted to

3    stay open; but various governmental agencies intervened

4    and told them, look, we got to abate the virus.  So you

5    need to close.  Not because it was COVID in the

6    restaurant or COVID in the -- in the -- in a gym, but

7    rather to prevent people from going into locations and

8    mingling with one another.

9        Q.  (BY MR. WEISS)  Can a suspension of operations be

10   necessary without a governmental order requiring

11   suspension of operations, just in general, not specific

12   to COVID, but in general?

13       A.  Yes, of course.  Let's say there's a catastrophic

14   explosion or fire; yes, of course.

15       Q.  And what about in your situation with your COVID

16   policyholder where they closed the gym -- or wasn't --

17   strike that.

18           The situation you talked about earlier with the

19   policyholder that contacted you and said we had somebody

20   who tested positive for COVID, we'd like to close and

21   get somebody in to clean, did you consider that closure

22   to be necessary until the COVID -- or the suspected

23   COVID was cleaned in that situation?

24           MS. BROCKMAN:  Objection to form.

25       A.  No.  And here's why:  That particular insured,

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2623 of 2921

1    they wanted to continue operations and they wanted to

2    clean the work area of the person who departed.  So

3    without even presenting me with evidence of bacteria on

4    a surface, they wanted to clean, be ready and open for

5    business as soon as possible.  What they often did was

6    at night, they'd have a cleaning crew come in and then

7    tell the business you're open for operations tomorrow

8    morning.  So they were very motivated to maintain

9    operations.

10   Q.  (BY MR. WEISS)  Okay.  Let's take it out of that

11   situation and just let's take it into another situation

12   where you have a business that actually has a positive

13   COVID test from a surface -- if that was even possible,

14   but let's assume that they have that -- and they decide

15   we have to close until we can get this cleaned up.  And

16   so they close their business and then they arrange for

17   cleaning and then they get it cleaned and then they

18   reopen.

19        Would Allied World consider that closure to have

20   been necessary if that's what the policyholder decided

21   that they needed to do?

22             MS. BROCKMAN:  Objection to form.

23   A.  Yeah, I'm not quite understanding that.  Would

24   you just run that by me briefly or --

25   Q.  (BY MR. WEISS)  Sure.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2624 of 2921

1    A.   Again one more time.

2    Q.   Sure.  Let's say I operate a gym and I have --

3  somebody comes in and they -- they go into my Pilates

4  studio and they sneeze all over the place and they

5  say -- and then they tell us, oh, by the way, I just

6  tested positive for COVID.  I get out my handy COVID

7  tester and I test the surfaces in my Pilates studio --

8  assuming that there's such a thing -- and I confirm that

9  I have COVID all over the place in my Pilates studio and

10  maybe even in other places in the gym where this person

11  was.

12       And so then I decide I'm going to have to close

13  my gym until I can get this cleaned.  So I close down my

14  gym to get it cleaned.  I suspend my operations.  Would

15  you consider that to be a necessary suspension of

16  operations?

17            MS. BROCKMAN:  Objection to form.

18    A.   You present me with facts of somebody was in the

19  Pilates studio and they were sneezing, coughing all over

20  the place, you tested, and COVID was present on mats and

21  various other equipment in the studio?

22    Q.   (BY MR. WEISS)  Correct.

23    A.   And you decide, of course, close it down and

24  clean the place?

25    Q.   Right.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2625 of 2921

1    A.   That's solely and directly from -- COVID is a

2    virus, is a pollution incident, and it's solely and

3    directly -- the business interruption is caused solely

4    and directly from a pollution incident at a scheduled

5    location.

6         Now you call me and say, Glenn, I cleaned the

7    place up tonight.  My question for you, Mr. Weiss, was

8    now that it's cleaned, wiped clean, floor to ceiling and

9    everything in between, you're going -- I assume then

10   you're going to be open for operations tomorrow and --

11   Q.   Right.  But my question --

12   A.   -- say that --

13   Q.   -- to you was do you agree that it was necessary

14   for me to close the operation to clean?

15         MS. BROCKMAN:   Objection to form.

16   Q.   (BY MR. WEISS)   I'm focussing on the term

17   "necessary" suspension of operations.   No government

18   told me I had to close down, but I decided --

19   A.   You tested.   You tested and you present me with

20   evidence of COVID in -- in various fluids or bacteria,

21   saliva, at the location, that's COVID, solely and

22   directly from a pollution incident at a location, you

23   decide to close.   Yes.

24   Q.   So you're not going to argue that it was

25   unnecessary for me to close in that case, right?

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2626 of 2921

1    A.    No, I'm not.

2    Q.    Okay.    Let's look on the same page, the business

3    interruption period, No. 5.    It says:    Business

4    interruption period means the period of time that begins

5    the number of hours shown as the "Business Interruption

6    Waiting Period" in Item 3.

7         And we've seen that that was 72 hours.

8         And then it says later on that it ends on the

9    time and date that is the earlier of, a., the time and

10   date that the insured resumes normal business operations

11   at the scheduled location or at another location; b.,

12   the time and date that the insured, acting reasonably

13   and with due diligence, should have resumed normal

14   business operations; and then c., is the time and date

15   that's 365 days after the time and date that the

16   business interruption first commenced.

17        And I want to focus on the term "normal business

18   operations" there.    What is -- what does normal business

19   operations mean according to Allied World?

20        MS. BROCKMAN:    Objection to form.

21   A.    The time and date that the insured resumes normal

22   business operations.    So if someone is a gym, business

23   is to operate and run a gym, it's when the doors open

24   for the gym.

25   Q.    (BY MR. WEISS)    Okay.    Let's take my

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2627 of 2921

1    we certainly were not going to offer comment about it.

2        Q.  Do you recall that in this March 2020 time period

3    that there was a general lack of testing kits available

4    to test individuals for COVID?

5            MS. BROCKMAN:  Objection to form.

6        A.  Yes.  And in addition, that there were a lack of

7    testing kits available, but also lack of PPE at the time

8    for people, masks -- gowns to wear, masks to cover their

9    faces.  And that also played a major role in the

10   stay-at-home orders from cities and governmental

11   agencies, because people were searching for masks to

12   wear.  They were going into drug stores and department

13   stores to find them, and they were all sold out.  So

14   people had to shelter in place until they were able to

15   wear protective equipment.

16       Q.  (BY MR. WEISS)  Right.  And in addition to the

17   inability to test individuals due to the lack of test

18   kits available, would you also agree that there was a

19   similar inability to test air and surfaces for COVID-19

20   as well during this early time period?

21           MS. BROCKMAN:  Objection to form.

22       A.  There were challenges all around and during this

23   time frame -- and I -- I don't have a calendar in front

24   of me; Mr. Weiss, but the vaccine wasn't available in

25   March --

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.                    Page 2628 of 2921

```
1        Q.  (BY MR. WEISS)  Right.
2        A.  -- of 2020.  That didn't come out until I believe
3    months after; and even when it did, people had to queue
4    up on lines for hours to get it.  So the governmental
5    orders about sheltering in place except for
6    non-essential personnel and businesses, I understand the
7    reasoning behind it.
8        Q.  Did Allied World review any governmental orders
9    in connection with its analysis of the 24 Hour Fitness
10   claim?  And the reason why I ask is that I didn't see
11   any in the claim file documents that were produced.
12            MS. BROCKMAN:  I'll object to the extent
13   that it seeks information protected by the
14   attorney-client privilege.  So if your answer
15   incorporates any information you received from counsel,
16   I'll instruct you not to answer.
17       A.  I've been advised, Mr. Weiss, not to respond.
18       Q.  (BY MR. WEISS)  Well, did you -- I'm kind of
19   unclear how that invades attorney-client privilege.
20   Because my question -- setting aside what counsel may
21   have reviewed, did any claims handlers, Ms. Pertain or
22   yourself or anybody else employed at Allied World,
23   review any governmental orders in connection with the
24   24 Hour Fitness claim?
25       A.  Yes.
```

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2629 of 2921

1    Q.   Okay.  And what governmental orders were

2    reviewed?

3    A.   Any order or orders that apply to a given

4    jurisdiction where an insured submitted a notice of

5    business interruption loss, we evaluated to determine

6    whether there -- the order was relating to COVID solely

7    and directly at a scheduled location -- at a given site

8    or address that the governmental order issued saying at

9    1234 Park Avenue is off limits because there's COVID at

10   that specific location.

11   Q.   Okay.  So I guess my question then is why weren't

12   copies of any of these orders in the documents from the

13   claim file that we've been given?

14   A.   I would have to go back and research that.  I

15   will tell you at the time when notices were coming in

16   fast and furious, we were reviewing orders on the fly.

17   By that, I mean at that moment in time looking for

18   verbiage along the lines of our insuring agreement here.

19   So that's the first thing -- we're getting the order,

20   we're looking for the verbiage, identifying an insured

21   location as a site that had COVID present in it

22   requiring closure.

23   Q.   So if -- if some claims handler on the 24 Hour

24   Fitness claim reviewed, for example, an order from

25   California, would you expect to see some indication of

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.

Page 2630 of 2921

1    letter which we've marked as Exhibit 12, and the part

2    about Allied's conclusion that the suspension of 24

3    Hour's operations did not appear to have been caused

4    solely and directly by the presence of COVID but,

5    rather, appeared that the Oregon shelter-in-place order

6    suspended all non-essential business operations,

7    including 24 Hour's business.

8         And my question was, can you explain why the

9    existence of the Oregon shelter-in-place order means

10    that the suspension of 24 Hour's operations at Portland

11    was not caused solely and directly by the presence of

12    COVID on, at, or within buildings or structures?

13         MS. BROCKMAN:   Objection to form.

14    A.   Well, regarding the Portland health gym -- health

15    club, there was no data presented to Zeesie or me --

16    well, to Zeesie, the main claim handler, that there was

17    a pollution incident at -- on, at, or under the health

18    club and the facility was closed solely and directly as

19    a result of COVID-19 at that location.

20    Q.   (BY MR. WEISS)   And it's Allied's position,

21    correct, that even if they had presented evidence of a

22    pollution incident, that the business interruption

23    wouldn't have been solely and directly from that

24    incident because the order issued in Oregon was a broad

25    order to close non-essential businesses; is that a fair

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.                    Page 2631 of 2921

1   statement?

2               MS. BROCKMAN:   Objection to form.

3       A.   Well, taking both in their totality --

4       Q.   (BY MR. WEISS)   Uh-huh.

5       A.   -- the -- the order to suspend non-essential

6   business operations was to -- was, as you read a moment

7   ago, to promote social distancing and minimize the

8   spread of COVID in the population at large, as opposed

9   to COVID at 24 Hour Fitness in Portland, Oregon, at such

10  and such a street in -- in Portland, Oregon.

11              MR. WEISS:   Okay.   So why don't we take our

12  break now.   And if you wouldn't mind, if you're able to

13  check on that one question that we were talking about,

14  and I think it was whether the -- the payment that you

15  plan to make on a claim involving COVID was for a

16  business interruption loss.   Okay?

17              THE WITNESS:   And -- yes, and I previously

18  spoke about the payment I made due to ERE, emergency

19  response expense.

20              MR. WEISS:   Correct.   Yep.

21              THE VIDEOGRAPHER:   We're off the record at

22  5:02.

23              (Recess from 5:02 p.m. to 5:21 p.m.)

24              THE VIDEOGRAPHER:   The time is 5:21 p.m.,

25  and we are back on the record.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**
**Page 2632 of 2921**

1     MR. WEISS:  All right.  So let's mark as the
2   next Exhibit -- 13, I believe?
3          THE REPORTER:  Correct.
4          MR. WEISS:  What was previously identified
5   as 19.
6          (Exhibit No. 13 marked.)
7   Q.  (BY MR. WEISS)  And this is another April 27th
8   letter from Ms. Pertain to Jeremy Gottlieb at 24 Hour.
9   Bates number is AWPLLSP 59.
10         And, Mr. Serrano, do you see it --
11         MS. BROCKMAN:  David, can you screen share
12   that?
13         MR. WEISS:  Oh, I'm sorry.  There we go.
14   Q.  (BY MR. WEISS)  Do you see that up on your
15   screen, Mr. Serrano, now?
16   A.  Yes, I do.
17   Q.  Okay.  And do you recognize this as the -- well,
18   let me ask you, what do you -- what do you recognize
19   this as?
20   A.  This is Allied World's coverage determination
21   letter dated April 27th, 2020, addressed to Jeremy
22   Gottlieb at 24 Hour Holdings Corp.
23   Q.  And does this letter relate to the locations,
24   other than the Portland location that was the subject of
25   the prior letter we looked at, which was Exhibit 11?

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2633 of 2921

1   A.  Yes, it is.

2   Q.  And, essentially, was Allied World's coverage

3   determination with regard to these other locations the

4   same as it was with respect to the Portland location?

5   A.  Yes, it -- yes, it is.

6   Q.  And, again, as with the prior exhibit, you would

7   have reviewed this before it got sent out?

8   A.  Yes, I did.

9   Q.  All right.

10          MR. WEISS:  I'm going to jump ahead, so

11  let's mark as the next exhibit, 14, what was previously

12  identified as 25.

13          (Exhibit No. 14 marked.)

14  Q.  (BY MR. WEISS)  And this is a June 10th, 2020,

15  letter from me to Ms. Brockman.  Do you have -- do you

16  have that up on your screen?

17  A.  Yes, I do.  Thank you.

18  Q.  And this is the -- is Bates numbered AWPLL 1 as

19  the beginning number.  Do you recall seeing this letter

20  in around June of 2020?

21  A.  Yes, I do.

22  Q.  Okay.  If we go to the second page of the letter,

23  I'll just scroll down to it, and let me know if you want

24  me to make it bigger for you.

25  A.  Oh, I've got my version here also.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2634 of 2921

1    Q.  Oh, good.  Okay.  So do you recall earlier we

2    were talking about, in a prior letter, some statements

3    that Mr. Gottlieb referred to where he said that

4    governmental officials were telling people to act as if

5    everyone had COVID-19; do you recall that --

6    A.  Yes, sir.

7    Q.  -- we talked about that earlier?  Okay.

8    A.  Yes, I remember reading that with you.

9    Q.  Okay.  And then here in this letter on page 2 at

10   the beginning part it says:  In March 2020, the United

11   States Surgeon General stated, "Everyone needs to act as

12   if they have the virus right now.  So, test or not test,

13   we need you to understand you could be spreading to

14   someone else.  Or you could be getting it from someone

15   else.  Stay at home."

16        And then the next -- and then after that it says:

17   On April 20th, 2020, the Governor of Ohio tweeted that,

18   "We must continue to assume that everyone has COVID --

19   hashtag COVID-19 because it is not going away until we

20   have a vaccine."

21        Do you see that?

22   A.  Yes, I do.

23   Q.  And do you recall seeing this when you -- when

24   you got the letter in June of 2020?

25   A.  Yes, I do.

Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment
NELL McCALLUM & ASSOCIATES, INC.          Page 2635 of 2921

1    Q.  Did -- do you know if anyone at Allied World did

2    anything to verify those statements or evaluate them at

3    all?

4             MS. BROCKMAN:  I'll caution you not to

5    respond to the extent that it discloses information

6    protected by the attorney-client privilege.

7             THE WITNESS:  All right.  Thank you,

8    Elizabeth.

9    A.  And so I'm not going to respond to that --

10   those -- that question, Mr. Weiss.

11   Q.  (BY MR. WEISS)  Okay.  Did -- did Allied World

12   disagree with the statement from the governor of Ohio

13   that, "We must continue to assume that everyone has

14   COVID-19 because it's not going away until we have a

15   vaccine"?

16            MS. BROCKMAN:  Objection to form.

17   A.  Well, I -- may I respond in my individual

18   capacity to that statement?

19   Q.  (BY MR. WEISS)  Yeah.  You're free to qualify

20   your answers as you -- as you want to.  So that's fine

21   with me.  Thank you.

22   A.  You're welcome.  It's written here:  The governor

23   of Ohio tweeted that, "We must continue to assume that

24   everyone has COVID-19 because it's not going away until

25   we have a vaccine."

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its**
**Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**                    **Page 2636 of 2921**

1       Now, there's a lot of different statements in

2  there, but let's take the first part.

3       Q.  Uh-huh.

4       A.  Assume everyone has COVID.  Obviously everyone

5  didn't have and doesn't have COVID.  Certain people did

6  and that's unfortunate, of course; but not everyone had

7  COVID.

8       And then he writes:  Because it's not going away.

9       I'm not sure what that has to do with the first

10 part of the sentence.  And it's not going away until we

11 have a vaccine.  I get his point about people sheltering

12 in place, I understand that.  But his statement about we

13 must continue to assume that everyone has COVID,

14 obviously everyone didn't have COVID, because if we did,

15 that would be a very dire circumstance.

16      Q.  I think the point he was trying to make was that

17 because testing was so sparse and because asymptomatic

18 people were spreading the disease, who didn't even know

19 they had it, that you just had to assume everyone had

20 COVID and take precautions along those lines.

21      So it gives -- with that explanation, does

22 that -- does that help you at all understand the

23 statement?  And you -- and this is not on behalf of

24 Allied.  I'm fine just you giving your own testimony on

25 this.

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**
**Page 2637 of 2921**

1    A.  Thank you.

2            MS. BROCKMAN:  Objection to form.

3    A.  Well, certainly if he -- if he wrote in the tweet

4    exactly as you said just now.

5    Q.  (BY MR. WEISS)  Uh-huh.

6    A.  I would agree with it, but he didn't.  So I

7    won't.

8    Q.  Okay.  Fair enough.

9        In the next paragraph there's a reference to a

10   U.S. Supreme Court case, South Bay United Pentecostal

11   Church versus Gavin Newsom, Governor of California.  Do

12   you recall if you read that case in connection with

13   receiving this letter on behalf of 24 Hour Fitness?

14   A.  I'm reading it.  (Examining document.)  Yes, I

15   just read it.  And not to breach any attorney-client

16   privileges --

17   Q.  Uh-huh.

18   A.  -- this was addressed to Elizabeth, who's on here

19   with me now, and we conferred about it.  And I'll just

20   leave it at that.

21   Q.  That's fine.

22       So going -- going down further, do you recall

23   that in -- in the letter there was -- and I think we

24   talked about this earlier briefly, that 24 Hour Fitness

25   had provided a list of various incidents related to

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**
**NELL McCALLUM & ASSOCIATES, INC.**          **Page 2638 of 2921**

```
1                         SIGNATURE PAGE

2

3       I, 30(b)(6) DEPOSITION OF ALLIED WORLD NATIONAL
     ASSURANCE COMPANY THROUGH GLENN SERRANO, AND DEPOSITION
        OF GLENN SERRANO, have read the foregoing deposition and
4    hereby affix my signature that same is true and correct,
     except as noted on the correction page.

5

6

                              _____
7                             30(b)(6) DEPOSITION OF
                              ALLIED WORLD NATIONAL
8                             ASSURANCE COMPANY THROUGH
                              GLENN SERRANO, AND
9                             DEPOSITION OF GLENN SERRANO

10

     THE STATE OF TEXAS        )
11   COUNTY OF _____ )

12

        Before me _____ on this day personally
13   appeared _____ known to me [or proved to
     me on the oath of _____ or through
14   _____ (description of identity card or
     other document)] to be the person whose name is
15   subscribed to the foregoing instrument and acknowledged
     to me that he/she executed the same for the purposes and
16   consideration therein expressed.
        Given under my hand and seal of office this _____
17   day of _____, 2022.

18

19

                              _____
20                            NOTARY PUBLIC IN AND FOR
                              THE STATE OF T E X A S
21

22

23   My Commission Expires:

24

25   _____
```

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

```
1    THE STATE OF TEXAS )
     COUNTY OF HARRIS   )
2
                    REPORTER'S CERTIFICATION
3      REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION OF ALLIED
     WORLD NATIONAL ASSURANCE COMPANY THROUGH GLENN SERRANO,
4               AND DEPOSITION OF GLENN SERRANO
                    TAKEN SEPTEMBER 14, 2022
5
         I, ROBIN GROSS, Certified Shorthand Reporter in and
6    for the State of Texas, hereby certify to the following:

7        That the witness, 30(b)(6) DEPOSITION OF ALLIED WORLD
     NATIONAL ASSURANCE COMPANY THROUGH GLENN SERRANO, AND
8    DEPOSITION OF GLENN SERRANO, was duly sworn by the
     officer and that the transcript of the oral deposition
9    is a true record of the testimony given by the witness;
         That the deposition transcript was submitted on
10   _____ to the witness or the attorney for the
     witness for examination, signature and return to Nell
11   McCallum & Associates, by _____;
         That the amount of time used by each party at the
12   deposition is as follows:

13       MR. DAVID E. WEISS - 5:35

14       I further certify that I am neither counsel for,
     related to, nor employed by any of the parties in the
15   action in which this proceeding was taken, and further
     that I am not financially or otherwise interested in the
16   outcome of the action.

17       Certified to by me this 27th day of September, 2022.

18

19

20       _____

21       ROBIN GROSS CSR, TEXAS CSR NO. 9015
         Expiration Date:  07-31-23
22       Nell McCallum & Associates, Inc.
         Firm Registration No. 10095
23       Expiration Date:  01-31-2023
         718 Westcott
24       Houston, Texas 77007
         (713) 861-0203/Fax(713) 861-2324
25
```

**Exhibit 185 to Plaintiff's Omnibus Appendix of Evidence in support of its
Oppositions to Defendants' Motions for Summary Judgment**

**NELL McCALLUM & ASSOCIATES, INC.**