## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (TMH) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (TMH) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF 24 HOUR FITNESS WORLDWIDE, INC.'S OPPOSITION TO PROPERTY INSURER DEFENDANTS' MOTION TO EXCLUDE DR. CARNETHON'S PROPOSED EXPERT TESTIMONY

David E. Weiss (admitted *pro hac vice*)
T. Connor O'Carroll (admitted *pro hac vice*)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
E-mail: dweiss@reedsmith.com
E-mail: cocarroll@reedsmith.com
Counsel for Plaintiff 24 HOUR FITNESS
WORLDWIDE, INC.

Mark W. Eckard (No. 4542)
REED SMITH LLP
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
E-mail: meckard@reedsmith.com

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

A.    Dr. Carnethon's Expert Background As An Epidemiologist ........................................... 3

B.    Dr. Carnethon's Background Regarding Detecting and Monitoring the Spread of
      COVID-19 ......................................................................................................................... 4

C.    Dr. Carnethon's Epidemiological Analysis ..................................................................... 5

D.    Dr. Carnethon's Opinion Will Help The Trier Of Fact Determine Whether The
      Evidence Supports The Presence And Spread Of Communicable Diseases At 24
      Hour's Insured Locations ................................................................................................. 8

LEGAL STANDARD .............................................................................................................. 9

ARGUMENT ........................................................................................................................... 11

A.    Dr. Carnethon's Challenged Expert Opinions Are Admissible ...................................... 12

      1.    Dr. Carnethon's Challenged Opinion Is Relevant To Assist The Trier Of
            Fact In Determining Whether Communicable Diseases Were Present And
            Spreading At 24 Hour's Clubs ............................................................................... 12

      2.    Dr. Carnethon Is Qualified To Opine About Communicable Diseases And
            How They Spread ................................................................................................... 15

      3.    Dr. Carnethon's Challenged Opinions Are Reliable .............................................. 18

      4.    Insurers Do Not Challenge Dr. Carnethon's Other Opinions ................................ 24

B.    Dr. Carnethon's Opinion Regarding Other Communicable Diseases Is Admissible ....... 25

      1.    Dr. Carnethon's Opinion Is Not New .................................................................... 25

      2.    Dr. Carnethon's Opinion Is Admissible For The Same Reasons Stated
            Above ..................................................................................................................... 28

CONCLUSION ....................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Boehringer Ingelheim Int'l GMBH*,
    No. 17-cv-01065-MSG-RL, 2019 U.S. Dist. LEXIS 28950 (D. Del. Feb. 25,
    2019) ...............................................................................................................13

*Allergan USA, Inc. v. MSN Labs. Private Ltd.*,
    No. 19-1727-RGA, 2023 U.S. Dist. LEXIS 135710 (D. Del. Aug. 4, 2023) ...................26, 27

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)...........................................................................7, 13

*Bowen v. E.I. DuPont de Nemours & Co.*,
    906 A.2d 787 (Del. 2006) ...............................................................................23

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011).............................................................19

*City of Almaty v. Ablyazov*,
    No. 15-cv-5345 (AJN), 2021 U.S. Dist. LEXIS 214695 (S.D.N.Y. Nov. 5,
    2021) ...............................................................................................................19

*Daniels-Feasel v. Forest Pharms., Inc.*,
    No. 17 CV 4188-LTS-JLC, 2021 U.S. Dist. LEXIS 168292 (S.D.N.Y. Sep. 3,
    2021) ...............................................................................................................23

*Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016).............................................................23

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).........................................................................................10

*De La Cruz v. V.I. Water & Power Auth.*,
    597 F. App'x 83 (3d Cir. 2014) .......................................................................15

*Dunn v. Hovic*,
    1 F.3d 1362 (3d Cir. 1993)...............................................................................24

*Eli Lilly & Co. v. Actavis Elizabeth LLC*,
    Civil Action No. 07-cv-3770 (DMC), 2010 U.S. Dist. LEXIS 47061 (D.N.J.
    May 13, 2010)..............................................................................................16, 17

*Emcore Corp. v. Optium Corp., Civil Action No. 6-1202*,
    2008 U.S. Dist. LEXIS 59794 (W.D. Pa. Aug. 5, 2008) .................................25

*Guarnieri v. Pa. Fed'n. Bhd. Of Maint. Of Way Emples.*,
    153 F. Supp. 2d 736 (E.D. Pa. 2001) ............................................................16, 18

*Habecker v. Copperloy Corp.*,
    893 F.2d 49 (3d Cir. 1990)...........................................................................11

*Hammond v. International Harvester Co.*,
    691 F.2d 646 (3d Cir. 1982)..........................................................................15

*K.C. Hopps, Ltd. v. Cincinnati Ins. Co.*,
    561 F. Supp. 3d 827 (W.D. Mo. 2021) ...........................................................14

*Karlo v. Pittsburgh Glass Works, LLC*,
    849 F.3d 61 (3d Cir. 2017)............................................................................18

*Keller v. Feasterville Family Health Care Ctr.*,
    557 F. Supp. 2d 671 (E.D. Pa. 2008) ..............................................................16

*Knight v. Otis Elevator Co.*,
    596 F.2d 84 (3d Cir. 1979).............................................................................16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).............................................................................10, 20

*Lauria v. AMTRAK*,
    145 F.3d 593 (3d Cir. 1998)..........................................................................19

*Lucent Techs. Inc. v. Gateway, Inc.*,
    2007 U.S. Dist. LEXIS 36246 (May 16, 2007) ..................................................26

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018)..............................................................23

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)..........................................................................10

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)............................................................................15

*Power Integrations, Inc. v. Fairchild Semiconductor Ina, Inc.*,
    585 F. Supp. 2d 568 (D. Del. 2008)................................................................26

*RSUI Indem. Co. v. Vision One, LLC*,
    No. C08-1386RSL, 2009 U.S. Dist. LEXIS 118425 (W.D. Wash. Dec. 18,
    2009) .........................................................................................................13

*Safeco Ins. Co. of Am. v. S & T Bank*,
  Civil Action No. 07-01086, 2010 U.S. Dist. LEXIS 18914 (W.D. Pa. Mar. 3,
  2010) ................................................................................................................13

*Saldana v. Kmart Corp.*,
  260 F.3d 228 (3d Cir. 2001)...........................................................................12

*Sikkelee v. Precision Airmotive Corp.*,
  522 F. Supp. 3d 120 (M.D. Pa. 2021) .............................................................13

*Smith v. State Farm Fire & Cas. Co.*,
  Civil Action No. 19-10319, 2023 U.S. Dist. LEXIS 88209 (D.N.J. May 19,
  2023) ................................................................................................................20

*In re Teva Sec. Litig.*,
  No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316 (D. Conn. Mar. 9,
  2021) ................................................................................................................13

*Thompson v. Doane Pet Care Co.*,
  470 F.3d 1201 (6th Cir. 2006) .........................................................................26

*Tumlinson v. Advanced Micro Devices, Inc.*,
  81 A.3d 1264 (Del. 2013) ................................................................................23

*United States v. Bridges*,
  No. 21-1679, 2022 U.S. App. LEXIS 25847 (3d Cir. Sep. 15, 2022) .....................24

*United States v. Clifford*,
  704 F.2d 86 (3d Cir. 1983)...............................................................................12

*United States v. Mitchell*,
  365 F.3d 215 (3d Cir. 2004).......................................................................10, 18

*United States v. Mulder*,
  273 F.3d 91 (2d Cir. 2001)...............................................................................24

*United States v. Watson*,
  260 F.3d 301 (3d Cir. 2001).............................................................................12

*United States v. Xue*,
  597 F. Supp. 3d 759 (E.D. Pa. 2022) ...............................................................20

*Villari v. Terminix Int'l, Inc.*,
  692 F. Supp. 568 (E.D. Pa. 1988) ....................................................................16

*In re Zoloft Prods. Liab. Litig.*,
  858 F.3d 787 (3d Cir. 2017)..........................................................................6, 23

**Rules**

Fed. R. Evid. 702 ...........................................................................................................9, 10, 15, 24

Fed. R. Evid. 702(a) ...................................................................................................................5

**Other Authorities**

4 Weinstein's Federal Evidence § 702.02 (2024) ........................................................24

*What is Epidemiology*, NATIONAL INSTITUTES OF HEALTH,
    https://www.nidcd.nih.gov/health/statistics/what-epidemiology (last visited
    Feb. 2, 2024) .........................................................................................................................3

## PRELIMINARY STATEMENT

Insurers'[1] submitted a Motion to Exclude ("Motion") the proposed testimony of Plaintiff 24 Hour Fitness Worldwide, Inc.'s ("24 Hour") Expert witness, Mercedes R. Carnethon, Ph.D. ("Dr. Carnethon"). 24 Hour submits this Memorandum of Law in opposition to Insurers' Motion.

## SUMMARY OF ARGUMENT

Insurers argue that Dr. Carnethon's opinions are irrelevant, that Dr. Carnethon is not qualified to give such opinions, and that Dr. Carnethon's opinions are not supported by fact or proper methodology. Insurers are wrong and their Motion should be denied in full for the following independent reasons:

1.      Dr. Carnethon's opinions are relevant because expert testimony, like all evidence, need not conclusively establish a disputed fact for it to be relevant. Expert testimony is relevant if it would help the trier of fact understand the evidence or determine a fact at issue. Here, 24 Hour seeks to establish the presence and spread of communicable diseases at its clubs, including COVID-19, using circumstantial evidence. The proposed expert testimony from Dr. Carnethon will be helpful to the trier of fact in its analysis of such evidence and the proper inferences to be drawn therefrom. Further, expert testimony is admissible to educate the factfinder about general principles at issue in this case; principles related to communicable diseases, generally, and COVID-19, particularly, and how communicable diseases spread among the population. This case involves complex issues regarding, among other things, (1) a global pandemic, (2) the spread of diseases, including COVID-19, in different communities and the prevalence of such diseases, (3)

---

[1]      "Insurers" refers to Defendants Continental Casualty Company ("Continental"), Starr Surplus Lines Insurance Company ("Starr"), Allianz Global Risks US Insurance Company ("Allianz"), Liberty Mutual Fire Insurance Company ("Liberty"), Certain Underwriters at Lloyd's, London ("Lloyd's"), Allied World National Assurance Company ("Allied World"), QBE Specialty Insurance Company ("QBE"), and General Security Indemnity of Arizona ("GSINDA").

how businesses like 24 Hour were expected and/or required to respond to the spread of COVID-19, (4) how governmental authorities responded to the pandemic, and (5) how COVID-19 is like other communicable diseases that were also prevalent and spreading during the relevant time period. Expert testimony regarding all these matters will assist the trier of fact in assessing the evidence to be presented in this case.

2.      Dr. Carnethon is an expert epidemiologist and qualified to present her opinions in this case, particularly her opinions regarding how diseases occur and spread among different groups of people. Dr. Carnethon's extensive background as an epidemiologist, and a leading academic in the field, including her work related to communicable diseases and in relation to COVID-19 specifically, makes her qualified to provide her expert opinions in this case.

3.      Dr. Carnethon's methodology is reliable because she bases her opinions on undisputed data inputs from 24 Hour and public health officials, and she relied on a methodology recognized by epidemiologists in the field to address epidemiological questions like those presented in this case. Indeed, even Insurers' own expert epidemiologist admitted to using "elements" of the same methodology as Dr. Carnethon used in her own analysis. Moreover, an expert does not need to conduct a specific study or analysis to provide reliable and admissible testimony. Dr. Carnethon examined reliable data that was known to 24 Hour and the public in early 2020 and adequately explained her methodology in her report. The fact that Insurers did not delve into Dr. Carnethon's report during her deposition does not render her report unreliable.

4.      Dr. Carnethon also offers expert testimony related to general principles and information regarding COVID-19, the lack of testing early in the pandemic, and the symptoms of various communicable diseases, among other things. Insurers do not challenge these parts of Dr. Carnethon's proposed testimony and this information will assist the trier of fact to understand the

evidence in this case. The Court should deny the Motion with respect to those matters the Insurers

do not challenge.

     5.     Dr. Carnethon's Declaration in support of 24 Hour's Motion for Summary

Judgment does not provide a "new" opinion. Dr. Carnethon's declaration is a reasonable synthesis

of the same opinions that Dr. Carnethon expressed in her expert report and during her deposition.

As such, Dr. Carnethon's Declaration is admissible for the same reasons as Dr. Carnethon's other

opinions.

## **BACKGROUND**

### A.    **Dr. Carnethon's Expert Background As An Epidemiologist**

     Unlike the Insurers' experts who are professional witnesses for insurance companies, Dr.

Carnethon is an actual academic and expert in her field. Dr. Carnethon is an epidemiologist and

currently a Professor and the Vice Chair of the Department of Preventive Medicine, and Professor

of Medicine in Pulmonary and Critical Care at the Northwestern University Feinberg School of

Medicine. Appx, Ex. 1 at 3.[2] Dr. Carnethon has served in academia for 20 years since earning a

Bachelor of Arts in Human Biology with Honors from Stanford University, a Master's and

Doctoral Degrees in Epidemiology from the University of North Carolina at Chapel Hill, and

postdoctoral training in cardiovascular disease epidemiology from the Stanford University School

of Medicine. *Id.*

     Dr. Carnethon has participated and continues to participate in epidemiological research.

Appx, Ex. 1 at 3–5. Since 2003, Dr. Carnethon has continuously received funding for her research

---

[2]     Epidemiology "is the branch of medical science that investigates all the factors that determine the presence or absence of diseases and disorders. Epidemiological research helps us to understand how many people have a disease or disorder, if those numbers are changing, and how the disorder affects our society and our economy." *What is Epidemiology*, NATIONAL INSTITUTES OF HEALTH, https://www.nidcd.nih.gov/health/statistics/what-epidemiology (last visited Feb. 2, 2024).

by the National Institutes of Health as a Principal Investigator or Co-Investigator. *Id.* at 3. Findings from Dr. Carnethon's research have thus far appeared in 315 original research articles, 20 commentaries and editorials, 15 scientific statements, and 3 published books. *Id.* Dr. Carnethon's research typically focuses on the distribution and determinants of the leading causes of death in the United States and globally, including cardiovascular disease and lung disease. *Id.*

**B.     Dr. Carnethon's Work Regarding Detecting and Monitoring the Spread of COVID-19**

Since the onset of the COVID-19 pandemic in 2020, Dr. Carnethon contributed her expertise in research methodology and behavioral medicine to identifying populations at the greatest risk for severe COVID-19 infections. Appx, Ex. 1 at 3. Dr. Carnethon discussed the effectiveness and application of disease mitigation strategies with workplaces, schools, churches, and the like. *Id.* Dr. Carnethon also published scientific articles about antibody-determined prevalence of SARS-CoV-2 among healthcare workers, viral load dynamics in mild to moderate infections, behavioral responses to the pandemic, and vaccine intentions among healthcare workers. *Id.* at 3–4. In addition, Dr. Carnethon received financial support from the American Lung Association to determine the antibody prevalence of SARS-CoV-2 infection in a cohort of 4,000 young adults (ages 25–35). *Id.* at 4.

Moreover, Dr. Carnethon contributed to public health messaging around the pandemic by regularly appearing on cable news (e.g., MSNBC), network television (e.g., ABC World News Tonight, PBS NewsHour, and Good Morning America) and radio (e.g., Bloomberg TV/radio and National Public Radio) in the United States and Canada (e.g., NewsNow). *Id.* On these public programs, Dr. Carnethon would explain scientific concepts related to the COVID-19 pandemic. *Id.* Dr. Carnethon also provided testimony on COVID-19 disparities among older adults to the U.S. Senate Special Committee on Aging on July 21, 2020, and was an invited speaker to the

National Disability Forum Conference for the Social Security Administration on November 18, 2020. *Id.* Also, Dr. Carnethon has been an invited speaker at numerous scientific conferences to discuss the impact of the COVID-19 pandemic on various population subgroups. *Id.*

## C.   Dr. Carnethon's Epidemiological Analysis

As an epidemiologist, Dr. Carnethon's studies focus on the distribution and causes of health events, including the prevalence of communicable diseases in particular populations. Appx, Ex. 1 at 4. To that end, Dr. Carnethon proposes to provide expert testimony in this case regarding various matters that "will help the trier of fact to understand the evidence or to determine a fact in issue,"[3] including: (1) evaluating and understanding the nature of SARS-CoV-2 (the virus that causes COVID-19) and COVID-19; (2) evaluating and understanding how SARS-CoV-2 and the COVID-19 disease are detected, spread, and transmitted; (3) evaluating the prevalence and spread of COVID-9 in the United States during the relevant period; (4) evaluating and explaining difficulties faced by the public health community in testing for and addressing the spread of COVID-19; (5) evaluating and explaining the manner in which businesses and governmental authorities responded to the spread of COVID-19; (6) evaluating the evidence regarding the prevalence and spread of COVID-19 and the reasonable conclusions to be drawn from the evidence, including 24 Hour's conclusion that, based on the prevalence of COVID-19 in the United States, and in the communities where 24 Hour operates, and the nature of 24 Hour's operations, COVID-19 was actually present and spreading at all of 24 Hour's locations in the winter and spring of 2020; and (7) evaluating 24 Hour's decision to close and prohibit access to its club locations due to these circumstances. *Id.*

---

[3]      Fed. R. Evid. 702(a).

To evaluate these questions, Dr. Carnethon evaluated data and other information regarding the above topics, and applied criteria commonly used by epidemiologists. *Id.* at 5. Specifically, Dr. Carnethon considered and utilized, among other things, the Bradford Hill criteria which considers: (1) strength of effect; (2) consistency of findings observed across unique settings; (3) specificity—no other likely explanation; (4) temporality—the cause happens before the effect in time; (5) biological gradient—greater exposure should lead to greater incidence; (6) plausibility— a biologically plausible mechanism of association; (7) coherence between epidemiological observation and laboratory evidence; (8) experiment; and, (9) analogy—similarities between the observed association and other prior associations. *Id.* Not all criteria must exist to reach a conclusion. *In re: Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017) (the Bradford Hill criteria is "neither an exhaustive nor a necessary list"); Appx, Ex. 1 at 5; Appx, Ex. 4 at 213 (Carnethon Depo. Tr. 60:12–16 ("the Bradford Hill criteria . . . are generally nine criteria for determining causality. They are not necessarily weighted equally, but they are in combination together, when you're meeting more than one criteria, can strongly suggest causality")). The Insurers' epidemiology expert, Allison Stock, PhD, MPH, MS ("Dr. Stock"), also claims to have used "elements of Bradford Hill" but not all of them because she states, "this is not a causation case." Appx, Ex. 5 at 220 (Stock Depo. Tr. At 118:8–16). Thus, as Dr. Stock acknowledges, the Bradford Hill criteria are appropriate for epidemiological analyses in non-causation cases. Albeit, while Dr. Stock disagrees with some of Dr. Carnethon's conclusions, nowhere does Dr. Stock take issue with Dr. Carnethon's use of Bradford Hill criteria, as she herself admittedly used. Appx, Ex. 5 at 220 (Stock Depo. Tr. at 118:11–12); *See* Appx, Ex. 2 (Expert Report of Dr. Stock).

In reaching her opinions, Dr. Carnethon took guidance from the above commonly accepted criteria (particularly, consistency, biological plausibility, coherence, and analogy) to assess

whether it was reasonable based on the available information and data to conclude that COVID-19 was present and spreading at 24 Hour's locations. This analysis included an assessment of how the COVID-19 pandemic, including the presence and spread of COVID-19 and the SARS-CoV-2 virus in the communities where 24 Hour operated, among other factors, affected 24 Hour's operations.

> In using this analysis, Dr. Carnethon concluded that (among other things):

> Based on the prevalence of SARS-CoV-2 and COVID-19 in the United States, including in the communities where 24HF operates; given the nature of 24HF's operations and the information 24HF had regarding the spread of COVID-19 generally, and at its locations; and given the prevalence and presence of individuals with other respiratory illnesses with similar symptoms, and the inability to differentiate between them; 24HF's conclusion, as confirmed in deposition testimony in this case, that COVID-19 was actually present and spreading at each of its locations (i.e., among staff, patrons and other visitors) during the winter and early spring of 2020 was reasonable. Given all of this, I also agree it was reasonable and necessary for 24HF to close all of its locations for the health and safety of individuals visiting its clubs.

Appx, Ex. 1 at 7.

Since a critical issue in this case is whether the circumstantial evidence presented by 24 Hour lends itself to a reasonable inference that COVID-19 was present and spreading at its clubs, Dr. Carnethon's above opinion is directly relevant, and will help the trier of fact to understand and evaluate that evidence, as Dr. Carnethon confirms that the available evidence does lend itself to a reasonable conclusion that COVID-19 was present and spreading at 24 Hour's clubs, the very issue to be decided in this case. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (the Federal Rules of Evidence "permit[] an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact") (internal citations omitted).

Moreover, Dr. Carnethon also presents a substantial amount of additional information and opinion regarding the COVID-19 pandemic and the spread of COVID-19, challenges faced by the public health community in addressing COVID-19, including limitations regarding testing, the

nature of communicable disease generally and how they spread, the prevalence of the cold and flu during the relevant period and the similarities between those communicable diseases and COVID-19 and the challenges faced by that, among other things. All these matters involve information that will help the trier of fact understand the case and the issues to be decided. ***The Insurers do not challenge or even address the additional opinions or information in their motion.***[4]

**D.     Dr. Carnethon's Opinion Will Help The Trier Of Fact Determine Whether The Evidence Supports The Presence And Spread Of Communicable Diseases At 24 Hour's Insured Locations**

Insurers participated in 24 Hour's property insurance program at issue in this case for the period of June 30, 2019 to June 30, 2020. *See* 24 Hour's Motion for Summary Judgment [DKT No. 238] at p. 5. Specifically, each of them agreed to provide coverage for a percentage of the overall coverage limits provided to 24 Hour and agreed to the same master policy form. *Id.* While individual Defendant Insurers issued their own policy endorsements addressing certain matters, each Defendant Insurer agreed, among other things, to the same communicable disease coverage set forth in an endorsement to each of their policies, entitled "Interruption by Communicable Disease" (the "Communicable Disease Endorsement"). *Id.* The Communicable Disease Endorsement covers business interruption losses when access to a "described location" is prohibited due to (1) the presence and spread of a communicable disease, and (2) "as a direct result of a declaration by a civil authority enforcing any law or ordinance regulating communicable diseases."

---

[4]     Perhaps this is because, like Dr. Carnethon, Dr. Stock also provided general information regarding SARS-CoV-2, how it spread, governmental responses to its spread, basic epidemiological principles, etc. Indeed, that is the bulk of the information contained in her report. Presumably, the Insurers also believe that such information will help the trier fact understand the evidence in this case. *See* Appx, Ex. 2 at 87–92 (Expert Report of Dr. Stock).

Throughout this litigation, Insurers have contended that 24 Hour has failed to provide evidence that a communicable disease was present at any of its clubs. However, as described in 24 Hour's Motion for Summary Judgment[5] and Opposition to Property Insurers' Motion for Summary Judgment,[6] 24 Hour satisfies this requirement when it shows, by a preponderance of the evidence (i.e. more likely than not), that a communicable disease was present and spreading at its clubs. This standard can be met through circumstantial evidence, as set forth in the underlying summary judgment papers, and as explained by Dr. Carnethon, the reasonable inferences drawn from such evidence supports 24 Hour's position that communicable diseases were present and spreading at its clubs during the relevant period, sufficient to trigger coverage. In addition, and equally important, the information provided by Dr. Carnethon will help the trier of fact generally understand the difficult concepts at issue in this case regarding the COVID-19 pandemic and the spread of communicable diseases, generally. The Insurers ignore this fact in their motion to exclude Dr. Carnethon's testimony, presumably because their own expert includes similar information in her report.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 permits an expert qualified "by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue . . . ." In addition, it must appear more likely than not to the court, that the testimony is based on "sufficient facts or data," be the "product of reliable principles and methods;" and the

---

[5]     *See* Section A.1 of 24 Hour's Reply in Support of its Motion for Partial Summary Judgment filed concurrently.
[6]     *See* Section A.1 of DKT No. 252 (24 Hour's Opposition to Property Insurers' Motion for Summary Judgment).

opinion must reflect "a reliable application of the principles and methods to the facts of the case." *Id.* The above reflects recent amendments to Rule 702, but the Advisory Committee Note to the amendments emphasized that "[n]othing in the amendment imposes any new, specific procedures." Fed. R. Evid. Adv. Comm. Note Rule 702. Thus, a trial judge continues to be charged with the same gatekeeping responsibility to ensure all expert testimony or evidence admitted at trial is relevant, reliable, and "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (quoting then Fed. R. Evid. 702).

Importantly, this gatekeeping role is not intended to replace the adversary system or the role of the jury. *United States v. Mitchell*, 365 F.3d 215, 244–245 (3d Cir. 2004). Instead, *Daubert* and the Third Circuit have emphasized that: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" to attack admissible evidence. *Id.* (quoting *Daubert*, 509 U.S. at 596).

Moreover, the court's gatekeeping inquiry is flexible and "[i]ts overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95. Generally, an expert's opinions must reflect "scientific knowledge . . . derived by the scientific method," representing "good science." *Daubert*, 509 U.S. at 590, 593. Again, the test of reliability is, however, a "flexible" one. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 140 (1999).

As such, the burden is on the party offering the expert report to demonstrate by a preponderance of proof that the opinions of their experts are admissible (not that, by a preponderance of the evidence, that the expert assessment is correct). *Oddi v. Ford Motor Co.*, 234

F.3d 136, 145 (3d Cir. 2000). Notably, any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law . . . shows that rejection of the expert testimony is the exception rather than the rule."); *Habecker v. Copperloy Corp.*, 893 F.2d 49, 52 (3d Cir. 1990) (stating that the Third Circuit "established a liberal policy of admitting expert testimony which will aid the trier of fact.").

Here, Dr. Carnethon's expert testimony is admissible, and Insurers' Motion should be denied in full.[7]

## ARGUMENT

Ignoring the bulk of the opinions set forth in Dr. Carnethon's report, Insurers object to only two of Dr. Carnethon's opinions. First, Insurers claim that Dr. Carnethon's opinion regarding the circumstantial evidence and the inferences to be drawn from such evidence regarding the likely presence of COVID-19 at 24 Hour's clubs is irrelevant, unsupportable, a legal conclusion, and that Dr. Carnethon is not qualified to give such an opinion in this case. Second, Insurers argue that Dr. Carnethon offers a "new" opinion regarding the presence of other communicable diseases and that this purported "new" opinion should also be excluded.

In sum, Insurers' Motion should be denied because (1) the challenged opinions are admissible under Rule 702 and applicable Supreme Court and Third Circuit precedent and (2) Dr. Carnethon has not offered a new opinion. Instead, Dr. Carnethon offers the same opinion in her declaration that she has posed throughout this case. Moreover, since Insurers only address a small portion of Dr. Carnethon's opinions, their request to exclude all her opinions should be rejected as improper. Further, Dr. Carnethon's unchallenged opinions are indisputably relevant and

---

[7]     At the very least, Dr. Carnethon should be permitted to testify to those matters in report the Insurers do not challenge.

admissible as they will aid the trier of fact in assessing the evidence and deciding the issues in dispute and are based on sound scientific principles.

## A.    Dr. Carnethon's Challenged Expert Opinions Are Admissible

Insurers seek to exclude Dr. Carnethon's opinion that it was reasonable for 24 Hour to conclude that communicable diseases, including COVID-19, were present and spreading at its locations.[8]

Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible if (1) the expert testimony is relevant for the purposes of the case and must assist the trier of fact, (2) the witness is qualified to testify as an expert by possessing specialized expertise, and (3) the procedures and methods used are reliable. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Here, Dr. Carnethon's testimony meets this standard and is admissible.

### 1.    Dr. Carnethon's Challenged Opinion Is Relevant To Assist The Trier Of Fact In Determining Whether Communicable Diseases Were More Likely Than Not Present And Spreading At 24 Hour's Clubs

Insurers incorrectly argue that because Dr. Carnethon does not offer the ultimate opinion that communicable diseases, including COVID-19, were actually present and spreading at 24 Hour's locations, her testimony is irrelevant to all issues before this Court. *See* Motion at ¶¶ 15–20. However, it is well established that expert testimony, like all evidence, need not conclusively establish a disputed fact for it to be relevant, and it can serve as circumstantial evidence from which the jury is permitted to draw inferences, or it can provide information to assist the trier of fact in drawing inferences from the evidence.

Expert testimony is relevant if it "merely supports an inference or conclusion[.]" *United*

---

[8] Insurers also seek to exclude the equally admissible testimony regarding the presence of the flu, cold, and other communicable diseases at 24 Hour's locations. The admissibility of this opinion is discussed in detail below. *See infra* Section B.

*States v. Watson*, 260 F.3d 301, 309 (3d Cir. 2001) (internal citations omitted). Evidence does not have to be conclusive or even powerfully convincing to be relevant. *See United States v. Clifford*, 704 F.2d 86, 90 (3d Cir. 1983) (evidence "need not conclusively prove a fact . . . to be admissible"). "A piece of evidence need only be a brick, not a wall." *AbbVie Inc. v. Boehringer Ingelheim Int'l GMBH*, No. 17-cv-01065-MSG-RL, 2019 U.S. Dist. LEXIS 28950, at *12 n.7 (D. Del. Feb. 25, 2019). In fact, courts routinely admit opinions based on statistical sampling, even if such evidence is not conclusive of a fact in issue. *See e.g.*, *Sikkelee v. Precision Airmotive Corp.*, 522 F. Supp. 3d 120, 133 n.27 (M.D. Pa. 2021) (explaining that an expert's opinion which relied on disputed studies and statistics was relevant as it "help[ed] frame the accident and its most likely cause"); *In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316, at *115–16 (D. Conn. Mar. 9, 2021) (expert evidence need not be a "standalone test" to be relevant).

Of course, an expert may also opine about the ultimate issues in a case so long as they are not giving a legal opinion. *Berckeley Inv. Grp., Ltd. V. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006); *see RSUI Indem. Co. v. Vision One, LLC*, No. C08-1386RSL, 2009 U.S. Dist. LEXIS 118425, at *4–5 (W.D. Wash. Dec. 18, 2009) (an expert may speak to the reasonableness of actions); *Safeco Ins. Co. of Am. v. S & T Bank*, Civil Action No. 07-01086, 2010 U.S. Dist. LEXIS 18914, at *31 (W.D. Pa. Mar. 3, 2010) (probabilities and inferences are acceptable bases for opinions by experts). The key to whether an expert improperly delves into improper legal opinion is whether the expert "give[s] his opinion as to what was required under the law, or whether the defendant complied with the [law]." *Berckeley*, 455 F.3d at 218.

Here, Insurers claim that Dr. Carnethon's opinion is irrelevant because "24 Hour's 'reasonable assumption' is not the same as the actual presence and spread of COVID-19[.]" Insurers' arguments are a strawman and overlook that Dr. Carnethon's opinion is not simply that

24 Hour made reasonable assumptions. Rather, Dr. Carnethon explains that it was **reasonable** for 24 Hour to **conclude** "that COVID-19 was **actually present and spreading** at each of its locations (i.e., among staff, patrons and other visitors) during the winter and early spring of 2020," based on the totality of the evidence available to 24 Hour regarding the presence and spread of COVID-19 in the communities where 24 Hour operated, including information from public health authorities and other government agencies, information in the public domain regarding the spread of COVID-19, information regarding employee reports of suspected cases, etc. Appx, Ex. 1 at 7 (emphasis added). This is the same information that 24 Hour contends supports the reasonable inference that COVID-19 was present and spreading at its clubs. *See* Doc. 252 at 16–20 (24 Hour's Opposition to Property Insurers' Motion for Summary Judgment). Understanding the information known to 24 Hour at the time it closed all its clubs, and the reasonable inferences to be drawn from that evidence, is directly relevant to the trier of fact's role in determining if communicable diseases, including COVID-19, were more likely than not present and spreading at the clubs during the relevant time.

Moreover, Insurers' arguments that Dr. Carnethon has no opinion on whether COVID-19 was **actually** present and spreading at 24 Hour's clubs during the first quarter of 2020 is another red herring. This is because it was **impossible** to rapidly test persons and locations for the novel virus in 2020. *See* Appx, Ex. 1 at 23–24. Thus, it is necessary to examine circumstantial evidence and reasonable inferences drawn from it to determine the presence and spread of COVID-19, which is something an expert epidemiologist like Dr. Carnethon is more than qualified to opine about. Nonetheless, Insurers' arguments misstate the appropriate standards, as absolute certainty is not the standard for admissibility in a civil case. *See K.C. Hopps, Ltd. v. Cincinnati Ins. Co.*, 561 F. Supp. 3d 827, 839 (W.D. Mo. 2021) (expert epidemiologist's opinion that COVID-19 was

"more likely than not" present at the insured's property was relevant in determining if the virus was "actually present" at the insured's property).

Insurers also claim, somewhat paradoxically to their relevance argument, that this opinion is irrelevant because it is a legal opinion. Motion at ¶ 21. However, Dr. Carnethon does not offer an opinion about what was required under the law, or whether the Insurers complied with the law. In fact, Dr. Carnethon specifically disclaims any opinion regarding whether coverage is triggered under the policies, including whether coverage under the Communicable Disease Endorsement has been established by 24 Hour. *See* Appx, Ex. 4 at 214 (Carnethon Depo. Tr. At 62:24–63:18).

### 2.      Dr. Carnethon Is Qualified To Opine About Communicable Diseases And How They Spread

Insurers also attack Dr. Carnethon's expertise and incorrectly claim that she is unqualified to speak about the outbreak of viruses in the community. Motion at ¶ 26. These arguments are unequivocally wrong and fail to credit Dr. Carnethon's superb qualifications concerning epidemiology and infectious diseases.

To be qualified to render an opinion, a witness must possess specialized "knowledge, skill, experience, training, or education. . . ." Fed. R. Evid. 702. The Third Circuit has emphasized that the "'specialized expertise' requirement is a liberal one: 'a broad range of knowledge, skills, and training [may] qualify an expert as such.'" *De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).

The trial court is not responsible for determining "the best possible training for an expert and restrict testimony to those who possess it." *De La Cruz*, 597 F. App'x at 91. As such, this Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with [an expert's] generalized qualifications." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 741 (3d Cir. 1994); *see e.g.*, *Hammond v. International Harvester Co.*, 691 F.2d 646, 652–53 (3d Cir.

- 15 -

1982) (holding that an engineer, whose only qualifications were sales experience in the field of automotive and agricultural equipment and teaching high school automobile repair, nevertheless could testify in a products liability action involving tractors); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87–88 (3d Cir. 1979) (holding that an expert could testify that unguarded elevator buttons constituted a design defect despite expert's lack of specific background in design and manufacture of elevators); *Villari v. Terminix Int'l, Inc.*, 692 F. Supp. 568, 573 (E.D. Pa. 1988) (finding that a toxicologist could testify as to the health of the plaintiffs even though he is not a medical doctor).

Moreover, an expert's testimony is not limited to the exact area in which she specializes, so long as the party offering the expert "demonstrate[s] that the expert has the necessary expertise." *Guarnieri v. Pa. Fed'n. Bhd. Of Maint. Of Way Emples.*, 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001). A party may demonstrate this by showing that the expert reviews necessary data or information pertaining to the proposed expert opinion. *See Keller v. Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671, 685 (E.D. Pa. 2008) ("I may not exclude [the expert's] testimony merely because he lacks a degree or specialty in clinical medicine, family medicine, or neuropathology. . . . [the expert] regularly reviews pathological data in his internal medicine practice, thereby rendering his testimony within his expertise"). Experts are also not required to perform certain tests to be qualified. *See Eli Lilly & Co. v. Actavis Elizabeth LLC*, Civil Action No. 07-cv-3770 (DMC), 2010 U.S. Dist. LEXIS 47061, at *11 (D.N.J. May 13, 2010) ("the fact that [an expert] did not conduct his own formulation experiments . . . does not render his opinion unreliable and inadmissible. [The expert] is not required to conduct tests in order to properly provide expert testimony.").

Here, Dr. Carnethon has a broad range of knowledge, skills, and training that qualifies her as an expert epidemiologist in this case. To begin, Dr. Carnethon has multiple degrees pertaining to human biology and epidemiology; moreover, Dr. Carnethon is a Professor and the Vice Chair

of the Department of Preventive Medicine at the renowned Northwestern University Feinberg School of Medicine. Appx, Ex. 1 at 3. Dr. Carnethon is an expert epidemiologist and her work concerns investigating the presence of diseases and how such diseases spread among populations. Dr. Carnethon continues to participate in epidemiological research, including research regarding COVID-19. Since the onset of the COVID-19 pandemic, Dr. Carnethon contributed her expertise to help identify populations at the greatest risk for severe COVID-19. Dr. Carnethon also published scientific articles about the prevalence of SARS-CoV-2 and received financial support from the American Lung Association to determine the antibody prevalence of SARS-CoV-2 in certain communities.

Nevertheless, Insurers claim that Dr. Carnethon is unqualified because she "had never before conducted any analysis to determine whether COVID-19 was present or spreading at any particular location, other than one instance of volunteer worker at her child's pre-school." Motion at ¶ 25. In the first instance, because COVID-19 was a "novel" illness, having pre-existing experience in evaluating the presence and spread of a disease that had only existed for approximately three months at the time 24 Hour closed its clubs is an unduly restrictive requirement for an expert to be qualified. But setting that aside, such arguments also fail to appreciate that Dr. Carnethon has discussed the effectiveness and application of disease mitigation strategies with workplaces, schools, churches, and the like. Appx, Ex. 1 at 3. Dr. Carnethon has also published scientific articles about antibody-determined prevalence of SARS-CoV-2 among healthcare workers, viral load dynamics in mild to moderate infections, behavioral responses to the pandemic, and vaccine intentions among healthcare workers. Appx, Ex. 1 at 3–4. Notwithstanding the foregoing and Dr. Carnethon's qualifications, an expert is not required to

conduct specific tests to be qualified to give an opinion. *Eli Lilly & Co.*, 2010 U.S. Dist. LEXIS 47061, at *11.

Insurers also claim that Dr. Carnethon is not the right type of epidemiologist because she "specializes in chronic diseases, not infectious diseases. Particularly, consequences of chronic diseases such as cardiovascular disease, obesity, and diabetes." Motion at ¶ 31. These arguments ignore that Dr. Carnethon has published peer-reviewed scientific articles regarding the COVID-19 virus, received financial support to determine the antibody prevalence of SARS-CoV-2 infection in a cohort of 4,000 young adults, and contributed to the public health messaging around the pandemic. Appx, Ex. 1 at 4. With these independent credentials, it does not matter that Dr. Carnethon generally has focused her work in a different area of epidemiology than that favored by Insurers. *See Guarnieri v. Pa. Fed'n. Bhd. of Maint. of Way Emples.*, 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001) (an "expert's testimony is not limited to the area in which he or she has specialized . . . [so long as, the party offering such testimony] demonstrate[s] that the expert has the necessary expertise to provide reliable evidence."). At most, the issue raised by Insurers goes to the weight the trier of fact might give to Dr. Carnethon's testimony and not its admissibility in the first instance. *United States v. Mitchell*, 365 F.3d 215, 244–245 (3d Cir. 2004). In sum, Dr. Carnethon is qualified to serve as an expert on the issues involved in this case.

### 3.     Dr. Carnethon's Challenged Opinions Are Reliable

Dr. Carnethon's challenged opinion that the circumstantial evidence lends itself to a reasonable conclusion that COVID-19 was present and spreading at 24 Hour's clubs is more than reliable. The standard for reliability is "not that high" and is "lower than the merits standard of correctness." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (internal citations omitted). "Each aspect of the expert's opinion must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules." *Id*. Generally, "criticisms of an expert's

explanations for reliance on, or rejection of, particular studies, are appropriately addressed through cross-examination, not through wholesale exclusion of the expert testimony." *City of Almaty v. Ablyazov*, No. 15-cv-5345 (AJN), 2021 U.S. Dist. LEXIS 214695, at *40 (S.D.N.Y. Nov. 5, 2021).

Despite the foregoing case law, Insurers argue that Dr. Carnethon's opinions are unreliable because (1) they are not based on sufficient facts or data and (2) Dr. Carnethon does not accurately conduct a Bradford Hill analysis. Both of Insurers' contentions are unsupported.

*First*, Insurers claim that Dr. Carnethon "conducted no study or analysis to determine whether COVID-19 was actually present and spreading at any 24 Hour location." Motion at ¶ 33. Insurers argue that because Dr. Carnethon does not know of any confirmed cases of COVID-19 at 24 Hour's clubs, she must have had "no facts or data, let alone sufficient facts or data, showing that COVID-19 was actually present or spreading at any 24 Hour location." Motion at ¶ 34. However, this argument misstates Dr. Carnethon's conclusion and simply amounts to a rehashing of the Insurers' flawed argument that 24 Hour can prove its case only through the type of evidence the Insurers say must be produced.

In fact, Dr. Carnethon examined extensive data that was known to 24 Hour and available to the public (including the Insurers) and government authorities, including public health officials, in early 2020. Specifically, Dr. Carnethon examined, among other things, studies which identified the prevalence of SARS-CoV-2 in the community, data regarding antibodies to the SARS-CoV-2 infection in certain communities, studies regarding availability of COVID-19 tests, and actual data from 24 Hour regarding the traffic in 24 Hour's clubs. Appx, Ex. 1 at 4–5. Despite Insurers' claims that data must be actually show that individuals with COVID-19 were present in 24 Hour's clubs (Motion at ¶¶ 33–34), the grounds for an expert's opinion "do not have to be perfect." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 287 (S.D.N.Y. 2011).

Rather, reliability may be based solely on an expert's practical experience. *See Lauria v. AMTRAK*, 145 F.3d 593, 599 n.7 (3d Cir. 1998) (explaining that the court was not "require[d]" to follow *Daubert* to test the expert's reliability [b]ecause [the expert's] opinion is based on his observations and familiarity . . . and is gleaned from years of practical experience"). Courts in this Circuit have understood that the *Daubert* factors are not necessarily applicable to determine that certain expert opinions are reliable. *See e.g.*, *United States v. Xue*, 597 F. Supp. 3d 759, 766 (E.D. Pa. 2022) ("When examining expert testimony that is based on practical experience, rather than academic theories, the Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable because the reliability of testimony from a practical experience expert depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.") (internal citations omitted); *Smith v. State Farm Fire & Cas. Co.*, Civil Action No. 19-10319 (KMW-AMD), 2023 U.S. Dist. LEXIS 88209, at *8 (D.N.J. May 19, 2023) (same). Ultimately, the test of reliability is a "flexible" one and a court is not constrained by any rigid application of particular factors. *Kumho*, 526 U.S. at 140.

In this case, the inputs used by Dr. Carnethon for her analysis meet the standard for reliability because Dr. Carnethon understands public health data and its importance based on her years of practical experience researching and studying epidemiology. On the other hand, Insurers offer no expert witness or testimony that the information relied on by Dr. Carnethon is unreliable; they simply say so without any support. At most, the Insurers do not agree with Dr. Carnethon's conclusions but neither they, nor even their own expert, attack the data and information she relies on in formulating the opinion that Insurers are challenging. Insurers' own experts employ the same sort of analysis in their own reports. *See* Appx, Ex. 2 at 84 (Dr. Stock explains in her report that she provides "a synopsis of basic epidemiological and public health methods, a review of the data

provided by 24 Hour Fitness (24-Hour), and overviews of the peer-reviewed published literature on COVID-19."); Appx, Ex. 3 at 124 (The Insurers' other expert, Dr. Sauer-Budge, stated that her report "is presented to provide a summary of the relevant science"). Any criticisms of Dr. Carnethon's work are appropriately addressed through cross-examination, not through wholesale exclusion of the expert opinion.

**Second**, Insurers claim that Dr. Carnethon's opinion is unreliable because she did not adequately conduct a Bradford Hill analysis in support of her opinions. Motion at ¶ 36. The Bradford Hill factors are generally accepted and a reliable methodology for epidemiologists. Appx, Ex. 4 at 213 (Carnethon Depo. Tr. At 60:11–21). This methodology is most often used to determine causality by generally nine specified criteria. *Id.* But these criteria are not just relevant to epidemiologists when assessing causality. As the Insurers' expert epidemiologist, Dr. Stock, confirmed in her deposition, she utilized some but not all, elements of the Bradford Hill criteria in her own work on this case, even though she admitted that "this is not a causation case." Appx, Ex. 5 at 220 (Stock Depo. Tr. at 118:8–16). In her report, while Dr. Stock disagrees with certain of Dr. Carnethon's conclusions, she does not take issue with Dr. Carnethon's use of the Bradford Hill criteria.

Dr. Carnethon explained that she examined the following criteria:

(1) Consistency. Public health officials noted multiple cases of COVID-19 in densely populated spaces (e.g., outdoor markets in Asia, social gatherings, worksites). These observations that disease was spreading in densely populated spaces were observed consistently across geographic locations internationally and domestically. Consequently, the decision by 24HF to acknowledge the risks posed by continuing to operate densely populated clubs and shut down was reasonable based on the causal criteria of consistency.

(2) Analogy. Business shutdowns in the U.S. were based both on consistency and on the causal criteria of analogy. Throughout history, one of the first responses to a communicable disease outbreak is to decrease the risk of exposure to the virus by removing the disease vectors (i.e., people) from the setting. Following this principle, cities and municipalities in Asia and Europe closed businesses and public

spaces. Consequently, when the disease was identified in U.S. cities and businesses closed their doors to slow the spread and "flatten the curve," this reflected the presence of infection in the population. These same disease mitigation strategies were undertaken during the initial SARS outbreak in 2003 and during the Ebola outbreaks in West Africa in 2014. Again, the decision by 24HF to shut down its business operations followed the principle of analogy that by de-densifying public settings, they could curtail ongoing spread and reduce the likelihood of further disease spreading in its clubs.

(3) Biological Plausibility. That COVID-19 was spreading through person-to-person transmission was biologically plausible given the similarity of the SARS-CoV-2 virus to other respiratory viruses that cause the common cold, influenza and the initial SARS virus. Small virus particles are propelled through ordinary respiration (breathing) and propelled even further with vigorous respiration including exercising, coughing and sneezing. These viral particles are inhaled by people and animals breathing within the same geographic unit of space. Theoretically, if these viral particles remain alive on surfaces, they can additionally infect individuals who touch these surfaces and transfer the virus to their own respiratory track through the mouth, nose or even the eyes. Thus, the decision by 24HF to close was based on the biological plausibility that individuals inside their clubs were spreading the SARS-CoV-2 virus that causes COVID-19 by breathing together in close proximity.

(4) Coherence. Once the SARS-CoV-2 virus was sequenced and could be studied further, there were experiments conducted to determine how long it could live on surfaces. Based on the observations that it could survive for hours to days (depending on the surface), scientists applied the criteria of coherence between laboratory and epidemiological evidence to suggest surface cleaning as a route of transmission. Unfortunately, however, it would have been impossible for 24HF to determine which surfaces in a given fitness club were affected by SARS-CoV-2 and apply cleaning strategies alone to reduce transmission. Consequently, other mitigation strategies including shutdowns were more effective and the best possible decision at the time and in hindsight.

Appx, Ex. 1 at 22–23.

Despite providing extensive information about Dr. Carnethon's methodology, and even though their own expert used Bradford Hill criteria for her opinions and did not challenge Dr. Carnethon's use of the same criteria, Insurers still claim that this information is not good enough to be reliable and cite various cases examining the Bradford Hill analysis to argue Dr. Carnethon's analysis must be more specific with respect to "causation." Motion at ¶ 38. But such arguments are fundamentally flawed because Dr. Carnethon does not offer an opinion regarding causation, as

"this is not a causation case" per Dr. Stock. Appx, Ex. 5 at 220 (Stock Depo. Tr. at 118:8–16).

Rather, the opinion the Insurers seek to challenge from Dr. Carnethon through their Motion, relates

to the reasonableness of concluding that a virus was present or spreading in particular locations

based on various types of available evidence. Moreover, all the cases cited by Insurers were

***products liability or personal injury*** cases examining causation, which have no bearing on any

issues in this case as Dr. Stock, again, confirmed. *See Daniels-Feasel v. Forest Pharms., Inc.*, No.

17 CV 4188-LTS-JLC, 2021 U.S. Dist. LEXIS 168292 (S.D.N.Y. Sep. 3, 2021) (expert using

Bradford Hill analysis to determine causation in products liability case); *Danley v. Bayer (In re*

*Mirena IUD Prods. Liab. Litig.)*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) (same); *In re : Zoloft*

*(Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787 (3d Cir. 2017) (same); *In re Mirena*

*IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213 (S.D.N.Y. 2018) (same);

*Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264 (Del. 2013) (same); *Bowen v. E.I.*

*DuPont de Nemours & Co.*, 906 A.2d 787 (Del. 2006) (expert using Bradford Hill analysis to

determine causation in personal injury case).

Moreover, when Insurers questioned Dr. Carnethon on her methodology, Dr. Carnethon

explained that, while she used some of the factors identified in the Bradford Hill analysis, the

methodology "would not be used for tracking the spread." Appx, Ex. 4 at 214 (Carnethon Depo.

Tr. at 64:21–65:5). Meaning, Dr. Carnethon told Insurers that the full Bradford Hill analysis is not

suitable for tracking the spread of COVID-19. Yet, Dr. Carnethon did find certain aspects of the

Bradford Hill analysis suitable for her methodology, but Insurers did not question her on the

reasons she applied those factors. Insurers could have further questioned Dr. Carnethon on her

methodology and the basis for her opinions but failed to delve into this. Insurers' failure to conduct

an adequate deposition is not a basis for them know to challenge the merits of her opinions.

In sum, the criticism of the Bradford Hill analysis undertaken in the Insurers' cases do not apply here and Insurers' arguments should be rejected.

### 4. Insurers Do Not Challenge Dr. Carnethon's Other Opinions

Insurers' Motion does not challenge the rest of the opinions or analysis provided by Dr. Carnethon. Throughout Dr. Carnethon's Report and Declaration, Dr. Carnethon synthesizes and analyze several important facts and principles related to COVID-19 and communicable diseases more generally.

An expert "may testify in the form of an opinion *or otherwise*." Fed. R. Evid. 702. Meaning, an expert need not form an opinion to testify; she may testify to general background, scientific principles, and other information that can help a jury understand issues. *See Dunn v. Hovic*, 1 F.3d 1362, 1367 n.5 (3d Cir. 1993) (Federal Rule of Evidence 702 "permits expert testimony, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . . The commentary to this rule further explains: The rule . . . recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.") (internal citations omitted); *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) (expert may present background information to help jury understand issues); 4 Weinstein's Federal Evidence § 702.02 (2024) ("Parties may use expert witnesses to provide the trier of fact with an explanation of scientific or other principles that are relevant to the case and leave it to the trier of fact to apply those principles to the facts of the case."). Such expert testimony can be important to "educate the factfinder." *United States v. Bridges*, No. 21-1679, 2022 U.S. App. LEXIS 25847, at *22 n.5 (3d Cir. Sep. 15, 2022) (citing Fed. R. Evid. Adv. Comm. Note Rule 702).

Insurers seek to exclude Dr. Carnethon entirely, but only address part of Dr. Carnethon's proposed expert testimony. This is improper as Insurers do not even acknowledge that Dr.

Carnethon has offered voluminous information related generally to COVID-19, the lack of testing, the symptoms of various communicable diseases, and how communities reacted to the rapid spread of the virus. *See* Appx, Ex. 1; [DKT No. 241-2] Carnethon Declaration in Support of 24 Hour's Motion for Summary Judgment. This information is equally as important and relevant in this case which involves complicated medical and scientific principles. This information will help the trier of fact understand the context of the pandemic, what is known about communicable diseases, and other scientific principles important to this case. In conclusion, since Insurers do not challenge the rest of Dr. Carnethon's proposed testimony and this information will assist the trier of fact to understand the evidence or to determine a fact in issue, the rest of Dr. Carnethon's proposed testimony is admissible. Indeed, the Insurers' own epidemiology expert is offering testimony on similar generalized topics and the Insurers are not contending her testimony is improper. *See* Appx, Ex. 2 at 87–92 (Expert Report of Dr. Stock).

**B.** **Dr. Carnethon's Opinion Regarding Other Communicable Diseases Is Admissible**

**1.** **Dr. Carnethon's Opinion Is Not New**

Insurers' incorrectly claim that Dr. Carnethon offered a new opinion in her Declaration in support of 24 Hour's Motion for Summary Judgment ("Declaration"). Specifically, Insurers take issue with her opinion that "communicable diseases, including the flu and common cold, were [] present and spreading at each 24 Hour location . . .." Motion at 18 (quoting Declaration at ¶ 40). Dr. Carnethon's opinion, as stated in her Declaration, is consistent with the opinions expressed in her expert report, wherein Dr. Carnethon stated: "It is without reasonable dispute that individuals with the common cold and related symptoms would have been present in each of the 24HF locations during this period, as well as individuals with the flu." Notably, Insurers' expert, Dr. Stock, did not challenge these conclusions at all in her report. *See* Motion at fn. 3.

While there is no practical difference between Dr. Carnethon's report and her declaration, a statement that is consistent with an opinion or issue previously addressed in an expert report is not considered a new opinion. *Emcore Corp. v. Optium Corp., Civil Action No. 6-1202*, 2008 U.S. Dist. LEXIS 59794, at *11 (W.D. Pa. Aug. 5, 2008) (citing *Thompson v. Doane Pet Care Co.,* 470 F.3d 1201, 1203 (6th Cir. 2006) (the Federal Rules "do[] not limit an expert's testimony simply to reading his report. No language in the rule[s] would suggest such a limitation. The rule[s] contemplate[] that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."); *Lucent Techs. Inc. v. Gateway, Inc.,* 2007 U.S. Dist. LEXIS 36246, *15 (May 16, 2007) (declaration permitted to be used where it is more detailed than report because it does not offer new opinions on the issues, but rather just elaborates on them)).

To determine whether an expert's testimony has exceeded the scope of her report, "'***the Court has not required verbatim consistency with the report*** but has allowed testimony which is consistent with the report and is ***a reasonable synthesis and/or elaboration*** of the opinions contained in the expert's report.'" *Allergan USA, Inc. v. MSN Labs. Private Ltd.*, No. 19-1727-RGA, 2023 U.S. Dist. LEXIS 135710, at *3–4 (D. Del. Aug. 4, 2023) (quoting *Power Integrations, Inc. v. Fairchild Semiconductor Ina, Inc.*, 585 F. Supp. 2d 568, 581 (D. Del. 2008)) (emphasis added).

Here, Dr. Carnethon's expert report provides extensive detail about the presence of influenza, the cold, and other respiratory illnesses throughout the United States during the COVID-19 outbreak. *See* Appx, Ex. 1 at 7–17. In fact, Dr. Carnethon states specifically that "[i]t is without reasonable dispute that individuals with the common cold and related symptoms would have been present in each of the 24HF locations during this period, as well as individuals with the flu." Appx, Ex. 1 at 14. Moreover, Dr. Carnethon concludes, "[g]iven the paucity of testing, and the similarity

of symptoms between individuals with COVID-19 and others with less fatal communicable respiratory illnesses caused by viruses, such as influenza or the common cold, it was necessary to treat all individuals with such symptoms as having COVID-19." Appx, Ex. 1 at 6. Insurers knew of this opinion and even questioned Dr. Carnethon regarding the presence of influenza at 24 Hour's clubs during her deposition. *See* Appx, Ex. 4 at 216 (Carnethon Depo. Tr. At 70:8–71:9).

Dr. Carnethon's opinion, as stated in her Declaration, that "communicable diseases, including the flu and common cold, were [] present and spreading at each 24 Hour location" is consistent with opinions and methodology stated throughout Dr. Carnethon's report. While the language is not verbatim, the opinion stated in the Declaration is merely a reasonable synthesis of the many pages dedicated to this opinion in Dr. Carnethon's report. *Allergan USA, Inc.*, 2023 U.S. Dist. LEXIS 135710, at *3–4 (a declaration does not "require verbatim consistency with the report," the declaration just must be a "a reasonable synthesis and/or elaboration of the opinions contained in the expert's report").

Insurers devote nearly two pages of their Motion explaining the timeline of expert disclosures and expert discovery in this case. *See* Motion at pp. 18–19. Insurers use this timeline as an attempt to bolster their falsity that Dr. Carnethon's opinion, as stated in her Declaration, is untimely. However, Insurers admit, in a footnote, that "Dr. Carnethon's report ***does discuss the alleged similarities between flu symptoms and COVID-19***." Motion at p. 18 fn. 3 (emphasis added). Insurers also cite Dr. Carnethon's report, which states that "it is without reasonable dispute that individuals with the common cold and related symptoms would have been present in each of the 24HF locations during this period, as well as individuals with the flu." Appx, Ex. 1 at 14; *see* Motion at p. 18 fn. 3. After recognizing that these sections of Dr. Carnethon's expert report offer the exact same opinion as the Declaration, Insurers claim this opinion in Dr. Carnethon's report

was made "somewhat cavalierly." Motion at p. 18 fn. 3. But Insurers' arguments, apart from having no legal significance, mischaracterize this opinion in relation to the rest of the report because this statement was made after extensive discussions regarding the high rate of circulating communicable respiratory illnesses in the United States.

Thus, Insurers' argument that Dr. Carnethon's "new opinion" should be disregarded in its entirety.

### 2.   Dr. Carnethon's Opinion Is Admissible For The Same Reasons Stated Above

Insurers claim that the presence of other communicable diseases is inadmissible because this opinion is not relevant for coverage under the Communicable Disease Endorsement. Motion at ¶ 53. This assumption is based on the incorrect premise that communicable diseases other than COVID-19 cannot trigger coverage under the Communicable Disease Endorsement. However, the policies at issue provide coverage for the actual presence and spread of "communicable dieases," broadly defined to mean "disease that may be transmitted directly or indirectly by one person or other life form to another. . . due to an infections agent." *See* 24 Hour's Motion for Summary Judgment [DKT No. 238] at p. 25. There is no dispute that "communicable diseases," as defined above, includes diseases like the cold, flu, and COVID-19. To trigger coverage, 24 Hour must show, among other things the actual presence and spread of ***communicable diseases*** at one or more clubs. Therefore, an expert's opinion regarding the presence of communicable diseases at 24 Hour's clubs is undoubtedly relevant.[9] Moreover, Dr. Carnethon is clearly qualified to opine on this topic, and her opinion was not even challenged by the Insurers' expert, Dr. Stock. *See supra*

---

[9]     *See* Section D of 24 Hour's Reply in Support of its Motion for Partial Summary Judgment filed concurrently; Section A.1 of DKT No. 252 (24 Hour's Opposition to Property Insurers' Motion for Summary Judgment).

Section A.2. Dr. Carnethon's opinion is also reliable for the same reasons stated above, and as illustrated by Dr. Stock's failure to challenge it. *See supra* Section A.3.

Insurers' Motion is yet another attempt to disregard 24 Hour's relevant and necessary evidence which demonstrates that communicable diseases were more likely than not actually present and spreading at 24 Hour's clubs. These arguments should be disregarded in their entirety.

## **CONCLUSION**

For the foregoing reasons, Insurers' Motion to Exclude the proposed testimony of Dr. Carnethon should be in full. The facts and legal precedent show that (1) Dr. Carnethon has not offered a new opinion, and instead, offers the same opinion in her declaration that she has posed throughout this case; and (2) all of Dr. Carnethon's opinions are admissible under precedent outlined by the Third Circuit and the Supreme Court of the United States.

Dated: February 12, 2024

Respectfully submitted,

**REED SMITH LLP**

*/s/ Mark W. Eckard*
Mark W. Eckard (No. 4542)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500
(302) 778-7575 (Fax)
meckard@reedsmith.com

David E. Weiss (admitted *pro hac vice*)
T. Connor O'Carroll (admitted *pro hac vice*)
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
(415) 543-8700
(415) 391-8269 (Fax)
dweiss@reedsmith.com
cocarroll@reedsmith.com

*Counsel for Plaintiff 24 HOUR FITNESS*

*WORLDWIDE, INC.*