## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RS FIT NW LLC, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Case No.: 20-11558 (TMH) |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | (Jointly Administered) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | Adv. Proc. No. 20-51051 (TMH) |
| GLOBAL RISKS US INSURANCE | ) | |
| COMPANY; LIBERTY MUTUAL | ) | |
| INSURANCE COMPANY; BEAZLEY - | ) | |
| LLOYD'S SYNDICATES 2623/623; ALLIED | ) | |
| WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS REQUEST FOR JUDICIAL NOTICE

David E. Weiss (admitted *pro hac vice*)
T. Connor O'Carroll (admitted *pro hac vice*)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543-8700
E-mail: dweiss@reedsmith.com
E-mail: cocarroll@reedsmith.com

Counsel for Plaintiff 24 HOUR FITNESS
WORLDWIDE, INC.

Mark W. Eckard (No. 4542)
REED SMITH LLP
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
E-mail: meckard@reedsmith.com

**<u>PLAINTIFF'S REPLY IN SUPPORT OF ITS REQUEST FOR JUDICIAL NOTICE</u>**

Plaintiff 24 Hour Fitness Worldwide, Inc. ("24 Hour") submitted its Request for Judicial Notice in connection with its Motion for Partial Summary Judgment on November 10, 2023 [DKT No. 240]. On January 12, 2024, Insurers'[1] submitted an Opposition to 24 Hour's Request for Judicial Notice ("Opposition") [DKT No. 250]. Now, 24 Hour respectfully submits this Reply in further support of its Request for Judicial Notice filed in connection with 24 Hour's Motion for Partial Summary Judgment.

**<u>LEGAL STANDARD FOR JUDICIAL NOTICE</u>**

1.      Under Federal Rule of Evidence 201(b), as made applicable by Federal Rule of Bankruptcy Procedure 9017, the Court may take judicial notice of a fact that "is generally known within the trial court's territorial jurisdiction" or if it "is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). Importantly, the Court "***must*** take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c) (emphasis added).

**<u>ARGUMENT</u>**

**I.      All the Exhibits Contained in 24 Hour's Request for Judicial Notice are Relevant**

2.      Insurers Opposition begins by claiming that "none of the exhibits" within 24 Hour's Request for Judicial Notice are "relevant to the threshold issues of coverage under the Property Policies." Oppo. at ¶ 3. Specifically, Insurers claim, none of the evidence cited in the Request for

---

[1]      "Insurers" means Defendants Continental Casualty Company ("Continental"), Starr Surplus Lines Insurance Company ("Starr"), Allianz Global Risks US Insurance Company ("Allianz"), Liberty Mutual Fire Insurance Company ("Liberty"), Certain Underwriters at Lloyd's, London ("Lloyd's"), Allied World National Assurance Company ("Allied World"), QBE Specialty Insurance Company ("QBE"), and General Security Indemnity of Arizona ("GSINDA").

Judicial Notice are relevant to whether 24 Hour can "carr[y] its burden to prove access was prohibited to one of its clubs due to the actual presence and spread of a communicable disease at that club." *Id.* Insurers' arguments fail because Insurers mistakenly set forth an overly restrictive standard for relevance.

3.      The "definition of relevant evidence is very broad." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004). Under the Federal Rules of Evidence, "relevant evidence means evidence ***having any tendency*** to make the existence of any fact that is of consequence to the determination of the action ***more probable or less probable*** than it would be without the evidence"; this "does not raise a high standard." *Id.* (citing Fed. R. Evid. 401) (emphasis added). Simply, evidence does not need to definitively prove or disprove a fact at issue; "evidence is irrelevant only when it has no tendency to prove the fact." Spain v. Gallegos, 26 F.3d 439, 452 (3d Cir. 1994) (citing *Blancha v. Raymark Indus.*, 972 F.2d 507, 514 (3d Cir. 1992)).

4.      Here, 24 Hour's burden to establish coverage is "proof by a preponderance of the evidence." *Buss v. Superior Court*, 16 Cal. 4th 35, 54 (1997). This standard is met when "the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily in number of witnesses or quantity, but in its effect on those to whom it is addressed." *Bichai v. DaVita, Inc*., 72 Cal. App. 5th 1126, 1138 (2021).

5.      In other words, "a party 'need prove only that [a fact] is ***more likely to be true than not true***.'" *People ex rel. Brown v. Tri-Union Seafoods, LLC*, 171 Cal. App. 4th 1549, 1567 (2009) (emphasis added); *K.C. Hopps Ltd. v. Cincinnati Ins. Co.*, 561 F. Supp. 3d 827, 839 (W.D. Mo. 2021) (explaining that the insured "does not need definitive proof of the virus's presence, but instead must prove that it was more likely than not that the virus physically contaminated its premises"). Therefore, for 24 Hour to meet its burden, as in the *K.C. Hopps Ltd.* case, 24 Hour

need only provide evidence that demonstrates that a communicable disease was *more likely than not* actually present and spreading at 24 Hour's clubs.

6.     The evidence cited in 24 Hour's Request for Judicial Notice is all relevant because it demonstrates that (1) travel was high in Los Angeles, (2) COVID-19 began spreading in places where 24 Hour operated, including Los Angeles County, (3) COVID-19 was spreading rapidly throughout Los Angeles County, (4) Los Angeles County is a densely populated area, (5) the lead insurer, Continental, recognizes that pandemics are an "inevitable part" of business and thus, an important risk worth insuring against, and (6) most insurance policies specifically *exclude* coverage for viruses (as opposed to 24 Hour's policies which contain an endorsement for communicable diseases). 24 Hour's evidence cited in the Request for Judicial Notice also (7) gives the definition of a pandemic and (8) shows how public health officials were advising about COVID-19.

7.     Specifically, Exhibit 63 provides census data for Los Angeles County. This information is relevant because person-to-person transmission was one of the primary transmission methods for COVID-19 and 24 Hour argues that the dense population and high travel in Los Angeles County makes it more likely than not that COVID-19 was present and spreading in 24 Hour's Los Angeles clubs.

8.     Exhibits 64–67 all contain data about the number of travelers through airports and the local port in Los Angeles County during the relevant period. This information is relevant because COVID-19 was highly linked to travel and this information shows that there was significant travel in Los Angeles during the period at issue. This evidence supports 24 Hour's position that COVID-19 was likely present and spreading throughout the Los Angeles community, and thus, 24 Hour's clubs.

9.      Exhibit 68 is defendant Continental's Securities and Exchange Commission's ("SEC") Annual Report. This SEC Report contains information showing that Continental understood the risk of pandemics for businesses. Under California law, insurance contracts are generally subject to the "ordinary rules of contractual interpretation." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992). When a policy is ambiguous, the court's goal in "construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions." *State of Cal. v. Cont'l Ins. Co.*, 15 Cal. App. 5th 1017, 1031 (2017). The SEC Report is relevant because it demonstrates that Continental may have understood that a "communicable disease endorsement" would cover risks associated with a pandemic.

10.     Exhibit 69 is a copy of data showing that most property insurance policies exclude coverage for viruses. This information is relevant because it demonstrates that if the parties intended to exclude coverage for viruses or pandemics, they could have and would have done so. *See infra* Section III.

11.     Exhibit 70 provides the definition of "pandemic" which is when a "disease's growth is exponential." This is relevant because it helps provide context and background information to the start and spread of COVID-19.

12.     Exhibit 71 is a report detailing the first cases of COVID-19 in the United States. This information is relevant because it demonstrates that early spread of the virus was in Los Angeles County, where 24 Hour operated 50 clubs. This evidence supports 24 Hour's position that COVID-19 was likely present and spreading throughout the Los Angeles community, and thus, 24 Hour's clubs.

13.     Exhibit 72 provides that the U.S. Surgeon General said that the spread of COVID-19 was "going to get bad." This information is relevant to understanding the knowledge of COVID-19 at the time of the spread and the decisions that led to 24 Hour closing its clubs.

14.     All this information pertains to the fact that individuals in Los Angeles had contracted COVID-19 and/or were spreading COVID-19 throughout the communities where 24 Hour operated its clubs during the relevant period.

15.     Moreover, this information is relevant to demonstrating that COVID-19 more likely than not was present and spreading in 24 Hour's Los Angeles clubs. Given the testing limitations at the time, 24 Hour's case will be premised on circumstantial evidence, from which reasonable inferences will be drawn that COVID-19 was actually present and spreading. For example, 24 Hour has submitted evidence demonstrating that during the relevant period, more than 65,000 people per day were visiting its clubs in Los Angeles, enough to fill an NFL football stadium. This information, coupled with the evidence of COVID-19 spreading throughout the community at large at the same time, is more than enough to conclude that it is more likely than not that COVID-19 was present and spread at its Los Angeles clubs. The logic of this conclusion is so plane that the insurers have no answer to it.

16.     All the evidence cited within 24 Hour's Request for Judicial Notice meets the **broad** standard of relevance as each item of evidence meets the standard of having ***any tendency*** to make it more probable that COVID-19 was more likely than not present and spreading in 24 Hour's Los Angeles clubs.

## II.     It Is Appropriate To Take Judicial Notice Of Exhibits 65, 70, And 71 Because They Contain Information From Reputable Sources And Are Readily Verifiable

17.     Insurers first claim that Exhibit 65 (visitor traffic data for Long Beach Airport published by *Visit Anaheim*) is improper for judicial notice because the website does not contain

the source for its data and because it is not generally known within Delaware. Opposition at ¶ 5.

A court may take judicial notice of facts found on the internet if they are not subject to reasonable dispute. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (reversing district court for failing to take judicial notice of online data and noting that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web."); *United States v. Richards*, No. 2:19-cr-353-RAH, 2020 U.S. Dist. LEXIS 158887, at *5-6 (M.D. Ala. Sep. 1, 2020) (taking judicial notice of information from websites regarding the status and emergency of the COVID-19 pandemic because this information was generally known and can be accurately and readily determined from public records whose accuracy cannot reasonably be questioned); *Kurschinske v. Meadville Forging Co.*, 2008 U.S. Dist. LEXIS 76281, *13 (W.D. Pa. Sept. 30, 2008) (a district court can take judicial notice of the travel information based on internet mapping services).

18.     Here, 24 Hour submits Exhibit 65 for the fact that the Long Beach Airport serves about 250,000 passengers every month. *See* Doc. 238 at 3, fn. 6. This information can be easily verified by reviewing the government website for Long Beach showing the "Activity Reports" for "total passenger traffic" for the Long Beach Airport.[2]

19.     Notwithstanding, Insurers cite *Freed v. St. Jude Med., Inc.*, No. 17-1128, 2017 U.S. Dist. LEXIS 149926, at *4–5 (D. Del. Sep. 15, 2017) to support their argument that Exhibit 65 should be excluded. Opposition at ¶ 5. This case law is easily distinguishable. The court in *Freed* denied judicial notice of the challenged document because the court had "nothing to determine the source of [the] document" and the only confirmation of the document's accuracy was a declaration from counsel stating it was a true and correct copy of the document. *Freed*, 2017 U.S. Dis. LEXIS

---

[2]     The web address for this information is: https://www.longbeach.gov/lgb/community-information/noise-abatement/monthly-noise-and-activity-reports/

149926, at*5–6. Here, in contrast, the information cited (that the Long Beach Airport services about 250,000 passengers every month) is easily verifiable by the government's data made available on its website. *See Qiu Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013) (information from a government website is "presumptively authentic").

20.     Insurers also claim that Exhibit 70 (a publication by Columbia University Mallman School of Public Health ("Columbia") providing definitions) is not subject to judicial notice because Insurers "cannot determine whether the information on the Columbia University website is actually quoting the World Health Organization or paraphrasing it." Oppo. at ¶ 8.

21.     Preliminarily, Insurers claim that if Columbia is "paraphrasing" the World Health Organization, then 24 Hour's "quote and description of the data is inaccurate." Oppo. at ¶ 8. Importantly, 24 Hour does not describe "data" from Columbia, it simply quotes the definition of "pandemic." *See* Doc. 238 at p. 9. A definition from a reputable source, such as Columbia, is subject to judicial notice because it is not subject to reasonable dispute. *See Garmon v. Liberty Life Assurance Co. of Boston*, 385 F. Supp. 2d 1184, 1203-1214 (N.D. Ala. 2004) (taking judicial notice of an exhibit containing definitions and descriptions of a plaintiff's medical conditions authored by national health institutes which cannot be reasonably questioned); *Bishop v. Wexford Health Sources, Inc.*, 2019 U.S. Dist. LEXIS 20384, 2019 WL 500050, at *2 (W.D. Pa. Feb. 8, 2019) (taking judicial notice of the meaning of medical terms, abbreviations and acronyms from "medilexicon.com" because these are readily verifiable from online dictionaries and other sources); *Gonzalez v. Apfel*, 113 F.Supp. 2d 580, 590 n.15 (S.D.N.Y. 2000) (taking judicial notice of a fact from an encyclopedia published by the American Medical Association); *Vlahos v. Schroeffel*, CV No. 02-CV-019DLI, 2006 U.S. Dist. LEXIS 95814, 2006 WL 544444, *5 (E.D. N.Y. Mar. 6, 2006) (taking judicial notice of a university hospital's website).

22.    Columbia is a reputable school of medicine and there is no reason to believe that its publication would inaccurately state the definition of a "pandemic." Moreover, the definition can be confirmed by other sources.[3]

23.    Columbia's definition of a pandemic is also subject to judicial notice because it is the type of information "generally known within the trial court's territorial jurisdiction" and we have noted that this includes "matters of common knowledge." *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 546 (3d Cir. 2012). Information is "generally known" of it "'so commonly known in the community as to make it unprofitable to require proof, as so certainly known as to make it indisputable among reasonable men.'" *Schwartz v. Commonwealth Land Title Ins. Co.*, 374 F. Supp. 564, 578 (E.D. Pa. 1974) (quoting C. McCormick, Law of Evidence § 324 (1954)). Given the fact that the global society just recently lived through the COVID-19 global pandemic, it is reasonable to assume that the definition of "pandemic" is common knowledge in the jurisdiction of Delaware. This serves as a second, independent reason for granting judicial notice of Columbia's definition of pandemic.

24.    Insurers also object to Exhibit 71 (public data from worldometers.info). Insurers claim that the information cannot be used because "the underlying source [of the data] is not readily available." Oppo. at ¶ 9. However, Insurers cite no legal authority explaining that information is not subject to reasonable dispute if it links to or provides "underlying data." *See* Oppo. at ¶ 9. Insurers arguments fail for the same reason stated above. Information from a reputable source is subject to judicial notice because it is not subject to reasonable dispute and can be accurately and

---

[3]    *See e.g.*, James J. Cochran, *Pandemics And Exponential Growth,* Significance, Volume 17, Issue 3, June 2020, Pages 18–21 (May 27, 2020); Jabeen Begum, MD, *What Is a Pandemic and How Does It Affect Us?*, WebMD https://www.webmd.com/cold-and-flu/what-is-pandemic (Nov. 6, 2023); *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, World Health Organization, https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (Mar. 11, 2020).

readily determined from other sources. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (approving district court's decision to take judicial notice of stock price data compiled by Dow Jones News service).

25.     Worldometers.info is maintained by the Institute for Health Metrics and Evaluation ("IHME")—a research institution working in global health statistics at the University of Washington in Seattle. There is no reason to question the reputability of Worldometer or IHME; nor is there any reason to question the accuracy of the data reported by the website. In fact, Worldometer is cited as a source in over "10,000 published books, in more than 25,000 professional journal articles." *See About Worldometer*, WORLDOMETER, https://www.worldometers.info/about/ (last visited Feb. 9, 2024). Moreover, the information published in this exhibit (where the first cases of COVID-19 occurred in the United States) is readily verifiable by other sources, including the CDC, news articles, and other data tracking the spread of COVID-19. Therefore, this information is subject to judicial notice.

## III.    It Is Appropriate To Take Judicial Notice Of Exhibit 69 Because It Is Relevant And Subject To Reasonable Dispute

26.     Insurers further argue that Exhibit 69 (data and information from the National Association of Insurance Commissioners ("NAIC")) is neither relevant nor subject to judicial notice. 24 Hour uses this exhibit to show that "83% of all [property] policies include an exclusion for viral contamination, virus, disease, or pandemic." Insurers claim that this information is irrelevant because there are "no virus exclusions in this case." Opposition at ¶ 7. Again, "relevant evidence means evidence *having any tendency* to make the existence of any fact that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence"; this "does not raise a high standard." *Gibson*, 355 F.3d at 232 (citing Fed. R. Evid. 401) (emphasis added). Additionally, under California law, insurance contracts are

generally subject to the "ordinary rules of contractual interpretation." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992). When a policy is ambiguous, the court's goal in "construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions." *State of Cal. v. Cont'l Ins. Co.*, 15 Cal. App. 5th 1017, 1031 (2017).

27.     Here, the information from the NAIC demonstrates that if the parties intended to exclude coverage for viruses or pandemics, they could have and would have done so, especially since most property policies contain this exclusionary language. And the fact "83% of all [property] policies include an exclusion for viral contamination" is not subject to reasonable dispute. Indeed, if the Insurers had grounds to dispute this fact, they should have submitted a declaration in opposition to 24 Hour's motion. Considering they are all part of the insurance industry, if the fact could reasonably be disputed they certainly would be in a position to do so with evidence.

28.     Exhibit 69 is also subject to judicial notice because a court may take judicial notice of facts found on the internet if they are not subject to reasonable dispute. *See O'Toole*, 499 F.3d at 1225 (reversing district court for failing to take judicial notice of online data and noting that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web."). The Court may take judicial notice of information of government-run groups and regulated industries. *See Patrick v. Reliance Standard Life Ins. Co.*, 527 F. Supp. 3d 689, 691 n.1 (D. Del. 2021) (taking judicial notice of database hosted by the American Medical Association); *McLaughlin v. Volkswagen of Am., Inc.*, 2000 U.S. Dist. LEXIS 17505, 2000 WL 1793071, at *1 (E.D.Pa.2000) (taking judicial notice of information from National Highway Traffic Safety Administration's website); *Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*, 2010 Bankr. LEXIS 2453, *37–38 (3d Cir. 2010) (taking judicial notice of public SEC filings).

29.     Nonetheless, Insurers claim that the NAIC data is subject to reasonable dispute because it "contains no links to underlying data." Oppo. at ¶ 7. However, Insurers cite no legal authority requiring underlying data be included in a request for judicial notice and such a requirement would make no sense. The NAIC is a regulatory-support organization created by and governed by the insurance regulators of the states and the District of Columbia.[4] The information used and collected by NAIC helps set standards, create laws, and form policies for insurance regulators in the United States. There is no reason to believe that the information published from NAIC is untrustworthy or disputable, and, as noted above, if the Insurers wished to dispute this fact, they should have submitted contrary evidence. Simply objecting to the credible evidence 24 Hour submitted is not sufficient.

30.     Finally, Insurers claim that they need to examine the underlying data to "understand the breakdown" of NAIC's reporting that of the 8 million insurance policies that contained business interruption coverage, "90% were for small businesses . . . 8% for medium businesses, and 2% for large businesses . . .." Oppo. at ¶ 7.[5] However, the only way Insurers could "examine" and "understand" this data is if they examined the 8 million policies in which NAIC is reporting on. This is not a necessary exercise for showing that information is subject to judicial notice.[6]

---

[4]     *See* About NAIC, NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS, https://content.naic.org/about (last visited Feb. 9, 2024).

[5]     Insurers also claim that 24 Hour "leaves out the end of [24 hour's] quoted language" that 98% of all policies had a requirement for physical loss. Oppo. at ¶ 7. But this information is not relevant since 24 Hour's Policies contain definitions for what sort of losses are covered, specifically "physical loss or damage" to property and where, under the policies, "physical loss or damage" specifically includes the presence and spread of a communicable disease.

[6]     24 Hour also only cites this exhibit 24 to show that "83% of all [property] policies include an exclusion for viral contamination, virus, disease, or pandemic." The number of other policies that contain Business Interruption Coverage is not relevant since 24 Hour's property policies do contain Business Interruption Coverage.

**IV.    It Is Appropriate To Take Judicial Notice Of Exhibit 72 Because Insurers Do Not Dispute That It Is Subject To Judicial Notice**

31.    Finally, Insurers "object to judicial notice to the extent 24 Hour (or its witnesses) rely on Exhibit 72 (an article titled "U.S. Surgeon general says coronavirus outbreak 'to get bad' this week"). But Insurers do not dispute that this article is subject to judicial notice. *See* Oppo at ¶ 10. Insurers also do not identify any reason why this article would not be subject to judicial notice. Since 24 Hour requested judicial notice of this article and it "is not subject to reasonable dispute," the Court "must take judicial notice" of the article. Fed. R. Evid. 201(b)–(c).

Dated: February 12, 2024                         Respectfully submitted,

                                                **REED SMITH LLP**

                                                */s/ Mark W. Eckard*
                                                Mark W. Eckard (No. 4542)
                                                1201 North Market Street, Suite 1500
                                                Wilmington, DE 19801
                                                (302) 778-7500
                                                (302) 778-7575 (Fax)
                                                meckard@reedsmith.com

                                                David E. Weiss (admitted *pro hac vice*)
                                                T. Connor O'Carroll (admitted *pro hac vice*)
                                                101 Second Street, Suite 1800
                                                San Francisco, CA 94105-3659
                                                (415) 543-8700
                                                (415) 391-8269 (Fax)
                                                dweiss@reedsmith.com
                                                cocarroll@reedsmith.com

                                                *Counsel for Plaintiff 24 HOUR FITNESS WORLDWIDE, INC.*