**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RS FIT NW LLC, | ) | |
| | ) | Case No. 20-11568 (TMH) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| ———————————————— | ) | |
| | ) | |
| 24 HOUR FITNESS WORLDWIDE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY; | ) | Adv. Pro. No. 20-51051 (TMH) |
| ENDURANCE AMERICAN SPECIALTY | ) | |
| INSURANCE COMPANY; STARR SURPLUS | ) | |
| LINES INSURANCE COMPANY; ALLIANZ | ) | |
| GLOBAL RISKS US INSURANCE COMPANY; | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY; | ) | |
| BEAZLEY-LLOYD'S SYNDICATES 2623/623; | ) | |
| ALLIED WORLD NATIONAL ASSURANCE | ) | |
| COMPANY; QBE SPECIALTY INSURANCE | ) | |
| COMPANY; and GENERAL SECURITY | ) | |
| INDEMNITY COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**ALLIED WORLD NATIONAL ASSURANCE COMPANY'S REPLY**
**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT REGARDING THE POLLUTION POLICY**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ii

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT ..................................................................................................... 1

   A.  Allied World is Entitled to Summary Judgment Because 24 Hour Has Not Met,
      and Cannot Meet, its Burden of Proof Under the Insuring Agreement of
      the Pollution Policy........................................................................................ 1

     1.  The Plain Language of the Pollution Policy Requires 24 Hour to Establish
        that  it Suffered Business Interruption Caused "Solely" and "Directly" by
        a Pollution Incident on, at or under a Scheduled Location .......................... 1

     2.  This Court Should Not Follow the Urban Edge Decision Because it is
        Contrary to Settled California Law............................................................ 6

     3.  Enforcing the Plain Meaning of the Terms "Solely" and "Directly" Does
        Not Violate California Law ..................................................................... 10

   B.  Allied World Is Also Entitled to Summary Judgment Because There Is No
      Evidence that the COVID Virus Was on, at or Under any Scheduled Location ............ 11

     1.  24 Hour's New Argument that the Flu Was Also Assumed to be Everywhere
        Fails to Create a Triable Issue of Fact that 24 Hour Suffered Business
        Interruption Caused Solely and Directly by a Pollution Incident on, at or
        under a Scheduled Location..................................................................... 13

     2.  The Opposition Does Not Cite to Any Evidence Demonstrating the
        Presence of the COVID Virus on, at or under Any Scheduled Location ................. 16

     3.  24 Hour's Other Arguments Are Baseless.............................................. 18

III.  CONCLUSION................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Another Planet Ent., LLC v. Vigilant Ins. Co.*,
2021 WL 774141 (N.D. Cal. Feb. 25, 2021) ........................................................18

*AU Health System, Inc. v. Affiliated FM Ins. Co.*,
593 F. Supp. 3d 1344 (S.D. Ga. 2022).................................................................12

*Auto Lenders Acceptance Corp. v. Gentlini Ford, Inc.*,
181 N.J. 245 (2004) ...............................................................................................6

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
5 Cal.4th 854 (1993) ...............................................................................................2

*Café Plaza De Mesilla Inc. v. Cont'l Cas. Co.*,
519 F. Supp. 3d 1006 (D.N.M. 2021) ..................................................................18

*In re Coordinated Pretrial Proceedings*,
906 F.2d 432 (9th Cir.1990), *cert. denied,* 111 S.Ct. 2274 (1991)........................12

*Dove v. Prudential Ins. Co. of Am.*,
2009 WL 1379574 (D. Kan. May 18, 2009), *rev'd and remanded*, 364 F.
App'x 461 (10th Cir. 2010) .................................................................................4, 8

*DZ Jewelry, LLC v. Certain Underwriters at Lloyds London*,
525 F. Supp. 3d 793 (S.D. Tex. 2021) .................................................................18

*Farm Air Flying Service v. Southeastern Aviation Ins. Services, Inc.*,
206 Cal.App.3d 637 (1988) ...................................................................................2

*Greenwood Racing Inc. v. Am. Guarantee & Liab. Ins. Co.*,
569 F. Supp. 3d 243 (E.D. Pa. 2021) ..................................................................17

*Howell v. State Farm Fire & Cas. Co.*,
218 Cal. App. 3d 1446 (1990) .............................................................................10

*Island Hotel Props., Inc. v. Fireman's Fund Ins. Co.*,
512 F. Supp. 3d 1323 (S.D. Fla. 2021) ...............................................................18

*Jackson v. Danberg*,
594 F.3d 201 (3d Cir. 2020)................................................................................16

*James v. Getty Oil Co. (E. Operations), Inc.*,
472 A.2d 33 (Del. Super. Ct. 1983) ...................................................................3, 8

*Johnson v. Hartford Fin. Servs. Grp., Inc.*,
  510 F.Supp.3d 1326 (N.D. Ga. 2021) ................................................................................18

*Jordan v. Allstate Ins. Co.*,
  116 Cal. App. 4th 1206 (2004) ..........................................................................................19

*K.C. Hopps Ltd. v. Cincinnati Ins. Co.*,
  561 F. Supp. 3d 827 (W.D. Mo. 2021) ..............................................................................18

*MacKinnon v. Truck Ins. Exch.*,
  31 Cal.4th 635 (2003) ...........................................................................................1, 11, 16

*Muldrow v. Brooks*,
  34 Fed. App'x 854 (3rd Cir. 2002) ....................................................................................14

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
  563 F.3d 777 (9th Cir. 2009) ...............................................................................................2

*Reid v. Google, Inc.*,
  50 Cal. 4th 512 (2010) .......................................................................................................10

*Paradigm Care & Enrichment Ctr., LLC v. W. Bend Mut. Ins. Co.*,
  529 F. Supp. 3d 927 (E.D. Wis. 2021), *aff'd*, 33 F.4th 417 (7th Cir. 2022) ....................17

*Promotional Headwear Int'l v. Cincinnati Ins. Co.*,
  504 F. Supp. 3d 1191 (D. Kan. 2020) ................................................................................18

*Prudential Ins. Co. of America, Inc. v. Sup.Ct. (Dunniway)*,
  98 Cal. App. 4th 585 (2002) ..............................................................................................19

*Shea v. Bonutti Rsch., Inc.*,
  2011 WL 53473 (S.D. Ohio Jan. 7, 2011) ........................................................................4, 8

*Simon Mktg., Inc. v. Gulf Ins. Co.*,
  149 Cal. App. 4th 616 (2007) ............................................................................................4, 8

*Stamm Theatres, Inc. v. Hartford Cas. Ins. Co.*,
  93 Cal. App. 4th 531 (2001) ................................................................................................3

*Sunstone Hotel Invs., Inc. v. Endurance Am. Specialty Ins. Co.*,
  607 F. Supp. 3d 1006 (C.D. Cal. 2022) ................................................................8, 9, 10, 20

*Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co.*,
  693 F.3d 665 (6th Cir. 2012) ............................................................................................6-7

*Uncork & Create LLC v. Cincinnati Ins. Co.*,
  498 F. Supp. 3d 878 (S.D.W. Va. 2020), *aff'd*, 27 F.4th 926 (4th Cir. 2022) ..................18

7824575.1

*Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*,
  929 F.3d 1143 (9th Cir. 2019) ........................................................................1, 11

*Universal Trading & Investment Co., Inc. v. Bureau for Representing Ukrainian Interests*,
  87 F.4th 62 (1st Cir. 2023).......................................................................................12

*Vardanyan v. AMCO Ins. Co.*,
  243 Cal. App. 4th 779 (2015) ...........................................................................10, 11

*ViacomCBS Inc. v. Great Divide Ins. Co.*,
  640 F. Supp. 3d 931 (C.D. Cal. 2022) .............................................................3, 4, 8

*Vons Cos., Inc. v. Fed. Ins. Co.*,
  212 F.3d 489 (9th Cir. 2000) ............................................................................4, 6, 8

**Statutes**

Insurance Code Section 530............................................................................................10

Defendant Allied World National Assurance Company ("Allied World") submits this Reply Memorandum in support of its Motion for Summary Judgment on the claim against it by Plaintiff 24 Hour Fitness Worldwide, Inc. ("24 Hour") under the Pollution Policy (the "Motion").

## I.   INTRODUCTION

24 Hour fails to offer any admissible evidence showing the existence of a triable issue of material fact. Rather, it proffers irrelevant and unsupported "expert opinion" and asks this Court to take its expert's word that the COVID virus[1] was present at each of its clubs. It also asks the Court to re-write the Pollution Policy in a manner that is directly contrary to its plain meaning. In addition, 24 Hour fails to (and cannot) establish that its claimed business interruption loss was caused "solely and directly by a pollution incident on, at or under a Scheduled Location," or that it was caused by such a "pollution incident" at all. Accordingly, the Court should grant the Motion.

## II.   ARGUMENT

**A.   Allied World is Entitled to Summary Judgment Because 24 Hour Has Not Met, and Cannot Meet, its Burden of Proof Under the Insuring Agreement of the Pollution Policy.**

*1.   The Plain Language of the Pollution Policy Requires 24 Hour to Establish that it Suffered Business Interruption Caused "Solely" and "Directly" by a Pollution Incident on, at or under a Scheduled Location.*

Under California law – which both sides agree governs this case – the "'burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded.'" *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 929 F.3d 1143, 1151 (9th Cir. 2019) (*quoting MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 648 (2003)). Thus, 24 Hour bears the burden of showing that its alleged loss falls within the insuring agreement in the Pollution Policy. The insuring agreement provides that Allied World

---

[1] All definitions in Defendant Allied World National Assurance Company's Motion for Summary Judgment and Incorporated Memorandum of Law Regarding the Pollution Policy (Adv DE 1) are incorporated herein by reference.

"will pay business interruption costs resulting from business interruption caused solely and directly by a pollution incident on, at or under a scheduled location." (Supp. Appendix AW0060) (Pollution Policy p. AWPLL000194). Therefore, to avoid summary judgment, 24 Hour must set forth evidence raising a triable issue of fact that its alleged loss was caused "solely" and "directly" by a "pollution incident" "on, at or under a scheduled location." 24 Hour has not met that burden.

The words "solely" and "directly" are unambiguous and have simple meanings. California law requires the Court to apply the unambiguous language of an insurance policy as written. *See Farm Air Flying Service v. Southeastern Aviation Ins. Services, Inc.*, 206 Cal.App.3d 637, 641 (1988) ("Where … the language of the [policy] is clear and unambiguous, the insured can reasonably expect only the coverage afforded by the plain language of the [policy]."). Under California law, courts "will not artificially create ambiguity where none exists" and "[i]f a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Northrop Grumman Corp. v. Factory Mut. Ins. Co.,* 563 F.3d 777, 779 (9th Cir. 2009) (citations and internal quotation marks omitted).

24 Hour concedes that California law requires this Court to interpret insurance policy language in the "ordinary and popular sense." (Plaintiff 24 Hour Fitness Worldwide, Inc.'s Opposition to Allied World's Motion for Summary Judgment re its Pollution Policy (the "Opposition") (Adv DE 253, p. 14) (*quoting* Cal. Civil Code § 1644). Indeed, interpreting policy language to give effect to its ordinary meaning is the "bedrock" of policy interpretation in California. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 867 (1993) ("This reliance on common understanding of language is bedrock."). Where, as here, the Pollution Policy does not expressly define "solely" and "directly," California courts will turn to dictionary

definitions to give effect to the ordinary meaning of policy language. *Stamm Theatres, Inc. v. Hartford Cas. Ins. Co.,* 93 Cal. App. 4th 531, 539 (2001) (*quoting Scott v. Cont'l Ins. Co.,* 44 Cal. App. 4th 24, 29-30 (1996)) ("'Indeed, courts in both insurance and noninsurance contexts regularly use the phrase "ordinary dictionary definition [or meaning]" as if "ordinary" were synonymous with "dictionary." [Citations.] ... It is thus safe to say that the "ordinary" sense of a word is to be found in its dictionary definition.'") (citations and footnote omitted).

California courts have applied the plain dictionary definitions of the words "solely" (or sole) and "directly" (or direct) in interpreting insurance policies. In *ViacomCBS Inc. v. Great Divide Ins. Co.,* 640 F. Supp. 3d 931, 945, 947 (C.D. Cal. 2022), the Court applied the dictionary definitions of "solely" and "directly" in interpreting an insurance policy, explaining:

> As the Policy does not define "solely" or "directly," (*see* Policy GD0089), resort to dictionary definitions is appropriate [Citation]. "Solely" means "to the exclusion of all else," and "directly" means "in a straightforward manner." *Solely*, Merriam-Webster, https://www.merriam-webster.com/dictionary/solely (accessed Nov. 4, 2022); *Directly*, Black's Law Dictionary (11th ed. 2019); *see also Directly*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary /english/directly (accessed Nov. 4, 2022) (defining "directly" as "without anything else being involved or in between"). Here, ViacomCBS did not incur the *2020 KCAs* pre-production costs exclusively or straightforwardly by reason of the abandonment…. ViacomCBS does not explain, in its argument or the proffered declarations, how its asserted industry custom and practice can effectively negate the clear and unambiguous terms, "solely and directly."

Not only did the Court in *ViacomCBS Inc.* apply the plain dictionary definitions of the words "solely" and "directly," but the Court expressly held that the terms "solely and directly" were "clear and unambiguous." *Id.* Indeed, 24 Hour does not cite any California authority – *because none exists* – indicating that the terms "solely and directly" are unclear or ambiguous.

As noted in Allied World's moving papers, other jurisdictions have adopted similar definitions of "sole" or "solely" and have also held that these words are unambiguous. *See James v. Getty Oil Co. (E. Operations), Inc.*, 472 A.2d 33, 39 (Del. Super. Ct. 1983) ("The common

3

dictionary meaning of the word 'sole' is clear and unambiguous.  It is defined as 'having no sharer,' 'being the only one…'); *Shea v. Bonutti Rsch., Inc.*, 2011 WL 53473, at *4 (S.D. Ohio Jan. 7, 2011) ("There is nothing ambiguous about the word 'sole'…It is defined as 'having no sharer,' 'being the only one…'"); *Dove v. Prudential Ins. Co. of Am.*, 2009 WL 1379574, at *7 (D. Kan. May 18, 2009), *rev'd and remanded*, 364 F. App'x 461 (10th Cir. 2010).[2]  Likewise, in *Vons Cos., Inc. v. Fed. Ins. Co.,* 212 F.3d 489, 492–93 (9th Cir. 2000), the Ninth Circuit, applying California law, held that "'direct' means 'direct'" and, as a result, an indemnity policy did not provide coverage for an indirect loss.  *See also Simon Mktg., Inc. v. Gulf Ins. Co.,* 149 Cal. App. 4th 616, 623 (2007).

In an attempt to circumvent the overwhelming weight of authority holding that the terms "solely" and "directly" are unambiguous, 24 Hour argues that these courts were interpreting different types of insurance policies or other types of contracts.  That is a distinction without a difference.  Under California law, *all types of* insurance policies and contracts must be interpreted using the ordinary and popular sense of the words.  These courts all expressly applied the plain dictionary definitions of the terms "solely" and "directly" and expressly held that these terms are unambiguous.  Consequently, this Court is bound to apply the plain and ordinary meaning of the terms "solely" and "directly" in the Pollution Policy.

It is telling that 24 Hour offers no definition of either "solely" or "directly."  The plain and ordinary meaning of "solely" is "to the exclusion of all else" and "directly" means "without anything else being involved or in between."  *ViacomCBS Inc.*, 640 F. Supp. 3d at 945.  Because 24 Hour cannot satisfy either definition, it ignores the plain meaning of both terms.

---

[2] Contrary to 24 Hour's assertion, *Dove v. Prudential Ins. Co. of Am.*, 364. F. Appx's 461, 465 (10th Cir. 2010), did not reverse the trial court's determination that the terms "solely and directly" were unambiguous.  Rather, the Tenth Circuit held that an ambiguity arose because the policy did not define or distinguish between "blind" and "legally blind."

Applying the plain meaning of the words "solely" and "directly" to the facts here clearly establishes that 24 Hour's business interruption losses cannot fall within the insuring agreement of the Pollution Policy.  24 Hour's own Complaint confirms that the governmental orders were a significant, *if not the primary*, reason 24 Hour closed its gyms.  24 Hour expressly pleads in the Complaint that it kept its gyms closed *even when it believed it was safe to open* due to governmental orders.  (Complaint ¶ 42) ("While Plaintiff believes that the modifications it has put in place now allow it to operate safely, it is required to comply with these government directives [to keep the gyms closed].").  24 Hour has thus admitted that it closed its gyms and kept them closed because "it is required to comply with these government directives."  (Complaint ¶ 42); (*see also* Orders, Adv DE 258 Exhs. 29, 41-119; Opposition p. 12 ("most governmental entities ordered non-essential business to close")).  Moreover, none of the governmental orders state that they were issued because the COVID virus was present at any 24 Hour facility.  (Orders, Adv DE 258, Exhs. 29, 41-119).

Importantly, 24 Hour does not dispute that its own 30(b)(6) witness admitted during his 30(b)(6) deposition that Dan Larson ("Larson"), 24 Hour's 30(b)(6) witness at its 30(b)(6) deposition on issues relating to 24 Hour's Claim under the Pollution Policy, admitted that "[g]overnment-related requirements were part of the decision-making process" in closing all of its then open fitness centers by midnight on March 16, 2020 (Supp. Appendix at AW0187-88) (Transcript of 30(b)(6) Deposition of Dan Larson ("Larson 30(b)(6) Dep."), 77:20-78:14), and that a "component … of the decision-making process" in 24 Hour's decision that it would be "temporarily closing all 24 Hour Fitness clubs, no later than midnight tonight, March 16," was "to comply with federal, state, and local government ordinances." (Supp. Appendix at AW0186) (Larson 30(b)(6) Dep. at 65:4-65:25).  Larson also admitted that 24 Hour closed numerous gyms

a second time, and that it closed these gyms pursuant to governmental orders, except that in 10 cases they were closed due to "lease rejections." (Supp. Appendix at AW0190) (Larson 30(b)(6) Dep. at 92:4-23).

24 Hour has thus failed to present admissible evidence creating a genuine issue of material fact that its alleged business interruption losses were caused "solely and directly" by the presence of the COVID virus on, at or under a Scheduled Location. Accordingly, it cannot establish coverage under the plain language of the insuring agreement in the Pollution Policy, and the Motion should be granted.

> **2. *This Court Should Not Follow the Urban Edge Decision Because it is Contrary to Settled California Law.***

24 Hour asks this Court to ignore California's plain meaning rule and instead to adopt the "proximate cause" test adopted by a New Jersey trial court in *Urban Edge Properties v. Allied World Assur. Co. (U.S.) Inc.*, Super. Ct. of New Jersey Law Div., Bergen County, Docket No.: BER-L-007987-20. (Adv DE 258, Exh. 152). Yet, New Jersey law on this issue is *directly at odds* with settled and controlling California law. Thus, the Court should reject 24 Hour's argument.

As the Court in *Urban Edge* explained, in *Auto Lenders Acceptance Corp. v. Gentlini Ford, Inc.*, 181 N.J. 245, 357 (2004), the New Jersey Supreme Court adopted the "proximate-cause test" in interpreting insurance policies. (Adv DE 258, Exh. 152 at 2162). Unlike New Jersey, California follows the plain meaning rule and has determined that "'direct' means 'direct'" *without consideration of proximate cause*. *Vons Companies, Inc.*, 212 F.3d at 492 ("We hold that 'direct' means 'direct'…"). Thus, the proximate-cause test is directly at odds with the plain meaning rule. *See Auto Lenders Acceptance Corp., supra,* 181 N.J. at 258-59 (expressly acknowledging *Vons Companies, Inc.* as contrary authority to the proximate-cause test); *see also Tooling, Mfg. & Techs.*

*Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 674 (6th Cir. 2012) (describing split of authority with a majority of jurisdictions, including California, adopting the "direct is direct" test, with a minority of jurisdiction, including New Jersey, adopting the "proximate cause" test).  Under the proximate cause test, an indirect loss that would not be covered under the plain meaning rule could still be considered a covered "direct" loss so long as the cause of the loss is deemed the "proximate" or the legal cause.

In *Urban Edge*, the Court explained that, because the claim arose in New Jersey, it would "follow the New Jersey Supreme Court's example and apply a proximate-cause test in the context of a policy which requires 'direct' causation."  *Urban Edge* (Adv DE 258 Exh. 152 at 2163).  The Court then went on to reason that it could not give "literal interpretations to restrictive causation language," *i.e.*, the plain meaning of the words "directly" or "solely" under New Jersey law.  *Id.* (citation and internal quotation marks omitted").  The Court went on to explain:

> The language of this Policy does not simply require "direct" causation, but "sole and direct" causation.  AWAC urges this Court to interpret the word "solely" as "exclusively," and points to *Arkema, Inc. v. Commerce & Indus. Ins. Co.*, but that case interpreted New York law; in fact, that Pennsylvania court acknowledged that various jurisdictions, including New Jersey, have "refused to give narrow, literal interpretations to restrictive causation language."  2007 U.S. Dist. LEXIS 2345 at *8-9 (E.D. Pa. Mar. 6, 2007) (citing *Shiffler v. Equitable Life Assur. Soc'y*, 838 F.2d 78, 84 (3rd Cir. 1988)).

*Urban Edge* (Adv DE 258 Exh. 152 at 2163).

The Court in *Urban Edge* then rejected the dictionary definition of "solely," which means "exclusively," because it was "too far afield of the reasonable expectations of the insured" and was therefore an "unacceptable standard in New Jersey."  *Urban Edge* (Adv DE 258 Exh. 152 at 2164).  The *Urban Edge* court's express adoption of New Jersey's "proximate-cause test" and rejection of the plain and ordinary meaning rule has no bearing on California law or the law of the other jurisdictions that have expressly held that the terms "solely" and "directly" are unambiguous, and

applied that unambiguous meanings of those terms.  *Vons Cos., Inc.*, 212 F.3d at 492–93; *ViacomCBS Inc.*, 640 F. Supp. 3d at 945, 947; *Shea*, 2011 WL 53473, at *4; *Dove*, 2009 WL 1379574, at *7, *rev'd and remanded*, 364 F. App'x 461; *Simon Mktg., Inc.*, 149 Cal. App. 4th at 623; *James*, 472 A.2d at 39.

Since New Jersey law is directly contrary to California law, 24 Hour's citation and reliance on *Urban Edge* is a clear attempt to circumvent California's controlling plain meaning rule.  Under the plain meaning of the Pollution Policy, 24 Hour must establish that any closures were caused "solely" and "directly" by the presence of the COVID virus at the gyms and not merely that the presence of the COVID virus was an "independently sufficient cause of the interruption," as permitted under New Jersey law.  *See Urban Edge* (Adv DE, 258 Exh. 152 at 2167).  24 Hour must also prove that the closures were not caused by other intervening events – not merely that the presence of the COVID virus was the "proximate cause" of the closures.  24 Hour cannot meet this burden under California law and has not even attempted to demonstrate that it has done so in the Opposition.

As set forth above, 24 Hour closed its gyms when the government orders required its gyms to close and opened them when the government orders allowed them to open, 24 Hours opened them.  24 Hour kept its gyms closed *even when it believed* they were safe to reopen.  Accordingly, the undisputed evidence and 24 Hour's own admissions establish that there are no triable issues of fact that would prevent this Court from granting summary judgment in Allied World's favor.

24 Hour's reliance on *Sunstone Hotel Invs., Inc. v. Endurance Am. Specialty Ins. Co.*, 607 F. Supp. 3d 1006 (C.D. Cal. 2022), is also misplaced.  The policy in *Sunstone* used the word "directly" but not the word "solely."  As such, it does not control this case.

In addition, *Sunstone* concerned a "super-spreader event" at an insured's location.

Sunstone hosted a conference at its Boston Marriott location from February 20, 2020 to February 27, 2020.  On or about March 5, 2020, Sunstone was informed by the Boston Public Health Department ("BPHD") that several individuals who could be traced to the hotel conference it hosted had tested positive for the COVID virus.  BPHD informed Sunstone that if it would not agree to close the hotel voluntarily, that the BPHD would order the closure and a quarantine of the hotel immediately.  Sunstone agreed to close the hotel for 14 days for cleaning with the hope of reopening the hotel.  But before Sunstone could reopen the hotel on March 27, 2020, the State of Massachusetts issued a stay-at-home order on March 23, 2020 that prohibited Sunstone from reopening the hotel.

In addition to the different policy language, another key difference between *Sunstone* and the instant case is that, unlike the hotel in *Sunstone*, which "was forced [by a governmental agency] to close after it allegedly became the site of the first super-spreader in the United States," 607 F. Supp. 3d at 1009, here there is absolutely no evidence of an actual or documented outbreak of COVID-19 at any of the insured locations.  The *Sunstone* Court noted that the actual and documented presence of the COVID virus was the direct cause of the hotel's closure.  That makes sense under those circumstances.  However, the Court *expressly conceded* that the insurer's argument "may hold weight" if there was no documented evidence of the presence of the COVID virus or a super-spreader event *at that hotel*.  The Court reasoned:

> But Endurance ignores that fact, insisting that the Massachusetts Order had nothing to do with the specific presence of COVID-19 at Marriott Boston Long Wharf. Though that argument may hold weight had Marriott Boston Long Wharf not been the site of the Biogen conference, believed to be a super-spreader event, it is not compelling here.

607 F. Supp. 3d 1017.

Here, unlike in *Sunstone*, different policy language is involved and 24 Hour has offered no evidence of the presence of the COVID virus at a scheduled location or that the presence of the COVID virus at a scheduled location was the sole and direct cause of the gym closures.

### 3. Enforcing the Plain Meaning of the Terms "Solely" and "Directly" Does Not Violate California Law.

24 Hour's argument that applying the plain dictionary definitions of "solely" and "directly" somehow violates California law is baseless. In support of its erroneous position, 24 Hour cites *Howell v. State Farm Fire & Cas. Co.,* 218 Cal. App. 3d 1446, 1452 (1990), *disapproved of by Reid v. Google, Inc.,* 50 Cal. 4th 512 (2010), and *Vardanyan v. AMCO Ins. Co.*, 243 Cal. App. 4th 779, 788-89 (2015). *Howell* and *Vardanyan* hold that under Insurance Code Section 530, a covered "peril" that is the efficient proximate cause of a loss cannot otherwise be *excluded* where there is more than one cause of loss. 24 Hour's reliance on *Howell* and *Vardanyan* is misplaced because those cases concern limitations placed on *exclusions*, *i.e.*, attempts to exclude otherwise covered losses. *Howell*, 218 Cal. App. 3d at 1456 ("The *exclusionary provisions* contained in the contracts at issue are not enforceable to the extent they purport to limit the insurers' liability beyond what is permitted by section 530 and its interpreting cases.") (emphasis added); *Vardanyan*, 243 Cal. App. 4th at 779, 785, 796 (construing an exception to an exclusion in an insurance policy, and explaining that "[a] policy cannot extend coverage for a specified peril, *then exclude coverage* for a loss caused by a combination of the covered peril and an excluded peril, without regard to whether the covered peril was the predominant or efficient proximate cause of the loss") (emphasis added).

By contrast, here, the unambiguous terms "solely" and "directly" are found in the insuring agreement that grants and defines the scope of coverage in the first place. Consequently, Allied World is not attempting to "exclude" an otherwise covered peril. Indeed, Allied World is not relying on *any exclusions* in the Motion. Rather, there is simply no evidence of a covered loss/peril

because 24 Hour cannot satisfy its obligations to set forth a prima facie case of coverage under the insuring grant.  Unlike where an exclusion is involved, the "burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded." *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co*., 929 F.3d 1143, 1151 (9th Cir. 2019) (*quoting MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 648 (2003)).  Thus, 24 Hour must plead and satisfy all elements of the *insuring grant*, which requires proof that the closures of the gyms were caused solely and directly by the presence of the COVID virus at, on or under a scheduled location.  However, 24 Hour has not presented admissible evidence that raises a material issue of fact as to whether there is a covered peril in the first instance.  Thus, contrary to 24 Hour's assertion, Allied World is not seeking to exclude an otherwise covered peril by citing any exclusions to the Pollution Policy and, therefore, 24 Hour's cases and accompanying argument are inapposite.

Finally, 24 Hour's attempt to analogize the words "solely and directly" here to the word "only" in *Vardanyan* fails because the phrase "solely and directly" appears in the insuring clause of the Pollution Policy and is unambiguous, whereas the word "only" in *Vardanyan* appeared in an exception to an exclusion from coverage and its placement in that exclusion rendered it ambiguous.

**B.    Allied World Is Also Entitled to Summary Judgment Because There Is No Evidence that the COVID Virus Was on, at or Under any Scheduled Location.**

To trigger coverage under the Pollution Policy, 24 Hour bears the burden of proving that its alleged business interruption was caused solely and directly by a pollution incident, on, at or under a scheduled location.  As demonstrated in the Motion, 24 Hour has offered no evidence that the COVID virus was actually at, on or under a scheduled location.  In response, the Opposition

relies on conjecture and assumption (repackaged as "circumstantial evidence") in its attempt to demonstrate that the coverage was triggered under the Pollution Policy.

However, "'speculation and surmise cannot carry the day at the summary judgment stage,'" and courts "'will not "pile[ ] inference upon inference at the summary judgment stage in a manner that 'elevates assumption over proof.'" *Universal Trading & Investment Co., Inc. v. Bureau for Representing Ukrainian Interests*, 87 F.4th 62, 80 (1st Cir. 2023) (citations omitted). Further, even if 24 Hour "assumed," "believed," or was "very concerned" that the COVID virus and/or other viruses were on, at or under a scheduled location, this would not be sufficient to trigger coverage. *See e.g., AU Health System, Inc. v. Affiliated FM Ins. Co.*, 593 F. Supp. 3d 1344, 1352 (S.D. Ga. 2022) (rejecting insured's speculative assertion in opposition to summary judgment motion that the COVID virus was "actually present" at all of its locations, finding that "the Court and [the insurer] are unwilling to blindly accept Plaintiff's contention that all of the Insured Locations had COVID-19 'actually present'").

In the absence of any reliable evidence of the actual presence of the COVID virus on, at or under a scheduled location, 24 Hour offers a variety of assumptions, unsupported and unreasonable "inferences" and misleading policy interpretations in a desperate attempt to satisfy its burden under the Pollution Policy insuring agreement. However, in ruling on a motion for a summary judgment, a district court may refuse to draw unreasonable inferences from circumstantial evidence. *In re Coordinated Pretrial Proceedings,* 906 F.2d 432, 441 (9th Cir.1990), *cert. denied,* 111 S.Ct. 2274 (1991). Consequently, 24 Hour's efforts are unavailing.

*1. 24 Hour's New Argument that the Flu Was Also Assumed to be Everywhere Fails to Create a Triable Issue of Fact that 24 Hour Suffered Business Interruption Caused Solely and Directly by a Pollution Incident on, at or under a Scheduled Location.*

Apparently recognizing that it has no evidence of the presence of the COVID virus on, at or under any scheduled location, 24 Hour has now asserted an entirely new argument, claiming that the flu and cold were also widely prevalent at the same time as the COVID virus and that, because *influenza* is also a viral communicable disease, the Court may look to the ubiquity of either COVID-19 or the flu as sufficient proof to trigger coverage under the Pollution Policy.  (Adv DE 253 at 8-10, 18).  Setting aside the fact that 24 Hour did not allege the presence of the flu or cold (or some other disease) as a basis for its claim in its Complaint, this argument is clearly flawed for a number of reasons.

In an effort to buttress its contention that the ubiquity of the flu and COVID-19 suffices as "circumstantial evidence" of the actual presence of the COVID virus at its properties, 24 Hour relies on a new expert opinion by Dr. Carnethon that "communicable diseases, including the flu and the common cold, were also present and spreading at each 24 Hour location…"  (Adv DE 257 at Attachment No. 4 at ¶ 43) (Carnethon Declaration at ¶ 43).  Dr. Carnethon further states in her Declaration that her new opinion that COVID-19 and other communicable diseases, such as the flu, were actually present and spreading at each of 24 Hour's locations during the relevant time period, is based, in part, on her "understanding" that 24 Hour purportedly experienced an increase of employee sick hours used for the first quarter of 2020 compared to the same period in the previous year (24 Hour's "sick hours data").  (*Id*. at ¶ 37).  Dr. Carnethon's Declaration further provides the additional new opinions that, based on this "understanding," "[i]t is reasonable to infer that the lack of available COVID-19 testing impacted 24 Hour's ability to monitor or track whether its employees had contracted the virus" and that "[i]t is also plausible, given the lack of

7824575.1

available COVID-19 testing during this time period, that some proportion of 24 Hour's sick time incurred in the first quarter of 2020 may have been attributed to COVID-19 and other communicable diseases."  (Adv DE 257 at Attachment No. 4 at ¶ 37) (Carnethon Dec. in Support of 24 Hour Opposition at ¶ 37).  Dr. Carnethon's opinion on this point is not only unreliable as "expert" testimony and should be excluded,[3] but her assertion that it is "plausible" that an increase in sick time during the first quarter of 2020 "may have been" due to COVID-19 and other communicable diseases is, again, nothing more than a speculative inference.

The purported increase in employee sick hours Dr. Carnethon refers to in her Declaration is based on a declaration from Katheryn Healon ("Healon"), 24 Hour's Senior Directory of Treasury and Pay Process.  24 Hour did not identify Healon in its initial disclosures or in response to interrogatories that specifically identify each person with knowledge of allegations in the Complaint.  (Adv DE 266, Exh. 31 at A.1350-1356) (24 Hour's Initial Disclosures at pp. 2-8); (*see also* Adv. DE 233, Exh. A-22 at A.0742) (24 Hour's Response to Interrogatory 2, Certain Defendants' First Set of Interrogatories).  Nor has the "sick hour data" Healon references and summarizes in her Declaration ever been produced to Allied World and it is not attached to Healon's Declaration.  As a result, Allied World was never afforded an opportunity to depose Healon or to test the evidence she references in her Declaration. The Court should therefore exclude Healon's Declaration in its entirety and not consider it on summary judgment.  *See Muldrow v. Brooks*, 34 Fed. App'x 854, 855 (3rd Cir. 2002) (finding that the district court did not

---

[3] Dr. Carnethon's new opinions asserted for the first time at the summary judgment phase should be rejected as untimely and excluded as they are neither the product of any reliable analysis nor are they based on any facts or data. Allied World incorporates by reference the arguments made in its Motion to Exclude Dr. Carnethon's Proposed Expert Testimony (the "Motion to Exclude") for a full discussion as to why these new opinions, as well as Dr. Carnethon's original principal expert opinions, should be excluded by this Court.

abuse its discretion in excluding testimony of witness whose identity was not disclosed until after party moved for summary judgment).

Even if the Court considers the Healon Declaration, the Healon Declaration still fails to demonstrate that the COVID virus or any other communicable disease was on, at or under any particular scheduled location, as required by the Pollution Policy. At bottom, the Healon Declaration and the data summarized therein indicate nothing more than a seasonal variation in 24 Hour's sick leave experience. Healon's unsubstantiated statements do not indicate whether any of the employees using sick time were diagnosed with any communicable disease or whether, if so, they were on the premises of any 24 Hour location during the period of time when they would have had the disease. The Healon Declaration is simply not relevant to the issue of whether the COVID virus was at, on or under a scheduled location.

Moreover, Dr. Carnethon's broader opinion, if not excluded by the Court for the reasons set forth in Allied World's Motion to Exclude, that in addition to the COVID virus, other communicable diseases such as the flu and the common cold were also at, on or under each scheduled location, is not based on any evidence or knowledge of any member or employee actually having a communicable disease at a 24 Hour location. Rather, it is based on the Healon Declaration discussed above and Dr. Carnethon's statement, without citation, that "the CDC estimates, the average individual gets 2-3 colds per year and the COVID virus was circulating during the heart of cold and flu season," which Dr. Carnethon states was a particularly severe flu season. (Adv. DE 257 at Attachment No. 4 at ¶ 28) (Carnethon Declaration at ¶ 28). It is not a reasonable assumption for Dr. Carnethon to then opine that the COVID virus and other communicable diseases were actually at, on or under each scheduled location under the Pollution

Policy during the relevant time period.  Speculation and conjecture simply cannot defeat summary judgment.  *Jackson v. Danberg*, 594 F.3d 201, 227 (3d Cir. 2020).[4]

### 2. The Opposition Does Not Cite to Any Evidence Demonstrating the Presence of the COVID Virus on, at or under Any Scheduled Location.

24 Hour contends that, even if the Court were to require proof of the presence of the COVID virus at, on or under a scheduled location, emails related to two of its 445 locations (Bergen County, New Jersey, and Alameda County, California) satisfy this requirement.  (Adv DE 258 at Exhs. 27 and 13).  Even a cursory review of the two proffered examples, however, makes clear that neither provides evidence (much less supports a reasonable inference) of the actual presence of the COVID virus at the referenced locations.

The March 13, 2020 email cited by 24 Hour in its Opposition regarding the Bergen County location does not demonstrate the actual presence of the COVID virus on, at or under that facility.  (Adv DE 258, Exh. 27).  The email advises that a member stated that he tested positive for COVID-19, but it does not provide a date on which the member tested positive and there is no indication that the member visited the facility after testing positive.  There is also no evidence the gym was closed as a result of this email, as would be required for 24 Hour to demonstrate that coverage was triggered for this location.

With respect to the Alameda County location, the document upon which 24 Hour relies is also not evidence of the presence of the COVID virus at that location.  (Adv DE 258, Exh.13).  As with the Bergen County example, the Alameda County email does not place the member at the

---

[4] In addition, the arguments in 24 Hour's Opposition regarding the presumed presence of COVID-19 and the flu "everywhere," taken as a whole, would invariably lead to absurd results.  Under California law, a court may not interpret a policy in such a way as to arrive an absurd result.  *MacKinnon v. Truck Ins. Exchange* 31 Cal.4th 635, 650 (2003) ("insurance policies will not be construed to reach an absurd result").  Yet, 24 Hour's argument in its Opposition together with its flawed interpretation of the Pollution Policy, taken as a whole, would invariably lead to absurd results because, applying the reasoning that 24 Hour urges the Court to adopt, this would mean that, if communicable diseases such as flu or COVID-19 are, at all times, "everywhere," then there would always be a "pollution incident" "everywhere."

Alameda County location at the time that he was purportedly diagnosed as "positive" with COVID-19, and additionally fails to demonstrate that the Alameda County location was closed solely and directly due to the information in the proffered email.  (*Id.*)

The only other cited "proof" of the actual presence of the COVID virus at a particular location cited in 24 Hour's opposition to the Motion is the Declaration of Dan Larson in which Larson states 24 Hour learned of a member who had possibly posted on Facebook he had tested positive for the COVID-19.  (Adv DE 257 ¶ 33, Adv DE 258-28).  Once again, however, the email exchange does not establish that a member with COVID-19 was present at one of 24 Hour's locations as there is no confirmation that the "rumor" in the email was true or that the member was present at the subject location after purportedly contracting COVID-19.  In fact, Larson's response to the email was to state "at this time Club Management has not been notified of a member or team member who has a confirmed case of COVID-19."  Regardless of its unsubstantiated claim to the contrary, 24 Hour simply and indisputably has no evidence of any employee or member with a confirmed COVID-19 infection being present at any 24 Hour location.

Thus, 24 Hour has not presented any evidence that the COVID virus was on, at or under a scheduled location because none exists.  Instead, 24 Hour proffers only speculation by its own purported experts that the COVID virus might have been at its gyms.

Instead, however, 24 Hour proffers speculation by its own purported experts that the COVID virus might have been at its gyms.  As set forth in Allied World's moving brief, courts throughout the country have consistently held that the existence of a pandemic is insufficient to establish the presence of the COVID virus at an insured location.  *Greenwood Racing Inc. v. Am. Guarantee & Liab. Ins. Co.,* 569 F. Supp. 3d 243, 250 (E.D. Pa. 2021); *Paradigm Care & Enrichment Ctr., LLC v. W. Bend Mut. Ins. Co*., 529 F. Supp. 3d 927, 936 (E.D. Wis. 2021), *aff'd,*

33 F.4th 417 (7th Cir. 2022); *DZ Jewelry, LLC v. Certain Underwriters at Lloyds London*, 525 F. Supp. 3d 793, 799 (S.D. Tex. 2021); *Another Planet Ent., LLC v. Vigilant Ins. Co*., 2021 WL 774141, *1 (N.D. Cal. Feb. 25, 2021); *Island Hotel Props., Inc. v. Fireman's Fund Ins. Co*., 512 F. Supp. 3d 1323, 1328 (S.D. Fla. 2021); *Café Plaza De Mesilla Inc. v. Cont'l Cas. Co.*, 519 F. Supp. 3d 1006, 1014 (D.N.M. 2021); *Johnson v. Hartford Fin. Servs. Grp., Inc.,* 510 F.Supp.3d 1326, 1334-35 (N.D. Ga. 2021); *Uncork & Create LLC v. Cincinnati Ins. Co*., 498 F. Supp. 3d 878, 883 (S.D.W. Va. 2020), *aff'd*, 27 F.4th 926 (4th Cir. 2022); *Promotional Headwear Int'l v. Cincinnati Ins. Co*., 504 F. Supp. 3d 1191, 1203 (D. Kan. 2020).  24 Hour's attempt to distinguish these cases as being "property" policy claims rather than pollution policy claims is a distinction without a difference given that, like property policies, the Pollution Policy requires that the pollution incident be present at the insured location.

24 Hour relies on *K.C. Hopps Ltd. v. Cincinnati Ins. Co.*, 561 F. Supp. 3d 827 (W.D. Mo. 2021), to argue that expert testimony about the general prevalence of the COVID virus raises a triable issue of fact.  However, *K.C. Hopps* is an outlier.  As shown above, the consensus of courts that have considered the issue have properly rejected speculation about the general prevalence of the virus as evidence of the presence of the COVID virus at an insured location.  Also, unlike here, the insurers in *K.C. Hopps* appear not to have objected to the improper expert testimony.

### 3.  *24 Hour's Other Arguments Are Baseless.*

24 Hour relies on a purported "admission" by Allied World and its experts that, COVID-19 was everywhere.  However, the generalized statement that 24 Hour relies is not evidence that the COVID virus was on, at or under *any particular* scheduled location – let alone that the COVID virus was on, at or under any particular schedule location at the time of any particular shutdown of a scheduled location.  (Adv DE 258 Exh. 151 at 2141-42).  Moreover, the factual basis of this

statement was never stated and is unclear, and there is no evidence that the Court to which the assertion was made found that COVID was "everywhere." (Adv DE 258 Exh. 151 at 2141-42). Indeed, as noted above, courts throughout the country have consistently held that neither speculation (which the statement appears to be) nor the existence of a pandemic is insufficient to establish the presence of the COVID virus at an insured location.

In addition, Allied World's employee's nonspecific testimony is irrelevant and certainly not an "admission" that the COVID virus was allegedly "everywhere." California law agrees. The policy provisions – not an insurer's employee's opinions – govern. *National Union Fire Ins. Co. of Pittsburgh, Penn.,* 10 Cal. App. 4th 846, 865 (1992) (claims adjuster's "admission" that policy covered claim in question did not establish liability); *Prudential Ins. Co. of America, Inc. v. Sup.Ct. (Dunniway),* 98 Cal. App. 4th 585, 603 (2002) (immaterial that insurer's employees had misinterpreted group health policy covering "full-time students" in providing benefits to persons who were not full-time students); *Jordan v. Allstate Ins. Co.,* 116 Cal. App. 4th 1206, 1217, fn. 8 (2004) (insurer's claims adjuster's interpretation of "dry rot" exclusion irrelevant because interpretation was question of law).

24 Hour also argues that the Pollution Policy does not require evidence of positive COVID-19 tests from employees, guests or other visitors or confirmation from a governmental authority confirming the presence of the COVID virus at any of its clubs. (Adv DE 253 at pp. 20-21). 24 Hour further argues that, because tests confirming the presence of the COVID virus were not available or readily available, it should be relieved of its obligation to present evidence of the presence of the COVID virus at, on or under a particular scheduled location because Allied World is "asking the impossible." (Opposition, Adv DE 253 p. 21). Allied World is not asking for the impossible but simply for the actual proof as required by the Pollution Policy; the presence of the

COVID virus on, at or under a scheduled location.  24 Hour's litany of excuses why it cannot or should be relieved of its obligations under the Pollution Policy is contradicted by *Sunstone Hotel Invs., Inc. v. Endurance Am. Specialty Ins. Co.*, 607 F. Supp. 3d 1006 (C.D. Cal. 2022), a case cited by 24 Hour in its Opposition.

The *Sunstone* case demonstrates the evidence 24 Hour could and should have presented to meet its burden of proof.  There, a "super-spreader event" occurred at an insured's location and on or about March 5, 2020, Sunstone was informed by the Boston Public Health Department ("BPHD") that several individuals who could be traced to the hotel conference it hosted had tested positive for COVID-19.  BPHD informed Sunstone that if it would not agree to voluntarily close the hotel, that the BPHD would order the closure and quarantine of the hotel immediately. Sunstone agreed to voluntarily close the hotel for 14 days for cleaning with the hope of reopening the hotel.  Before Sunstone could reopen the hotel on March 27, 2020, the State of Massachusetts issued a stay-at-home order on March 23, 2020 that prohibited Sunstone from reopening the hotel.

The facts of *Sunstone* illustrate that presenting *evidence* of the presence of the COVID virus at, on or under a scheduled location was entirely possible.  *Sunstone* illustrates that such information could have been obtained if there was *in fact* actual evidence of the presence of the COVID virus on, at or under the gyms.  Because 24 Hour has failed to present admissible evidence to raise a triable issue of fact of the presence of the COVID virus at, on or under a scheduled location, Allied World requests that the Motion be granted.

### III.    <u>CONCLUSION</u>

For the reasons stated herein and in the Motion, Allied World respectfully requests that the Court grant its Motion for Summary Judgment.

Dated: Wilmington, Delaware
February 12, 2024

GELLERT, SCALI, BUSENKELL & BROWN, LLC

By: _/s/ Michael Busenkell_
Michael Busenkell (DE 3933)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
Tel: (302) 425-5812
Email: mbusenkell@gsbblaw.com

OTTERBOURG P.C.
Richard G. Haddad (admitted *pro hac vice*)
Andrew S. Halpern (admitted *pro hac vice*)
230 Park Avenue
New York, New York 10169
Tel.: (212) 661-9100
Email: rhaddad@otterbourg.com
          ahalpern@otterbourg.com

SELMAN LEICHENGER EDSON HSU NEWMAN MOORE LLP
Elizabeth M. Brockman (admitted *pro hac vice*)
Calvin S. Whang (*pro hac vice* admission pending)
10880 Wilshire Boulevard, Suite 1200
Los Angeles, California 90024
Tel.: (310) 445-0800
ebrockman@selmanlaw.com
cwhang@selmanlaw.com

7824575.1