## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*, | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors[1]. | ) | Jointly Administered |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR ZOHAR III, CORP. AND ITS AFFILIATED DEBTORS

---

[1]     The Debtors and the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is c/o FTI Consulting, Inc., 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...........................................................................................................................2

I.      PATRIARCH'S OBJECTION SHOULD BE OVERRULED ...........................................2

      A.      The Bankruptcy Code authorizes the Assets to be transferred to the Post-Emergence Entities free and clear of Patriarch's claims ..........................................2

      B.      Patriarch's equitable subordination objection should be overruled ........................3

      C.      Patriarch's setoff objections should be overruled ....................................................6

            1.      The issue Patriarch has presented is not ripe ...............................................7

            2.      The governing statutes authorize the transfer free and clear of setoff rights ....................................................................................................8

            3.      Equitable considerations do not dictate a different result ..........................12

      D.      Patriarch's remaining objections are resolved by the proposed Confirmation Order ...............................................................................................14

II.     THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE ........................................................15

      A.      The Plan should be confirmed as modified in the "Third Amended" Plan ...........16

      B.      Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code .............................................................................................17

            1.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code .............................................................................18

            2.      The Plan Complies with Section 1123(a) of the Bankruptcy Code ...........20

            3.      The Plan Complies with Section 1123(b) of the Bankruptcy Code ...........24

      C.      Section 1129(a)(2): The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code ......................................................................38

      D.      Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law .........................................................................40

E.    Section 1129(a)(4): The Plan Provides that Professional Fees and
      Expenses Are Subject to Court Approval ...............................................................40

F.    Section 1129(a)(5):  The Debtors Have Disclosed All Necessary
      Information Regarding Directors, Officers, and Insiders .....................................41

G.    Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes
      Subject to the Jurisdiction of Any Governmental Regulatory Commission..........42

H.    Section 1129(a)(7): The Plan Is in the Best Interest of All Creditors...................43

I.    Section 1129(a)(8): The Plan Complies with Section 1129(a)(8) of the
      Bankruptcy Code, with the Exception of Class 14 and the Deemed
      Rejecting Classes ...................................................................................................44

J.    Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed
      Administrative Claims, Professional Claims, Priority Tax Claims and
      Other Priority Claims.............................................................................................45

K.    Section 1129(a)(10): At Least One Class of Impaired Claims Has
      Accepted the Plan ..................................................................................................46

L.    Section 1129(a)(11): The Plan Provides for the Liquidation of the Debtors.........46

M.    Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid....................47

N.    The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of
      the Bankruptcy Code...............................................................................................47

      1.    The Plan Does Not Discriminate Unfairly.................................................48

      2.    The Plan Is Fair and Equitable..................................................................49

O.    The Plan Satisfies the Requirements of Section 1129(c), (d), and (e) of the
      Bankruptcy Code ...................................................................................................50

CONCLUSION.................................................................................................................51

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court N.Y., N.Y. (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996)..................................................................................17

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)..................................................................................43, 49

*C.I.R. v. Keystone Consol. Indus., Inc.*,
    508 U.S. 152 (1993)..................................................................................9

*Enron Corp. v. New Power Co. (In re New Power Co.)*,
    438 F.3d 1113 (11th Cir. 2006) ..........................................................15

*Florida Dep't of Rev. v. Picadilly Cafeterias, Inc.*,
    554 U.S. 33 ..............................................................................................9

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*,
    209 F.3d 252 (3d Cir. 2000)....................................................................8

*Gruen Mktg. Corp. v. Asia Commercial Co. (In re Jewelcor Inc.)*,
    150 B.R. 580 (Bankr. M.D. Pa. 1992) ..................................................37

*In re Adelphia Comm'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)..................................................28

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988)..................................................15

*In re Armstrong World Indus., Inc.*,
    432 F.3d 507 (3d Cir. 2005)..................................................................47

*In re Barney & Carey Co.*,
    170 B.R. 17 (Bankr. D. Mass. 1994) ....................................................48

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990)....................................................48

*In re Continental Airlines*,
    134 F.3d 536 (3d Cir. 1998)..............................................................8, 9

*In re De Laurentiis Ent. Grp. Inc.*,
    963 F.2d 1269 (9th Cir. 1992) .......................................................................8, 9, 13

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ......................................................3, 9, 10, 11

*In re Dura Auto. Sys., Inc.*,
    379 B.R. 257 (Bankr. D. Del. 2007) ..................................................................47

*In re Dynamic Tooling Sys., Inc.*,
    349 B.R. 847 (Bankr. D. Kan. 2006) ..................................................................11

*In re Flour City Bagels, LLC*,
    No. 16–20213, 2017 WL 3531494 (Bankr. W.D.N.Y. Aug. 16, 2017)...................11

*In re Glob. Safety Textiles Holdings LLC*,
    No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009)..............15

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ..................................................................29

*In re Insilco Techs., Inc.*,
    480 F.3d 212 (3d Cir. 2007).................................................................................4

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)..............................................................................17

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part*, *rev'd in part on other*
    *grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *In re Johns-Manville Corp.*, 843
    F.2d 636 (2d Cir. 1988)......................................................................................48

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (D. Del. 2003).........................................................................47, 48

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)................................................................29

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ..................................................................39

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ..................................................................17

*In re Orexigen Therapeutics, Inc.*,
    990 F.3d 748 (3d Cir. 2021)................................................................................7

*In re Owens Corning,*
    419 F.3d 195 (3d Cir. 2005) ...................................................................................37

*In re PPI Enters. (U.S.), Inc.,*
    228 B.R. 339 (Bankr. D. Del. 1998) .....................................................................39

*In re PWS Holding Corp.,*
    228 F.3d 224 (3d Cir. 2000) .......................................................................35, 38, 39

*In re Resorts Int'l, Inc.,*
    145 B.R. 412 (Bankr. D.N.J. 1990) ......................................................................40

*In re Rubicon U.S. REIT, Inc.,*
    434 B.R. 168 (Bankr. D. Del. 2010) .....................................................................48

*In re Sabine Oil & Gas Corp.,*
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ..................................................................28

*In re Spansion, Inc.,*
    426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................32

*In re Stone & Webster, Inc.,*
    286 B.R. 532 (Bankr. D. Del. 2002) .....................................................................37

*In re TK Holdings Inc., et al.,*
    ECF No. 2109, No. 17-11375-BLS (Bankr. D. Del. Feb. 16, 2018) ......................11

*In re Trans World Airlines, Inc.,*
    275 B.R. 712 (Bankr. D. Del. 2002) ................................................................10, 12

*In re Tribune Co.,*
    464 B.R. 126 (Bankr. D. Del. 2011) .........................................................15, 28, 29

*In re Tribune Co.,*
    972 F.3d 228 (3d Cir. 2020) .....................................................................................9

*In re Wash. Mut., Inc.,*
    442 B.R. 314(Bankr. D. Del. 2011) ......................................................................29

*In re Wash. Mut., Inc.,*
    461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, No. 08-12229 MFW,
    2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) ................................................6

*In re Zenith Elecs. Corp.,*
    241 B.R. 92 (Bankr. D. Del. 1999) ......................................................29, 30, 32, 34

*Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.),*
    329 B.R. 491 (D.N.J. 2005) ..................................................................................40

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012)................................................................13

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
    872 F.2d 36 (3d Cir. 1989)...............................................................................24, 25

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993)...............................................................................................9

*U.S. v. Norton*
    717 F.2d 767 (3d Cir. 1983)...............................................................................9, 14

*United States v. Energy Res. Co.*,
    495 U.S. 545 (1990)..............................................................................................11

**STATUTES**

11 U.S.C § 105(a) ...................................................................................................37

11 U.S.C. § 330......................................................................................................40

11 U.S.C. § 331......................................................................................................40

11 U.S.C. §  363...........................................................................................9, 10, 11, 27

11 U.S.C. § 365......................................................................................................24

11 U.S.C. § 502(a) ...................................................................................................7

11 U.S.C. § 503(b)...................................................................................................40

11 U.S.C. § 507(a)(1)–(8).........................................................................................45

11 U.S.C. § 510.............................................................................................4, 5, 48

11 U.S.C. § 553.............................................................................................7, 8, 14

11 U.S.C. § 1114......................................................................................................47

11 U.S.C. § 1122........................................................................................17, 18, 20

11 U.S.C. § 1123........................................................................................... *passim*

11 U.S.C. § 1125...............................................................................................35, 38

11 U.S.C. § 1126...............................................................................................38, 44

11 U.S.C. § 1127......................................................................................................16

11 U.S.C. § 1129 ......................................................................................................... *passim*

11 U.S.C. § 1141 ......................................................................................................... 3, 9, 10

11 U.S.C. § 1142 ......................................................................................................... 37

28 U.S.C. § 1930 ......................................................................................................... 46

**RULES**

Fed. R. Bankr. P. 3016 ................................................................................................ 36

Fed. R. Bankr. P. 3018 ................................................................................................ 39

Fed. R. Bankr. P. 9019 ................................................................................................ 32

**OTHER AUTHORITIES**

7 *Collier on Bankruptcy* ¶ 1129.02[2] (16th ed. 2016) ............................................ 38

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ....................... 17

*Process*, 76 Am. Bankr. L.J. 235, 236-37 (2002) ...................................................... 10

Zohar III, Corp., Zohar II 2005-1, Corp., Zohar CDO 2003-1, Corp., Zohar III, Limited, Zohar II 2005-1, Limited, and Zohar CDO 2003-1, Limited (collectively, the "**Debtors**"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this memorandum of law (this "**Memorandum**") in support of confirmation, pursuant to section 1129 of the Bankruptcy Code, of the *Third Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and Its Affiliated Debtors* (together with the Plan Supplement, and as may be amended, modified or supplemented, the "**Plan**").[2]  The pertinent facts relating to the Debtors' request for confirmation of the Plan are set forth in the Disclosure Statement, the Plan, the *Declaration of Justin Edelson of Reliable Companies Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and Its Affiliated Debtors* (the "**Voting Declaration**"), and the *Declaration of Michael Katzenstein in Support of Confirmation of Third Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and Its Affiliated Debtors* filed contemporaneously herewith (the "**Katzenstein Declaration**," and together with the Voting Declaration, the "**Declarations**")**.** The Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      These chapter 11 cases have been pending for more than four years and the Debtors are on the precipice of exiting under a chapter 11 plan.  The Debtors have proposed a Plan that has been unanimously accepted by all parties who were eligible to vote on it and actually did so.[3]  After

---

[2]      Capitalized terms used but not defined herein have the meaning ascribed to them in the Plan.

[3]      The Indenture Trustee was eligible to vote its claims in Class 14 of the Plan.  However, based on its interpretation of section 5.3 of the Zohar I Indenture, it advised the Debtors that it

extensive discussions with the Office of the United States Trustee and the Indenture Trustee, the Debtors have resolved all potential objections to the Plan that such parties may have raised.

2.      A singular (and limited) objection to confirmation has been lodged by Patriarch.[4] For the reasons set forth in Part I of this Memorandum, Patriarch's remaining objections should be overruled. For the reasons set forth in Part II of this Memorandum, the Debtors have established that all requirements for confirmation of the Plan have been satisfied. Accordingly, the Court should enter the Confirmation Order[5] and confirm the Plan.

## ARGUMENT

## I.      PATRIARCH'S OBJECTION SHOULD BE OVERRULED

3.      Under the Plan, the Debtors are proposing to sell or otherwise transfer their assets, including Litigation Assets that have been asserted against Patriarch, free and clear of all claims, liens and other interests against the Debtors and their assets. Through the Objection, Patriarch asks this court to find that such a free and clear sale or transfer should, nonetheless, impose on the Asset Recovery Entities and Litigation Trust (which will be referred to herein as the "**Post-Emergence Entities**") that will acquire those assets the burdens of various claims that Patriarch has asserted against the Debtors or the Debtors' creditors. The court should decline to do so.

### A.      The Bankruptcy Code authorizes the Assets to be transferred to the Post-Emergence Entities free and clear of Patriarch's claims

4.      The Bankruptcy Code clearly and plainly states that "property dealt with by the plan (in these cases, the Litigation Assets, among other assets) is free and clear of all claims and

---

believes it was not permitted to vote on the Plan. Notwithstanding its abstention from voting, the Indenture Trustee has lodged no objection to the Plan.

[4]      *See* Docket No. 3326 (the "**Objection**"). For ease of reading, the Debtors will use the shortened term "Patriarch" to refer to the Patriarch Stakeholders, as defined in the Plan and Objection.

[5]      A proposed Confirmation Order has been filed contemporaneous herwith.

interests of creditors [and] equity security holders," unless the Plan, Confirmation Order or section 1141(d)(2) and (3) provide otherwise.  *See* 11 U.S.C. § 1141(c).  Sections 1141(d)(2) and (3) are not applicable,[6] and the Plan and proposed Confirmation Order each expressly provide that the Asset Recovery Entities and Litigation Trust will receive the Debtors' assets (including the Litigation Assets) free and clear of "liens, Claims and other interests."  *See* Plan, Arts. 6.6(d) and 6.8(d).  The Court has clear statutory authority to implement disposition of the Debtors' assets under the Plan free and clear of Patriarch's claims,[7] and it should find that the Post-Emergence Entities are not liable for the claims or interest that Patriarch asserts or may hold against the Debtors and their assets.

### B.    Patriarch's equitable subordination objection should be overruled

5.     Patriarch argues that the transfer of the Debtors' assets to the Post-Emergence Entities "must be made subject to the Patriarch Stakeholder's equitable subordination claims."[8] As an initial matter, Patriarch concedes that its "equitable subordinate claims … are not claims against the Debtors or liens against their assets" or even interests.[9]  Given that its equitable subordination claims are not claims, liens or interests against or in the Debtors or their assets, Patriarch appears to be requesting that the Court create for it an *in rem* interest in the Debtors'

---

[6]     Section 1141(d)(2) concerns individual debtors and is not applicable here.  11 U.S.C. § 1141(d)(2).  Section 1141(d)(3) provides that a discharge is not available in a liquidating chapter 11 case.  11 U.S.C. § 1141(d)(3).  This subsection does not provide that a party receiving assets from a debtor under a chapter 11 plan is liable for any claim of the debtor, whether discharged or not, so it is not applicable to the present situation.

[7]     *See In re Ditech Holding Corp.*, 606 B.R. 544, 588 (Bankr. S.D.N.Y. 2019) ("The Court therefore sees no reason why section 1141(c) cannot provide that the property transferred to the Buyers be "free and clear" of claims upon confirmation, just as it would be free and clear of liens. .. . [I]t does not follow that section 1141(c) cannot be invoked to provide that the property dealt with by the plan upon confirmation will be free and clear of claims.").

[8]     Obj. ¶ 7.

[9]     Obj. ¶ 5 and accompanying n. 5.

assets that does not exist today.  However, it offers no authority for such a measure, and the Court should decline to take that measure.

6.       As the Third Circuit has held, an "equitable subordination action . . . seeks to modify the treatment of . . . allowed claims."[10]  Thus, Patriarch's equitable subordination action is simply derivative of the claims Patriarch asserts against the Debtor.[11]  As noted in Part I(A) of this Memorandum, the Debtors' assets can be sold and transferred to the Post-Emergence Entities free and clear of Patriarch's claims (and any rights attendant to such claims).  All Patriarch is entitled to receive from the Debtors on account of its claims against them, is what the Plan provides for it—nothing.[12]

7.       The Zohar Indentures are the primary contracts governing the relationship between the Debtors and their principal creditors and shareholders, including Patriarch.  Those documents point to one inescapable conclusion—unless the Debtors' Class A Noteholders are paid in full (which they will not be under the Plan), the Patriarch parties are not entitled to any recovery from the Debtors' assets,[13] including the valuable claims against Patriarch included as part of the Litigation Assets.[14]  The Plan, through its classification and treatment scheme and enforcement of

---

[10]     *In re Insilco Techs., Inc.*, 480 F.3d 212, 219 (3d Cir. 2007).

[11]     Section 510(c) only permits the subordination of one allowed claim to another allowed claim.  *See* 11 U.S.C. § 510(c) (the Court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.").  The Debtors do not concede that Patriarch has any allowed claims and anticipate that objections to the allowance of the proofs of claim Patriarch filed in April will be sought in due course under a variety of theories.

[12]     The one exception is with respect to any unpaid senior collateral manager fees, which, if Allowed, would be part of the Patriarch Disputed CMA Fee Claims that are Unimpaired under the Plan.  *See* Plan, Articles 2A, 9A, and 14A.

[13]     *But*, see note. 12, *supra*.

[14]     Various provisions of the Zohar Indentures state and reinforce these inter-creditor arrangements, including subordination, turn-over, and no-action provisions.  *See, e.g.,* Zohar Indentures §§ 2.6, 5.8, 5.9, 11.1, 13.1

the subordination and priority of payment provisions of the Zohar Indentures, implements this result.[15] And Patriarch has not objected to the classification and treatment of Claims and Interests under the Plan—nor can it.

8.     Patriarch has twice sought to avoid the result dictated by the Zohar Indentures and embodied in the Plan.  Both times the Court has soundly rejected Patriarch's efforts.

9.     _First_, the Court issued a thorough, well-reasoned 40-page opinion rejecting entirely Patriarch's request to equitably subordinate the claims of various senior creditors to the claims of Patriarch, concluding that any efforts by Patriarch to further advance its asserted equitable subordination rights would be "futile and potentially abusive to the Defendants and this Court."[16] _Second_, Patriarch sought a stay of the Subordination Dismissal Opinion and Order.  The Court rejected that request,[17] finding that Patriarch: had "not sufficiently demonstrated a reasonable likelihood of their appeal success;" in moving, did not even "present much legal analysis in support" and "in part, mischaracterize[d] . . . the Court's rulings;" and ultimately, did not "convince the [Court] that [Patriarch has] a reasonable chance of success on appeal."[18]

10.     Having rejected the equitable subordination claims raised by Patriarch, this Court should proceed to enforce the Subordination Dismissal Opinion and Order in connection with

---

[15]     Under section 510(a) of the Bankruptcy Code, this Court can and should enforce the subordination provisions set forth in the Indenture.  _See_ 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.").

[16]     _See Memorandum Opinion and Order on Defendants' Motions to Dismiss the Amended Complaint of Lynn Tilton and the Patriarch & Octaluna Entities for Equitable Subordination_ ("**Subordination Dismissal Opinion and Order**"), Adv. Proc. No. 19-50390 (KBO) (Bankr. D. Del. Mar. 25, 2022), Adv. Docket No. 236, at 40.

[17]     Adv. Proc. No. 19-50390 (KBO) (Bankr. D. Del. Mar. 25, 2022), Docket No. 264.

[18]     Apr. 13, 2022 Hr'g Tr. 20:14–25, 21:18–19.

consideration and ultimate Confirmation of the Plan.[19]  The Plan properly classifies claims and interest, so it should be confirmed without any modification concerning Patriarch's equitable subordination claims vis a vis the Debtors' assets.

### C.    Patriarch's setoff objections should be overruled

11.    Having failed to prevail on reversing the contractual priorities under the Zohar Indentures, which (if successful) would have given it control over the Litigation Assets asserted against it, Patriarch seeks to substantially de-value those Litigation Assets by the amount of its deeply subordinated and deeply out-of-the money B Notes (and other out of the money claims that are treated as General Unsecured Claims under the Plan).

12.    As noted in Part I(A) of this Memorandum, the Post-Emergence Entities are not assuming and will not be subject to the claims asserted by Patriarch.  Patriarch, however, asks this Court to find that its purported setoff rights survive the free and clear (i) sale of Zohar II's and Zohar III's assets (which include their respective Litigation Assets) to Zohar II Recovery LLC and Zohar III Recovery LLC and the subsequent transfer of those Litigation Assets to the Litigation Trust, and (ii) Zohar I's direct transfer of its Litigation Assets to the Litigation Trust—arguing that

---

[19]    *See In re Wash. Mut., Inc.*, 461 B.R. 200, 219-20 (Bankr. D. Del. 2011), vacated in part, No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).  In *Washington Mutual*, certain creditors asserted that they owned certain assets, the Court found that they did not, the creditors appealed the order and during the pendency of the appeal, the debtors proposed a plan that transferred those assets to another creditor.  The appellants-creditors objected to confirmation on the grounds that the court could not consider confirmation of the plan that disposed of the disputed assets while their appeal was pending.  Judge Walrath found that the plan was consistent with her ruling that the debtors owned the assets and that she had authority to enforce her order (*which had not been stayed*, like the Subordination Dismissal Opinion and Order).  She also found that she would enforce her order and overrule the objection because acceding to the appellants-creditors' request "would preclude the Court from dealing with confirmation of any plan of reorganization that implicates the [disputed assets] and possibly stall th[e] bankruptcy cases indefinitely."  *Id.* at 220.

both statutory authority (section 553 of the Bankruptcy Code) and principles of equity require that result. They do not. The Court should overrule Patriarch's objections on three grounds.

### 1. The issue Patriarch has presented is not ripe

13. There is no setoff before the Court today, and any right of setoff will be subject to myriad considerations. At a foundational level, the essential predicates for a setoff—a debt owed to the Debtor and a claim against the Debtor[20]—have not yet been established. The claims and causes of action against Patriarch that constitute Litigation Assets have not yet been adjudicated and, therefore, there is no present "debt" owing by Patriarch to form the basis of a setoff. And Patriarch's claims against the Debtors, assuming *arguendo* that the Litigation Assets will be subject to such claims post-Effective Date, have not yet been Allowed.[21] Further, the Bankruptcy Code merely preserves (in certain instances) state law rights to setoff; it does not create them.[22] Whether such a set off right exists, and was preserved and can be enforced (against any party) pursuant to section 553 of the Bankruptcy Code, has not been proven to this Court in the context of confirmation. Accordingly, the Court can refrain from deciding the impact of confirmation on any hypothetical setoff rights and find that the Plan provides for the sale and transfer of assets free

---

[20]    *See* 11 U.S.C. § 553 (". . .any right of a creditor to offset a mutual debt owing by such creditor to the debtor . . . against a claim of such creditor against the debtor …").

[21]    Section 553 of the Bankruptcy Code only preserve set off rights, among other things, to the extent of an allowed claim. *See* 11 U.S.C. § 553. The Code provides that claims are allowed unless a party in interest objects. *See* 11 U.S.C. § 502(a). Further, under the Plan, the Debtors continue to have the right to object to Patriarch's claims before they are Allowed. *See* Plan, Articles 1.9, 1.52, 8.2 & 8.5 (providing process for disputing and allowing filed proofs of claim). The Debtors believe there are a multitude of grounds to object to Patriarch's claims and such objections will be timely raised.

[22]    *In re Orexigen Therapeutics, Inc.*, 990 F.3d 748, 753 and N. 8 (3d Cir. 2021) ("The parties agree, as an initial matter, that to assert a setoff exception under § 553, a right to setoff must exist under applicable state law. . . . They are correct.").

and clear of setoff rights to the maximum extent permitted under applicable law, rather than adjudicate specific holder's set off rights.

### 2.    The governing statutes authorize the transfer free and clear of setoff rights

14.    If the Court considers the impact of the Plan on Patriarch's setoff rights in the context of Confirmation, as a statutory matter, the Plan will transfer the Debtors' assets free and clear of any setoff rights.  The Third Circuit has held that the preservation of the right to setoff set forth in section 553 of the Bankruptcy Code must yield to the "free and clear" provisions of the Bankruptcy Code.  As acknowledged by Patriarch, in *Folger Adam Security,* the Third Circuit held that a debtor's sale of its assets free and clear results in a sale free and clear of set-off rights that were not exercised prior to the petition date.[23]  Patriarch tries to escape the Third Circuit's holding in *Folger Adam Security* by distinguishing between sales under section 363 and section 1141 and further relying on the Ninth's Circuit's decision in *De Laurentiis* (and its progeny) which, in effect, found that section 553 and section 1141 were in direct conflict and, further, that section 553 prevailed in that conflict.[24]  But in *Continental,* the Third Circuit was presented squarely with the arguments raised in *De Laurentiis* and stated it was "not persuaded . . . that § 1141 may be disregarded when a set off is asserted."[25]  The Third Circuit declined to adopt the blanket holding of *De Laurentiis* and, instead, found that section 1141 can extinguish setoff rights.[26]

[23]    *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 262-64 (3d Cir. 2000).

[24]    *Cf.* Obj. ¶ 10 and n. 14 (citing *In re Holder, In re De Laurentiis Entertainment Group, Inc., In re BOUSA Inc.,* and *In re South Park Care Associates, Inc.*)

[25]    *In re Continental Airlines*, 134 F.3d 536, 541 (3d Cir. 1998).  *Continental* followed the Third Circuit's prior decision in *U.S. v. Norton* 717 F.2d 767 (3d Cir. 1983) which found that confirmation of a plan (under chapter 13 of the Bankruptcy Code) foreclosed the IRS from asserting rights of set off that had not been exercised prior to confirmation.

[26]    While the Third Circuit in *Continental*, held that a set-off right that is timely acted upon may not be extinguished by the discharge in a <u>*reorganization*</u> proceeding, the court in *Continental*

15.     This court should interpret the free and clear provisions of section 1141(c) in a manner that is consistent with-and no less restrictive than-the manner in which they would be implemented in a free and clear sale under section 363(f).  As a textual matter, section 1141(c) provides that assets treated under a plan are free and clear of claims and interest, whereas section 363(f) is limited merely to transfers free and clear of interests.  The Court should, therefore, not apply section 1141(c) in a manner that is narrower than how section 363(f) has been interpreted by the Third Circuit and applied with respect to setoffs.[27]  The Bankruptcy Court for the Southern District of New York reached that same conclusion in *Ditech Holding*, a case relied on by

---

did not opine on how the free and clear provisions of section 1141(c) would impact an asserted (but not exercised) right of setoff when the debt owed by the creditor to the Debtors was transferred to a third-party under a plan.  Section 10.8 of the Plan, consistent with *Continental*, provides for a bar on a creditor's exercise of any setoff rights where such right was not timely preserved in a filing with the Court pre-confirmation.  However, that section of the Plan does not "attach" those asserted setoff rights to specific assets of the Debtors and cause them to travel with those assets when they are sold or otherwise transferred to a third party under the Plan.

[27]     *See Florida Dep't of Rev. v. Picadilly Cafeterias, Inc.*, 554 U.S. 33, 39 ("'[I]dentical words used in different parts of the same act are intended to have the same meaning[.]'") (quoting *C.I.R. v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993)) ("It is a normal rule of statutory construction … that identical words used in different parts of the same act are intended to have the same meaning[.]") (internal citations and quotations omitted); *In re Tribune Co.*, 972 F.3d 228, 238 (3d Cir. 2020) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 460 (1993) ("Although these cases interpret different sections of the [Bankruptcy] Code, their analysis applies equally to § 1129(b)(1) because '[p]resumptively, identical words used in different parts of the same act are intended to have the same meaning.'")); *see also Keystone Consol.*, 508 U.S. at 159 (in analyzing the meaning of the phrase "sale or exchange" within different sections of the tax code, stating "[f]urther, the Code must be given as great an internal symmetry and consistency as its words permit.").  The Court in *Ditech Holding* quoted favorably one commentator for the proposition that "As would be expected given the more extensive process involved in plan confirmation, the literal language of §§ 1123 and 1141 gives the bankruptcy court broader authority to approve sales free and clear of claims and interests than does § 363(f), which requires little in the way of notice, disclosure, and an opportunity for objectors and alternate bidders to actually be heard."  *In re Ditech Holding Corp.*, 606 B.R. 544, 587 (Bankr. S.D.N.Y 2019) (quoting George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process*, 76 Am. Bankr. L.J. 235, 236-37 (2002).

Patriarch.[28]  In *Ditech Holding*, the Court found that a chapter 11 plan that involved a sale of the debtors' assets could effectuate a sale of those assets free and clear of certain setoff rights asserted by the debtors' customers but that such setoff rights could continue to be asserted against any assets retained by the Debtors.[29]  As a practical matter a debtor should not be deprived of the valuable free and clear right with respect to setoff simply because it determines to sell its assets under a plan (with the additional benefits to its estate from a chapter 11) rather than a section 363 sale.  Here, the senior Noteholders could have achieved the same results for themselves under a section 363 sale followed by a potential liquidating plan, but would not have necessarily been required to support or finance the chapter 11 plan—to the detriment of the Debtors' Estates.

16.    Further, there is no basis for the distinction Patriarch tries to develop.  The Plan relies on both sections 363 and 1123 of the Bankruptcy Code to authorize the sale and transfer of assets to the Post-Emergence Entities.  *See* Plan, Art. 6.1(e).  This court has previously held that a sale implemented under a chapter 11 plan is entitled to a finding that the assets transferred are free and clear under section 363(f).[30]  Further, section 1123(b)(6) of the Bankruptcy Code permits the

---

[28]    *Ditech Holding.*, 606 B.R. at 588 ("Accordingly, while the Second Amended Plan will need to withstand scrutiny under the standards of section 1129 before it is confirmed and the free and clear sales are effectuated, it does not follow that section 1141(c) cannot be invoked to provide that the property dealt with by the plan upon confirmation will be free and clear of claims.").

[29]    *See Ditech Holding,* 606 B.R. at 596.  The Court relied on two cases from this Circuit: *Folger Adam Security*, discussed *supra*, for the proposition that a sale can be effectuated free and clear of setoff rights not exercised prior to the petition date; and *In re Trans World Airlines, Inc.*, 275 B.R. 712, 718 (Bankr. D. Del. 2002), for the proposition that a sale of assets to a non-debtor purchaser free and clear of set-off right preserved those set off rights as against the debtor-seller.

[30]    *See* Feb. 16, 2018 Hr'g Tr. at 172:2–5  *In re TK Holdings Inc., et al.*, ECF No. 2109, No. 17-11375-BLS (Bankr. D. Del. Feb. 16, 2018) ("I am prepared to find that KSS is entitled to all of the protections available under Section 363(m), as a good faith purchaser and under 363(f), as a purchaser of assets free and clear of liens, claims, and encumbrances."); *see also In re Dynamic Tooling Sys., Inc.*, 349 B.R. 847, 855 (Bankr. D. Kan. 2006) (stating that the acquisition of the Debtors' assets "can only be characterized as a sale under § 1123(b)(4) and, to the extent the sale is made free and clear of liens and interests, the concepts of § 363(f) governing such sales are implicated" in an order confirming confirmation of a plan); *In re Flour City Bagels, LLC*, No. 16–

Debtors to include in the Plan "any other appropriate provision not inconsistent with the applicable provisions of this title,"[31] and this "statutory directive [is] consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationship."[32]  Accordingly, section 1123(b)(6) allows for the Plan to implement a free and clear transfer to the Post-Emergence Entities that is no less burdensome to the purchaser (i.e., free and clear of setoff rights consistent with *Folder Adam Security*) as could be achieved in a sale under section 363(f) of the Bankruptcy Code.[33]

17.    Consistent with the Third Circuit's interpretation of "free and clear" in *Folger Adam Security,* Patriarch loses any right it has to assert a setoff against the Debtors' assets once they are transferred to a third-party under the Plan unless it exercised those rights pre-petition.[34] The fact that it asserted those rights (for the first time in a proof of claim filed less than two months

---

20213, 2017 WL 3531494, at *9 (Bankr. W.D.N.Y. Aug. 16, 2017) ("[i]n accordance with the Plan and APA, and pursuant to sections 363(f)(2) and 1123(b) of the Bankruptcy Code, the sale of the Purchased Assets to the Buyer shall be free and clear of all liens, claims, and encumbrances.").

[31]    11 U.S.C. § 1123(b)(6).  In addition, section 1123(b)(5) allows for a plan to "modify the rights of holders of secured claims . . . or of holders of unsecured claims." 11 U.S.C. § 1123(b)(5).

[32]    *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

[33]    *Ditech Holding* is a helpful illustration of this point.  In that case, a principal dispute concerned whether a sale free and clear under a chapter 11 pan was subject to section 363(o) which provides an express exception to a free and clear sale ("notwithstanding subsection (f)") for certain consumer lending actions.  The court in *Ditech Holding* found that section 363(o) would not apply to the sale implemented under the plan, resulting in a more favorable result for the purchaser than could be obtained in a free and clear sale under section 363 alone.  *See Ditech Holding*, 606 B.R. at 591.

[34]    Patriarch has not contended that it exercised any setoff rights prepetition, nor could it have given the contractual limitations on Patriarch under the Zohar Indentures.  Of course, Patriarch conceded its claims were not setoff prepetition when it filed its proof of claims asserting such amounts as outstanding against the Debtors.

ago) is, in the best-case for Patriarch scenario, relevant only to its ability to assert its set off rights against the Debtors.[35]

18.    Sustaining Patriarch's objection would amount to granting to it a free-floating *in rem* right against assets purchased in a "free and clear" sale.  Patriarch has offered no statutory or decisional authority supporting such an imposition, and the Court should decline to do so.

### 3.    Equitable considerations do not dictate a different result

19.    The equities also do not favor affording Patriarch a right to setoff its Claims against the Debtors to reduce recoveries on the Litigation Assets, where these recoveries would otherwise inure to the benefit of the Debtors' contractually senior-in-priority creditors.

20.    The Litigation Assets include more than 40 counts in the Zohar-Patriarch Adversary Proceeding asserting in excess of *a billion dollars* of damages for Patriarch's asserted malfeasance. The principal claims asserted by Patriarch that would form the basis for a setoff arise out of the B Notes with a stated principal amount of $546 million.  These notes were issued for no consideration[36] and were expressly required to be treated as equity under the Zohar Indentures;[37] moreover, they were subordinated to payment in full of all of the Debtors' senior noteholders.[38] Indeed, in a trial regarding the Class B Notes of Zohar I, the District Court for the Southern District of New York summarized the circumstance of the issuance of the Class B Notes as follows:

---

[35]    *Cf. Trans World Airlines, Inc.*, *supra* n. 29.

[36]    *See* Decl. of Carolyn Schiff, Docket No. 504, Ex. 8 ("Subscription Agreement" for Class B Notes issued by Zohar II) ("The issuer acknowledges that the Class B Notes are not being issued for cash[.]"); Zohar II Indenture § 3.2(e) (requiring delivery of "Funding Certificate") and Exh. H ("Funding Certificate" stating proceeds from Class B Notes of $0.00).  The Zohar I and Zohar III Indentures are to similar effect

[37]    *See* Zohar Indentures § 2.9 ("The Issuer and the Holders of the Class B Notes and Class C Notes agree to treat such Notes as equity for tax purposes[.]")

[38]    *See* Zohar Indentures §§ 2.6, 5.8, 5.9, 11.1, 13.1

The Class B Notes were *issued to an affiliate of Patriarch*, called Octaluna, LLC, *for no cash*. . . . The Class B Notes *were zero-coupon notes*, and therefore, they *paid no interest*. Patriarch was the beneficial owner of the Class B Notes. Under the Indenture, the Class B Notes were *fully subordinated to the Class A Notes, with no right to any payments until after the Class A Notes are repaid in full and other claims and expenses are also satisfied*. The Class B Notes *represented the potential back-end gain from Zohar*, and they were *defined as equity, rather than debt*, for federal income tax purposes, but the Indenture provided that the parties could, in the future, amend the Indenture to re-characterize the Class B Note as debt. The Class B Notes were not rated by either Moody's or S & P.[39]

21.     The equities based on the facts here, are a far cry from those presented in *De Laurentiis*, on which Patriarch hangs its "equities" hat. There, the debts were simple contractual claims—the debtor's creditor had actually provided $1.6 million of advertising services to the debtor, and the debtor had licensed $1.25 million of television rights for one of its movies to the creditor.[40] Starting from the most basic premise—an actual exchange of value, the B Notes are clearly distinguishable. *Patriarch paid nothing for them*. But Patriarch seeks to preserve its putative ability to take a dollar-for-dollar reduction for the B Notes against damages that would be awarded against it. Again, *De Laurentiis* is distinguishable. There were no allegations of theft or fiduciary and other misconduct by the creditor in that case, as there are with Patriarch here. And the creditor in *De Laurentiis* had not agreed to, in effect, get in the back of the line for payment under its contracts with the debtor (and its creditors) and then tried to use setoff rights to put itself right to the front of the line. But that is exactly what Patriarch would be doing here if it prevails in asserting any setoff rights. Setoff is, at bottom, a remedy that the Court should grant or deny in

---

[39]     *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 688 (S.D.N.Y. 2012) (emphasis added).

[40]     *In re De Laurentiis Ent. Grp. Inc.*, 963 F.2d 1269, 1271 (9th Cir. 1992).

the exercise of its equitable discretion.[41] As noted above, no actual setoff is before the Court in connection with Confirmation.  But since Patriarch believes equitable considerations are at play, the court should consider the actual equities of this case (which weigh heavily against Patriarch) and not preserve its argument for a setoff against the Litigation Assets.

> **D.      Patriarch's remaining objections are resolved by the proposed Confirmation Order**

22.     Through the Plan, the Debtors do not seek to enjoin Patriarch from prosecuting its appeal of the Subordination Dismissal Opinion and Order nor does the Plan propose for Patriarch to release or enjoin any claims it has against third parties.  *Cf.* Obj. Part II.  To clarify any concerns Patriarch has on these points, the proposed Confirmation Order provides at Paragraph 56:

> Notwithstanding anything contained in the Plan , the Plan Documents or this Confirmation Order to the contrary, (i) except to the extent of exculpation under Plan Section 10.5, neither the Plan nor this Order shall constitute a release of any claims, interests or Causes of Action held by any Patriarch Stakeholders against any non-Debtor; (ii) except to the extent of exculpation under Plan Section 10.5, neither the Plan nor this Order shall constitute an injunction against the commencement of any claims or Causes of Action held by any Patriarch Stakeholder against any non-Debtor or enjoin the continuation of litigation of the Patriarch Disputed CMA Fee Claims pursuant to the terms of the CMA Fee Dispute Documents and the claims asserted in the Amended Equitable Subordination Complain (as defined in the Disclosure Statement), including the appeal of this Court's March 25, 2022 order [Case No. 19-50390-KBO, Adv. D.I. 236]; and (iii) neither the Plan nor this Order shall constitute a release of any Patriarch Stakeholders' defenses against any claims by the Debtors or any of their successors.

23.     Patriarch also objected to the Plan's memorialization and final implementation of the transactions set forth in the Zohar I Sale Documents.  *See* Obj. Part III.  The Debtors, MBIA

---

[41]      *Norton*, 717 F.2d at 772 ("The broad equitable discretion of courts in recognizing setoff rights defined by the common law has been carried over to the Bankruptcy Reform Act of 1978 and in particular to section 553, whose language is permissive, not mandatory.").

and Patriarch have reached an agreement the will preserve the parties' existing rights, litigation claims and positions regarding the effect of the Zohar I Sale Documents up to March 20, 2020, but give effect to them after that date.  As a result, the proposed Confirmation Order provides at Paragraph 55:

> From the Effective Date and thereafter, MBIA shall have all rights to such Zohar I PC Assets free and clear of all claims and interests of the Debtors or any other party; provided, however, that all parties reserve all rights and remedies with respect to their existing litigation claims and positions relating to the beneficial ownership of equity interests prior to March 21, 2020 and the Zohar I Auction, including as set forth in the actions captioned as Zohar CDO 2003-1 v. Patriarch, No. 17-cv-0307-PKC (S.D.N.Y.) and In re Zohar III, Corp. (Tilton v. MBIA Inc.), Adv. Proc. No. 19-ap-50390 (Bankr. D. Del.) (KBO) and the Zohar-Patriarch Adversary Proceeding; provided further, however, that all parties likewise reserve any and all rights and remedies and defenses they may have with respect to any of the foregoing, including with respect to any litigation claims and positions.

24.    Finally, the Debtors are no longer pursuing a waiver of the 14-day stay of the effectiveness of the Confirmation Order.  *Cf.* Obj. Part IV.

## II.    THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE

25.    To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[42]  This Memorandum, the record of the Chapter 11 Cases, the Declarations, and any additional evidence that may be presented at or in connection with the Confirmation Hearing (including by declaration or proffer), will demonstrate, by a preponderance of the evidence, that

---

[42]    *See In re Tribune Co.*, 464 B.R. 126, 151–52, (Bankr. D. Del. 2011) (explaining that the plan proponent bears the burden of establishing the plan's compliance with section 1129 of the Bankruptcy Code) (internal citations omitted).

all applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.  Accordingly, the Plan should be confirmed.

### A.    The Plan should be confirmed as modified in the "Third Amended" Plan

26.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[43]  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who previously accepted the plan, if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or interest of any equity security holder.[44]  Courts interpreting Bankruptcy Rule 3019 have held that a proposed modification to a previously accepted plan will be deemed accepted if such modification is not material or does not adversely affect the way creditors and stakeholders are treated.[45]  Courts have found that a modification is material if "it so affects a creditor . . . who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance."[46]  As such, the focus of the material and adverse change analysis is on the Voting Classes.[47]

---

[43]    *See* 11 U.S.C. § 1127(a).

[44]    *See* Fed. R. Bankr. P. 3019(a).

[45]    *See, e.g., In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009).

[46]    *In re Am. Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (quoting 8 Collier on Bankruptcy ¶ 3019.03, p. 3019–3 (15th ed. 1987)).

[47]    *See Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117–18 (11th Cir. 2006) (if a "modification materially and adversely changes the way that a claim or interest holder is treated," then "the claim or interest holder is entitled to a new disclosure statement *and another vote*" (emphasis added));

16

27.     Subsequent to the Debtors' solicitation of votes to approve or reject the Plan, the Debtors made certain changes to the Plan as originally solicited in response to informal objections from the Indenture Trustee and U.S. Bank, as well as in consultation with the Controlling Party and Controlling Class.  The modifications do not materially and adversely change the treatment provided under the Plan to any Holder of a Claim or Interest.  Indeed, there has been no substantive changes to the actual distributions that will be made to creditors under the Plan.  Many of the changes are largely clarifying or technical in nature and concern the means by which the Post-Effective Entities will conduct themselves, and have been made in consultation with the creditors who will be the largest stakeholders in the Post-Effective Entities (the Controlling Class and Controlling Party).  In addition, as described below, the Plan as amended continues to comply with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Accordingly, no further solicitation is required.

**B.      Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code**

28.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[48]  The legislative history of section 1129(a)(1) of the Bankruptcy Code indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing the classification of claims and contents of a chapter 11 plan, respectively.[49]  As demonstrated below, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code and all other applicable provisions thereof.

---

[48]     *See* 11 U.S.C. § 1129(a)(1).

[49]     H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963; *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

1.    **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code**

29.    Section 1122 of the Bankruptcy Code provides that the claims or interests within a given plan class must be "substantially similar."[50] Section 1122 of the Bankruptcy Code, however, does not require that all substantially similar claims or equity interests be classified together. Instead, courts have recognized that similar claims may be classified separately, provided there is a reasonable basis for doing so.[51] Courts also are afforded broad discretion in approving a plan proponent's classification structure, and should consider the specific facts of each case when making such a determination.[52]

30.    The Plan provides for separate classification of Claims and Interests based upon differences in the legal nature, priority and other appropriate distinguishing characteristics of such Claims and Interests, including, without limitation, the various rights of the Holders under the Zohar Indentures.  The Plan designates twenty-four (24) Classes (twenty-three (23) of Claims and one (1) of Interests).  *See* Plan, Art. II.  Each class is a separate Class for each applicable Debtor, other than Interests in Class 19 this classification scheme complies with section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are substantially similar to each other.  Furthermore, the Plan's classification scheme is based on the similar nature of Claims or Interests contained in each Class, and not on any impermissible classification factor or to affect the outcome of Plan voting:

---

[50]    See 11 U.S.C. § 1122(a).

[51]    *See, e.g.*, *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court N.Y., N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996).

[52]    *See, e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (observing that "Congress intended to afford bankruptcy judges broad discretion [under section 1122] to decide the propriety of plans in light of the facts of each case").

a) Three separate classes for the Other Priority Claims, one for each Debtor grouping;[53]

b) Three separate classes for the Indenture Trustee Claims, one for each Debtor grouping;

c) Five separate classes on account of obligations owed to the Debtors' collateral managers; one entity was appointed collateral manager for three separate Debtors and another entity was appointed collateral manager of only two Debtors;

d) Seven separate classes on account of each tranche of Notes across the three separate Zohar Indentures;

e) Two separate classes for the Credit Enhancement Liability Claims against Zohar I and Zohar II; and

f) Three separate classes for the remaining General Unsecured Claims, one for each Debtor grouping.

31.     Holders of Claims in the Classes listed in the following table are Unimpaired, conclusively presumed to have accepted the Plan, and not entitled to vote to accept or reject the Plan (collectively, the "**Unimpaired Classes**"):

| Class | Description |
|-------|-------------|
| 1 | Zohar III Other Priority Claims |
| 2 | Zohar III Indenture Trustee Claims |
| 2A | Zohar III Patriarch Disputed CMA Fee Claim |
| 2B | Zohar III Ankura CMA Claims |
| 8 | Zohar II Other Priority Claims |
| 9 | Zohar II Indenture Trustee Claims |
| 9A | Zohar II Patriarch Disputed CMA Fee Claim |
| 9B | Zohar II Ankura CMA Claims |
| 13 | Zohar I Other Priority Claims |
| 14A | Zohar I Patriarch Disputed CMA Fee Claim |

32.     Holders of Claims in the Classes listed in the following table are Impaired, and entitled to vote to accept or reject the Plan (collectively, the "**Voting Classes**"):

---

[53]     The Plan proposes to substantively consolidate the Debtors into groupings based on the parent-subsidiary relationship between each of the "Limited" and "Corporation" entities.

| Class | Description |
|-------|-------------|
| 3 | Zohar III A-1 Note Claims |
| 10 | Zohar II Credit Enhancement Claims |
| 14 | Zohar I Indenture Trustee Claims |
| 15 | Zohar I Credit Enhancement Claims |

33.     Holders of Claims and Interests in the Classes listed in the following table are conclusively presumed to have rejected the Plan, and not entitled to vote to accept or reject the Plan (collectively, the "**Deemed Rejecting Classes**"):

| Class | Description |
|-------|-------------|
| 4 | Zohar III A-2 Note Claims |
| 5 | Zohar III A-3 Note Claims |
| 6 | Zohar III B Note Claims |
| 7 | Zohar III General Unsecured Claims |
| 11 | Zohar II B Note Claims |
| 12 | Zohar II General Unsecured Claims |
| 16 | Zohar I A-3 Note Claims |
| 17 | Zohar I B Note Claims |
| 18 | Zohar I General Unsecured Claims |
| 19 | Interests |

### 2.     The Plan Complies with Section 1123(a) of the Bankruptcy Code

34.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements for corporate debtors in connection with confirmation of a chapter 11 plan.[54] As shown below, the Plan complies with each of these requirements, to the extent applicable to Confirmation.

a.     Section 1123(a)(1): Designation of Classes of Claims and Interests

35.     Section 1123(a)(1) of the Bankruptcy Code requires that a chapter 11 plan designate classes of claims and equity interests, subject to section 1122 of the Bankruptcy

---

[54]     *See* 11 U.S.C. § 1123(a).  Section 1123(a)(8) of the Bankruptcy Code applies to cases where the debtor is an individual and, accordingly, is inapplicable to the Debtors and the Plan. *See* 11 U.S.C. § 1123(a)(8).

Code.[55]  The Plan designates twenty-three (23) Classes of Claims and one (1) Class of Interests, in accordance with section 1122 of the Bankruptcy Code.  *See* Plan, Art. II.

   b.     <u>Section 1123(a)(2): Classes that Are Not Impaired by the Plan</u>

36.     Section 1123(a)(2) of the Bankruptcy Code requires that a chapter 11 plan specify which classes of claims or equity interests are unimpaired under such plan.[56]  The Plan specifies that the Unimpaired Classes are Unimpaired.  *See* Plan, Art. II.

   c.     <u>Section 1123(a)(3): Treatment of Classes that Are Impaired by the Plan</u>

37.     Section 1123(a)(3) of the Bankruptcy Code requires that a chapter 11 plan specify how the classes of claims or equity interests that are impaired under such plan will be treated.  *See* U.S.C. § 1123(a)(3). The Plan designates the Voting Classes and the Deemed Rejecting Classes as Impaired, and specifies the treatment of Claims and Interests in such Classes.  *See* Plan, Art. IV.

   d.     <u>Section 1123(a)(4): Equal Treatment Within Each Class</u>

38.     Section 1123(a)(4) of the Bankruptcy Code requires that a chapter 11 plan provide the same treatment for each claim or interest within a particular class, unless the holder of a claim or interest agrees to receive less favorable treatment than other class members.  *See* 11 U.S.C. § 1123(a)(4).  Pursuant to the Plan, the treatment of each Claim or Interest in each Class is the same as the treatment of each other Claim or Interest in such Class, unless the Holder has agreed to receive less favorable treatment than other Holders in such Class.  *See* Plan, Art. IV.

---

[55]     *See* 11 U.S.C. § 1123(a)(1).

[56]     *See* U.S.C. § 1123(a)(2).

e.    <u>Section 1123(a)(5): Adequate Means for Implementation</u>

39.    Section 1123(a)(5) of the Bankruptcy Code requires that a chapter 11 plan provide "adequate means for the plan's implementation."[57]  Article VI of the Plan provides a detailed description of the transactions that are contemplated by the Plan, and the Debtors believe that these transactions provide adequate means for implementation of the Plan.  For each Debtor, the Plan will be implemented by the Wind-Down Administrator, and the Plan contemplates the funding of the Escrow Accounts in the amounts and for the purposes provided in Section 6.1(a) of the Plan. The Wind-Down Administrator will have the rights and responsibilities identified in Article VI of the Plan, including, without limitation, to wind up the Debtors' affairs, ensure that all reports required by the U.S. Trustee are filed, and administer Distributions to Holders of Allowed Administrative and Priority Claims, in the case of the Wind-Down Administrator.

40.    The Plan also contemplates the various emergence transactions set forth in Section 6.1(b)–(e)and 6.17 of the Plan, including the transfer of the Remaining Assets as provided for therein, and the implementation of the MD Credit Bid Transaction.  In addition, the terms and provisions of the Settlement Agreement shall remain in full force and effect from and after the Effective Date, except that MBIA, for the assets acquired under the Zohar I Sale Documents, and the applicable Asset Recovery Managers shall assume the obligations of the Debtors' Chief Restructuring Officer and Independent Director with respect to the monetization process (the "**Monetization Process**") under the Settlement Agreement and July 2 Order for the debt and equity interests in the Portfolio Companies contributed to them on the Effective Date. Finally, the Plan also contemplates the substantive consolidation of the Debtors as provided for in Section 6.4 of the Plan.

---

[57]    *See* 11 U.S.C. § 1123(a)(5).

        f.        <u>Section 1123(a)(6): Prohibitions on Issuance of Non-Voting Securities</u>

41.      The Plan does not provide for the issuance of any non-voting securities.

        g.        <u>Section 1123(a)(7): Provisions Regarding Directors and Officers</u>

42.      Section 1123(a)(7) of the Bankruptcy Code requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."[58]  Here, the Debtors are managed by Chief Restructuring Officer, Michael Katzenstein, and Independent Director, Joseph J. Farnan, Jr. (the "**Independent Director**"), both of whom shall be deemed to have resigned upon the occurrence of the Effective Date.  *See* Plan, Art. 6.5(f).

43.      The Plan Supplement will disclose that New Zohar II LLC will be managed by its sole member, MBIA.  Each of its direct or indirect subsidiaries, Zohar II Intermediate LLC and Zohar II Recovery LLC, will be managed by their respective sole member.

44.      The Plan Supplement will disclose that New Zohar III LLC will be managed by John Greene, a principal of Bardin Hill Investment Partners, LP. (together with its managed funds, "**Bardin Hill**"), whose managed funds are, collectively, the largest Zohar III A-1 Noteholder and DIP Lender.  Each of its direct or indirect subsidiaries, Zohar II Intermediate LLC, Zohar II Recovery LLC and New Stila Holdco LLC, will be managed by their respective sole member.

45.      At Zohar II Recovery LLC and Zohar III Recovery LLC, David Dunn will be appointed as the Asset Recovery Manager, and he will responsible for discharging the obligations of the Asset Recovery Manager of those entities under the Plan.  Mr.  Dunn will also serve as

---

[58]     *See* 11 U.S.C. § 1123(a)(7).

Wind-Down Administrator and Litigation Trustee. The Plan Supplement will disclose the proposed compensation of Mr. Dunn.[59]

46.     Each of these appointments is subject to approval by the Bankruptcy Court in connection with Confirmation. *See* Plan, Art. 6.5(b), 6.6(b), 6.8(b). As required by the Plan, the appointment of Mr. Dunn has been made after consultation with the Controlling Party and the Controlling Class, who are not insiders and represent the largest creditors in the classes receiving distributions under the Plan and have served as the committee under the Settlement Agreement throughout the duration of these Chapter 11 Cases.

47.     In light of the foregoing, the Plan's provisions related to the selection of a Wind-Down Administrator, Asset Recovery Managers and the Litigation Trustee are consistent with the interests of Holders of Claims and Interests and with public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

### 3.     The Plan Complies with Section 1123(b) of the Bankruptcy Code

48.     Section 1123(b) of the Bankruptcy Code sets forth certain permissive provisions that may be incorporated into a chapter 11 plan.[60] Each provision of the Plan is consistent with section 1123(b) of the Bankruptcy Code.

#### a.     Impairment and Unimpairment of Claims and Interests

49.     Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."[61] As discussed above, Claims and Interests in the Voting Classes and the Deemed Rejecting Classes are Impaired, and

---

[59]     MBIA and Mr. Greene will not be compensated.

[60]     *See* 11 U.S.C. § 1123(b).

[61]     *See* 11 U.S.C. § 1123(b)(1).

Claims in the Unimpaired Classes are Unimpaired.  Thus, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

         b.     <u>Assumption and Rejection of Executory Contracts and Leases</u>

50.      Section 1123(b)(2) of the Bankruptcy Code allows a chapter 11 plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases.[62]  Section 9.1 of the Plan provides that, on the Effective Date, all of the Debtors' executory contracts and unexpired leases will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, subject to certain exceptions.  *See* Plan, Art. 9.1.

51.      Assumption or rejection of an executory contract or unexpired lease of a debtor is subject to judicial review under the business judgment standard.[63]  This standard is satisfied when a debtor determines that assumption or rejection will benefit the estate.[64]  Here, as the Plan contemplates the winding down of the Debtors' affairs, the Debtors have exercised appropriate business judgment in proposing a default rejection plan as it pertains to the Debtors' executory contracts and unexpired leases.

52.      Accordingly, the treatment of executory contracts and unexpired leases in the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

         c.     <u>Appointment of Estate Representative</u>

53.      Section 1123(b)(3)(B) provides that a plan may "provide for the retention and enforcement . . . by a representative of the estate appointed for such purpose, of any . . . claim or

---

[62]    *See* 11 U.S.C. § 1123(b)(2).

[63]    *See, e.g.*, *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989).

[64]    *See, e.g., id.*

interest [belonging to the debtor or to the estate]."[65]  In connection with the Litigation Trust, which is discussed in the following section, the Litigation Trustee will be appointed as the estates' representative for purposes of prosecuting the Litigation Assets.   *See* Plan, Art. 6.8(b). Appointment of the Litigation Trustee as a representative of the estate is consistent with, and supported by, section 1123(b)(3)(B) of the Bankruptcy Code.

d.    Sale of Assets Free and Clear

54.    Section 1123(b)(4) provides that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests."[66]  Section 1123(b)(5) provides that a plan may "modify the rights of the holders of secured claims … or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims."[67]   Finally, a plan may "include any other provision not inconsistent with the applicable provisions of this title."[68]

55.    *First*, the Plan provides for a sale of all the assets of Zohar II and Zohar III (including their respective Litigation Assets)[69] to Zohar II Recovery LLC and Zohar III Recovery LLC, respectively, and for those entities to subsequently transfer the Litigation Assets they acquire to the Litigation Trust.  *See* Plan, Art. 6.1 (c)–(d), 6.8(a), (d), Plan Supp. Ex. A (post-Effective Date

---

[65]    11 U.S.C. § 1123(b)(3)(B).

[66]    11 U.S.C. § 1123(b)(4).

[67]    11 U.S.C. § 1123(b)(5). Section 1123(b)(5) limits the ability to modify rights with respect to claims secured by a security interest in residential real property, which is not applicable here. *Id.*

[68]    11 U.S.C. § 1123(b)(6).

[69]    "Litigation Assets" means "any Causes of Action, claims or rights to payment beneficially owned by, or that can be asserted by, a Debtor or its Estate as of the Effective Date, including, but not limited to, the claims and causes of action (including counter-claims and defenses) brought, asserted by, or that can be asserted by the Debtors or their Estates in the Zohar-Patriarch Adversary Proceeding, the Stila Proceeding or related to the Portfolio Companies."

organization chart). However, the MD Term Loan Indebtedness owned by Zohar II and Zohar III will be sold to MDHI Holdco LLC, instead of Zohar II Recovery LLC and Zohar III Recovery LLC. *See* Plan, Art. 6.1 (c)–(d), 6.17.

56.     *Second*, the Plan provides for Zohar I to transfer its Litigation Assets to the Litigation Trust on the Effective Date.

57.     Since the value of the assets of Zohar II is not greater than the Allowed amount of the Zohar II Credit Enhancement Liability Claims and the value of the assets of Zohar III is not greater that the Allowed amount of the Zohar III A-1 Note Claims,[70] those Creditors are the only classes of claims participating in the sale transactions under the Plan—ultimately receiving the equity in New Zohar II LLC and New Notes issued by Zohar II Recovery LLC for Zohar II, the equity in New Zohar III LLC and New Notes issued by Zohar III Recovery LLC for Zohar III, and equity in MDHI Holdco LLC's parent and New Notes issued by MDHI Holdco LLC. Likewise, since the value of the remaining assets of Zohar I is not greater than the Allowed amount of the Zohar I Credit Enhancement Liability Claims,[71] no creditors of Zohar I junior to the Zohar I Credit Enhancement Liability Claims are receiving distributions from the Litigation Trust.

58.     The sale of assets to Zohar II Recovery LLC and Zohar III Recovery LLC (and subsequent transfer by each of them to the Litigation Trust) shall be free and clear of Liens, Claims and other interests, as contemplated under the Plan. *See* Plan, Art. 6.6(d); 6.8(d). Such relief is authorized under the Code.[72]

---

[70]     *See* Katzenstein. Decl. ¶¶ 7–8.

[71]     *Id.*

[72]     *See* Memo. Part I(A), I(c)(2); 11 U.S.C §§ 363(f), 1123(b)(4)–(6); 1141(c)

e.      Releases, Exculpations and Injunction

59.     The Plan includes certain release, exculpation and injunction provisions.  *See* Plan. Art. 10.3 – 10.6.  These provisions are proper because, among other things, they are the product of arms' length and good faith negotiations, have received support from the Holders of Claims in the Voting Classes, which voted to accept the Plan, and will be given and made after due notice and an opportunity to object and be heard with respect thereto, as the Plan, the Disclosure Statement and the various related notices each unambiguously state that the Plan contains certain release, exculpation and injunction provisions.  Such provisions are fair and equitable, are given for valuable consideration, and are in the best interests of the Debtors and their Estates.  Notably, no party has objected to the releases or exculpation proposed to be granted by the Debtors or effectuated under the Plan.

60.     In light of this, these provisions are consistent with the Bankruptcy Code and, thus, section 1123(b) of the Bankruptcy Code is satisfied.

(1)      Debtor Release

61.     Under Section 10.3 of the Plan, the Debtors propose to release the Released Parties[73] for and from any and all claims or Causes of Action existing as of the Effective Date or

---

[73]     The Plan defines the "Released Parties" to mean, "collectively, in each case, solely in their respective capacities as such: (a) the Exculpated Parties, (b) Ankura, (c) the Indenture Trustee, (d) each DIP Lender, (e) the Controlling Party, (f) the members of the Controlling Class, (g) all Holders of Claims that vote to accept the Plan, and (h) with respect to each of the Entities described in subsections (c) through (g), such Entity's Related Parties; provided, however, that notwithstanding any provision of the Plan to the contrary, (i) Lynn Tilton, the Patriarch Stakeholders, the respective Affiliates of any of them and their Related Parties (other than the Exculpated Parties and Ankura, if they are Related Parties or Affiliates of the foregoing) shall not be Released Parties and shall not be released under the Plan and (ii) any party that objects to Confirmation of the Plan (by filing an objection with the Court or appearing at the Confirmation Hearing and making an objection on the record), files a motion to stay the effectiveness of the Confirmation Order or files an appeal of the Confirmation Order shall not be a Released Party and shall not be released under the Plan."

thereafter whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity, arising from or related to any actions, transactions, events or omissions occurring on or before the Effective Date relating to the Debtors, in anyway whatsoever, or the Chapter 11 Cases, other than any act or omission constituting gross negligence, actual fraud or willful misconduct by any of the Released Parties (the "**Debtor Release**"). *See* Plan, Art. 10.3. A plan that proposes to release a claim or a cause of action belonging to the Debtors' Estates is a "settlement" within the scope of section 1123(b)(3)(A) of the Bankruptcy Code.[74]

62. Bankruptcy courts typically consider the following *Master Mortgage* factors to determine whether a release by a debtor should be approved: (a) whether there is an identity of interest between the debtor and the third party, such that a such against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (b) whether the non-debtor has made a substantial contribution; (c) the essential nature of the release to the extent that, without the release, there is little likelihood of success; (d) an agreement by a substantial majority of creditors to support the release, specifically if the impacted class or classes "overwhelmingly" vote to accept the plan; and (e) whether there is a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the release.[75] Importantly, a court need not find

---

[74]     *See In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) ("Bankruptcy Code § 1123 provides that a play may provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or the estate.'"). *See also In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016) ("Section 1123 of the Bankruptcy Code states that a chapter 11 plan may 'provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate.'") (citing 1123(b)(3)(A) of the Bankruptcy Code); *In re Adelphia Comm'ns Corp.*, 368 B.R. 140, 273 (Bankr. S.D.N.Y. 2007) ("Section 1123(b)(3)(A) provides that a plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate.").

[75]     *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (*citing In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

that all of these factors apply to approve a debtor's release of claims.[76]  Rather, such factors are "helpful in weighing the equities of the particular case after a fact-specific review."[77]

63.     An analysis of these factors demonstrates that the Debtor Release is fair, reasonable, in the best interests of the Debtors and their Estates, and appropriate under the circumstances of the Chapter 11 Cases.

64.     *First*, there is an identity of interest between the Debtors and the Released Parties because such parties all "share the common goal" of confirming and implementing the Plan, which will allow the Chapter 11 Cases to be wound down in a timely and efficient manner.[78]  Furthermore, the Plan is the result of arm's length and good faith negotiations among, and efforts by, a number of the Released Parties.[79]  The Released Parties have been critical participants in various aspects of the Chapter 11 Cases, including, without limitation, in connection with the Monetization Process, and share a common goal with the Debtors in seeing the Plan succeed and ensuring that the Chapter 11 Cases are wound down in a timely and efficient manner.[80]  Moreover, critical to the success of the Plan is the ability to use the encumbered cash of (or new money financing provided by) the Debtors' Noteholders to ensure that the confirmation requirement of paying allowed administrative and priority claims in full and an orderly wind down of the Debtors can be

---

[76]     *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).

[77]     *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013).

[78]     *See In re Tribune Co.*, 464 B.R. at 187 (finding an identity of interest existed between the debtors and the released parties because they "share[d] the common goal of confirming" the plan and implementing the global settlement).  In contrast, any party that objects to Confirmation of the Plan, files a motion to stay the effectiveness of the Confirmation Order, or files an appeal of the Confirmation Order shall not be a Released Party.

[79]     *See* Katzenstein Decl.  ¶ 16.

[80]     *Id.* ¶ 17.

satisfied.[81]  Simply put, like the Debtors, these parties desire to confirm the Plan and implement the transactions contemplated thereunder, and their involvement and support for the Plan was necessary to do so.[82]

65.    Beyond sharing a common goal with the Released Parties, the Debtors have certain indemnification and contribution obligations to the Released Parties under the Debtors' organizational documents and certain other agreements, including the Zohar Indentures and related Transaction Documents, the New Agent Order, and the Zohar II and Zohar III Ankura CM Agreements (as applicable, and each as defined in the Disclosure Statement).[83]

66.    _Second_, the Released Parties are providing necessary contributions in exchange for the Debtor Release.  For example, the Debtors' Chief Restructuring Officer, the personnel assisting him, and the Debtors' Independent Director have continued to manage the Debtors' business affairs throughout the Chapter 11 Cases, and helped to develop and implement the Debtors' chapter 11 strategy (including in connection with the Monetization Process) and otherwise navigate the Debtors through a complex, protracted and often highly contentious chapter 11 process.

67.    Additionally, although the Indenture Trustee (for the benefit of the Noteholders) has liens and superpriority claims, as applicable, on substantially all of the Debtors' assets, the Noteholders have accepted the Plan at each Debtor in a matter that allows for the Debtor to effectuate the treatment provided for under the Plan for Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims.  Absent this acceptance, these Allowed

---

[81]    _Id._ ¶ 16.

[82]    _See Zenith Elecs._, 241 B.R. at 110 (concluding that certain releases who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed").

[83]    _See_ Katzenstein Decl. ¶ 19.

Claims likely would not recover because the collateral securing the Noteholders' claims, constitutes all of the Debtors' assets. Accordingly, under the circumstances of the Chapter 11 Cases, the value contributed by the Released Parties is sufficient to support the Debtor Release.[84]

68.     _Third_, the Debtor Release is a necessary and integral component of the Plan, and constitutes a sound exercise of the Debtors' business judgment, as attested to in the Katzenstein Declaration.[85]  The Debtor Release was necessary to formulating the Plan, which is the result of arm's-length and good faith negotiations among the Debtors and a number of the Released Parties, including the Indenture Trustee, DIP lender, the Controlling Party and the Controlling Class. During the course of negotiations regarding the Plan, it was clear that the Debtor Release would be a necessary condition to implementing the Plan.  Without the Debtor Release, the Debtors would have been unable to secure the benefits provided by the Plan, as such release was a material term in the negotiations with certain Released Parties for their support of the Plan.  Accordingly, the Debtor Release is essential to Plan consummation and to preserving and maximizing the value of the Debtors' Estates for the benefit of their stakeholders.

69.     _Fourth_, as evidenced by the Voting Declaration and noted herein, the Plan was accepted by every creditor that voted.[86]  Also, interested parties received more than sufficient notice of the Debtor Release, and had ample time to raise any objections thereto, and no such objections were filed.  This degree of consensus and lack of any opposition evidences creditor support for the Debtor Release.

---

[84]     _See_ Katzenstein Decl. ¶ 17.

[85]     _See_ Katzenstein Decl. ¶¶ 16, 20.

[86]     _See, e.g._, Edelson Decl. ¶ 10.

70.    _Fifth_, as noted above, without the Plan and the Debtor Release, it is unknown whether the Indenture Trustee, the Controlling Party, and the Controlling Class would agree to the use of cash collateral to provide for a treatment similar to what is provided for under the Plan for Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims in any theoretical alternatives to the Plan, as discussed above and in the Disclosure Statement.[87]

71.    Ultimately, the Debtor Release represents a valid settlement of all claims and Causes of Action that the Debtors and their Estates may have against the Released Parties as provided for in the Plan, pursuant to section 1123(b)(3)(A) and Bankruptcy Rule 9019, and the Debtors have proposed the Debtor Release based on their sound business judgment and the facts and circumstances of the Chapter 11 Cases.[88]  The Released Parties have been critical participants in various aspects of the Chapter 11 Cases, including the Monetization Process, and share a common goal with the Debtors in seeing the Plan succeed and ensuring that the Chapter 11 Cases are wound down in a timely and efficient manner.[89]

72.    As set forth in the Katzenstein Declaration, based on his participation in the Chapter 11 Cases and his discussions with the Debtors' bankruptcy counsel, the Debtors' Chief Restructuring Officer is not aware of any viable claims and Causes of Action that the Debtors might have against the Released Parties.[90]  Further, this Court previously issued the Subordination

---

[87]    _See_ Katzenstein Decl. ¶¶ 16, 17; _see also Zenith Elecs._, 241 B.R. at 111 (explaining that the fifth factor was met because "the Plan does provide a distribution to the creditors in exchange for the Releases" and supporting that conclusion by explaining that creditors received more under the plan than they would have in a liquidation).

[88]    _See In re Spansion, Inc._, 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.").

[89]    _See_ Katzenstein Decl. ¶¶ 16, 17.

[90]    _See_ Katzenstein Decl. ¶ 18.

Dismissal Opinion and Order, dismissing in its entirety without leave to amend Patriarch's complaint to equitably subordinate the claims of certain noteholders. In doing so, this Court found that the Controlling Party, the Controlling Class and the Indenture Trustee (and others) did not act inequitably as alleged, including that the Controlling Party and the Controlling Class did not engage in any inequitable conduct on and after the Petition Date. Additionally, on September 29, 2021, the Honorable P. Keven Castel of the United States District Court for the Southern District of New York entered an order in that certain action titled *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-00307-PKC dismissing substantially similar (if not identical) claims of misconduct by the Patriarch Stakeholders against, among others, the Controlling Party, the Controlling Class, and the Indenture Trustee as were asserted in the Amended Equitable Subordination Complaint.

73.    In light of the foregoing, the Debtor Release should be approved.

(2)    Third-Party Releases

74.    Section 10.4 of the Plan also provides for certain releases of the Released Parties by the Releasing Parties[91] (the "**Third-Party Releases**"). The Debtors believe that the Third-Party Releases are appropriate here because, under the circumstances, they are consensual. Specifically, the Third Party Releases are being given by (a) certain of the Released Parties that negotiated the Plan and (b) Holders of Claims that voted to accept the Plan.[92] *See* Plan, Art. 1.118, 1.119, 10.4.

---

[91]    "Releasing Parties" means "collectively, in each case only in its capacity as such: (a) Ankura, (b) the Indenture Trustee, (c) the DIP Lender, (d) the Controlling Party, (e) the members of the Controlling Class, and (f) all Holders of Claims that vote to accept the Plan; *provided*, *however*, that if any of the foregoing entities is excluded as a Released Party due to application of the *proviso* in the definition of "Released Party" such entity also shall not be a Releasing Party."

[92]    *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) ("This is a release of third party claims against LGE. This cannot be accomplished without the affirmative agreement of the creditor affected. . . . Therefore, we conclude that this provision must be modified to permit

(3)     Exculpation

75.     Section 10.5 of the Plan provides for exculpation of the Exculpated Parties, which parties have fiduciary obligations to the Estates (the "**Exculpation**").  *See* Plan, Art. 10.5.[93]  The Exculpation is subject to a standard carve out for willful misconduct and gross negligence as determined by a Final Order.  *Id*.

76.     It is well established that exculpation is appropriate for fiduciaries of a bankruptcy estate, including the debtor, its directors, officers and professionals.[94]  The Exculpated Parties played critical roles in, and made significant contributions to, the Chapter 11 Cases, including formulating and prosecuting the Debtors' chapter 11 strategy, implementing the Monetization Process, and formulating and negotiating the Plan.  As such, they are entitled to protection from exposure to claims against them relating to their participation in the Chapter 11 Cases as provided for in Section 10.5 of the Plan and in accordance with section 1125(e) of the Bankruptcy Code.[95]  In addition, as discussed above, the Debtors and their Estates have certain indemnification obligations with respect to a number of the Exculpated Parties, and therefore the Exculpation will

---

the release only of Zenith's claims against LGE and the claims of any creditor who actually voted in favor of the Plan.").

[93]     The Plan defines "Exculpated Parties" as:  "(a) each Professional retained by the Debtors or the Independent Director after the Petition Date, (b) Joseph J. Farnan, Jr., Marc Kirschner, Michael Katzenstein, Robert Kost, and (c) FTI Consulting, Inc., Goldin & Associates, LLC, Teneo Holdings, LLC, and their respective "additional personnel" supporting the independent Chief Restructuring Officers and Chief Monetizaton Officer. For the avoidance of doubt, Exculpated Parties includes (y) Young Conaway Stargatt & Taylor, LLP and any consultants retained by Young Conaway Stargatt & Taylor, LLP to assist in their representation of the Debtors, White & Case LLP, Houlihan Lokey Capital Inc., KPMG LLP, Direct Fee Review, LLC, Robinson Gray PA, Fox Rothschild LLP, Morris, Nichols, Arsht & Tunnell, LLP, Reliable Companies, and Walkers (Cayman) LLP and (z) the members, partners, directors, officers, managers, and employees of each party referenced in (a)-(c) and (y) of this definition who provided services to the Debtors or Independent Director, solely in their capacities as such."  Plan, § 1.60.

[94]     *See In re PWS Holding Corp.*, 228 F.3d 224, 245–47 (3d Cir. 2000).

[95]     *See id.*;11 U.S.C. § 1125(e).

also provide a material benefit to the Debtors and their Estates.  Furthermore, interested parties received more than sufficient notice of the Exculpation, and had ample time to raise any objections thereto, and no such objections were filed.  As a result, the Exculpation is appropriate, consistent with applicable law and should be approved.

(4)    Plan Injunction

77.    Finally, to the extent provided for therein, Section 10.6 of the Plan enjoins (the "**Plan Injunction**") all Entities, on and after the Effective Date, from commencing or continuing any action, employment of process, or act to collect, offset (except as permitted by Section 10.8 of the Plan) or recover any claim, interest, or Cause of Action satisfied, released or exculpated under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, against, as applicable, each Asset Recovery Entity, Asset Recovery Manager, Litigation Trust, Litigation Trustee, Wind-Down Company (if any), Wind-Down Administrator, Released Parties or Exculpated Parties (collectively, the "**Plan Injunction Parties**").  The Plan Injunction is a necessary and critical component of the Plan, including the Debtor Release, the Third-Party Release and the Exculpation. Absent the Plan Injunction, Holders of Claims and Interests could seek recourse against the Plan Injunction Parties or their assets on account of any such claims, interest, or Causes of Action, thereby frustrating the intent and purposes of the Plan.  Without the matters covered and enforced by the Plan Injunction, the Debtors simply would not have been able to attain support for the implementation of the Plan.  In compliance with Bankruptcy Rule 3016, the Disclosure Statement and the Plan identify the acts to be enjoined by, and all entities that would be subject to, the Plan Injunction.  The Plan Injunction is therefore appropriate and should be approved.

> f.    Other Appropriate Provisions Not Inconsistent with the Applicable
> Provisions of the Bankruptcy Code

78.    Section 1123(b)(6) of the Bankruptcy Code is a "catchall" provision permitting a

chapter 11 plan to include any appropriate provision as long as such provision is not inconsistent

with applicable sections of the Bankruptcy Code.

> (1)    Modified Substantive Consolidation

79.    Section 6.4 of the Plan provides for the substantive consolidation, as of the

Effective Date, of (i) Zohar I Corp. with Zohar I Limited, (ii) Zohar II Corp. with Zohar II

Limited, and (iii) Zohar III. Corp. with Zohar III Limited for all purposes, including voting,

confirmation, and Distribution.  *See* Plan § 6.4 "Substantive consolidation . . . emanates from

equity.  It treats separate legal entities as if they were merged into a single survivor left with all

the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).  The result

is that claims of creditors against separate debtors morph into claims against the consolidated

survivor."[96]  Section 1123(a)(5)(C) of the Bankruptcy Code expressly contemplates that a plan

may merge or consolidate debtors as a means for the implementation of the plan.[97]

80.    Here, substantive consolidation is appropriate.   The Plan does not propose

substantive consolidation to deprive a specific creditor or group of creditors of their rights while

providing a windfall to other creditors.  Furthermore, a vote of the Voting Classes in favor of such

treatment is a basis for substantive consolidation in these Chapter 11 Cases.  The Voting Classes

---

[96]    *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) (internal quotation marks and citation omitted).

[97]    *See* 11 U.S.C. § 1123(a)(5)(E); *In re Stone & Webster, Inc.*, 286 B.R. 532, 542 (Bankr. D. Del. 2002) ("[S]ubstantive consolidation such as that proposed by the Plan is, by reason of § 1123(a)(5)(C), clearly an allowable provision in a Chapter 11 plan.").

have accepted the Plan. Moreover, no party has objected to the proposed substantive consolidation, and accordingly, the proposed substantive consolidation should be approved.

(2)     Retention of Jurisdiction

81.     Article XII of the Plan provides that the Bankruptcy Court shall have jurisdiction of all matters in connection with, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, with respect to the matters specifically identified in Article XII. The post-confirmation retention of jurisdiction by the Bankruptcy Court is permitted by the Bankruptcy Code.[98] The continuing jurisdiction of the Bankruptcy Court, as set forth in Article XII of the Plan, is appropriate and wholly consistent with applicable law.

**C.     Section 1129(a)(2): The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code**

82.     Section 1129(a)(2) of the Bankruptcy Code requires that the "proponent of the plan comply with the applicable provisions of [the Bankruptcy Code]."[99] Whereas section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the activities of the plan proponent.[100] In determining whether the plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.[101]

---

[98]     *See, e.g.*, *Gruen Mktg. Corp. v. Asia Commercial Co. (In re Jewelcor Inc.)*, 150 B.R. 580, 582 (Bankr. M.D. Pa. 1992) ("There is no doubt that the bankruptcy court's jurisdiction continues post confirmation to protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation.") (internal citations omitted).

[99]     *See* 11 U.S.C. § 1129(a)(2).

[100]    *See* 7 *Collier on Bankruptcy* ¶ 1129.02[2] (16th ed. 2016).

[101]    *See, e.g.*, *PWS Holding Corp.*, 228 F.3d at 248.

83.     The Debtors have complied with all disclosure and solicitation requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement.  The Disclosure Statement, the Plan, the Ballots, the notice of the Confirmation Hearing and all other related documents were distributed to parties in accordance with the Disclosure Statement Order.[102]

84.     As described in the Edelson Declaration, the Debtors extended the voting deadline with respect to the Holders of Zohar III A-1 Notes Claims as a result of the low response rate from such holders.[103]  In connection with such extension, the Debtors determined to supplement notice to the holders by utilizing the services of Mediant Inc. and Broadridge Financial Solutions, Inc. As a result of utilizing such providers, the Debtors had to supplement the record date for holders of such notes, but it appears from a review of the records obtained from the Indenture Trustee and the Mediant and Broadridge that there were no changes in position between the two record dates. Therefore, the Debtors believe that no party was adversely impacted by the revision to the record date and, in fact, no party rejected the Plan or object to it in the affected Class.  As a result of such supplemental notice, the Debtors ultimately received ballots from holders reflecting more than 90% of the outstanding Zohar III A-1 Notes.  The Debtors believe that appropriate cause exists to modify the record date under these circumsatances.[104]

85.     Accordingly, section 1129(a)(2) of the Bankruptcy Code has been satisfied.

---

[102]     *See* Edelson Decl. ¶¶ 6-8; Docket Nos. 3272, 3350].

[103]     *See* Edelson Decl. ¶ 8.

[104]     *See* Fed. R. Bankr. P. 3018 (providing that the Court may set a record date for the voting of a security other than the date a disclosure statement is approved "for cause").

**D.      Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law**

86.      Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."[105]  Good faith is generally interpreted to mean that there exists a reasonable likelihood that the "plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[106]  Good faith is to be viewed in light of the particular facts and circumstances of the case.[107]

87.      The Debtors have proposed the Plan in good faith.  Throughout the Chapter 11 Cases, when practicable, the Debtors have worked to build consensus among the various creditor constituencies and interested parties.  The Plan and the process leading up to its formulation is the result of arms' length and good faith negotiations among the Debtors and certain of their significant creditors, including the Controlling Party and the Controlling Class.[108]  Accordingly, section 1129(a)(3) of the Bankruptcy Code has been satisfied.

**E.      Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses Are Subject to Court Approval**

88.      Section 1129(a)(4) of the Bankruptcy Code requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," either be approved by the court as reasonable or subject to approval of the court as reasonable.[109]  Section 1129(a)(4) has been construed to require that all payments

---

[105]      11 U.S.C. § 1129(a)(3).

[106]      *PWS Holding Corp.,* 228 F.3d at 242 (internal quotation marks and citation omitted).

[107]      *See, e.g.*, *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998).

[108]      *See* Katzenstein. Decl. ¶¶ 9, 24.

[109]      *See* 11 U.S.C. § 1129(a)(4).

on account of professional fees and expenses from estate assets be subject to the Bankruptcy Court's review and approval.[110]

89.    In accordance with section 1129(a)(4) of the Bankruptcy Code, no payments will be made on account of Professional Claims by the Debtors or the Estates other than payments that are authorized by order of the Bankruptcy Court.  Pursuant to Section 3.3 of the Plan, all persons seeking allowance of Professional Claims under the Plan shall file, on or before the date that is thirty (30) calendar days after the Effective Date, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred.  *See* Plan, Art. 3.3.  The Plan also provides that the Bankruptcy Court shall retain jurisdiction to "hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331, and 503(b) of the Bankruptcy Code."  Plan, Art. XII.  Accordingly, section 1129(a)(4) of the Bankruptcy Code has been satisfied.

**F.    Section 1129(a)(5):  The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

90.    Section 1129(a)(5) of the Bankruptcy Code requires (a) that the proponent of a plan disclose the identity and affiliations of the proposed directors, officers or voting trustees of the debtors, an affiliate of a debtor participating in a joint plan with a debtor, or a successor to the debtor under the plan, (b) that the appointment or continuance of such individuals be consistent with the interests of creditors and equity security holders and with public policy, and (c) that there be disclosure of the identity and nature of the compensation of any insiders to be retained or employed by the reorganized debtors.[111]

---

[110]    *See, e.g.*, *Lisanti Foods, Inc. v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005); *Resorts Int'l, Inc.*, 145 B.R. 412, 476 (Bankr. D.N.J. 1990).

[111]    *See* 11 U.S.C. § 1129(a)(5).

91.     Section 6.5(f) of the Plan provides that any officer, director or manager of the Debtors shall be deemed to have resigned upon the Effective Date.

92.     As will be disclosed in the Plan Supplement, the Plan provides that, David Dunn will serve as Wind-Down Administrator, Asset Recovery Manager for Zohar II Recovery LLC and Zohar III Recovery LLC, and Litigation Trustee.  Mr. Dunn's appointment is acceptable to the Controlling Party and the Controlling Class.  Mr. Dunn is not an insider, and his proposed compensation will be disclosed in the Plan Supplement.

93.     John Greene, a Portfolio Manager of Bardin Hill will serve as the manager of New Zohar III LLC and MBIA will act as member-manager of New Zohar II, LLC.  Neither  party is an insider of the Debtors nor will they be compensated for their service.[112]

94.     Finally, FTI, a firm at which Mr. Katzenstein, the Debtors' CRO, is a senior managing director, may provide services to the Wind-Down Administrator or Post-Emergence Entities, and will be paid in a manner consistent with (or no more favorable than) the hourly rates charged to the estate.

95.     The Debtors submit that the appointment and employment of these parties is consistent with the interests of stakeholders and with public policy.  Accordingly, section 1129(a)(5) of the Bankruptcy Code has been satisfied.

**G.     Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission**

96.     Section 1129(a)(6) of the Bankruptcy Code requires that any governmental regulatory commission having jurisdiction over the rates charged by the debtor in the operation of its business approve any rate change provided for in a plan of reorganization.[113]  The Plan does not

---

[112]     The remaining Asset Recovery Entities will be member-managed.

[113]     *See* 11 U.S.C. § 1129(a)(6).

provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.    Therefore, section 1129(a)(6) is inapplicable.

> **H.    Section 1129(a)(7): The Plan Is in the Best Interest of All Creditors**

97.    Section 1129(a)(7) of the Bankruptcy Code requires that holders of impaired claims or interests which do not vote to accept the chapter 11 plan at issue "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date."[114]  Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests test."  This test focuses on individual creditors' claims rather than classes of claims.[115]

98.    As set forth more fully in Article XII.B.1 of the Disclosure Statement, after considering the effects that a chapter 7 liquidation would have on the Debtors' remaining assets and the funds available for distribution to Holders of Allowed Claims; and given (i) that the Debtors' assets, including any claims and causes of action under chapter 5 of the Bankruptcy Code and any commercial tort claims of Zohar II and Zohar III, are subject to the liens and superpriority claims, as applicable, of the DIP Lenders and the Indenture Trustee, and (ii) the multitude of unknowns associated with conversion of the Chapter 11 Cases to chapter 7, the Debtors believe that confirmation of the Plan will not provide the Holders of Allowed Claims in Impaired Classes (including the Deemed Rejecting Classes) less than such Holders would receive if the Chapter 11 Cases were converted to chapter 7.  Indeed, only the senior-most class of noteholders and the

---

[114]    *See* 11 U.S.C. § 1129(a)(7)(A).

[115]    *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

Indenture Trustee will receive a recovery in any scenario.  All of the noteholders in those classes that voted have affirmatively accepted the Plan, and no noteholder in the senior-most class nor the Indenture Trustee have objected to the Plan on any grounds.

99.     As a result, as attested to in the Katzenstein Declaration, the Debtors believe that the Plan is a superior alternative than converting the Chapter 11 Case to chapter 7 of the Bankruptcy Code (and any other theoretical alternative to the Plan), and will provide the Holders of Allowed Claims in Impaired Classes with no less recovery than such Holder would receive upon conversion of the Chapter 11 Case to chapter 7.  Accordingly, section 1129(a)(7) of the Bankruptcy Code has been satisfied.

**I.     Section 1129(a)(8): The Plan Complies with Section 1129(a)(8) of the Bankruptcy Code, with the Exception of Class 14 and the Deemed Rejecting Classes**

100.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accepts the plan, as follows: "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan."[116]

101.    As set forth above, the Unimpaired Classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have voted to accept the Plan.[117]  Thus, section 1129(a)(8) has been satisfied as to these Classes.

102.    As set forth above, and as reflected in the Voting Declaration, the Plan has been unanimously accepted by Holders of Claims in the Voting Classes, other than Class 14 where no

---

[116]    *See* 11 U.S.C. § 1129(a)(8).

[117]    Consistent with Paragraph 31 of the Disclosure Statement Order, the Patriarch Provisional Ballots have not been counted since Patriarch *did not* object to the Plan on the grounds that the Zohar I Patriarch Disputed CMA Fee Claim, the Zohar II Patriarch Disputed CMA Fee Claim and the Zohar III Patriarch Disputed CMA Fee Claim are not Unimpaired.

votes were cast.[118]  Thus, as to these Impaired Classes, section 1129(a)(8) likewise has been satisfied.

103.    Finally, Holders of Claims in the Deemed Rejecting Classes are not entitled to receive or retain any property under the Plan on account of their Claims and Interests and, therefore, are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.[119]

104.    The Plan nonetheless may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, as discussed below.

**J.    Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Administrative Claims, Professional Claims, Priority Tax Claims and Other Priority Claims**

105.    Section 1129(a)(9) of the Bankruptcy Code requires that entities holding allowed claims entitled to priority under section 507(a)(1)-(8) of the Bankruptcy Code receive specified cash payments under a plan.[120]  Here, as set forth in Articles III and IV thereof, the Plan provides the treatment required by section 1129(a)(9) of the Bankruptcy Code for Allowed Administrative Claims, Professional Claims, Priority Tax Claims and Other Priority Claims.  Accordingly, section 1129(a)(9) of the Bankruptcy Code has been satisfied.

106.    The exception, which can be implemented by agreement of the affected creditors,[121] is with respect to the deemed satisfaction of the DIP Claims and Adequate Protection Claims through the (i) implementation of the "Roll Option" under the DIP Credit Agreement and (ii)

---

[118]    *See* Edelson Decl. ¶ 10.

[119]    *See* 11 U.S.C. § 1126(g).

[120]    *See* 11 U.S.C. § 1129(a)(9).

[121]    *See* 1129(a)(9) ("Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim . . . .").

treatment provided to the holders of Classes 2, 3, 9, 10, 14 and 15 under the Plan, where such creditors, who benefit from the Adequate Protection Claims, will be receiving the collateral securing their claims through the Plan sale transactions.

### K.    Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan

107.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."[122]  As set forth above and in the Voting Declaration, each of the Voting Classes other than Class 14 voted to accept the Plan, determined without including any acceptance of the Plan by any insider.[123]  Therefore, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code with respect to each of the Debtors.

### L.    Section 1129(a)(11): The Plan Provides for the Liquidation of the Debtors

108.    Section 1129(a)(11) of the Bankruptcy Code requires that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[124]

109.    The Plan is a plan of liquidation, and appoints the Wind-Down Administrator to resolve and wind down the Debtors' affairs, as provided for in Section 6.5 of the Plan.  As set forth in the Katzenstein Declaration, the Debtors believe that the funding of the Escrow Accounts under the Plan will be sufficient to allow the Wind-Down Administrator to make the various payments required to be made under the Plan and wind-down the Debtors' affairs.[125]  The Asset Recovery

---

[122]    *See* 11 U.S.C. § 1129(a)(10).

[123]    *See* Edelson Decl. ¶ 10 & Exh. A.

[124]    *See* 11 U.S.C. § 1129(a)(11).

[125]    *See* Katzenstein Decl. ¶ 27.

Entities and Litigation Trust will also have initial funding or commitment for funding from the ultimate parties that will be the owners of the Post-Emergence Entities, as well as the ability to obtain further funding, such that they can carry out their intended purposes.[126]    Accordingly, section 1129(a)(11) of the Bankruptcy Code has been satisfied.

>        **M.        Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid**

110.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the Plan."[127]    In accordance with section 1129(a)(12), Section 13.5 of the Plan provides that all U.S. Trustee Fees for each Debtor shall be paid until the earlier of such time that a particular case is closed, dismissed or converted, and all U.S. Trustee Fees coming due after the Effective Date shall be paid by the applicable Litigation Trust.  As a result, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.  Sections 1129(a)(13)–(16) of the Bankruptcy Code are inapplicable to the Debtor and the Plan, as the Debtors:  (i) do not provide "retiree benefits," as defined in section 1114(a) of the Bankruptcy Code; (ii) have no domestic support obligations; (iii) are not individuals; and (iv) are not nonprofit corporations.[128]

>        **N.        The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code**

111.    Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a chapter 11 plan in circumstances where not all impaired classes of claims and equity interests vote to accept a chapter 11 plan. *See* 11 U.S.C. § 1129(b). This mechanism is often referred to as

---

[126]    *See id.*

[127]    *See* 11 U.S.C. § 1129(a)(12).

[128]    *See* 11 U.S.C. § 1129(a)(13)–(16).

"cram down." Under that section, the Bankruptcy Court may "cram down" a plan as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to impaired classes that did not vote to accept the plan.[129] Here, as noted above, Class 14 and the Deemed Rejecting Classes did not accept the Plan. Accordingly, the Debtors invoke section 1129(b) to "cram down" the Plan with respect to Class 14 and the Deemed Rejecting Classes.

### 1.    The Plan Does Not Discriminate Unfairly

112.    The unfair discrimination standard of section 1129(b) of the Bankruptcy Code requires that a chapter 11 plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly-situated classes.[130] Generally, a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment.[131] Accordingly, as between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or

---

[129]    *See, e.g.*, *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005); *In re Dura Auto. Sys., Inc.*, 379 B.R. 257, 271–72 (Bankr. D. Del. 2007); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (D. Del. 2003).

[130]    *See, e.g.*, *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994).

[131]    *See, e.g.*, *In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 175 (Bankr. D. Del. 2010) (noting that courts generally look to whether "[v]alid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan"); *In re Lernout*, 301 B.R. at 660 ("The hallmarks of the various [unfair discrimination] tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination").

interests,[132] or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[133]

113.    Here, the Plan does not "discriminate unfairly" with respect to Class 14 or the Deemed Rejecting Classes as there are no similarly situated Classes receiving more favorable treatment.  The Plan treatment is consistent with the various rights of parties under the Zohar Indentures, and the statutory mandate of section 510 of the Bankruptcy Code.[134]  Indeed, to comply with section 1129(a)(1) of the Bankruptcy Code, which requires that a chapter 11 plan comply with applicable provisions of the Bankruptcy Code, section 510 must be enforced.  Thus, the Plan does not "discriminate unfairly" with respect to any impaired Classes of Claims or Interests under the Plan that did not accept the Plan.

## 2.    The Plan Is Fair and Equitable

114.    No party has objected on the grounds that the Plan is not "fair and equitable."  For an impaired class of unsecured claims, "fair and equitable" means:

> With respect to a class of unsecured claims:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.[135]

---

[132]    *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part*, *rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[133]    *See, e.g.*, *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

[134]    *See* 11 U.S.C. § 510(a).

[135]    11 U.S.C. § 1129(b)(2)(B); *see also LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,'

And for an impaired class of equity interests, it means:

> <u>With respect to a class of interests</u>:  (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to the non-accepting class will not receive or retain any property under the plan on account of such junior interest any property.[136]

115.    In the instant case, the "fair and equitable" requirement is satisfied as to the Deemed Rejecting Classes because (a) no Claims or Interests junior to such Classes will receive or retain any property under the Plan on account of such junior Claims or Interests, and (b) no Holder of a Claim senior to such Classes will receive more than payment in full on account of its Claim.[137] Therefore, the Plan is "fair and equitable" with respect to the impaired Classes of Claims and Interests under the Plan that did not vote to accept the Plan.

116.    With respect to Class 14, The Indenture Trustee is the sole holder of the claim in Class 14.  The Indenture Trustee did not vote to accept or reject the Plan, nor has it objected to the Plan.  The Plan is fair and equitable because the Indenture Trustee will retain its liens on the Debtors' assets securing its claim and it will receive payment when those assets are liquidated up to the full, allowed amount of the Zohar I Indenture Trustee claim.[138]

**O.    The Plan Satisfies the Requirements of Section 1129(c), (d), and (e) of the Bankruptcy Code**

117.    The Plan is the only pending plan on file in the Chapter 11 Cases and, as such, section 1129(c) of the Bankruptcy Code is satisfied.  The principal purpose of the Plan is not the

---

§ 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[136]    11 U.S.C. § 1129(b)(2)(C).

[137]    *See* Katzenstein Decl. ¶ 7, 8.

[138]    *See* 11 U.S.C. § 1129(b)(2)(A)(i).

avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, and no party in interest has alleged otherwise.  In light of this, section 1129(d) of the Bankruptcy Code is inapplicable.  Finally, the Chapter 11 Case are not "small business cases" and, therefore, section 1129(e) of the Bankruptcy Code is inapplicable.

## **CONCLUSION**

118.    The Plan complies with and satisfies all applicable requirements of section 1129 of the Bankruptcy Code.  The remaining, unresolved parts of the Objection are without merit and should be overruled.  Therefore, the Debtors requests that the Bankruptcy Court (i) confirm the Plan and (ii) grant the Debtors such other and further relief as is just and proper.

Dated: June 15, 2022         YOUNG CONAWAY STARGATT & TAYLOR, LLP
         Wilmington, Delaware

*/s/ Ryan M. Bartley*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4421)
Ryan M. Bartley
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Emails:     jpatton@ycst.com
            rbrady@ycst.com
            mnestor@ycst.com
            jbarry@ycst.com
            rbartley@ycst.com

*Attorneys for the Debtors*